No. 23-10362

# In the
# United States Court of Appeals for the Fifth Circuit

———————

ALLIANCE FOR HIPPOCRATIC MEDICINE; AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS & GYNECOLOGISTS; AMERICAN COLLEGE OF PEDIATRICIANS;
CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; SHAUN JESTER, D.O.; REGINA
FROST-CLARK, M.D.; TYLER JOHNSON, D.O.; GEORGE DELGADO, M.D.,
*Plaintiffs-Appellees*,

v.

FOOD & DRUG ADMINISTRATION; ROBERT M. CALIFF, COMMISSIONER OF FOOD AND
DRUGS; JANET WOODCOCK, M.D., IN HER OFFICIAL CAPACITY AS PRINCIPAL DEPUTY
COMMISSIONER, U.S. FOOD AND DRUG ADMINISTRATION; PATRIZIA CAVAZZONI,
M.D., IN HER OFFICIAL CAPACITY AS DIRECTOR, CENTER FOR DRUG EVALUATION
AND RESEARCH, U.S. FOOD AND DRUG ADMINISTRATION; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, SECRETARY,
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *Defendants-Appellants*,

v.

DANCO LABORATORIES, L.L.C, *Intervenor – Appellant*.

———————

**AMICUS CURIAE BRIEF OF ADVANCING AMERICAN FREEDOM IN SUPPORT OF
PLAINTIFF-APPELLEES**

———————

J. MARC WHEAT
  *Counsel of Record*
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W., Suite 930
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

April 11, 2023

# Table of Contents

Table of Authorities ................................................................................... iii

Interest of Amicus Curiae ........................................................................... 1

Summary of the Argument........................................................................... 1

Argument..................................................................................................... 3

I.    The FDA Approved Mifepristone Without Regard for the Significant
      Safety Concerns Apparent at the Time of Approval ........................................ 5

II.   The FDA's Approval of Mifepristone for Use as an Abortifacient is Not
      Entitled to *Auer* Deference Because it Violated the Plain Language of
      Subpart H of CFR Part 314................................................................. 8

      A.   *Pregnancy is not a serious or life-threatening illness, and thus is not
           the type of condition Subpart H is intended to address, and so* Auer
           *deference should not apply* ........................................................ 10

      B.   *Chemical abortions did not provide a "meaningful therapeutic benefit
           over existing treatments" because chemical abortion was neither safer
           nor more effective than surgical abortions* ............................................ 11

      C.   *Approval of the Mifepristone/Misoprostol Regimen was not based on
           "adequate and well-controlled studies."* ................................................ 13

IV.   *Auer* Deference, Like *Chevron* Deference, Undermines the Constitutional
      Balance of Powers Between the Branches and should not be applied in this
      case........................................................................................... 15

      A.   *Both the constitutional balance of power between the branches and the
           express language of the Administrative Procedure Act require the
           judicial branch to interpret the law*......................................................... 16

      B.   *Both Chevron and Auer undermine the constitutional principle of
           separation of powers and allow executive agencies to abuse their
           authority to the detriment of freedom and the rule of law* ...................... 17

C. *The Supreme Court's major questions doctrine jurisprudence supports rejecting deference in this case* ................................................................. 19

V.  Chemical abortion continues to pose a significant safety risk for women, made worse by the lax reporting requirements approved by the FDA ........... 21

    A. *The danger to women posed by chemical abortions has not abated in the 23 years since its approval by the FDA* .............................................. 22

    B. *The FDA's slackened reporting standards put women at further risk and smack of politics rather than healthcare* ........................................... 23

Conclusion ............................................................................................................ 24

CERTIFICATE OF COMPLIANCE ..................................................................... 26

ECF CERTIFICATIONS ........................................................................................ 27

CERTIFICATE OF SERVICE ............................................................................... 28

# Table of Authorities

## Cases

*Alliance for Hippocratic Medicine v. FDA*,
  ---F. Supp. 3d ----, 2023 WL 2325871 (N.D. Tex. 2023) ......................................5

*Auer v. Robbins*,
  519 U.S. 452 (1997)........................................................................ *passim*

*Buffington v. McDonough*,
  143 S. Ct. 14 (2022)..................................................................... 17, 18

*Chevron v. NRDC*,
  467 U.S. 837 (1984)....................................................................... *passim*

*Dobbs v. Jackson Women's Health Organization*,
  142 S. Ct. 2228 (2022)..............................................................................5

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)................................................................................20

*Gonzales v. Oregon*,
  546 U.S. 243 (2006)....................................................................... 19, 20

*Johnson v. BOKF Nat'l Ass'n*,
  15 F.4th 356 (5th Cir. 2021) .............................................................3, 9

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019).........................................................8-10, 17-19

*Marbury v. Madison*,
  5 U.S. 137 (1803)...................................................................................16

*National Cable & Telecommunications Assn. v. Brand X Internet Services*,
  545 U.S. 967 (2005)...............................................................................19

*NFIB v. OSHA*,
    142 S. Ct. 661 (2022)........................................................................................ 19, 20

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)...............................................................................................16

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
    505 U.S. 833 (1992)...............................................................................................5

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)..........................................................................................19

## Constitution and Statutes

Mass. Const. pt. 1, art. XXX.................................................................................15

5 U.S.C. § 553.......................................................................................................16

5 U.S.C. § 706.......................................................................................................17

## Regulations

21 CFR § 314.126(e)..............................................................................................13

21 CFR § 314.500 ...........................................................................................6, 9-11

21 CFR § 314.510 ...................................................................................................9

21 C.F.R. § 314.520 ..............................................................................................23

## Other Authorities

Food and Drug Administration, Approved Labeling Text for Mifeprex (Sept. 28,
    2000),
    https://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.htm........ 23

Food and Drug Administration, Risk Evaluation and Mitigation Strategy (March 2016), https://www.fda.gov/media/164649/download ........................................ 24

Food and Drug Administration, Risk Evaluation and Management Strategy (May 2021), https://www.fda.gov/media/164651/download .............................. 24

Larkin & Slattery, The World After *Seminole Rock* and *Auer*, 42 Harv. J. L. & Pub. Pol'y 625 (2019) ......................................................................................... 18

Maarit Niinimaki et al., *Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study*, BJM, April 20, 2011 ........................................................................................... 22

Maarit Niinimaki et al., *Immediate complications after medical compared with surgical termination of pregnancy*, 114 Obstetrics & Gynecology 795 (2009) .............................................................................................................. 22, 23

*RU-486: Demonstrating a Low Standard for Women's Health? Hearing before the House Subcommittee on Criminal Justice, Drug Policy and Human Res., Committee on Government Reform*, 109th Cong. (May 17, 2006), available at https://archive.org/details/gov.gpo.fdsys.CHRG-109hhrg31397 .......................... 3

James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions*, 1999-2015, Health Serv. Rsch. & Managerial Epidemiology, Nov. 9, 2021 .............. 28

*The FDA and RU-486: Lowering the Standard for Women's Health*, House of Representatives Government Reform Committee; Subcommittee on Criminal Justice, Drug Policy, and Human Resources (Oct. 2006), available at https://www.liveaction.org/news/wp-content/uploads/2020/08/SouderStaffReportonRU-486.pdf ................................. 3

"The Population Council is a nonprofit founded in 1952 by John D. Rockefeller III to address supposed world overpopulation." Population Council, https://www.influencewatch.org/non-profit/population-council/ ........................ 10

## Interest of Amicus Curiae

Movant, Advancing American Freedom (AAF) is a nonprofit organization that promotes and defends policies that elevate traditional American values, including the uniquely American idea that all men are created equal and endowed by their Creator with unalienable rights to life, liberty, and the pursuit of happiness. This case is important to AAF because it presents an opportunity for this court to demonstrate that the FDA does not merit judicial deference under *Chevron v. NRDC*, 467 U.S. 837 (1984) nor under *Auer v. Robbins*, 519 U.S. 452 (1997), two lines of cases that for too long have permitted the confusion of powers of the several branches of the Federal government. The genius of the Constitution is its structure, dividing power against itself into three coequal branches and thereby protecting the liberties of its citizens from usurpers of delegated and limited governmental power.[1]

## Summary of the Argument

In October of 2006, the United States House of Representatives Government Reform Committee's Subcommittee on Criminal Justice, Drug Policy, and Human Resources released a report outlining the significant problems with the FDA's approval in 2000 of the drugs mifepristone and misoprostol for use as a chemical

---

[1] All parties received timely notice and have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part. No person other than *Amicus curiae* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

abortifacient. The FDA approved this regimen of drugs under regulatory language designed to allow the agency to approve drugs that would provide meaningful therapeutic benefits over existing treatments when used to fight serious and life-threatening illnesses. Because abortion is not a treatment, pregnancy is not an illness and is not, itself, serious or life-threatening, and because it was more dangerous and less effective than the alternative, surgical abortion, the FDA abused its own regulation in approving the chemical abortion drugs.

When reviewing agency action, whether justified on the basis of statutory or regulatory authority, this Court should not defer to agency interpretations. Rather, courts should exercise independent judgment as to the legality of the agency action. When courts defer, they allow agencies to expand their power, undermining the separation of powers and the freedoms that constitutional principle exists to protect. The power to legislate belongs to Congress and the power to interpret belongs to the courts. Agencies, as members of the executive branch, may only apply existing law. While the Supreme Court has held that that includes creating regulations through delegated congressional authority, it does not include the ability to change the meaning of those regulations outside the established regulatory process.

Chemical abortions were and are a more dangerous and less effective form of abortion. Further, states have a legitimate interest in protecting the health and safety of the mother as well as the life of the unborn. The FDA's approval of and the Biden

administration's effort to expand access to chemical abortion both undermine states' efforts to protect their legitimate interests and overstep the FDA's power. The health and safety of the woman are not served by chemical abortions which can cause significant harm to her. The FDA's increasingly lax reporting and use requirements for the drugs make it almost impossible to determine the true scope of the danger posed by chemical abortion drugs. For all of these reasons, this Court should uphold the stay issued by the district court in this case.

## Argument

In October of 2006, the United States House of Representatives Government Reform Committee's Subcommittee on Criminal Justice, Drug Policy, and Human Resources conducted a hearing entitled *RU-486: Demonstrating a Low Standard for Women's Health?* [2] ("Congressional Hearing"), and subcommittee staff issued a subsequent report entitled *The FDA and RU-486: Lowering the Standard for Women's Health*[3] ("Congressional Report"). This report addressed the significant

---

[2] *RU-486: Demonstrating a Low Standard for Women's Health? Hearing before the House Subcommittee on Criminal Justice, Drug Policy and Human Res., Committee on Government Reform*, 109th Cong. (May 17, 2006), available at https://archive.org/details/gov.gpo.fdsys.CHRG-109hhrg31397.

[3] *The FDA and RU-486: Lowering the Standard for Women's Health*, House of Representatives Government Reform Committee; Subcommittee on Criminal Justice, Drug Policy, and Human Resources (Oct. 2006), available at https://www.liveaction.org/news/wp-content/uploads/2020/08/SouderStaffReportonRU-486.pdf.

flaws in the FDA's approval of RU-486 ("mifepristone") for use in conjunction with misoprostol as a chemical abortifacient. The report details the significant safety concerns that existed at the time of approval and the FDA's abuse of the Subpart H new drug approval process despite those concerns.

As Staff Director and Senior Counsel of the Subcommittee on Criminal Justice, Drug Policy, and Human Resources from 2003-2007, I supervised the investigatory team led by Michelle Powers Gress identifying the problems detailed in our report. I write today on behalf of Advancing American Freedom in support of the Alliance for Hippocratic Medicine, the American Association of Pro-Life Obstetricians and Gynecologists, the American College of Pediatricians, the Christian Medical and Dental Associations, and the physicians suing on behalf of themselves and their patients, Dr. Shaun Jester, Dr. Regina Frost-Clark, Dr. Tyler Johnson, and Dr. George Delgado, because the problems apparent in 2006 at the time of the report remain today, even as the FDA decreases the protective protocols associated with chemical abortions.

Now, the plaintiffs are challenging the FDAs' the approval of that drug as the Biden Administration and others seeks to expand access to dangerous chemical abortions, particularly in states that have exercised their legislative authority in light of their legitimate interest in the safety of both mothers and their preborn children

4

by restricting legal abortions.[4] The district court's stay of the FDA's approval of the mifepristone/misoprostol regimen must be upheld because of the clear legal deficiencies of the drug's approval process and because the agency's action in this case is not entitled to deference. Further, the current dangers of chemical abortions provide a strong justification as a matter of policy, to halt the distribution and use of the chemical abortion drugs.

The FDA's decades-long avoidance of review must end. The "FDA [has] stonewalled judicial review," *Alliance for Hippocratic Medicine v. FDA*, ---F. Supp. 3d ----, 2023 WL 2325871, 1 (N.D. Tex. 2023), because it knows that approving mifepristone for abortifacient use violated its own rules. If the government was confident in its determination, especially in a legal context so deferential to those decisions, it would have allowed judicial review to proceed long ago. Too many women have been harmed and too many lives have been destroyed by this illegally approved drug. This Court should uphold the stay issued by the district court.

## I.    The FDA Approved Mifepristone Without Regard for the Significant Safety Concerns Apparent at the Time of Approval.

---

[4] The states' legitimate interest in protecting the life of the unborn and the safety and health of the mother are recognized by the Court today and were recognized at the time of the FDA's approval. *See Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2284 (2022); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992).

As will be discussed in greater detail below, the FDA regulation under which it approved the mifepristone/misoprostol regimen for use as an abortifacient requires that new drugs approved through that process provide a "meaningful therapeutic benefit over existing treatments." 21 CFR § 314.500. There was ample evidence prior to the FDA's approval of mifepristone in 2000 that chemical abortions provided no such benefit over the existing procedure; surgical abortions.

In 1981, human trials of mifepristone took place in Geneva, Switzerland after seventeen months of animal research. Congressional Report at 10. Even those initial human trials indicated the potential dangers of the drug when used as an abortifacient. Those trials resulted in two unsuccessful abortions out of eleven attempts with two of the eleven women requiring further medical intervention including, in one case, emergency surgery and a blood transfusion. Congressional Report at 10. The next round of trials, conducted in several different countries, produced widely varied success rates from as low as fifty-four percent (54%) to as high as ninety percent (90%). Congressional Report at 10-11. That success rate increased to ninety-four percent (94%) in one trial when doctors in Sweden began to administer misoprostol in combination with mifepristone, though it remained

significantly lower than the ninety-nine percent (99%) success rate of surgical abortion at the time.[5] *Id*.

After mifepristone was approved in France, a committee of experts reviewed data on 30,000 women who had used mifepristone as an abortifacient and found numerous significant risks associated with use of the drug. Congressional Report at 11-12. Further, the World Health Organization released a study in 1991 in which just under three percent (3%) of women with completed abortions and almost thirty percent (30%) of those with incomplete abortions "had to be given 'antibiotic therapy to prevent or cure suspected genitourinary infection' during the six-week follow-up period." Congressional Report at 12, n. 63.

Writing before the drug's approval, the FDA's medical reviewer, found that chemical abortions were of limited value given the short time period during which they were available, the need for three visits to a medical facility during the process, the need for a follow-up visit to ensure that surgical intervention is not required, and because of specific problems with chemical abortion in comparison to surgical abortion. Congressional Report at 29-30. In particular, the reviewer noted the higher failure rates of chemical abortion, the greater frequency of symptoms including

---

[5] Success was defined as fetal death without the need for further medical intervention.

7

cramping, nausea, and vomiting, and the increased blood loss associated with chemical as opposed to surgical abortions. Congressional Report at 29-30.

Further, the FDA Medical Officer's review found that for women with pregnancies up to seven weeks, the original gestational limit approved by the FDA, the failure rate was almost eight percent (8%), with the percentage increasing at longer gestational periods, up to twenty-three percent (23%) for pregnancies at 57-63 days. Congressional Report at 31.

Because these failure rates were higher and the symptoms associated more frequent, and because chemical abortion provided no other significant benefits over the alternative, surgical abortion, improved efficacy and safety could not have justified the FDA's approval of mifepristone for abortifacient use under its own regulation.

## II.  The FDA's Approval of Mifepristone for Use as an Abortifacient is Not Entitled to *Auer* Deference Because it Violated the Plain Language of Subpart H of CFR Part 314.

Federal executive agencies derive whatever power they have from Congressional authority. They receive that authority from Congress by legislation empowering them to exercise legal control over a particular policy domain. When an agency's interpretation of that legislation is challenged in court, courts will often accept the agency's interpretation if the language of the statute is ambiguous, and

the agency's interpretation of that statute is reasonable. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

In *Auer v. Robbins*, 519 U.S. 452 (1997), the Supreme Court established a similar doctrine that applies to an agency's interpretation of its own regulations. When an agency interprets one of its own regulations, and that regulation is genuinely ambiguous, the agency's interpretation may be entitled to deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). This judicial approach, called *Auer* deference, has not been overturned, but its future is uncertain. *Id*. at 2425 (Gorsuch, J. concurring) (Justice Gorsuch, joined by Justices Thomas, Alito, and Kavanaugh in relevant parts, arguing that it is time to overrule *Auer*.) Regardless, as explained below, it does not apply here because the language of Subpart H is clear and was flagrantly violated by the FDA's approval of mifepristone as an abortifacient. .

Subpart H, an FDA promulgated regulation titled *Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses*, allows the FDA to approve new drugs to treat "serious or life-threatening illnesses" and "that provide meaningful therapeutic benefit to patients over existing treatments." 21 CFR § 314.500. Further, the FDA may approve the new drug only "on the basis of adequate and well-controlled clinical trials." 21 CFR § 314.510. Thus, its purpose is to allow for expedited approval of new drugs when doing so would allow for improved treatment of people whose illnesses are serious and who need better treatment options. The

9

FDA, in approving the mifepristone/misoprostol regimen for chemical abortions, acted outside of this clear purpose and violated the plain requirements of the regulation's text.

*Auer* deference only applies "to an agency's reasonable interpretation of its own regulations when the regulation's text is 'genuinely ambiguous,' and the 'character and context of the agency's interpretation entitles it to controlling weight.'" *Johnson v. BOKF Nat'l Ass'n*, 15 F.4th 356, 362 (5th Cir. 2021) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414, 2416 (2019)). Genuine ambiguity is a requirement the Court takes seriously. "When we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). In this case, the language of Subpart H is unambiguous, and the FDA's interpretation of that language is just as clearly contrary to that language in several ways.

A. *Pregnancy is not a serious or life-threatening illness, and thus is not the type of condition Subpart H is intended to address, and so* Auer *deference should not apply.*

Subpart H exists to allow for the approval of new drugs for the treatment of "serious or life-threatening illnesses." 21 CFR § 314.500. Most importantly, pregnancy is not an illness. As noted by the Subcommittee report, the FDA's letter

10

to the Population Council,[6] mifepristone's sponsor for FDA approval in the United States, referred to "the termination of an unwanted pregnancy" as the "serious condition" to be addressed by the approval of mifepristone. (Congressional Report 19, n. 99). However, the language of the regulation does not provide for approval of drugs for serious conditions but rather for illnesses. Although pregnancy may occasionally result in serious or life-threatening conditions, pregnancy itself is neither serious nor life-threatening. Because *Auer* deference only applies to ambiguous regulatory language, it is inapplicable here because the language of Subpart H is clear as is the FDA's violation of the requirements of that language.

    *B.  Chemical abortions did not provide a "meaningful therapeutic benefit over existing treatments" because chemical abortion was neither safer nor more effective than surgical abortions.*

Subpart H also requires that new drugs approved through its process "provide meaningful therapeutic benefit to patients over existing treatments." 21 CFR § 314.500. The regulation gives as examples of such therapeutic benefits the "ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy." *Id*. Even assuming that abortion constitutes a treatment with therapeutic benefits, it was clear from the evidence at the time of

---

[6] "The Population Council is a nonprofit founded in 1952 by John D. Rockefeller III to address supposed world overpopulation." Population Council, https://www.influencewatch.org/non-profit/population-council/ (last visited Feb. 9, 2023).

approval that chemical abortion was both more dangerous for the woman and less effective than surgical abortion.

The report quotes the FDA's Approval Memo to the Population Council as describing the supposed therapeutic benefit of chemical over surgical abortions as being the "avoidance of a surgical procedure." Congressional Report at 21, n. 106 (internal quotation marks omitted). The report identifies four problems with this idea.

First, the report notes that mifepristone was not approved only for use for women intolerant of surgical abortions, as would be expected for a less safe, less effective form of abortion. Congressional Report at 22. The report says, "[the] FDA baldly asserted that there was a clinical benefit for chemical abortion and made no effort to produce statistical evidence of an actual benefit." Congressional Report at 22.

Second, the report points to the fact that a substantial portion of women using mifepristone and misoprostol to induce an abortion ultimately required surgical intervention thus casting doubt on the supposed benefit of chemical abortions because, "women must be able to tolerate the surgical procedure" if they are going to attempt a chemical abortion. Congressional Report at 22. As the report notes, the FDA must show that there is, in fact, some clinical benefit to an approved drug, which they did not do in this case. *Id*.

12

Third, the report notes that the fact that some patients may prefer one form of treatment over another is not itself a clinical benefit.

Finally, the report notes that the FDA medical officer, prior to approval of mifepristone, made comments to the effect that bleeding was a significantly more prevalent and serious issue in multiple studies looking at chemical as compared to surgical abortions. "Given these comments," the report says, "it is impossible to conclude that [mifepristone] medical abortions provide a meaningful therapeutic benefit over surgical abortion." Congressional Report at 23.

## C. *Approval of the Mifepristone/Misoprostol Regimen was not based on "adequate and well-controlled studies."*

Subpart H also requires that the FDA's approval of a drug be "on the basis of well-controlled clinical trials." Further, 21 CFR 314.126(e) says, "Uncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness." In this case, the data relied on by the FDA was not concurrently controlled. *See* Congressional Report at 15-19. As the Congressional Report notes, the trials the FDA relied on were not concurrently controlled against either a placebo or first trimester surgical abortion. Congressional Report at 14. As part of the investigation for the report, the subcommittee held a hearing in which the FDA Deputy Commissioner for Operations, Dr. Janet

Woodcock, said that a historical control was used in assessing the trials of mifepristone. Congressional Hearing at 92. In other words, the trials were controlled against the existing data on pregnancy, miscarriage, and abortion.

The Congressional Report points out three problems with the FDA's assertion of non-concurrent control as a basis for the approval of mifepristone. First, the "FDA's assertion that the French and U.S. trials were historically controlled appears to be a post hoc assertion." Congressional Report at 17. The study that reported on the American trials did not mention a control group and a statement from an FDA statistician who reviewed French trials suggested a lack of concurrent control groups in those trials as well. Congressional Report at 17.

Second, the American studies of mifepristone excluded women with numerous medical or other issues but the FDA acknowledged that the historical data, the control group, was data from the general population and thus did not exclude women with those health problems. Congressional Report at 18. As a result, the apparent safety of mifepristone relative to surgical abortion was likely inflated because the data on chemical abortions was gathered from relatively healthy women, while the data on surgical abortions included women with health problems who would have been excluded from the studies of chemical abortion. Regardless, because the trial and control groups were not matched in terms of their health background, they are not a "meaningful control." Congressional Report at 18. As the report concludes, "If

14

it was not possible to match the populations with the historical data set, then a concurrent control should have been used." Congressional Report at 18.

Finally, the report notes that using historical data rather than a concurrent control group results in "defining the clinical endpoint too restrictively." Congressional Report at 18. In other words, surgical abortions and miscarriage do not, "produce only simple zero or one outcomes." Congressional Report at 18. As the report notes, "A control should have been used in the [mifepristone] trial that compared different methods of producing the experimental outcome – first-trimester pregnancy termination – while assessing each method's ability to manage highly predictable, regular complications of medical abortion (i.e., hemorrhage, incomplete abortion)." Congressional Report at 18.

In sum, the FDA only claimed that its studies were controlled after approval, the American studies of mifepristone excluded women with numerous medical issues potentially inflating the appearance of safety of chemical as opposed to surgical abortion, and the historical data used as a non-concurrent control provided, at best, a low resolution picture of the safety and effectiveness of chemical as opposed to surgical abortions. Thus, because the FDA violated the clear language of Subpart H, it is not entitled to *Auer* deference and the district court's stay of the FDA's approval of mifepristone for abortifacient use should be upheld.

15

**IV.** *Auer* **Deference, Like** *Chevron* **Deference, Undermines the Constitutional Balance of Powers Between the Branches and should not be applied in this case.**

The 1780 Massachusetts state constitution, drafted by John Adams, prohibited each of its government's three branches from exercising the powers of the other two so that, "it may be a government of laws and not of men." Mass. Const. pt. 1, art. XXX. When Congress delegates its authority to executive agencies, the risk increases that we will have a government of men, namely bureaucrats, and not of laws. This case is a perfect example of agency officials flagrantly disregarding the rule of law to advance their political goals.

A.    *Both the constitutional balance of power between the branches and the express language of the Administrative Procedure Act require the judicial branch to interpret the law.*

Both *Chevron* and *Auer* deference require courts to yield to agency interpretations of law. When the courts defer in this way, they are abandoning their constitutional responsibility. As Chief Justice John Marshall recognized, "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Similarly, Justice Thomas has noted, "Those who ratified the Constitution knew that legal texts would often contain ambiguities. . .The judicial power was understood to include the power to resolve these ambiguities over time. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 119 (2015) (Thomas, J. concurring) (citations omitted). When executive agencies'

16

interpretations of statutes or regulations are granted deference, they are exercising the judicial power of final interpretation. Thus, both *Chevron* and *Auer*, in effect, allow agencies to supersede both Article III of the Constitution and the constitutional principle of separation of powers.

The Administrative Procedure Act (APA) is a statute enacted by Congress to govern administrative agencies. For example, it requires that in most cases, for an agency to promulgate a new regulation, it must issue public notice of its intent to regulate and must allow for and respond to public comments on the proposed regulation. 5 U.S.C. § 553. If an agency fails to comply with those requirements, the courts on review must strike down the regulation. As Justice Gorsuch notes, "some have even described it as a kind of constitution for our 'administrative state.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2432 (2019) (Gorsuch, J. concurring). The APA echoes Chief Justice Marshall's sentiment above. It requires "reviewing courts to 'decide all relevant questions of law' and 'set aside agency action ... found to be ... not in accordance with law.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2432 (2019) (Gorsuch, J. concurring) (quoting 5 U.S.C. § 706). Thus, agencies and reviewing courts are bound by the requirements of the APA. When courts defer to agency interpretation, whether of a statute under *Chevron* or a regulation under *Auer*, they supply executive agencies with greater authority than intended by Congress and allowed by the Constitution.

17

**B. Both Chevron and Auer undermine the constitutional principle of separation of powers and allow executive agencies to abuse their authority to the detriment of freedom and the rule of law.**

Courts should consider *Auer* and *Chevron* together because of the doctrines' significant similarities both in their structure and in their shortcomings. The fundamental problems of *Chevron*, its deference to agencies to the detriment of those challenging an agency interpretation of statutory law, is well illustrated by *Buffington v. McDonough*, 143 S. Ct. 14 (2022). There, the Court denied the petition for certiorari of a veteran who had certain retroactive disability benefits payments withheld because of a Department of Veterans Affairs statutory interpretation. *Buffington*, 143 S. Ct. at 14 (Gorsuch, J. dissenting). There, the lower "courts invoked '*Chevron* deference,' bypassed any independent review of the relevant statutes, and allowed the agency to continue to employ its rules to the detriment of veterans." *Id*. Although not every case that invokes *Chevron* deference is so dramatic, every court that does so by necessity violates both the APA and Article III, as well as the constitutional principle of separation of powers.

*Auer* deference, similarly, "creates a 'systematic judicial bias in favor of the federal government, the most powerful of parties, and against everyone else.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2425 (2019) (Gorsuch, J. concurring) (quoting Larkin & Slattery, The World After *Seminole Rock* and *Auer*, 42 Harv. J. L. & Pub. Pol'y 625, 641 (2019)). Justice Gorsuch argued in *Kisor* that the majority was "keeping *Auer*

18

on life support" and that it emerged from the majority's whittling, "maimed and enfeebled—in truth, zombified." *Id*. Even in its weakened state, *Auer* can cause problems. One of the most significant is the ability it gives agencies to overturn judicial precedent and change federal law without following the notice and comment requirements of the APA. Depending on the type of decision, a court's holding in a case creates precedent which can be overturned or made inapplicable by a future case, congressional action, changes in regulation pursuant to the requirements of the APA, or, in some cases, a constitutional amendment. However, under *Auer*, if a court defers to an agency interpretation and the agency later changes its interpretation of that regulation without going through the notice and comment process, and a court then defers to that new interpretation, the agency has effectively been allowed to change the law outside of the congressionally established regulatory process. *See Kisor*, 139 S. Ct. at 2433 (Gorsuch, J., concurring) (citing *National Cable & Telecommunications Assn. v. Brand X Internet Services*, 545 U.S. 967 (2005)).

In this case, and as discussed above, the language of Subpart H is clear. To the extent that the FDA relies on *Auer* to justify its interpretation here, it demonstrates the danger of that doctrine. If this Court defers to the FDA's interpretation of Subpart H, it will signal to agencies that their powers are not limited by the language of their regulations or statutes but only by the imagination and creativity of their bureaucrats. The FDA's willingness to ignore the significant safety concerns of mifepristone at

the time it approved it for use as an abortifacient, as well as the agency's willingness to flout the clear text of its own regulation, is exactly the type of agency abuse that demands independent judicial review.

### C. The Supreme Court's major questions doctrine jurisprudence supports rejecting deference in this case.

The Supreme Court has applied the major questions doctrine in cases of potential *Chevron* deference "when an agency claims the power to resolve a matter of great 'political significance' or end an 'earnest and profound debate across the country.'" *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2620 (2022) (quoting *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022) (internal quotation marks omitted); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006)). "The major questions doctrine seeks to protect against 'unintentional, oblique, or otherwise unlikely' intrusions," on the interest of "self-government, equality, fair notice, federalism, and the separation of powers." *Id*. (quoting *NFIB v. OSHA*, 142 S. Ct. at 669).

In the same year that the FDA approved the mifepristone/misoprostol regimen, the Supreme Court issued one of its most important major questions doctrine decisions, striking down another instance of overreach by the same FDA. In *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), the Court denied the FDA's claimed authority to regulate or even ban tobacco products based on Congress's grant of authority to regulate "drugs" and "devices." *West Virginia*, 142 S. Ct. at 2608 (citing *Brown & Williamson Tobacco Corp.*, 529 U.S. at 126-27). The

20

Court, "rejected that 'expansive construction of the statute,' concluding that 'Congress could not have intended to delegate' such a sweeping and consequential authority 'in so cryptic a fashion.'" *Id.* (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 160). The FDA was apparently busy at the start of the new millennium testing the limits of its power.

The same rationale applies here, where the FDA, rather than reaching beyond its Congressionally approved power, tried to reach beyond the limits it had established for itself through the regulatory process. Abortion is today, and was in 2000, one of the most hotly contested issues in American life. Chemical abortion is no less controversial. Federal executive agencies are not empowered to end such debates unilaterally. Here, the FDA sought to expand abortion access by its approval of chemical abortion, disregarding both the significant safety issues of the drug and the political process that could have resolved this issue.

*Chevron* and *Auer* allow federal agencies and their bureaucrats to exercise expanded government power. Through its major questions doctrine jurisprudence, the Supreme Court has sought to hem in such excesses to protect the separation of powers and the freedoms that constitutional principle was designed to protect. This case is a striking example of the need for such judicial protection. The district court was thus correct to issue a stay of mifepristone's approval in this case and this Court should uphold that stay.

**V.    Chemical abortion continues to pose a significant safety risk for women, made worse by the lax reporting requirements approved by the FDA.**

As discussed above, the FDA knew about the significant, negative health consequences of the mifepristone/misoprostol regimen before approving it for abortifacient use in the United States. Despite the continued danger of chemical abortion since its approval, the FDA has weakened the reporting requirements, casting doubt on its claims about the safety of the mifepristone/misoprostol regimen.

A.   *The danger to women posed by chemical abortions has not abated in the 23 years since its approval by the FDA.*

By 2006, the dangers of chemical abortion had become even more evident than they were when the FDA approved the drugs for that use in 2000. In her testimony in the Congressional Hearing in May of 2006, Dr. Donna Harrison said,

> In my experience as an ob-gyn, the volume of blood loss seen in the life-threatening cases is comparable to that observed in major surgical trauma cases like motor-vehicle accidents. This volume of blood loss is rarely seen in early surgical abortion without perforation of the uterus, and it is rarely seen in spontaneous abortion.

Congressional Hearing at 142. She added that no risk factors predicted such hemorrhage, and that it was life threatening for women without access to immediate medical care. *Id*. Such dangers have been ignored by the FDA in its effort to expand abortion access over the past 23 years.

The information that has become available since the Congressional Report is no more encouraging. Several studies have shown the medical risk associated with the use of chemical abortion. Ten percent (10%) of women, after use of chemical abortion, will need follow up medical treatment for failed or incomplete abortion, Maarit Niinimaki et al., *Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study*, BJM, April 20, 2011, at 4, and twenty percent (20%) of women who use mifepristone and misoprostol to induce abortions will have an adverse event, including hemorrhaging and infections. Maarit Niinimaki et al., *Immediate complications after medical compared with surgical termination of pregnancy*, 114 Obstetrics & Gynecology 795 (2009). This rate of adverse events is four times greater than the adverse event rate of surgical abortion. *Id.* Further, five percent (5%) of women who undergo a chemical abortion will need to visit the emergency room within thirty days; a rate fifty percent (50%) higher than those who undergo surgical abortions. James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions*, 1999-2015, Health Serv. Rsch. & Managerial Epidemiology, Nov. 9, 2021.

### B. The FDA's slackened reporting standards put women at further risk and smack of politics rather than healthcare.

Today, adverse events are likely to be widely underreported because the FDA only requires prescribers to report deaths, not other less-than-lethal adverse events

associated with the drugs. In 2000, the FDA approved the mifepristone/misoprostol regimen with certain restrictions and requirements to assure safe use, consistent with Subpart H. *See* 21 C.F.R. § 314.520. Although compliance with those restrictions was insufficient to render use of the regimen safe, they were much more stringent than the requirements imposed today. Among those requirements in 2000, prescribers were obligated to report non-fatal but serious adverse events to the drug manufacturer. Food and Drug Administration, Approved Labeling Text for Mifeprex (Sept. 28, 2000), https://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.htm.

Shockingly, beginning in 2016, prescribers need only report deaths associated with the drug, not other serious adverse events. Food and Drug Administration, Risk Evaluation and Mitigation Strategy (March 2016), https://www.fda.gov/media/164649/download. Food and Drug Administration, Risk Evaluation and Management Strategy (May 2021), https://www.fda.gov/media/164651/download. Such lax reporting requirements obscure the true dangers of chemical abortion in the United States today.

The data relied upon by the FDA when it approved the mifepristone/misoprostol regimen in 2000 was insufficient to support its finding that chemical abortion was a safe alternative to surgical abortion. In the ensuing two decades, the paucity of information collected by the FDA on the safety of chemical

24

abortion continues to show significant dangers for women using these drugs. Despite this data suggesting significant danger, the FDA continues to slacken requirements both for use of the drugs and for reporting the dangerous consequences of their use. Such reckless disregard of data collection on women's well-being smacks of political maneuvering more than medical science.

## Conclusion

For the forgoing reasons, we urge the Court to uphold the district court's order staying the FDA's unlawful approval of the mifepristone/misoprostol regimen as an abortifacient in both its name-brand and generic forms and to grant all of the plaintiff's other prayers for relief.

Respectfully submitted,

/s/ J. Marc Wheat
J. Marc Wheat
General Counsel
Advancing American Freedom, Inc.
801 Pennsylvania Avenue, N.W., Suite 930
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,629 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font in text and Times New Roman 14-point font in footnotes produced by Microsoft Word software.

/s/ J. Marc Wheat
J. Marc Wheat

## ECF CERTIFICATIONS

I certify that the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13, the electronic submission is an exact copy of the paper submission, and the document has been scanned for viruses and is free of viruses.

/s/ J. Marc Wheat
J. Marc Wheat

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2023, an electronic copy of the foregoing brief was filed with the Clerk of this Court using the CM/ECF system, which will serve all counsel of record.

/s/ J. Marc Wheat
J. Marc Wheat
