No. 23-10362

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

ALLIANCE FOR HIPPOCRATIC MEDICINE; AMERICAN ASSOCIATION OF PRO- LIFE
OBSTETRICIANS & GYNECOLOGISTS; AMERICAN COLLEGE OF PEDIATRICIANS;
CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; SHAUN JESTER, D.O.; REGINA
FROST-CLARK, M.D.; TYLER JOHNSON, D.O.; GEORGE DELGADO, M.D.,

*Plaintiffs-Appellees*,

v.

U.S. FOOD & DRUG ADMINISTRATION; ROBERT M. CALIFF, Commissioner of Food
and Drugs; JANET WOODCOCK, M.D., in her official capacity as Principal Deputy
Commissioner, U.S. Food and Drug Administration; PATRIZIA CAVAZZONI, M.D.,
in her official capacity as Director, Center for Drug Evaluation and Research, U.S.
Food and Drug Administration; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; XAVIER BECERRA, Secretary, U.S. Department of Health and
Human Services,

*Defendants-Appellants*,

v.

DANCO LABORATORIES, L.L.C.,

*Intervenor-Appellant*,

Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division, Case No. 2:22-CV-223-Z
The Honorable Matthew J. Kaczmaryk, Judge Presiding

**BRIEF *AMICI CURIAE* OF 69 MEMBERS OF THE UNITED STATES
CONGRESS SUPPORTING PLAINTIFFS-APPELLEES IN OPPOSITION
TO THE EMERGENCY MOTION FOR A STAY PENDING APPEAL**

STEVEN H. ADEN
   *Counsel of Record*
CAROLYN MCDONNELL
DANIELLE PIMENTEL
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 20036
Steven.Aden@aul.org
Telephone: (202) 741-4917

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................... i

TABLE OF AUTHORITIES ....................................................... ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ...............................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT .......................................................................4

    I.    The FDA's Failure to Adhere to the FFDCA's Drug Approval Process Has Created Grave Risks to the Health and Safety of Women and Girls ...............................................................4

    II.    The FDA Endangers Pregnant Adolescents Seeking Chemical Abortion Drugs By Unlawfully Waiving the Pediatric Study Requirement .......................................................10

    III.    The FDA Has Created Serious Hazards For Women's Health and Safety By Permitting Mail-Order Chemical Abortion Drugs In Violation of Federal Law ........................................14

CONCLUSION ...................................................................20

CERTIFICATE OF COMPLIANCE ...................................................21

CERTIFICATE OF SERVICE ......................................................22

APPENDIX .....................................................................1a

LIST OF *AMICI CURIAE* ......................................................2a

    United States Senate .....................................................2a

    United States House of Representatives ...................................3a

# TABLE OF AUTHORITIES

**Cases**

*Dobbs v. Jackson Women's Health Organization*,
    142 S. Ct. 2228 (2022).......................................................................11

*H.L. v. Matheson*,
    450 U.S. 398 (1981)...........................................................................11

*Nken v. Holder*,
    556 U.S. 418 (2009).............................................................................3

*Ridgely v. Fed. Emergency Mgmt. Agency*,
    512 F.3d 727 (5th Cir. 2008) ..............................................................3

*Wisconsin v. Yoder*,
    406 U.S. 205, 232 (1972) ..................................................................11

**Statutes**

18 U.S.C. § 1461 ......................................................................................2, 14

18 U.S.C. § 1462 ......................................................................................2, 14

21 U.S.C. § 355 ..........................................................................................1, 4

21 U.S.C. § 355c ......................................................................................2, 10

Cal. Bus. & Prof. Code § 2253(b) (2022) ...................................................15

**Legislative History and Reports**

*Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations for 2001: Part 2 of Hearings Before the Subcomm. of the Comm. on Appropriations*, 106th Cong. (2000) .................8

*Child Interstate Abortion Notification Act: Hearing on H.R. 2299 Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 112th Cong. 19 (2012)....................................................................................................12

Staff of Subcomm. on Crim. Just., Drug Pol'y and Hum. Res. of the H. Comm. on Gov't Reform, 109th Cong., *The FDA and RU-486: Lowering the Standard for Women's Health* 40 (Subcomm. Print 2006) .................. 3, 4, 13

**Other Authorities**

Aviva L. Katz et al., *Informed Consent in Decision-Making in Pediatric Practice*, Pediatrics, Aug. 2016, at e1 ........................................................11

Christina A. Circucci et al., *Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act*, Health Servs. Rsch. & Managerial Epidemiology, Dec. 21, 2021, at 1 .................................................................5

Christina Camilleri et al., *Biological, Behavioral and Physiological Consequences of Drug-Induced Pregnancy Termination at First-Trimester Human Equivalent in an Animal Model*, Frontiers NeuroSci., May 29, 2019, at 1 ...................................................................................9, 10

Clarke D. Forsythe & Donna Harrison, *State Regulation of Chemical Abortion After* Dobbs, 16 Liberty U. L. Rev. 377 (2022) ................................. 2, 13, 14

Comm. on Health Care for Underserved Women, Am. Coll. of Obstetricians & Gynecologists, *Intimate Partner Violence*, Comm. Op. No. 518 (reaffirmed 2022)..........................................................................................19

Comm. on Health Care for Underserved Women, Am. Coll. of Obstetricians & Gynecologists, *Reproductive and Sexual Coercion*, Comm. Op. No. 554 (Feb. 2013)..........................................................................................18

Comm. on Obstetric Practice, Am. Coll. of Obstetricians & Gynecologists et al., *Methods for Estimating the Due Date*, Comm. Op. No. 700 (reaffirmed 2022)..........................................................................................16

Comm. On Practice Bulletins – Gynecology and the Soc'y of Family Planning, Am. Coll. of Obstetricians & Gynecologists, *Medication Abortion Up to 70 Days of Gestation*, Comm. Op. 225 (reaffirmed 2023) ..........................................................................................................17

*COVID-19 FAQs for Obstetricians-Gynecologists, Obstetrics*, Am. Coll. of Obstetricians & Gynecologists (rev. July 1, 2021), https://www.acog.org/clinical-information/physician-faqs/covid-19-faqs-for-ob-gyns-obstetrics.............................................................................19

David C. Reardon & Christopher Craver, *Effects of Pregnancy Loss on Subsequent Postpartum Mental Health: A Prospective Longitudinal Cohort Study*, Int'l J. Env't Rsch. & Pub. Health, Feb. 23, 2021, at 1 ..........8

*Ectopic Pregnancy*, Mayo Clinic (Mar. 12, 2022), https://www.mayoclinic.org/diseases-conditions/ectopic-pregnancy/diagnosis- treatment/drc-20372093 ............................................16

James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999–2015*, Health Servs. Rsch. & Managerial Epidemiology, Nov. 9, 2021, at 1.................................................................................................5, 6

Kathryn R. Grauerholz et al., *Uncovering Prolonged Grief Reactions Subsequent to a Reproductive Loss: Implications for the Primary Care Provider*, Frontiers Psych., May 12, 2021, at 1...........................................8, 9

Letter from Cindy Hyde-Smith, Senator, U.S. Cong., et al., to Robert Califf, Comm'r, U.S. Food & Drug Admin. (Jan. 26, 2023), https://www.hydesmith.senate.gov/sites/default/files/2023-01/012623%20Bicameral%20Letter%20to%20FDA%20re%20Abortion%20Drugs.pdf.........................................................................................14

Letter from James Lankford, Senator, U.S. Cong., et al., to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (Jan. 25, 2023), https://www.lankford.senate.gov/imo/media/doc/dojletterabortionmail.pdf ....................................................................................................................15

Louis Jacob et al., *Association Between Induced Abortion, Spontaneous Abortion, and Infertility Respectively and the Risk of Psychiatric Disorders in 57,770 Women Followed in Gynecological Practices in Germany*, 251 J. Affective Disorders 107 (2019) ..........................................9

Maarit J. Mentula et al., *Immediate Adverse Events After Second Trimester Medical Termination of Pregnancy: Results of a Nationwide Registry Study*, 26 Hum. Reprod. 927 (2011) ...............................................................7

Maarit Niinimaki et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 Obstetrics & Gynecology 795 (2009)................................................................7

*Medical Abortion*, Mayo Clinic (July 29, 2022), https://www.mayoclinic.org/tests-procedures/medical-abortion/about/pac-20394687 ..........................................15

*Medical Abortion*, Univ. of Cal. San Francisco Health, www.ucsfhealth.org/treatments/medical-abortion (last visited Feb. 8, 2023) ................................................................15

Megan Hall et al., *Associations Between Intimate Partner Violence and Termination of Pregnancy: A Systematic Review and Meta-Analysis*, PLOS Med., Jan. 7, 2014, at 1 ..........................................18

*Mifepristone U.S. Post-Marketing Adverse Events Summary Through 06/30/2022*, U.S. Food & Drug Admin. 1 (June 30, 2022), https://www.fda.gov/media/164331/download ..............................5

Nadia Akseer et al., *Characteristics and Birth Outcomes of Pregnant Adolescents Compared to Older Women: An Analysis of Individual Level Data from 140,000 Mothers from 20 RCTs*, eClinicalMed., Feb. 26, 2022, at 1 ................................................................12

Nathalie Fleming et al., *Adolescent Pregnancy Guidelines*, 37 J. Obstetrics & Gynaecology Can. 740 (2015)..........................................13

*Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, U.S. Food & Drug Admin. (Jan. 4, 2023), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation ................................................................2, 16

Ralph P. Miech, *Pathophysiology of Mifepristone-Induced Septic Shock Due to* Clostridium Sordellii, 39 Annals Pharmacotherapy 1483 (2005)..............14

*Rh Factor Blood Test*, Mayo Clinic (July 29, 2022), https://www.mayoclinic.org/tests-procedures/rh-factor/about/pac-20394960 ................................................................17

Sam Rowlands & Susan Walker, *Reproductive Control by Others: Means, Perpetrators and Effects*, 45 BMJ Sexual & Reprod. Health 61 (2019).......18

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* are 69 Members of the United States Congress, 11 Senators and 58 Members of the House of Representatives, representing 30 States. A complete list of *Amici* is found in the Appendix to this brief. Congress delegates power to the U.S. Food and Drug Administration (FDA) to approve drugs and regulate their safety and efficacy. As pro-life elected representatives, *Amici* are committed to protecting women and girls from the harms of the abortion industry. By approving and deregulating chemical abortion drugs, the FDA has not followed Congress' statutorily prescribed drug approval process and has subverted Congress' critical public policy interests in upholding patient welfare. The FDA's lawless actions ultimately endanger women and girls seeking chemical abortions.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress has carefully considered the approval process for new drugs, instituting safeguards to protect patients' welfare. The Federal Food, Drug, and Cosmetic Act (FFDCA) ensures new drugs are safe and effective for patients. 21 U.S.C. § 355. The Pediatric Research Equity Act (PREA) recognizes that pediatric patients face unique challenges, and therefore requires that drug assessments include

---

[1] No party's counsel authored any part of this brief. No person other than *Amici Curiae* and their counsel contributed any money intended to fund the preparation or submission of this brief. Plaintiffs-Appellees, Defendants-Appellants, and Intervenor-Appellants received timely notice, and have granted consent to the filing of this *amici curiae* brief on April 11, 2023.

studies showing the safety and effectiveness of the drug for pediatric use, as well as the proper dosing and administration for these young patients. *Id*. at § 355c. Congress similarly has decreed that abortion-inducing drugs are "nonmailable matter" by the United States Postal Service and private carriers, protecting women and girls from the heightened risks of mail-order chemical abortion drugs. 18 U.S.C. §§ 1461–1462.

In spite of this, the FDA has approved and deregulated chemical abortion drugs. The "chemical abortion pill" (also known as a "medical abortion") is a regimen of two drugs, mifepristone and misoprostol.[2] "[M]ifepristone (brand name, Mifeprex), is an antiprogesterone, which starves the pregnancy. The second, misoprotol (brand name, Cytotec), a prostaglandin, causes the uterus to contract, which mechanically expels the fetus and placenta." Clarke D. Forsythe & Donna Harrison, *State Regulation of Chemical Abortion After* Dobbs, 16 Liberty U. L. Rev. 377, 377 (2022).

*Amici* agree with Plaintiffs that the FDA's actions have contravened these federal laws, and, accordingly, have violated the Administrative Procedure Act. By exceeding the scope of its delegated power from Congress, the FDA has subverted

---

[2] *Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, U.S. Food & Drug Admin. (Jan. 4, 2023), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation.

Congress' public policy interests in patient safety. As the U.S. House Committee on Government Reform (now known as the Committee on Oversight and Accountability)'s Subcommittee on Criminal Justice, Drug Policy and Human Resources has recognized:

> The integrity of the FDA in the approval and monitoring of RU-486 has been substandard and necessitates the withdrawal of this dangerous and fatal product before more women suffer the known and anticipated consequences or fatalities. RU-486 is a hazardous drug for women, its unusual approval demonstrates a lower standard of care for women, and its withdrawal from the market is justified and necessary to protect the public's health.

Staff of Subcomm. on Crim. Just., Drug Pol'y and Hum. Res. of the H. Comm. on Gov't Reform, 109th Cong., *The FDA and RU-486: Lowering the Standard for Women's Health* 40 (Subcomm. Print 2006). *Amici* highlight how chemical abortion drugs pose serious threats to the health and safety of women and girls, and a Section 705 stay of the FDA's approval of chemical abortion drugs is in the interest of public policy to protect patient safety, which is why the Court should deny the emergency motion for a stay pending appeal.[3]

---

[3] Preliminary injunctions have four factors: "(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Because the [District] Court [found] injunctive relief is generally appropriate, Section 705 plainly authorize[d] the lesser remedy of issuing 'all necessary and appropriate process' to postpone the effective date of the challenged actions." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 2:22-cv-223-Z, slip op. at 66 (N.D. Tex. Apr. 7, 2023).

# ARGUMENT

I.  THE FDA'S FAILURE TO ADHERE TO THE FFDCA'S DRUG APPROVAL PROCESS HAS CREATED GRAVE RISKS TO THE HEALTH AND SAFETY OF WOMEN AND GIRLS.

Congress places safeguards within the FFDCA to ensure new drugs are safe and efficacious for patients. 21 U.S.C. § 355. Chemical abortion drugs already pose serious threats to patient health and safety. Thus, by unlawfully approving and deregulating chemical abortion drugs, the FDA is further jeopardizing patients' welfare. As the Subcommittee on Criminal Justice, Drug Policy and Human Resources recognized in their report, *The FDA and RU-486: Lowering the Standard for Women's Health*, "the medical community knew what American women would soon learn by experience," that chemical abortion drugs pose grave risks. Staff of Subcomm. on Crim. Just., *supra*, at 13. The report detailed that "mifepristone interferes with the body's immune response . . . is more inconvenient than surgical abortion . . . is more painful . . . is less effective . . . is associated with more adverse events . . . [and] causes more frequent and more severe hemorrhage than its surgical counterpart." *Id*. at 13–14.

Since 2016, the FDA has only required adverse events reporting for deaths resulting from chemical abortion drugs; reporting is otherwise voluntary. As one study concludes, "FAERS [the FDA Adverse Event Reporting System] is inadequate to evaluate the safety of mifepristone" due to reporting discrepancies, and the fact

4

that the FDA no longer mandates reporting of non-lethal adverse events. Christina A. Circucci et al., *Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act*, Health Servs. Rsch. & Managerial Epidemiology, Dec. 21, 2021, at 1, 4. Even so, the FDA has received FAERS Mifeprex reports through June 30, 2022 documenting 28 deaths, 4,213 adverse events, 1,048 hospitalizations (excluding deaths), 604 blood loss incidents requiring transfusions, 414 infections, and 71 severe infections. *Mifepristone U.S. Post-Marketing Adverse Events Summary Through 06/30/2022*, U.S. Food & Drug Admin. 1, 1–2 (June 30, 2022), https://www.fda.gov/media/164331/download.

A 2021 peer-reviewed study showed alarming results; chemical-abortion related emergency room visits (*i.e.*, visits medically coded as chemical abortion complications) per 1,000 abortions "went from 8.5 to 51.7, an increase of 507%" over thirteen years. James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999–2015*, Health Servs. Rsch. & Managerial Epidemiology, Nov. 9, 2021, at 1, 5. By 2015, the rate of emergency room visits within 30 days for any cause (*i.e.*, any emergency room visit regardless of how it was medically coded) per 1000 chemical abortions was 354.8. *Id.* at 4–5. This means 35.48% of women ended up in the emergency room within thirty days of taking chemical abortion drugs. *Id.*

The study found that "[emergency room] visits following [a chemical abortion] grew from 3.6% of all postabortion visits in 2002 to 33.9% of all postabortion visits in 2015." *Id*. at 8. During the same period, chemical abortions "increased from 4.4% of total abortions in 2002 to 34.1% in 2015." *Id*.

The actual number of adverse effects is likely much higher due to emergency room miscoding. As compared to miscoding of surgical abortion-related treatment, 2015 data showed emergency rooms were four times as likely to miscode chemical abortion-related treatment as miscarriage-related treatment. *Id*. at 1. Between 2013 and 2015, emergency rooms miscoded up to 60.9% of chemical abortion-related visits as miscarriage-related visits. *Id*. at 4. This means that U.S. data are severely incomplete, and studies have understated the risks chemical abortion drugs pose to women and girls, which include hemorrhaging and infection due to retained pregnancy tissue.

Previously, U.S. abortion studies have reported lower chemical abortion complication rates than statistics found in international scientific studies. *Id*. at 7. For example, studies from Scandinavian countries, which record pregnancy and medical events more accurately than the United States, give a better picture of chemical abortion complications than U.S. data. In a study of 42,619 Finnish women receiving chemical abortions up to nine weeks gestational age, the overall adverse events were almost fourfold higher in chemical (20.0%) versus surgical abortions

(5.6%). Maarit Niinimaki et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 Obstetrics & Gynecology 795, 795 (2009). Women hemorrhaged more commonly after chemical abortion (15.6% compared with 2.1%). *Id*. They also had incomplete abortions more often in chemical abortions (6.7% versus 1.6%). *Id*. The rate of surgical (re)evacuation was higher after chemical abortions (5.9%) than surgical abortions (1.8%). *Id*.

Another study examined first and second trimester chemical abortions of 18,248 Finnish women. Maarit J. Mentula et al., *Immediate Adverse Events After Second Trimester Medical Termination of Pregnancy: Results of a Nationwide Registry Study*, 26 Hum. Reprod. 927, 927 (2011). Women undergoing first and second trimester chemical abortions needed surgical evacuation in 9.9% of cases. *Id*. at 929. Women specifically undergoing second trimester chemical abortions needed surgical evacuation in 39% of cases. *Id*. at 931. Later in pregnancy, the likelihood of serious complications significantly increases, something that cannot be controlled for when drugs are sent through the mail and taken at the woman's discretion.

A concerning aspect of the initial drug approval is that the FDA had no evidence of the drugs' psychological or long-term physical effects. As FDA Commissioner Jane Henney testified before Congress in February 2000 regarding the FDA's review of chemical abortion drugs:

> The primary clinical trials conducted by the sponsor to support the safety and efficacy of mifepristone—RU-486—were discussed before

the Reproductive Health Advisory Committee in July 1996. *These clinical studies did not include an evaluation of the psychological effects of the drug in women or an evaluation of the long-term medical consequences of the drug in women.* FDA is unaware of any published studies on the psychological effects or the long-term medical consequences of mifepristone in women.[4]

Abortion poses mental health risks for women and girls. "Pregnancy loss (natural or induced) is associated with an increased risk of mental health problems." David C. Reardon & Christopher Craver, *Effects of Pregnancy Loss on Subsequent Postpartum Mental Health: A Prospective Longitudinal Cohort Study*, Int'l J. Env't Rsch. & Pub. Health, Feb. 23, 2021, at 1, 1. "Research on mental health subsequent to early pregnancy loss as a result of elective induced abortions has historically been polarized, but recent research indicates an increased correlation to the genesis or exacerbation of substance abuse and affective disorders including suicidal ideation." Kathryn R. Grauerholz et al., *Uncovering Prolonged Grief Reactions Subsequent to a Reproductive Loss: Implications for the Primary Care Provider*, Frontiers Psych., May 12, 2021, at 1, 2. Scholarship shows "that the emotional reaction or grief experience related to miscarriage and abortion can be prolonged, afflict mental health, and/or impact intimate or parental relationships." *Id*. Similarly, "[s]everal recent international studies have demonstrated that repetitive early pregnancy loss,

---

[4] *Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations for 2001: Part 2 of Hearings Before the Subcomm. of the Comm. on Appropriations*, 106th Cong. (2000) (emphasis added). The testimony is available at https://www.govinfo.gov/content/pkg/CHRG-106hhrg63888/html/CHRG-106hhrg63888.htm.

including both miscarriage and induced abortions, is associated with increased levels of distress, depression, anxiety, and reduced quality of life scores in social and mental health categories." *Id.*; *see, e.g.*, Louis Jacob et al., *Association Between Induced Abortion, Spontaneous Abortion, and Infertility Respectively and the Risk of Psychiatric Disorders in 57,770 Women Followed in Gynecological Practices in Germany*, 251 J. Affective Disorders 107, 111 (2019) (finding "a positive relationship between induced abortion . . . and psychiatric disorders in gynecological practices in Germany").

"In the case of medical abortion, consideration needs to be given to the pharmacological effects of mifepristone (RU486), in addition to any procedural consequences." Christina Camilleri et al., *Biological, Behavioral and Physiological Consequences of Drug-Induced Pregnancy Termination at First-Trimester Human Equivalent in an Animal Model*, Frontiers NeuroSci., May 29, 2019, at 1, 2. One study examined the "biological, behavioral and physiological consequences of pharmacologically terminating a pregnancy at mid-term (first-trimester human equivalent) in an animal model." *Id*. at 13. The researchers concluded, "[t]aken together, our analyses appear to indicate a significant effect of pregnancy termination on the biological (rat weight, food intake, vaginal impedance), physiological (oxidative balance) and most especially, behavioral parameters (sucrose consumption, rearings, distance active, percentage time active, overall

speed) measured." *Id*. The study suggested further research regarding chemical abortion's impact on physiology and neurophysiology to help understand chemical abortion's impact on humans. *Id*. at 16. In sum, chemical abortion drugs already pose serious threats to patient welfare. By subverting the FFDCA's patient safeguards, the FDA is playing a dangerous game with the health and safety of women and girls, which is why this Court should allow the District Court's Section 705 stay of the FDA's approval of chemical abortion drugs to go into effect.

II.   THE FDA ENDANGERS PREGNANT ADOLESCENTS SEEKING CHEMICAL ABORTION DRUGS BY UNLAWFULLY WAIVING THE PEDIATRIC STUDY REQUIREMENT.

Under the Pediatric Research Equity Act (PREA), assessments of new drugs must include studies showing the safety and effectiveness of the drug for pediatric use, as well as the proper dosing and administration for adolescent patients. 21 U.S.C. § 355c. The FDA can waive the pediatric rule "[i]f the course of the disease and the effects of the drug are sufficiently similar in adults and pediatric patients . . . ." *Id.* at § 355c(a)(2)(B)(i). In the initial drug approval of chemical abortion drugs in 2000, the FDA waived the pediatric rule, incorrectly stating "there is no biological reason to expect menstruating females under age 18 to have a different physiological outcome with the regimen." Compl. Ex. 24, at 7. Contrary to the FDA's assertion, adolescent patients seeking chemical abortions face unique

challenges that place them in dissimilar conditions to adult women, and waiving the pediatric rule jeopardizes the health and safety of adolescent patients.

Adolescents do not have fully developed decision-making capabilities. As the Supreme Court acknowledged in *H.L. v. Matheson*, "[t]he medical, emotional, and psychological consequences of an abortion are serious and can be lasting; this is particularly so when the patient is immature." 450 U.S. 398, 411 (1981), *overruled on other grounds by Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). Generally, "[a]ppropriate decisional capacity and legal empowerment are the determinants of decision-making authority in medicine." Aviva L. Katz et al., *Informed Consent in Decision-Making in Pediatric Practice*, Pediatrics, Aug. 2016, at e1, e2. Nevertheless, "[a] reliance on individual liberties and autonomy in the pediatric patient is not realistic or legally accepted, so parents or other surrogates provide 'informed permission' for diagnosis and treatment, with the assent of the child as developmentally appropriate." *Id*. Consequently, parental guidance is instrumental for an adolescent patient's informed consent.[5] Parental involvement helps an adolescent patient select a competent healthcare professional who prioritizes her health. *Child Interstate Abortion Notification Act: Hearing on H.R.*

---

[5] The FDA's approval and deregulation of chemical abortion drugs also blatantly ignores parents' constitutional rights to the care and upbringing of their minor pregnant daughters. *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.").

*2299 Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 112th Cong. 19 (2012) (statement of Teresa Stanton Collett, Professor of Law, University of St. Thomas School of Law). Parents may "provide additional medical history and information [regarding their minor daughter] to abortion providers prior to [the] performance of the abortion," safeguard that an adolescent girl understands the medical risks of the procedure, and give her advice during the informed consent process. *Id*. at 26–27. Moreover, parental involvement "ensures that the parents have the ability to monitor for post-abortion complications." *Id*. at 19.

Adolescents have high risk pregnancies and often delay prenatal care. "Adolescence is a critical period marking phenomenal changes including rapid physical, psychosocial, sexual and cognitive maturation, and nutrient needs of adolescents are higher than at any other stage in the lifecycle." Nadia Akseer et al., *Characteristics and Birth Outcomes of Pregnant Adolescents Compared to Older Women: An Analysis of Individual Level Data from 140,000 Mothers from 20 RCTs*, eClinicalMed., Feb. 26, 2022, at 1, 3. During pregnancy, "adolescent girls are a particularly vulnerable group since the demands of regular growth and development are augmented by the heightened nutritional requirements of supporting a fetus." *Id*. Due to adolescent patients' developing bodies, they have a "biological predisposition for high-risk pregnancies." *Id*. at 12. The high-risk nature of adolescent pregnancy is compounded by the fact that pregnant adolescent patients

often delay care. Nathalie Fleming et al., *Adolescent Pregnancy Guidelines*, 37 J. Obstetrics & Gynaecology Can. 740, 743 (2015). There are multiple reasons adolescent patients delay care, including:

> lack of knowledge about the importance of prenatal care and lack of understanding of the consequences of its absence; history as a victim of violence, desire to hide pregnancy, fear of potential apprehension of the baby, contemplation of abortion services; concerns about lack of privacy or judgemental attitudes from health care providers or adults; and financial barriers.

*Id*. Unfortunately, "[l]ack of, or delayed, adolescent prenatal care is associated with adverse maternal, obstetrical, and neonatal outcomes." *Id*.

The FDA authorized chemical abortion drugs without knowing the drugs' impact on adolescent development, especially its effect on girls' immune systems. *See* Subcomm. on Crim. Just., *supra*, at 12 (recognizing medical concerns about mifepristone's immune system inhibition). Mifepristone, an anti-progestin, interferes with the immune system "by binding with a woman's progesterone receptors on the nuclear membranes of cells in the uterus, ovary, brain, breast, and immune system." Forsythe, *supra*, at 388. Since mifepristone has blocked uterine progesterone receptors, "the mother's cells in the placenta stop functioning, which eventually leads to the death of the embryo through, in essence, starvation," and at a certain point, the mother loses her unborn child. *Id*. at 388–389. However, mifepristone has another effect upon the body: "the blockade of glucocorticoid receptors also induces an unexpected immune blockade, suppressing the immune

system, which can result in increased susceptibility to overwhelming infection" throughout the body. *Id.* at 389; *see also* Ralph P. Miech, *Pathophysiology of Mifepristone-Induced Septic Shock Due to* Clostridium Sordellii, 39 Annals Pharmacotherapy 1483, 1483 (2005) ("[I]t it appears that the mechanisms of mifepristone action favor the development of infection that leads to septic shock and intensifies the actions of multiple inflammatory cytokines, resulting in fulminant, lethal septic shock."). Thus, adolescent patients seeking chemical abortion drugs face unique challenges compared to their adult counterparts. By waiving the pediatric study, the FDA has endangered girls seeking chemical abortion drugs.

III. THE FDA HAS CREATED SERIOUS HAZARDS FOR WOMEN'S HEALTH AND SAFETY BY PERMITTING MAIL-ORDER CHEMICAL ABORTION DRUGS IN VIOLATION OF FEDERAL LAW.

Federal law bars the use of the United States Postal Service and private carriers from mailing abortion-inducing drugs, including the chemical abortion regimen of mifepristone and misoprostol. 18 U.S.C. §§ 1461–1462.[6] *Amici* agree with Plaintiffs that the FDA's actions permit distribution of these drugs through means prohibited under 18 U.S.C. §§ 1461–1462. Pls.' Br. In Supp. of Their Mot.

---

[6] Members of Congress recently expressed their opposition to the FDA's decision to eliminate the in-person dispensing requirement for chemical abortion drugs, recognizing the dangers the drugs pose to women and girls, and how the FDA's actions violate federal criminal law. Letter from Cindy Hyde-Smith, Senator, U.S. Cong., et al., to Robert Califf, Comm'r, U.S. Food & Drug Admin. (Jan. 26, 2023), https://www.hydesmith.senate.gov/sites/default/files/2023-01/012623%20Bicameral%20Letter%20to%20FDA%20re%20Abortion%20Drugs.pdf.

for Prelim. Inj. 20–21.[7] By contravening federal law to allow telemedicine and mail-order chemical abortion drugs, the FDA is endangering women's health and safety.

In-person visits are necessary for chemical abortions. The Mayo Clinic states that: "Medical abortion isn't an option if you . . . *[c]an't make follow-up visits to your doctor* or don't have access to emergency care." *Medical Abortion*, Mayo Clinic (July 29, 2022), https://www.mayoclinic.org/tests-procedures/medical-abortion/about/pac-20394687 (emphasis in original). Medical institutions are in agreement about this, as "[a] medical abortion involves at least two visits to a doctor's office or clinic." *Medical Abortion*, Univ. of Cal. San Francisco Health, www.ucsfhealth.org/treatments/medical-abortion (last visited Apr. 11, 2023). Follow-up visits and reporting are critical to ensure that if a woman has retained tissue, she receives essential follow-up care.

But even before a chemical abortion, healthcare providers must confirm a woman is a medically appropriate candidate for chemical abortion. In most states, this consultation is with a physician. In a few states, like California, it can be done by a midlevel provider, such as a nurse practitioner, certified nurse-midwife, or physician assistant. Cal. Bus. & Prof. Code § 2253(b) (2022). A number of medical

---

[7] In response to the Department of Justice Office of Legal Counsel's recent memo contending federal laws do not prohibit the mailing of chemical abortion drugs, Members of Congress wrote to Attorney General Merrick Garland, reminding him that the "plain text and clear meaning of the law" prohibit the mailing of chemical abortion drugs. Letter from James Lankford, Senator, U.S. Cong., et al., to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. 1 (Jan. 25, 2023), https://www.lankford.senate.gov/imo/media/doc/dojletterabortionmail.pdf.

conditions make a woman ineligible to take chemical abortion drugs, including having a potentially dangerous ectopic pregnancy (a pregnancy outside of the uterus) or having an intrauterine device (IUD) in place. *Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, *supra*. Chemical abortion cannot terminate an ectopic pregnancy and should not be used after the first seventy days of pregnancy due to heightened risk to the woman's health. *Id.* A physician can only diagnose an ectopic pregnancy by blood tests and an ultrasound, which means a physician cannot determine via telemedicine whether a pregnancy is ectopic. *Ectopic Pregnancy*, Mayo Clinic (Mar. 12, 2022), https://www.mayoclinic.org/diseases-conditions/ectopic-pregnancy/diagnosis-treatment/drc-20372093.

Determining gestational age usually is done in-person by ultrasound. Ultrasound is the most accurate method to establish or confirm gestational age in the first trimester. Comm. on Obstetric Practice, Am. Coll. of Obstetricians & Gynecologists et al., *Methods for Estimating the Due Date*, Comm. Op. No. 700, at 1 (reaffirmed 2022). Dating a pregnancy by using a woman's last menstrual period (LMP) is far less accurate. The American College of Obstetricians and Gynecologists (ACOG) indicates only one half of women accurately recall their LMP. *Id.* at 2. In one study, forty percent of women had more than a five-day discrepancy between their LMP dating and the ultrasound dating. *Id.* In this regard, LMP dating is not

nearly as precise as an ultrasound. But an accurate measurement of gestational age is required to show that a woman is even a candidate for a chemical abortion.

Without an in-person evaluation, abortion providers also cannot test for Rh negative blood type. During pregnancy, if a woman has Rh negative blood while her fetus is Rh positive, the woman's body may produce antibodies after exposure to fetal red blood cells. *Rh Factor Blood Test*, Mayo Clinic (July 29, 2022), https://www.mayoclinic.org/tests-procedures/rh-factor/about/pac-20394960.

Abortion can cause maternal exposure to fetal blood, even in the first trimester. *Id*. Therefore, if indicated, a healthcare provider must give a woman with Rh negative blood an Rh immuneglobulin injection. Without the injection, antibodies can damage future pregnancies by creating life-threatening anemia in fetal red blood cells. *Id*. ACOG describes that "Rh testing is recommended in patients with unknown Rh status before medication abortion, and Rh D immunoglobulin should be administered if indicated." Comm. On Practice Bulletins – Gynecology and the Soc'y of Family Planning, Am. Coll. of Obstetricians & Gynecologists, *Medication Abortion Up to 70 Days of Gestation*, Comm. Op. 225, at 40 (reaffirmed 2023). Rh negative blood typing is thus a medically necessary test, but it cannot occur during chemical abortions that are done entirely via telemedicine.

A woman seeking an abortion may be facing intimate partner violence (IPV). There are "[h]igh rates of physical, sexual, and emotional IPV . . . among women

seeking a[n abortion]." Megan Hall et al., *Associations Between Intimate Partner Violence and Termination of Pregnancy: A Systematic Review and Meta-Analysis*, PLOS Med., Jan. 7, 2014, at 1, 15. For women seeking abortion, the prevalence of IPV is nearly three times greater than women continuing a pregnancy. Comm. on Health Care for Underserved Women, Am. Coll. of Obstetricians & Gynecologists, *Reproductive and Sexual Coercion*, Comm. Op. No. 554, at 2 (Feb. 2013). Post-abortive IPV victims also have a "significant association" with "psychosocial problems including depression . . . , suicidal ideation . . . , stress . . . , and disturbing thoughts." Hall, *supra*, at 11.

Similarly, intimate partners, family members, and sex traffickers may be asserting reproductive control over the woman, which are "actions that interfere with a woman's reproductive intentions." Sam Rowlands & Susan Walker, *Reproductive Control by Others: Means, Perpetrators and Effects*, 45 BMJ Sexual & Reprod. Health 61, 62, 65 (2019). In the context of abortion, reproductive control not only produces coerced abortions or continued pregnancies, but it also affects whether the pregnancy was intended in the first place. *Id*. at 62–63. Reproductive control is a prevalent issue for women. "As many as one-quarter of women of reproductive age attending for sexual and reproductive health services give a history of ever having suffered [reproductive control]." *Id*. at 62.

18

Medical professionals must "[s]creen for IPV in a private and safe setting with the woman alone and not with her partner, friends, family, or caregiver." Comm. on Health Care for Underserved Women, Am. Coll. of Obstetricians & Gynecologists, *Intimate Partner Violence*, Comm. Op. No. 518, at 3 (reaffirmed 2022). Yet, telemedicine cannot ensure that a coercive partner, friend, family member, or caregiver is not in the room with a woman seeking a chemical abortion. In a telehealth setting, ACOG recommends healthcare providers screen patients multiple times because patients may not be able to disclose abuse each time they are screened. *COVID-19 FAQs for Obstetricians-Gynecologists, Obstetrics*, Am. Coll. of Obstetricians & Gynecologists (rev. July 1, 2021), https://www.acog.org/clinical-information/physician-faqs/covid-19-faqs-for-ob-gyns-obstetrics; *see also Intimate Partner Violence*, *supra*, at 3 (noting IPV screening should occur periodically and "at various times . . . because some women do not disclose abuse the first time they are asked"). In other words, domestic violence screening by telehealth "may not allow individuals the privacy or safety needed to disclose abuse." *Id*. Thus, telehealth ineffectively screens women seeking chemical abortions for domestic violence or coercion. If she changes her mind, no medical professional is there to help her. She is left alone to care for her physiological and psychological health, as well as her safety if complications or IPV arise.

## CONCLUSION

The FDA's unlawful approval and deregulation of chemical abortion drugs subverts Congress' public policy considerations and safeguards for patient safety. *Amici* urge the Court to deny the emergency motion for a stay pending appeal, which will allow the District Court's Section 705 stay to go into effect and protect women and girls from the harms of chemical abortion drugs.

<div style="margin-left:40%">

Respectfully submitted,

STEVEN H. ADEN
*Counsel of Record*
CAROLYN MCDONNELL
DANIELLE PIMENTEL
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 20036
Steven.Aden@aul.org
Telephone: (202) 741-4917

*Counsel for* Amici Curiae

</div>

April 11, 2023

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

A. I hereby certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because it contains 4,631 words, excluding the parts exempted by Fed. R. App. P. 32(f).

B. I also certify that this brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ Steven H. Aden
STEVEN H. ADEN
  *Counsel of Record*
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 20036
Steven.Aden@aul.org
Telephone: (202) 741-4917

*Counsel for* Amicus Curiae

April 11, 2023

21

## CERTIFICATE OF SERVICE

I certify that on April 11, 2023, I electronically filed the foregoing brief with the Clerk of Court throughout the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ Steven H. Aden
STEVEN H. ADEN
   *Counsel of Record*
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.
Suite 500
Washington, DC 20036
Steven.Aden@aul.org
Telephone: (202) 741-4917

*Counsel for* Amicus Curiae

**APPENDIX**

# LIST OF *AMICI CURIAE*

## *United States Senate*

Lead Senator: Cindy Hyde-Smith (MS)

Mike Braun (IN)

Kevin Cramer (ND)

Mike Crapo (ID)

Steve Daines (MT)

James Lankford (OK)

Roger Marshall (KS)

James Risch (ID)

Marco Rubio (FL)

Rick Scott (FL)

Tommy Tuberville (AL)

### *United States House of Representatives*

Lead Representative: August Pfluger (TX–11)

| | |
|---|---|
| Robert Aderholt (AL–04) | Virginia Foxx (NC–05) |
| Mark Alford (MO–04) | Russell Fry (SC–07) |
| Jim Banks (IN–03) | Russ Fulcher (ID–01) |
| Aaron Bean (FL–04) | Bob Good (VA–05) |
| Andy Biggs (AZ–05) | Paul Gosar (AZ–09) |
| Lauren Boebert (CO–03) | Glenn Grothman (WI–06) |
| Mike Bost (IL–12) | Michael Guest (MS–03) |
| Michael Burgess (TX–26) | Andy Harris, M.D. (MD–01) |
| Jerry Carl (AL–01) | Diana Harshbarger (TN–01) |
| Ben Cline (VA–06) | Kevin Hern (OK–01) |
| Michael Cloud (TX–27) | Clay Higgins (LA–03) |
| Andrew Clyde (GA–09) | Richard Hudson (NC–09) |
| Warren Davidson (OH–08) | Bill Johnson (OH–06) |
| Jeff Duncan (SC–03) | Mike Johnson (LA–04) |
| Jake Ellzey (TX–06) | Mike Kelly (PA–16) |
| Ron Estes (KS–04) | Trent Kelly (MS–01) |
| Mike Ezell (MS–04) | Doug LaMalfa (CA–01) |
| Randy Feenstra (IA–04) | Doug Lamborn (CO–05) |

Debbie Lesko (AZ–08)                    Joe Wilson (SC–02)

Lisa McClain (MI–09)

Mary Miller (IL–15)

Max Miller (OH–07)

John Moolenaar (MI–02)

Alex. X. Mooney (WV–02)

Nathaniel Moran (TX–01)

Gregory Murphy (NC–03)

Ralph Norman (SC–05)

Andy Ogles (TN–05)

David Rouzer (NC–07)

Keith Self (TX–03)

Pete Sessions (TX–17)

Chris Smith (NJ–04)

Claudia Tenney (NY–24)

William Timmons, IV (SC–04)

Tim Walberg (MI–05)

Randy Weber, Sr. (TX–14)

Daniel Webster (FL–11)

Roger Williams (TX–25)