No. 23-10362

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR HIPPOCRATIC MEDICINE; AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS & GYNECOLOGISTS; AMERICAN COLLEGE OF PEDIATRICIANS;
CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; SHAUN JESTER, D.O.; REGINA
FROST-CLARK, M.D.; TYLER JOHNSON, D.O.; GEORGE DELGADO, M.D.,

*Plaintiffs-Appellees,*

*v.*

U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.; JANET
WOODCOCK, M.D.; PATRIZIA CAVAZZONI, M.D.; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; XAVIER BECERRA,

*Defendants-Appellants,*

*v.*

DANCO LABORATORIES, L.L.C.,

*Intervenor-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, AMARILLO
CIVIL ACTION NO. 2:22-CV-00223-Z (HON. MATTHEW J. KACSMARYK)

## BRIEF OF *AMICUS CURIAE* NAACP LEGAL DEFENSE AND
## EDUCATIONAL FUND, INC. IN SUPPORT OF DEFENDANTS-
## APPELLANTS' MOTION FOR A STAY PENDING APPEAL

JANAI S. NELSON
    *President & Director-Counsel*
SAMUEL SPITAL
ALEXANDRA S. THOMPSON
ARIELLE HUMPHRIES*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 RECTOR ST, 5TH FLOOR
NEW YORK, NY 10006
TEL.: (212) 965-2200

*Admission Pending*

PILAR WHITAKER
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14TH STREET NW, SUITE 600
WASHINGTON, DC 20005
TEL.: (202) 682-1300

## CERTIFICATE OF INTERESTED PERSONS

### Case No. 23-10362, *Alliance for Hippocratic Medicine et al. v. U.S. Food & Drug Administration*

The undersigned counsel of record certifies Pursuant to Fed. R. App. P. 26.1 and 5th Cir. R. 28.2.1, *amicus curiae* NAACP Legal Defense and Educational Fund, Inc. ("LDF") is a nonprofit, non-partisan corporation. LDF has no parent corporation, and no publicly held corporation holds ten percent of its stock.

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the Defendants-Appellants' Certificate of Interested Persons–the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amicus Curiae*

NAACP Legal Defense and Educational Fund, Inc.

*Attorneys for Amicus Curiae*

Janai S. Nelson
Samuel Spital
Alexandra S. Thompson
Pilar Whitaker
Arielle Humphries

Respectfully submitted,

*/s/ Samuel Spital*

PILAR WHITAKER
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel.: (202) 682-1300

JANAI S. NELSON
SAMUEL SPITAL
ALEXANDRA S. THOMPSON
ARIELLE HUMPHRIES*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector St, 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
sspital@naacpldf.org

*Attorney of Record for Amicus Curiae
NAACP Legal Defense and
Educational Fund, Inc.*

*Admission pending*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CONTENTS ................................................................................... iii

TABLE OF AUTHORITIES ............................................................................. iv

INTEREST OF *AMICUS CURIAE* .................................................................... 1

SUMMARY OF THE ARGUMENT ................................................................... 4

ARGUMENT .................................................................................................. 6

I.   THE DISTRICT COURT'S DECISION SEVERELY RESTRICTS ABORTION IN STATES WHERE IT REMAINS LEGAL ............................ 6

II.  THE DISTRICT COURT FAILED TO CONSIDER THE RELIANCE INTERESTS OF PEOPLE WHO REQUIRE ACCESS TO SAFE ABORTION CARE ...................................................................................... 8

    A.   Pregnant Black Women and Other Black Pregnant People Rely on Access to Abortion to Make Decisions Regarding Their Futures ........ 9

    B.   State Laws Restricting Abortion Access Have Created Strong Reliance Interests in the Availability of Mifepristone ........................................ 11

III. THE PUBLIC INTEREST IS NOT SUPPORTED BY THE DISTRICT COURT'S DECISION .................................................................................. 14

    A.   The Court Did Not Consider the Real-World Impact of Restricting Abortion Care. ....................................................................................... 15

    B.   Suspending Access to Mifepristone Exacerbates Inequities in Abortion Care for Black Pregnant Women and Other Pregnant People .............. 17

CONCLUSION .............................................................................................. 21

CERTIFICATE OF SERVICE .......................................................................... 22

CERTIFICATE OF COMPLIANCE ................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
No. 2:22-CV-223-Z (N.D. Tex. Apr. 7, 2023) (Order) ............................ *passim*

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ...................................................................4, 7, 18, 19

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016)......................................................................................8

*Harris v. McRae*,
448 U.S. 297 (1980) (Marshall, J., dissenting).................................................21

*June Med. Servs. v. Russo*,
140 S. Ct. 2103 (2020)....................................................................................14

*Planned Parenthood of Se. Pa. v. Casey*,
505 U.S. 833 (1992), *overruled on other grounds by Dobbs*, 142 S. Ct. 2228
(2022)............................................................................................................9, 16

*Roe v. Wade*,
410 U.S. 113 (1973)...................................................................................10, 14

*Washington v. U.S. Food & Drug Admin.*,
No. 1:23-CV-3026-TOR (E.D. Wash. filed Feb. 23, 2023) ............................7, 8

**Other Authorities**

Advancing New Standards in Reproductive Health, Bixby Ctr. for Glob.
Reproductive Health, *Turnaway Study*,
www.ansirh.org/sites/default/files/publications/files/turnaway_study_brief_web
.pdf (last visited Apr. 10, 2023).........................................................................16

Amelia Thomson-DeVeaux, *A Texas Judge's Decision Could Replace Abortion
Access . . . Again*, FiveThirtyEight (Apr. 7, 2023),
https://fivethirtyeight.com/features/mifepristone-ruling-abortion-access/.........13

*The Availability and Use of Medication Abortion*, KFF (Feb. 24, 2023),
https://www.kff.org/womens-health-policy/fact-sheet/the-availability-and-use-
of-medication-abortion/ ................................................................. 13

Benjamin Rader et al., *Estimated Travel Time and Spatial Access to Abortion
Facilities in the US Before and After the Dobbs v Jackson Women's Health
Decision*, 328 JAMA 2041 (2022).................................................... 12

Cameron Scott, *Model Shows Where Women Lost Access to Abortion After Dobbs*
Univ. of Cal. S.F. (Nov. 1, 2022),
https://www.ucsf.edu/news/2022/10/424121/model-shows-where-women-lost-
access-abortion-after-dobbs ........................................................12, 13

Courtney A. Schreiber et al., *Mifepristone Pretreatment for the Medical
Management of Early Pregnancy Loss*, 278 N. Engl. J. Med. 2161 (2018) ......18

Cynthia Prather et al., *Racism, African American Women, and Their Sexual and
Reproductive Health: A Review of Historical and Contemporary Evidence and
Implications for Health Equity*, 2 Health Equity 249 (2018)...........................17

Dana M. Johnson et al., *The Economic Context of Pursuing Online Medication
Abortion in the United States*, SSM - Qualitative Rsch. Health, Dec. 2021
....................................................................................................12, 14

Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and
Women Who Are Denied Wanted Abortions in the United States*, 108 Am. J.
Pub. Health 407 (2018) ....................................................................16

Elizabeth G. Raymond et al., *Medication Abortion with Misoprostol-Only: A
Sample Protocol*, Contraception, Feb. 25, 2023,
https://www.contraceptionjournal.org/article/S0010-7824(23)00060-4/fulltext;
....................................................................................................13

Elizabeth Nash & Lauren Cross, *2021 Is on Track to Become the Most Devastating
Antiabortion State Legislative Session in Decades*, Guttmacher Inst. (June 14,
2021), https://www.guttmacher.org/article/2021/04/2021-track-become-most-
devastating-antiabortion-state-legislative-session-decades ...............................11

Inst. for Women's Pol'y Rsch., *The Economic Effects of Abortion Access: A Review
of the Evidence* (2019), https://iwpr.org/wp-
content/uploads/2020/07/B377_Abortion-Access-Fact-Sheet_final.pdf ...........10

Jeff Diamant & Besheer Mohamed, *What the Data Says About Abortion in the U.S.*, Pew Rsch. Ctr. (Jan. 11, 2023), https://www.pewresearch.org/fact-tank/2023/01/11/what-the-data-says-about-abortion-in-the-u-s-2/ ...............9, 17

Justin J. Chu et al., *Mifepristone and Misoprostol Versus Misoprostol Alone for the Management of Missed Miscarriage (MifeMiso): A Randomised, Double-Blind, Placebo Controlled Trial*, 396 Lancent 770 (2020) ..........................................18

Kate Bahn et al., *Linking Reproductive Health Care Access to Labor Market Opportunities for Women*, Ctr. for Am. Progress (Nov. 21, 2017), https://www.americanprogress.org/issues/women/reports/2017/11/21/442653/linking-reproductive-health-care-access-labor-market-opportunities-women .....10

Liza Fuentes, *Inequity in US Abortion Rights and Access: The End of Roe Is Deepening Existing Divides*, Guttmacher Institute (Jan. 17, 2023), https://www.guttmacher.org/2023/01/inequity-us-abortion-rights-and-access-end-roe-deepening-existing-divides ................................................................19

Mara Gordon & Sarah McCammon, *A Drug That Eases Miscarriages Is Difficult for Women to Get*, NPR (Jan. 10, 2019), https://www.npr.org/sections/health-shots/2019/01/10/666957368/a-drug-that-eases-miscarriages-is-difficult-for-women-to-get ......................................................................................18

Nat'l Partnership for Women and Families, *Fact Sheet: Black Women Experience Pervasive Disparities in Access to Health Insurance* (2019), https://www.nationalpartnership.org/our-work/resources/health-care/black-womens-health-insurance-coverage.pdf ............................................................20

Pien Huang & Mara Gordon, *Telehealth Abortion Demand Is Soaring. But Access May Come Down to Where You Live*, NPR (May 20, 2022), https://www.npr.org/sections/health-shots/2022/05/20/1099179361/telehealth-abortions-are-simple-and-private-but-restricted-in-many-states ......................13

*Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, U.S. Food & Drug Admin. (Jan. 4, 2023) https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation...................................................................................6

Sarah C.M. Roberts et al., *Out-of Pocket Costs and Insurance Coverage for Abortion in the United States*, 24 Women's Health Issues e211, e217 (2014)...20

Sarah Knight et al., *Here's Where Abortions Are Now Banned Or Severely Restricted*, NPR (Mar. 31, 2023), https://www.npr.org/sections/health-shots/2022/06/24/1107126432/abortion-bans-supreme-court-roe-v-wade ........19

Sarah Miller et al., *The Economic Consequences of Being Denied an Abortion* (Nat'l Bureau of Econ. Rsch., Working Paper No. 26662, 2020, https://www.nber.org/system/files/working_papers/w26662/w26662.pdf ..16, 17

Soc'y of Family Planning, *#WeCount Report* (2022), https://tinyurl.com/3wuermmy .........................................................................12

Taylor Jackson & Kelsey Butler, *Abortion Desert in the US South Is Hurting Black Women the Most*, Bloomberg (Aug. 23, 2022), https://www.bloomberg.com/news/articles/2022-08-23/black-women-are-hardest-hit-by-abortion-restrictions-sweeping-the-deep-south?leadSource=uverify%20wall ................................................................19

Ushma D. Upadhyay et al., *Trends in Self-Pay Charges and Insurance Acceptance for Abortion in the United States, 2017-20*, 41 Health Affs. 507 (2022)...........20

# INTEREST OF *AMICUS CURIAE*[1]

The NAACP Legal Defense & Educational Fund, Inc. (LDF) is the nation's first and foremost civil rights law organization. Through litigation, advocacy, public education, and outreach, LDF strives to secure equal justice under the law for all Americans and to break down barriers that prevent Black people from realizing their basic civil and human rights.

For decades, LDF has pursued litigation to secure the economic rights of Black families and individuals. Litigation to ensure nondiscriminatory delivery of babies, as well as the adequacy of health care and hospital services available to Black communities has been a long-standing LDF concern. *See, e.g., Bryan v. Koch*, 627 F.2d 612 (2d Cir. 1980) (challenging the closing of Sydenham public hospital in Harlem under Title VI of the Civil Rights Act of 1964). LDF has also worked on behalf of Black individuals struggling with the burden of discriminatory and inadequate health care services and the resulting health crises.

Black and low-income people rely on the right to abortion care at higher rates than other groups, and face profound inequities in accessing essential health care as a result of a long history of systemic racism and discrimination. LDF has supported

---

[1] Counsel for all parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no party's counsel authored this brief either in whole or in part, and further, that no party or party's counsel, or person or entity other than *amicus curiae*, *amicus curiae*'s members, and their counsel, contributed money intended to fund preparing or submitting this brief.

efforts to promote equal rights and access to reproductive health care, emphasizing the impact of restrictions on abortion access on Black women[2] and other pregnant people living in poverty. *See, e.g.*, Brief for the NAACP Legal Defense & Educational Fund, Inc. and other Organizations as Amici Curiae in Support of Petitioners, *Rust v. Sullivan*, 500 U.S. 173 (1991) (Nos. 89-1391 & 89-1392), 1990 WL 10012645; Brief of Amici Curiae of the NAACP Legal Defense & Educational Fund, Inc., and other Organizations in Support of Planned Parenthood of Southeastern Pennsylvania, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) (Nos. 91-744 & 91-902), 1992 WL 12006401; Brief of Amicus Curiae NAACP Legal Defense & Educational Fund, Inc., in Support of Petitioners, *Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) (No. 21-463), 2021 WL 5029029; Brief for Amici the Lawyers' Committee for Civil Rights Under Law, The Leadership Conference for Civil and Human Rights and 16 Civil Rights Organizations in Support of Respondents, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (No. 19-1392), 2021 WL 4594026.

LDF has an interest in this case, which will decide whether access to mifepristone as part of the medication abortion protocol is to be restricted nationwide. Limitations on medication abortion will disproportionately limit the

---

[2] *Amicus curiae*'s use of "woman" or "women" is not meant to exclude people of other gender identities that may be able to become pregnant and need to seek abortion services.

reproductive health options available to Black and low-income people. Consistent with its efforts to secure equal access to health care, LDF has a strong interest in ensuring continued access to safe abortion care.

## SUMMARY OF THE ARGUMENT

More than twenty years ago, the FDA approved the drug mifepristone as safe and effective for the medical termination of pregnancy. A regimen of mifepristone, followed by misoprostol, is an FDA-approved protocol for medication abortion. Nevertheless, two decades later, Plaintiffs-Appellees now argue the agency erred in determining the safety and effectiveness of mifepristone and exceeded its regulatory authority. Medication abortions account for majority of all abortions in the United States. Given the severe consequences of both undermining precedent and restricting access to medication abortion, the District Court's order should be stayed for three reasons.

*First*, the ruling—which serves to impede access to a safe and effective form of abortion care—directly undermines the Supreme Court's recent directive that "[s]tates that readily allow abortion" may continue to do so, and that all states "may evaluate the competing interests and decide how to address this consequential issue." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2305 (2022) (Kavanaugh, J., concurring). This is especially true here as the District Court's Order restricts abortion access in states where it otherwise remains legal.

*Second*, by enjoining the FDA's authorization of mifepristone and its 2021 removal of in-person disbursement requirements, the district court failed to consider the reliance interests — pregnant people have relied on access to medication abortion

care for decades. The district court wrongly presumed that, in the absence of medication abortions, pregnant people could seek procedural abortions. In doing so, the district court ignored the challenges this method poses for many pregnant people, including increased travel times to clinics, increased wait times at those clinics, and increased costs. These challenges disproportionately harm Black and low-income pregnant people who may not be able to afford the increased costs and time associated with a procedural abortion.

*Finally*, the district court's decision is contrary to the public's interest. The availability of mifepristone plays a significant role in easing abortion access, and invalidating FDA approval for mifepristone will significantly impede abortion access. This is especially true for the majority of Black Americans, who live in southern and midwestern states that have passed the most restrictive abortion laws since *Dobbs*. With the most common method of abortion further limited, the challenges to accessing abortion care only compound for Black and low-income pregnant people.

For these reasons, we respectfully urge this Court to immediately extend the administrative stay and then stay the district court's order pending appeal.

## ARGUMENT

## I.    THE DISTRICT COURT'S DECISION SEVERELY RESTRICTS ABORTION IN STATES WHERE IT REMAINS LEGAL

Since 2000, the FDA has permitted the use of mifepristone in a two-drug regimen for medication abortion. During that time, mifepristone has been widely used safely and effectively to terminate early pregnancies for millions of patients. More recently, the FDA has approved mifepristone as part of the medication abortion protocol up to 10 weeks after a person's last menstrual period.[3] The district court's decision below stays the FDA's approval of mifepristone nationwide. *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 2:22-CV-223-Z (N.D. Tex. Apr. 7, 2023), ECF No. 137 (order granting preliminary injunction) [hereinafter Order, ECF No. 137]. Absent intervention from this Court, the two-step abortion regimen will be inaccessible beginning on April 14, 2023, even in states where it would otherwise be legal.

Because the district court's opinion will impact the availability of mifepristone in all 50 states, it is contrary to the minimal assurances provided for in *Dobbs*. Justice Kavanaugh's concurrence emphasized that the *Dobbs* decision "does not prevent the numerous States that readily allow abortion from continuing to

---

[3] *Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, U.S. Food & Drug Admin. (Jan. 4, 2023) https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation.

readily allow abortion" and that all states "may evaluate the competing interests and decide how to address this consequential issue." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2305 (2022) (Kavanaugh, J., concurring).

The vast majority of those states that "continu[e] to readily allow abortion" filed an *amicus* brief in opposition to the preliminary injunction motion here, *see* Brief for the States of New York, et al. as Amici Curiae in Support of Defendants and in Opposition to Plaintiffs' Motion for Preliminary Injunction, *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 2:22-CV-223-Z (N.D. Tex. Feb. 13, 2023), ECF No. 102, and are plaintiffs in *Washington v. United States Food & Drug Administration*, a case brought by seventeen states and the District of Columbia to remove excessively burdensome FDA restrictions on mifepristone. Complaint at 3, 127, *Washington v. U.S. Food & Drug Admin.*, No. 1:23-CV-3026-TOR (E.D. Wash. Feb. 23, 2023), ECF No. 1. The plaintiffs in *Washington* argued that:

> As states across the country have moved to criminalize and civilly penalize abortion, the Plaintiff States have preserved the right to access abortion care, and have welcomed people from other states who need abortion care. The extremely limited availability of abortion in other states, and the growing threat to abortion access nationwide, makes patients' access to medication abortion paramount.

*Id.* at 2.

On the same day the preliminary injunction was granted below, the district court in *Washington* issued an order preliminarily enjoining the FDA from "altering

7

the status quo and rights as it relates to the availability of mifepristone" in the Plaintiff States, a decision that is in significant tension with the district court's order here. *Washington v. United States Food & Drug Admin.*, No. 1:23-CV-3026-TOR (E.D. Wash. Apr. 7, 2023), ECF No. 80 (Order).

Rather than leave it to individual states to "readily allow abortion," as encouraged by Justice Kavanaugh, the district court's order disallows the two-step medication abortion option entirely.[4]

## II. THE DISTRICT COURT FAILED TO CONSIDER THE RELIANCE INTERESTS OF PEOPLE WHO REQUIRE ACCESS TO SAFE ABORTION CARE

The FDA's 2021 removal of the in-person dispensing requirement and addition of a pharmacy certification process; as well as its initial approval of mifepristone "'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016) (quotation omitted). The district court failed to consider these interests, and this court must immediately extend the administrative stay and stay the district court's order pending appeal.

---

[4] LDF strongly disagrees with the central holding of *Dobbs v. Jackson Women's Health*, notwithstanding the above-referenced statements representing that the decision does not interfere with states' abilities to continue to allow abortion care.

### A. Pregnant Black Women and Other Black Pregnant People Rely on Access to Abortion to Make Decisions Regarding Their Futures

The Supreme Court opined thirty years ago that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992), *overruled on other grounds by Dobbs*, 142 S. Ct. 2228. As discussed below, the availability of mifepristone plays a significant role in easing abortion access for pregnant women and other pregnant people who face barriers to accessing procedural abortion.

Increased abortion access has had a demonstrably positive economic impact on women, and on Black women, in particular. A review of the data from 2020 among states that report racial and ethnic data on abortion patients indicates 39 percent identify as non-Hispanic Black, and among those aged 15-44 there were 24.4 abortions per 1,000 non-Hispanic Black women.[5] When people can decide if, when, and how many children to have, they are able to make conscious determinations about other aspects of their lives. A literature review conducted by the Institute for Women's Policy Research found that abortion access increased college attainment for women, with "[i]ncreases in postsecondary attainment . . . concentrated among

---

[5] Jeff Diamant & Besheer Mohamed, *What the Data Says About Abortion in the U.S.*, Pew Rsch. Ctr. (Jan. 11, 2023), https://www.pewresearch.org/fact-tank/2023/01/11/what-the-data-says-about-abortion-in-the-u-s-2/.

Black women, who had much larger decreases in teen fertility than White women."[6]

The same review also found that abortion legalization in the 1970s, following *Roe v. Wade*, led to a 9.6 percent increase in Black women's college graduation rate[7] and that abortion access resulted in a 6.9 percent increase in Black women's labor market participation rate, which was three times higher than the corresponding rate for women generally (2 percent).[8]

Further, abortion access may alleviate labor market problems faced disproportionately by Black women. For example, women in states with better reproductive health care face less occupational segregation, increased job mobility, and increased access to non-wage benefits such as paid sick days and leave, as well as promotional opportunities.[9] These impacts compound over generations: children born to women with abortion access had lower rates of poverty, were more likely to graduate college, and were less likely to receive public assistance as adults.[10]

---

[6] Inst. for Women's Pol'y Rsch., *The Economic Effects of Abortion Access: A Review of the Evidence* 2 (2019), https://iwpr.org/wp-content/uploads/2020/07/B377_Abortion-Access-Fact-Sheet_final.pdf.

[7] *Id.* (citing Joshua D. Angrist & William N. Evans, *Schooling and Labor Market Consequences of the 1970 State Abortion Reforms*, 18 Rsch. Lab. Econ. 75 (2000)).

[8] *Id.* (citing David E. Kalist, *Abortion and Female Labor Force Participation: Evidence Prior to Roe v. Wade*, 25 J. Lab. Rsch. 503 (2004)).

[9] *See* Kate Bahn et al., *Linking Reproductive Health Care Access to Labor Market Opportunities for Women*, Ctr. for Am. Progress (Nov. 21, 2017), https://www.americanprogress.org/issues/women/reports/2017/11/21/442653/linking-reproductive-health-care-access-labor-market-opportunities-women.

[10] Inst. for Women's Pol'y Rsch., *supra* note 6, at 2 (citing Jonathan Gruber et al., *Abortion Legalization and Child Living Circumstances: Who Is the 'Marginal Child'?*, 114 Q. J. Econ. 263 (1999) and Elizabeth Oltmans Ananat et al., *Abortion and Selection*, 91 Rev. Econ. & Stat. 124 (2009)).

In view of these strong reliance interests, this court must grant Defendant-Appellants' request for a stay.

## B. State Laws Restricting Abortion Access Have Created Strong Reliance Interests in the Availability of Mifepristone

The district court wrongly presumes that procedural abortion is widely-accessible, such that it is a viable substitute for medication abortion. *See* Order, ECF No. 137 at 48. To the contrary, because of state-imposed barriers to access procedural abortion, pregnant women and other pregnant people have relied on the availability of mifepristone in the United States for over 20 years. The availability of mifepristone as part of the medication abortion protocol ensures pregnant women and other pregnant people are afforded greater safety, privacy, and autonomy. These reliance interests are intensified for those with extremely limited access to facility-based abortion care, including people of color, people living with low incomes, and people in rural communities. The district court failed to take these reliance interests into account.

To be sure, between 1973 and 2022, states passed nearly 1,400 restrictions to abortion access, many necessitating multi-day appointments several hours away from home.[11] The Supreme Court's ruling in *Dobbs v. Jackson Women's Health* has

---

[11] *See* Elizabeth Nash & Lauren Cross, *2021 Is on Track to Become the Most Devastating Antiabortion State Legislative Session in Decades*, Guttmacher Inst. (June 14, 2021), https://www.guttmacher.org/article/2021/04/2021-track-become-most-devastating-antiabortion-state-legislative-session-decades.

led to further strain on access to abortion care, as states have moved to foreclose access altogether. According to #WeCount, an abortion reporting effort, North Carolina saw a 37 percent increase in the number of abortions performed; Kansas, 36 percent; and Colorado, 33 percent from April 2022 through August 2022.[12] As one study noted, "[l]aws that closed local abortion clinics forced people to travel long distances for care and state-mandated waiting periods added travel costs, and lost wages due to time off work."[13]

This strain on patients and clinics has exacerbated the reliance on medication abortion, as pregnant women and other pregnant people must travel further for procedural abortion. Since *Dobbs*, travel times for abortion care have increased by more than four hours in states with six weeks bans.[14] In Texas, travel time has increased from 15 minutes to more than eight hours because of abortion facility closures.[15] Black women have been disproportionately impacted by restricted access to in-person care, with 40 percent now having to travel distances of at least one hour, compared to just 15 percent traveling long distances pre-*Dobbs*.[16]

---

[12] Soc'y of Family Planning, *#WeCount Report* 3 (2022), https://tinyurl.com/3wuermmy.

[13] Dana M. Johnson et al., *The Economic Context of Pursuing Online Medication Abortion in the United States*, SSM - Qualitative Rsch. Health, Dec. 2021, at 1, 4.

[14] Benjamin Rader et al., *Estimated Travel Time and Spatial Access to Abortion Facilities in the US Before and After the Dobbs v Jackson Women's Health Decision*, 328 JAMA 2041, 2045 (2022).

[15] Cameron Scott, *Model Shows Where Women Lost Access to Abortion After Dobbs* Univ. of Cal. S.F. (Nov. 1, 2022), https://www.ucsf.edu/news/2022/10/424121/model-shows-where-women-lost-access-abortion-after-dobbs.

[16] *Id.*

As of December 2022, 40 percent of abortion clinics open in the United States were only scheduling appointments via medication abortion.[17] And, while the FDA permitted the use of telehealth and the mailing of medication abortion, some conflicting state laws make it more challenging for patients in those states to access medication abortion through these means.[18] Without access to mifepristone, pregnant women and other pregnant people seeking medication abortion care through the health care system will be limited to the use of misoprostol only to terminate their pregnancy. Misoprostol alone can be used safely and effectively for early pregnancy termination, but it may result in more or longer side effects such as diarrhea, fever and chills, and ongoing pregnancy is more likely after misoprostol-only treatment.[19]

Finally, people often rely upon medication abortion because of their "experiences of being low-income, uninsured, experiencing sudden economic instability, and living paycheck-to-paycheck."[20] Indeed, the Supreme Court

---

[17] Amelia Thomson-DeVeaux, *A Texas Judge's Decision Could Reduce Abortion Access . . . Again*, FiveThirtyEight (Apr. 7, 2023), https://fivethirtyeight.com/features/mifepristone-ruling-abortion-access/.

[18] Pien Huang & Mara Gordon*, Telehealth Abortion Demand Is Soaring. But Access May Come Down to Where You Live*, NPR (May 20, 2022), https://www.npr.org/sections/health-shots/2022/05/20/1099179361/telehealth-abortions-are-simple-and-private-but-restricted-in-many-states.

[19] Elizabeth G. Raymond et al., *Medication Abortion with Misoprostol-Only: A Sample Protocol*, Contraception, Feb. 25, 2023, at 1, 2, https://www.contraceptionjournal.org/article/S0010-7824(23)00060-4/fulltext; *The Availability and Use of Medication Abortion*, KFF (Feb. 24, 2023), https://www.kff.org/womens-health-policy/fact-sheet/the-availability-and-use-of-medication-abortion/.

[20] Johnson et al., *supra* note 13, at 3.

recognized nearly 50 years ago that travel is prohibitive to accessing abortion care, emphasizing that the petitioner in *Roe v. Wade* "could not afford to travel . . . in order to secure a legal abortion under safe conditions." 410 U.S. 113, 120 (1973). And, again, the Court recognized that "the burdens of . . . increased travel would fall disproportionately on poor women, who are least able to absorb them." *June Med. Servs. v. Russo*, 140 S. Ct. 2103, 2130 (2020). These onerous requirements for patients and providers have erected near-insurmountable barriers to clinic-based abortion care for people with limited economic resources and time.

In view of these realities, a stay is proper because the district court did not give serious consideration to these significant reliance interests.

### III.     THE PUBLIC INTEREST IS NOT SUPPORTED BY THE DISTRICT COURT'S DECISION

The district court claims a preliminary injunction is necessary to protect the public interest by "ensuring that women and girls are protected from unnecessary harm and that Defendants do not disregard federal law." Order, ECF No. 137 at 64. However, the district court's failure to consider the potential and foreseeable harms of eliminating access to medication abortion further undermines the district court's reasoning. As discussed below, issuing a preliminary injunction is contrary to the public interest and this court must extend the administrative stay and the district court's order pending appeal.

## A. The Court Did Not Consider the Real-World Impact of Restricting Abortion Care.

The district court does not seriously contend with the impact of decreased abortion access. Instead, the district court misconstrues the declaration of Defendant-Appellant's expert, which describes the negative socioeconomic impacts on children when their parents are denied abortion care by mischaracterizing that as a "eugenic goal[]," and contrary to the public's interest. *See id*. (quotation marks and citation omitted). Conflating the perverse and horrific history of forced sterilization and medical experimentation suffered by Black women and other people in the United States with efforts to highlight the harms that result from denial of reproductive care and bodily autonomy is a false equivalence that should be rejected. People seek abortion care for myriad reasons, including to ensure stability for oneself and their family, which is not a "eugenic goal[]." Black pregnant women and other pregnant people who seek abortion care, do so in order to exert their autonomy and agency over their reproductive lives in their best interest, as well as that of their families. *See Casey*, 505 U.S. at 851 ("Matters[] involving the most intimate and personal choices a person may make in a lifetime [are] choices central to personal dignity and autonomy . . . ."). The district court's assertion that greater abortion access is a "eugenics goal" disregards the very real impacts and public interests at issue in this case, is inaccurate, and dangerously stigmatizes people who seek abortion care.

To be sure, the financial consequences of abortion denial can be severe. One study revealed that individuals who were denied abortions and eventually gave birth were four times more likely to have household incomes below the federal poverty level and were more likely to report being unable to afford basic necessities.[21] A 2020 working paper found that abortion denial corresponds with a 78 percent increase in the amount of overdue debt and an 81 percent increase in negative public records, including bankruptcy and eviction.[22] The researchers observed:

> [T]he impact of being denied an abortion on collections is as large as the effect of being evicted and the impact on unpaid bills is several times larger than the effect of losing health insurance. Although imprecisely estimated in our setting, it appears that denying a woman an abortion reduces her credit score by more than the impact of a health shock resulting in a hospitalization or being exposed to high levels of flooding following Hurricane Harvey.[23]

Thus, the significant real-world social and economic costs of reducing access to medication abortion, which could result in denying abortion access to many pregnant Black women and other pregnant people, weigh strongly in favor of Defendant-Appellant's request for a stay.

---

[21] Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 108 Am. J. Pub. Health 407, 410–12 (2018); Advancing New Standards in Reproductive Health, Bixby Ctr. for Glob. Reproductive Health, *Turnaway Study*, www.ansirh.org/sites/default/files/publications/files/turnaway_study_brief_web.pdf (last visited Apr. 10, 2023) (hereinafter *Turnaway Study*).

[22] Sarah Miller et al., *The Economic Consequences of Being Denied an Abortion* 3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 26662, 2020), https://www.nber.org/system/files/working_papers/w26662/w26662.pdf. Notably, this working paper drew on data collected in the Turnaway Study, *supra* note 21.

[23] Miller et al., *supra* note 22, at 29 (internal citations omitted).

### B. Suspending Access to Mifepristone Exacerbates Inequities in Abortion Care for Black Pregnant Women and Other Pregnant People

Due to systemic racism and discrimination, Black women and Black people generally, including those who can become pregnant, have faced inequities in their ability to access essential health care, including abortion care.[24] The district court's decision to suspend the FDA's approval of mifepristone will exacerbate existing racial and economic inequities in access to abortion care. Cementing inequities along racial and economic lines undermines any conceivable interest in the public good.

In the past several years, medication abortion use has increased from 40 percent in 2018, to 44 percent in 2019 up to 53 percent in 2020.[25] Thus, 2020 was the first time that medication abortion was the predominant method of abortion care in the United States.

However, the number of abortions provided by health care providers sharply declined post-*Dobbs*. Abortion access in the United States has been on shifting sands ever since the *Dobbs* decision, 142 S. Ct. 228. For example, from April 2022 through August 2022, there was a 95 percent decrease in the number of abortions by provider in states that banned or severely restricted access to abortion, and there was a 32

---

[24] *See* Cynthia Prather et al., *Racism, African American Women, and Their Sexual and Reproductive Health: A Review of Historical and Contemporary Evidence and Implications for Health Equit*y, 2 Health Equity 249 (2018).
[25] Diamant & Mohamed, *supra* note 5.

17

percent decrease in the number of abortions by providers in states that restricted abortion access. Should this district court's decision stand, there will be additional chaos and confusion for Black pregnant women and other pregnant people, as well as health care providers around what kind care is legal and where, which will have real world impacts for abortion and miscarriage care.[26]

Southern and midwestern states, where the majority of Black Americans live, have passed the most restrictive abortion laws post-*Dobbs*.[27] Most abortions are now banned in over 10 states, and seven other states severely limit access to abortion care.[28] In the 100 days immediately after *Dobbs*, 66 abortion clinics in the United States, across 15 southern and midwestern states, stopped providing abortion care, leading to an even greater abortion care desert in communities than existed before.[29]

---

[26] Pretreatment with mifepristone followed by misoprostol has been found to result in a "higher likelihood of prompt and effective treatment of early pregnancy loss than misoprostol use alone." Courtney A. Schreiber et al., *Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss*, 378 N. Engl. J. Med. 2161, 2169 (2018); *see also* Justin J. Chu et al., *Mifepristone and Misoprostol Versus Misoprostol Alone for the Management of Missed Miscarriage (MifeMiso): A Randomised, Double-Blind, Placebo Controlled Trial*, 396 Lancent 770 (2020). Misoprostol is only available to health care providers in the United States consistent with the restrictions on mifepristone. *See* Mara Gordon & Sarah McCammon, *A Drug That Eases Miscarriages Is Difficult for Women to Get*, NPR (Jan. 10, 2019), https://www.npr.org/sections/health-shots/2019/01/10/666957368/a-drug-that-eases-miscarriages-is-difficult-for-women-to-get.

[27] Liza Fuentes, *Inequity in US Abortion Rights and Access: The End of Roe Is Deepening Existing Divides*, Guttmacher Institute, (Jan. 17, 2023), https://www.guttmacher.org/2023/01/inequity-us-abortion-rights-and-access-end-roe-deepening-existing-divides.

[28] Sarah Knight et al., *Here's Where Abortions Are Now Banned Or Severely Restricted*, NPR (Mar. 31, 2023), https://www.npr.org/sections/health-shots/2022/06/24/1107126432/abortion-bans-supreme-court-roe-v-wade.

[29] *See* Fuentes, *supra* note 27.

The proportion of Black women abortion seekers pre-*Dobbs* was greater in states that now have extreme abortion bans or restrictions, like Georgia, Alabama, Tennessee, Arkansas and Mississippi.[30] Because Black women in the South are statistically likely to have higher poverty rates, for many traveling out of their state for abortion care is not feasible.[31]

Access to abortion care can also be limited based on a lack of access to insurance coverage. Thirteen percent of Black women ages 15-49 have no health insurance compared to 8 percent of white women.[32] Black women of reproductive age face the biggest disparity in insurance coverage.[33] Because the Hyde Amendment prohibits federal funding of most abortions, and many states restrict private insurers from covering abortion services, pregnant women and other pregnant people seeking abortion care need to find the resources to cover the out-of-pocket costs for care in addition to travel related costs, and because many are already parents, they must also arrange for childcare expenses.[34] Because many pregnant

---

[30] Taylor Jackson & Kelsey Butler, *Abortion Desert in the US South Is Hurting Black Women the Most*, Bloomberg (Aug. 23, 2022), https://www.bloomberg.com/news/articles/2022-08-23/black-women-are-hardest-hit-by-abortion-restrictions-sweeping-the-deep-south?leadSource=uverify%20wall.

[31] *Id.*

[32] Fuentes, *supra* note 27.

[33] Nat'l Partnership for Women and Families, *Fact Sheet: Black Women Experience Pervasive Disparities in Access to Health Insurance* (2019), https://www.nationalpartnership.org/our-work/resources/health-care/black-womens-health-insurance-coverage.pdf.

[34] *See* Ushma D. Upadhyay et al., *Trends in Self-Pay Charges and Insurance Acceptance for Abortion in the United States, 2017-20*, 41 Health Affs. 507, 507, 513–14 (2022).

Black women and other pregnant people seeking abortion care will need to pay out of pocket due to lack of insurance access or restrictions on using insurance for services, they may be forced to forego payment of bills and other necessary expenses in order to afford abortion care.[35] For pregnant Black women and other pregnant people living on low incomes navigating a more limited landscape for abortion care – i.e., misoprostol-only providers or procedural abortion care – will pose challenges and could pose an insurmountable burden to accessing abortion care.[36]

In the years immediately following the *Roe* decision, Justice Marshall observed the disparities in abortion access and specifically noted that the denial of federal funding for abortion care was tantamount to the denial of a legal abortion for indigent women. *Harris v. McRae*, 448 U.S. 297, 338 (1980) (Marshall, J., dissenting). He noted that "nonwhite women obtain abortions at nearly double the rate of whites," and that access to abortion care was made more challenging for indigent women, a majority of whom are people of color. *Id.* at 343. In the forty-three years since *Roe*, and with no federal constitutional right to abortion post-*Dobbs*, pregnant Black women, other pregnant Black people, and indigent pregnant people of color continue to have the greatest challenges in accessing abortion care because of systemic racism and economic injustice.

---

[35] *See* Sarah C.M. Roberts et al., *Out-of Pocket Costs and Insurance Coverage for Abortion in the United States,* 24 Women's Health Issues e211, e217 (2014).
[36] *See* Upadhyay et al., *supra* note 34, at 514.

## CONCLUSION

For the foregoing reasons, this Court should immediately extend the administrative stay and the district court's order pending appeal.

Respectfully submitted,

*/s/ Samuel Spital*

| | |
|---|---|
| PILAR WHITAKER | JANAI S. NELSON |
| NAACP LEGAL DEFENSE AND | SAMUEL SPITAL |
| EDUCATIONAL FUND, INC. | ALEXANDRA S. THOMPSON |
| 700 14th Street NW, Suite 600 | ARIELLE HUMPHRIES* |
| Washington, DC 20005 | NAACP LEGAL DEFENSE AND |
| Tel.: (202) 682-1300 | EDUCATIONAL FUND, INC. |
| | 40 Rector St, 5th Floor |
| | New York, NY 10006 |
| | Tel.: 212-965-2200 |
| | sspital@naacpldf.org |

*Counsel for Amicus Curiae NAACP Legal Defense and Educational Fund, Inc.*

*\*Admission Pending*

21

## CERTIFICATE OF SERVICE

I certify that on April 11, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 11, 2023                    */s/ Samuel Spital*
                                          Samuel Spital

                                          *Counsel of Record for Amicus Curiae*
                                          *NAACP Legal Defense and Educational*
                                          *Fund, Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned certifies that:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5), as it contains 4,706 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman, 14-point font.

Dated: April 11, 2023                    */s/ Samuel Spital*
                                          Samuel Spital

                                          *Counsel of Record for Amicus Curiae*
                                          *NAACP Legal Defense and Educational*
                                          *Fund, Inc.*