No. 23-10362

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALLIANCE FOR HIPPOCRATIC MEDICINE, ET AL.,
*Plaintiffs-Appellees,*
*v.*
U.S. FOOD AND DRUG ADMINISTRATION, ET AL.,
*Defendants-Appellants,*

and

DANCO LABORATORIES, LLC,
*Intervenor-Appellant.*

On Appeal from the United States District Court for the Northern District of Texas, No. 2:22-cv-00223-Z

**APPENDIX OF EXHIBITS IN OPPOSITION TO AN EMERGENCY STAY PENDING APPEAL VOLUME 1 (ALLIANCE.APP. 001-114)**

JULIE MARIE BLAKE
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jblake@adflegal.org

ERIK C. BAPTIST
JOHN J. BURSCH
ERIN M. HAWLEY
MATTHEW S. BOWMAN
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
ebaptist@adflegal.org
jbursch@adflegal.org
ehawley@adflegal.org
mbowman@adflegal.org

*Counsel for Plaintiffs-Appellees*

**TABLE OF EXHIBITS**

| Description | App. Page No. |
|---|---|
| **Volume 1** | |
| Declaration of Dr. Christina Francis, ECF No. 1-8, Exhibit 7 to Complaint; MPI App. 191-200 | 001-010 |
| Declaration of Dr. Ingrid Skop, ECF No. 1-9, Exhibit 8 to Complaint; MPI App. 211-218 | 011-020 |
| Declaration of Dr. Nancy Wozniak, ECF No. 1-10, Exhibit 9 to Complaint; MPI App. 219-224 | 021-028 |
| Declaration of Dr. Steven A. Foley, ECF No. 1-11, Exhibit 10 to Complaint; MPI App. 862-868 | 029-034 |
| Defendants' Opposition to Plaintiffs Motion for a Preliminary Injunction, ECF No. 28 | 035-086 |
| Declaration of Dr. Tyler Johnson, ECF No. 1-50, Exhibit 49 to Complaint; MPI App. 869-875 | 087-093 |
| Declaration of Dr. Regina Frost-Clark, ECF No. 1-51, Exhibit 50 to Complaint; MPI App. 876-881 | 094-100 |
| Declaration of Dr. George Delgado, ECF No. 1-52, Exhibit 51 to Complaint; MPI App. 882-889 | 101-106 |
| Declaration of Dr. Shaun Jester, ECF No. 1-53, Exhibit 52 to Complaint; MPI App. 882-889 | 107-114 |
| **Volume 2** | |
| 2000 Letter from Danco to FDA (Jan. 21, 2000), ECF No. 121; MPI App. 908-914 | 115-121 |
| FDA, Center for Drug Evaluation and Research, Summary Review of Application Number: 020687Orig1s020 (March 29, 2016) (2016 Summary Review), ECF No. 1-33, Exhibit 32 to Complaint; MPI App. 624-652 | 122-150 |
| 2002 Citizen Petition of Am. Ass'n of Pro-Life Obstetricians & Gynecologists to U.S. Food & Drug Admin. (FDA) (Aug. 20, 2002), ECF No. 1-14, Exhibit 13 to Complaint; MPI App. 280-375 | Part 1 151-174 |
| **Volume 3** | |
| 2002 Citizen Petition of Am. Ass'n of Pro-Life Obstetricians & Gynecologists to U.S. Food & Drug Admin. (FDA) (Aug. 20, 2002), ECF No. 1-14, Exhibit 13 to Complaint; MPI App. 280-375 | Part 2 175-246 |

| | |
|---|---|
| 2021 FDA Letter to Am. Coll. of Obstetricians & Gynecologists and Soc'y for Maternal-Fetal Med. about Mifepristone REMS (Apr. 12, 2021),<br>     ECF No. 1-40, Exhibit 39 to Complaint; MPI App. 713-715 | 247-249 |
| **Volume 4** | |
| Declaration of Mario R. Dickerson,<br>     ECF No. 1-4, Exhibit 3 to Complaint; MPI App. 156-162 | 250-256 |
| Declaration of Dr. Donna Harrison,<br>     ECF No. 1-5, Exhibit 4 to Complaint; MPI App. 163-176 | 257-270 |
| Declaration of Dr. Jeffrey Barrows,<br>     ECF No. 1-6, Exhibit 5 to Complaint; MPI App. 177-183 | 271-277 |
| Declaration of Dr. Quentin Van Meter,<br>     ECF No. 1-7, Exhibit 6 to Complaint; MPI App. 184-190 | 278-284 |
| Marrit Niinimaki et al., *Immediate Complications After Medical Compared With Surgical Termination of Pregnancy*, 114 Obstetrics & Gynecology 795 (2009),<br>     ECF No. 1-17, Exhibit 16 to Complaint; MPI App. 398-408 | 285-295 |
| James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999-2015*, Health Servs. Rsch. & Managerial Epidemiology, Nov. 9, 2021,<br>     ECF No. 1-18, Exhibit 1 to Complaint; MPI App. 409-420 | 296-307 |
| Katherine A. Rafferty & Tessa Longbons, *#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives*. 36 Health Commc'n 1485 (2021),<br>     ECF No. 1-21, Exhibit 20 to Complaint; MPI App. 434-446 | 308-320 |
| New Drug, Antibiotic, and Biological Drug Product Regulations; Accelerated Approval, 57 Fed. Reg. 58,942 (Dec. 11, 1992),<br>     ECF No. 1-23, Exhibit 22 to Complaint; MPI App.489-508 | 321-340 |
| FDA Letter to Population Council re: NDA (Feb. 18, 2000),<br>     ECF No. 1-24, Exhibit 23 to Complaint; MPI App.509-516 | 341-348 |

| Volume 5 | |
|---|---|
| 2003 Citizen Petitioners' Response to Opposition Comments filed by The Population Council, Inc. and Danco Laboratories, LLC (Oct. 10, 2003),<br>    ECF No. 1-27, Exhibit 26 to Complaint; MPI App. 530-560 | 349-379 |
| Questions and Answers on FDA's Adverse Event Reporting System (FAERS), https://www.fda.gov/drugs/surveillance/questions-and-answers-fdas-adverse-event-reporting-system-faers,<br>    ECF No. 1-45, Exhibit 44 to Complaint; MPI App. 770-774 | 380-384 |
| Kathi A. Aultman et al., *Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 26 Law & Medicine 3 (2021),<br>    ECF 1-46, Exhibit 45 to Complaint; MPI App. 775-800 | 385-410 |
| Memorandum from FDA on Review of Supplemental Drug Applications Proposing Modifications to the Mifepristone REMS Program (Dec. 23, 2022),<br>    ECF No. 121; MPI App. 890 | 411 |
| Declaration of Dr. Donna Harrison,<br>    ECF No. 121; MPI App. 891-907 | 412-428 |
| Hannah Levintova, *The Abortion Pill's Secret Money Men*, Mother Jones, March-April 2023,<br>    ECF No. 121; MPI App. 929-938 | 429-438 |
| David C. Reardon & John M. Thorp, *Pregnancy associated death in record linkage studies relative to delivery, termination of pregnancy, and natural losses: A systematic review with a narrative synthesis and meta-analysis*, 5 SAGE Open Medicine 1 (2017),<br>    ECF No. 121; MPI App. 939-955 | 439-455 |
| 2019 FDA Abbreviated New Drug Application (ANDA) Approval Letter to GenBioPro, Inc. (Apr. 11, 2019),<br>    ECF No. 1-37, Exhibit 36 to Complaint; MPI App. 695 | 456-462 |
| 2019 FDA Supplemental Approval Letter to Danco Laboratories, LLC (Apr. 11, 2019),<br>    ECF No. 1-38, Exhibit 37 to Complaint; MPI App. 702 | 463-470 |

# Exhibit 7

Declaration of Dr. Christina Francis

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, <br>      Plaintiffs, <br><br>     v. <br><br> **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA**, in his official capacity as Secretary, U.S. Department of Health and Human Services, <br>      Defendants. | Case No. _____ |

1

Alliance.App. 002

## DECLARATION OF DR. CHRISTINA FRANCIS

I, Christina Francis, a citizen of the United States of America and a resident of Indiana, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified Obstetrician and Gynecologist (OB/Gyn) in good standing and licensed to practice in Indiana. I have been in active practice for 14 years and have worked for the last six years as an OB/Gyn Hospitalist in Fort Wayne, Indiana.

3. As an OB/Gyn Hospitalist, my practice is completely hospital-based. I manage both high- and low-risk pregnancies and deliveries, obstetric critical care, gynecological emergencies presenting to our Emergency Department, and inpatient obstetric and gynecologic consultations.

4. I am a member of the Board of Directors of Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG). I am also the CEO-elect of AAPLOG.

5. I am familiar with AAPLOG, its policy positions, its members, the members' interests and concerns. AAPLOG and its members oppose elective abortions, both surgical and chemical.

6. AAPLOG is the largest organization of pro-life obstetricians and gynecologists ("OB/Gyns") in the world and is headquartered in Indiana.

2

Alliance.App. 003

AAPLOG includes OB/Gyns and other physicians, with more than 7,000 medical professionals nationwide and more than 300 members in Texas. AAPLOG members oppose elective abortion and are committed to the care and well-being of their patients including both pregnant women and their unborn children. AAPLOG members are concerned about the adverse impacts of chemical abortion on their practice of medicine.

7. AAPLOG's mission includes advocating on behalf of its members, including in litigation.

8. AAPLOG sues in this case on behalf of itself and its members.

9. I am familiar with the FDA's regulation of chemical abortion drugs, including mifepristone and misoprostol.

10. I have seen first-hand the complications that can result from use of these dangerous chemical abortion drugs. Although Fort Wayne does not have an abortion facility, I have seen several women present with complications after seeking chemical abortions with mifepristone and misoprostol.

11. The frequency of these complications has increased since a federal district court first enjoined and set aside the FDA's in-person dispensing requirement for mifepristone in 2020.

12. As an example of how chemical abortion harms my patients and my medical practice, one of my patients had obtained mifepristone and misoprostol from a website, without an in-person visit. She was told that the drugs would come from India. After taking the chemical abortion drugs, she began having very

heavy bleeding followed by significant abdominal pain and a fever. When I saw her in the emergency room, she had evidence of retained pregnancy tissue along with endometritis, an infection of the uterine lining. She also had acute kidney injury, with elevated creatinine. She required a dilation and curettage (D&C) surgery to finish evacuating her uterus of the remaining pregnancy tissue and hospitalization for intravenous (IV) antibiotics, IV hydration, and a blood transfusion. I spent several hours with her the day of her surgery/hospital admission, keeping me from my primary patient responsibilities in the labor and delivery unit and requiring me to call in an additional physician to help cover those responsibilities.

13. As an additional example, a partner of mine and I cared for another patient who also suffered complications from chemical abortion. I had taken care of her when she was hospitalized for hyperemesis gravidarum at 9 weeks 5 days gestation. She was discharged home in good condition after significant improvement with medications. During that hospital stay, she had an ultrasound, which showed a healthy pregnancy with no apparent complications and a strong fetal heart rate. During her hospitalization, she expressed to me that she was considering abortion because of experiencing hyperemesis but was unsure. Approximately one week after her discharge, the patient presented back at our emergency room with heavy vaginal bleeding and unstable vital signs as a result of taking chemical abortion drugs. One of my partners was able to detect a fetal heartbeat. Due to the

4

amount of bleeding that she was experiencing and evidence of hemodynamic

instability, however, my partner had no choice but to perform an emergency

D&C. The patient needed to be hospitalized overnight for close observation

after the D&C. Not only did my partner need to provide several hours of

critical care for this patient, but my partner also needed to call in a back-up

physician to care for another critically ill patient. And because the preborn

baby still had a heartbeat when the patient presented, my partner felt as

though she was forced to participate in something that she did not want to be

a part of—completing the abortion.

14. As we see an increasing number of complications related to chemical

abortions, it will place a greater strain on our healthcare system (especially

in light of the fact that we are in the midst of a nationwide blood shortage

and there are several healthcare deserts where there are no OB/Gyn's), and

more physicians with ethical and medical objections to abortion will be forced

to participate in completing unfinished elective chemical abortions in

emergency situations, just as my partner was.

15. AAPLOG members are opposed to being forced to end the life of a human

being in the womb for no medical reason, including by having to complete an

incomplete elective chemical abortion. The objections are both ethical and

medical as they stem from the purpose of medicine itself, which is to heal and

not to electively kill human beings regardless of their location. Accordingly,

AAPLOG and our members are harmed by the FDA's repeated removal of

5

necessary safeguards, which may force them to treat women and girls

seeking the completion of an elective chemical abortion.

16. AAPLOG, its members, and their patients are also harmed by the FDA's

actions that require prescribers to report only deaths and no other

complications associated with chemical abortion. As a physician, I know that

other complications have significant impacts on my patients as well as our

healthcare system. Therefore, the FDA should require reporting of these

complications too. But the system for reporting adverse events is not set up to

be conducive for busy physicians to report these complications and takes a

significant amount of time.

17. To report complications to the manufacturer, Danco, a form must be printed,

filled out by hand, and then either mailed or scanned and emailed back.

Much of the information required by this form is impossible to obtain by the

physician seeing the patient if they were not the one who dispensed the

chemical abortion drugs (such as lot number and dosage)—forcing me to leave

several fields blank. I never received confirmation from Danco whether the

complications I reported were recorded or reported to the FDA.

18. In addition to reporting to the manufacturer, the process of reporting to the

FDA Adverse Event Reporting System (FAERS) is also cumbersome. The

actual form to be filled out is not easy to find online—requiring several steps

to get to it. It once took me two hours to get the website to accept submission

of the form, taking me away from the care of my other patients. The

6

minimum amount of time I have spent reporting a mifepristone complication to the FAERS is thirty minutes—valuable time that should be spent in patient care.

19. The FDA's failure to require reporting of all adverse events, combined with its inadequate reporting system, prevents AAPLOG from providing the public, our members, and our members' patients with accurate statistics and complete information regarding potential risks associated with the use of chemical abortion drugs.

20. The inability to share accurate information with member physicians, their patients, and the public on the risks of chemical abortion frustrates and complicates AAPLOG's purpose to support women's health and to educate doctors, their patients, and the public about these dangers. It forces physicians to actually provide their patients with inaccurate information, leading to the lack of fully informed consent for women.

21. AAPLOG needs to divert limited time, energy, and resources to compensate for this lack of information by conducting our own studies and analyses of the available data. This diversion of time, energy, and resources comes to the detriment of other advocacy and educational efforts of AAPLOG, including our efforts regarding the dangers of surgical abortion, the conscience rights of doctors, and the sanctity of life at all stages.

22. In 2002, AAPLOG submitted a Citizen Petition challenging the FDA's approval of Mifeprex and requesting an audit of the Mifeprex clinical studies.

7

AAPLOG, as an organization, is concerned about women's health issues and recognized that the FDA's violations of its standards and rules in approving Mifeprex put women's lives and health at risk. It took considerable time, energy, and resources to draft the 92-page petition and the 30-page response to comments letter, in addition to compiling and analyzing supporting sources and studies. This effort caused AAPLOG to divert limited time, energy, and resources from its other priorities and routine functions.

23. Later, in 2019, AAPLOG submitted another Citizen Petition challenging the FDA's 2016 major changes to the chemical abortion drug regimen. It also took considerable time, energy, and resources to draft the 26-page petition, in addition to compiling and analyzing supporting sources and studies. This effort caused AAPLOG to divert limited time, energy, and resources from its other priorities and routine functions.

24. Because abortion activists continue to file their own citizen petitions and letters with the FDA asking the agency to eliminate all protections for women and girls who take chemical abortion drugs, and knowing the Biden administration's relentless, politicized efforts to push these drugs throughout the country, AAPLOG continues to expend considerable time, energy, and resources on its public advocacy and educational activities regarding chemical abortion drugs—to the detriment of other AAPLOG priorities and functions. This diversion of time, energy, and resources will not cease until the FDA's approval and deregulation of chemical abortion drugs ceases.

Alliance.App. 009

Executed this November __11__, 2022.

By: _____

Christina Francis, M.D.

9

# Exhibit 8

Declaration of Dr. Ingrid Skop

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, <br> Plaintiffs, <br><br> v. <br><br> **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA**, in his official capacity as Secretary, U.S. Department of Health and Human Services, <br> Defendants. | Case No. _____ |

1

## DECLARATION OF DR. INGRID SKOP

I, Ingrid Skop, a citizen of the United States and a resident of San Antonio, Texas, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1.  I am over eighteen years old and make this declaration on personal knowledge.

2.  I am a board-certified obstetrician and gynecologist working for OB Hospitalist Group with privileges in the Baptist Hospital System.

3.  I also serve as a Senior Fellow and Director of Medical Affairs at the Charlotte Lozier Institute.

4.  I am a member of Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG), where I served as a member of the board from 2018-2020. I am also a member of the Christian Medical & Dental Associations.

5.  I received my medical degree from Washington University School of Medicine in 1992 and completed my residency in obstetrics and gynecology at the University of Texas Health Sciences Center at San Antonio in 1996.

6.  My current practice involves delivering babies and performing surgeries in a hospital setting as an obstetric hospitalist. In my prior 25-year career in a large single-specialty OB/GYN practice, I also provided clinic-based obstetric and gynecologic care to women and girls.

Alliance.App. 013

7. I have provided written and oral expert testimony about chemical abortion to several state legislatures and to the United States Congress.

8. I have also published the peer-reviewed articles "Chemical Abortion: Risks Posed by Changes in Supervision" and "Medical Abortion: What Physicians Need to Know" in the Journal of American Physicians and Surgeons.

9. The articles I published reflect the research I have performed on the risks associated with unsupervised chemical abortion—a practice that is becoming more common.

10. A chemical abortion includes providing patients with a combination of two drugs. One drug—mifepristone—blocks hormonal support, killing the unborn child, while the other—misoprostol—induces uterine contractions to expel the unborn child and the pregnancy tissue.

11. The drugs mifepristone and misoprostol may cause serious complications for the women and girls who take them.

12. In my practice, I often treat patients who are admitted through the hospital's emergency department with complications from chemical abortions.

13. In my practice, I have cared for several dozen women in the emergency department who were totally unprepared for the pain and bleeding they experienced due to chemical abortion.

14. In my experience caring for women who have gone through chemical abortion, the doctors who prescribed or administered chemical abortion drugs

3

to these women often did not adequately prepare them for the drugs' effects, so these women could not have truly achieved informed consent.

15. At least a dozen patients have expressed significant emotional distress to me when they viewed the body of their unborn child in the toilet after the chemical abortion.

16. I have treated patients who have experienced trauma and emotional distress because of complications from chemical abortion. Those women were not anticipating that complications were possible and likely did not have sufficient informed consent to proceed with chemical abortion.

17. In my practice, I have cared for at least a dozen women who have required surgery to remove retained pregnancy tissue after a chemical abortion. Sometimes this includes the embryo or fetus, and sometimes it is placental tissue that has not been completely expelled.

18. I have cared for approximately five women who, after a chemical abortion, have required admission for a blood transfusion or intravenous antibiotics or both.

19. Complications from chemical abortion are not uncommon. In fact, chemical abortions involve more complications than surgical abortions.

20. The FDA's actions in 2016 and 2021 have increased the frequency of complications from chemical abortion.

21. Given my experience, I expect to see and treat more patients presenting with complications from chemical abortion.

Alliance.App. 015

22. For example, in one month while covering the emergency room, my group practice admitted three women to the hospital. Of the three women admitted in one month due to chemical abortion complications, one required admission to the intensive care unit for sepsis and intravenous antibiotics, one required a blood transfusion for hemorrhage, and one required surgical completion for the retained products of conception (*i.e.*, the doctors had to surgically finish the abortion with a suction aspiration procedure).

23. In my office, I treated one young woman who had been bleeding for six weeks after she took the chemical abortions drugs given to her by a doctor at a Planned Parenthood clinic. After two follow-ups at Planned Parenthood, during which she was given additional misoprostol but not offered surgical completion, she presented to me for help. I performed a sonogram, identified a significant amount of pregnancy tissue remaining in her uterus, and performed a suction aspiration procedure to resolve her complication.

24. I have also cared for minor women below the age of 18 who have obtained chemical abortion drugs. Although mifepristone has not been studied specifically in minor women, the FDA has negligently allowed their provision to this special age group, assuming their response will be the same as adult women.

25. The FDA's actions deregulating mifepristone and expanding access to unsupervised chemical abortion harm women and their doctors, including me. Concerns about "unsafe, back-alley abortions" were used to overturn all

Alliance.App. 016

state abortion restrictions in 1973 and they are being recycled today to allow the abortion industry to continue perpetuating dangerous abortion methods. Yet, a clear-eyed look at the FDA's actions allowing unsupervised "mail-order abortions" shows that they are now promoting illegal, unsafe "chemical coat hangers" to the women they falsely say they want to protect.

26. The FDA's actions harm women, including my patients, because without proper oversight, chemical abortions can become even more dangerous than when they are supervised.

27. The FDA's actions harm women, including my patients, because clinics and physicians prescribing or dispensing chemical abortion drugs, or websites that provide these drugs through mail order delivery without any physician involvement, often underprepare women for the severity and risks of chemical abortion, and they often provide insufficient or no follow-up care to those women. Many women are inadequately prepared for the effects of the drugs, the severity of the pain and bleeding they will experience, the human tissue they will expel, and some are unaware that they have complicating factors such as ectopic implantation, more advanced gestation than estimated, and Rh-negative blood type. These patients are being abandoned because in many cases there is no doctor-patient relationship, so they often present to overwhelmed emergency rooms in their distress, where they are usually cared for by physicians other than the abortion prescriber.

28. Unsupervised chemical abortion—authorized by the FDA—harms women because they may have underestimated the gestational age of their unborn child. Women who should not be a candidate for chemical abortion because they are past the FDA-approved cutoff of ten weeks gestation may consume chemical abortion drugs, which will increase their chances of complications due to the increased amount of tissue, leading to hemorrhage, infection and/or the need for surgeries or other emergency care.

29. For example, approximately 2% of pregnancies are ectopic pregnancies, implanted outside of the uterine cavity. Chemical abortion drugs will not effectually end an ectopic pregnancy because they exert their effects on the uterus, which leaves women at risk of severe harm from hemorrhage due to tubal rupture, in need of emergent surgery or potentially at risk of death. Failure to perform an ultrasound prior to prescribing abortion drugs will cause some women to remain undiagnosed and at high risk for these adverse outcomes.

30. The FDA's removal of the reporting requirement for adverse events of mifepristone harms women by creating an inaccurate safety profile, and it harms my practice because it makes it more difficult to practice evidence-based medicine. The incidence of abortion-related complications remains unknown if there is no accurate system for data collection.

31. The FDA's actions also harm women because the lack of oversight will likely exacerbate human trafficking, which happens frequently in San Antonio. In

7

my practice, part of my care of my patients is ensuring that they are making medical decisions free of coercion. Many trafficked women experience unintended pregnancies and alert doctors serve as an important resource to intervene on behalf of women. Removing the in-person medical interaction removes an opportunity to identify and rescue these women. It also leaves them at risk of being coerced into an abortion they may not desire.

32. Deregulated chemical abortion harms my practice because it increases the number of women who come to the emergency department with complications. When I must perform surgery to deal with complications from chemical abortions, this takes attention away from my other patients. As a hospitalist, I am often supervising multiple laboring patients on labor and delivery. When I am called to the operating room to address an emergency resulting from chemical abortion, this necessarily means I may not be immediately available if an emergency should occur with one of my laboring patients.

33. Unsupervised chemical abortion is heartbreaking to me because it causes women to suffer unnecessarily, and my patients deserve quality medical care.

34. The FDA's expansion of chemical abortion also harms my conscience rights because it could force me to have to surgically finish an incomplete elective chemical abortion. I object to abortion because it ends a human life. My moral and ethical obligation to my patients is to promote human life and health.

But the FDA's actions may force me to end the life of a human being in the womb for no medical reason.

Executed this November 11, 2022.

By: _____
Ingrid Skop, MD

# Exhibit 9

Declaration of Dr. Nancy Wozniak

IN IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services, | |
| Defendants. | |

1

## DECLARATION OF DR. NANCY WOZNIAK

I, Nancy Wozniak, M.D., a citizen of the United States and a resident of
Fishers, Indiana, declare under penalty of perjury under 28 U.S.C. § 1746 that the
following is true and correct to the best of my knowledge.

1.  I am over eighteen years old and make this declaration on personal
    knowledge.

2.  I am a board-certified obstetrician and gynecologist practicing in the greater
    Indianapolis area. My practice includes obstetrics at two Indianapolis-area
    hospitals.

3.  I am a member of the Board of Directors of Plaintiff American Association of
    Pro-Life Obstetricians and Gynecologists (AAPLOG) and serve as AAPLOG's
    Secretary. I am familiar with AAPLOG, its policy positions, its members, the
    members' interests and concerns. AAPLOG and its members oppose elective
    abortions, both surgical and chemical.

4.  I am familiar the approval of mifepristone and misoprostol as chemical
    abortion drugs by the U.S. Food and Drug Administration (FDA) and with
    the FDA's Risk Evaluation and Mitigation Strategy (REMS) for the use of
    mifepristone and misoprostol for chemical abortions.

5.  A REMS is a drug safety program that the FDA can require for certain
    medications with serious safety concerns to help ensure the benefits of the
    medication outweigh its risks.

2

Alliance.App. 023

6. Under the REMS established by the FDA in 2016 for mifepristone and misoprostol, the agency eliminated (a) the in-person administration requirement, (b) mandatory post-abortion follow-ups, and (c) the requirement that prescribers report all adverse events except death.

7. In 2016, the FDA also expanded the gestational age for approved mifepristone use to 70 days (or 10 weeks) from 49 days (or 7 weeks).

8. The FDA's actions harm patients and practitioners like me.

9. Mifepristone and misoprostol are dangerous drugs that can harm women. Without the appropriate supervision, women taking these drugs are at risk of serious complications and even death in the worst cases.

10. I believe the FDA's expansion of the approved timeframe for mifepristone and misoprostol use to 10 weeks of gestation harms women. An abortionist should never prescribe these drugs to any woman for an abortion after 8 weeks' gestation because I have seen so many women get into trouble with bleeding past that gestational age.

11. Few people die from chemical abortions because of the excellent care they receive from OBGYN doctors, but the infrequency of deaths conceals the danger that these drugs pose to women and girls—especially when administered without proper supervision.

12. In my experience, most of the complications related to the use of mifepristone and misoprostol for chemical abortions result in "near misses" due to the timely intervention of healthcare providers.

3

13. Recently many states like Indiana have enacted laws to regulate abortions more carefully. To circumvent those laws, abortion providers are relying on increased access to chemical abortion drugs through mail-order schemes or telemedicine.

14. The increasing number of chemical abortions through mail-order or telemedicine methods means that more women will suffer complications from unsupervised use of mifepristone and misoprostol.

15. The risk of complications from chemical abortions is four to seven times greater than from surgical abortions.

16. Currently, many women are now being prescribed mifepristone and misoprostol without a sonogram to verify the gestational age of the unborn child or to rule out ectopic pregnancies or other potential complications.

17. Women have the potential to present to the emergency department with torrential bleeding due to taking mifepristone and misoprostol for a chemical abortion without accurate dating and appropriate supervision. This places enormous stress and pressure on physicians and OB/Gyns who work in hospitals.

18. In my observation, incidents of women presenting to emergency departments with complaints of bleeding are becoming increasingly more common.

19. Due to the FDA's elimination of the adverse event reporting requirements, however, it is impossible to know how frequently women and doctors are facing these complications.

4

20. The FDA's elimination of the adverse event reporting requirements for non-fatal complications harms doctors' ability to practice evidence-based medicine and to provide their patients about the risks of chemical abortion and obtain their informed consent. Doctors are only as good as the information that they receive.

21. These physicians must treat women in emergency situations without an existing relationship with the patient, without a known gestational age, and without any known medications that the patient may have been prescribed. This dynamic also increases doctors' exposure to allegations of malpractice and potential liability.

22. The FDA's loosening of regulations related to chemical abortions harms hospitalists by putting them in higher-risk situations with less critical information about patients, which increases their exposure to allegations of malpractice and potential liability.

23. In the last six months, I had an experience treating a woman that illustrates how dangerous and damaging the FDA's actions are to women and practitioners.

24. One of my patients, who was about nine weeks pregnant, had previously been treated by hospital staff for a pulmonary embolism with anti-coagulants. She was advised that she could not seek a chemical abortion because it was contraindicated due to the medications; yet the woman left the hospital and sought an abortion at Planned Parenthood of Indiana. The woman was given

5

mifepristone by the doctor at Planned Parenthood and took the drug. The

woman called an Uber for a ride home from Planned Parenthood. The woman

began to experience bleeding and other adverse side effects from the

mifepristone. The woman's Uber driver did not take her home because she

was so ill and instead brought her to the hospital's emergency department. At

the hospital, the woman came under my care. The woman had not yet taken

the second abortion drug, misoprostol. I treated the patient for the adverse

effects she suffered and told her not to take the misoprostol given to her by

Planned Parenthood because of the grave risk that she could bleed out and

die. The woman had a subsequent ultrasound, which showed that her unborn

child was still alive. I advised the internists treating this patient to avoid

administering certain medications that could harm the patient and her

unborn child.

25. This experience that I had illustrates one of many "near misses" where

women and girls face potentially deadly situations, but they are saved by

intervention at a hospital's emergency department.

26. Under the FDA's current reporting requirements, this experience need not be

reported as an adverse event. I attempted to report this event to the Indiana

Department of Public Health, but my report was rejected because the State

said it was not a "true" adverse event because the patient ultimately

recovered.

6

Alliance.App. 027

27. In my experience with the patient I just described, I spent a significant amount of time that day working to save her life from unnecessary complications due to the irresponsible administration and use of mifepristone and misoprostol. As a result of the significant time that I devoted to that patient, my time and attention was taken away from my other patients, who also need my care.

28. I also know that many women who are suffering complications from chemical abortions tell their doctors that they are experiencing miscarriages. This phenomenon—regardless of why it occurs—means that doctors cannot be certain of what their patients have taken or are experiencing. The lack of information makes it extremely difficult to provide proper treatment to these patients. This inaccurate information also means that the true number of incidences of complications from chemical abortions are significantly underreported or not fully known.

29. Given my experience, I expect to see and treat more patients presenting themselves with complications from chemical abortion.

Executed this November ⏟11⏟, 2022.

By: _____
    Nancy Goodwine-Wozniak, M.D.

7

# Exhibit 10

Declaration of Dr. Steven A. Foley

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

**ALLIANCE FOR HIPPOCRATIC
MEDICINE**, on behalf of itself, its members,
and their members, and their members'
patients; **AMERICAN ASSOCIATION OF
PRO-LIFE OBSTETRICIANS AND
GYNECOLOGISTS**, on behalf of itself, its
members, and their patients; **AMERICAN
COLLEGE OF PEDIATRICIANS**, on
behalf of itself, its members, and their
patients; **CHRISTIAN MEDICAL &
DENTAL ASSOCIATIONS**, on behalf of
itself, its members, and their patients;
**SHAUN JESTER, D.O.**, on behalf of
himself and his patients; **REGINA FROST-
CLARK, M.D.**, on behalf of herself and her
patients; **TYLER JOHNSON, D.O.**, on
behalf of himself and his patients; and
**GEORGE DELGADO, M.D.**, on behalf of
himself and his patients,
          Plaintiffs,

          v.

**U.S. FOOD AND DRUG
ADMINISTRATION; ROBERT M.
CALIFF, M.D.**, in his official capacity as
Commissioner of Food and Drugs, U.S. Food
and Drug Administration; **JANET
WOODCOCK, M.D.**, in her official capacity
as Principal Deputy Commissioner, U.S.
Food and Drug Administration **PATRIZIA
CAVAZZONI, M.D.**, in her official capacity
as Director, Center for Drug Evaluation and
Research, U.S. Food and Drug
Administration; **U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES**; and
**XAVIER BECERRA,** in his official capacity
as Secretary, U.S. Department of Health and
Human Services,
          Defendants.

Case No. _____

1

## DECLARATION OF DR. STEVEN A. FOLEY

I, Steven A. Foley, a citizen of the United States and a resident of Carmel,
Indiana, declare under penalty of perjury under 28 U.S.C. § 1746 that the following
is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal
   knowledge.

2. I am board-certified in obstetrics and gynecology. I practice in Angola,
   Indiana, and Evansville, Indiana.

3. As a hospitalist, I am associated with several hospitals and cover the
   emergency department for hospitals. As an OB/Gyn in a hospital setting, I
   have treated numerous women who have suffered complications from
   abortions.

4. I have practiced obstetrics and gynecology in Indiana and other states for
   many years.

5. I am a member of Plaintiff Christian Medical and Dental Associations.

6. During my time in Colorado, I was one of the only OB/Gyn doctors available
   to many patients. For example, during my time working in the plains of
   Colorado, it was 120 miles to the next OB/Gyn doctor.

7. I believe regulatory actions of the United States Food and Drug
   Administration (FDA) on chemical abortion will harm my practice and my
   patients.

2

Alliance.App. 031

8. Women suffer more complications from chemical abortions than surgical abortions.

9. The removal of the supervision requirements before administering chemical abortion drugs harms patients because it does not allow a doctor to establish gestational age, determine whether the woman has an ectopic pregnancy, or to check the Rhesus (Rh) levels of the patients. Giving women abortifacient drugs without these simple screening steps is simply against the standard of care and will cause more complications.

10. The FDA's actions will especially harm my practice in Indiana since the state's ban on abortions after 15 weeks took effect on September 15, 2022. This means more women will turn to chemical abortion drugs that they are able to obtain online and through the mail because they will seek to use these drugs to obtain surreptitious abortions after the gestational age limit. The increase in number of women taking chemical abortion drugs, especially later in gestational age, will lead to an increased demand in the emergency department.

11. Under the current practice by those who prescribe and dispense chemical abortion drugs like mifepristone and misoprostol, there is no follow-up or additional care provided to patients. Instead, with no established relationship with a physician, patients are simply left to report to the emergency room when they experience adverse effects.

3

12. Many women are underinformed on the severity of the effects associated
    with chemical abortions, including the duration and severity of bleeding, the
    pain associated with the process, and the emotional trauma that they
    experience.

13. When chemical abortion drugs work as intended, a woman will effectively
    deliver her unborn child and the placental and any other pregnancy tissues.

14. Many women who report to the emergency department do not disclose that
    they have taken abortifacient drugs. In some instances, women will tell
    medical providers that they are suffering a miscarriage. The lack of
    information or misinformation received by doctors by their patients impacts
    the course of treatment and the care that doctors can provide.

15. Because abortionists do not adequately inform a woman or a girl about what
    happens during a chemical abortion and give these drugs to her to take
    outside of the abortion facility, I have needed to treat and care for many
    women who have presented to the emergency department with intense
    bleeding and other effects of the chemical abortion drugs—although not
    considered complications from the regimen.

16. I have also treated several women for abortion-pill reversal, where women
    seek to stop a chemical abortion from occurring after they have taken
    mifepristone. I prescribe the drug progesterone for these patients in an
    attempt to save their pregnancy. These women experience mental anguish

4

over the experience of having chosen chemical abortion, and some of them do not feel like they were properly advised as to what they were choosing.

17. The FDA's removal of the adverse event reporting requirement for all adverse events except death harms my ability to perform evidence-based medicine. I am unable to assess the risks present to women because the FDA's removal of reporting requirements undermines the legitimacy of risk data.

Executed this November 13, 2022.

By: _____
Steven A. Foley, M.D.

5

Alliance.App. 034

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| Alliance for Hippocratic Medicine, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>U.S. Food and Drug Administration, *et al.*,<br><br>                    Defendants. | Case No. 2:22-cv-00223-Z |

### Defendants' Opposition To Plaintiffs' Motion For A Preliminary Injunction

OF COUNSEL:

SAMUEL R. BAGENSTOS
General Counsel

MARK RAZA
Associate General Counsel
U.S. Department of Health
  and Human Services
Chief Counsel
Food and Drug Administration

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Acting Director

HILARY K. PERKINS
Assistant Director

NOAH T. KATZEN (D.C. Bar. No. 1006053)
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386
(202) 305-2428
(202) 514-8742 (fax)
Noah.T.Katzen@usdoj.gov

[Additional counsel on next page]

ERIC B. BECKENHAUER
Assistant Director

DANIEL SCHWEI
Special Counsel

JULIE STRAUS HARRIS
Senior Trial Counsel

CHRISTOPHER A. EISWERTH
EMILY NESTLER
KATE TALMOR
Trial Attorneys
Federal Programs Branch
Civil Division
U.S. Department of Justice

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

   I.   Statutory and Regulatory Background ................................................................. 2

   II.  Factual and Procedural Background ...................................................................... 3

      A.   FDA Actions Involving Mifepristone ........................................................ 3

      B.   Plaintiffs' Citizen Petitions ........................................................................ 6

      C.   This Litigation ............................................................................................ 7

LEGAL STANDARD ............................................................................................................... 8

ARGUMENT ......................................................................................................................... 8

   I.   Plaintiffs' Claims Are Unlikely To Succeed On The Merits ............................... 8

      A.   Plaintiffs Lack Standing and Are Outside the Zone of Interests ................ 8

          1.   Plaintiff Physicians Lack Article III Standing ................................. 9

          2.   Plaintiff Medical Associations Lack Article III Standing................ 14

          3.   Plaintiffs Are Outside the Zone of Interests ................................... 15

      B.   The Vast Majority of Plaintiffs' Challenges Are Untimely or Unexhausted ............... 16

          1.   All of Plaintiffs' Claims Are Untimely or Unexhausted, Except Their Narrow Challenge to FDA's 2021 Response to the 2019 Citizen Petition ......................... 16

          2.   Review of FDA's December 2021 Petition Response Is Limited to the Narrow Issues Presented in the 2019 Citizen Petition ......................... 17

      C.   Plaintiffs' Claims Are Likely To Fail On The Merits.................................. 20

          1.   Plaintiffs' FDCA Challenge to FDA's Response to the 2019 Citizen Petition Should Be Rejected............... 20

          2.   Plaintiffs' Untimely FDCA Challenges to the 2000 Approval and 2016 Citizen Petition Response Should Also Be Rejected ......................... 23

              a.   Plaintiffs' Limited Safety and Efficacy Claim Is Likely To Fail ......................... 24

              b.   Plaintiffs' Subpart H Claim Is Likely To Fail.............................. 25

          3.   Plaintiffs' Untimely and Unexhausted Claims Regarding the Comstock Act Fail as a Matter of Law ......................... 28

   II.  Plaintiffs Will Not Suffer Irreparable Harm Without An Injunction Against A Drug That Has Been On The Market For More Than Twenty Years ......................... 31

      A.   Plaintiffs' Own Actions Confirm the Lack of Irreparable Harm................ 31

      B.   Plaintiffs' Theories of Injury Are Highly Speculative on Their Own Terms ............... 32

C.    Contrary to Plaintiffs' Claimed Harms, Serious Complications with Mifepristone Are Rare .................................................................................................... 33

1.    The Agency Record Confirms Mifepristone's Safety and Efficacy ...................... 33

2.    Plaintiffs' Submitted Studies Do Not Undermine FDA's Expert Judgments ......... 34

III.    A Preliminary Injunction Would Harm The Public Interest And Third Parties ........... 38

CONCLUSION.............................................................................................................. 40

ii

TABLE OF AUTHORITIES

**Cases**

*Am. Coll. of Obstetricians & Gynecologists v. FDA,*
   472 F. Supp. 3d 183 (D. Md. 2020) .................................................. 6

*ASARCO Inc. v. Kadish,*
   490 U.S. 605 (1989) ....................................................................... 10

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA,*
   539 F. Supp. 2d 4 (D.D.C. 2008), *aff'd,*
   358 F. App'x 179 (D.C. Cir. 2009) ................................................. 16

*Ass'n of Am. Physicians v. FDA,*
   358 F. App'x 179 (D.C. Cir. 2009) ................................................. 17

*Ass'n of Am. Physicians & Surgeons v. FDA,*
   13 F.4th 531 (6th Cir. 2021) ........................................................... 13

*Bennett v. Spear,*
   520 U.S. 154 (1997) ....................................................................... 15

*Biden v. Texas,*
   142 S. Ct. 2528 (2022) ................................................................... 19

*Cent. & S.W. Servs., Inc. v. EPA,*
   220 F.3d 683 (5th Cir. 2000) ......................................................... 28

*Chacon v. Granata,*
   515 F.2d 922 (5th Cir. 1975) ......................................................... 31

*Cherry v. Unidentified Defendants,*
   No. 19-cv-657, 2019 WL 7838559 (E.D. Tex. Oct. 16, 2019) ........ 32

*City of Dallas v. Delta Air Lines, Inc.,*
   847 F.3d 279 (5th Cir. 2017) ......................................................... 32

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .............................................................. 9, 10, 14

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987) .............................................................. 9, 15

*Cody Labs., Inc. v. Sebelius,*
   446 F. App'x 964 (10th Cir. 2011) ................................................. 17

*Consumers Union of United States, Inc. v. Walker,*
   145 F.2d 33 (D.C. Cir. 1944) ......................................................... 29

*Darby v. Cisneros,*
   509 U.S. 137 (1993) ....................................................................... 17

*Davis v. United States,*
   62 F.2d 473 (6th Cir. 1933) ........................................................... 29

Alliance.App. 039

*Dennis Melancon, Inc. v. City of New Orleans*,
   703 F.3d 262 (5th Cir. 2012) ............................................................ 8

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .................................................................... 21

*DiGiovanni v. FAA*,
   249 F. App'x 842 (2d Cir. 2007) .................................................... 17

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) .................................................................... 21

*FDA v. Am. Coll. of Obstetricians & Gynecologists*,
   141 S. Ct. 578 (2021) .................................................................. 6, 37

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ...................................................... 14

*Forest Grove Sch. Dist. v. T.A.*,
   557 U.S. 230 (2009) ........................................................................ 29

*Gbalazeh v. City of Dallas*,
   394 F. Supp. 3d 666 (N.D. Tex. 2019) .......................................... 32

*Gonannies, Inc. v. Goupair.Com, Inc.*,
   464 F. Supp. 2d 603 (N.D. Tex. 2006) .......................................... 32

*Grocery Mfrs. Ass'n v. EPA*,
   693 F.3d 169 (D.C. Cir. 2012) ........................................................ 9

*Growth Energy v. EPA*,
   5 F.4th 1 (D.C. Cir. 2021) .............................................................. 19

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................................ 20

*Holland Am. Ins. Co. v. Succession of Roy*,
   777 F.2d 992 (5th Cir. 1985) .......................................................... 33

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ............................................................ 23

*June Medical Services LLC v. Russo*,
   140 S. Ct. 2103 (2020) .................................................................... 14

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*,
   88 F.3d 1191 (D.C. Cir. 1996) ...................................................... 20

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) .................................................................... 27

*Koretoff v. Vilsack*,
   707 F.3d 394 (D.C. Cir. 2013) ...................................................... 18

*La Union del Pueblo Entero v. Abbott*,
   No. 21-CV-0844, 2022 WL 3052489 (W.D. Tex. Aug. 2, 2022) ............ 14

iv

*Ladd v. Livingston*,
  77 F.3d 286 (5th Cir. 2015) ......................................................................... 8

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
  No. 17-CV-3200, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) .......................... 32

*Little v. KPMG LLC*,
  575 F.3d 533 (5th Cir. 2009) ....................................................................... 10

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ................................................................................... 29

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................... 8, 9, 10

*Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*,
  447 F. Supp. 3d 522 (N.D. Tex. 2020) ............................................................ 8

*McAfee v. FDA*,
  36 F.4th 272 (D.C. Cir. 2022) ...................................................... 17, 18, 24, 25

*N.A.A.C.P. v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) ....................................................................... 15

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*,
  158 F.3d 135 (D.C. Cir. 1998) ................................................................ 19, 20

*Nat'l Mining Ass'n v. U.S. Dep't of Interior*,
  70 F.3d 1345 (D.C. Cir. 1995) ..................................................................... 19

*Nken v. Holder*,
  556 U.S. 418 (2009) ..................................................................................... 8

*NLRB Union v. FLRA*,
  834 F.2d 191 (D.C. Cir. 1987) .................................................... 17, 18, 24

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ....................................................................... 14

*Ortiz v. Am. Airlines, Inc.*,
  5 F.4th 622 (5th Cir. 2021) ......................................................................... 15

*Palm Valley Health Care, Inc. v. Azar*,
  947 F.3d 321 (5th Cir. 2020) ....................................................................... 17

*Pharm. Mfg. Research Servs., Inc. v. FDA*,
  957 F.3d 254 (D.C. Cir. 2020) ..................................................................... 21

*Pharmacia Corp. v. Alcon Labs., Inc.*,
  201 F. Supp. 2d 335 (D.N.J. 2002) ............................................................... 38

*Prof'l Drivers Council v. Bureau of Motor Carrier Safety*,
  706 F.2d 1216 (D.C. Cir. 1983) ................................................................... 17

*Ridgely v. FEMA*,
  512 F.3d 727 (5th Cir. 2008) ......................................................................... 8

Alliance.App. 041

*Schering Corp. v. FDA*,
  51 F.3d 390 (3d Cir. 1995) ................................................................... 22

*Sierra Club v. EPA*,
  551 F.3d 1019 (D.C. Cir. 2008) ........................................ 19, 20, 33, 40

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................... 13

*Tenth St. Residential Ass'n v. City of Dallas*,
  968 F.3d 492 (5th Cir. 2020) .............................................................. 15

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ............................................................... 19

*Texas v. EPA*,
  690 F.3d 670 (5th Cir. 2012) .............................................................. 21

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018) ................................................ 32

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .......................................................................... 9

*U.S. Inventor Inc. v. Vidal*,
  No. 21-40601, 2022 WL 4595001 (5th Cir. Sept. 30, 2022) ............... 15

*United States v. H.L. Blake Co.*,
  189 F. Supp. 930 (W.D. Ark. 1960) .................................................... 29

*United States v. One Package*,
  86 F.2d 737 (2d Cir. 1936) ................................................................. 29

*Wages & White Lion Invs., L.L.C. v. FDA*,
  41 F.4th 427 (5th Cir. 2022) .................................................. 21, 33, 36

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................. 8

**Statutes**

5 U.S.C. § 701(a)(2) ................................................................................ 20

18 U.S.C. §

  1461 ............................................................................................ 16, 28

  1462 ...................................................................................... 16, 28, 30

21 U.S.C. §

  321(p) ............................................................................................... 2

  331 ................................................................................................ 3, 30

  355 ................................................................................................ 2, 23

  355(a) ................................................................................................. 2

vi

355(d) ............................................................................................................ 2

355(d)(4) ..................................................................................................... 22

355(d)(5) ..................................................................................................... 22

355(e) ............................................................................................................ 6

355(j)(2) ............................................................................................... 2, 5, 20

355-1 .................................................................................................... 3, 26

355-1(a)(1) .................................................................................................. 27

355-1(f)(3) ..................................................................................................... 3

355-1(g) ...................................................................................................... 23

355-1(g)(4)(B) ............................................................................................... 3

393(b)(2)(B) ................................................................................................... 2

28 U.S.C. § 2401(a) ....................................................................................... 16

Pub. L. No. 110-85, § 909(b)(1) ............................................................... 4, 25

Pub. L. No. 110-85, § 909(b)(3) .................................................................... 26

Pub. L. No. 110-85, tit. IX, § 901 ................................................................... 3

Pub. L. No. 110-85, tit. IX, § 909 ................................................................... 3

Pub. L. No. 110-85, tit. IX, § 909(b) ............................................................. 30

Pub. L. No. 110-85, tit. IX, § 909(b)(3) ........................................................ 30

**Regulations**

21 C.F.R §

314.105(c) ............................................................................................... 2, 22

314.125(b)(2) ............................................................................................... 22

10.25(a) ...................................................................................................... 17

10.45(b) ................................................................................................. 6, 17

10.45(f) ....................................................................................................... 17

314.50 ............................................................................................................ 2

314.500 ............................................................................................... 3, 25, 26

314.520 ...................................................................................................... 2, 4

314.560 ....................................................................................................... 25

314.70 ............................................................................................................ 2

314.80 ......................................................................................................... 23

314.81 ......................................................................................................... 23

314.98 ......................................................................................................... 23

Alliance.App. 043

**Other Authorities**

FDAWeek, *GOP Fails to Narrow Scope of FDA Reform Bill During Senate Mark-Up* (Apr. 20, 2007) ............................................................................................................ 30

57 Fed. Reg. 13234 (Apr. 15, 1992) .......................................................................... 27

57 Fed. Reg. 58,942 (Dec. 11, 1992) ................................................................... 2, 26

153 Cong. Rec S5444 (daily ed. May 2, 2007).......................................................... 26

153 Cong. Reg. S5759 (daily ed. May 9, 2007) ........................................................ 26

S. 1082, 110th Cong., 1st Sess., tit. II, § 214(b)(3)(B) ............................................. 30

Staff Report, H. Cmte. Gov't Reform, *The FDA and RU-486: Lowering the Standard for Women's Health* (Oct. 2006) ........................................................................... 30

Alliance.App. 044

**INTRODUCTION**

More than twenty-two years ago, the U.S. Food and Drug Administration (FDA) approved the drug mifepristone as safe and effective for the medical termination of intrauterine pregnancy under certain conditions. In this unprecedented action, Plaintiffs ask this Court to upend that longstanding scientific determination based on speculative allegations of harm offered in support of claims and arguments that are untimely, unexhausted, and without merit. Plaintiffs' motion for a preliminary injunction satisfies none of the requirements for the extraordinary relief they seek and should be denied.

Plaintiffs have not shown any likelihood of success on the merits. Their lawsuit relies on speculation to assert novel claims of injury that are not cognizable under Article III and that place Plaintiffs well outside the zone of interests protected by any relevant statute. Plaintiffs are attempting to challenge agency action long after the limitations period has expired and raising claims they did not exhaust with FDA. The only merits issues that possibly could be heard by this Court are those that Plaintiffs presented to FDA in a 2019 citizen petition. That petition challenged particular changes to the conditions of use and restrictions on the distribution of mifepristone. In responding to the 2019 petition, FDA reasonably rejected Plaintiffs' arguments.

Plaintiffs also fail to show that they will suffer imminent and irreparable harm without a preliminary injunction. Plaintiffs' speculative assertions of injury—made months and even decades after the agency actions they challenge—are unsupported by any evidence that Plaintiffs will be harmed by the availability of mifepristone absent an injunction. In contrast, issuance of a preliminary injunction would cause significant harm, depriving patients of a safe and effective drug that has been on the market for more than two decades. Entry of a preliminary injunction here would hardly serve the typical purpose of such relief—maintaining the status quo during the

pendency of litigation. Rather, it would upend the status quo and the reliance interests of patients and doctors who depend on mifepristone, as well as businesses involved with mifepristone distribution. The balance of the equities and the public interest thus also strongly favor denial of Plaintiffs' motion.

BACKGROUND

## I.    Statutory and Regulatory Background

Congress has entrusted to FDA the responsibility to ensure that "new drugs" are safe and effective. *See* 21 U.S.C. §§ 321(p), 355; *see also id.* § 393(b)(2)(B). The Federal Food, Drug, and Cosmetic Act (FDCA) generally prohibits the interstate distribution of new drugs that have not received FDA approval. *Id.* § 355(a). In deciding whether to approve a new drug, FDA evaluates whether a new drug application contains scientific evidence demonstrating that the drug is safe and effective for its intended uses. *Id.* § 355(d); *see also* 21 C.F.R. §§ 314.50, 314.105(c). Similarly, when a sponsor submits a supplemental new drug application proposing changes to the conditions of approval for a drug (such as changes to a drug's labeling or FDA-imposed restrictions), FDA reviews the scientific evidence to support the changes. *See* 21 C.F.R. § 314.70. To approve a generic version of a previously approved drug, FDA reviews whether an abbreviated new drug application contains information to show that the proposed generic drug is materially the "same" as the approved drug. 21 U.S.C. § 355(j)(2).

In furtherance of its statutory responsibilities, including the responsibility to determine whether to approve drugs as safe and effective for intended uses, FDA issued regulations in 1992 to authorize the imposition of conditions "needed to assure safe use" of certain new drugs that otherwise satisfy the requirements of the FDCA. Final Rule, 57 Fed. Reg. 58,942, 58,958 (Dec. 11, 1992) (codified at 21 C.F.R. § 314.520). The regulations, known as Subpart H, apply to certain new drugs "studied for their safety and effectiveness in treating serious or life-threatening

2

illnesses" that "provide meaningful therapeutic benefit to patients over existing treatments." 21 C.F.R. § 314.500.

In 2007, Congress enacted the Food and Drug Administration Amendments Act of 2007 (FDAAA), which (among other things) gave FDA authority to require a "risk evaluation and mitigation strategy" (REMS) when it determines that such a strategy is necessary to ensure that the benefits of a drug outweigh the risks. *See* Pub. L. No. 110-85, tit. IX, § 901 (codified at, *inter alia*, 21 U.S.C. § 355-1). This new authority codified and expanded FDA's Subpart H authority to impose restrictions on a manufacturer's distribution of a drug to assure safe use. Under the REMS framework, for certain drugs, FDA may include what are known as "elements to assure safe use," such as a requirement that a drug's prescribers have particular training or experience, that a drug be dispensed only in certain healthcare settings, or that a drug be dispensed only after documentation of safe use conditions is provided. 21 U.S.C. § 355-1(f)(3).

Congress expressly addressed in FDAAA how to incorporate drugs with existing Subpart H restrictions into the new REMS framework. *See* Pub. L. No. 110-85, tit. IX, § 909 (21 U.S.C. § 331 note). Congress "deemed" such drugs to have a REMS in effect upon the effective date of FDAAA, with the REMS imposing the restrictions previously imposed under Subpart H. *Id.* § 909(b). Congress provided that any such restrictions would continue to be required under the new statutory regime unless and until FDA determined that modifications were necessary. *Id.*; *see id.* § 355-1(g)(4)(B), (h) (authorizing FDA to require the sponsor to propose modifications to a drug's REMS). Since the effective date of Title IX of FDAAA, authority that FDA had asserted under the relevant portions of Subpart H has thus rested on the REMS provisions of FDAAA.

## II.   Factual and Procedural Background

### A.   FDA Actions Involving Mifepristone

FDA approved the marketing of mifepristone under the brand name Mifeprex in 2000. In

Alliance.App. 047

so doing, the agency determined, as to a particular manufacturer's application, that mifepristone is safe and effective for the medical termination of intrauterine pregnancy through 49 days gestation when used in a regimen with an already-approved drug, misoprostol. After following the approved regimen, the patient is expected to experience cramping and bleeding while the contents of the uterus are expelled, similar to a miscarriage. FDA extensively reviewed the scientific evidence and determined that the benefits of mifepristone outweigh any risks. Dkt. No. 8 (App.) 518-25.

When FDA originally approved Mifeprex, the agency relied upon Subpart H to place certain restrictions on the manufacturer's distribution of the drug product to assure its safe use.[1] For example, FDA imposed an in-person dispensing requirement and permitted the drug to be distributed only to prescribers who agreed to dispense it in certain healthcare settings, by or under the supervision of a qualified physician who attested to the ability to accurately date pregnancies and diagnose ectopic pregnancies. App. 523.

These "restrictions to assure safe use" (21 C.F.R. § 314.520) were in effect on the effective date of FDAAA. Accordingly, pursuant to FDAAA, mifepristone was "deemed to have in effect an approved [REMS]" that continued these restrictions. Pub. L. No. 110-85, § 909(b)(1); *see also* 73 Fed. Reg. 16,313 (Mar. 27, 2008); App. 598-602. FDA subsequently granted express approval to the mifepristone REMS after determining that it remained "necessary … to ensure the benefits of [mifepristone] outweigh the risks of serious complications." App. 599.

Later, on March 29, 2016, FDA approved a supplemental new drug application from the sponsor to alter Mifeprex's indication, labeling, and REMS. App. 616. Relying on safety and efficacy data from multiple studies, FDA increased the gestational age limit from 49 to 70 days.

---

[1] The Subpart H regulations are referred to as FDA's "accelerated approval" regulations. However, FDA's 2000 approval of mifepristone, which occurred more than four years after the new drug application was submitted to the agency, did not involve an "accelerated review," contrary to Plaintiffs' implication. *Compare* Dkt. No. 7 (Mot.) 14, *with* App. 527-29.

Alliance.App. 048

App. 631. FDA also reduced the number of required in-person clinic visits to one. The agency determined that at-home administration of misoprostol is safe because multiple studies showed that administration of the drug was "associated with exceedingly low rates of serious adverse events" and because administering misoprostol at home would more likely result in patients being in an "appropriate and safe location" when the cramping and bleeding caused by the drug would begin. App. 640. FDA also found no significant difference in outcomes based on whether patients had follow-up appointments via phone call or in-person or based on the timing of those appointments. App. 641. Additionally, FDA allowed a broader set of healthcare providers, rather than only physicians, to prescribe mifepristone, finding no serious risk to patients from expanding the types of healthcare providers who could become certified under the REMS. App. 641-42.

In 2019, FDA approved a different manufacturer's abbreviated new drug application for a generic version of mifepristone. App. 694-700. That decision did not in any way reevaluate the safety and efficacy of mifepristone. Instead, FDA's approval of the generic drug was based solely on FDA's determination that the generic drug was materially the "same" as brand-name Mifeprex. 21 U.S.C. § 355(j)(2). When it approved the abbreviated new drug application, FDA also approved the Mifepristone REMS Program, which covers both Mifeprex and the generic. App. 703.[2]

In April 2021, FDA decided to exercise enforcement discretion during the public health emergency with respect to the in-person dispensing requirement. App. 713-15. That decision stemmed from the finding that the availability of mifepristone by mail during a six-month period in which the in-person dispensing requirement had been enjoined, *see Am. Coll. of Obstetricians*

---

[2] For avoidance of doubt, this brief uses "mifepristone" to refer to drug products that are approved for medical termination of early pregnancy, in both branded and generic form. FDA has separately approved another manufacturer's distribution of the brand name drug Korlym, which uses mifepristone in the treatment of Cushing's syndrome. Defendants do not understand Plaintiffs' claims to seek any relief with respect to that separate drug approval.

Alliance.App. 049

& *Gynecologists v. FDA*, 472 F. Supp. 3d 183 (D. Md. 2020), *stayed by FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578, 578 (2021) (mem.), did not appear to show increases in serious safety concerns, according to the literature. App. 713-15.

On January 3, 2023, FDA approved a supplemental application, modifying the REMS by, *inter alia*, removing the in-person dispensing requirement.[3]

### B.  Plaintiffs' Citizen Petitions

Before asking a court to invalidate FDA's approval of a drug application, a plaintiff must first file a citizen petition raising its arguments to the agency. *See* 21 C.F.R. § 10.45(b); *see also* 21 U.S.C. § 355(e) (setting forth requirements for withdrawal of a drug approval). In 2002, Plaintiffs American Association of Pro-Life Obstetricians and Gynecologists ("AAPLOG") and the Christian Medical Association ("CMA") submitted a citizen petition asking FDA to withdraw the 2000 approval of mifepristone. App. 281-375. FDA denied the petition on March 29, 2016. App. 562-94. FDA addressed the petitioners' arguments and rejected them based on studies and other scientific evidence (including evidence postdating the 2000 approval) that continued to demonstrate that mifepristone was safe and effective for its indicated uses. App. 568-574, 578-89. FDA also rejected petitioners' challenge to the appropriateness of FDA's earlier reliance on Subpart H, explaining that mifepristone satisfied the regulatory prerequisites because it provides a meaningful therapeutic benefit to some patients experiencing a life-threatening condition (because pregnancy can be a serious medical condition for at least some women). App. 565-66.

In 2019, Plaintiffs AAPLOG and American College of Pediatricians ("ACP") submitted another citizen petition, this time challenging several aspects of the 2016 changes to the conditions of approval, including the REMS. App. 668-69, 672, 679. The 2019 petition did not ask FDA to

---

[3] Plaintiffs do not challenge the 2023 action in this case, but they seek to enjoin all of FDA's approvals of mifepristone, which would, practically, render FDA's recent action inoperative.

withdraw approval of mifepristone. App. 688-93. Rather, it asked FDA to "[r]etain" the REMS and its in-person dispensing requirement, and to "restore and strengthen elements of the [mifepristone] regimen and prescriber requirements approved in 2000" to: (1) limit mifepristone's use to 49 days gestation; (2) require the drug to be administered by or under the supervision of a physically present and certified physician who has ruled out ectopic pregnancy; (3) require three office visits; (4) include a contraindication for patients who do not have convenient access to emergency medical care; (5) require reporting of certain adverse events to FDA; and (6) require additional studies. App. 668-69.

On December 16, 2021, FDA responded to each of petitioners' arguments. App. 729-69. FDA "agree[d]" that, based on the data available at that time, certain of the REMS requirements "continue[d] to be necessary components" of safe distribution of mifepristone. App. 750-51. But FDA declined to make the changes that petitioners had requested. Indeed, FDA determined that the REMS "must be modified to remove" the in-person dispensing requirement because, based on FDA's review of, among other things, the REMS assessment data, postmarketing safety information, and the published literature, the requirement was no longer necessary to ensure the benefits of the drug outweigh the risks and removing it would reduce the burden on the healthcare delivery system. App. 750-64.

### C. This Litigation

On November 18, 2022, Plaintiffs filed their complaint, challenging FDA's approval of mifepristone in 2000; FDA's approval of the supplemental new drug application and related changes to the conditions of approval, including the REMS, in 2016; and FDA's denial of the citizen petitions in 2016 and 2021. The complaint also challenges FDA's approval of the generic version of mifepristone in 2019 and FDA's decision in 2021 to exercise its discretion not to enforce the in-person dispensing requirement during the public health emergency. Plaintiffs' claims all

Alliance.App. 051

arise under the Administrative Procedure Act. Plaintiffs now seek a preliminary injunction on four grounds and ask this Court, among other things, to order Defendants "to withdraw or suspend *all* of [the] approvals of chemical abortion drugs." Mot. 7.

LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury will outweigh any harm that will result to [a] non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. FEMA*, 512 F.3d 727, 734 (5th Cir. 2008); *see also Ladd v. Livingston*, 77 F.3d 286, 288 (5th Cir. 2015). The third and fourth factors merge when the government is the party opposing the motion. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction "should not be granted unless the movant has clearly carried the burden of persuasion on all four requirements." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (quotation marks and citation omitted); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (requiring a "clear showing"). "[I]f the [p]laintiff fails to satisfy even one" element, "the Court may logically conclude that [the] [p]laintiff fails to meet its burden—regardless of success on the other elements." *Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 528 (N.D. Tex. 2020) (Kacsmaryk, J.).

ARGUMENT

## I.  Plaintiffs' Claims Are Unlikely To Succeed On The Merits

Plaintiffs have not shown a likelihood of success as to any of their claims.

### A.  Plaintiffs Lack Standing and Are Outside the Zone of Interests

Plaintiffs lack standing to bring any of their claims. To meet the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), Plaintiffs "must show

8

(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent;

(ii) that the injury was likely caused by the defendant[s]; and (iii) that the injury would likely be

redressed by judicial relief," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). An

"injury-in-fact" must be "actual" or "certainly impending," *Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 409 (2013), not "conjectural" or "hypothetical," *Lujan*, 504 U.S. at 560. "'[A]llegations

of possible future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at

565 n.2). To satisfy the causation requirement, Plaintiffs must also show that their alleged injuries

are "fairly traceable to the challenged action of the defendant, and not the result of the independent

action of some third party not before the court." *Lujan*, 504 U.S. at 560. In addition to the

requirements of Article III, plaintiffs challenging the actions of federal agencies must demonstrate

that they are within the "zone of interests" protected or regulated by the statute in question. *Clarke*

*v. Sec. Indus. Ass'n*, 479 U.S. 388, 395-96 (1987).

### 1. Plaintiff Physicians Lack Article III Standing

None of the individual Plaintiffs or the organizational Plaintiffs' physician members

(collectively, the "complaining physicians") has established an injury-in-fact necessary to satisfy

Article III. The complaining physicians are not themselves regulated by FDA, and they do not

purport to prescribe mifepristone. *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 177 (D.C. Cir.

2012) (explaining that fuel manufacturers lacked standing to challenge EPA approval of a fuel

they were not required to distribute). Rather, they contend that they will be injured—in a highly

roundabout fashion—because *other* physicians will prescribe mifepristone to patients who will

experience adverse events; those patients will seek care from a complaining physician; and the

complaining physician will divert time and resources from other patients, subjecting them to

"potential liability" exposure and insurance costs, and potentially causing them to suffer grief,

distress, and guilt. Mot. 9-10. Plaintiffs also argue that FDA's actions prevent them from practicing

Alliance.App. 053

evidence-based medicine, harm the doctor-patient relationship, and deprive them of the opportunity to provide pregnancy care. Mot. 10.

Plaintiffs' allegations of injury to the complaining physicians fail because they depend upon layer after layer of speculation. They require Plaintiffs to establish that, despite the rarity of serious adverse events associated with mifepristone,[4] individuals who are prescribed mifepristone elsewhere will seek out the care of a complaining physician. Those patients then must cause disproportionate burdens, forcing the physician to neglect other patients and somehow exposing the complaining physician to new risks—perhaps because the hypothetical mifepristone users who seek out the complaining physicians after receiving mifepristone from other physicians will entrap their emergency physicians by providing an incomplete medical history and will then sue them for malpractice. *See, e.g.*, App. 865-67, 871-74, 880.

The speculative nature of these claims is self-evident. Courts have consistently rejected such theories of standing based on multi-tiered speculation because they "depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989)); *see, e.g.*, *Clapper*, 568 U.S. at 414 ("speculative chain of possibilities" does not establish impending constitutional injury and declining to "endorse standing theories that rest on speculation about the decisions of independent actors"); *Little v. KPMG LLC*, 575 F.3d 533, 541 (5th Cir. 2009) (injury based on several layers of decisions by third parties too speculative to confer Article III standing).

Here, Plaintiffs do not even attempt to allege facts supporting the chain of causation. They do not corroborate any of the pecuniary harms that they purport to fear, nor any of the intangible

---

[4] *See* Katzen Decl., Ex. 1D, at 8, https://perma.cc/2UJ5-8WVF.

concerns that they raise. That omission is particularly telling given the more than two decades that mifepristone has been in use. If Plaintiffs' injuries had an evidentiary basis, then Plaintiffs would be able to marshal allegations grounded in fact rather than conjecture.

For example, Plaintiffs contend that treating patients who experience complications from mifepristone might cause the complaining physicians to divert time and resources from other patients. Mot. 9. Plaintiffs fail to acknowledge that the alternatives to mifepristone—surgical abortion or continued pregnancy—also have rates of complications, with childbirth's being substantially higher than mifepristone's. App. 565 n.6 ("The risk of childbirth related death was therefore approximately 14 times higher than the rate associated with legal abortion."). Even if it were appropriate to focus only on mifepristone, Plaintiffs make allegations only to support the isolated existence of adverse events[5]—but nothing that would remotely support Plaintiffs' sweeping and speculative assertion that adverse events from use of mifepristone will "overwhelm the medical system" and their medical practices in particular (Mot. 9). The declarations nowhere allege facts plausibly showing that such one-off incidents interfere with Plaintiffs' practices or with the treatment of other patients. *Contra* Ex. 5 (Zite Decl.) ¶¶ 10-14.

Plaintiffs' other assertions of injury to individual physicians are likewise based on a series of speculative contingencies. They contend that they will face increased liability exposure and insurance costs from treating patients who experience complications from mifepristone (*see, e.g.*, App. 873), but no Plaintiff or declarant claims to have been sued, threatened with a lawsuit, or required to pay increased insurance premiums. Moreover, Plaintiffs' own explanation for how they

---

[5] *See, e.g.,* App. 193-94 ¶¶ 2, 10 (Dr. Francis, who has worked at a hospital "for the last six years," but identifies only "several women" who have "present[ed] with complications"); App. 216 ¶ 23 (Dr. Wozniak, one patient over the last six months); App. 880 ¶ 16 (Dr. Delgado, who "expect[s] to see and treat more patients … with complications," but does not identify any past example); App. 886 ¶ 17 (Dr. Jester, citing a purported complication from a medical abortion).

Alliance.App. 055

might suffer this purely hypothetical injury depends on speculation about actions of third parties not traceable to FDA, *i.e.*, patients who will not accurately report their medical history—again, citing no concrete evidence in support. *See* App. 89-90. Plaintiffs also express fear that treating hypothetical future patients will cause them distress, grief, or guilt in the unlikely event that they were somehow "force[d]" to "complete an unfinished elective abortion." App. 160-61, Mot. 9. But no complaining physician alleges that he or she has ever been forced to "complete an unfinished elective abortion," nor do Plaintiffs provide any evidence that such injury is likely, much less imminent. Indeed, their own statements confirm that their fears of having to assist in an abortion resulting from mifepristone complications are based on speculation alone. *See, e.g.*, App. 160-61 ("FDA's removal of safeguards *could* force CMA members … to complete an unfinished elective abortion") (emphasis added).

Plaintiffs assert that patients' ability to choose medication abortion deprives them of the "opportunity to provide professional services and care for the woman and child through pregnancy." App. 87, 90. But this assumes—without evidence—that patients seeking medication abortion from a different provider would, in the absence of mifepristone, switch to a complaining physician's practice and opt to carry their pregnancies to term. *Compare* Zite Decl. ¶ 11; Ex. 2 (Lindo Decl.) ¶¶ 47-48 (explaining that, if mifepristone becomes unavailable, individuals prevented from obtaining medication abortions from healthcare providers will seek out surgical abortions or else attempt to self-manage their abortions). Plaintiffs also fail to substantiate their vague assertions that, by not requiring healthcare providers to report non-fatal adverse events, FDA prevents physicians "from practicing evidence-based medicine" and "harms the doctor-patient relationship." Mot. 10.[6] Indeed, no Plaintiff or medical association member claims to

---

[6] Plaintiffs do not square their objection to having to spend time reporting adverse events with their competing objection that FDA no longer requires healthcare providers to report non-fatal

consult with patients on whether they should take mifepristone.

Even if Plaintiffs could substantiate their standing theories with nonspeculative allegations, those allegations must pertain to a judicially cognizable injury—*i.e.*, one that satisfies the concreteness requirement. Where, as here, a plaintiff claims intangible harm, courts assess whether the asserted harm "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). Plaintiffs do not cite any decision, from any court, endorsing a physician's right to bring suit to advance an interest in evidence-based medicine, or an undefined interest in the physician-patient relationship, or an interest in avoiding adverse events for their patients, or an interest in avoiding new business for themselves. Mot. 10.

Indeed, Plaintiffs' approach to standing would entitle physicians to sue over virtually any FDA action. As Plaintiffs' argument runs, if FDA approved a new heart medication, emergency physicians would have standing to challenge the approval on the theory that some patients would experience adverse events under the new treatment; in contrast, cardiologists would have standing to challenge the approval on the theory that some patients would no longer require their services. This guaranteed pathway to challenge any government action would not be limited to FDA actions. Physicians could sue the National Highway Traffic Safety Administration for agency actions that caused (or prevented) traffic accidents; or pediatricians could sue the U.S. Department of Agriculture for standards that improved (or imperiled) student nutrition. The breathtaking consequences for Plaintiffs' theories of standing, in the absence of historical or statutory support, is a strong indication that Plaintiffs' injuries are not judicially cognizable.[7]

---

adverse events. *Contra* App. 82 ("The FDA's elimination of the requirement for abortionists to report all adverse events related to chemical abortion leads to unreliable reporting.").

[7] For similar reasons, Plaintiffs cannot claim third-party standing on behalf of their patients. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 547 (6th Cir. 2021) (third-party

### 2.  Plaintiff Medical Associations Lack Article III Standing

The medical associations also lack standing. They argue both that they have associational standing based on alleged injuries to their members, and that they have organizational standing because (they allege) FDA's actions have caused them to divert time and resources and have frustrated their ability to provide their members, patients, and the public with accurate information. *See* Mot. 7-8; *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Plaintiffs' theory of associational standing fails because, as explained in the preceding section, the medical associations have not identified any member with a non-speculative and legally cognizable injury-in-fact. *See OCA-Greater Houston*, 867 F.3d at 610. The medical associations' theory of organizational standing fails because neither their alleged diversion of resources nor their alleged informational injury satisfies Article III.

First, Plaintiffs' allegation that FDA's actions have forced them to divert resources does not establish standing because that injury is self-inflicted and unsubstantiated. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919-20 (D.C. Cir. 2015); *La Union del Pueblo Entero v. Abbott*, No. 21-CV-0844, 2022 WL 3052489, at *32 (W.D. Tex. Aug. 2, 2022).

Plaintiffs say that they have had to divert their resources away from unspecified priorities in order to "educate and inform their members, their patients, and the public on the dangers of chemical abortion drugs." Mot. 7. But in so alleging, Plaintiffs have failed to identify any Article III injury that their alleged diversion of resources is necessary to avoid. Nor have they sought to

standing "does not relieve plaintiffs of the need to independently establish their *own* Article III standing") (emphasis added). And notwithstanding Plaintiffs' suggestion, *June Medical Services LLC v. Russo*, 140 S. Ct. 2103 (2020), is not to the contrary. There, physicians had Article III standing to challenge regulations of physician conduct and threats of sanctions. *Id.* at 2119.

substantiate how that alleged diversion has impeded their mission, such as by "identif[ying] …

specific projects" harmed by that diversion. *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir.

2010); *see also Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020)

(finding no organizational standing because "[c]ritically, [the plaintiff] provided no evidence that

its members were required to forego other projects or causes as a result of" challenged conduct).

Second, Plaintiffs' allegations that FDA has "frustrated and complicated" their "ability to

educate and inform their members, their patients, and the public" likewise fail to establish standing.

Plaintiffs cannot claim injury from FDA's decision not to require broader reporting of adverse

events because they are not statutorily entitled to such information. *See U.S. Inventor Inc. v. Vidal*,

No. 21-40601, 2022 WL 4595001, at *7 (5th Cir. Sept. 30, 2022) ("An informational injury occurs

if a plaintiff fails to obtain information that must be publicly disclosed pursuant to a statute.").[8]

### 3.  Plaintiffs Are Outside the Zone of Interests

Plaintiffs also have not demonstrated that they are within the zone of interests of the FDCA

drug approval provisions that they invoke. A plaintiff falls outside the zone of interests when its

"interests are so marginally related to or inconsistent with the purposes implicit in the statute that

it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at

399. Whether Plaintiffs satisfy "the zone-of-interests test is to be determined not by reference to

the overall purpose of the Act in question … but by reference to the particular provision of law

upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997).

While Plaintiffs contend that the "legal and regulatory framework" of the FDCA as a whole

---

[8] In any event, Plaintiffs must demonstrate standing for every claim that they bring. *Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 628 (5th Cir. 2021). At most, Plaintiffs' contentions that they have diverted resources to analyze adverse events and have been frustrated in their ability to educate their members, patients, and the public about adverse events would be relevant to FDA's decision to remove the REMS requirement that certified prescribers report non-fatal adverse events. But Plaintiffs do not assert that decision as a basis for a preliminary injunction.

protects physicians' interests, Mot. 10, they identify no particular provision of the FDCA protecting such interests, and physicians cannot satisfy the zone of interests test by generally invoking the overall purposes of the FDCA. *See, e.g., Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F. Supp. 2d 4, 18 (D.D.C. 2008) (holding that physicians were not within the zone of interests in challenge to FDA approval of supplemental new drug application), *aff'd*, 358 F. App'x 179 (D.C. Cir. 2009).[9]

### B.  The Vast Majority of Plaintiffs' Challenges Are Untimely or Unexhausted

#### 1.  All of Plaintiffs' Claims Are Untimely or Unexhausted, Except Their Narrow Challenge to FDA's 2021 Response to the 2019 Citizen Petition

All of Plaintiffs' claims are untimely or unexhausted except their challenge to FDA's December 16, 2021, response to the 2019 citizen petition.

First, there is a six-year statute of limitations to challenge each agency action. *See* 28 U.S.C. § 2401(a). FDA approved the new drug application for mifepristone in 2000. FDA responded to Plaintiffs' 2002 citizen petition, which challenged the 2000 approval (*see* App. 280), on March 29, 2016. Both agency actions occurred more than six years before Plaintiffs filed this suit on November 18, 2022. Thus, the statute of limitations plainly bars Plaintiffs' challenge to FDA's underlying approval of mifepristone, including its response to the 2002 citizen petition.

Second, Plaintiffs cannot challenge FDA's approval of the supplemental new drug application for the generic version of mifepristone. Although FDA took that action in 2019, Plaintiffs have not exhausted their administrative remedies to challenge the action. That omission is fatal because "[exhaustion] is required … by agency rule as a prerequisite to judicial review."

---

[9] Plaintiffs also invoke the Comstock Act, which in some circumstances imposes criminal restrictions on mailing abortion-inducing drugs or sending them by common carrier. *See* 18 U.S.C. §§ 1461, 1462; Mot. 20-21. But Plaintiffs do not explain how they are within the zone of interests of that criminal statute, and they could not plausibly do so.

Alliance.App. 060

*Darby v. Cisneros*, 509 U.S. 137, 153 (1993). As Plaintiffs themselves acknowledge, Mot. 11, FDA regulations explicitly require litigants to file "a [citizen] petition under [21 C.F.R.] § 10.25(a) … before any legal action is filed in a court," 21 C.F.R. § 10.45(b). Because Plaintiffs "filed no such citizen petition with FDA contesting the [2019 generic] approval," their challenge cannot proceed. *Ass'n of Am. Physicians v. FDA*, 358 F. App'x 179, 181 (D.C. Cir. 2009); *see also Cody Labs., Inc. v. Sebelius*, 446 F. App'x 964, 969 (10th Cir. 2011) ("Courts have often dismissed suits against the FDA for failure to utilize the citizen petition procedure.").

### 2. Review of FDA's December 2021 Petition Response Is Limited to the Narrow Issues Presented in the 2019 Citizen Petition

When FDA denies a petition to rescind an agency action, judicial review of the denial is strictly "limited to the 'narrow issues as defined by the denial of the petition'" and does not otherwise reach "the agency's original action." *NLRB Union v. FLRA*, 834 F.2d 191, 196 (D.C. Cir. 1987) (quoting *Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1217 n.2 (D.C. Cir. 1983)); *cf. McAfee v. FDA*, 36 F.4th 272, 277 (D.C. Cir. 2022); *DiGiovanni v. FAA*, 249 F. App'x 842, 844 (2d Cir. 2007). This framework applies the usual rule that courts "will not ordinarily consider arguments that a litigant could have raised before an agency but chose not to." *Palm Valley Health Care, Inc. v. Azar,* 947 F.3d 321, 327 (5th Cir. 2020); *see* 21 C.F.R. § 10.45(f) (providing that, in an action under the APA, FDA "shall take the position" that "views" not raised in the administrative record "may not be considered").

Here, Plaintiffs' 2019 citizen petition did not ask FDA to reconsider or revoke the approval of mifepristone or otherwise revisit the agency's 2000 approval decision. App. 667-93. Instead, the petition expressly asked FDA to "restore and strengthen elements of the [mifepristone] regimen and prescriber requirements approved in 2000," specifically concerning the gestational limit for use of mifepristone; requirements for administration under the supervision of a physician; the

17

Alliance.App. 061

number of office visits; contraindication for patients without convenient access to emergency care; adverse-event reporting; and additional studies. App. 668. The petition also asked FDA to "[c]ontinue limiting" dispensing "to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber" on the sole ground that these measures were necessary for patient safety. App. 681-92. Those are the specific—and the only—claims that were presented to FDA and rejected by the agency in its December 2021 response to the petition, App. 730-31. No other issues can be raised in a challenge to the decision. *See NLRB Union*, 834 F.2d at 196.

Plaintiffs nevertheless seek to use FDA's 2021 response to the 2019 petition as a hook for raising issues to this Court that are wholly absent from both the 2019 petition and FDA's 2021 response to that petition. But Plaintiffs cannot fault FDA for failing to "acknowledge or address" issues that Plaintiffs never raised. Mot. 21. In particular, the response to the 2019 petition provided no mechanism to review FDA's approval of mifepristone in 2000 (Mot. 14-18), which the petition did not ask FDA to reconsider or withdraw. *Contra* App. 668 ("The undersigned submit this petition to request the Commissioner of Food and Drugs to: … retain the Mifeprex Risk Evaluation and Mitigation Strategy (REMS), and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber."). Nor does the response provide a basis to review Plaintiffs' arguments regarding Subpart H of FDA's regulations or FDA's failure to impose limits allegedly based upon the Comstock Act, none of which was raised in the 2019 petition. *See McAfee*, 36 F.4th at 277 (refusing to reach arguments challenging FDA's statutory authority that were not made in citizen petition); *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (per curiam).

Plaintiffs' reliance on the reopening doctrine, *see* Mot. 11-12, does not alter the analysis. That doctrine applies when "an agency reconsider[s] a previously decided matter," because "if the

Alliance.App. 062

agency has opened the issue up anew . . . its renewed adherence is substantively reviewable." *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141 (D.C. Cir. 1998) ("*NARPO*"); *see also, e.g.*, *Sierra Club v. EPA*, 551 F.3d 1019, 1024-25 (D.C. Cir. 2008) (agency revisiting a regulation); *Texas v. Biden*, 20 F.4th 928, 951 (5th Cir. 2021), *rev'd on other grounds sub nom. Biden v. Texas*, 142 S. Ct. 2528 (2022) (agency revisiting termination of a policy). The doctrine is not triggered merely because the agency has responded to a citizen petition; "[a]n agency is normally obliged under the Administrative Procedure Act to issue some sort of explanation when it denies a petition." *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1352 (D.C. Cir. 1995). "A reopening has occurred only if 'the entire context demonstrates that the agency has undertaken a serious, substantive reconsidering of the existing rule.'" *Texas*, 20 F.4th at 952 (quoting *Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021) (per curiam)). Further, only agency action within the limitations period can provide the basis for reopening. *See id.* at 951. The reopening doctrine does not apply here.

In no way did the 2021 petition response reconsider the underlying approval of mifepristone. FDA's "statement of denial of the petition," which merely "responded to assertions in the petition," is not "sufficient to trigger the reopening doctrine." *Nat'l Min. Ass'n*, 70 F.3d at 1351-52. Indeed, far from requesting that the 2000 approval be revisited or withdrawn, the 2019 petition affirmatively urged FDA to "Retain the Mifeprex REMS." App. 669.

FDA also did not reconsider the underlying approval of mifepristone when it modified the REMS in 2016. That decision made targeted alterations to the conditions of approval for mifepristone. The agency never "announc[ed] an intention to reconsider" the underlying approval, "never asked for comments" in relation to that decision, and otherwise left no doubt that the agency intended to "continue[], rather than reopen[]," that decision. *Texas*, 20 F.4th at 954-55; *see also*

*NARPO*, 158 F.3d at 144 (asking whether the agency conducted a "wholesale review" or intended to "revisit the distinct and settled subject" of the earlier decision). Nor did FDA constructively reopen the earlier approval. Courts have found constructive reopening where the agency made "extensive changes" that "significantly alter[ed] the stakes of judicial review," recognizing that prior to such changes the agency's decision "may not have been worth challenging" on its own. *See Sierra Club*, 551 F.3d at 1025-26 (citing *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1227 (D.C. Cir. 1996)). But here, the 2016 changes to the conditions of approval plainly did not alter Plaintiffs' litigation calculus with respect to the 2000 approval of mifepristone: Plaintiffs challenged the 2000 approval by filing a citizen petition in 2002. But they did not seek judicial review of FDA's denial of that petition during the limitations period.

No other agency action supports Plaintiffs' reopening theory. The approval of the generic version of mifepristone in 2019 did not reopen any issues related to the approval of Mifeprex in 2000. The generic approval simply determined that the generic version of the drug is materially the "same" as the approved version; it did not reconsider whether the approved version met the approval requirements. 21 U.S.C. § 355(j)(2).

Finally, to the extent Plaintiffs seek to challenge FDA's enforcement discretion regarding the in-person dispensing requirement, Mot. 19-20, that challenge would be foreclosed under *Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *see* 5 U.S.C. § 701(a)(2). Such a challenge would, moreover, be moot, given FDA's subsequent approval of supplemental new drug applications to remove the in-person dispensing requirement. *See supra* p. 6 & n.3.

### C. Plaintiffs' Claims Are Likely To Fail On The Merits

In any event, each of Plaintiffs' claims is likely to fail on the merits.

#### 1. Plaintiffs' FDCA Challenge to FDA's Response to the 2019 Citizen Petition Should Be Rejected

Plaintiffs' sole timely and exhausted claim is their challenge to FDA's 2021 response to the 2019 citizen petition as allegedly contrary to the FDCA. That claim fails because FDA's rejection of the arguments in the petition was reasonable and not contrary to law. Plaintiffs identify no sound reason for the Court to second-guess FDA's scientific judgments nor any provision of the FDCA that supports their contentions.

Plaintiffs' challenge to the 2021 petition response rests on the contention that FDA relied improperly on certain clinical trials and adverse-event reporting data. *See* Mot. 19-20. In reviewing Plaintiffs' claims, this Court's role is to "simply ensur[e] that the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). FDA is due deference "where the parties disagree on the science" because "Congress deemed only the FDA as the scientific expert here—not the federal courts." *Wages & White Lion Invs., L.L.C. v. FDA*, 41 F.4th 427, 436 (5th Cir. 2022).

Here, FDA's decisions were "reasonable and reasonably explained." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019). Each conclusion rested on FDA's expert scientific judgment with respect to the conditions of use. *See* App. 750-51 ("FDA's determination as to whether a REMS is necessary to ensure that the benefits of a drug outweigh its risks is a complex, drug-specific inquiry, reflecting an analysis of multiple, interrelated factors and of how those factors apply in a particular case."). This Court should defer to FDA's "scientific analysis of the evidence before it." *Pharm. Mfg. Research Servs., Inc. v. FDA*, 957 F.3d 254, 262 (D.C. Cir. 2020); *Texas v. EPA*, 690 F.3d 670, 677 (5th Cir. 2012).

Specifically, in affirming its 2016 conclusion that mifepristone can safely be used up to 70 days gestation, FDA's 2021 petition response cited studies that "showed comparable efficacy" and only "rare" serious adverse events from using mifepristone up to 70 days gestation. App. 736-38.

Alliance.App. 065

Additionally, FDA determined that "the increase in failure rate with each incremental week of gestation, as described in approved mifepristone labeling, is small," consistent with a published meta-analysis. App. 738. Plaintiffs cite one particular study in arguing that FDA "rel[ied] on studies" that did not "match" the conditions of use described in mifepristone's approved labeling, Mot. 19, but FDA's analysis makes clear that it relied on a multitude of studies, the vast majority of which Plaintiffs do not challenge. *See* App. 736 (discussing 22 studies); *see also* Katzen Decl., Exs. 1A, at 32-38, https://perma.cc/SR23-X9LJ, and 1B, at 15-16, https://perma.cc/5KSW-Q6AF.

Plaintiffs frame their disagreement as an argument that FDA "violated the [FDCA]" by relying on studies that evaluated use of mifepristone in a "drug regimen that did not match" FDA's approved labeling. Mot. 17, 19. But Plaintiffs point to no statutory provision requiring the conditions of use in a drug's approved labeling to duplicate the protocol requirements used in the studies supporting its approval. Instead, the statute instructs FDA to refuse to approve an application (including a supplement to an approved application) if, *inter alia*, considering "the information submitted . . . as part of the application" and "any other information" before the agency regarding the drug, there is "insufficient information to determine whether such drug is safe for use under" the proposed conditions of use, or a "lack of substantial evidence that the drug will have the effect it purports or is represented to have" under such conditions. 21 U.S.C. § 355(d)(4), (5). The FDCA thus requires FDA to apply its scientific expertise in determining whether a drug has been shown to be safe and effective under particular conditions of use, and the application of that expertise is owed substantial deference. 21 C.F.R. §§ 314.105(c), 314.125(b)(2); *see Schering Corp. v. FDA*, 51 F.3d 390, 399 (3d Cir. 1995) ("[J]udgments as to what is required to ascertain the safety and efficacy of drugs falls squarely within the ambit of the FDA's expertise and merit deference from us."). As FDA has explained, "[m]any clinical trial designs are more restrictive

(*e.g.*, additional laboratory and clinical monitoring, stricter inclusion and exclusion criteria, more visits) than will be necessary or recommended in post-approval clinical use; this additional level of caution is exercised until the safety and efficacy of the product is demonstrated." App. 589.

Plaintiffs' challenge to FDA's decision that the REMS should be modified to eliminate the in-person dispensing requirement also fails. Plaintiffs assert that certain studies had limitations (Mot. 20), but the FDCA does not require FDA to consider only data free from limitations in making approval and REMS modification decisions. *See* 21 U.S.C. §§ 355, 355-1(g). *See Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 453 (5th Cir. 2021) (reasoning that an agency's decision was not arbitrary and capricious when "it acted on the imperfect data it had"). In determining that patient safety did not require in-person dispensing in clinics, medical offices, or hospitals, FDA reviewed a wealth of data and concluded that "mifepristone will remain safe and effective if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met and pharmacy certification is added." App. 754-65. Plaintiffs also fault FDA for relying on adverse-event reporting data (Mot. 20), but the fact that FDA stopped mandating that certified prescribers report non-fatal adverse events to sponsors does not render unlawful the agency's reliance on data that were reported. 21 C.F.R. §§ 314.80, 314.81, 314.98. Plaintiffs offer no explanation for why it was impermissible to rely on the reported data.

In short, each of FDA's judgments was grounded in scientific evidence, reasonably explained, and lawful. There is no basis to remand for reconsideration of any aspect of FDA's petition response (which is the maximum relief that could be available for this claim).

### 2. Plaintiffs' Untimely FDCA Challenges to the 2000 Approval and 2016 Citizen Petition Response Should Also Be Rejected

As explained above, Plaintiffs' remaining challenges—to the 2000 approval of mifepristone and FDA's 2016 citizen petition response—are untimely. In those challenges,

Plaintiffs assert (1) that FDA violated the FDCA because FDA did not include in the approved conditions of use certain conditions present in the clinical studies on which it relied, and (2) that Subpart H did not authorize FDA's approval. Each claim is likely to fail on the merits.

### a.    Plaintiffs' Limited Safety and Efficacy Claim Is Likely To Fail

Plaintiffs contend that FDA violated the FDCA by failing to replicate all of the protocol requirements in the U.S. clinical trial in the ensuing conditions of approval. Mot. 17-18. This claim fails on multiple grounds.

Plaintiffs did not raise the claim in their 2019 citizen petition. Had they done so, their otherwise untimely claim would be subject only to "extremely limited" review in district court. *NLRB Union*, 834 F.2d at 196; *see McAfee*, 36 F.4th at 274 ("extremely limited and highly deferential"). Plaintiffs cannot satisfy typical APA review, much less a heightened standard.

As discussed above, FDA's approval of mifepristone in 2000 rested on a comprehensive evaluation of the scientific data, and FDA reasonably determined, in its expert judgment, that the evidence before it demonstrated that the drug was safe and effective for abortions under the specified conditions. *See* App. 518-25, 562-94. As FDA explained in its initial approval memorandum, it reviewed three separate clinical trials involving more than 2,500 pregnant patients, and those trials provided substantial evidence of effectiveness and showed a low rate of serious adverse events. *See* App. 518; *see also* App. 568-75, 585 (citing studies reporting no deaths, very few blood transfusions, and very low rates of surgical intervention). Indeed, when it reviewed the data from the two larger trials (even before the U.S. clinical trial data were available for its review), FDA's Reproductive Health Drugs Advisory Committee voted unanimously (with two abstentions) that mifepristone's benefits outweighed its risks. App. 518.

Plaintiffs' only argument is that the U.S. clinical trial included "safeguards" that were not incorporated into the conditions of use for mifepristone that FDA approved in 2000. Mot. at 18.

24

But, as explained above, there is no legal basis for Plaintiffs' contention that the approved conditions of use of a drug must duplicate the protocol requirements for the clinical trials supporting its approval. *See supra* pp. 22-23. Here, FDA thoroughly explained why the protocol requirements in the clinical trials were unnecessary for the safe and effective use of mifepristone. *See* App. 579-82; App. 521-22. In any event, Plaintiffs' criticism of the clinical data previously considered by FDA does not present any new evidence that works a "fundamental change in the factual premises" of FDA's findings. *McAfee*, 36 F.4th at 274. Ultimately, Plaintiffs offer no basis for this Court to supplant FDA's considered judgment of the scientific evidence.

### b.  Plaintiffs' Subpart H Claim Is Likely To Fail

Plaintiffs contend that FDA erred in invoking its Subpart H regulations, 21 C.F.R. §§ 314.500, 314.560 *et seq.*, as part of the 2000 approval of mifepristone. Mot. 14-16. Plaintiffs misconceive of Subpart H as the source of approval authority. *E.g.*, Mot. 4, 14. To the contrary, FDA's authority to approve the marketing of new drug products stems from the FDCA; Subpart H is a regulatory implementation of its statutory authority. In any event, Plaintiffs failed to raise a challenge to compliance with Subpart H in the 2019 citizen petition, so they cannot pursue such a claim here. Moreover, Plaintiffs fail to show any error of law, much less a "plain error" sufficient to overturn FDA's longstanding decision. *McAfee*, 36 F.4th at 274.

As an initial matter, Plaintiffs' arguments about Subpart H have been overtaken by congressional action. In FDAAA, Congress specifically directed that drugs with elements to assure safe use "in effect on the effective date of this Act" (like mifepristone) would be "deemed to have in effect an approved" REMS. Pub. L. No. 110-85, § 909(b)(1). Even if this Court were now to conclude that FDA should not have relied on Subpart H in 2000, that would not change the incontrovertible fact that mifepristone's restrictions were "in effect on the effective date of this Act", *id.*, and thus that mifepristone was incorporated into the REMS statutory framework pursuant

to Congress's mandate. Indeed, Congress was well aware that FDAAA would be "deem[ing]" mifepristone to have a REMS.[10]

Moreover, in 2011, FDA approved a proposed REMS that the mifepristone application holder was required to submit under FDAAA. Pub. L. No. 110-85, § 909(b)(3); App. 599. Plaintiffs do not dispute that mifepristone is eligible for approval under the REMS statutory framework (*see* 21 U.S.C. § 355-1(a)(1) (applying the framework to drugs intended to treat "a disease or condition")), so any hypothetical error in the initial reliance on Subpart H would have no continuing impact on mifepristone's current approval under 21 U.S.C. § 355-1 and independently under FDA's 2011 action.

In any event, FDA's reliance on Subpart H was appropriate. FDA promulgated Subpart H as an implementation of its authority, under the FDCA, to (among other things) approve new drugs only if safe for use under the conditions prescribed, recommended, or suggested in their labeling. Subpart H is available for new drugs that (1) "have been studied for their safety and effectiveness in treating serious or life-threatening illnesses," and (2) "provide meaningful therapeutic benefit to patients over existing treatments." 21 C.F.R. § 314.500. Both prongs were satisfied here.

On the first prong, Plaintiffs' contention that "[p]regnancy is not an illness," Mot. 14, ignores FDA's consistent construction of its own regulation. In the final rule, FDA explained that Subpart H was available for serious or life-threatening "conditions," whether or not they were understood colloquially to be "illnesses." 57 Fed. Reg. 58,942, 58,946 (Dec. 11, 1992); *see also* App. 565 (confirming that "the subpart H regulations are intended to apply to serious or life-threatening conditions, as well as to illnesses or diseases"). FDA's contemporaneous use of

---

[10] *See* 153 Cong. Reg. S5759, 5765 (daily ed. May 9, 2007) (statement of Sen. Coburn) (reflecting congressional awareness that mifepristone would be distributed under a deemed REMS following the enactment of FDAAA); 153 Cong. Rec S5444, 5469 (daily ed. May 2, 2007) (statement of Sen. DeMint) (same).

Alliance.App. 070

"condition" in the Subpart H preamble provides "direct insight into what the rule was intended to mean" and "what it was supposed to include." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019).[11] Congress subsequently ratified FDA's understanding of its regulation by applying the REMS statutory framework to drugs for treating a "disease or condition" through FDAAA. 21 U.S.C. § 355-1(a)(1).

As to the second prong of § 314.500, Plaintiffs' attempt to second-guess FDA's determination that mifepristone offers a "meaningful therapeutic benefit," Mot. 16, is unavailing. Plaintiffs' assertion that abortion drugs "are not an alternative 'therapy' for patients unresponsive to, or intolerant of, surgical abortion" because some patients require surgical intervention after the medication regimen, *id.*, is belied by the evidence before FDA. As FDA explained in denying the 2002 citizen petition, "medical abortion through the use of Mifeprex provides a meaningful therapeutic benefit to some patients over surgical abortion," because it "avoided an invasive surgical procedure and anesthesia in 92 percent" of patients in the trial. App. 566. Avoidance of surgery provides therapeutic benefits by minimizing the risk of complications from anesthesia or sedation, including "a severe allergic reaction, a sudden drop in blood pressure with cardiorespiratory arrest, death, and a longer recovery time" as compared to medication. *Id.* FDA reasonably found these benefits to support approval—a conclusion plainly not contrary to law.

At a minimum, FDA's authority to approve mifepristone outside of Subpart H—whether under FDAAA's REMS provision or under the agency's preexisting statutory authority, *see* 57 Fed. Reg. 13234, 13237 (Apr. 15, 1992)—means that the appropriate remedy for any improper invocation of Subpart H would be remand without vacatur. No greater relief could be warranted because FDA would have authority to confirm that mifepristone has already been approved outside

---

[11] Plaintiffs state that the initial sponsor of the Mifeprex NDA argued that pregnancy is not an illness, Mot. 15, but fail to note that the sponsor agreed to approval under Subpart H. App. 523.

Alliance.App. 071

of Subpart H, and vacatur would be enormously disruptive as explained below. *See Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000). There is thus no basis to enjoin FDA's approval of mifepristone even if the Court were to accept Plaintiffs' Subpart H argument.

### 3. Plaintiffs' Untimely and Unexhausted Claims Regarding the Comstock Act Fail as a Matter of Law

Plaintiffs suggest that the Comstock Act, 18 U.S.C. §§ 1461, 1462, required FDA to prohibit the manufacturers of mifepristone from distributing it to prescribers by mail or by common carrier. Mot. 21. But Plaintiffs failed to present this argument at any stage of any administrative proceeding. Thus, this argument is unexhausted and barred from review. *See supra* p. 18. Plaintiffs' Comstock argument is also untimely as to the 2000 approval of mifepristone and the 2016 citizen petition denial. *See supra* pp. 16-17.

Plaintiffs' argument also fails on the merits. Plaintiffs provide no reason why FDA was required to consider that Act in deciding whether and under what conditions to approve mifepristone. That is particularly true given that the initial approval occurred in 2000, at a time when the Comstock Act could not constitutionally have been enforced against the mailing of items for abortions. Certainly the Comstock Act does not bear on the safety and efficacy findings at the core of FDA's approval decision, and nothing in the law requires FDA to incorporate into its drug approvals purported criminal-law restrictions on modes of transporting drugs.

More fundamentally, Plaintiffs misconstrue the Comstock Act. They contend that the Comstock Act "expressly prohibit[s] the distribution of chemical abortion drugs by mail, express company, or common carrier." Mot. 20 (citing 18 U.S.C. §§ 1461, 1462). As the Department of Justice's Office of Legal Counsel has explained, however, since the early 20th century the Comstock Act has been understood "not to prohibit all mailing or other conveyance of items that can be used to prevent or terminate pregnancy." Katzen Decl., Ex. 1C (*Application of the Comstock*

*Act to the Mailing of Prescription Drugs That Can Be Used for Abortions*, 46 Op. O.L.C. ___, at 5 (Dec. 23, 2022)), https://perma.cc/8XHW-32JD. In particular, federal courts of appeals settled upon a consensus view that the Comstock Act did not prohibit the mailing or other conveyance of contraceptives or items designed to produce abortions where the sender does not intend them to be used unlawfully. *See id.* at 5-11 (discussing, *e.g.*, *Davis v. United States*, 62 F.2d 473, 474-75 (6th Cir. 1933); and *United States v. One Package*, 86 F.2d 737, 738-40 (2d Cir. 1936); *Consumers Union of United States, Inc. v. Walker*, 145 F.2d 33, 33 (D.C. Cir. 1944)); *see also United States v. H.L. Blake Co.*, 189 F. Supp. 930, 935 (W.D. Ark. 1960).

Congress was well aware of this judicial interpretation, as well as the Postal Service's acceptance of the courts' settled construction. *See* Katzen Decl., Ex. 1C, at 12-13, 15-16, https://perma.cc/8XHW-32JD. Yet despite re-enacting or amending the Comstock Act several times over the ensuing decades, Congress never modified the relevant statutory text to reject or displace this settled construction. *See id.* at 11-15. Thus, Congress "implicitly adopted that construction of the statute." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 244 n.11 (2009); *see also, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Thus even if FDA were required to consider the Comstock Act, because the Comstock Act does not prohibit the mailing or other conveyance of abortion-inducing drugs where the sender does not intend them to be used unlawfully, and given that these drugs may be used lawfully, neither FDA's decisions related to in-person dispensing nor the absence of a prior FDA affirmative prohibition on distribution by mail was inconsistent with the Comstock Act.

Moreover, Plaintiffs' interpretation of the Comstock Act—as requiring FDA to affirmatively prohibit "distribution of mifepristone by mail, express company, and common

Alliance.App. 073

carrier," Mot. 21—is foreclosed by the 2007 FDAAA provisions related to REMS. As explained

above, FDA initially approved mifepristone pursuant to Subpart H, and in doing so imposed certain

restrictions on mifepristone's distribution. *See supra* p. 6; App. 514. In 2007, through FDAAA,

Congress created the REMS authority and specifically "deemed" certain Subpart H drugs to have

a REMS in effect, with the REMS containing the same distribution restrictions then in effect for

each drug. *See* Pub. L. No. 110-85, tit. IX, § 909(b) (codified at note following 21 U.S.C. § 331).

In enacting this legislation, Congress was well aware that it was directing mifepristone's

preexisting distribution scheme to continue. Indeed, Senators critical of mifepristone's approval

specifically noted that result.[12] As Plaintiffs acknowledge, FDA's preexisting restrictions "did not

include prohibitions on the upstream distribution of mifepristone . . . by mail, express company, or

common carrier." Mot. 21; *cf.* App. 521-23 (discussing the distribution system). Nor did those FDA

restrictions prohibit the importation of mifepristone, *cf.* 18 U.S.C. § 1462, despite the

understanding of various Members of Congress that the drug was being imported. *See, e.g.*, Staff

Report, H. Cmte. Gov't Reform, *The FDA and RU-486: Lowering the Standard for Women's

Health* (Oct. 2006), at 3.

Plaintiffs' argument that FDA was required to impose additional distribution restrictions in

light of the Comstock Act is therefore foreclosed by FDAAA—because, through that legislation,

Congress affirmatively endorsed mifepristone's availability and distribution in the absence of those

---

[12] *See supra* n.10. One Senate opponent proposed to include a provision in the bill suspending
FDA's approval of mifepristone, which was rejected. *See* FDAWeek, *GOP Fails to Narrow Scope
of FDA Reform Bill During Senate Mark-Up* (Apr. 20, 2007) ("[Sen. Coburn] also offered an
amendment to suspend the approval of RU486 and make FDA review how it was approved. . . .
That amendment failed[.]"). The Senate version of the bill then included a different provision
targeting mifepristone—requiring the mifepristone manufacturer to submit a revised REMS on a
more accelerated schedule than other drugs—which likewise was rejected in favor of requiring
proposed REMS submissions from all drug manufacturers on the same timeline. *Compare* S. 1082,
110th Cong., 1st Sess., tit. II, § 214(b)(3)(B) (engrossed in Senate, May 9, 2007), *with* Pub. L.
No. 110-85, tit. IX, § 909(b)(3).

Alliance.App. 074

restrictions.

## II.  Plaintiffs Will Not Suffer Irreparable Harm Without An Injunction Against A Drug That Has Been On The Market For More Than Twenty Years

Plaintiffs' motion should be denied for the independent reason that they fail to show irreparable harm. As explained above, *supra* § I.A, Plaintiffs establish no cognizable injury, let alone irreparable harm. Yet they ask this Court for emergency relief in the form of a mandatory injunction that would immediately withdraw approval of a safe and effective drug that has been available in the United States for more than two decades—based on speculative allegations of harm and Plaintiffs' untested assertions (relying for their merits arguments on extra-record evidence not properly before this court) that they know better than FDA whether this drug is safe. That request is extraordinary and unprecedented. Plaintiffs have pointed to no case, and the government has been unable to locate any example, where a court has second-guessed FDA's safety and efficacy determination and ordered a widely available FDA-approved drug to be removed from the market—much less an example that includes a two-decade delay. Nor have Plaintiffs identified any instance in which a court has entered a preliminary injunction suspending or withdrawing approval of a widely available drug on any other ground.

### A.  Plaintiffs' Own Actions Confirm the Lack of Irreparable Harm

Plaintiffs fail to show the imminent and irreparable harm necessary for injunctive relief. *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). It is extremely difficult to make that showing in a case like this, where Plaintiffs seek to upend longstanding agency action. Mifepristone has been on the market for more than twenty years, first under restrictions imposed as part of the initial approval and then under a REMS. Even the most recent action Plaintiffs challenge occurred in December 2021, eleven months before Plaintiffs filed suit. "Federal courts in Texas have long recognized" that such a "delay in seeking an injunction" indicates "that the

31

alleged harm does not rise to a level that merits an injunction." *Texas v. United States*, 328 F. Supp. 3d 662, 738 (S.D. Tex. 2018) (denying a preliminary injunction against Deferred Action for Childhood Arrivals where the policy existed for six years before plaintiffs filed suit); *see also, e.g.*, *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 17-CV-3200, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) ("[C]ourts generally consider anywhere from a three-month delay to a six-month delay enough to militate against issuing injunctive relief."); *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (explaining that delay "demonstrates a lack of urgency and undercuts the need for a preliminary injunction").

Plaintiffs' extreme delay in filing suit undermines their substantive argument for a preliminary injunction because it shows that they face no imminent, irreparable harm. "The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Plaintiffs' dilatory approach to challenging the agency actions at issue here by itself demonstrates that they will not suffer irreparable harm warranting emergency relief while this case is litigated to final judgment—a conclusion only compounded by the fact that the injunction they seek would upend, rather than preserve, the status quo. *See Cherry v. Unidentified Defendants*, No. 19-cv-657, 2019 WL 7838559, at *1 (E.D. Tex. Oct. 16, 2019) ("The purpose of a preliminary injunction is *not* to give a plaintiff the ultimate relief he seeks.").

**B.  Plaintiffs' Theories of Injury Are Highly Speculative on Their Own Terms**

For the reasons explained above, *see supra* § I.A, Plaintiffs' assertions of harm are too speculative to show even standing. It follows *a fortiori* that they are too speculative to show irreparable harm. *Cf. Gbalazeh v. City of Dallas*, 394 F. Supp. 3d 666, 672 (N.D. Tex. 2019) ("[E]stablishing that there is a substantial threat of irreparable injury on a motion for preliminary

Alliance.App. 076

injunction is a much taller task than showing injury-in-fact to survive a motion to dismiss.").

### C. Contrary to Plaintiffs' Claimed Harms, Serious Complications with Mifepristone Are Rare

In addition, Plaintiffs' alleged harms depend on a shared faulty premise—that mifepristone "inflict[s] severe complications on many women and girls" and "cause[s] more complications than even surgical abortions." Mot. 1-2. Congress authorized FDA to evaluate the safety of new drugs using its scientific expertise. Based on extensive scientific evidence, FDA determined more than two decades ago that mifepristone is safe and effective for its approved use and that its benefits outweigh its risks. *See supra* p. 4. FDA's scientific determination is entitled to significant deference. *See Wages & White Lion Invs.*, 41 F.4th at 436 ("[W]here the parties disagree on the science, we owe the FDA deference."); *see also Sierra Club v. EPA*, 939 F.3d 649, 680 (5th Cir. 2019) ("A reviewing court must be 'most deferential' to the agency where, as here, its decision is based upon its evaluation of complex scientific data within its technical expertise."). FDA's conclusions are amply confirmed by the administrative record here—which is the only relevant record for purposes of the merits in this case. Moreover, for purposes of evaluating whether irreparable harm would result without a preliminary injunction, evidence set forth in the attached declarations further confirms that mifepristone has been demonstrably safe and effective in practice, when considered based on clinicians' real-world experience prescribing the medication. *See* Zite Decl. ¶ 6; Ex. 7 (McHugh Decl.) ¶ 8; Ex. 3 (Ireland Decl.) ¶ 8. Accordingly, Plaintiffs cannot show that they will suffer irreparable injury during the pendency of this litigation (if at all). *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

### 1. The Agency Record Confirms Mifepristone's Safety and Efficacy

Plaintiffs' claim that women's use of mifepristone imposes greater burdens on Plaintiffs than would be present if mifepristone were removed from the market are belied by the record.

Based on its review of the scientific literature, FDA concluded that "[s]erious adverse events associated with the use of mifepristone through 70 days gestational age are rare." App. 736. More specifically, "the rates of serious adverse events are low: transfusions are 0-0.1 percent, sepsis is less than 0.01 percent, hospitalization related to medical abortion [*i.e.*, medication-induced abortion] is 0-0.7 percent, and hemorrhage is 0.1 percent." *Id.*; *see also* App. 635-36. These conclusions were compiled based on eleven different studies, containing data on "well over 30,000 patients." Katzen Decl., Ex. 1A, at 50, https://perma.cc/SR23-X9LJ; *see also id.* at 51-59 (discussing adverse events on a study-by-study basis). FDA also concluded that mifepristone is highly effective in terminating pregnancy without a need for surgical intervention. App. 736, 767; *see also* App. 736 (discussing rates of "complete medical abortion" across 22 studies, between "93.2 percent to 98.7 percent in the United States studies, and 92 percent to 98 percent in the non-United States studies"); Katzen Decl., Exs. 1A, at 21-47, https://perma.cc/SR23-X9LJ & 1B (Table of Studies for 20-687), at 1-24, https://perma.cc/5KSW-Q6AF.

Notably, as FDA concluded, although medication and surgical abortion each have contraindications and particular risks and benefits for certain patients, the overall safety and efficacy rates are not significantly different. Some patients will benefit, for example, by the avoidance of "an invasive surgical procedure and anesthesia" with medication abortion. App. 566; *see* Ex. 4 (Kieltyka Decl.) ¶¶ 19-22, 30; McHugh Decl. ¶ 7; Ireland Decl. ¶ 10. But averaged across the entire population, FDA highlighted one study "of 30,146 United States women undergoing pregnancy termination before 64 days of gestation from November 2010 to August 2013," which found that "[e]fficacy of pregnancy termination was 99.6 percent and 99.8 percent for medical and surgical abortion, respectively," with "no difference in major adverse events." App. 766-67.

### 2.  Plaintiffs' Submitted Studies Do Not Undermine FDA's Expert Judgments

Rather than confront the significant evidence confirming mifepristone's safety, Plaintiffs

34

Alliance.App. 078

ask this Court to second-guess the agency based on five selected publications. Three are part of the agency record, *see* App. 391-97, 398-40, 421-28, and, as such, were considered by FDA in rendering the challenged decisions. App. 644, 737, 766-67. Two are from outside the record. *See* App. 409-420, 429-33. None purports to conclude that mifepristone is unsafe. Indeed, three of them expressly *endorse* mifepristone as a safe treatment.[13]

Moreover, Plaintiffs misconstrue these studies and their relevant findings. For example, Plaintiffs contend that Niinimaki 2009 (App. 398-408) establishes that "[t]wenty percent (20%) of females will have an adverse event after taking chemical abortion drugs—a rate four times higher than with surgical abortion." Compl. ¶ 65. But that figure includes some instances of uterine bleeding that FDA has described as "an expected and necessary part of the process" that "should only be considered [an] adverse event[] if the amount of bleeding or pain exceeds what would be expected for such a process." Katzen Decl., Ex 1A, at 68-69, https://perma.cc/SR23-X9LJ; *see also* App. 766; Katzen Decl., Ex. 1E, at 11, https://perma.cc/K69R-33EZ and https://perma.cc/RZ2M-9DQH. Indeed, the authors of the cited study recognized that "[u]terine bleeding requiring surgical evacuation probably better reflects the severity of bleeding after termination of pregnancy," and clarified that the rate of *that* complication "was relatively low[.]" App. 403-04.

Plaintiffs also place undue significance on Mentula 2011 (App. 391-97) when they cite a complication rate for women who take mifepristone during the *second* trimester. *See* Compl. ¶ 64. Given that FDA approved mifepristone only for an intended use through 10 weeks, that study is largely irrelevant (and the data were "relatively old"), as FDA explained. *See* App. 737. A similar problem exists with Plaintiffs' reliance on Niinimaki 2011 (App. 421-28), *see* Compl. ¶ 64, which

---

[13] *E.g.*, App. 407 ("[T]ermination of pregnancy by means of either medical or surgical methods is associated with a low level of serious complications."); *see also* App. 392-97, 422.

Alliance.App. 079

included women taking mifepristone up to 20 weeks' gestation—double the time period approved by FDA—and which likewise inflated the complication rate, as the authors acknowledged. *See* App. 425 ("Advanced duration of gestation was strongly related to the risk of incomplete abortion and surgical evacuation."); *see also* App. 644; Katzen Decl., Ex. 1A, at 74-75, https://perma.cc/SR23-X9LJ. In short, FDA independently reviewed all three studies; its determination that the studies comport with FDA's conclusions must be afforded deference. *See Wages & White Lion Invs.*, 41 F.4th at 436.

As for Plaintiffs' extra-record studies—which cannot be considered in connection with the merits of Plaintiffs' underlying claims—Plaintiffs once again mischaracterize their relevance. In particular, Plaintiffs rely on Studnicki 2021 (App. 409-20) to assert that "chemical abortions are over fifty percent (50%) more likely than surgical abortions to result in an emergency department visit within thirty days," Mot. 16. The mifepristone Medication Guide informs patients that cramping and bleeding are an expected part of ending a pregnancy.[14] There are many reasons why patients may seek ER care. *See, e.g.*, App. 172. But serious adverse events are rare, and an ER visit does not mean there has been an adverse event, let alone a serious adverse event. In any event, Plaintiffs' comparison of the relative likelihood of ER visits obscures the fact that Studnicki 2021 reported data showing the rate of emergency room visits is within the range reported in the FDA approved labeling (2.9%-4.6%),[15] which is low for both medication and surgical abortion: 3.6% for medication abortion, and 1.3% for surgical abortion.[16] *Accord* Zite Decl. ¶¶ 8-10, 12-14 (describing, based on experience, low rate of hospital visits due to "adverse events related to mifepristone following FDA's revision of the REMS"); Ireland Decl. ¶ 8. In short, this publication

---

[14] *See* Katzen Decl., Ex. 1D, at 16, https://perma.cc/2UJ5-8WVF.

[15] *See id.* at 8.

[16] *See* App. 413 (medication abortion: 2,201 abortion-related visits/61,076 total abortions performed; surgical abortion: 4,660/361,924).

Alliance.App. 080

does not undermine FDA's scientific determination that mifepristone for the medical termination of intrauterine pregnancy through 70 days gestation is safe for its intended use.

The Studnicki 2021 publication is even less relevant when considered in light of Plaintiffs' second extra-record study, App. 430-33 (Studnicki 2022). Although the Studnicki 2021 publication calculated that medication abortion was more likely than surgical abortion to lead to an emergency room visit, the Studnicki 2022 publication found that the likelihood of being admitted to the hospital was higher for *surgical* abortion (although the overall hospital admission rate for both procedures was quite low). *See* App. 431 ("Women experiencing chemical abortion and a subsequent emergency room (ER) visit within 30 days were less likely . . . to be hospitalized for any reason in that same time period than women who had experienced surgical abortion."). The Studnicki 2022 publication confirms that it is, at best, exceedingly unlikely that removing mifepristone from the market (as Plaintiffs request) would meaningfully decrease the burdens on the medical system, let alone on Plaintiffs in particular. *See also* Lindo Decl. ¶¶ 48 (explaining that individuals would seek surgical abortions); *id.* ¶¶ 49-50 (explaining that removing mifepristone from the market would increase burdens on the medical system as a whole, including with respect to patients seeking healthcare other than abortion); Zite Decl. ¶¶ 11, 15.

In short, none of Plaintiffs' publications undermines FDA's scientific determinations regarding the safety and efficacy of mifepristone. These determinations are entitled to "significant deference," and there is no basis "to compel the FDA to alter the regime for medical abortion" based on Plaintiffs' speculative assertions of harm that contradict the agency's findings. *Am. Coll. of Obstetricians and Gynecologists*, 141 S. Ct. at 578-79 (Roberts, C.J., concurring). Because serious complications with mifepristone are rare, *see, e.g.*, Zite Decl. ¶¶ 8-10, 12-14, Plaintiffs cannot show—despite the drug's two decades on the market—that they face an influx of patients

Alliance.App. 081

who (a) experience complications from mifepristone, (b) seek treatment from Plaintiffs, and (c) would not have experienced complications from surgical abortion or childbirth. And without showing such a comparatively larger influx, Plaintiffs cannot show that their practices will be meaningfully affected—or irreparably harmed.

### III. A Preliminary Injunction Would Harm The Public Interest And Third Parties

The public interest would be dramatically harmed by effectively withdrawing from the marketplace a safe and effective drug that has lawfully been on the market for twenty-two years. FDA's determination that mifepristone provides a "meaningful therapeutic benefit to patients" over existing treatments, App. 523, 565-66, has been confirmed through decades of experience of thousands of women who, in consultation with their doctors, have determined that mifepristone is the safest and best option for them when compared to surgical abortion or childbirth. *See* Lindo Decl. ¶¶ 30-45; Kieltyka Decl. ¶¶ 18-34; McHugh Decl. ¶ 6; Ireland Decl. ¶¶ 10-13. The public interest is "paramount" where, as here, "an injunction would deprive the public of an important medical benefit." *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 385 (D.N.J. 2002). Indeed, under these circumstances, relief may be denied on public interest grounds even if a court decides other factors may weigh in Plaintiffs' favor. *Id.* (citing cases).

Removing access to mifepristone would cause worse health outcomes for patients who rely on the availability of mifepristone to safely and effectively terminate their pregnancies. *See* Kieltyka Decl. ¶¶ 19-22; Lindo Decl. ¶ 45; Ex. 6 (Glaser Decl.) ¶ 13. Many patients will likely seek legal access to abortion regardless of any injunction issued in this case—but an injunction would force them to do so through an invasive medical procedure that increases health risks for some patients and that may be otherwise inaccessible to others. *See* Lindo Decl. ¶¶ 47-72 (describing increase in wait times for surgical abortion that would result absent mifepristone, and the far-reaching impacts of such increased wait times on patients, their families, and healthcare

Alliance.App. 082

providers); *see also* Kieltyka Decl. ¶¶ 36-45 (explaining that unavailability of mifepristone would force Maine Family Planning to eliminate abortion services at 17 of its 18 clinics across the state of Maine, many in rural areas that lack alternative options); Ireland Decl. ¶ 14; McHugh Decl. ¶ 15. Indeed, as individual providers have explained, a substantial proportion of patients choose medication abortion for a variety of reasons including medical necessity, privacy, and avoiding further trauma, and its sudden absence would be expected to impose real and significant harms on such patients. *See, e.g.*, Kieltkya Decl. ¶¶ 19-31, 40-45; McHugh Decl. ¶ 15; Ireland Decl. ¶¶ 10-14. The effects of a preliminary injunction would be particularly acute for patients for whom mifepristone is the medically indicated treatment because of the patient's pre-existing health condition. For example, surgical abortion involves anesthesia, but people who are allergic to anesthesia can experience "a sudden drop in blood pressure with cardiorespiratory arrest, [and] death." App. 566; *see also* App. 521, 523; Kieltyka Decl. ¶ 20. And as Dr. Ireland explained, patient populations for whom medication abortion is more appropriate than a surgical abortion "include[] patients who are survivors of abuse, including rape and incest, for whom pelvic exams can recreate severe trauma," "[a]dolescent patients, who have not yet had a pelvic exam," and "patients in the intensive care unit or trauma patients who have difficulty with the positioning required for suction D&C." Ireland Decl. ¶ 7; *see also* Kieltyka Decl. ¶ 30; McHugh Decl. ¶¶ 10-14; Glaser Decl. ¶ 11. Notwithstanding these serious implications, the requested relief would deprive patients and their doctors of the opportunity "to decide whether a medical or surgical abortion is preferable and safer in [the patient's] particular situation." App. 566.

A preliminary injunction also would undermine the capacity of state healthcare systems. Taking away patients' option of medication abortion would lead to overcrowding and delays at clinics that provide surgical abortion, including not only dedicated abortion clinics but also general

Alliance.App. 083

practitioners. *See* Lindo Decl. ¶¶ 48-50. This would lead to delays for an array of healthcare services as providers and resources are unnecessarily diverted to surgical abortions. *Id*. Even a preliminary injunction with a more limited scope than withdrawal of mifepristone would unduly burden the public and healthcare systems, where FDA, in its scientific judgment, has determined that mifepristone is safe and effective for its intended uses and the benefits outweigh the risks.

Moreover, a preliminary injunction would interfere with the reliance interests of businesses involved in the sale and distribution of mifepristone. These businesses have relied on FDA's approval of mifepristone for the past twenty-two years to invest in the infrastructure to support these pharmaceutical products. These businesses, in turn, have employees whose jobs depend on the continued availability of mifepristone. More generally, if longstanding FDA drug approvals were so easily enjoined, even decades after being issued, pharmaceutical companies would be unable to confidently rely on FDA approval decisions to develop the pharmaceutical-drug infrastructure that Americans depend on to treat a variety of health conditions.

Finally, a preliminary injunction would interfere with Congress's decision to entrust FDA with responsibility to ensure the safety and efficacy of drugs. In discharging this role, FDA applies its technical expertise to make complex scientific determinations about drugs' safety and efficacy, and these determinations are entitled to substantial deference. *See Sierra Club*, 939 F.3d at 680. Allowing Plaintiffs to supplant FDA's considered judgment with cursory and baseless allegations of harm would undermine the administrative framework that Congress designed for the regulation of pharmaceutical drugs.

## CONCLUSION

Plaintiffs' Motion for a Preliminary Injunction should be denied.

January 13, 2023

Respectfully submitted,

HILARY K. PERKINS
Assistant Director

*/s/ Noah T. Katzen*
NOAH T. KATZEN (D.C. Bar. No. 1006053)
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
(202) 305-2428
(202) 514-8742 (fax)
Noah.T.Katzen@usdoj.gov

ERIC B. BECKENHAUER
Assistant Director

DANIEL SCHWEI
Special Counsel

JULIE STRAUS HARRIS
Senior Trial Counsel

CHRISTOPHER A. EISWERTH
EMILY NESTLER
KATE TALMOR
Trial Attorneys
Federal Programs Branch
Civil Division
    U.S. Department of Justice

41

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed by email according to the Court's Emergency

Procedures for the U.S. District Court for the Northern District of Texas, will be sent via

electronic mail to all counsel of record.

January 13, 2023                              */s/ Noah T. Katzen*
                                              NOAH T. KATZEN

# Exhibit 49

Declaration of Dr. Tyler Johnson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services, | |
| Defendants. | |

1

## DECLARATION OF DR. TYLER JOHNSON

I, Tyler Johnson, D.O., a citizen of the United States and a resident of Leo,
Indiana, declare under penalty of perjury under 28 U.S.C. § 1746 that the following
is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal
   knowledge.

2. I received my Bachelor of Science in Biology from the University of Saint
   Francis in Fort Wayne. I attended medical school at the Lake Erie College of
   Osteopathic Medicine. My residency was at Michigan State University's
   Kalamazoo Center for Medical Studies.

3. I am an emergency department physician certified by the American Board of
   Emergency Medicine. I practice in the emergency departments of hospitals in
   northern Indiana. My practice includes treating patients throughout rural
   northern Indiana into the inner-city of Fort Wayne. I am also the director of
   emergency medicine at Parkview Dekalb Hospital.

4. I am a member of the American Association of Pro-Life Obstetricians and
   Gynecologists (AAPLOG).

5. I am familiar with the U.S. Food and Drug Administration's (FDA) Risk
   Evaluation and Mitigation Strategy (REMS) drug safety program. I am also
   familiar with the REMS issued by the FDA for the chemical abortion drugs
   mifepristone and misoprostol in 2016.

2

6. The FDA's 2016 REMS for mifepristone and misoprostol expanded the acceptable gestational age for chemical abortion, eliminated the in-person administration requirement for these dangerous drugs, eliminated mandatory post-abortion follow-up visits, and eliminated the requirement for prescribers to report all non-fatal adverse events.

7. The FDA's actions harm both women and practitioners.

8. Mifepristone and misoprostol are dangerous drugs that have serious effects on a woman's body. Without the medical supervision, women taking these drugs are at risk of serious and life-threatening complications and even death.

9. I have seen at least a dozen cases of life-threatening complications from the use of abortifacient drugs over the years. These emergency situations are becoming more common as more women are turning to chemical abortion as the FDA has relaxed its regulations.

10. In one case, for example, I treated a woman in the emergency department who had been given an abortion pill from a clinic in Chicago. She took the pill and began to experience heavy bleeding on the drive back to Fort Wayne. By the time she arrived at the hospital, she was unconscious. I performed emergent treatment and gave her a necessary blood transfusion. The patient required further evaluation and observation in the hospital. I have seen multiple cases similar to this one.

Alliance.App. 090

11. About a month ago, I treated an 18-year-old woman in the emergency department who was experiencing severe pain. Although the situation was not life-threatening to her, she was terrified, and it was clear to me that she did not understand what she had been given. It is not uncommon for women who take mifepristone and misoprostol to come to the emergency department because the pain is so terrible.

12. Many of the patients I have treated for complications with chemical abortion experience trauma. They usually have no follow-up with the doctors who prescribed or dispensed the abortifacient drugs, and they are not adequately prepared to understand what the drugs will do to them. In these situations, it is clear to me that these women and girls could not have given informed consent to chemical abortion.

13. In many cases, women are hesitant to tell us that they have taken chemical abortion drugs. On multiple occasions I have treated women in the emergency department who are experiencing extremely heavy bleeding even after they have already passed the unborn child. The women will sometimes eventually explain that they took abortifacient drugs, which helps us understand what is happening to them. I understand that many women are told by staff at the dispensing clinics to tell emergency department doctors that they are experiencing a "miscarriage."

14. Because of the FDA's relaxed regulation of these dangerous drugs, it is extremely easy for women to obtain mifepristone and misoprostol with little

Alliance.App. 091

or no supervision. This leaves emergency physicians like me to deal with preventable emergent and life-threatening situations after these women have taken these drugs. The unsupervised administration of chemical abortion drugs simply harms women and physicians.

15.  The FDA's actions have created a culture of chaos for emergency room physicians. In my experience, patients who are given abortifacient drugs at clinics do not understand what they have taken and are often reluctant to tell emergency doctors what they have taken. This puts me and my colleagues in a position where we have to treat women in emergency situations without crucial information. This culture puts us in increasingly higher risk situations, which increases our exposure to claims of malpractice and liability.

16.  The increase in women presenting in the emergency department for complications with chemical abortions harms other patients too. Because more women are unnecessarily presenting in the emergency department, more of my time and attention is taken away from other patients who need it.

17.  I also believe the FDA's elimination of reporting requirements for non-fatal adverse events harms women and practitioners. I believe we are not tracking these medications closely enough to know the extent of the negative side-effects commonly experienced. This also harms physicians' ability to practice evidence-based medicine. Moreover, women and girls cannot give informed

Alliance.App. 092

consent to chemical abortion when they do not receive accurate information about the risks associated with mifepristone and misoprostol.

18. Given my experience, I expect to see and treat more patients presenting themselves with complications from chemical abortion.

Executed this November __11__, 2022.

By: _____

Tyler Johnson, D.O.

Alliance.App. 093

# Exhibit 50

Declaration of Dr. Regina Frost-Clark

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services, <br><br> Defendants. | Case No. _____ |

1

## DECLARATION OF DR. REGINA FROST-CLARK

I, Regina R. Frost-Clark, a citizen of the United States and a resident of
Michigan, declare under penalty of perjury under 28 U.S.C. § 1746 that the
following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal
   knowledge.

2. I am board-certified in obstetrics and gynecology. I practice with St. John
   OB/Gyn Associates, part of Ascension Medical Group.

3. I received my M.D. from Wayne State University and did my residency at St.
   John Hospital and Medical Center in Detroit, Michigan.

4. I am in a hospital owned practice and am often called to the emergency
   department for consultations.

5. I am familiar with the approval and regulatory changes by the United States
   Food and Drug Administration (FDA) regarding chemical abortion.
   Specifically, I am familiar with the relaxing of supervision requirements for
   administering these very serious drugs, and I am familiar with the relaxed
   reporting requirements for adverse events related to chemical abortions.

6. I believe these FDA actions will harm women, including my patients, and my
   practice.

7. As an OB/Gyn, I have treated several women who have suffered
   complications from chemical abortions.

2

Alliance.App. 096

8. The wider availability of chemical abortion drugs will result in an increase in the frequency of complications related to the drugs' use.

9. In at least a dozen cases, I have treated women who were suffering significant bleeding after taking chemical abortion drugs. Occasionally, women have to be admitted to the hospital for observation due to bleeding complications.

10. In my experience, women who have been given chemical abortion drugs often do not know what they were given or how much of a particular drug they took.

11. In most instances where I treat women who have complications from chemical abortion drugs, they have received it from an abortion facility. Recently a woman told me she obtained these drugs by herself—likely online—and took them without any medical supervision.

12. The FDA's suspension of the in-person dispensing requirement of mifepristone and misoprostol harms women and doctors because it has resulted in an increase in complications.

13. Without an in-person dispensing requirement for chemical abortion drugs, there is a greater chance that women with a molar or ectopic pregnancy will be given drugs that will be ineffectual, leaving them exposed to potentially deadly complications like a rupture or hemorrhage.

Alliance.App. 097

14. Similarly, without an in-person dispensing requirement, patients may be given chemical abortion drugs without a confirmed pregnancy or for an inappropriate gestational age.

15. In these instances, patients may avoid seeking appropriate medical care because they are unaware of the risks they potentially face, which puts them in greater danger of complications.

16. Women presenting with complications from chemical abortion pose a challenging situation because I may not have access to their medical history—either because I am unable to access any medical records from prescribers of the chemical abortion drugs or because they obtained the chemical abortion drugs without any medical oversight to begin with. Additionally, the patients themselves usually do not understand what they have been given, how much they have taken, or their follow-up instructions.

17. The lack of patient history and knowledge harms my ability to treat patients. For example, with patients experiencing bleeding, the course of treatment will vary if I believe the bleeding is regular or abnormal cyclical bleeding as opposed to bleeding resulting from attempted abortion.

18. I expect to see more and more women with chemical abortion complications as the use of the drugs increases. Because of the increased complications and the limited information available to me due to the FDA's actions, I fear that I will have greater exposure to liability in my practice.

4

19. The FDA's actions have led to more confusion for patients and providers. The
FDA has forced my colleagues and me to make decisions about patient care
based on limited information. It also requires me to spend a lot of time trying
to reconstruct patient medical histories to best serve my patients.

20. The FDA's actions make it difficult for patients to have informed consent.
Doctors cannot confirm the pregnancy, the location of the pregnancy, or the
gestational age without an examination. In abortion clinic settings, it is
unclear whether patients are seeing the same physician each time. And often
there are no patient follow-up visits with the dispensing facility.

21. Under the current practice by those who prescribe chemical abortion drugs
like mifepristone and misoprostol, there is no follow-up or additional care
provided to patients and therefore no rapport between patients and their
physicians. This makes it difficult to assess who is responsible for these
patients when they experience complications.

22. The FDA's removal of the adverse event reporting requirement for all adverse
events except death harms my ability to perform evidence-based medicine. I
am unable to assess the risks present to women because the FDA's removal of
reporting requirements undermines the legitimacy of risk data. For example,
Ranitidine, commonly known as Zantac, was pulled from the market due to
cancer associations after years of use. Without adverse event reporting, I
cannot properly assess the risks that my patients face from abortifacient
drugs.

5

Alliance.App. 099

23. I have not reported adverse events that I have witnessed as a result of
chemical abortions because the process is so cumbersome. In addition to the
burdensome paperwork, it is difficult to file an accurate report given that in
many cases I am not certain what the patient was given by the chemical
abortion prescriber.

Executed this November 13, 2022.

By: _____

Regina Frost-Clark, M.D.

# Exhibit 51

Declaration of Dr. George Delgado

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,<br>            Plaintiffs,<br><br>        v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>            Defendants. | Case No. _____ |

1

## DECLARATION OF DR. GEORGE DELGADO

I, George Delgado, a citizen of the United States and resident of San Marcos, California, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am board-certified in family medicine and in hospice and palliative medicine.

3. I serve as a medical advisor to the Abortion Pill Rescue Network and as director of medical affairs of Culture of Life Family Services (COLFS) Medical Clinic.

4. I received my medical degree from the University of California, Davis School of Medicine in 1988 and completed my residency at Santa Monica Hospital/ UCLA Medical Center in 1991.

5. I am a Natural Family Planning (NFP) Medical Consultant trained in NaProTechnology. I have also completed a one-year Certification Program in Health Care Ethics with the National Catholic Bioethics Center.

6. I performed the second recorded successful reversal of chemical abortion in the United States.

7. I established Abortion Pill Reversal, a program that connects women who regret taking the abortion-inducing drug, mifepristone (RU-486), and want to reverse the effects of the chemical abortion regimen.

2

8.  I founded the Steno Institute, a non-profit organization, to conduct, promote and publish high-quality, morally sound health science and clinical research in pro-life areas, including chemical abortion reversal.

9.  I published the first peer-reviewed article in the medical literature describing the reversal of the abortion-inducing drug, mifepristone (RU-486), using progesterone. The case study, "Progesterone Use To Reverse The Effects Of Mifepristone," presented a series of cases demonstrating successful reversal of mifepristone effects in women who chose to reverse the chemical abortion process. Four of six women who took mifepristone were able to carry their pregnancies to term after receiving intramuscular progesterone 200 mg.

10. I co-authored a peer-reviewed article, "A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone," published in Issues in Law & Medicine, Volume 33, Number 1, 2018. The results of the study concluded that the reversal of the effects of mifepristone using progesterone is safe and effective.

11. Based on my review of peer-reviewed studies, I can attest that there are higher levels of complications from chemical abortion than from surgical abortion. For example, the risk of severe bleeding with chemical abortion is five times higher than from surgical abortion.

12. In my family medicine practice, I continue to see patients one day per week while serving primarily in an administrative role.

3

Alliance.App. 104

13. I treat women with Abortion Pill Reversal in my office in addition to treating women who suffer complications from chemical abortions.

14. I see women who have a great deal of regret from undergoing the chemical abortion drug regimen. They are distressed, sad, and feel terrible about what they have done. While it is rewarding to offer these women a chance at reversing chemical abortion, this is some of the most emotionally taxing work I have done in my career.

15. For example, I spoke with one patient who sought to reverse a chemical abortion after taking mifepristone under duress by the abortion doctor. She recounted that the doctor at the abortion center rushed her to make a decision, placed the pill in her bare hand, and told her to take the pill before it melted in her hand and that it was very expensive. She took the pill because of the duress she was under and immediately regretted the decision. She successfully reversed her chemical abortion. This example illustrates how women and girls are not giving informed consent when undergoing chemical abortion and sometimes coerced into taking these drugs.

16. Given my experience, I expect to see and treat more patients presenting themselves with complications from chemical abortion and seeking reversal of mifepristone.

17. My practice renders early prenatal care to mothers and provides care to babies that are born. In doing so, my practice will bill a patient's insurance company for reimbursement for the costs of care. When my patients have

4

chemical abortions, there is a tangible financial loss to my practice in losing

the opportunity to render professional prenatal care for the mother or to care

for babies who are never born.

18. The FDA's elimination of necessary safeguards for pregnant women and girls,

such as removing the requirement for an in-person follow-up examination

after a chemical abortion, will increase the demands on my time in my family

medicine practice and reduce the time I would like to spend with other

patients. I will have to treat an increased number of patients due to abortion

facilities' failure to provide follow-up care to women and girls.

19. Executed this November 14, 2022.

By: _____

George Delgado, M.D.

5

Alliance.App. 106

# Exhibit 52

Declaration of Dr. Shaun Jester

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, | | Case No. _____ |
|         Plaintiffs, | | |
|    v. | | |
| **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services, | | |
|         Defendants. | | |

1

Alliance.App. 108

**DECLARATION OF DR. SHAUN JESTER**

I, Shaun Jester, a citizen of the United States and a resident of Dumas,
Texas, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is
true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal
   knowledge.

2. I am a board-certified obstetrician and gynecologist and am the Medical
   Director of Moore County Ob/Gyn in Dumas, Texas. I have been board-
   certified since 2007.

3. I received my medical degree in 1999 from the Texas College of Osteopathic
   Medicine at the University of North Texas Health Science Center at Fort
   Worth.

4. I have a busy medical practice. I am one of three doctors on call. My practice
   includes cesarean section deliveries, hysterectomies, and other women's
   health treatments. My practice includes about thirty deliveries each month.

5. A Risk Evaluation and Mitigation Strategy (REMS) is a drug safety program
   that the U.S. Food and Drug Administration (FDA) can require for certain
   medications with serious safety concerns to help ensure the benefits of the
   medication outweigh its risks.

6. I understand that the FDA approved chemical abortion drugs for use in the
   United States in 2000.

2

Alliance.App. 109

7. I am also familiar with the FDA's regulatory changes regarding chemical abortion drugs, especially the REMS issued in 2016 and associated with the use of mifepristone and misoprostol for chemical abortions.

8. I understand that the FDA approved the use of mifepristone up to 70 days (or 10 weeks) of gestation in 2016, which is longer than the previous standard of 49 days (or 7 weeks).

9. I am familiar with the FDA's suspension and elimination of the in-person dispensing requirements for administering these dangerous drugs in 2021.

10. I am familiar with the removal of the requirement for an in-person, post-abortion office visit, which is when a physician determines whether any fetal parts or other products of conception remain. These visits are essential to ensure that women experience no complications after chemical abortion.

11. I am also familiar with the relaxed reporting requirements for adverse events related to chemical abortions.

12. I believe these FDA actions will harm my patients, women, and women's medicine.

13. I believe that the FDA's approval for using mifepristone at a later gestational age, and the elimination of the in-person dispensing requirement and follow-up visit requirement, are especially dangerous for women.

14. Based on my experience, mothers are often mistaken about how far along they are in pregnancy. According to the Listening to Mothers III survey, 26% of women's due dates are changed.

3

Alliance.App. 110

15. Without an in-person visit to obtain an ultrasound, there is no way to be certain about the gestational age of an unborn child. Women may be further along in pregnancy than is currently acceptable for chemical abortion. Similarly, without an in-person examination, it is impossible to rule out an ectopic pregnancy, which would not be terminated by a chemical abortion and could put women at an increased risk of rupture or even death.

16. Based on my experience treating patients, I believe unsupervised chemical abortions are dangerous and potentially life-threatening especially due to increased risk of hemorrhage and/or infection the further along they are after 6 weeks' gestation.

17. For instance, I treated a woman who traveled from Texas to obtain chemical abortion drugs from Planned Parenthood New Mexico to complete an abortion at 10 weeks' gestation. The woman returned to Texas, suffered from two weeks of moderate to heavy bleeding, and then developed a uterine infection. At the hospital, I provided her with intravenous antibiotics and performed a dilation and curettage procedure. If she had waited a few more days before receiving care, she could have been septic and died. I reported this adverse event to the FDA.

18. The FDA's actions harm my practice by causing unnecessary harm to my patients that could have been avoided by retention and enforcement of the REMS.

4

Alliance.App. 111

19. Doctors like me serve patients as professional health care providers. I provide care to all women and unborn children, and I give them the best professional services possible. Just like other employed obstetrical providers, my hospital will bill for the cost of obstetrical and medical services rendered. When my patients have chemical abortions, I lose the opportunity to provide these obstetrical and medical services to care for the woman and child through pregnancy and bring about a successful delivery of a new life.

20. Additionally, the wider availability of chemical abortion drugs will result in more patients experiencing complications and the number of patients in emergency situations will rise. These situations are naturally higher risk for both the patient and for the physician providing care. In the chemical abortion case that I reported as an adverse event to the FDA, I had no existing patient relationship or prior knowledge of the patient's medical history. Such cases can be a high-pressure, high-risk situation for practitioners like me.

21. The FDA's deregulation of these dangerous drugs increases our exposure to liability.

22. There are many contraindications to prescribing mifepristone, including adrenal failure, steroid use, severe anemia, bleeding disorders, the use of intrauterine devices, undiagnosed ectopic pregnancy, and others. I do not believe telemedicine can rule out all contraindications to prescribing

5

mifepristone because some of these conditions can only be ascertained with an in-person examination or lab work.

23. Telemedicine does not allow for a critical ultrasound assessment to rule out ectopic pregnancies and verify that the patients are within the 70 days allowed for chemical abortions. In this way, the FDA's loosening of regulations for abortifacient drugs harms women and practitioners by exposing them to increased risk of complications.

24. I believe the relaxed reporting requirements for adverse events related to chemical abortion drugs harm women and physicians because they create an inaccurate and false safety profile for the use of mifepristone and misoprostol. Many women and girls do not fully understand the nature of chemical abortion and the risks that these drugs present to them.

25. The elimination of mandatory follow-up visits after chemical abortion drugs have been administered is also dangerous and harms women and practitioners. Without follow-up visits, physicians cannot identify potential complications like sepsis and hemorrhage, lingering products of conception, and others until the patient is at a critical time or it is too late to help the patient.

26. I care for my patients and give them the best medical care and guidance that I can. I believe that chemical abortions harm women, including my patients, and harm the medical practice. The elimination of REMS critical to ensuring safe use of the chemical abortion drugs prevents doctors from fulfilling their

oath to "do no harm" by permitting the administration of abortifacient drugs to patients without full knowledge or appreciation for the impact those drugs would have on them.

27. As with my patient who suffered an adverse event, it disturbed me that she was not informed that it was not normal to bleed for multiple weeks and that if she had a routine follow-up visit, as required by past REMS, this situation could have been avoided before requiring overnight hospitalization and her being at risk for developing sepsis.

Executed this November _14_, 2022.

By: _____

Shaun Jester, D.O.

7