No. 23-10362

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ALLIANCE FOR HIPPOCRATIC MEDICINE, ET AL.,
*Plaintiffs-Appellees,*
*v.*
U.S. FOOD AND DRUG ADMINISTRATION, ET AL.,
*Defendants-Appellants,*

and

DANCO LABORATORIES, LLC,
*Intervenor-Appellant.*

On Appeal from the United States District Court for the Northern
District of Texas, No. 2:22-cv-00223-Z

APPENDIX OF EXHIBITS IN OPPOSITION TO AN EMERGENCY STAY
PENDING APPEAL VOLUME 4 (ALLIANCE.APP. 250-348)

JULIE MARIE BLAKE
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jblake@adflegal.org

ERIK C. BAPTIST
JOHN J. BURSCH
ERIN M. HAWLEY
MATTHEW S. BOWMAN
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
ebaptist@adflegal.org
jbursch@adflegal.org
ehawley@adflegal.org
mbowman@adflegal.org

*Counsel for Plaintiffs-Appellees*

## TABLE OF EXHIBITS

| Description | App. Page No. |
|---|---|
| **Volume 1** | |
| Declaration of Dr. Christina Francis,<br>    ECF No. 1-8, Exhibit 7 to Complaint; MPI App. 191-200 | 001-010 |
| Declaration of Dr. Ingrid Skop,<br>    ECF No. 1-9, Exhibit 8 to Complaint; MPI App. 211-218 | 011-020 |
| Declaration of Dr. Nancy Wozniak,<br>    ECF No. 1-10, Exhibit 9 to Complaint; MPI App. 219-224 | 021-028 |
| Declaration of Dr. Steven A. Foley,<br>    ECF No. 1-11, Exhibit 10 to Complaint; MPI App. 862-868 | 029-034 |
| Defendants' Opposition to Plaintiffs Motion for a Preliminary Injunction, ECF No. 28 | 035-086 |
| Declaration of Dr. Tyler Johnson,<br>    ECF No. 1-50, Exhibit 49 to Complaint; MPI App. 869-875 | 087-093 |
| Declaration of Dr. Regina Frost-Clark,<br>    ECF No. 1-51, Exhibit 50 to Complaint; MPI App. 876-881 | 094-100 |
| Declaration of Dr. George Delgado,<br>    ECF No. 1-52, Exhibit 51 to Complaint; MPI App. 882-889 | 101-106 |
| Declaration of Dr. Shaun Jester,<br>    ECF No. 1-53, Exhibit 52 to Complaint; MPI App. 882-889 | 107-114 |
| **Volume 2** | |
| 2000 Letter from Danco to FDA (Jan. 21, 2000),<br>    ECF No. 121; MPI App. 908-914 | 115-121 |
| FDA, Center for Drug Evaluation and Research, Summary Review of Application Number: 020687Orig1s020 (March 29, 2016) (2016 Summary Review),<br>    ECF No. 1-33, Exhibit 32 to Complaint; MPI App. 624-652 | 122-150 |
| 2002 Citizen Petition of Am. Ass'n of Pro-Life Obstetricians & Gynecologists to U.S. Food & Drug Admin. (FDA) (Aug. 20, 2002),<br>    ECF No. 1-14, Exhibit 13 to Complaint; MPI App. 280-375 | Part 1<br>151-174 |
| **Volume 3** | |
| 2002 Citizen Petition of Am. Ass'n of Pro-Life Obstetricians & Gynecologists to U.S. Food & Drug Admin. (FDA) (Aug. 20, 2002),<br>    ECF No. 1-14, Exhibit 13 to Complaint; MPI App. 280-375 | Part 2<br>175-246 |

| | |
|---|---|
| 2021 FDA Letter to Am. Coll. of Obstetricians & Gynecologists and Soc'y for Maternal-Fetal Med. about Mifepristone REMS (Apr. 12, 2021),<br>    ECF No. 1-40, Exhibit 39 to Complaint; MPI App. 713-715 | 247-249 |
| **Volume 4** | |
| Declaration of Mario R. Dickerson,<br>    ECF No. 1-4, Exhibit 3 to Complaint; MPI App. 156-162 | 250-256 |
| Declaration of Dr. Donna Harrison,<br>    ECF No. 1-5, Exhibit 4 to Complaint; MPI App. 163-176 | 257-270 |
| Declaration of Dr. Jeffrey Barrows,<br>    ECF No. 1-6, Exhibit 5 to Complaint; MPI App. 177-183 | 271-277 |
| Declaration of Dr. Quentin Van Meter,<br>    ECF No. 1-7, Exhibit 6 to Complaint; MPI App. 184-190 | 278-284 |
| Marrit Niinimaki et al., *Immediate Complications After Medical Compared With Surgical Termination of Pregnancy*, 114 Obstetrics & Gynecology 795 (2009),<br>    ECF No. 1-17, Exhibit 16 to Complaint; MPI App. 398-408 | 285-295 |
| James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999-2015*, Health Servs. Rsch. & Managerial Epidemiology, Nov. 9, 2021,<br>    ECF No. 1-18, Exhibit 1 to Complaint; MPI App. 409-420 | 296-307 |
| Katherine A. Rafferty & Tessa Longbons, *#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives.* 36 Health Commc'n 1485 (2021),<br>    ECF No. 1-21, Exhibit 20 to Complaint; MPI App. 434-446 | 308-320 |
| New Drug, Antibiotic, and Biological Drug Product Regulations; Accelerated Approval, 57 Fed. Reg. 58,942 (Dec. 11, 1992),<br>    ECF No. 1-23, Exhibit 22 to Complaint; MPI App.489-508 | 321-340 |
| FDA Letter to Population Council re: NDA (Feb. 18, 2000),<br>    ECF No. 1-24, Exhibit 23 to Complaint; MPI App.509-516 | 341-348 |

| Volume 5 | |
|---|---|
| 2003 Citizen Petitioners' Response to Opposition Comments filed by The Population Council, Inc. and Danco Laboratories, LLC (Oct. 10, 2003),<br>    ECF No. 1-27, Exhibit 26 to Complaint; MPI App. 530-560 | 349-379 |
| Questions and Answers on FDA's Adverse Event Reporting System (FAERS), https://www.fda.gov/drugs/surveillance/questions-and-answers-fdas-adverse-event-reporting-system-faers,<br>    ECF No. 1-45, Exhibit 44 to Complaint; MPI App. 770-774 | 380-384 |
| Kathi A. Aultman et al., *Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 26 Law & Medicine 3 (2021),<br>    ECF 1-46, Exhibit 45 to Complaint; MPI App. 775-800 | 385-410 |
| Memorandum from FDA on Review of Supplemental Drug Applications Proposing Modifications to the Mifepristone REMS Program (Dec. 23, 2022),<br>    ECF No. 121; MPI App. 890 | 411 |
| Declaration of Dr. Donna Harrison,<br>    ECF No. 121; MPI App. 891-907 | 412-428 |
| Hannah Levintova, *The Abortion Pill's Secret Money Men*, Mother Jones, March-April 2023,<br>    ECF No. 121; MPI App. 929-938 | 429-438 |
| David C. Reardon & John M. Thorp, *Pregnancy associated death in record linkage studies relative to delivery, termination of pregnancy, and natural losses: A systematic review with a narrative synthesis and meta-analysis*, 5 SAGE Open Medicine 1 (2017),<br>    ECF No. 121; MPI App. 939-955 | 439-455 |
| 2019 FDA Abbreviated New Drug Application (ANDA) Approval Letter to GenBioPro, Inc. (Apr. 11, 2019),<br>    ECF No. 1-37, Exhibit 36 to Complaint; MPI App. 695 | 456-462 |
| 2019 FDA Supplemental Approval Letter to Danco Laboratories, LLC (Apr. 11, 2019),<br>    ECF No. 1-38, Exhibit 37 to Complaint; MPI App. 702 | 463-470 |

# Exhibit 3

Declaration of Mario R. Dickerson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

**ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,

        Plaintiffs,

    v.

**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services,

        Defendants.

Case No. _____

1

## DECLARATION OF MARIO R. DICKERSON

I, Mario R. Dickerson, a citizen of the United States and a resident of Willow

Grove, Pennsylvania, declare under penalty of perjury under 28 U.S.C. § 1746 that

the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal
   knowledge.

2. I serve as the Executive Director of the Catholic Medical Association
   ("CMA"). Given my involvement in CMA, I am familiar with the
   organization's history, the issues confronting it, and the views of the
   organization and its members concerning various emerging issues, including
   the deregulated use of mifepristone, or RU-486, to accomplish chemical
   abortions. I am also familiar with CMA members and their practices.

3. CMA is the largest association of Catholic individuals in healthcare. CMA is a
   national, physician-led community that includes about 2700 physicians and
   healthcare professionals nationwide.

4. CMA is a nonprofit organization incorporated in Virginia, and its registered
   agent is in Virginia.

5. CMA's mission is to inform, organize, and inspire its members, in steadfast
   fidelity to the teachings of the Catholic Church, to uphold the principles of the
   Catholic faith in the science and practice of medicine.

6. CMA seeks to pursue its mission in conformity to Christ the Divine Physician.
   Its members are challenged to be a voice of truth spoken in charity, to show

how Catholic teachings on the human person, human rights and the common good intersect with and improve the science and practice of medicine, and to defend the sacredness and dignity of human life at all stages.

7. CMA is a member of the Alliance for Hippocratic Medicine (AHM).

8. CMA is committed to taking a Catholic and Hippocratic approach to medicine.

9. Consistent with Catholic teaching, CMA and its members are morally and ethically opposed to all forms of abortion—chemical or surgical.

10. I have spoken with CMA members who have treated women harmed by chemical abortion drugs.

11. The FDA's unauthorized approval of mifepristone (also known as "Mifeprex" and "RU-486") and subsequent elimination of certain safeguards for the use of the dangerous chemical abortion drug regimen, including those found in the Risk Evaluation and Mitigation Strategy (REMS) for mifepristone, has led to an increasing risk that women and girls may suffer adverse events from chemical abortion.

12. The FDA has continued to eliminate safeguards such that the chemical abortion drugs can now be administered and dispensed with no in-person examination or oversight by a physician. This leaves physicians, including CMA members, to treat the complications that women and girls suffer due to the actions of the FDA and abortionists.

Alliance.App. 253

13. CMA's member physicians include OB/GYNs and emergency department physicians who have treated women suffering complications from chemical abortion.

14. The FDA's actions harm CMA and its member physicians who are called away from other patients to render emergency treatment to women and/or girls who present to emergency departments with symptoms, such as heavy bleeding and severe pain, and more serious complications, including hemorrhage and sepsis caused by chemical abortion drugs. This causes CMA's member physicians much stress and grief, while impeding their ability to perform their practice of medicine in the manner that they desire.

15. Often, emergency department doctors do not have a prior relationship with these patients and lack access to the patient's medical history. Sometimes these patients were underinformed about the effects of the chemical abortion drug regimen, they may not even know what drugs they consumed, or they are told to say they are suffering a miscarriage if there is a need for them to seek emergency help following a chemical abortion. This leaves doctors at increased risk of liability and could impact their ability to render the best care possible to the patient—all because of the FDA's elimination of necessary safeguards.

16. Moreover, the FDA's removal of necessary safeguards could force CMA members to treat women and girls who present to emergency departments following an elective chemical abortion requiring those doctors to complete an

4

Alliance.App. 254

unfinished elective abortion—terminating the life of an unborn child—in
violation of their conscience rights.

17. Since 2005, CMA has called upon the FDA to respond to citizens petitions
calling for removal of RU-486 from the market in an urgent action. CMA
renewed this resolution in 2015.

18. In 2016, CMA enacted a resolution that called for the FDA to require a central
registry for all those having a chemical abortion, with mandatory reporting
from every state and territory of complications and mortalities from chemical
abortions; that the drug be administered only by a physician with surgical
privileges at a hospital within 30 minutes of the facility where the drug is
dispensed; that the dispensing physician be responsible for follow-up and
handling of complications; and that the patient be informed that the process
could be stopped without harm to her or the baby.

19. These resolutions are vital to ensure the safety of women and girls, and to
protect doctors, including CMA members.

20. CMA has spent considerable time, effort and resources challenging the FDA's
actions—at the expense of other CMA priorities. For example, to implement
these resolutions, committees have had to review them, it has taken time
during General Assembly meetings to discuss them, which takes our members
away from their other business, and it has taken time for our Executive
Director and Board to review, taking them away from other priorities such as
fundraising and membership recruitment and retention.

Alliance.App. 255

21. Due to inadequate adverse event reporting, the true rates of risks associated with chemical abortion drugs remain unknown and undercounted. This prevents CMA from providing the public, their members, and their members' patients with accurate statistics and complete information regarding the risks associated with the use of chemical abortion drugs.

22. CMA is a leading national voice on applying the principles of the Catholic faith to medicine. CMA creates and organizes educational resources and events; advocates for members, the Church, and the medical profession in public forums; and provides guidance for bishops and other national leaders on healthcare ethics and policy. The inability to share accurate information on the risks of chemical abortion frustrates and complicates CMA's purpose to educate doctors, their patients, and the public about these dangers.

Executed this November  12 , 2022.


By: _Mario R. Dickerson_

    Mario R. Dickerson

Alliance.App. 256

# Exhibit 4

Declaration of Dr. Donna Harrison

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, <br> Plaintiffs, <br><br> v. <br><br> **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA**, in his official capacity as Secretary, U.S. Department of Health and Human Services, <br> Defendants. | Case No. _____ |

1

Alliance.App. 258

## DECLARATION OF DR. DONNA HARRISON

I, Donna Harrison, a citizen of the United States of America and a resident of Berrien Center, Michigan, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified obstetrician and gynecologist.

3. I received my medical degree from the University of Michigan and completed my residency at a University of Michigan affiliate hospital, St. Joseph Mercy Hospital.

4. I am a diplomate of the American Board of Obstetrics and Gynecology.

5. I serve as the Chief Executive Officer of Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG).

6. I also serve as the President of Plaintiff Alliance for Hippocratic Medicine (AHM).

7. I am familiar with AAPLOG, its members, their fields of practice, and AAPLOG's policies and positions, including as set forth in the complaint, which I have reviewed.

8. AAPLOG is the largest organization of pro-life obstetricians and gynecologists ("OB/Gyns") in the world and is headquartered in Indiana. AAPLOG includes OB/Gyns and other physicians, with more than 7,000 medical professionals nationwide and more than 300 members in Texas.

Alliance.App. 259

AAPLOG members oppose elective abortion and are committed to the care and well-being of their patients including both pregnant women and their unborn children. AAPLOG members are concerned about the adverse impacts of chemical abortion on their practice of medicine.

9. AAPLOG's mission includes advocating on behalf of its members, including in litigation.

10. AAPLOG sues in this case on behalf of itself and its members.

11. I am also familiar with AHM, its members, their members' fields of practice, and AHM's policies and positions, including as set forth in the complaint, which I have reviewed.

12. AHM is a nonprofit organization that upholds and promotes the fundamental principles of Hippocratic medicine. AHM is incorporated in the State of Texas and has its registered agent in Amarillo, Texas.

13. AHM's members include the membership of the American Association of Pro-Life Obstetricians and Gynecologists, American College of Pediatricians, Catholic Medical Association, Christian Medical and Dental Associations, and Coptic Medical Association of North America. In opposing chemical abortion, AHM's members are concerned about the safety and well-being of pregnant women and girls, their preborn children, and chemical abortion's adverse impacts on the practice of medicine.

14. AHM sues in this case on behalf of itself and its members.

3

Alliance.App. 260

15. I am familiar with chemical abortion drugs, their use, and the complications that accompany chemical abortion.

16. As part of my duties and responsibilities at AAPLOG, I have authored several studies on the approval of mifepristone as an abortifacient. Among these, I co-authored two studies with other physicians and scholars examining the adverse events associated with the use of mifepristone. Our studies of the real-world use of mifepristone concluded that significant morbidity and mortality have occurred following the use of mifepristone as an abortifacient. We recommended that a pre-abortion ultrasound should be required to rule out ectopic pregnancy and confirm the gestational age of the unborn child. We concluded that the FDA's adverse event reporting system is grossly inadequate to evaluate real-world complications and significantly underestimates adverse events from mifepristone. One major reason that the FAERS database does not reflect real world complications is that FDA only required the manufacturer to report complications, and the manufacturer in turn obtains data from the abortionists. However, as our studies of the FAERs database indicate, most complications are not handled by the abortion provider, but rather by the Emergency Department, and the Emergency Department physician has no knowledge of the reporting process or obligation to report those complications to the manufacturer or to the FDA. *See* Kathi Aultman, et al., *Deaths and Severe Adverse Events After the Use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 36

4

Issues L. Med. 3 (2021), https://pubmed.ncbi.nlm.nih.gov/33939340/;

Margaret M. Gary & Donna J. Harrison, *Analysis of Severe Adverse Events
Related to the Use of Mifepristone as an Abortifacient*, 40 Ann. Pharmacother.
171 (2006), https://pubmed.ncbi.nlm.nih.gov/16380436/.

17. In addition, as part of my duties and responsibilities at AAPLOG, I co-
authored a paper comparing the published complications after use of
mifepristone from Planned Parenthood in 2009 and 2010 and compared those
numbers to the complications in the FDA Adverse Event Reporting System
for the same time period. We found that Cleland identified 1,530 Planned
Parenthood mifepristone cases with specific adverse events (AEs) for 2009
and 2010. For this period, FAERS online dashboard includes a total (from all
providers) of only 664, and the FDA released only 330 adverse event reports
(AERs) through Freedom of Information Act (FOIA) requests. Cleland
identified 1,158 ongoing pregnancies in 2009 and 2010. FAERS dashboard
contains only 95, and only 39 were released via FOIA requests. We concluded
that there are significant discrepancies in the total number of AERs and
specific AEs for 2009 and 2010 mifepristone abortions reported in 1) Cleland's
documentation of Planned Parenthood AEs, 2) FAERS dashboard, and 3)
AERs provided through FOIA. These discrepancies render FAERS
inadequate to evaluate the safety of mifepristone abortions. *See* Christina A
Cirucci, et al., *Mifepristone Adverse Events Identified by Planned Parenthood
in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting*

5

*System and Those Obtained Through the Freedom of Information Act*, 8
Health Servs. Rsch. & Managerial Epidemiol. 23333928211068919 (2021),
https://pubmed.ncbi.nlm.nih.gov/34993274/.

18. I also co-authored a study looking at the real-world effects of the FDA
Approval of Mifeprex on Emergency Room utilization after Mifeprex
abortions. The massive increased utilization of Emergency Departments to
manage abortion complications is a predictable consequence of the FDA's
failure to require the same qualifications of Mifeprex abortion providers as
were mirrored in the clinical trial for Mifeprex approval.

19. Because the FDA abandoned the post marketing requirement that abortion
providers have admitting privileges to handle their own complications and
allowed abortion providers who lack the ability to handle complications to
dispense Mifeprex, the predictable consequence is the explosion of Mifeprex
complications including hemorrhage, adding to the current shortage of blood
and blood products across the United States. *See* James Studnicki, et al., *A
Longitudinal Cohort Study of Emergency Room Utilization Following
Mifepristone Chemical and Surgical Abortions, 1999-2015*, 8 Health Servs.
Rsch. & Managerial Epidemiol. 23333928211053965 (2021),
https://pubmed.ncbi.nlm.nih.gov/34778493/.

20. I am familiar with the FDA's regulation of chemical abortion drugs, including
mifepristone and misoprostol. As part of my duties and responsibilities at
AAPLOG, I co-authored the original 2002 Citizen Petition and the 2019

6

Alliance.App. 263

Citizen Petition filed by AAPLOG and others to challenge the FDA's actions on chemical abortion drugs. As part of my duties and responsibilities at AAPLOG, I also co-authored a study detailing the aberrancies of the FDA Approval process as it affects real-world patients. *See* Byron C. Calhoun & Donna J. Harrison, *Challenges to the FDA Approval of Mifepristone*, 38 Ann. Pharmacother. 163 (2004), https://pubmed.ncbi.nlm.nih.gov/14742814/.

21. In a chemical abortion, women take mifepristone to terminate the pregnancy by killing the preborn child. Women then take misoprostol to expel all pregnancy tissues, including the preborn child, through contractions and cramping.

22. Women who take chemical abortion drugs experience more complications than those who have surgical abortions.

23. There are many intense side effects for women who take chemical abortion drugs, including cramping and heavy bleeding.

24. Since the FDA's 2000 Approval of Mifeprex (the chemical abortion drug regimen consisting of mifepristone and misoprostol), medical professionals have needed to treat women and girls who have suffered from chemical abortion and experienced complications.

25. Mifepristone and misoprostol are serious drugs that should not be administered without medical supervision. The FDA's actions to eliminate the necessary supervision of these drugs harm women and obstetrics professionals, including AHM, AAPLOG, and their members.

26. Since the FDA's 2016 Major Changes to eliminate safeguards for the use of Mifeprex, AAPLOG members have needed to treat an increasing rate of women and girls who suffer complications from chemical abortion.

27. The increase in the frequency of complications harms medical providers—including AHM and AAPLOG members—because they end up managing the increase in complications.

28. When women suffer complications from chemical abortions, it can overwhelm the medical system and consume crucial limited medical resources, including blood for transfusions, physician time and attention, space in hospital and medical centers, and other equipment and medicines.

29. The increased occurrence of complications related to chemical abortions also multiplies the workload of healthcare providers, including AHM and AAPLOG members, in some cases by astronomical amounts. This is especially true in maternity care "deserts" (i.e., geographic areas where there are not a large number of OB/Gyn providers for patients).

30. For OB/Gyn professionals, the increase in complications due to increased use of chemical abortion drugs means that the typical care given to patients goes from simple patient management to complicated patient management. Patients who suffer complications from chemical abortions require significantly more time and attention from providers than the typical OB/Gyn patient requires.

Alliance.App. 265

31. In my experience, many patients do not fully understand the nature of chemical abortion or the risks that these drugs present to them. This results in an increase in the frequency of women seeking emergency medical care for side effects such as cramping, heavy bleeding, and severe pain even if they are not suffering an adverse event.

32. I understand that the FDA has removed the requirement for abortionists to report all adverse events for mifepristone.

33. Many doctors likely do not know about the need to report adverse events related to chemical abortion to the FDA. Similarly, many doctors likely do not know how to report adverse events. This means that complications handled by practitioners other than the abortionist are rarely reported to the FDA or the manufacturer.

34. I personally know of practitioners, including AAPLOG members, who have tried to report adverse events related to chemical abortion drugs to the FDA. The process is complicated, cumbersome, and time-consuming. The adverse event reporting requirements and the FAERS submission process harm medical practices by taking away significant time from a doctor to treat and meet with patients.

35. The FDA's decision not to require abortionists to report all adverse events for mifepristone harms women and girls because this deregulatory action creates an inaccurate and false safety profile for the use of mifepristone and misoprostol.

9

Alliance.App. 266

36. Without an accurate picture of the adverse effects of widespread chemical abortion drug use, physicians cannot effectively practice evidence-based medicine. If the FDA is not collecting the vast majority of adverse events to understand the true risk, healthcare providers cannot assess the risks of a particular course of treatment and inform their patients accordingly.

37. The inability of providers to adequately inform women of the known risks associated with chemical abortion drugs precludes women and girls from giving informed consent to taking these drugs. The lack of information also harms the patient-doctor relationship with all medical care providers because the patients no longer trust that their healthcare providers are telling the truth. This even harms organizations and practitioners who do not support or practice chemical abortion, including AHM, AAPLOG, and their members.

38. Due to inadequate adverse event reporting, the true rates of risks associated with chemical abortion drugs remain unknown and undercounted. This prevents AHM and AAPLOG from providing the public, their members, and their members' patients with accurate statistics and complete information regarding potential risks associated with the use of chemical abortion drugs.

39. The inability to share accurate information with member physicians, their patients, and the public on the risks of chemical abortion frustrates and complicates AHM's and AAPLOG's purpose to support women's health and to educate doctors, their patients, and the public about these dangers.

Alliance.App. 267

40. AHM and AAPLOG need to divert limited time, energy, and resources to compensate for this lack of information by conducting their own studies and analyses of the available data. This diversion of time, energy, and resources comes to the detriment of other advocacy and educational efforts of AHM and AAPLOG, including their efforts regarding the dangers of surgical abortion, the conscience rights of doctors, and the sanctity of life at all stages.

41. On behalf of AAPLOG and serving as the chairperson for AAPLOG's Subcommittee on Mifeprex, I submitted a Citizen Petition in 2002 challenging the FDA's approval of Mifeprex and requesting an audit of the Mifeprex clinical studies. AAPLOG, as an organization, is concerned about women's health issues and recognized that the FDA's violations of its standards and rules in approving Mifeprex put women's lives and health at risk. It took considerable time, energy, and resources to draft the 92-page petition and the 30-page response to comments letter, in addition to compiling and analyzing supporting sources and studies. This effort caused AAPLOG to divert limited time, energy, and resources from its other priorities and routine functions.

42. Similarly, AAPLOG submitted another Citizen Petition in 2019 challenging the FDA's 2016 major changes to the chemical abortion drug regimen, which I also co-authored. It also took considerable time, energy, and resources to draft the 26-page petition, in addition to compiling and analyzing supporting

11

sources and studies. This effort caused AAPLOG to divert limited time, energy, and resources from its other priorities and routine functions.

43. Because abortion activists continue to file their own citizen petitions and letters with the FDA asking the agency to eliminate all protections for women and girls who take chemical abortion drugs, and knowing the Biden administration's relentless, politicized efforts to push these drugs throughout the country, AHM and AAPLOG continue to expend considerable time, energy, and resources on its public advocacy and educational activities regarding chemical abortion drugs—to the detriment of other AHM and AAPLOG priorities and functions. This diversion of time, energy, and resources will not cease until the FDA's approval and deregulation of chemical abortion drugs ceases.

44. AHM and AAPLOG members are opposed to being forced to end the life of a human being in the womb for no medical reason. The objections are both ethical and medical as they stem from the purpose of medicine itself, which is to heal and not to electively kill human beings regardless of their location. The FDA's removal of REMS for safe use—which eliminates in-person evaluations and follow-up care—places our member doctors at increased risk of being forced to violate their conscience rights. The FDA's actions could force our members into a situation where they must render treatment to a woman in the emergency department suffering complications from chemical

Alliance.App. 269

abortion while she is still carrying a living fetus, and they must perform a

D&C to treat her complications—ending the life of a human being.

Executed this November __11__, 2022.

By: _____ MD.
Donna Harrison, M.D.

13

# Exhibit 5

Declaration of Dr. Jeffrey Barrows

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,<br>            Plaintiffs,<br><br>    v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>            Defendants. | Case No. _____ |

1

Alliance.App. 272

## DECLARATION OF DR. JEFFREY BARROWS

I, Jeffrey Barrows, D.O. M.A. (Ethics), a citizen of the United States and a resident of Blountville, Tennessee, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified obstetrician and gynecologist and am the Senior Vice President of Bioethics and Public Policy for Plaintiff Christian Medical & Dental Associations (CMDA).

3. I practiced obstetrics and gynecology for approximately 18 years. I practiced gynecology in an office setting for an additional ten years.

4. I am familiar with CMDA, its members, their fields of practice, and CMDA's policies and positions.

5. CMDA is a national nonprofit organization headquartered in Tennessee. Its members are more than 13,000 Christian physicians, dentists, and allied healthcare professionals. CMDA has more than 1,200 members in Texas, including more than 600 physicians and approximately 35 OBGYNs.

6. CMDA is opposed to elective abortions as contrary to sacred scripture, respect for the sanctity of human life, and traditional, historical Judeo-Christian medical ethics.

7. CMDA's mission includes advocating on behalf of its members, including in litigation.

2

8. CMDA brings this suit on behalf of itself and its members.

9. CMDA has members in Texas and around the country who care for pregnant women in hospitals and clinics. CMDA's members care for women who suffer complications from chemical abortions.

10. A Risk Evaluation and Mitigation Strategy (REMS) is a drug safety program that the U.S. Food and Drug Administration (FDA) can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks.

11. I am familiar with the FDA's approval of chemical abortion drugs in 2000.

12. I am familiar with the FDA's regulatory changes regarding chemical abortion drugs, especially the REMS issued in 2016 and associated with the use of mifepristone and misoprostol for chemical abortions.

13. I understand that the FDA's 2016 changes expanded the gestational age for approved mifepristone use to 70 days (or 10 weeks) from 49 days (or 7 weeks), that it eliminated the in-person administration requirements for chemical abortion drugs, that it eliminated the requirement for a follow-up appointment after those drugs have been taken, and that it eliminated the prescriber reporting requirement for all adverse events except for death.

14. I also understand that the FDA subsequently eliminated the in-person dispensing requirements in 2021.

15. The FDA's actions harm women, practitioners, CMDA members, CMDA as an organization, and the medical profession generally.

3

Alliance.App. 274

16. Mifepristone and misoprostol are dangerous drugs that can potentially harm women. Relaxing the required medical supervision and oversight for patients taking these drugs puts women's health at risk.

17. By eliminating the in-person dispensing requirement and the requirement for a post-abortion follow-up, the FDA has exposed women to a higher likelihood of undetected serious complications. Specifically, the expanded use of telemedicine for chemical abortions means that some women who are beyond 70 days' gestation because they are mistaken or wrong about the gestational age of their unborn child will take these drugs outside of the appropriate window.

18. Similarly, without in-person visits and sonograms, women with ectopic pregnancies may escape diagnosis, which puts them at a greater risk of serious and life-threatening complications such as rupture of the Fallopian tube and secondary hemorrhage. Undetected ectopic pregnancies are especially dangerous for women because in some cases they can result in extreme bleeding for women.

19. By eliminating the adverse event reporting requirement for all events except death, the FDA has also undermined physicians' ability to practice evidence-based medicine. By failing to collect accurate information about the complications associated with chemical abortion, the FDA leaves doctors without accurate information about the drugs' safety for women.

4

Alliance.App. 275

20. As an organization, CMDA is harmed by the FDA's failure to require reporting of all adverse events, which prevents CMDA from providing the public, our members, and our members' patients with accurate statistics and complete information regarding potential risks associated with the use of chemical abortion drugs.

21. The inability to share accurate information with member physicians, their patients, and the public on the risks of chemical abortion frustrates and complicates CMDA's purpose to provide professional healthcare and to educate doctors, their patients, and the public about the dangers of chemical abortion.

22. By removing the requirements for in-person visits, the FDA has increased the risk of malpractice claims against physicians. The best way to prevent malpractice is for physicians to establish relationships with patients who they can treat over time. By doing away with the necessary medical supervision, the FDA will cause more women to present in life-threatening circumstances into the care of hospitalists and emergency department physicians who have no prior history with these patients.

23. By putting more doctors into riskier, emergent medical situations, the FDA's regulatory actions expose physicians to increased claims of liability.

24. The increased risks of exposure to liability and malpractice claims also impacts physicians because it drives up their insurance costs, especially those who practice in the hospital.

5

Alliance.App. 276

25. The FDA's loosening of chemical abortion regulations impacts the standard of care and the demands and expectations that hospitals will put on their physicians. The FDA has radically altered the standard of care for mifepristone and misoprostol. The agency did this without the requisite evidence to support its actions.

26. I am also concerned that the FDA's actions will force CMDA members to complete an unfinished elective abortion in an emergency situation, causing immediate emotional and moral distress for our members who are opposed to elective abortion and do not want to feel complicit in an immoral, unnecessary procedure.

27. CMDA has been involved with challenging the FDA's approval of chemical abortion drugs for 20 years. In 2002, we submitted a Citizen Petition with other pro-life groups challenging the FDA's actions, diverting valuable time and effort from CMDA's routine functions in order to assist in filing the petition.

Executed this November 12, 2022.

By: _Jeffrey Barrows, D.O. M.A._

Jeffrey Barrows, D.O. M.A.

Alliance.App. 277

# Exhibit 6

Declaration of Dr. Quentin Van Meter

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, | Case No. _____ |
|       Plaintiffs, | |
|    v. | |
| **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services, | |
|       Defendants. | |

1

Alliance.App. 279

## DECLARATION OF DR. QUENTIN L. VAN METER

I, Quentin L. Van Meter, a citizen of the United States and resident of Atlanta, Georgia, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified pediatric endocrinologist.

3. I received my medical degree from the Medical College of Virginia in 1973.

4. I did my pediatric internship (1973-1974) and my pediatric residency (1974-1976) at the Naval Regional Medical Center in Oakland, through the University of California, San Francisco. I completed my pediatric endocrinology fellowship from 1978 to 1980 at The Johns Hopkins Hospital. I also worked as a staff pediatric endocrinologist at the Naval Hospital in San Diego (1980-1986) and was Chairman and Director of the residency training program at the Naval Hospital Oakland (1986-1991).

5. Following a 20-year career in the Navy Medical Corps, I moved to the Atlanta area and joined the Fayette Medical Clinic as a Pediatrician and Pediatric Endocrinologist. To better serve the ever-expanding population of pediatric patients with endocrine disorders, I developed my own full-time pediatric endocrine practice. Specifically, my practice helps children by treating them for disorders related to hormones and the endocrine glands that produce them.

2

Alliance.App. 280

6. I currently serve as the president of the American College of Pediatricians.

7. I am familiar with the American College of Pediatricians, its members, their fields of practice, and the organization's policies and positions, including as set forth in the complaint, which I have reviewed.

8. The American College of Pediatricians is a national organization of pediatricians and other healthcare professionals. Its membership includes more than 600 physicians and other healthcare professionals drawn from 47 different states across the nation. The American College of Pediatricians has members in the State of Texas.

9. The American College of Pediatricians brings this suit on behalf of itself and its members.

10. I am familiar with the FDA's approval of mifepristone and issuance of a risk evaluation and mitigation strategy (REMS) for the chemical abortion drug regimen, which includes both mifepristone and misoprostol.

11. I understand that prior to the 2000 approval of mifepristone, the FDA never required a clinical study evaluating the safety and effectiveness of chemical abortion drugs on pregnant girls under 18 years of age.

12. As a blocker of the hormone progesterone, mifepristone is an endocrine disruptor and, therefore, could interfere with pubertal development or adversely impact an adolescent girl's developing body and reproductive system. The FDA's failure to require pediatric clinical studies places girls at

3

Alliance.App. 281

risk from these drugs, which have the potential to dangerously adversely impact the health, safety, and welfare of the exposed adolescents.

13. To my knowledge, the FDA's 2000 approval of mifepristone for use in girls was unsupported by any scientific data showing that chemical abortion drugs are safe for girls under 18 years of age.

14. By failing to require studies, the FDA's 2000 approval placed young girls going through their reproductive development at risk.

15. Numerous studies have demonstrated that there is an increased risk from chemical abortion drugs to pregnant women and girls as compared to surgical abortion.

16. One recent study discovered that one-third of all post-abortion hospital emergency department visits in 2015 were after use of chemical abortion drugs. The FDA's elimination of REMS and loosening of restrictions increases the risk that girls will suffer complications from chemical abortion drugs.

17. I am also aware that, in 2016, the FDA eliminated the requirement that abortionists report non-fatal adverse events—preventing the agency, women and girls, their doctors, and the public from having an accurate understanding of the complications from chemical abortion drugs and the rate at which they occur.

18. Women, girls and their parents cannot give informed consent to chemical abortions drugs without this necessary information. And doctors cannot

4

accurately apprise their patients about the dangers of chemical abortion drugs without adequate studies elucidating these risks.

19. The American College of Pediatricians is also harmed by the FDA's failure to require reporting of all adverse events because it prevents us as an organization from providing the public, our members, and our members' patients with accurate statistics and complete information regarding potential risks associated with the use of chemical abortion drugs.

20. The inability to share accurate information with member physicians, their patients, and the public on the risks of chemical abortion frustrates and compromises our organization's purpose to provide professional healthcare and to educate doctors, their patients, and the public about the dangers of chemical abortion.

21. The American College of Pediatricians has challenged the FDA's continued deregulation of chemical abortion drugs. In 2019, we submitted a Citizen Petition with another pro-life group challenging FDA's 2016 major changes. It took considerable time, energy, and resources to assist in drafting the 26-page petition and compiling and analyzing supporting sources and studies. This effort caused the American College of Pediatricians to divert limited time, energy, and resources from its other priorities and routine functions.

22. The American College of Pediatricians continues to expend considerable time, energy, and resources on its public advocacy and educational activities

5

exposing the risk of harm to women, including pediatric girls, from the FDA's

unlawful approval and deregulation of chemical abortion drugs.

Executed this November **11**, 2022.

By: _____

Quentin L. Van Meter, M.D.

6

# Exhibit 16

Maarit Niinimäki et al., *Immediate Complications After Medical Compared With Surgical Termination of Pregnancy*, 114 Obstetrics & Gynecology 795 (2009)

# Immediate Complications After Medical Compared With Surgical Termination of Pregnancy

*Maarit Niinimäki, MD, Anneli Pouta, MD, PhD, Aini Bloigu, Mika Gissler, BSc, PhD, Elina Hemminki, MD, PhD, Satu Suhonen, MD, PhD, and Oskari Heikinheimo, MD, PhD*

**OBJECTIVE:** To estimate the immediate adverse events and safety of medical compared with surgical abortion using high-quality registry data.

**METHODS:** All women in Finland undergoing induced abortion from 2000–2006 with a gestational duration of 63 days or less (n=42,619) were followed up until 42 days postabortion using national health registries. The incidence and risk factors of adverse events after medical (n=22,368) and surgical (n=20,251) abortion were compared. Univariable and multivariable association models were used to analyze the risk of the three main complications (hemorrhage, infection, and incomplete abortion) and surgical (re)evacuation.

**RESULTS:** The overall incidence of adverse events was fourfold higher in the medical compared with surgical abortion cohort (20.0% compared with 5.6%, *P*<.001). Hemorrhage (15.6% compared with 2.1%, *P*<.001) and incomplete abortion (6.7% compared with 1.6%, *P*<.001)

were more common after medical abortion. The rate of surgical (re)evacuation was 5.9% after medical abortion and 1.8% after surgical abortion (*P*<.001). Although rare, injuries requiring operative treatment or operative complications occurred more often with surgical termination of pregnancy (0.6% compared with 0.03%, *P*<.001). No differences were noted in the incidence of infections (1.7% compared with 1.7%, *P*=.85), thromboembolic disease, psychiatric morbidity, or death.

**CONCLUSION:** Both methods of abortion are generally safe, but medical termination is associated with a higher incidence of adverse events. These observations are relevant when counseling women seeking early abortion.
*(Obstet Gynecol 2009;114:795–804)*

**LEVEL OF EVIDENCE:** II

*From the Department of Obstetrics and Gynecology, Oulu University Hospital, the Graduate School of Circumpolar Wellbeing, Health and Adaptation, and the National Institute for Health and Welfare, Oulu, Finland; and the National Institute for Health and Welfare and the Nordic School of Public Health, the Department of Obstetrics and Gynecology, Helsinki University Central Hospital, Helsinki, Finland.*

*Funded by Helsinki University Central Hospital (Drs. Suhonen and Heikinheimo), University Hospital of Oulu (Dr. Niinimäki), and The Finnish Cultural Foundation (Dr. Niinimäki).*

*The authors thank Matti Kesti for his help with computation.*

*Corresponding author: Dr. Oskari Heikinheimo, Dept Ob&Gyn, Helsinki University Central Hospital, P.O. Box 140, 00029-HUS, Helsinki, Finland; e-mail: oskari.heikinheimo@helsinki.fi.*

*Financial Disclosure*
*Dr. Suhonen has lectured at meetings organized by Schering Plough (Helsinki, Finland). Dr. Heikinheimo has been a paid consultant and lecturer for Bayer Schering Pharma AG (Berlin, Germany) and for Schering-Plough (Helsinki, Finland). He also belongs to both the international and Finnish advisory boards for Bayer Schering Pharma. The other authors did not disclose any potential conflicts of interest.*

© 2009 by The American College of Obstetricians and Gynecologists. Published by Lippincott Williams & Wilkins.
ISSN: 0029-7844/09

Termination of pregnancy is one of the most common gynecologic procedures. For instance, in the United States, nearly half of pregnancies are unintended,[1] and 22% of all pregnancies (excluding miscarriages) end in termination.[2] Abortion practices have changed dramatically in recent years since the medical method with antiprogestin mifepristone and prostaglandins was introduced. For example, in 2007 in Finland 64%,[3] in Sweden 61%,[4] and in the United Kingdom 35%[5] of all abortions were performed using the medical method. Thus, the safety of induced abortion in general, especially that of the medical method, is of great public health interest.

Most previous studies focused on the short-term complications of induced abortion have been small or have not involved comparison of the two dominant methods of abortion (medical and surgical). In a large, register-based study, 5% of the patients had a complication (bleeding, infection, or (re)evacuation) after surgical abortion during a short-term follow-up period of 2 weeks.[6] In a previous meta-analysis in which medical and surgical termination of pregnancy in the

Copyright© American College of Obstetricians and Gynecologists
EX. 16 pg. 91


Alliance.App. 286

first trimester were compared, no differences in pelvic infection or ongoing pregnancies were noted between the methods. Evidence of different rates of other potential side effects or complications between the two abortion techniques could not be confirmed because the trials included were small.[7]

Only a few randomized controlled trials have been performed to compare success rates and complications between medical and surgical abortion.[8–10] In a previous, partly randomized study, no difference in the number of complications was noted. Although the rate of complete abortion was significantly higher in the surgical group (98% compared with 94%), the surgically treated women had a higher incidence of antibiotic treatment than did those undergoing medical abortion.[8] In another randomized controlled trial, complete abortion without a second procedure occurred in 98% of cases after surgical abortion and in 95% after medical abortion. Moreover, no differences in the rates of major complications were observed.[11]

The purpose of the present study was to compare medical and surgical abortion in regard to the incidence and risk factors of immediate (ie, within 42 days after termination of pregnancy) adverse events and complications in a large nationwide cohort. A nationwide cohort with high-quality data derived from national health registries offers the possibility to estimate extensively the risk of adverse events associated with the two methods of early termination of pregnancy. Using this same cohort, we recently reported that the risk of repeat abortion after medical compared with surgical termination of pregnancy depends on various sociodemographic factors but not on the method of abortion.[12]

## MATERIALS AND METHODS

This was a cohort study including all women undergoing termination of pregnancy in Finland between January 1, 2000, and December 31, 2006. According to the current law on induced abortions, women need permission with legal indication for termination of pregnancy, but the legislation is interpreted liberally. The Finnish legislation on induced abortion[13] was summarized in our recent study.[12]

The present study was conducted after receiving approval from the ethics committee of the Northern Ostrobothnia Hospital District. The Ministry of Social Affairs and Health and Statistics Finland gave their permission to use the confidential personal-level data from the registries. The Data Protection Ombudsman was notified regarding the data linkage before the analyses as required by the national data-protection legislation.

All women who underwent induced abortion by either medical or surgical methods at a gestational age of 63 days or less were included. The duration of gestation was limited to 63 days because, during the study period of 2000–2006, medical abortions, for the most part, were performed only up to that time.[14] The time of follow-up after abortion was 42 days (6 weeks). Medical abortion was defined as the use of mifepristone alone or in combination with misoprostol or other prostaglandins. Surgical abortion included induced abortions with dilation and curettage or vacuum aspiration. The participants were divided into two arms of the study according to the primary abortion method. For women having more than one abortion, only the first termination of pregnancy during the study period was included.

The study was based on three national registries: the Abortion Registry,[3] the Care Registry for Health Institutions (later renamed the Hospital Registry)[15] complied by the National Institute for Health and Welfare, and the Cause-of-Death Registry of Statistics Finland.[16] The study participants were selected from the Abortion Registry as described in our previous study,[12] after which the other registries were linked with the cohort.

We linked information on the study participants in the Hospital Registry concerning all hospital-inpatient episodes (all hospitals) and outpatient visits (public hospitals) within 42 days after termination of pregnancy to analyze complications related to induced abortion. All of the diagnoses (based on the International Classification of Diseases [ICD]-10, International Statistical Classification of Diseases and Related Health Problems[17]) and codes for surgical procedures (based on the Nordic Classification of Surgical Procedures[18]) found in the cohort were evaluated to select those considered to be of clinical importance.

Complications were divided into seven categories: 1) hemorrhage (all reported hemorrhages), 2) postabortal infections (pelvic inflammatory disease, endometritis, cervicitis, wound infections, pyrexia of unknown origin, urinary tract infections, and septicemia), 3) incomplete abortion (surgical [re]evacuation, any reported incomplete abortion), 4) injuries or other reasons for surgical operation (all injuries, cervical laceration, uterine perforation, all surgical interventions during the time of follow-up), 5) thromboembolic disease (pulmonary embolism, deep vein thrombosis), 6) psychiatric morbidity (depression, intoxication, psychoses) and 7) death (death from any cause, pregnancy-related death according to the World Health Organization definition). The classification was based on that reported in the Joint Study of

Copyright© American College of Obstetricians and Gynecologists

EX. 16 pg. 92

Alliance.App. 287

the Royal College of General Practitioners and the Royal College of Obstetricians and Gynaecologists[19] and modified for the present study.

The Cause-of-Death Register kept by Statistics Finland contains data from death certificates and includes all deaths of Finnish citizens and permanent residents in Finland classified according to ICD-10 codes.[20] All of the early deaths (within 42 days of termination of pregnancy) were classified as direct, indirect, or unrelated. This classification was based on that in an earlier study by Deneux-Tharaux et al.[21]

Differences between the groups were assessed using Student's t-test for continuous variables and the $\chi^2$ test for categorical variables. Logistic regression analyses were performed to adjust for the differences in background characteristics in the comparisons of medical and surgical abortions. Furthermore, logistic regression was used to identify risk factors for complications. Variables that showed statistically significant associations with complications in univariable analysis were further entered in multivariable analysis. The estimated risks are presented as odds ratios with 95% confidence intervals. The statistical analyses were performed by using SPSS 16.0 for Windows (SPSS Inc., Chicago, IL).

## RESULTS

The total number of women in the cohort was 42,619. Of these, 22,368 had primary medical and 20,251 primary surgical termination of pregnancy. The characteristics of the women in the cohort are presented in Table 1. The women in the medical-abortion cohort were somewhat younger and more often primigravid, nulliparous, and single. The most notable difference between the groups was the shorter duration of gestation in the cohort undergoing medical abortion; surgical abortions in Finland usually are performed after the 6th week of gestation.

The incidence of various adverse events and complications is shown in Table 2. The most common adverse events were hemorrhage and incomplete abortion, both of which were more common in the medical group. The incidence of infection did not differ between the groups. Injuries requiring operation were rare but were more common in the surgical group. No differences between the two groups were noted in the incidence of thromboembolic disease, psychiatric morbidity, or death, partly because the overall incidence of these events was low. All of the deaths were unrelated to pregnancy: suicide (n=3), homicide (n=1), subarachnoid hemorrhage (n=1), and traffic accident (n=1).

When comparing the numbers of women with adverse events or complications, the difference between the two groups was notable: 20% of women in the medical-abortion group and 5.6% of women in the surgical-abortion group had at least one type of adverse event. When looking at the number of complications per patient, there were fewer multiple complications after surgical abortion (Table 2).

We also analyzed the three most common complications in relation to the duration of gestation (Fig. 1). In the medical-abortion cohort, the proportion of women with hemorrhage decreased with advancing duration of gestation; with surgical abortion it increased, albeit not significantly. In both groups, the incidence of infection and incomplete abortion increased with advancing duration of gestation.

Univariable and multivariable analyses were performed concerning the risk factors for three major classes of complications (hemorrhage, infection, and incomplete abortion) and for surgical (re)evacuation, separately for the medical and surgical abortion cohorts (Table 3), and for the whole cohort combined (Fig. 2). In multivariable analysis, the risk of hemorrhage after medical abortion was increased in the age group of 20–24 years, among parous women, among those of lower socioeconomic status, and among those living in densely populated or rural areas. The risk decreased with advancing duration of gestation. After surgical termination of pregnancy, an increased risk of hemorrhage was seen in the age groups of 20–24, 25–29, 30–34, and 35–39 years when compared with women younger than 20 years. A rural type of residence was associated with a decreased risk of hemorrhage.

Multivariable analysis revealed an increased risk of infection after medical abortion in the age group of 20–24 years and with advanced duration of gestation of 50–56 and 57–63 days. After surgical abortion, an increased risk of infection was found in the age group of 20–24 years, with increasing duration of gestation, and among women of lower socioeconomic class. A decreased risk of infection was associated with parity and with women living in densely populated or rural areas.

The risk factors associated with incomplete medical abortion were age of 20–24 years, parity, previous abortion, being single, living in a densely populated or rural area, and advanced duration of gestation. The risk of experiencing incomplete surgical abortion was associated with previous abortion, cohabiting or being single, and with a duration of gestation of 57–63 days.

In multivariable analysis, the risk of bleeding was almost eightfold higher, the risk of incomplete abor-

Copyright© American College of Obstetricians and Gynecologists

Alliance.App. 288

EX. 16 pg. 93



**Table 1.** Characteristics of the Participants Included in the Study

|  | Medical Abortion (n=22,368) | Surgical Abortion (n=20,251) | P |
|---|---|---|---|
| Age (y) |  |  |  |
| Median (mean) | 25.0 (26.3) | 26.0 (27.3) | <.001 |
| 95% confidence interval | 26.2–26.4 | 27.2–27.4 |  |
| Age category (y) |  |  |  |
| Younger than 20 | 5,058 (22.6) | 4,352 (21.5) | <.001 |
| 20–24 | 5,665 (25.3) | 4,337 (21.4) |  |
| 25–29 | 4,098 (18.3) | 3,442 (17.0) |  |
| 30–34 | 3,406 (15.2) | 3,393 (16.8) |  |
| 35–39 | 2,934 (13.1) | 3,130 (15.5) |  |
| 40 or older | 1,207 (5.4) | 1,596 (7.9) |  |
| Parity |  |  |  |
| 0 | 12,819 (57.3) | 10,171 (50.2) | <.001 |
| 1 | 3,444 (15.4) | 3,384 (16.7) |  |
| 2 | 3,897 (17.4) | 4,125 (20.4) |  |
| 3 or more | 2,207 (9.9) | 2,570 (12.7) |  |
| Previous abortions |  |  |  |
| 0 | 18,626 (83.3) | 15,461 (76.4) | <.001 |
| 1 | 2,856 (12.8) | 3,471 (17.1) |  |
| 2 | 664 (3.0) | 927 (4.6) |  |
| 3 or more | 221 (1.0) | 390 (1.9) |  |
| Marital status |  |  |  |
| Married | 4,350 (19.5) | 4,718 (23.3) | <.001 |
| Cohabiting | 3,592 (16.1) | 3,113 (15.4) |  |
| Single | 14,394 (64.4) | 12,412 (61.3) |  |
| Social status |  |  |  |
| Upper white-collar worker | 1,595 (7.1) | 1,497 (7.4) | <.001 |
| Lower white-collar worker | 4,799 (21.5) | 4,794 (23.7) |  |
| Blue-collar worker | 2,691 (12.0) | 3,060 (15.1) |  |
| Student | 7,598 (34.0) | 5,990 (29.6) |  |
| Other | 1,072 (4.8) | 1,386 (6.8) |  |
| Unknown | 4,613 (20.6) | 3,524 (17.4) |  |
| Type of residence |  |  |  |
| Urban | 16,668 (74.5) | 15,118 (74.7) | <.001 |
| Densely populated area | 2,788 (12.5) | 2,286 (11.3) |  |
| Rural | 2,912 (13.0) | 2,847 (14.1) |  |
| Indication for abortion |  |  |  |
| Social reasons | 19,691 (88.0) | 17,175 (84.8) | <.001 |
| Age 17 y or younger | 1,507 (6.7) | 1,459 (7.2) |  |
| Age 40 y or older | 754 (3.4) | 1,076 (5.3) |  |
| Four children or more | 366 (1.6) | 457 (2.3) |  |
| Other | 50 (0.2) | 84 (0.4) |  |
| Duration of gestation (d) |  |  | <.001 |
| 42 or fewer | 6,012 (26.9) | 1,895 (9.4) |  |
| 43–49 | 7,355 (32.9) | 4,724 (23.3) |  |
| 50–56 | 6,014 (26.9) | 7,033 (34.7) |  |
| 57–63 | 2,987 (13.4) | 6,599 (32.6) |  |

Data are n (%) unless otherwise specified.

tion was fivefold higher, and the risk of (re)evacuation was twofold higher after medical abortion compared with surgical abortion. The risk of infection, as derived from univariable analysis, was not associated with the method of abortion.

## DISCUSSION

In the present study, we found that the two methods of pregnancy termination (medical and surgical) are generally safe. However, the incidence of the two most common adverse events (hemorrhage and incomplete abortion) were notably higher among women undergoing medical abortion, whereas complications requiring surgical treatment, although rare, were more common after surgical abortion. The rates of postabortal infection and serious morbidity (such as thromboembolic events) did not differ between the two groups. There were no pregnancy-related deaths

Copyright© American College of Obstetricians and Gynecologists

EX. 16 pg. 94

Alliance.App. 289

**Table 2. Incidence of Adverse Events in the Cohort**

| | Medical Abortion (n=22,368) | Surgical Abortion (n=20,251) | $P^*$ | Adjusted OR[†] (95% CI) |
|---|---|---|---|---|
| Hemorrhage | 3,487 (15.6) | 433 (2.1) | <.001 | 7.93 (7.15–8.81) |
| Hemorrhage with surgical (re)evacuation | 645 (2.9) | 173 (0.9) | <.001 | |
| Infection | 383 (1.7) | 342 (1.7) | .85 | 1.15 (0.98–1.34) |
| Infection with surgical (re)evacuation | 172 (0.8) | 122 (0.6) | .02 | |
| Incomplete abortion | 1,495 (6.7) | 323 (1.6) | <.001 | 5.37 (4.49–6.28) |
| Incomplete abortion with surgical (re)evacuation | 1,320 (5.9) | 77 (0.4) | <.001 | |
| Injury | 6 (0.03) | 122 (0.60) | <.001 | NA[‡] |
| Thromboembolic disease | 18 (0.08) | 17 (0.08) | .90 | NA |
| Psychiatric morbidity | 2 (0.009) | 1 (0.005) | .62 | NA |
| Death | 2 (0.009) | 4 (0.020) | .35 | NA |
| Women with adverse events | 4,479 (20.0) | 1,127 (5.6) | <.001 | 4.23 (3.94–4.54) |
| Surgical (re)evacuation | 1,320 (5.9) | 363 (1.8) | <.001 | 3.58 (3.18–4.03) |
| Number of adverse events per woman | | | | |
| 0 | 17,889 (80.0) | 19,124 (94.4) | <.001 | |
| 1 | 3,624 (16.2) | 1,021 (5.0) | | |
| 2 | 796 (3.6) | 97 (0.5) | | |
| 3 | 59 (0.26) | 9 (0.04) | | |

OR, odds ratio; CI, confidence interval; NA, not applicable.
Data are n (%) unless otherwise specified.
* Chi-square test for comparison between medical and surgical cohort.
† Surgical cohort as a reference adjusted for age, parity, previous abortion, social status, marital status, type of residence, and duration of gestation.
‡ Not applicable owing to small number of patients in one or both groups.

in our data. Because medical abortion is being used increasingly in several countries, it is likely to result in an elevated incidence of overall morbidity related to termination of pregnancy.

The present study covers almost all of the induced abortions performed in Finland during the years 2000–2006 and thus is a unique data source regarding even uncommon adverse events. However, the validity of the data is a potential problem in register-based studies such as the present one. In the Registry of Induced Abortions, 95% of the informa-



**Fig. 1.** Complications according to the duration of gestation in the medical and surgical cohorts (%).
*Niinimäki. Complications After Medical and Surgical Abortion. Obstet Gynecol 2009.*

tion has been proven to be identical to that in medical records.[22] However, the reliability of diagnoses and interventions can vary, and underreporting or over-reporting by physicians cannot be ruled out. In addition, the Hospital Registry, which was used as a data source, contains data concerning hospital care only. Thus, adverse events dealt with outside the public hospital system, especially those treated in primary health care, will have been missed. Moreover, a single patient may have various diagnoses and complications, such as incomplete abortion and bleeding, and thus may have been registered more than once. The participants, however, each had a unique personal identification number, and we were able to eliminate double counting in our study.

It is important to note that the severity of the diagnoses found in the Hospital Registry may vary substantially. Thus, another problem in this kind of study is the definition of criteria for complications and adverse events. We evaluated all the ICD-10 diagnoses and codes for surgical procedures included in the Hospital Registry and classified them into seven categories.[19] In addition, women choosing surgical and medical abortion differed subtly in several respects and thus may be prone to different types of adverse events.

The rate of consultation related to a diagnosis of hemorrhage was high and eight times more common after medical termination of pregnancy. Because

Copyright© American College of Obstetricians and Gynecologists

Alliance.App. 290

EX. 16 pg. 95



**Table 3.** Results of the Multivariable Analysis in Three Major Complications and Surgical (Re)Evaluation

|  | Hemorrhage | | Infection | |
|  | Medical | Surgical | Medical | Surgical |
|---|---|---|---|---|
| Age (y) | 1.00 (0.96–1.04) | | | |
| Age category (y) | | | | |
|   Younger than 20 | 1 | 1 | 1 | 1 |
|   20–24 | 1.26 (1.00–1.58) | 1.72 (1.25–2.37) | 1.37 (1.03–1.83) | 1.72 (1.13–2.62) |
|   25–29 | 1.29 (0.88–1.91) | 1.82 (1.30–2.54) | 1.31 (0.95–1.80) | 1.31 (0.77–2.23) |
|   30–34 | 1.47 (0.83–2.58) | 2.01 (1.45–2.79) | 0.82 (0.56–1.19) | 1.77 (1.02–3.08) |
|   35–39 | 1.17 (0.56–2.46) | 1.79 (1.28–2.52) | 1.10 (0.77–1.58) | 1.05 (0.54–2.01) |
|   40 or older | 1.01 (0.40–2.56) | 0.50 (0.26–0.95) | 0.95 (0.56–1.61) | 1.54 (0.74–3.20) |
| Parity | | | | |
|   None | 1 | | | 1 |
|   Yes | 1.25 (1.08–1.45) | | | 0.80 (0.56–1.14) |
| Previous abortion | | | | |
|   None | 1 | | | |
|   Yes | 1.07 (0.93–1.22) | | | |
| Social status | | | | |
|   Upper white-collar worker | | | | 1 |
|   Lower white-collar worker | 1.14 (0.92–1.40) | | | 3.21 (1.38–7.46) |
|   Blue-collar worker | 1.54 (1.23–1.93) | | | 4.40 (1.87–10.36) |
|   Student | 1.50 (1.19–1.88) | | | 3.47 (1.44–8.36) |
|   Other | 1.58 (1.20–2.08) | | | 4.50 (1.80–11.27) |
| Marital status | | | | |
|   Married | 1 | | | |
|   Cohabiting | 1.12 (0.94–1.34) | | | |
|   Single | 1.05 (0.90–1.22) | | | |
| Residence | | | | |
|   Urban | 1 | 1 | | 1 |
|   Densely populated | 1.43 (1.23–1.66) | 0.98 (0.72–1.33) | | 0.85 (0.55–1.32) |
|   Rural | 1.25 (1.07–1.45) | 0.71 (0.51–0.98) | | 0.54 (0.33–0.87) |
| Duration of gestation (d) | | | | |
|   42 or fewer | 1 | | 1 | 1 |
|   43–49 | 0.93 (0.82–1.05) | | 1.33 (0.98–1.80) | 1.03 (.059–1.80) |
|   50–56 | 0.74 (0.64–0.85) | | 1.91 (1.42–2.56) | 1.15 (0.68–1.94) |
|   57–63 | 0.63 (0.51–0.76) | | 2.26 (1.62–3.15) | 1.15 (0.68–1.96) |

Data are odds ratio (95% confidence interval).
Only those variables that showed a statistically significant association with a complication in univariable analysis (data not shown) were entered in multivariable analysis.

medical abortion is associated with uterine bleeding lasting approximately 2 weeks,[23] the high rate of consultation is not surprising. Uterine bleeding requiring surgical evacuation probably better reflects the severity of bleeding after termination of pregnancy. The incidence of such bleeding was relatively low, but it was more common in the medical-abortion group. In earlier studies, an average of 10% of women who underwent medical abortion complained of excessive bleeding.[24]

In line with uterine bleeding, the rate of incomplete abortion was higher in the cohort undergoing medical abortion. Surgical evacuation performed because of incomplete abortion occurred in approximately 6% of women having medical termination of pregnancy. The highest rates of complete medical

abortion, reported from centers with extensive experience of the technique, are up to 98%.[11,25] However, it is reassuring to note that a high rate of complete abortion, approaching those reported from centers with extensive experience, was reached in the present national cohort.

One of our key findings was that the rates of infectious morbidity were similar after medical and surgical abortion. In a previous survey, the need for postabortal antibiotics for suspected endometritis was higher after surgical abortion.[26] Moreover, the use of medical abortion previously has been associated with rare cases of severe infectious morbidity and mortality.[27] Reassuringly, only two cases with serious infections (septicemia caused by *Staphylococcus aureus* and *Streptococcus*) occurred in the present cohort, one in

Copyright© American College of Obstetricians and Gynecologists

EX. 16 pg. 96

Alliance.App. 291



| Incomplete Abortion | | Surgical (Re)Evacuation | |
|---|---|---|---|
| Medical | Surgical | Medical | Surgical |
| 1.04 (0.99–1.10) | | 1.05 (0.99–1.11) | |
| | | | |
| 1 | | 1 | |
| 1.14 (0.80–1.62) | | 1.15 (0.79–1.67) | |
| 1.05 (0.60–1.86) | | 1.03 (0.56–1.88) | |
| 0.89 (0.40–2.00) | | 0.89 (0.38–2.09) | |
| 0.66 (0.23–1.88) | | 0.66 (0.22–2.00) | |
| 0.41 (0.11–1.52) | | 0.39 (0.10–1.57) | |
| | | | |
| 1 | | 1 | |
| 1.65 (1.33–2.03) | | 1.59 (1.27–1.98) | |
| | | | |
| 1 | 1 | 1 | |
| 1.34 (1.11–1.60) | 1.38 (1.08–1.76) | 1.30 (1.08–1.58) | |
| | | | |
| 1 | | 1 | |
| 0.97 (0.75–1.24) | | 0.97 (0.74–1.28) | |
| 0.83 (0.62–1.11) | | 0.88 (0.65–1.20) | |
| 1.04 (0.77–1.40) | | 1.02 (0.74–1.40) | |
| 0.74 (0.50–1.08) | | 0.84 (0.57–1.25) | |
| | | | |
| 1 | 1 | 1 | |
| 1.07 (0.84–1.35) | 1.46 (1.00–2.13) | 1.10 (0.86–1.41) | |
| 0.94 (0.76–1.15) | 1.46 (1.09–1.97) | 0.92 (0.74–1.14) | |
| | | | |
| 1 | | 1 | 1 |
| 1.40 (1.13–1.74) | | 1.43 (1.14–1.79) | 0.75 (0.52–1.08) |
| 1.38 (1.12–1.70) | | 1.48 (1.19–1.84) | 0.68 (0.48–0.96) |
| | | | |
| 1 | 1 | 1 | 1 |
| 0.96 (0.78–1.16) | 1.64 (0.97–2.75) | 1.01 (0.81–1.24) | 1.63 (0.97–2.73) |
| 1.34 (1.12–1.66) | 1.59 (0.96–2.62) | 1.41 (1.14–1.75) | 1.92 (1.17–3.15) |
| 1.55 (1.22–1.98) | 1.91 (1.16–3.14) | 1.77 (1.38–2.28) | 2.23 (1.36–3.65) |

the medical and one in the surgical group. However, as previously reported, cases of *Clostridium sordellii* septicemia occurred at a rate of 1 per 100,000[27]; even the present cohort is too small to assess the incidence of such a rare infection.

Injuries and surgical interventions for other reasons were relatively rare in both groups. Not surprisingly, the incidence of postabortal surgical intervention was lower among women undergoing medical abortion. Some other serious and rare complications were identified as well. These included thromboembolic and psychiatric complications as well as some deaths. The incidence of thromboembolic complications is in line with earlier reports of an increased risk during pregnancy.[28,29] In a previous register-based study, it was concluded that deaths from external causes of injury and poisoning (including unintentional and intentional injuries, suicides, and homicides) are significantly more common in women after induced abortion compared with nonpregnant women or women after birth.[30] In the present cohort also, five out of six cases of death were the result of external causes. In addition, psychiatric diagnoses, such as depression and psychoses, were identified, but the rates of these complications did not differ between the two cohorts. Similarly, in an earlier, partly randomized study, no differences between women with medically or surgically performed abortions emerged in regard to postabortal anxiety, depression, or self-esteem.[31] Naturally, the present kind of study setting (register-based study) gives only a crude idea of short-term psychiatric morbidity associated with termination of pregnancy.

Copyright© American College of Obstetricians and Gynecologists

Alliance.App. 292





**Fig. 2.** Risk factors regarding three major complications (bleeding [**A**], infection [**B**], and incomplete abortion [**C**]) among the entire cohort (medical and surgical cohorts combined). OR, odds ratio; CI, confidence interval. *OR for infections is derived from univariable analysis.

*Niinimäki. Complications After Medical and Surgical Abortion. Obstet Gynecol 2009.*

Copyright© American College of Obstetricians and Gynecologists

EX. 16 pg. 98

Alliance.App. 293



The most important risk factor with regard to the two most common adverse events (hemorrhage and incomplete abortion) was the method of abortion. Other risk factors were, for the most part, in line with those reported previously–advanced gestational age, parity, and previous induced abortions.[11,32–34] For unknown reasons, the risk of hemorrhage after medical abortion diminished with advancing duration of gestation. Tolerance of bleeding–a natural part of medical abortion–varies from one woman and physician to another and also depends on preabortion counseling. Other explanations, such as possible bias in reporting the events in the registry, are possible but cannot be verified in the present study. We included all cases requiring consultation in specialized health care because they are registered uniformly in Finland. In addition, every such visit adds to the costs of the health care system. More detailed analysis of all health care costs related to termination of pregnancy and its complications, according to the method, is needed.

In conclusion, termination of pregnancy by means of either medical or surgical methods is associated with a low level of serious complications. On the basis of the present data, however, it appears that medical abortion results in an increased incidence of adverse events.

## REFERENCES

1. Finer B, Henshaw SK. Disparities in rates of unintended pregnancy in the United States, 1994 and 2001. Perspect Sex Reprod Health 2006;38:90–6.

2. Jones RK, Zolna MR, Henshaw SK, Finer LB. Abortion in the United States: incidence and access to services, 2005. Perspect Sex Reprod Health 2008;40:6–16.

3. National Institute for Health and Welfare: Induced abortions. Available at: http://www.stakes.fi/EN/tilastot/statisticsbytopic/reproduction/abortions.htm. Retrieved February 5, 2009.

4. The National Board of Health and Welfare. Available at: http://www.socialstyrelsen.se/. Accessed February 5, 2009.

5. Department of Health. Available at: www.dh.gov.uk. Accessed February 5, 2009.

6. Zhou W, Nielsen GL, Moller M, Olsen J. Short-term complications after surgically induced abortions: a register-based study of 56 117 abortions. Acta Obstet Gynecol Scand 2002; 81:331–6.

7. Say L, Kulier R, Gulmezoglu M, Campana A. Medical versus surgical methods for first trimester termination of pregnancy. The Cochrane Database of Systemic Reviews 2005, Issue 1. Art.No.:CD003037. DOI:DOI:10.1002/14651858.CD003037.pub2.

8. Rorbye C, Norgaard M, Nilas L. Medical versus surgical abortion efficacy, complications and leave of absence compared in a partly randomized study. Contraception 2004;70: 393–9.

9. Ashok PW, Kidd A, Flett GM, Fitzmaurice A, Graham W, Templeton A. A randomized comparison of medical abortion and surgical vacuum aspiration at 10-13 weeks gestation. Hum Reprod 2002;17:92–8.

10. Henshaw RC, Naji SA, Russell IT, Templeton AA. A comparison of medical abortion (using mifepristone and gemeprost) with surgical vacuum aspiration: efficacy and early medical sequelae. Hum Reprod 1994;9:2167–72.

11. Ashok PW, Templeton A, Wagaarachchi PT, Flett GM. Factors affecting the outcome of early medical abortion: a review of 4132 consecutive cases. BJOG 2002;109:1281–9.

12. Niinimaki M, Pouta A, Bloigu A, Gissler M, Hemminki E, Suhonen S, et al. Frequency and risk factors for repeat abortions after surgical compared with medical termination of pregnancy. Obstet Gynecol 2009;113:845–52.

13. Finlex. http://www.finlex.fi/fi/laki/ajantasa/1970/19700239?search%5Btype%5D=pika&search%5Bpika%5D=raskau%2A. Retrieved January 21, 2009.

14. Finnish Gynecological Association's task force. Abortion. Duodecim 2001;117:2084–94.

15. National Institute for Health and Welfare: Institutional health care. Available at: http://www.stakes.fi/EN/tilastot/statisticsby topic/healthservices/institutionalhealthcare.htm. Accessed January 27, 2009.

16. Statistics Finland. Available at: www.stat.fi. Accessed January 27, 2009.

17. World Health Organization. Available at: http://www.who.int/classifications/icd/en/. Accessed January 27, 2009.

18. Nordic Centre for Classifications in Health Care. http://www.nordclass.uu.se/. Accessed January 27, 2009.

19. Induced abortion operations and their early sequelae. Joint study of the Royal College of General Practitioners and the Royal College of Obstetricians and Gynaecologists. J R Coll Gen Pract 1985;35:175–80.

20. Gissler M, Berg C, Bouvier-Colle MH, Buekens P. Pregnancy-associated mortality after birth, spontaneous abortion, or induced abortion in Finland, 1987-2000. Am J Obstet Gynecol 2004;190:422–7.

21. Deneux-Tharaux C, Berg C, Bouvier-Colle MH, Gissler M, Harper M, Nannini A, et al. Underreporting of pregnancy-related mortality in the United States and Europe [published erratum appears in Obstet Gynecol 2005;107:209]. Obstet Gynecol 2005;106:684–92.

22. Gissler M, Ulander VM, Hemminki E, Rasimus A. Declining induced abortion rate in Finland: data quality of the Finnish abortion register. Int J Epidemiol 1996;25:376–80.

23. Spitz IM, Bardin CW, Benton L, Robbins A. Early pregnancy termination with mifepristone and misoprostol in the United States. N Engl J Med 1998;338:1241–7.

24. Sitruk-Ware R. Mifepristone and misoprostol sequential regimen side effects, complications and safety. Contraception 2006;74:48–55.

25. Ashok PW, Penney GC, Flett GM, Templeton A. An effective regimen for early medical abortion: a report of 2000 consecutive cases. Hum Reprod 1998;13:2962–5.

26. Cameron ST, Glasier AF, Logan J, Benton L, Baird DT. Impact of the introduction of new medical methods on therapeutic abortions at the Royal Infirmary of Edinburgh. Br J Obstet Gynaecol 1996;103:1222–9.

27. Fischer M, Bhatnagar J, Guarner J, Reagan S, Hacker JK, Van Meter SH, et al. Fatal toxic shock syndrome associated with clostridium sordellii after medical abortion. N Engl J Med 2005;353:2352–60.

28. Heit JA, Kobbervig CE, James AH, Petterson TM, Bailey KR, Melton LJ, 3rd. Trends in the incidence of venous thromboembolism during pregnancy or postpartum: a 30-year population-based study. Ann Intern Med 2005;143:697–706.

Copyright© American College of Obstetricians and Gynecologists

Alliance.App. 294

EX. 16 pg. 99


29. James AH, Jamison MG, Brancazio LR, Myers ER. Venous thromboembolism during pregnancy and the postpartum period: incidence, risk factors, and mortality. Am J Obstet Gynecol 2006;194:1311–5.

30. Gissler M, Berg C, Bouvier-Colle MH, Buekens P. Injury deaths, suicides and homicides associated with pregnancy, Finland 1987-2000. Eur J Public Health 2005;15:459–63.

31. Henshaw R, Naji S, Russell I, Templeton A. Psychological responses following medical abortion (using mifepristone and gemeprost) and surgical vacuum aspiration. A patient-centered, partially randomised prospective study. Acta Obstet Gynecol Scand 1994;73:812–8.

32. Bartley J, Tong S, Everington D, Baird DT. Parity is a major determinant of success rate in medical abortion: a retrospective analysis of 3161 consecutive cases of early medical abortion treated with reduced doses of mifepristone and vaginal gemeprost. Contraception 2000;62:297–303.

33. Allen RH, Westhoff C, De Nonno L, Fielding SL, Schaff EA. Curettage after mifepristone-induced abortion: frequency, timing, and indications. Obstet Gynecol 2001;98:101–6.

34. Child TJ, Thomas J, Rees M, MacKenzie IZ. A comparative study of surgical and medical procedures: 932 pregnancy terminations up to 63 days gestation. Hum Reprod 2001;16: 67–71.



# OBSTETRICS & GYNECOLOGY

## Updated Fourth Edition Available

*A Guide to Writing for Obstetrics & Gynecology* has been updated to help prospective authors, especially those who are beginning in medical journal writing, produce better papers.

Topics covered include:

- New conflict of interest policy
- Updated levels of evidence
- Planning and structuring a manuscript
- Writing tips, including an overview of syntax, grammar, abbreviations, acronyms, jargon, and troublesome terms
- Common pitfalls of authorship (eg, redundant publication and conflict of interest)
- An overview of the peer-review process

Copies of this valuable resource are available, free of charge, from *Obstetrics & Gynecology*. Requests may be submitted by fax (202-479-0830) or e-mail (obgyn@greenjournal.org).

*rev 10/2008*

Copyright© American College of Obstetricians and Gynecologists    EX. 16 pg. 010



Alliance.App. 295

# Exhibit 17

James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999-2015*, Health Servs. Rsch. & Managerial Epidemiology, Nov. 9, 2021

*Original Research*

Health Services Research and
Managerial Epidemiology
Volume 8: 1-11
© The Author(s) 2021
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/23333928211053965
journals.sagepub.com/home/hme

⑤SAGE

# A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999–2015

James Studnicki[1] ⑩, Donna J. Harrison[2], Tessa Longbons[1] ⑩, Ingrid Skop[1], David C. Reardon[3], John W. Fisher[1], Maka Tsulukidze[4], and Christopher Craver[1]

## Abstract

**Introduction:** Existing research on postabortion emergency room visits is sparse and limited by methods which underestimate the incidence of adverse events following abortion. Postabortion emergency room (ER) use since Food and Drug Administration approval of chemical abortion in 2000 can identify trends in the relative morbidity burden of chemical versus surgical procedures.

**Objective:** To complete the first longitudinal cohort study of postabortion emergency room use following chemical and surgical abortions.

**Methods:** A population-based longitudinal cohort study of 423 000 confirmed induced abortions and 121,283 subsequent ER visits occurring within 30 days of the procedure, in the years 1999-2015, to Medicaid-eligible women over 13 years of age with at least one pregnancy outcome, in the 17 states which provided public funding for abortion.

**Results:** ER visits are at greater risk to occur following a chemical rather than a surgical abortion: all ER visits (OR 1.22, CL 1.19-1.24); miscoded spontaneous (OR 1.88, CL 1.81-1.96); and abortion-related (OR 1.53, CL 1.49-1.58). ER visit rates per 1000 abortions grew faster for chemical abortions, and by 2015, chemical versus surgical rates were 354.8 versus 357.9 for all ER visits; 31.5 versus 8.6 for miscoded spontaneous abortion visits; and 51.7 versus 22.0 for abortion-related visits. Abortion-related visits as a percent of total visits are twice as high for chemical abortions, reaching 14.6% by 2015. Miscoded spontaneous abortion visits as a percent of total visits are nearly 4 times as high for chemical abortions, reaching 8.9% of total visits and 60.9% of abortion-related visits by 2015.

**Conclusion:** The incidence and per-abortion rate of ER visits following any induced abortion are growing, but chemical abortion is consistently and progressively associated with more postabortion ER visit morbidity than surgical abortion. There is also a distinct trend of a growing number of women miscoded as receiving treatment for spontaneous abortion in the ER following a chemical abortion.

## Keywords

induced abortion, mifepristone, medical abortion, emergency room, Medicaid

## Introduction

Since its fast-track approval by the USA Food and Drug Administration (FDA) in September 2000, induced abortion by the administration of mifepristone and misoprostol (ie, chemical abortion) has grown to over 50% of all induced abortions in the United States and may, in fact, be responsible for ending a long-term decline in the number of induced abortions in the United States[1]

Research on the safety of induced abortion, and particularly those that are chemically induced, continues to be handicapped

[1] Charlotte Lozier Institute, Arlington, VA, USA
[2] American Association of Pro-Life Obstetricians and Gynecologists, Eau Claire, MI, USA
[3] Elliot Institute, Springfield, IL, USA
[4] Florida Gulf Coast University, Fort Myers, FL, USA

**Corresponding Author:**
James Studnicki, Charlotte Lozier Institute, Arlington, VA, USA.
Email: jstudnicki@lozierinstitute.org


Creative Commons Non Commercial CC BY-NC: This article is distributed under the terms of the Creative Commons Attribution-NonCommercial 4.0 License (https://creativecommons.org/licenses/by-nc/4.0/) which permits non-commercial use, reproduction and distribution of the work without further permission provided the original work is attributed as specified on the SAGE and Open Access page (https://us.sagepub.com/en-us/nam/open-access-at-sage).

Case: 23-10362    Document: 95-4    Page: 53    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z    Document 1-18    Filed 11/18/22    Page 3 of 12    PageID 411

2                                                              *Health Services Research and Managerial Epidemiology*

in the United States by the absence of a comprehensive national reporting system of pregnancy outcomes. The Centers for Disease Control and Prevention (CDC) Abortion Surveillance Reports are derived from a profoundly flawed system in which reporting by the states is voluntary, with many states reporting intermittently and some not at all. The reporting of specific data elements is similarly piecemeal and, most disappointing, no event-level data is actually available for any rigorous analytical purposes. Adverse events which may be related to an induced abortion such as a death, incomplete abortion, severe bleeding, or infection are often underreported because there is no certain way to link the adverse event to the precipitating abortion. Further, the FDA's adverse event reporting requirements for mifepristone extend only to deaths.[2] Large population-based record-linkage studies from nations with comprehensive reproductive history data linked to adverse events provide the best opportunity to overcome many of these data limitations and find a much higher overall incidence of adverse events in the chemical compared with the surgical cohort.[3,4] By contrast, USA studies of chemical abortion safety are frequently conducted on opportunity samples of women who have recently undergone an induced abortion. Already limited by the nonrandom nature of patient selection, these studies are frequently subject to design limitations such as the exclusion of an incomplete abortion as a complication, or an unacceptably high percentage of women lost to follow-up.[5,6]

The emergency room (ER) visit is a particularly insightful event by which to assess and compare the relative safety of chemical and surgical abortions for 2 reasons. First, adverse events following a mifepristone abortion are more likely to be experienced at home in the absence of a physician, increasing the likelihood of an ER visit. Second, the ER visit can be for any number of complications and is, therefore, a broad proxy indicator for abortion-related morbidity. One major concern is that ER secondary data describes treatment for a condition (eg, hemorrhage) which may be attributed to a prior event (eg, abortion), but, as we have seen, the prior event is often missed. For example, a study of abortion-related emergency room visits in the United States, using the Nationwide Emergency Department Sample, categorized whether visits were abortion related based only on information taken from the ER visit record. There was no independent confirmation from a different source that an abortion had occurred. Therefore, a woman who was experiencing excessive bleeding following a chemical abortion but did not reveal the abortion to the ER physician would not be identified as an abortion-related visit. Not surprisingly, the study found an extraordinarily low percentage (0.01%) of abortion-related visits among all ER visits to women age 15 to 49.[7] For all the reasons related to data availability and quality, as well as methodological inadequacies, evidence suggests that postabortion complications are substantially underreported.[8,9]

As we have described, research on adverse events following induced abortion varies by procedure, protocols to detect complication, length of follow-up and the sources and quality of data. The emergency room visit as a comprehensive marker for post-abortion complications has been infrequently and inadequately

utilized in existing research. Therefore, the objective of this research was to complete the first population based longitudinal cohort study of the trajectory of postabortion emergency room utilization following both chemical and surgical abortions in order to test the hypothesis that chemical abortion results in higher emergency room utilization. We selected a longitudinal cohort design because of its superiority in suggesting causation. Uniquely, our methodology includes first a confirmation of the actual provision of either a chemical or surgical abortion and, only after confirmation, identifies broadly all emergency room utilization before disaggregating abortion-related ER use. In the absence of a national abortion registry, this analysis is intended to provide the most comprehensive view of postabortion-related morbidity in the years following the FDA approval of mifepristone abortion, as well as a glimpse of what we might expect in the future.

## Methods

Data were obtained from the enrollee-level Medicaid Analytic eXtract files licensed through the Centers for Medicare and Medicaid Services (CMS) Chronic Condition Data Warehouse's Medicaid data. The analytic dataset is comprised of enrollees from the 17 states whose official policies applied state funds to most abortions not covered by federal Medicaid during the period 1999 through 2015. Not all states funded abortion consistently or to the same extent during the study period. Despite their official policies, Arizona and Illinois funded relatively few abortions during this period, and Alaska experienced a short interruption to its abortion coverage.[10] Not all states had provided claims data through 2015 due to differing reporting timeframes. The latest year of data relative to each state was 2013 for Arkansas, Illinois, Maryland, Montana, and New Mexico; 2014 for Arizona, Hawaii, Massachusetts, and Washington; and 2015 for California, Connecticut, Minnesota, New Jersey, New York, Oregon, Vermont, and West Virginia.

The study population was made up of enrollees over 13 years of age with at least one identifiable pregnancy outcome from 1999 through the latest year of data available for each state. For each beneficiary, all unique pregnancy outcomes were identified using International Classification of Diseases, Ninth Revision (ICD-9) codes. Additionally, Current Procedural Terminology, fourth Edition (CPT4) and Healthcare Common Procedure Coding System (HCPCS) codes were used to confirm pregnancy outcomes.

These codes were used to allocate all pregnancy outcomes into 4 categories: live birth (ICD-9V27.0, V27.2, and V27.5), natural fetal loss (ICD-9V27.1, V27.4, V27.7, 630, 631, 633, 634), induced abortion (ICD-9 635.xx, CPT4 59840, 59841, 59850, 59851, 59852, 59855, 59856, 59857, and HCPCS: S0199, S2260, S2265, S2266, S2267, X7724, X7726, S0190, S0191), and undetermined (ICD-9 636.xx, 637.xx, 638.xx). In order to identify each unique pregnancy, multiple diagnostic or treatment codes within 30 days of a pregnancy loss (natural, induced, or undetermined) or within 180 days of a live birth were counted as a single pregnancy outcome using the first

*Studnicki et al*                                                                                   3

date associated with that series of Medicaid claims. Twins and higher order gestations that resulted in a combination of live birth and fetal loss were excluded from the analysis.

The analytic strategy was composed of 3 phases. First, we identified every confirmed surgical induced abortion (ICD/CPT codes—CPT4 59840, 59841, 59850, 59851, 59852, 59855, 59856, 59857) and every confirmed chemical induced abortion (HCPCS codes S0190, S0191) in each specific year 1999 to 2015 (index abortion). Codes S0190 and S0191 were added by CMS on January 1, 2001, so chemical abortions prior to that date could have been missed; however, because mifepristone did not receive approval from the FDA until September 28, 2000, the number of mifepristone abortions not captured here is likely minimal. Additionally, as an explanatory variable, we determined whether there was a prior induced abortion or live birth in the 12 months preceding the index abortion procedure. Second, we identified every emergency room visit occurring within thirty days of the index abortion procedure (Place of Service code 23 [emergency room]), including multiple visits for each patient. We further disaggregated ER visits into 3 categories: all-cause, abortion-related codes (ICD-9, 630-639) and spontaneous abortion code (ICD-9, 634). We mapped and adjusted the appropriate codes during the last two quarters of calendar year 2015 to reflect the transition from ICD-9 to ICD-10. The following descriptive metrics were calculated: chemical abortions as a percent of total induced abortions; ER visits following chemical abortions as a percent of total ER visits following total induced abortions; coded abortion-related visits as a percent of total ER visits following an induced abortion; miscoded spontaneous abortion ER visits as a percent of total ER visits following an induced abortion; miscoded spontaneous abortion ER visits as a percent of abortion-related ER visits following an induced abortion; and abortion ER visit rates per 1000 specified induced abortions for all-cause, coded abortion-related, and miscoded spontaneous abortion visit categories. Comparisons of the 1999 to 2015 longitudinal trajectory of these descriptive metrics are displayed in a series of 9 figures.

Third, we performed logistic regression models to identify the association of selected predictor variables with the likelihood of experiencing each of the 3 defined categories of ER visits following an induced abortion. The outcome variable in each equation was the dichotomous indication (yes/no) of the specific type of ER visit. The predictor variables were as follows: surgical abortion; chemical abortion; age at induced abortion; race; months of Medicaid eligibility at induced abortion; prior (within a calendar year of induced abortion) birth; and prior (within a calendar year of induced abortion) induced abortion. The odds ratios were calculated for the entire 17-year study period and, with the disproportional growth of chemical abortions over time, underestimate the current advantage of chemical abortion (vs surgical) in eliciting emergency room visits in the later years of the study observation period.

Summary analytic tables were created using (SAS/STAT) software, version (10) of the SAS system for (Unix).

Copyright (2019) SAS Institute Inc. All comparative analyses were completed using Microsoft Excel (version 16).

The study has been exempted from Institutional Review Board (IRB) review pursuant to the USA Department of Health and Human Services Policy for Protection of Human Research Subjects at C.F.R. 46.101(b). See IRB ID: 7269, www.sterlingirb.com.

## Findings

From 1999 to 2015, there was a total of 423 000 confirmed induced abortion Medicaid procedures, 361 924 surgical and 61,706 chemical. Surgical abortions increased from 4479 in 1999 to a peak of 36 204 in 2012, declined in 2013 to 2014 to 28 101, and concluded 2015 at 29 558. Chemical abortions had no Medicaid claims in the study population in 1999 to 2000 and only 15 in 2001. From 2002 when there were 352, chemical abortions increased to 8768 in 2012, followed by a 2013 to 2014 decline similar to that experienced by surgical abortion. Following inclusion of California chemical abortions in 2015, the chemical abortion number more than doubled to 15 279. As a result, mifepristone abortions grew from 4.4% of total abortions in 2002 to 34.1% in 2015 (Table 1 and Figure 1).

Similarly, emergency room visits within 30 days of an induced abortion increased during the study observation period for both surgical and chemical abortions. Emergency room visits following chemical abortions grew consistently as a percentage of all ER visits within 30 days of the procedure: 3.5% (36 ÷ [36 + 977]) in 2002; 6.9% (452 ÷ [452 + 6060]) in 2007; 22.0% (3220 ÷ [3220 + 11,401]) in 2012; and 33.9% (5421 ÷ [5421 + 10,578]) in 2015 (Table 1). The steeper growth in total and abortion-related ER visits for mifepristone abortions are apparent in the comparison of Figure 2 (surgical) and Figure 3 (chemical). Total ER visits during the study period totaled 121,283, 99,928 surgical and 21,355 chemical.

There are clear differences for surgical and chemical abortions in terms of the reason for the ER visits following the procedure. Abortion-related visits (ICD-9 630-639) remain stable at 4% to 5% of total ER visits for surgical abortions, reaching a high of 6.2% in 2015. This percentage is 8% to 9% between 2002 and 2013 for chemical abortions, with increases in 2014 to 2015 peaking at 14.6%. Abortion-related ER visits represent a higher percentage of total ER visits for chemical abortions (Figure 4).

ER visits miscoded as a spontaneous abortion following a chemical abortion range between 2% and 3% of total visits from 2003 to 2012, increasing abruptly between 2013 and 2015 reaching 8.9%. ER visits miscoded as a spontaneous abortion following a confirmed surgical abortion averaged less than 1% of all ER visits until 2008, 1.2%-1.3% from 2009 to 2014, and peaked at 2.4% in 2015. Therefore, from 2005 to 2015, visits miscoded for spontaneous abortion treatment in the ER as a percent of all visits, went from 2 to 4 times as likely following a chemical abortion as compared to a surgical abortion (Figure 5).

**Table 1.** Chemical and Surgical Induced Abortions and ER Visits Within 30 Days, 1999-2015.

| Year | Chemical | | | | Surgical | | | |
|---|---|---|---|---|---|---|---|---|
| | Abortions | All ER Visits | 630 to 639 | 634 | Abortions | All ER Visits | 630 to 639 | 634 |
| 1999 | 0 | | | | 4479 | 351 | 15 | 5 |
| 2000 | 0 | | | | 7248 | 598 | 31 | 11 |
| 2001 | 15 | 1 | | | 9986 | 732 | 20 | 7 |
| 2002 | 352 | 36 | 3 | 0 | 7729 | 977 | 41 | 10 |
| 2003 | 803 | 108 | 6 | 2 | 13 012 | 1792 | 70 | 12 |
| 2004 | 1319 | 198 | 17 | 1 | 18 463 | 2871 | 99 | 14 |
| 2005 | 1360 | 316 | 29 | 9 | 19 226 | 4178 | 170 | 42 |
| 2006 | 1192 | 351 | 23 | 6 | 20 558 | 5042 | 218 | 51 |
| 2007 | 1521 | 452 | 37 | 13 | 21 244 | 6060 | 263 | 53 |
| 2008 | 1988 | 799 | 50 | 14 | 22 125 | 6954 | 313 | 66 |
| 2009 | 3032 | 1121 | 100 | 27 | 25 764 | 7879 | 358 | 91 |
| 2010 | 4848 | 1702 | 147 | 48 | 30 019 | 8820 | 386 | 114 |
| 2011 | 6834 | 2787 | 233 | 99 | 32 394 | 10 044 | 465 | 104 |
| 2012 | 8768 | 3220 | 277 | 88 | 36 204 | 11 401 | 536 | 150 |
| 2013 | 6856 | 2401 | 219 | 94 | 35 814 | 11 681 | 558 | 142 |
| 2014 | 6909 | 2442 | 270 | 117 | 28 101 | 9970 | 466 | 120 |
| 2015 | 15 279 | 5421 | 790 | 481 | 29 558 | 10 578 | 651 | 254 |

As a percent of abortion-related visits (ICD-9, 630-639), visits miscoded for spontaneous abortion treatments (ICD-9, 634) following a confirmed mifepristone abortion averaged approximately 30% between 2003 and 2012 and increased between 2013 and 2015, reaching 60.9%. ER visits miscoded as treatment for spontaneous abortion as a percent of abortion-related visits following a confirmed surgical abortion are a consistently lower percentage than for those following a chemical abortion, peaking at 39% in 2015 (Figure 6). Treatment in the ER miscoded as for spontaneous abortion is consistently and progressively more likely following a chemical abortion than following a surgical abortion.

All-cause ER visit rates within 30 days of an abortion have increased consistently throughout the study period for all types of induced abortion. There were 78.4 all-cause visits per 1000 surgical abortions in 1999 and 357.9 in 2015, an increase of 356% in the rate. Using 2002 as the initial year with sufficient abortion and ER visit counts to calculate a rate, the chemical



**Figure 1.** Medicaid abortions (surgical and chemical), 1999–2015, and chemical abortion % total.

*Studnicki et al*                                                                                    5



**Figure 2.** Emergency room (ER) use following surgical abortion, 1999-2015.

abortion rate increased from 102.3 in 2002 to 354.8, a rate increase of 247%. When the surgical rate increase is calculated from 2002 (126.4) and 2015 (357.9), the rate increase is 183%. Both the consistent increase in the rate of ER visits per abortion procedure and the higher chemical rate relative to the surgical rate after 2004 are apparent in Figure 7.

Abortion-related ER visits (ICD-9 630-639) per abortion exhibit a similar upward trend in rates for both surgical and chemical abortions, but, beginning in 2002, a growing divergence by type of abortion is evident. The surgical abortion to abortion-related visit rate increases from 5.3 in 2002 to 22.0 in 2015, an increase of 315%. Chemical abortion visit rates during the same period went from 8.5 to 51.7, an increase of 507% (Figure 8).

ER visit rates miscoded as for spontaneous abortion (ICD-9 634) within 30 days of a surgical abortion show a declining pattern from a peak of 1.5 in 2000 to a low point of 0.8 in 2004, a gradual increase between 2.2 and 4.3 from 2005 to 2014, and a doubling to 8.6 in 2015. By contrast, ER visit rates miscoded as for spontaneous abortion treatment following a chemical abortion show a consistent increase from 8.55 in 2007, the first year ER visits in this category reached double digits, to 31.5 in 2015. Between 2007 and 2015, the ER visit rate miscoded for spontaneous abortion increased 244% following surgical abortion and 268% following chemical abortion (Figure 9). Caution previously noted regarding the coding and classification of these visits is similarly warranted here.

A summary of the logistic regression analyses is in Table 2. All 3 types of ER visits during the study observation period are more likely to occur following a chemical abortion than following a surgical abortion: all-cause (OR 1.22, CL 1.19-1.24); abortion-related (OR 1.53, CL 1.49-1.58); and spontaneous abortion (OR 1.88, CL 1.81-1.96). Prior pregnancy outcomes increase the likelihood of any type of subsequent ER visit. However, an ER visit is significantly more likely to occur following a prior chemical abortion than following a prior surgical abortion: all-cause (OR 2.54, CL 2.38-2.70 vs OR 1.78, CL 1.73-1.82); abortion-related (OR 1.80, CL 1.65-1.97 vs OR 1.35, CL 1.29-1.41); and spontaneous abortion (OR 1.74, CL 1.54-1.96 vs OR 1.43, CL 1.35-1.52). A prior live birth is a lower risk factor for post abortion ER visits than is either a chemical or surgical induced abortion: all-cause (OR 1.52, CL 1.48-1.56); abortion-related (OR 1.09, CL 1.04-1.15); and spontaneous abortion (OR 1.12, CL 1.04-1.20).

Hispanics are slightly more likely than whites to experience any type of post abortion ER visit: all-cause (OR 1.07, CL 1.05-1.10); abortion-related (OR 1.03, CL 1.00-1.07); and spontaneous abortion (OR 1.03, CL 0.98-1.09). Blacks, by contrast, are consistently less likely than whites to experience any type of post abortion ER visit: all-cause (OR 0.59, CL 0.58-0.61); abortion-related (OR 0.68, CL 0.66-0.71); and spontaneous abortion (OR 0.72, CL 0.68-0.76). Age at time of the abortion and years of Medicaid eligibility are not important risk factors in predicting post abortion emergency room use.



**Figure 3.** Emergency room (ER) use following chemical abortion, 1999–2015.

## Discussion

Regression analysis definitively supports the hypothesis that chemical abortion is associated with more frequent emergency room visits of all kinds for the entire study period. In addition, we found that ER visit rates per 1000 abortion procedures increased consistently throughout the study period following both types of induced abortion, but the rates for mifepristone abortion visits grew faster, especially for abortion-related visits. By 2015, mifepristone versus surgical ER rates were: all visits (354.8 vs 357.9); miscoded spontaneous abortion



**Figure 4.** Abortion-related visits as a percent of all emergency room (ER) visits.

Case: 23-10362    Document: 95-4    Page: 58    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z    Document 1-18    Filed 11/18/22    Page 8 of 12    PageID 416

*Studnicki et al*                                                                                    7



**Figure 5.** Miscoded spontaneous abortion visits as a percent of all emergency room (ER) visits.

(31.5 vs 8.6); and abortion-related (51.7 vs 22.0). The reasons for the increasing rate of ER visits following mifepristone abortions are not readily apparent but may be influenced by mifepristone abortion providers who are unable or unskilled to handle complications after chemical abortions. This finding would be consistent with an analysis of FDA Adverse Event Reports which showed that abortion providers only managed slightly over half of the dilation and curettage procedures (D&Cs) required for hemorrhage and retained tissue, and the remainder were handled by the emergency room.[11] Further research is needed to delineate whether there is a difference between ER visit utilization after abortions performed by those abortion providers untrained in surgical procedures (ie, midwives, advance practice clinicians, Family Medicine providers and other types of providers). This finding is also of significance when considering the implications of removing a requirement for in-person medical supervision of mifepristone abortion as is currently under consideration by the FDA.[12]

These findings are especially consequential because they are derived directly from all paid medical claims records, unlike most other studies of abortion complications which involve voluntary survey reporting and/or a more limited query of a select set of treatment codes. The more comprehensive examination of all ER codes associated with confirmed abortion events undertaken in this research requires reconsideration of previous findings which now appear to have understated the full range of risks associated with abortion. For example, previous research on only fee-for-service California Medicaid beneficiaries and using only a single code (ICD-9 635.xx) in 2009 to 2010 concluded that 6.4% of all abortions were followed by any ER visit within 6 weeks and 0.87% were followed by an abortion-related

visit.[13] Results of our research summarized for the same 2 years found 4.8 times (30.7%) the number of total ER visits and 1.8 times (1.56%) the number of abortion-related visits within our shorter 30-day postabortion observation period. We were able to detect this more accurate number of complications because the women were included in our study based on a CPT code payment for mifepristone abortion, thus eliminating the need for the treating physician to recognize a complication from a chemical abortion.

The finding that many ER visits following known induced abortions are misclassified as postmiscarriage complications is particularly noteworthy. Abortion studies in the United States consistently report lower postabortion complication rates than are documented in the international scientific literature. There are likely multiple reasons for this discrepancy, but among them are the miscoding of abortion-related complications by the provider and the nondisclosure of prior abortion history by the patient. Women obtaining chemical abortions must sign a patient agreement indicating they will bring with them the mifepristone medication guide if seeking emergency care, but some abortion advocates encourage women to withhold information if seeking treatment for an adverse event.[14,15] Our study demonstrated ER visits misclassified or miscoded as spontaneous abortion grew for both types of induced abortion, reaching 39% of abortion-related visits following surgical abortion and 60.9% of visits following chemical abortion in 2015. These mifepristone abortion complications would have been invisible to previous researchers, resulting in a large underestimation of actual mifepristone abortion complications. Our more accurate estimation has significant implications for the evaluation of risks communicated



**Figure 6.** Miscoded spontaneous abortion visits as a percent of abortion-related emergency room (ER) visits.

to women in the process of informed consent prior to abortion, as well as in policy making regarding mifepristone abortion.

Consistent with CDC reports, we found the percentage of abortions performed by means of mifepristone and misoprostol increased from 4.4% of total abortions in 2002 to 34.1% in 2015. Similarly, ER visits following mifepristone abortion grew from 3.6% of all postabortion visits in 2002 to 33.9% of all postabortion visits in 2015. The trend toward increasing use of mifepristone abortion requires all concerned with health

care utilization to carefully follow the ramifications of ER utilization.

There are limitations related to the use of Medicaid claims data. Medicaid-eligible beneficiaries are by definition financially disadvantaged and are not representative of all women experiencing abortion. Conversely, a data set composed entirely of low-income women may also be considered an advantage since results are unlikely to be explained by differences in income or other factors strongly associated with income. The lower risk of any ER visit following induced abortion among



**Figure 7.** Total emergency room (ER) visits per 1000 abortions.

*Studnicki et al*                                                                                               9



**Figure 8.** Miscoded spontaneous abortion emergency room (ER) visits per 1000 abortions.

Black women suggests that a more granular analysis of the influence of race is warranted. Services received by eligible women but paid by another source (eg, out of pocket) are not included in the claims data. Services received when the women were not eligible are similarly not included.

Administrative data are also subject to limitations regarding coding errors, inconsistent coding, and the exclusion of codes considered nonessential for billing.[16,17] There are inconsistencies in coding which may vary state by state. Our data extraction protocol required both an ICD code and CPT code to



**Figure 9.** Abortion-related emergency room (ER) visits per 1000 abortions.

Case: 23-10362    Document: 95-4    Page: 61    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z    Document 1-18    Filed 11/18/22    Page 11 of 12    PageID 419

10

*Health Services Research and Managerial Epidemiology*

**Table 2.** Logistic Regression Odds Ratio Estimates (OR) and (Wald) Confidence Limits (CLs).

| | Any ER Visit | | Abortion-Related Visit | | Spontaneous Abortion Visit | |
|---|---|---|---|---|---|---|
| | OR | 95% CLs | OR | 95% CLs | OR | 95% CLs |
| Chemical versus Surgical Abortion | 1.22 | 1.19 to 1.24 | 1.53 | 1.49 to 1.58 | 1.88 | 1.81 to 1.96 |
| Race | | | | | | |
| Black versus White | 0.59 | 0.58 to 0.61 | 0.68 | 0.66 to 0.71 | 0.72 | 0.68 to 0.76 |
| Hispanic versus White | 1.07 | 1.05 to 1.10 | 1.03 | 1.00 to 1.07 | 1.03 | 0.98 to 1.09 |
| Other versus White | 0.91 | 0.89 to 0.93 | 0.88 | 0.85 to 0.91 | 0.85 | 0.81 to 0.89 |
| Pregnancy 365 d prior versus no | | | | | | |
| Prior surgical abortion | 1.78 | 1.73 to 1.82 | 1.35 | 1.29 to 1.41 | 1.43 | 1.35 to 1.52 |
| Prior chemical abortion | 2.54 | 2.38 to 2.70 | 1.80 | 1.65 to 1.97 | 1.74 | 1.54 to 1.96 |
| Prior live birth | 1.52 | 1.48 to 1.56 | 1.09 | 1.04 to 1.15 | 1.12 | 1.04 to 1.20 |
| Age | 0.993 | 0.992 to 0.994 | 1.003 | 1.001 to 1.004 | 1.000 | 0.997 to 1.003 |
| Months Medicaid Eligibility | 1.008 | 1.007 to 1.008 | 1.006 | 1.005 to 1.007 | 1.006 | 1.006 to 1.006 |

identify beneficiaries who had an induced abortion. To the extent that some states or individual providers do not code an abortion with an ICD code, our study population may undercount the number of abortions. This undercount would likely be due to a random variation in coding protocols and is unlikely to affect the trends related in our findings.

In summary, mifepristone abortion is consistently and progressively associated with increased morbidity in the form of postabortion emergency room utilization among the population of women with publicly funded abortions. The determination of the causes and potential means of prevention for this burden of illness should have the highest priority of our health agencies and elected officials. Additional research is necessary to investigate the prevalence and type of effects beyond 30 days.

### Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author(s) disclosed receipt of the following financial support for the research, authorship, and/or publication of this article: This work was supported by the Charlotte Lozier Institute.

### ORCID iDs

James Studnicki  https://orcid.org/0000-0003-2958-7493
Tessa Longbons  https://orcid.org/0000-0003-0479-9166

### References

1. Longbons T. U.S. abortion trends: 2019 and preliminary 2020. Charlotte Lozier Institute. American Reports Series Issue 19, September 2021. Accessed September 10, 2021. https://lozierinstitute.org/us-abortion-trends-2019-and-preliminary-2020/

2. U.S. Government Accountability Office. Food and Drug Administration: Information on mifeprex labeling changes and ongoing monitoring efforts. GAO-18-292. Published March 28, 2018. Accessed September 9, 2021.

3. Niinimäki M, Pouta A, Bloigu A, et al. Immediate complications after medical compared with surgical termination of pregnancy. *Obstet Gynecol.* 2009;114(4):795-804. doi: 10.1097/AOG.0b013e3181b5ccf9

4. Carlsson I, Breding K, Larsson P-G. Complications related to induced abortion: a combined retrospective and longitudinal follow-up study. *BMC Women's Health.* 2018;18(1):158. doi: 10.1186/s12905-018-0645-6

5. Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes after medical abortion. *Obstet Gynecol.* 2013;121(1):166-171. doi: 10.1097/aog.0b013e3182755763

6. Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. *Obstet Gynecol.* 2015;126(1):22-28. doi: 10.1097/AOG.0000000000000910

7. Upadhyay UD, Johns NE, Barron R, et al. Abortion-related emergency department visits in the United States: an analysis of a national emergency department sample. *BMC Med.* 2018;16(1):88. doi: 10.1186/s12916-018-1072-0

8. Studnicki J, Reardon D, Harrison D, Fisher J, Skop I. Improving the metrics and data reporting for maternal mortality: a challenge to public health surveillance and effective prevention. *Online J Public Health Inform.* 2019;11(2):e17. doi: 10.5210/ojphi.v11i2.10012

9. Schaible B. Improving the accuracy of maternal mortality and pregnancy related death. *Issues Law Med.* 2014;29(2):231-242.

10. New MJ. Hyde @ 40: analyzing the impact of the Hyde amendment. Charlotte Lozier Institute, On Point Series 12. 2016. Accessed September 9, 2021. https://s27589.pcdn.co/wp-content/uploads/2016/09/OP_hyde_9.28.3.pdf

11. Aultman K, Cirucci CA, Harrison DJ, Beran BD, Lockwood MD, Seiler S. Deaths and severe adverse events after the use of mifepristone as an abortifacient from September 2000 to February 2019. *Issues Law Med.* 2021;36(1):3-26.

12. Joint Mot. to Stay Case Pending Agency Review, *Chelius v. Becerra*, Civ. No. 1:17-00493 JAO-RT (D. Haw.).

13. Upadhyay UD, Desai S, Zlidar V, et al. Incidence of emergency department visits and complications after abortion. *Obstet*

Case: 23-10362     Document: 95-4     Page: 62     Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 1-18   Filed 11/18/22   Page 12 of 12   PageID 420

*Studnicki et al*                                                                                           11

*Gynecol.* 2015;125(1):175-183. doi: 10.1097/AOG.0000000000
000603

14. Safe2Choose. Will medical staff be able to notice that I am having an abortion? Accessed September 9, 2021. https://safe2choose.org/faq/medical-abortion-faq/during-abortion-with-pills/will-medical-staff-be-able-to-notice-that-i-am-having-an-abortion

15. Plan C. Abortion pills FAQ: Can I get in trouble for using abortion pills? Accessed September 9, 2021. https://www.plancpills.org/guide-how-to-get-abortion-pills#faq

16. Hicks J. *The Potential of Claims Data to Support the Measurement of Health Care Quality*. Dissertation, RAND; 2003.

17. Romano PS. Using administrative data to identify associations between implanted medical devices and chronic diseases. *Ann Epidemiol.* 2000;10(4):197-199. doi: 10.1016/s1047-2797(00)00041-7

## Author Biographies

**James Studnicki** is currently Vice President and Director of Data Analytics at the Charlotte Lozier Institute in Arlington, Virginia. Over a span of four decades, he held academic appointments at the Johns Hopkins University School of Hygiene and Public Health, the University of South Florida College of Public Health, and the University of North Carolina, Charlotte, where for ten years he served as the Irwin Belk Endowed Chair in Health Services Research. He holds Doctor of Science (ScD) and Master of Public Health (MPH) degrees from Johns Hopkins and a Master of Business Administration (MBA) from the George Washington University.

**Donna J. Harrison**, M.D. dip ABOG received her M.D. from the University of Michigan and completed ObGyn residency at a University of Michigan Affiliate hospital (St. Joseph Mercy Hospital). She is currently CEO of the American Association of Pro-Life Obstetricians and Gynecologists.

**Tessa Longbons** is a research associate with the Charlotte Lozier Institute. Her research focuses on abortion statistics at the state and national levels and the changing landscape of abortion policy, provision, and access in the United States. She received her B.A. from Thomas Edison State University.

**Ingrid Skop**, M.D., F.A.C.O.G. has been a practicing obstetrician-gynecologist in San Antonio, Texas for 24 years. She received her Bachelor of Science in physiology from Oklahoma State University and her medical doctorate from Washington University School of Medicine. She completed her residency in obstetrics and gynecology at the University of Texas Health Science Center at San Antonio. She is a Fellow of the American College of Obstetrics and Gynecology, a Charlotte Lozier Institute Associate Scholar and Chairman of the American Association of Pro-Life Obstetricians and Gynecologist's Maternal Mortality Committee. She is the Board Chairman of Any Woman Can Pregnancy Resource Center-which specializes in free mental health counseling and is a board member of The Source for Women-a consortium of holistic women's health care centers in Texas. She is married to a physician and is the proud mother of two sons and a daughter.

**David C. Reardon** is the director of Elliot Institute, a biomedical ethicist, and a lead author on numerous studies and books examining the risk factors and effects of pregnancy loss on women and families.

**John W. Fisher** is currently an Associate Scholar at the Charlotte Lozier Institute. Following a 22 year career as a nuclear submarine officer, he served as the Director of Life Support and engineering at the Florida Aquarium, Chief Financial Officer of Technology Transfer Services, and 10 years as an Assistant Professor at the University of North Carolina at Charlotte College of Health and Human Services. He holds a PhD in Information Systems and Decision Sciences from the University of South Florida, a JD from Massachusetts School of Law, and Master's degrees from the Massachusetts Institute of Technology (Ocean Engineering), University of Notre Dame (Administration), Indiana University (Business Administration), and the United States Naval War College (National Security Policy). He is currently a member of the bar in New Hampshire and Massachusetts.

**Maka Tsulukidze**, MD, PhD, MPH is an Assistant Professor at the Florida Gulf Coast University, Marieb College of Health & Human Services. Before joining FGCU, she was a Postdoctoral Fellow at the Dartmouth Center for Health Care Delivery Science. She has earned a PhD degree from the University of North Carolina at Charlotte and MD from Tbilisi Medical Academy. Previously she was a UNICEF National Consultant to the Parliament of Georgia, Short-Term Consultant at PAHO/WHO and Senior Expert at the Parliament of Georgia, Committee on Health and Social Issues. She has also worked as a Deputy Chair/Project Manager for the Task Force for Prevention of Micronutrient Malnutrition and Food Fortification Initiatives established under the Parliament of Georgia, Committee on Health and Social Issues.

**Christopher Craver** is an independent health services researcher affiliated with the Charlotte Lozier Institute focused on the use of secondary healthcare data sources in population based scientific research. He is widely published in many healthcare topics including cancer treatment, rare disease populations, and the efficacy of surgical services.

# Exhibit 20

Katherine A. Rafferty & Tessa Longbons,
*#AbortionChangesYou: A Case Study to Understand the
Communicative Tensions in Women's Medication
Abortion Narratives*. 36 Health Commc'n 1485 (2021)

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/341823567

# #AbortionChangesYou : A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives

**Article** *in* Health Communication · June 2020

DOI: 10.1080/10410236.2020.1770507

CITATIONS
6

READS
1,678

2 authors, including:

Katherine Rafferty
Iowa State University

**17** PUBLICATIONS   **123** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

Project   End-of-Life Communication View project

All content following this page was uploaded by Katherine Rafferty on 09 June 2020.

The user has requested enhancement of the downloaded file.



Routledge
Taylor & Francis Group

Health Communication

ISSN: (Print) (Online) Journal homepage: https://www.tandfonline.com/loi/hhth20

# *#AbortionChangesYou*: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives

Katherine A. Rafferty & Tessa Longbons

**To cite this article:** Katherine A. Rafferty & Tessa Longbons (2020): *#AbortionChangesYou*: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives, Health Communication, DOI: 10.1080/10410236.2020.1770507

**To link to this article:** https://doi.org/10.1080/10410236.2020.1770507


Published online: 01 Jun 2020.


Submit your article to this journal ✎


View related articles ⧉


View Crossmark data ⧉

Alliance.App. 310

EX. 20 pg. 02

HEALTH COMMUNICATION
https://doi.org/10.1080/10410236.2020.1770507





# #*AbortionChangesYou*: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives

Katherine A. Rafferty[a] and Tessa Longbons[b]

[a]Iowa State University; [b]Charlotte Lozier Institute

**ABSTRACT**

One out of four women in the United States will have an abortion by age 45. While abortion rates are steadily declining in the United States, the rate of medication abortions continues to increase, with 39% of all abortions being medication abortions. Our study is one of the first to analyze women's narratives after having had a medication abortion. Using relational dialectics theory, we conducted a case study of the nonpartisan website, *Abortion Changes You*. Our contrapuntal analysis rendered four sites of dialectical tension found across women's blog posts: *only choice* vs. *other alternatives, unprepared* vs. *knowledgeable, relief* vs. *regret*, and *silence* vs. *openness*. Each site of struggle characterized a different noteworthy moment within a woman's medication abortion experience: the decision, the medication abortion process, identity after abortion, and managing the stigmatizing silence before and after the abortion. We discuss theoretical and practical implications about how the larger politicized discourses prevalent within the abortion debate impact the liminality of women who are contemplating a medication abortion and affect their own narrative construction about the medication abortion experience.

One out of four women will undergo an abortion procedure in the United States by age 45 (R. K. Jones & Jerman, 2017), and 862, 320 reported abortions occur each year (Jones et al., 2019). Despite its frequency, abortion remains a highly contested and stigmatized biopolitical public health issue in the United States (Altshuler et al., 2017). The historic *Roe v. Wade* case has resulted in two nationalized political movements – Right to Life and Right to Choice – that have juxtaposed stances on the legality of abortion. However, the stigma and shame associated with abortion precede and transcend this historic case. Stormer (2010) concluded that a collective memory of secrets and shame has characterized the topic of abortion since Planned Parenthood's 1955 conference, "Abortion in the United States".

While abortion rates are steadily declining in the U.S. (Jones et al., 2019), the rate of medication abortions continues to increase. In 2000, the U.S. Food and Drug Administration (FDA) approved mifepristone to be used in combination with misoprostol as a form of medication abortion. Since then, the annual number of medication abortions has risen steadily: less than 6% of all abortions in 2001 to 39% of all abortions in 2017 (Jones et al., 2019, 2008). Between 2014–2017, the number of medication abortions provided at facilities other than hospitals increased by 25% (Jones et al., 2019). Presently, over one-third of all reported abortions in the U.S. are medication abortions (Jones et al., 2019). In 2016, the FDA protocol expanded provider eligibility for dispensing mifepristone to women. Thus, abortion provision is transitioning from formalized medical procedures conducted in health care settings to a protocol where most of the abortion occurs individually at home with limited clinician assistance (Biggs et al., 2019). Given the privatization of abortion provision, research is needed to examine the distinct experiences of women who have undergone this type of abortion. After all, researchers have found that women often elect to have a medication abortion over a surgical abortion because of more privacy, convenience, and the perception of having more control (Newton et al., 2016). However, medication abortion has been found to have a higher complication rate that results in more emergency department visits post-medication abortion compared to post-surgical abortion (Upadhyay et al., 2015).

Medication abortion practices in the U.S. adhere to the following evidence-based guidelines: using mifepristone in combination with a prostaglandin to carry success rates up to 99% for early pregnancy termination with rare occurrence of serious adverse events. However, the focus of this research is on successful terminations, increases in abortion access, and reductions of in-person clinic visits (H. E. Jones et al., 2017). There remains a dearth of research, particularly in the U.S., that examines women's personal experiences with having this type of abortion procedure (e.g., acknowledging their emotions, understanding their self-efficacy with completing the abortion at home, being aware of whether they are adequately informed about the process). To our knowledge, the only study is from Sweden; researchers used semi-structured telephone interviews with 119 women who had a medication abortion (Hedqvist et al., 2016). They found that almost half (43%) experienced more bleeding than expected, and one-

**CONTACT** Katherine A. Rafferty ✉ rafferty@iastate.edu 📍 Communication Studies Program, Department of Psychology, Iowa State University, USA

© 2020 Taylor & Francis Group, LLC

fourth (26%) bled for more than four weeks. In addition, one-third (34%) stated that they received insufficient information about what to expect. Women who had never had an abortion nor had gone through childbirth were more likely to feel misinformed.

Scholars know that the medication abortion process is distinct from surgical abortions, with the features of medication abortion (e.g., lack of medical presence, time required for abortion completion, personal experiences with pain and bleeding) influencing women's perception and satisfaction (Newton et al., 2016). Yet, this research on women's satisfaction with medication abortion is often conflicting (Kimport et al., 2012) and limited (Hedqvist et al., 2016). Given that women increasingly prefer medication abortion over surgical abortion (Newton et al., 2016), the need for studying women's experiences post-medication abortion becomes imperative.

### Importance of analyzing unsolicited blogging narratives about one's abortion

To understand women's medication abortion experiences, it is important to study platforms where women engage in unsolicited talk. Unsolicited talk is ideal for collecting formative research that can be studied to explore individual and cultural experiences (Baxter, 2011). First, the audience of these texts is a "generalized other" (Mead, 1982), or culture, rather than a specific individual with whom the author has a relationship (Langellier & Peterson, 2004). The absence of a specific audience encourages narrators to provide an unadulterated account of their experience, rather than tailor their story to specific individuals (e.g., a friend who has had a certain stance on the abortion issue). Similarly, anonymity allows for potentially muted or stigmatized groups to post information without fear of sanctioning. In a culture where abortion remains highly contested and talk about having had an abortion is often muted or stigmatized (Altshuler et al., 2017), it is likely that women may prefer to self-disclose their medication abortion experiences online than via face-to-face channels. Furthermore, because women traditionally constitute a co-culture who have historically been muted and must strategically use communication to participate in a dominant patriarchal society (M. Orbe, 2005; M. P. Orbe, 1998), scholars must study platforms where women are sharing unsolicited stories in back-channel outlets (e.g., online blogs).

### Online blogs as a platform for unsolicited talk

One backchannel platform of unsolicited talk is online blogs. Blogs provide a computer-mediated platform where people can self-disclose their personal thoughts, feelings, and experiences to others online. The proliferation of blogs in the last decade has transformed the way that we, as a society, "share, create, and curate information with individuals and communities" (Becker & Freburg, 2014, p. 415). Blogs often resemble online personal journal entries that enable writers to freely express themselves in ways that may be less face-threatening or stigmatizing (M. Jones & Alony, 2008). One of the many applications and uses of blogs is to share experiences and events through storytelling.

### Relational Dialectics Theory (RDT)

Because talking about one's abortion experience remains stigmatized and muted (Cockrill & Nack, 2013), examining women's stories after having had a medication abortion may illuminate the competing discourses surrounding this debated moral and social issue (e.g., largely evident in the two polarized movements: Right to Choice v. Right to Life), as well as some of the larger dominant discourses from the polarized political movements that influence how women tell their own medication abortion story. Given this goal, RDT (Baxter, 2011) is a relevant framework to assess the competing cultural norms and expectations, which are also referred to as discourses. At any given moment, discourses may be dominant/centripetal or marginalized/centrifugal (i.e., anything that deviates from the dominant discourse). Scholars use RDT as a framework to examine the interplay between certain discourses that then construct social meaning and reality for individuals. Within the theory, there are four types of utterances (i.e., speaking chains) from which dialectical tensions (i.e., centripetal vs. centrifugal) may stem: *distal already-spokens* – utterances reflecting the cultural meaning and discourses that cultural members give voice to in their talk; *proximal already-spokens* – utterances conveying past meanings and discourses within a given relationship; *proximal not-yet-spokens* – immediate response from the hearer in the interaction; and *distal not-yet-spokens* – anticipated responses of a generalized other within the culture. The purpose of this paper is to examine how, if at all, these four types of utterance chains are present within women's medication abortion narratives.

A second aspect of RDT (Baxter, 2011) is to understand how social reality is created discursively through power. Power is located in the struggle between marginalized/centrifugal and dominant/centripetal discourses. There are three ways that power can be located within discourses: diachronic separation, synchronic interplay, and discursive transformation. Diachronic separation occurs when discourses emerge in different texts or locations. Synchronic interplay is when discourses negate (total rejection of a competing discourse), counter (offer limited legitimacy to a discourse), and/or entertain (consider multiple worldviews/discourses or general ambivalence toward discourses) one another. Finally, discursive transformations occur when the interplay of competing discourses creates new meanings rather than remaining in opposition to one another (Baxter, 2011). This current study will focus on examining the synchronic interplay among the centripetal and centrifugal discourses.

### A case study of women who have experienced medication abortion

To analyze women's personal narratives and the larger discourses influencing their talk about their own medication abortion, we conducted a case study of the website www.abortionchangesyou.com. We selected this website for several reasons: it is not openly politicized, bloggers do not interact with others, bloggers post anonymously, bloggers do not need to create an account in order to post, and the platform is a space for unsolicited stories with no reward or



compensation to those who post. Furthermore, from a strategic storytelling standpoint (Tyler, 2007), it is important to study women's blogs from an organization that recognizes each woman's individual narrative, as opposed to propagating narratives that openly align with the agenda of only one political movement. The woman who created this website has had an abortion herself and openly shares this information on the "About Us" page. The naming of her own abortion experience grounds co-cultural theorizing (M. Orbe, 2005; M. P. Orbe, 1998) such that other women who feel muted may be empowered and capable of finding similar language strategies.

In this case study, we explore the complexity and consequentiality of women's language choices with anonymously telling their own medication abortion story, as well as offer the potential to capture the interplay of individual, organizational, and social discourses surrounding the abortion debate. The current divisiveness surrounding the socio-political climate in the U.S. about abortion provides further exigency and credence for this research. Our critical analysis is rooted in the interpretive paradigm with the purpose of explaining, describing, and illustrating the stories that women share on this website (Tracy, 2013). The following research questions guide our iterative analysis:

RQ1: What topics are women disclosing to the "generalized other" in their blog?

RQ2: What (if any) sites of struggle characterize women's abortion narrative?

## Methods

We conducted a case study approach (Arden Ford et al., 2014) of one website, www.abortionchangesyou.com. Case studies are a contextual examination used to understand a phenomenon within a particular context "and with respect to multiple perspectives within that context" (Arden Ford et al., 2014, p. 118). By employing a case study approach, we were able to draw on multiple perspectives (e.g., 98 different blog stories) that were rooted in a specific context. This methodological choice is common in other communication research, where the unit of analysis is an organization and the goals are to provide an in-depth understanding of the unique particulars and complexities of the case within a larger social context (Norander & Brandhorst, 2017).

Our case study included 98 blogs from women who have had a medication abortion and shared their story on the website. We included all blogs posted between October 2007 – February 2018. This date range reflects the time period between the submission of the first medication abortion blog on the website in 2007, and the point at which we extracted our data for analysis in 2018. Women's blogs ranged in length from one paragraph to three pages of text, single-spaced (the average number of words for the 98 blogs was 655 words). All 98 blogs included content about one's own medication abortion; the vast majority (91 women; 93%) also discussed the events and emotions experienced before and after their medication abortion.

## Data analysis and synthesis

The case study approach allows for different data analysis strategies (Norander & Brandhorst, 2017). Because the purpose of our case study is to develop a thick description of the case, using an interpretive analytic strategy is most prudent. We selected Baxter's (2011) contrapuntal analysis to study the meanings circulating around individual and relational identities evidenced within the language choices of the women blogging about their own medication abortion. Given the larger competing discourses about the legality of abortion in the U.S., we felt that the struggle of competing and contradictory discourses would likely be apparent in women's personal blogging narratives. Further, contrapuntal analysis (Baxter, 2011) offered a critical perspective to our analysis as we studied the voices of marginalized women (e.g., women who have had a medication abortion) whose perspectives are often muted and stigmatized in society.

To understand the competing discourses and how meaning was constructed through their interplay, we conducted the first stages of thematic analysis to identify the discourses evident within each blog post (Braun & Clarke, 2006). This process required the three coders to independently familiarize themselves with the entire data set: reading the blogs several times and conducting line-by-line coding that captured the essence of the story in each line. Many of the inductive analytic codes applied to the text were descriptive (e.g., uncertainty; not ready), process (e.g., discovering pregnancy, taking the pills), or in vivo codes (e.g., wanted baby; alone; Saldaña, 2013). The coders met regularly for five months to discuss the codes independently applied to each blog post. During this time, codes emerged into themes as processes were identified in the data and repetitively noticed by all three coders (e.g., changing self perception, silence, responsibility, good parenting). Discrepancies in coding were discussed during coding meetings and resolved through group consensus (Strauss & Corbin, 1990).

During the third and fourth months of data analysis, we went back to the data set to identify where discourses competed (e.g., culpability; justification). Here, we paid particular attention to where the bloggers used instances of negating (e.g., claiming another discourse as irrelevant or rejecting it), countering (e.g., offering a particular discursive position in replacement of another), and entertaining (e.g., not completely rejecting a discourse, but instead noting the potential possibilities with different discourses; Baxter, 2011). Women used negating when saying, "can't," "not," "couldn't," and "never." Examples of countering were most apparent when women used the word "but." Entertaining often occurred when women used the words "possibility" and "could have." Finally, we identified where and how competing discourses interpenetrated (Baxter, 2011). Dialogically contractive discursive practices are silenced discourses. Examples of these discursive practices included negating talk, such as: "can't talk about the abortion," or "there was no other choice." In contrast, dialogically expansive discursive practices are discourses that are encouraged and amplified. Women used these discourses when saying things like: "I don't want the procedure, but I don't want the baby" or "hoping for a brighter future now that it is over."

EX. 20 pg. 05

Data were analyzed until the point of theoretical saturation (i.e., no new thematic categories were present in the blog posts; Strauss & Corbin, 1990), which occurred after the 54th blog post. However, we continued to analyze the remaining blog posts in an effort to verify that our analysis of the discourses evident in the 54 posts accurately reflected all of the posts within the entire data set. Further, we wanted to extract the best exemplars from the entire case study and desired that quotations within all posts be considered for representation. Clear and concise exemplars of competing discourses within women's narratives were then selected and agreed upon by all coders.

### Trustworthiness and rigor

Evaluation of the quality of case study research should be determined by criteria associated within the naturalistic paradigm (Arden Ford et al., 2014). Trustworthiness is the criterion that assesses the credibility, transferability, dependability, and confirmability of the data collection and analysis processes (Lincoln & Guba, 1985). We upheld these principles when conducting this study by beginning with a careful design that clearly defined its purpose, research questions, and notion of "boundedness" (i.e., establishing the limits and context of the case; Arden Ford et al., 2014). Second, we spent sufficient time developing and analyzing the case: our analysis transpired over five months. Third, we upheld the principles of reflexivity by using inductive coding for all blog posts and writing individual and group memos throughout the entire coding process as a way to remain transparent and keep a data audit. Fourth, we had a team of three female coders, which allowed for the presence of multiple feminine perspectives.

### Findings

Our research questions focused on the topics that women discussed in their personal online blogging narrative posted to www.abortionchangesyou.com (RQ1), and what (if any) sites of struggle were evident in these narratives (RQ2). Our contrapuntal analysis (Baxter, 2011) rendered four sites of dialectical tension: *only choice* vs. *other alternatives*, *unprepared* vs. *knowledgeable*, *relief* vs. *regret*, and *silence* vs. *openness*. Each site of struggle characterized a different noteworthy moment within a woman's medication abortion experience: the decision, the medication abortion process, identity after the abortion, and managing the stigmatizing silence before and after the abortion. When recounting their decision to have an abortion, women referenced the struggle of *only choice* vs. *other alternatives*. As women discussed the medication abortion process, the competing discourse of *unprepared* vs. *knowledgeable* was evidenced. Women's narratives about their identity after the abortion indicated the dialectical struggle of *relief* vs. *regret*. Finally, the challenges with managing the tension between *silence* vs. *openness* pervaded women's narratives. Below we discuss each site of struggle using exemplar quotes from women's blogs. Quotes were not edited from their original post.

### The decision: Only choice vs. other alternatives

Part of women's narratives included a detailed account of their decision to have a medication abortion. This decision was described as being rife with contradiction, and not a flippant choice. Women enumerated various reasons that were influential in their decision-making process: bad timing, financial instability, relationship problems, lack of family support, not married, too young, too many other children, not prepared to be a parent yet, and/or best decision given the circumstances. After stating one of the aforementioned reasons, 92 women (94%) also explained that abortion was the only or best option given the circumstances. For example, one woman said: "I felt the child growing inside of me. I was rubbing my stomach without me even knowing. I felt the doubt in my heart, but kept telling myself this is the best decision I needed to make" (6–18-17). A different woman recounted:

> "I always leaned more towards keeping the baby and my boyfriend more towards abortion. I knew I could have the baby but it would be difficult. We both work jobs that barely pay over minimum wage and we both were scared to grow up and care for a child" (10-24-17).

Collectively, these exemplars illustrate how any possibility of keeping the baby was negated by one of the reasons that warranted the need for having a medication abortion. Many of the reasons women cited for choosing abortion align with the discourses from the Right to Choice movement: "A pregnancy to a woman is perhaps one of the most determinative aspects of her life. It disrupts her body. It disrupts her education. It disrupts her employment. And it often disrupts her entire family life" (*Roe v. Wade*).

However, the decision to have a medication abortion was not always independently made by the woman. In fact, 52 women (53%) reported that the father to their child or other family members (e.g., parents) negated women's own desires to keep the baby. For example, one woman said:

> "I remember my husband telling me, 'well, don't expect me to be too happy with the idea of having it if you decide to keep it. I won't be too loving.' That was a knife through my heart and I made the tough decision to go through with the abortion" (7-6-12).

Other family members also influenced women's medication abortion decision, albeit her own desires to keep her baby:

> "But my father on the other hand was a different story. He is an old school Puerto Rican who told me that I had to leave if I kept the baby. I had 2 weeks to get an abortion or else he would disown me forever" (3-8-2018).

In both accounts, women communicated their personal choice to have their baby; yet, their choice was negated by family and friends who advocated that abortion was necessary. Centrifugal discourses about others influencing or pressuring women to have an abortion are marginalized discourses.

Finally, when making their decision, 48 women (49%) reported vacillating between keeping their baby and having a medication abortion. Ultimately, outside circumstances or other people influenced their decision to abort. As mentioned earlier, 92 women (94%) shared that abortion was the best or



only option available given the circumstances. In many of these narratives, women did not believe nor realize that other alternatives, besides abortion, were tenable options until after having the abortion. For instance, one woman said:

> "They all tell you 'it's your choice' in the moment, but you don't feel that it is. Being unable to afford it, unable to tell your loved ones, not having the help or feeling unable to support a child. When your partner doesn't want it like you do. All these things push you, blind you to a decision that you don't realize will destroy you" (8-23-17).

Similarly, another woman recounted: "I was kind of excited but I was so scared to tell my family …. I told my mom and her first response was I hope you're getting an abortion. You're going to be a terrible mom" (11-5-17). Both exemplars illustrate the distal and proximal already-spoken discourses that influenced each woman's decision to have a medication abortion. Ultimately, these centripetal discourses (coming from society, the pro-choice movement, other people in their lives, or their own fears) negated the centrifugal discourse that other alternatives (adoption or keeping their baby) were justifiable options available to them.

### The medication abortion process: Unprepared vs. knowledgeable

Medication abortions where women undergo most of the process individually at home with limited assistance from a medical provider are becoming more commonplace (Biggs et al., 2019; H. E. Jones et al., 2017). While this process is generally reported to be safe and adhere to evidence-based guidelines (H. E. Jones et al., 2017), little is known about women's personal experiences with having this type of abortion. All women in this case study reported having had a medication abortion. Forty-eight women (49%) provided detailed accounts of their actual medication abortion experience at home. Women said things like: "I felt her come out" (1-8-16). Some women detailed the hardships of this process by saying: "I was in so much pain on the bathroom floor" (3–15-18); "the pills made me vomit, lose control of my bowels, sweat, faint, pass out, and go into full labor" (10-9-09); and "I lay on my bed in the fetal position, holding my stomach" (9-5-15). Other women did not self-report such negative experiences: "The actual process of taking the pill was frightening but not as bad as I imagined" (9-8-15) and "I just popped some pills and got a period" (7-1-15).

In analyzing women's talk about the medication abortion process, a second site of struggle was identified: *knowledgeable vs. unprepared*. In this struggle, women discussed how they were told certain information about the medication abortion process (e.g., when to take the pills, what the pills do, the need to contact a provider if complications arise), but ultimately this information was insufficient, limited, or misleading. Fourteen women (14%) reported being inadequately prepared about what to expect during the medication abortion process. For example, one woman said:

> "They lied to me and said they would give me some pills that would make it just like a late period with a little cramping … The pain of the contractions was so intense I felt like my intestines

were pulled out slowly. I collapsed screaming on my bathroom floor, sweat, tears, blood, vomit, and shit all over me" (10-9-09).

Similarly, a different woman recounted:

> "They told me, if you by chance are in pain you can take these pain relievers. If by chance I'm in pain? That sounded like the process would be easy and not so painful. Well NO that was not the case, within 30 minutes I felt really bad cramping. It just kept getting worse and worse. I was crying and moaning from the pain. I literally thought I was dying" (9-2-17).

In both instances, women's personal abortion experiences did not align with the proximal-already-spoken messages (e.g., "it's just a pill") that they were told by their medical providers.

When women's personal experiences contradicted what they were originally told by health care providers, family, or friends women felt deceived. One woman communicated her frustration by saying: "They told me it wouldn't hurt and I wouldn't feel a thing. THAT WAS SUCH A LIE. I felt everything, I heard everything, I seen everything. I ended up blacking out from the pain and puking all over myself" (11-5-17). Similarly, another woman said:

> "We were told we would go back to normal and it won't affect us but they were wrong!!! All I feel is emptiness and hatred. I used to be the happiest most positive girl. All I want is to take it back" (12-15-14).

Even if women did not explicitly report feeling deceived, many women stated that they were inadequately prepared about what to expect. For instance, one woman said: "I knew to expect blood clotting, but nothing could've prepared me for seeing her body. It was the color of my own skin, and was actually starting to look like a person" (1-8-16). Within women's narratives, they expressed a desire for more detailed information about things such as: potential side effects, the intensity of cramping and bleeding, what to do after passing the baby, and potential negative emotions (e.g., fear, uncertainty, sadness, pain) felt after the abortion. When this comprehensive information was not communicated to them prior to taking the pills at home, women reported feeling misled, misinformed, and even deceived. These types of experiences and feelings after having had a medication abortion remain centrifugal discourses that are muted within the abortion debate.

### Identity after medication abortion: Relief vs. regret

A third site of dialectical struggle was found in women's talk about their identity after the medication abortion. Most women (N = 81; 83%) reported that their medication abortion changed them, which is not surprising given the name of the website: *Abortion Changes You*. Of noteworthy significance is understanding *how* women talked about these changes and the tension evident in this part of their narrative. Of the 81 women (83%) who stated feeling *changed* after their medication abortion, 75 women (77%) reported being changed in a negative way. Here, women said things like: "I really thought that I could somehow go back to the way things were before finding out I was pregnant. But I cannot. I am not the same person, and my husband is certainly not the same either" (7–11-11). Negative changes often occurred when women's



actual abortion experience did not align with their preconceived ideas about what to expect. These ideas were informed by larger discourses from society, as well as messages from others (e.g., health care providers). Three women indicated a positive change after their abortion by noting something like:

"Abortion did change my life … As soon as the stomach cramps (only slightly worse than regular menstrual pains) went away, I felt like a whole new person. I couldn't believe how much energy I had again. It was like waking out of a deep depression" (7-1-15).

Positive changes were denoted by experiencing an initial sense of relief with no longer being pregnant. Finally, three women were ambivalent or didn't report their change as positive or negative. One woman said: "I truly believe there is no right and wrong with this situation, it is a life changer but it's your choice" (9-7-10).

Women discussed various issues when talking about change: impact on their emotional health as a result of the abortion, differences in their relationship with their partner/spouse, and new perspectives on their general views of abortion. However, conflicting emotions were evident across all women's blog posts. For instance, one woman said:

"I went home and confessed to my mother … She helped pull the gigantic blood clots from my body … No one told me it would be like this; the clinic simply gave me what I asked for without telling me what it entailed" (7-20-16).

Similarly, another woman recounted: "I thought maybe after the due date I would feel better, but it doesn't end there. It NEVER ends! The pain and emptiness stays there forever" (4–30-17). In these different accounts, the women alluded to their initial expectations of what the medication abortion would entail or what others told them would happen after their abortion. When a woman's actual medication abortion experience did not align with these messages, women felt disempowered, vulnerable, lost, upset, and sometimes deceived.

When discussing the changes experienced after the abortion, many women talked about emotional changes. One woman said:

"At first it all seemed like a weight had been lifted and everything was okay then I started to feel really sad and low and now all I do is think about how many weeks pregnant I would have been and what my baby would look like and I miss so much" (4-26-10).

As mentioned, processing one's abortion experience was emotional and took time. Some women wrestled with experiencing negative and difficult emotions after having their abortion. In fact, 37 women (38%) explicitly stated problems with anxiety, depression, drug abuse, and suicidal thoughts as a result of the abortion. For example, one woman said: "I am haunted by the image of my tiny baby. I always will be. I cut myself and even wanted to die" (3–22-13). Another woman recounted: "Looking at my kids thinking of another beautiful child. Couldn't live with myself. Wishing God would take my life" (12–16-11). Collectively, these exemplars illustrate women's emotional changes about processing of their medication abortion.

Finally, 75 women (77%) explicitly stated that they regretted their decision to have an abortion. However, the

term regret was rife with contradiction and also included talk about initial relief. For instance, one woman said: "I know I did the right thing for myself and it would be a lot harder for me right now. But I still would give anything to go back in time and keep my baby" (11–19-12). Regret was regarded as a process that was realized over time and through one's life experience. One woman stated: "Had I known how badly I would feel now, I would have kept the baby, even if I had to go through it alone" (10–21-15). Another woman elaborated upon this process by saying:

"Knowing what I know now at almost a year later I would not have the abortion. That was my child and I should have done what I needed to do to give them a great life. I thought I had no options but I did. I should have put my child first. No matter how early the abortion is its still a growing life and i wish i had done things differently" (4-30-17).

In both accounts, women defined regret as the emotional pain, suffering, remorse, and guilt felt after the medication abortion. Yet, these emotions were often coupled with initial feelings of relief from no longer being pregnant. In sum, the decision to have a medication abortion was significant, transformative, and lifechanging for these women. One woman noted this change by saying: "From the outside, our life looks exactly the same as it would have. But on the inside, everything has changed for me" (10–21-15). Collectively, these accounts expose how the different emotional changes resulted in a lived, dialectical tension between their life before the abortion and their life after the abortion.

### Managing the comprehensive stigmatizing silence: Silence vs. openness

Across women's narratives, there existed an overarching dialectical tension of *silence* vs. *openness*, which was difficult for many women to manage when interacting with others. In this struggle, women shared how their medication abortion was often a solo, private experience that was not openly shared with others. Many women decided *not* to inform certain family members about their pregnancy and abortion. Women noted feelings of shame, embarrassment, worry, or fear as some of the reasons for not telling others. Along with stating these emotions, women said things like: "I never told the father and I don't intend to" (8-4-17); "I don't know if I will ever tell my husband and children about what I did" (2–11-12); or "I couldn't talk to my family" (3–16-17). The initial decision to remain silent made it difficult to talk openly with others about their feelings and experiences after their medication abortion. Silence was also experienced in other ways: one woman was glad she was home alone during her abortion so no one could hear her, while a different woman left the abortion clinic and began crying and said, "why is there so much silence here?" as she was taking her pill alone in her bathroom at home.

Even if women did allow certain family members to become privy to their abortion decision, openly discussing their feelings after the abortion remained difficult. When talking with others, one woman said: "I love my husband but it is beyond difficult for me to talk to him about this,

EX. 20 pg. 08

because I know he wants nothing more than to just move on from this" (4–28-18). A different woman recounted: "My close friends know here but I don't really feel I can talk to them about it. I don't feel like i can talk to anyone about it" (2-9-13). Despite these women's desires to talk about their abortion, others (e.g., the baby's father, their husband, family members) refused to engage in conversation with them. As a result, women said things like: "I feel like I have no one to speak to about it since he doesn't think about it the way I do" (9-8-15), and "I try to talk about it with my family and the baby's dad but they all tell me it's in the past" (10–28-17).

Oftentimes, certain dates (such as their child's due date) or friends with other babies who are of similar age to their "would-have-been child" led to triggering events where women desired to express their feelings with others, but felt like they couldn't talk openly. For instance, one woman said: "But I haven't really been able to share the true regret and near constant jealousy of my loved ones engagements or pregnancies" (11–21-16). Another woman stated: "I knew I had to have an abortion, but these feelings I have right now I never imagined I'd have. I don't want to go out, I don't want to tell anyone, all I feel like doing is crying" (7-8-18). Thus, the isolation and silence leading up to her own medication abortion continued to pervade after the abortion, creating additional communication challenges with freely expressing her emotions with family and friends.

Silence was often described as being frustrating and challenging. In fact, 59 women (60%) reported feelings of isolation and alienation. As a result, some women personally attacked themselves. For example, one woman said: "I feel like I'm living a lie I get up get ready for work get my family up like normal the days go on like normal but I'm not normal I killed my baby I'm a monster!!" (3–14-17). Similarly, a different woman wrote: "As a mom I feel like a monster and I have to act like nothing happened" (4–18-17). These demeaning language choices (e.g., monster, killer) are present in the distal-already-spoken societal discourses about abortion. Women's awareness of these larger discourses led some women to write about their intentional use of selective language choices when talking about their abortion with others. One woman shared: "I tried to find an OBGYN that could see me ASAP. I went in and told them I had a miscarriage because I was ashamed of the truth of what I did" (3–21-18). Finally, some women reported struggling in silence by saying things like: "I am in desperate need of assistance and I am too embarrassed to attend an in person support group" (11–21-16), and "And when I got home, I had to hold it all in. I was so ashamed of my choice. I couldn't let anyone know" (2–11-11). Even though these women were able to anonymously write about their abortion on this website, they felt muted by their loved ones because of the centripetal discourses of shame and embarrassment associated with abortion.

## Discussion

A national study that assessed women's support for and interest in alternative models of abortion provision found that about half of

U.S. women are supportive of and nearly one-third are interested in medication abortion (Biggs et al., 2019). The growing interest and practice in this type of abortion provision warrant scholars to understand women's experiences. Our study is the first in the U.S. to conduct a case analysis of women's online blogging narratives about having had a medication abortion. We focused on understanding the discursive dynamics and contradictions that influenced and shaped women's talk about their own experiences. Our analysis rendered four sites of dialectical tension: *only choice* vs. *other alternatives, unprepared* vs. *knowledgeable, relief* vs. *regret*, and *silence* vs. *openness*. Each site of struggle characterized a different stage of women's medication abortion narrative: the decision, the medication abortion process, after-abortion identity, and the general stigmatizing silence associated with abortion.

As other scholars have noted (Kimport & Doty, 2019), we found that women relied upon language choices that aligned with the existing ideological frameworks from both the Right to Life and Right to Choice movements. For instance, some women used the words "fetal tissue," while other women used the word "baby" when referencing their pregnancy. Women also explicitly mentioned distal already-spoken messages from both movements about how they were told "it's just a pill" or "I've killed my baby." Such language choices are not idle linguistic distinctions, but rather indicate a woman's awareness of the different semantics and terminology surrounding the larger cultural narratives about abortion. This awareness was particularly evident when women discussed the overarching silence stigmatizing one's abilities to openly talk with family and friends about their medication abortion experience. Thus, women's talk about their own personal experiences, their justification for having an abortion, and their own sense-making after the medication abortion were shaped by the available heuristics and frames from larger cultural discourses and political movements (Kimport & Doty, 2019).

Cultural narratives of abortion are powerful and construct meaning and truth (Ludlow, 2008). While a woman's personal story about her medication abortion is individual and now occurs in a more private setting (e.g., at home), this experience remains social and political, defined, and reified by larger cultural narratives and semantics (Beynon-Jones, 2017; Cockrill & Nack, 2013). The sexual liberalism script that reflects positive attitudes toward nontraditional sexual behaviors influences individual's attitudes about abortion (Tokunaga et al., 2015), as well as their own narratives about medication abortion. We found evidence of these larger discourses within women's talk about their own medication abortion, and in particular, their rationale for their decision, their description of the medication abortion process, their reflections on their identity after the abortion, and the overall stigmatizing silence resulting in a muted voice and the public illegitimacy of their own narrative. For instance, many of the justifiable reasons recounted by women in this case study for having an abortion align with the centripetal discourses of the Right to Choice movement regarding bodily rights and a woman's freedom of choice. Among women having abortions in the U.S., finances and lack of readiness are the most commonly cited reasons for choosing abortion (Finer et al., 2005).

The presence of larger cultural narratives can result in dialectical tensions as one seeks to construct her own abortion narrative and considers disclosing that narrative to others. In

particular, many women described experiencing both relief and regret after their abortion. Historically, these two emotions have been juxtaposed and positioned as binary emotions that are socially and politically aligned (Ehrlich & Doan, 2019). The Right to Choice movement discourse aligns with the notion that abortion proffers emotional relief, whereas the Right to Life movement discourse positions itself with abortion resulting in regret. This polarized alignment and framing results in both movements speaking different languages and never fully listening nor engaging with the other (Wiederhold, 2014). One proposed origin of this framing dates back to the legal reasoning of the 2007 U.S. Supreme Court case *Gonzales v. Carhart*, where the federal partial-birth abortion ban was upheld. However, our analysis of women's narratives post-medication abortion exposes the complex duality of these two emotions often being experienced in tandem, as opposed to being simplistic binaries. The either-or, unidimensional script from both the Right to Choice and Right to Life movements – abortion provides either relief or results in regret – fueled a sense of tension for many of the women as they processed their identity after the abortion and considered openly disclosing those private experiences with others. Thus, these women's narratives illustrate that one's individual experiences with having had a medication abortion may result in a both/and: initial relief coupled with later regret. A reliance upon political movement discourses to construct one's own narrative may continue to marginalize or invalidate one's own private medication abortion experience when the larger scripts remain politically charged and polarized (LaRoche & Foster, 2018).

The stigma and risk that characterize the topic of abortion are influenced and shaped by the larger centrifugal discourses from both the Right to Choice and Right to Life movements (Beynon-Jones, 2017; Cockrill & Nack, 2013). For example, Cockrill and Nack (2013) found that women seeking an abortion often attempt to manage the stigma of abortion through non-disclosure, stating their reasons for having an abortion as "exceptional" and necessary, or condemning the Right to Life perspectives about abortion. In a different study on Southside Chicago African-American adolescent females, the majority of sexually active teens never talked with their parents about the topic of abortion, and almost 20% expressed fears of harm or eviction if their parent were to learn of an abortion in their past (Sisco et al., 2014). In our case study, we found that women also experienced stigma, silence, and fear that led them to remain private and/or secretive with certain individuals throughout their medication abortion experience. Silence before or during the medication abortion process resulted in women experiencing additional challenges later on with talking openly about one's experiences. Altogether, these findings align with communication scholars who have found that when private health information disclosures are deemed as being threatening or stigmatizing, one's private health information remains concealed (Baxter & Akkoor, 2011; Ebersole & Hernandez, 2016). This is important because secrecy of one's abortion is associated with poorer coping (Major & Gramzow, 1999; Major et al., 1997), and may result in further isolation and lack of social support from others (Cockrill & Biggs, 2017).

Recent movements such as Shout Your Abortion and #YouKnowMe have tried to dispel the stigma and silence surrounding abortion. However, these movements remain politically aligned and purport the "American Dream" abortion narrative: I was able to go to college/graduate/get a good job due to my abortion. These more recent public narratives frame abortion as a restitution or quest experience (Frank, 1995), where women are portrayed as being able to return to normalcy and good health, or regard their abortion story as one part of their personal journey that they were able to overcome. While such discourses were evident in some women's blogs and have been shown to reduce abortion stigma when openly disclosed (Cockrill & Biggs, 2017), many women's narratives within this case study characterized chaos narratives (Frank, 1995) where the abortion experience interrupted their daily lives and left them feeling out of control. Most notably, over 50% of the sample reported that the father to their child or other family members used negating language as a means to justify a woman's need for an abortion, albeit her own desires to keep her baby. In addition, 75 women (77%) regretted their decision, and 37 women (38%) reported struggling with mental illness and suicidal thoughts after the abortion. While previous scholarship has also found evidence of some women experiencing negative outcomes after an abortion due to a lack of decision-making power and limited social support (Kimport et al., 2011), as well as possible significant relationships between abortion and mental health problems (see Fergusson et al., 2013; Reardon, 2018), these centrifugal discourses remain muted and marginalized in the U.S. abortion debate.

### Limitations and directions for future research

As with all scholarship there are limitations. Most notably, there is a lack of generalizability due to the limited scope: we only analyzed women's medication abortion narratives anonymously posted to one website. However, it is important to note that the purpose of this project was to make analytic generalizations based on gathering an in-depth descriptive understanding of these women's medication abortion narratives. Second, all qualitative case studies are limited by the sensitivity and integrity of the investigators. We attempted to surmount this obstacle by having three qualitatively trained female researchers who completed independent coding and collectively participated in the contrapuntal analysis process. Third, case study research is criticized for not having a clear set of systematic procedures (Yin, 2014). To address this concern, we sought to clarify and provide transparency with the methodological techniques used. Fourth, the anonymity of women's blog submissions to the website did not allow us to gather and report the social demographics of the women who anonymously shared their abortion narratives, which again hinders the generalizability of our findings. Finally, the population of women who write an anonymous post about their abortion experience may be different from those who do not.

All of these limitations provide avenues for future research. Most importantly, this single case study demonstrates the need for a broader, pluralistic, mixed-method research strategy that


assesses women's medication abortion narratives, particularly given its increased popularity amongst women seeking this type of abortion provision. Such research could interview women who have had a medication abortion, as well as use surveys to assess different variables such as demographic factors, health literacy, and privacy management strategies employed when talking about one's medication abortion.

## Conclusion

n sum, our findings show that the medication abortion experience is rife with tension and contradiction. This complexity and duality are not evident in much of the larger cultural discourses and political debates about abortion. Many women in this case study noted that their decision to have a medication abortion was not a flippant decision or an easy choice where women remained unscathed. Women's narratives about their medication abortion experience were complex, and no singular narrative fully encapsulated or defined what women experienced during and after their medication abortion. Therefore, it is critical to transcend the silence in order to expose both sides of the debate and understand how these larger discourses influenced women's personal language choices when constructing their own abortion narrative and anonymously sharing it with others online. The tensions and dialectical struggles experienced after having a medication abortion and attempting to share it with others remain silent from public discourse and debate (Hallgarten, 2018). Presently, this silence positions one's abortion story as an either-or, binary experience that is politically aligned with one movement or another. The larger discourses prevalent within both the Right to Life and Right to Choice movements impact the liminality of women who are contemplating a medication abortion and affect their own narrative reconstruction and sense-making after their private medication abortion.

## Acknowledgments

We would like to thank Chuck Donovan, Michaelene Fredenburg, and Genevieve Plaster for their support and assistance throughout the entire research process. We also want to thank Caroline Funk for her assistance with data analysis. In addition, we would like to recognize the women, who through their own accord and as separate from this research study, chose to publicly share their story online.

## References

Abortion Changes You. (n.d.). Stories. https://www.abortionchangesyou.com/stories

Altshuler, A. L., Ojanen-Goldsmith, A., Blumenthal, P. D., & Freedman, L. R. (2017). A good abortion experience: A qualitative exploration of women's needs and preferences in clinical care. Social Science Medicine, 191(1), 109–116. https://doi.org/10.1016/j.socscimed.2017.09.010

Arden Ford, L., Golden, M. A., & Berlin Ray, E. (2014). The case study in health communication research. In B. B. Whaley (Ed.), Research methods in health communication: Principles and application (pp. 41–56). Routledge.

Baxter, L. A. (2011). Voicing relationships: A dialogic perspective. Sage.

Baxter, L. A., & Akkoor, C. (2011). Topic expansiveness and family communication patterns. Journal of Family Communication, 11(1), 1–20. https://doi.org/10.1080/15267431003773523

Becker, K. A., & Freburg, K. (2014). Medical student storytelling on an institutional blog: A case study analysis. Medical Teacher, 36(5), 415–421. https://doi.org/10.3109/0142159X.2014.891001

Beynon-Jones, S. M. (2017). Untroubling abortion: A discourse analysis of women's accounts. Feminism & Psychology, 27(2), 225–242. https://doi.org/10.1177/0959353517696515

Biggs, M. A., Ralph, L., Raifman, S., Foster, D. G., & Grossman, D. (2019). Support for and interest in alternative models of medication abortion provision among a national probability sample of U.S. women. Contraception, 99(2), 118–124. https://doi.org/10.1016/j.contraception.2018.10.007

Braun, V., & Clarke, V. (2006). Using thematic analysis in psychology. Qualitative Research in Psychology, 3(2), 77–101. https://doi.org/10.1191/1478088706qp063oa

Cockrill, K., & Biggs, A. (2017). Can stories reduce abortion stigma? Findings from a longitudinal cohort study. Culture, Health & Sexuality, 20(3), 335–350. https://doi.org/10.1080/13691058.2017.1346202

Cockrill, K., & Nack, A. (2013). "I'm not that type of person": Managing the stigma of having an abortion. Deviant Behavior, 34(12), 973–990. https://psycnet.apa.org/doi/10.1080/01639625.2013.800423

Ebersole, D. S., & Hernandez, R. A. (2016). "Taking good care of our health": Parent-adolescent perceptions of boundary management about health information. Communication Quarterly, 64(5), 573–595. https://doi.org/10.1080/01463373.2016.1176939

Ehrlich, J. S., & Doan, A. E. (2019). Abortion regret: The new attack on reproductive freedom. Praeger. http://publisher.abc-clio.com/9781440839856

Fergusson, D. M., Horwood, J. L., & Boden, J. M. (2013). Does abortion reduce the mental health risks of unwanted or unintended pregnancy? A re-appraisal of the evidence. Australian & New Zealand Journal of Psychiatry, 47(9), 819–827. https://doi.org/10.1177/0004867413484597

Finer, L. B., Frohwirth, L. F., Dauphinee, L. A., Singh, S., & Moore, A. M. (2005). Reasons U.S. women have abortions: Quantitative and qualitative perspectives. Perspectives on Sexual and Reproductive Health, 37(3), 110–118. https://doi.org/10.1363/psrh.37.110.05

Frank, A. W. (1995). The wounded storyteller: Body, illness and ethics. University of Chicago Press.

Hallgarten, L. (2018). Abortion narratives: Moving from statistics to stories. The Lancet, 391(10134), 1988–1989. https://doi.org/10.1016/S0140-6736(18)31036-5

Hedqvist, M., Brolin, L., Tydén, T., & Larsson, M. (2016). Women's experiences of having an early medical abortion at home. Sexual & Reproductive Healthcare, 9(1), 48–54. https://doi.org/10.1016/j.srhc.2016.07.003

Jones, H. E., O'Connell White, K., Norman, W. V., Guilbert, E., Lichtenberg, E. S., & Paul, M. (2017). First trimester medication abortion practice in the United States and Canada. PloS One, 12(10), e0186487. https://doi.org/10.1371/journal.pone.0186487

Jones, M., & Alony, I. (2008). Blogs – The new source of data analysis. Journal of Issues in Informing Science and Information Technology, 5(1), 433–446. https://doi.org/10.28945/1019

Jones, R. K., & Jerman, J. (2017). Population group abortion rates and lifetime incidence of abortion: United States, 2008–2014. American Journal of Public Health, 107(12), 1904–1909. https://doi.org/10.2105/AJPH.2017.304042

Jones, R. K., Zolna, M. R. S., Henshaw, S. K., & Finer, L. B. (2008). Abortion in the United States: Incidence and access to services, 2005. Perspectives on Sexual and Reproductive Health, 40(1), 6–16. https://doi.org/10.1363/4000608

Jones, R. K., Witwer, E., & Jerman, J. (2019, September). Abortion incidence and service availability in the United States, 2017. Guttmacher institute. https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017

Kimport, K., Cockrill, K., & Weitz, T. A. (2012). Analyzing the impacts of abortion clinic structures and processes: A qualitative analysis of women's negative experience of abortion clinics. Contraception, 85(2), 204–210. https://doi.org/10.1016/j.contraception.2011.05.020

Kimport, K., & Doty, C. (2019). Interpreting the truth: How people make sense of new information about abortion. Women's Health Issues, 29(2), 182–187. https://doi.org/10.1016/j.whi.2019.01.004

Kimport, K., Foster, K., & Weitz, T. A. (2011). Social sources of women's emotional difficulty after abortion: Lessons from women's abortion narratives. *Perspectives on Sexual and Reproductive Health*, *43*(2), 103–109. https://doi.org/10.1363/4310311

Langellier, K. M., & Peterson, E. E. (2004). *Performing narrative: Storytelling in daily life*. Temple University Press.

LaRoche, K. J., & Roche, A. M. (2018). *Exploring Canadian women's multiple abortion experiences: Implications for reducing stigma and improving patient-centered care.*

Lincoln, Y., & Guba, E. (1985). *Naturalistic inquiry*. Sage.

Ludlow, J. (2008). The things we cannot say: Witnessing the traumatization of abortion in the United States. *WSQ: Women's Studies Quarterly*, *36*(1–2), 28–41. https://doi.org/10.1353/wsq.0.0057

Major, B., & Gramzow, R. H. (1999). Abortion as stigma: Cognitive and emotional implications of concealment. *Journal of Personality and Social Psychology*, *77*(4), 735–745. https://psycnet.apa.org/doi/10.1037/0022-3514.77.4.735

Major, B., Zubek, J., Cooper, L. M., Cozzarelli, C., & Richards, C. (1997). Mixed messages: Implications of social conflict and social support within close relationships for adjustment to a stressful life event. *Journal of Personality and Social Psychology*, *72*(6), 1349–1363. https://psycnet.apa.org/doi/10.1037/0022-3514.72.6.1349

Mead, H. (1982). *The individual and the social self: Unpublished work of George Herbert Mead* (D. L. Miller, Edited by). University of Chicago.

Newton, D., Bayly, C., McNamee, K., Hardiman, A., Bismark, M., Webster, A., & Keogh, L. (2016). How do women seeking abortion choose between surgical and medical abortion? Perspectives from abortion service providers. *Australian and New Zealand Journal of Obstetrics and Gynecology*, *56*(5), 523–529. https://doi.org/http://dx.doi.org/10.1111/ajo.12506

Norander, S., & Brandhorst, J. (2017). Case Study. In M. Allen (Ed.), *The SAGE encyclopedia of communication research methods* (pp. 117–119). Sage.

Orbe, M. (2005). Continuing the legacy of theorizing from the margins: Conceptualizations of co-cultural theory. *Women & Language*, *28*(2), 65–66.

Orbe, M. P. (1998). From the standpoint(s) of traditionally muted groups: Explicating a co-cultural communication theoretical model.

*Communication Theory*, *8*(1), 1–26. https://doi.org/10.1111/j.1468-2885.1998.tb00209.x

Reardon, D. C. (2018). The abortion and mental health controversy: A comprehensive literature review of common ground agreements, disagreements, actionable recommendations, and research opportunities. *SAGE Open Medicine*, *6*(1), 1–38. https://doi.org/10.1177/2050312118807624

Saldaña, J. (2013). *The coding manual for qualitative researchers* (2nd ed.). Sage.

Sisco, K. M., Martins, S. L., Kavanagh, E. K., & Gilliam, M. L. (2014). Parent-daughter communication about abortion among non-pregnant African-American adolescent females. *Journal of Adolescent Health*, *55*(6), 835–841. https://doi.org/10.1016/j.jadohealth.2014.07.010

Stormer, N. (2010). A likely past: Abortion, social data, and a collective memory of secrets in 1950s America. *Communication and Critical/Cultural Studies*, *7*(4), 337–359. https://doi.org/10.1080/14791420.2010.523430

Strauss, A., & Corbin, J. (1990). *Basics of qualitative research: Grounded theory procedures and techniques*. Sage.

Tokunaga, R. S., Wright, P. J., & McKinley, C. J. (2015). U.S. adults' pornography viewing and support for abortion: A three-wave panel study. *Health Communication*, *30*(6), 577–588. https://doi.org/10.1080/10410236.2013.875867

Tracy, S. J. (2013). *Qualitative research methods: Collecting evidence, crafting analysis, communicating impact*. Wiley-Blackwell.

Tyler, J. A. (2007). Incorporating storytelling into practice: How HDR practitioners foster strategic storytelling. *Human Resource Development Quarterly*, *18*(4), 559–587. https://doi.org/10.1002/hrdq.1219

Upadhyay, U. D., Desai, S., Zlidar, V., Weitz, T. A., Grossman, D., Anderson, P., & Taylor, D. (2015). Incidence of emergency department visits and complications after abortion. *Obstetrics and Gynecology*, *125*(1), 175–183. https://doi.org/10.1097/AOG.0000000000000603

Wiederhold, A. M. (2014). Narrative spaces between intractability outside the clinic. *Health Communication*, *29*(7), 741–744. https://doi.org/10.1080/10410236.2013.769661

Yin, R. K. (2014). *Case study research: Design and methods*. Sage.

Alliance.App. 320

View publication stats

# Exhibit 22

New Drug, Antibiotic, and Biological Drug Product
Regulations; Accelerated Approval, 57 Fed. Reg. 58942
(Dec. 11, 1992)

**58942**    Federal Register / Vol. 57, No. 239 / Friday, December 11, 1992 / Rules and Regulations

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

**21 CFR Parts 314 and 601**

[Docket No. 91N–0278]

RIN 0905–AD66

**New Drug, Antibiotic, and Biological Drug Product Regulations; Accelerated Approval**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is issuing final regulations under which the agency will accelerate approval of certain new drugs and biological products for serious or life-threatening illnesses, with provisions for any necessary continued study of the drugs' clinical benefits after approval or with restrictions on use, if necessary. These new procedures are intended to provide expedited marketing of drugs for patients suffering from such illnesses when the drugs provide meaningful therapeutic benefit compared to existing treatment. Accelerated approval will be considered in two situations: (1) When approval can be reliably based on evidence from adequate and well-controlled studies of the drug's effect on a surrogate endpoint that reasonably suggests clinical benefit or on evidence of the drug's effect on a clinical endpoint other than survival or irreversible morbidity, pending completion of studies to establish and define the degree of clinical benefits to patients; and (2) when FDA determines that a drug, effective for the treatment of a disease, can be used safely only if distribution or use is modified or restricted. Drugs or biological products approved under these procedures will have met the requisite standards for safety and effectiveness under the Federal Food, Drug, and Cosmetic Act (the act) or the Public Health Service Act (the PHS Act) and, thus, will have full approval for marketing.

**EFFECTIVE DATE:** January 11, 1993.

**FOR FURTHER INFORMATION CONTACT:**
Marilyn L. Watson, Center for Drug Evaluation and Research (HFD–360), Food and Drug Administration, 7500 Standish Pl., Rockville, MD 20855, 301–295–8038.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In the Federal Register of April 15, 1992 (57 FR 13234), FDA published proposed procedures under which the agency would accelerate approval of certain new drugs and biological products for serious or life-threatening illnesses, with provision for required continued study of the drugs' clinical benefits after approval or for restrictions on distribution or use, where those are necessary for safe use of the drugs. FDA provided 60 days for public comment, and, upon request, in the Federal Register of June 18, 1992 (57 FR 27202), extended the comment period for an additional 30 days until July 15, 1992. The final rule incorporates all of the provisions of the proposed rule and provides additional clarification regarding both timing and content of the submissions of promotional materials and regarding the nature of required postmarketing studies. The agency has added a new provision clarifying when certain postmarketing requirements of the rule will be terminated.

Highlights of the final rule are summarized below, followed by a summary and discussion of the comments.

## II. Highlights of the Final Rule

This final rule establishes procedures under parts 314 and 601 (21 CFR parts 314 and 601) under which FDA will accelerate approval of certain new drugs and biological products for serious or life-threatening illnesses, with provision for required continued study of the drugs' clinical benefits after approval or for restrictions on distribution or use, where those are necessary for safe use of the drugs. These procedures are intended to provide expedited marketing of drugs for patients suffering from such illnesses when the drugs provide meaningful therapeutic advantage over existing treatment. The preamble of the proposed rule (57 FR 13234) provides a description of other mechanisms available to facilitate access, speed development, and expedite review of therapeutic products (e.g., treatment investigational new drug applications (IND's), subpart E, parallel track). Where appropriate, these mechanisms can be utilized in concert with accelerated approval. The major provisions of the final rule are as follows:

### A. Scope

The new procedures apply to certain new drug, antibiotic, and biological products used in the treatment of serious or life-threatening diseases, where the products provide meaningful therapeutic advantage over existing treatment (21 CFR 314.500 and 601.40).

### B. Criteria for Approval

Accelerated approval will be considered in two situations: (1) When approval can be reliably based on evidence of the drug's effect on a surrogate endpoint that reasonably suggests clinical benefit or on evidence of the drug's effect on a clinical endpoint other than survival or irreversible morbidity, pending completion of studies to establish and define the degree of clinical benefits to patients; and (2) when FDA determines that a drug, effective for the treatment of a disease, can be used safely only if distribution or use is modified or restricted. Drugs or biological products approved under this final rule will have met the requisite standards for safety and effectiveness under the act or the PHS Act and, thus, will have full approval for marketing (21 CFR 314.510, 314.520, 601.41, and 601.42). Ordinarily, products used to treat serious or life-threatening illnesses, for which approval is based on a surrogate endpoint that is recognized as validated by definitive studies, will be considered for approval under the traditional process rather than under accelerated approval.

### C. Postmarketing Studies

Where a drug's approval under these provisions is based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity, the applicant will be required to conduct clinical studies necessary to verify and describe the drug's clinical benefit and to resolve remaining uncertainty as to the relation of the surrogate endpoint upon which approval was based to clinical benefit, or the observed clinical benefit to ultimate outcome. The requirement for any additional study to demonstrate actual clinical benefit will not be more stringent than those that would normally be required for marketing approval; it is expected that the studies will usually be underway at the time of approval. The proposed regulations have been revised to clarify that required postmarketing studies must also be adequate and well-controlled (21 CFR 314.510 and 601.41).

### D. Restrictions on Use After Marketing

FDA may grant marketing approval of a drug or biological product shown to be effective where safe use can only be assured if distribution or use is restricted. Under this final rule, FDA may: (1) Restrict distribution to certain facilities or to physicians with special training or experience, or (2) condition distribution on the performance of

EX. 22 pg.01

Case 2:22-cv-00223-Z    Document 1-33    Filed 11/18/22    Page 3 of 29    PageID 491

specified medical procedures. The restrictions on use will be tailored to the specific safety issue raised by the particular drug or biological product and agreed to by the applicant at the time of approval (21 CFR 314.520 and 601.42). FDA expects that the imposition of these restrictions on distribution will be rare.

### E. Promotional Materials

The final rule requires submission of planned promotional materials, including promotional labeling and advertisements, both prior to approval (reflecting the initial campaign), and following approval, unless informed by the agency that such submission is no longer necessary, at least 30 days before the intended time of initial dissemination of the promotional labeling or initial publication of the advertisement (21 CFR 314.550 and 601.45).

### F. Withdrawal of Approval

The final rule establishes an expedited procedure for the withdrawal of approval if: (1) Postmarketing clinical studies fail to verify clinical benefit; (2) the applicant fails to perform the required postmarketing study with due diligence; (3) use after marketing demonstrates that postmarketing restrictions are inadequate to ensure safe use of the drug or biological product; (4) the applicant fails to adhere to the postmarketing restrictions agreed upon; (5) the promotional materials are false or misleading; or (6) other evidence demonstrates that the drug or biological product is not shown to be safe or effective under its conditions of use (21 CFR 314.530 and 601.43).

### G. Termination of Requirements

In response to comments, the final rule provides that the requirements set forth in §§ 314.520, 314.530, and 314.550 for new drugs and antibiotics and §§ 601.42, 601.43, and 601.45 for biological products ordinarily will terminate when FDA determines that the results of required postmarketing studies have demonstrated that the drug or biological product has clinical benefit, or, where restrictions on distribution or use have been imposed, when FDA determines that safe use of the drug or biological product can be ensured without such restrictions, e.g., through appropriate labeling. FDA will notify the applicant when these requirements no longer apply (21 CFR 314.560 and 601.46).

### III. Effective Date

This regulation will become effective on January 11, 1993.

### IV. Comments on the Proposed Rule

FDA received 54 comments on the proposed rule. The comments came from individuals, specific disease organizations, universities, pharmaceutical manufacturers, trade associations, health professionals, and professional societies. The comments reflect broad support and acceptance of the goal of expediting the approval of drugs intended for the treatment of serious and life-threatening illnesses. A number of comments asked that the proposal be finalized expeditiously without change. Many comments posed specific questions and raised important concerns.

### A. General Comments

1. One comment suggested that the term "conditional approval" was less confusing and ambiguous than the term "accelerated approval." The comment also referred to the statement in the proposal that "Drugs * * * approved under this proposal will have met the requisite standards * * * under the (act)" and argued that because postmarketing conditions may be imposed, this statement can only be read to say that the requisite standards under the act can only be met by a lower standard of evidence in hand, combined with assurance that further evidence will be obtained.

Another comment expressed concern that the proposal appears to establish a standard for the evaluation of drug product effectiveness that is inconsistent with the substantial evidence requirement of section 505(d) of the act (21 U.S.C. 355(d)), which means "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling * * *." The comment argued that, with few exceptions, the agency has consistently interpreted the "substantial evidence" requirement as an instruction that determinations of effectiveness be based on data unambiguously reflecting the clinical status of subjects evaluated under controlled conditions in bona fide clinical experiments. In the absence of compelling empirical evidence documenting that a drug-induced change in a surrogate measure reliably and consistently predicts improved

clinical outcome, a surrogate indicator is no more than a hypothetical construct. The comment asserted that the proposed rule's endorsement of the use of unvalidated surrogate endpoints, therefore, appears to represent a significant departure from traditional agency interpretations of "substantial evidence" within the meaning of the act because it allows belief rather than evidence to serve as the basis for a conclusion about the effectiveness of a new drug.

Three comments asserted that the new regulations are not needed to approve drugs intended to treat serious or life-threatening illnesses. Two comments cited FDA's approval, without new regulations, of didanosine (formerly called ddI) and zalcitabine (formerly called ddc) in combination with zidovudine (formerly called AZT) based on a surrogate marker, i.e., an increase in CD4 cell counts and the "subpart E" procedures at 21 CFR part 312, which address the need for expediting the development, evaluation, and marketing of new therapies intended to treat life-threatening or severely debilitating illnesses as examples of existing mechanisms for the expedited approval of important new drugs. One comment argued that the act requires that drugs be shown to be "safe" and "effective," and proof of effectiveness is not limited by the act to demonstration of an effect on "survival or irreversible morbidity," as the proposed rule seems to assume. The comment further argued that FDA has considerable statutory discretion to define what type of data constitutes proof of effectiveness, and demonstration of an effect on a surrogate marker is one type of such proof.

The agency believes that what the procedures are called is much less important than what the procedures are. The shorthand term selected by the agency reflects the intent of the rule, especially that part related to use of surrogate markers, which is to make drugs that provide meaningful improvement over existing therapies for serious illnesses widely available (through marketing) at the earliest time consistent with the law. The essence of the proposal is thus acceleration, not the imposition of conditions. Approval under these procedures is dependent on compliance with certain additional requirements, such as timely completion of studies to document the expected clinical benefit. The evidence available at the time of approval under this rule will meet the statutory standard, in that there must be evidence from adequate and well-controlled studies showing that the drug will have

the effect it is represented to have in its labeling. That effect will, in this case, be an effect on a surrogate endpoint that is reasonably likely to predict a clinical benefit and labeling will refer to the effect on the surrogate, not to effect on clinical outcome.

While the act does not refer to particular endpoints or state a preference for clinical, as opposed to surrogate, endpoints, it is well established that the effect shown in well-controlled studies, must, in the judgment of the agency, be clinically meaningful. Moreover, the safety standard in the act, that a drug must be shown to be safe for its intended use, implies a risk/benefit judgment. The effect shown must be such as to outweigh the risks of the treatment under the conditions of use. Approval under this rule requires, therefore, that the effect shown be, in the judgment of the agency, clinically meaningful, and of such importance as to outweigh the risks of treatment. This judgment does not represent either a "lower standard" or one inconsistent with section 505(d) of the act, but rather an assessment about whether different types of data show that the same statutory standard has been met.

Approval based on surrogate endpoints is not new, although the issue has not previously been considered in regulations. The agency has, in a number of instances, approved drugs based on surrogate endpoints. For example, drugs for hypertension have been approved based on their effects on blood pressure rather than on survival or stroke rate. Similarly, drugs for hypercholesterolemia have been approved based on effects on serum cholesterol rather than on coronary artery disease (angina, heart attacks). But, in those cases there was very good evidence from clinical trials (in the case of hypertension) and from epidemiologic and animal studies (in the case of hypercholesterolemia) that improving the surrogate would lead to or is associated with the desired effects on morbidity and mortality. Even so, there is still today considerable debate about who will benefit from cholesterol lowering. Controlled trials assessing effects on clinical endpoints of morbidity and mortality from use of cholesterol-lowering drugs have been, and are being, conducted.

Reliance on a surrogate endpoint almost always introduces some uncertainty into the risk/benefit assessment, because clinical benefit is not measured directly and the quantitative relation of the effect on the surrogate to the clinical effect is rarely known. The expected risk/benefit relationship may fail to emerge because: (1) The identified surrogate may not in fact be causally related to clinical outcome (even though it was thought to be) or (2) the drug may have a smaller than expected benefit and a larger than expected adverse effect that could not be recognized without large-scale clinical trials of long duration. Reliance on surrogate markers therefore requires an additional measure of judgment, not only weighing benefit versus risk, as always, but also deciding what the therapeutic benefit is based upon the drug effect on the surrogate.

The sections of the final rule that address approval based upon a drug effect on a surrogate endpoint specifically clarify the regulatory approval criteria when the agency relies on a surrogate endpoint that, while "reasonably likely" to predict clinical benefit, is not as well established as the surrogates ordinarily used as bases of approval in the past. Postmarketing studies required to verify and describe actual clinical benefits would also be required to be adequate and well-controlled studies. Sections 314.510 and 601.41 have been revised to clarify this point. If, on completion of required postmarketing studies, the effect on the surrogate is not shown to correspond to a favorable effect on clinical benefit, the rule provides an expedited means of removing the drug from the market.

Approval of didanosine and zalcitabine under current procedures does not show that the rule is of no value. Although approval did rely on a surrogate endpoint that is of the kind specifically addressed by the rule, the fact that studies to define clinical benefit were nearly complete and were being conducted under the auspices of the National Institute of Allergy and Infectious Diseases made it less crucial to have additional guarantees that such studies would be conducted promptly. Moreover, the sponsors of didanosine and zalcitabine agreed prior to approval to expedited withdrawal of the drug from the market if benefit were not shown. The provisions of the final rule will ensure that appropriate safeguards exist for timely generation of data on actual clinical benefit, for appropriate promotional information about labeled indications, and for prompt withdrawal of the drug from the market if clinical benefit is not confirmed.

2. Pointing to a statement in the preamble to the proposed rule that it is in the public interest to make promising new treatments available at the earliest possible point in time for use in life-threatening and serious illnesses, one comment expressed concern that the proposed rule may lead to the marketing of large numbers of clinically ineffective, but pharmacologically active, drugs and this may not be in the interest of the public health. The comment argued that early access to so-called "promising" drugs is not the same as early access to safe and effective drugs, and the number of potential markers that may be advanced as surrogates of clinical outcome is exceedingly large. The comment suggested that it may be more appropriate to seek adoption of the proposed requirements through an amendment to the act.

FDA agrees with the contention that providing people who have serious or life-threatening illnesses with numerous clinically ineffective drugs would not be helpful. However, the agency does not agree that the rule can be expected to have this result. Although studies using surrogate endpoints may provide less assurance of clinical benefit than studies using clinical endpoints, FDA believes compliance with all of the elements of the accelerated approval program will not result in the marketing of large numbers of clinically ineffective drugs. The new procedures apply to a limited group of circumstances, namely, to drugs intended for serious or life-threatening illnesses when the drugs provide a meaningful therapeutic benefit over existing therapy. Reliance on a surrogate endpoint is not equivalent to reliance on any evidence of pharmacologic activity. The endpoint must be reasonably likely, based on epidemiologic, therapeutic, pathophysiologic, or other evidence, to predict clinical benefit.

Whether a given endpoint is, in fact, reasonably likely to predict clinical benefit is inevitably a matter of judgment. FDA, using available internal and external expertise, will have to make informed judgments in each case presented, just as it does now. The agency acknowledges that there are well-recognized reasons for caution when surrogate endpoints are relied on. Certain putative surrogates have ultimately been shown not to correspond to clinical benefit. Perhaps the most noteworthy example is the failure of antiarrhythmic agents in the Cardiac Arrhythmia Suppression Trial (CAST) to improve survival by depressing ventricular ectopic beats; effective suppression of ectopic beats was associated with increased mortality.

A sponsor must persuasively support the reasonableness of the proposed surrogate as a predictor and show how the benefits of treatment will outweigh the risks. Such presentations are likely to be persuasive only when the disease to be treated is particularly severe (so

that considerable risk is acceptable) and/or when the surrogate endpoint is well supported. In addition, it will be the sponsor's clear obligation to resolve any doubts as to clinical value by carrying out definitive studies.

FDA does not agree that it would be more appropriate to seek an amendment to the act than to adopt the proposed requirements. As discussed in the preamble to the proposed rule as well as elsewhere in this preamble to the final rule, existing provisions of the act and the PHS Act authorize promulgation of the requirements in the final regulations.

3. One comment expressed concern that because the proposed rule would establish conditions on a drug's approval, third-party payors may decline reimbursement because the so-called approval would have attributes of investigational status.

The agency expects that, because drugs approved under the accelerated approval process meet the statutory standards for safety and effectiveness, they would be eligible for reimbursement under State Medicaid programs or other third-party plans. Drug products granted accelerated approval will not be, under the law, investigational, as suggested by the comment.

4. One comment asked if all drugs considered for accelerated approval must be reviewed by an advisory committee. The comment stated that because advisory committees meet infrequently, waiting for the next meeting may slow down the approval process.

FDA is not required to consult with an advisory committee before approving an application under these accelerated approval regulations, or any other regulation. However, FDA intends to consult the appropriate committee in most instances. Advisory committee meetings can usually be scheduled to avoid significant delays in the review process. The agency will consider any request by an applicant for referral of the application to an advisory committee.

*B. Scope*

5. Four comments asked for further clarification of what diseases are covered by the rule. One comment stated that the terms "serious," and "life-threatening," are defined in the proposal by reference to 21 CFR 312.34, followed by a brief statement explaining the role of judgment and examples of diseases that are currently judged to be

serious. The comment asked that FDA also describe: (1) Diseases that are not currently included in the category of "serious," (2) examples of diseases that are currently judged "life-threatening," and (3) examples of diseases that are not currently included in the category "life-threatening."

One comment contended that the statement in the preamble that "seriousness of a disease is a matter of judgment, but generally is based on its impact on such factors as survival, day-to-day functioning, or the likelihood that the disease, if left untreated, will progress from a less severe condition to a more serious one" too narrowly limits diseases covered by the proposed rule (57 FR 13234 at 13235). The comment argued that some "less severe" diseases, even if treated, may progress to a more serious state, and that these diseases should also be covered by the rule. On the other hand, two comments argued that the language in the preamble that classifies diseases as "serious" was overly broad and subjective and far too large a number of illnesses could be eligible as being "serious."

FDA discussed the meaning of the terms "serious" and "life-threatening" in its final rules on "treatment IND's" (52 FR 19466 at 19467, May 22, 1987) and "subpart E" procedures (54 FR 41516 at 41518—41519, October 21, 1988). The use of these terms in this rule is the same as FDA defined and used the terms in those rulemakings. It would be virtually impossible to name every "serious" and "life-threatening" disease that would be within the scope of this rule. In FDA's experience with "treatment IND's" and drugs covered by the "subpart E" procedures there have not been problems in determining which diseases fall within the meaning of the terms "serious" and "life-threatening," and FDA would expect no problems under this accelerated approval program. The likelihood of progression to a serious condition with available treatments would also be considered in assessing whether the disease is within the scope of the final rule. The preamble to the proposed rule (57 FR 13234 at 13235) referred to chronic illnesses that are generally well managed by available therapy, but can have serious outcomes for certain populations or in some or all of their phases. Applicants are encouraged to consult with FDA's reviewing divisions early in the drug development process if they have questions about whether their specific product is within the scope of this rule.

The concerns expressed in these and other comments about considering too many illnesses eligible for consideration under the accelerated approval procedures may arise from the underlying fear that reliance on surrogate endpoints will become routine, the "normal" way drugs are brought to the market. This fear is groundless. The vast majority of drugs are directed at symptomatic or short-term conditions (pain, heart failure, acute infections, gastrointestinal complaints) whose response to drugs, if it occurs, is readily measured and where there is no need to consider or accept surrogate endpoints. Surrogates, with few exceptions, are of interest in the following situations: (1) Where the clinical benefit, if there is one, is likely to be well in the future; and (2) where the implications of the effect on the surrogate are great because the disease has no treatment at all or the drug seems to treat people with no alternative (e.g., because they cannot tolerate the usual effective treatment). In the first case, great care is needed, and would be given, as there would generally be no experience linking an effect on the surrogate to clinical success, and there have been conspicuous examples of lack of linkage (CAST, referred to above; drugs that increase cardiac output in patients with heart failure but that decrease survival; imperfect agreement of effects on coronary artery patency and effects on survival in patients with myocardial infarction; lack of beneficial effect on bone fracture rate despite favorable effects on bone density in patients with osteoporosis). FDA and outside experts will be aware of these examples as proposed surrogates are considered. The implications are especially great when considering prophylactic therapy, i.e., treatments to prevent chronic illness (coronary artery disease, cancer), in an essentially well population. In the second case, there will generally have been experience (with the standard therapy) to evaluate in considering linkage of the surrogate to benefit; this was, for example, the case with didanosine, where evidence from zidovudine studies of the relationship of an effect on CD4 lymphocytes and clinical outcome could be assessed. Similarly, there is considerable experience to show that durable complete responses in many cancers correspond to improved survival, so that an agent inducing them in refractory illness or in primary

58946    Federal Register / Vol. 57, No. 239 / Friday, December 11, 1992 / Rules and Regulations

disease that had previously been poorly responsive would generally be seen as reasonably likely to provide a clinical benefit.

6. One comment stated that epilepsy is a serious and life-threatening condition and asked that it be included within the scope of the proposal. The preamble cited, among other illnesses, depression and psychoses as examples of chronic illnesses that can have serious outcomes even if they are generally well managed. One comment asserted that neither depression nor psychosis is a disease, nor is either one serious or life-threatening. The comment stated that depression and psychosis are diagnoses. The comment urged the agency to remove them from the definition of life-threatening "illnesses" or "diseases."

With respect to epilepsy, FDA notes that in the "treatment IND" final rule (52 FR 19466 at 19467, May 22, 1987), the agency listed "certain forms of epilepsy" as an example of a disease or stage of disease that would normally be considered "serious." Certain forms of epilepsy may also be considered "serious" under the accelerated approval program. It is unlikely, however, that a surrogate endpoint would be utilized in such a case, as seizure frequency, a clinical endpoint, is readily measured.

FDA's reference to depression and psychoses was intended to give examples of conditions or diseases that can be serious for certain populations or in some or all of their phases. While drugs for the treatment of depression and psychosis would be examples of those that could be covered by the accelerated approval program, it is not the use of surrogate endpoints that would be expected; the symptoms and signs of these diseases are readily studied. On the other hand, some of these drugs have been quite toxic (e.g., clozapine for refractory psychoses) and might be considered for approval with restrictions to ensure safe use.

7. Two comments asked how FDA will decide that a drug is eligible for accelerated approval. One comment asserted that the decision should be an option for the applicant to consider, not a decision for FDA to make unilaterally. Pointing to a statement in the preamble (57 FR 13234 at 13235) that FDA reserves the right not to apply accelerated approval procedures when it believes in good faith that the drug's foreseeable use is reasonably likely to be outside the scope of "life-threatening diseases without meaningful therapeutic benefit over existing therapy," the comments argued that, if there are patients with life-threatening conditions that can benefit from expedited approval, the needs of the patients should determine the procedures used to approve the drug. One comment contended that applicants of products considered candidates for accelerated approval may have their drug or biological product "forced" into the accelerated approval process and be forced to conduct a program of studies to substantiate that surrogate endpoints actually predict significant clinical benefits.

The medical reviewing divisions within FDA's Center for Drug Evaluation and Research (CDER) and Center for Biologics Evaluation and Research (CBER) will determine the type of regulatory review that FDA may apply to an application. FDA encourages sponsors to meet with FDA early in the drug development process to discuss the applicability of the accelerated approval program to their product; however, FDA reserves the discretion to determine whether these procedures are applicable to a specific product.

With respect to the preamble statement cited by one comment, the comment misreads the preamble statement, which does not say that FDA will, in all cases, apply FDA's traditional approval mechanisms rather than this accelerated process for drugs where a majority of the drug's foreseeable uses are outside the scope of "life-threatening" diseases without meaningful therapeutic benefit over existing therapy. The statement merely informs applicants that FDA will consider the possible impact of widespread use of a drug for uses other than the one supporting accelerated approval; drugs approved under this program would often have only small safety data bases so that widespread off-label use might have serious implications. The agency does not believe that such a situation would regularly lead to exclusion from these provisions.

FDA does not agree that applicants seeking approval to market drug and biological products that would be candidates for accelerated approval will be forced to use the accelerated approval mechanism. It is true, however, that some proposed surrogate endpoints would not be considered acceptable bases for approval without assurance that the clinical studies to show clinical benefit will be conducted. A sponsor that wishes the application to be considered under the traditional approval process may request and receive such consideration.

The agency wishes to clarify the circumstances in which the accelerated approval regulations will apply. Sections 314.500 and 601.40 describe aspects of the scope of these regulations. Moreover, these regulations are intended to apply to applications based on surrogate endpoints whose validity is not fully established, to applications based on clinical endpoints that leave unanswered major questions about the product's effect on ultimate outcome, and to applications for products whose safe and effective use requires limitations on distribution or use. In all other situations, accelerated approval requirements will not apply.

Where approval is based on a surrogate endpoint that is accepted as validated to predict or correlate with clinical benefit, the product will be considered under the traditional process, and the postmarketing requirements under accelerated approval will not apply. Approvals of products for serious or life-threatening illnesses based on clinical endpoints other than survival or irreversible morbidity will usually also be considered under traditional procedures. Approvals based on such clinical endpoints will be considered under the accelerated approval regulations only when it is essential to determine effects on survival or irreversible morbidity in order to confirm the favorable risk/benefit judgment that led to approval. Applications for products for serious or life-threatening illnesses that provide a meaningful therapeutic benefit over existing therapy will receive a priority rating and expedited review, even when not considered under the accelerated approval procedures.

The agency also wishes to clarify that whenever an application is approved under § 314.510 or § 601.41, postmarketing studies confirming the product's clinical benefit will thus be required. Therefore, in order to eliminate potential confusion, the agency has amended §§ 314.510 and 601.41 to clarify these points.

FDA also recognizes that over time a particular surrogate, once acceptable as a basis for approval only under the accelerated approval regulations, could become recognized as validated by definitive studies (just as high blood pressure, for example, over time became validated as a surrogate with clinical significance). In such cases, a future application relying on such a surrogate would not require postmarketing studies confirming the surrogate's clinical benefit and the application would be considered under traditional procedures.

8. Two comments asked for clarification of the phrase "meaningful

EX. 22 pg.05

therapeutic benefit over existing therapy" as used in the description of what drugs the accelerated approval program should apply to. Specifically, pointing to an example described in the preamble that a new therapy would be eligible for accelerated approval if there was "a clear improvement" over existing therapy in being more effective or better tolerated, one comment urged FDA to clarify the meaning of "clear improvement" to discourage applicants of "me-too" products from wasting the agency's time and resources by applying for accelerated approval of such products. The comment also asked that FDA specify that if a new drug is approved under the accelerated approval provisions because the drug exhibits a "clear improvement" over an existing drug that was also granted accelerated approval, then specific restrictions will be placed on the prior approved drug to limit its use only to patients who cannot tolerate the new drug, or whose physicians assess that a change to the new drug might involve significant risks to the patient that outweigh the benefits. One comment asked that the term "meaningful therapeutic benefit over existing therapy" be interpreted and consistently applied to both drugs and biological products.

FDA believes that the examples given to help clarify the phrase "meaningful therapeutic benefit over existing therapy" (ability to treat unresponsive or intolerant patients or improved response compared to available therapy) are readily understood illustrations of the intent of the requirement. A drug that is essentially the same as available treatment (what the comment refers to as a "me too" drug) will not have a credible claim to a meaningful therapeutic benefit over that existing treatment and this should be easily detected.

With respect to restricting use of a drug previously approved under accelerated approval procedures when a new drug granted accelerated approval is a clear improvement over the prior approved drug, this would rarely be appropriate. Although, in some instances, certain therapies are identified as "second-line," this requires essentially unequivocal evidence of an advantage of alternative therapy, not likely on the basis of a surrogate endpoint. Labeling for both drugs will be accurate, however, allowing physicians to prescribe both the newly approved drug and the prior drug properly.

9. One comment asked if a change in the route of administration would be

considered as a meaningful benefit and within the scope of the proposal.

A change in the route of administration may be a candidate for accelerated approval depending upon the particular evidence presented.

10. One comment asked if subpart E drugs currently under investigation will be considered for accelerated approval. The comment assumed that new drug applications (NDA's) and supplemental NDA's considered for accelerated approval will have the highest priority for review.

Subpart E drugs will be considered for accelerated approval if they satisfy both eligibility criteria for accelerated approval, i.e., if they are being developed for the treatment of serious or life-threatening illnesses and the products will provide meaningful therapeutic benefits to patients over existing treatment. As discussed above, applicants should consult with FDA early in the development process to determine the nature of the regulatory review. Early consultations are a critical part of subpart E procedures. Drugs being reviewed under accelerated approval procedures will receive high priority review. However, applications for drugs for acquired immunodeficiency syndrome (AIDS) and human immunodeficiency virus (HIV)-related conditions will receive the highest priority review.

*C. Criteria for Approval*

11. Two comments expressed concern that the proposal did not provide enough detail on what constitutes an appropriate surrogate endpoint. One comment recommended that FDA adopt specific criteria for what constitutes an appropriate surrogate endpoint. The comment suggested that such criteria should include: (1) The surrogate endpoint must be biologically plausible in that it must be consistent with what is known about the pathophysiology and pathogenesis of the disease; (2) the surrogate endpoint must be present or abnormal in a large percentage of people who have the disease; (3) the surrogate endpoint must be a good predictor of the disease progression and should correlate closely with the significant clinical endpoint; (4) there should be a correlation between the quantitative aspect of the surrogate endpoint and the progression of the disease (e.g., the more severe the disease, the more deviant the surrogate endpoint from normal); (5) the regression of the surrogate endpoint should be significantly associated with clinical improvement (e.g., those with the greatest improvement in the surrogate endpoint should also show the greatest clinical effects); conversely, the

lack of regression of the surrogate endpoint should be commonly associated with a lack of clinical improvement; and (6) the incidence of regression or improvement in the surrogate endpoint should be significantly greater in treated than untreated patients.

One comment asked if the use of microalbuminuria data is a surrogate for diabetic nephropathy and if all drugs relying on surrogate endpoints would be eligible for accelerated approval, e.g., an angiotensin receptor antagonist with potential utility for treatment of congestive heart failure. The comment also asked what would happen if postmarketing studies demonstrate beneficial changes of surrogate endpoints but not beneficial clinical endpoints. The comment also asked if FDA will consider publishing guidelines on which surrogate endpoints would be appropriate for the diseases that may be affected by the proposed rule. Another comment expressed the belief that there is no evidence that surrogate endpoints are necessarily good indicators of therapeutic benefit. The comment stated that a drug may have an effect on a surrogate endpoint, but will not make any clinical difference because the advanced stage of the patient's disease precludes any effective therapy or the surrogate marker is not synchronous with the patient's clinical condition.

Another comment asserted that the requirement to base an approval on a surrogate endpoint that is "reasonably likely, based on epidemiologic, therapeutic, pathophysiologic, or other evidence, to predict clinical benefit other than survival or irreversible morbidity" is not restrictive enough to assure adequate consumer protection. Terms like "reasonably likely" and "or other evidence" allow drug manufacturers too much latitude for claiming that there is a correlation between surrogate endpoints affected by their drugs and clinical endpoints. The comment argued that until a correlation between a surrogate endpoint and a clinical endpoint has been established, a particular surrogate endpoint should only be used to approve subsequent drugs, without adequate clinical evidence, if there is a very strong effect of the drug on the surrogate marker or, if the effect is not sufficiently strong, there is an additional surrogate marker which corroborates the results of the first.

FDA intends to publish informal guidance concerning surrogate endpoints, but does not believe specific requirements for an appropriate surrogate should be specified by

regulation. Any given specifications may not be applicable to a particular case. For example, the thoughtful suggested criteria supplied by the comment would rarely, if ever, be applicable to the first effective drug for a disease, because criterion 5 requires that regression of the surrogate endpoint be associated quantitatively with clinical improvement. If there had never been effective treatment, this would never be known. Yet the surrogate could be persuasive on other grounds, such as a well-documented etiologic relation. In general, it is likely that one or another strongly supportive piece of evidence might outweigh gaps in other areas.

In developing informal guidance on surrogate endpoints, FDA will consider the suggestions in this comment. Interested persons will have an opportunity to comment on any guidance documents in this area developed by the agency. In some cases, new or revised drug class, or disease-specific, clinical guidelines may refer to surrogate endpoints. FDA is not prepared, at this time, to comment on the acceptability of an endpoint that it has not specifically considered, e.g., microalbuminuria.

The final regulations make it clear that not all drugs submitted for approval based on surrogate endpoint data are eligible for accelerated approval (§§ 314.500 and 601.40). The drug in question must be for a serious or life-threatening condition and must provide meaningful therapeutic benefit over existing therapy. In the case of an angiotensin receptor antagonist posed by the comment, there is existing documented life-prolonging treatment for congestive heart failure. An application for a new agent, to be eligible for accelerated approval, would have to show potential benefit over available therapy as well as identify a reasonable surrogate endpoint. This is problematic since no accepted surrogate endpoint for studies to treat congestive heart failure has been identified to date. For example, some drugs with favorable effects on hemodynamic measures in heart failure patients have been clinically ineffective.

The regulations are clear in requiring that, for drugs approved under these provisions based on surrogate endpoints, the postmarketing studies must show clinical benefit, not just the previously shown effect on the surrogate (§§ 314.510, 314.530, 601.41, and 601.43).

Surrogates, or proposed surrogates, are not always good, nor necessarily bad, indicators of therapeutic benefit and must be judged on a case-by-case basis. Even very good surrogates may

not be perfect: Blood pressure lowering has been a better predictor of effect on stroke than on coronary artery disease, cholesterol lowering has had a clearer effect on coronary artery disease than on survival. Moreover, a surrogate may be persuasive for a phase of disease with short expected survival but much less so in an earlier phase of the disease. Caution is always appropriate in evaluating surrogate endpoints and the particular therapeutic setting should always be considered. The agency believes that the evaluation of surrogate endpoint data and the safeguards built into these accelerated approval procedures will provide adequate consumer protection.

12. One comment expressed concern that if there is no accepted surrogate endpoint, an applicant's only option is to conduct a study using some clinical event as an endpoint, which may result in long, large studies that delay approval to the detriment of patients and sponsors. One comment suggested as an alternative that FDA permit approval of a drug based on a study using a clinical endpoint, but accept a less rigorous standard of statistical significance, e.g., 0.20 or 0.15 instead of 0.05. The comment further suggested that the sponsor could then complete postmarketing studies to establish statistical significance at conventional levels. The comment argued that this alternative is totally consistent with FDA's willingness to accept greater uncertainty in approving drugs for serious and life-threatening illnesses.

The intent of the rule is to allow FDA to utilize a particular kind of evidence, an effect on a surrogate endpoint, as a basis for approval, and, where appropriate, to ensure that remaining doubts about the relationship of the effect on the surrogate to clinical benefit are resolved by additional adequate and well-controlled studies with clinical endpoints. The rule is not intended to place into the market drugs with little evidence of usefulness. Although there is no statutory requirement for significance testing of any particular value, there are well-established conventions for assessing statistical significance to support the statutorily required conclusion that the well-controlled studies have demonstrated that a drug will have the effect it is represented to have. There is nothing about serious or life-threatening diseases that make them uniquely difficult to study. A meaningful effect on survival or morbidity where there is no effective therapy should be readily discerned. Such studies need be long and large only when the effect is small or difficult to detect. In that event,

proper assessment of benefit, and valid weighing of its relation to risk, is especially critical.

13. One comment asked that FDA clarify that one study could be the basis of approval and that one postmarketing study should be all that is needed to establish the link between the endpoint used for approval and some relevant clinical benefit.

FDA interprets the statute, and good science, as requiring at least two adequate and well-controlled studies to establish effectiveness. In some instances, drugs have been approved on the basis of a single well-controlled study; this has been done where the study was of excellent design, showed a high degree of statistical significance, involved multiple study centers, and showed some evidence of internal replicability, e.g., similar effects in major study subsets. FDA encourages applicants to discuss with FDA early in a drug's development the basis for the applicant's choice of a specific endpoint and, where applicable, the basis for its belief that a single study would be a sufficient basis for approval. With respect to postmarketing studies, FDA anticipates that the requirement will usually be met by studies already underway at the time of approval. As stated in the proposed rule, the requirement for any additional study to demonstrate actual clinical benefit will not be more stringent than those that would normally be required for marketing approval of the same drug for the same claim.

14. One comment expressed concern that the preamble to the proposed rule implied that a sponsor of an AIDS drug might have to do a postmarketing study to establish an effect on survival after showing an effect on such endpoints as weight or incidence of opportunistic infection (57 FR 13234 at 13235–13236). The comment stated that FDA's own advisory committee indicated that it was pleased to see an effect from a nucleoside analogue on the incidence of opportunistic infections with AIDS patients but did not suggest that further work should be done to show an effect on mortality. The comment argued that in some cases direct correlation with clinical endpoints such as mortality is difficult to prove and urged FDA to be flexible on this issue to encourage sponsors to go through the accelerated approval process.

Ordinarily, an effect on a meaningful clinical endpoint, e.g., on rate of opportunistic infections in AIDS, is a sufficient basis for approval without need for followup studies. Other endpoints, however, might leave major questions unanswered. For example, a

EX. 22 pg.07

Case: 23-10362    Document: 95-4    Page: 84    Date Filed: 04/11/2023

Federal Register / Vol. 57, No. 239 / Friday, December 11, 1992 / Rules and Regulations   58949
Case 2:22-cv-00223 Document 1-73 Filed 11/18/22 Page 90 of 126 PageID 497

modest effect on weight gain in AIDS without other demonstrated benefit, if considered an adequate basis for approval, while a clinical endpoint, might leave sufficient doubt as to the ultimate value of the effect so that further studies would be necessary. FDA intends to interpret this provision of the regulations with flexibility. This provision should also serve as a reminder, however, that for life-threatening diseases, the ultimate aim of therapy is improved survival as well as improved symptoms.

15. One comment asked FDA to clarify what a sponsor's obligation is to continue supplying medication on a compassionate basis if clinical efficacy is not demonstrated to FDA's satisfaction in postmarketing studies but individual patients appear to be benefiting from use of the drug.

Sponsors are not obligated to supply drugs on a "compassionate basis." Whether, if clinical studies did not show effectiveness, further availability of the drug would be appropriate under any mechanism would be determined case-by-case.

## D. Promotional Materials

16. Three comments asserted that requiring advance submissions of promotional materials is both beyond FDA's statutory authority and is unnecessary. Although FDA stated in the proposal that it does not intend specifically to approve promotional materials, two comments contended that is the likely effect of advance submission. The comment cited section 502(n) of the act (21 U.S.C. 352(n)), which provides that no regulation promulgated under that provision shall require prior FDA approval of the content of any advertisement "except in extraordinary circumstances," and asserted that the "extraordinary circumstances" language would not apply to drugs approved under the accelerated approval program. One comment argued that submission of promotional material prior and subsequent to approval is unwarranted when dealing with treatments for serious or life-threatening illnesses where dissemination of the most current and timely information is important to the treating physician. One comment questioned why there would be any greater likelihood of misleading promotional claims for products approved under the proposed accelerated approval process than for drugs intended to treat serious or life-threatening diseases that are approved under the normal NDA procedures. The comment also expressed the hope that the proposed requirement for advance

submission of promotional materials was not based upon an assumption that promotional materials for drugs intended to treat serious diseases are more likely to be misleading than promotional materials for other types of drugs because any such assumption would be unfounded. One comment argued that if an advertisement or labeling is inaccurate, the product is misbranded and FDA could then obtain injunctive relief, seize the product, and/ or initiate criminal proceedings. Another comment considered requiring advance submission of promotional materials unreasonable because companies are not required to do so now. One comment questioned the legal authority for requiring presubmission of promotional material following approval of a drug product, and the reason for the requirement.

The agency believes that the requirements for submission of promotional materials in the context of accelerated approval are authorized by statute. Subsections 505(d)(4) and (d)(5) of the act provide that, in determining whether to approve a drug as safe and effective, the agency may consider not only information such as data from clinical studies but also "any other information" relevant to safety and effectiveness under the proposed conditions of use. Such information would include information about how the drug would be promoted. In determining whether the drug's proposed labeling would be "false or misleading" under section 505(d)(7) of the act, the agency is similarly authorized to evaluate "all material facts" during the approval process, including the facts about promotion.

FDA is also authorized by section 505(k) of the act to require reporting of information subsequent to approval necessary to enable the agency to determine whether there may be grounds for withdrawing the approval. Among the grounds for withdrawal specified in section 505(e) of the act are that the evidence reveals the drug is not shown to be safe and effective under its conditions of use. In addition, drug approval may be withdrawn if information shows the labeling to be false or misleading. Information on how the drug will be promoted is again relevant to whether the drug's marketing approval should be withdrawn. Section 701(a) of the act (21 U.S.C. 371(a)) generally authorizes FDA to promulgate regulations for the efficient enforcement of the act.

For biological products, additional authority in section 351 of the PHS Act (42 U.S.C. 262) authorizes the promulgation of regulations designed to

ensure the continued safety, purity, and potency of the products. The content of promotional materials is important to the continued safe and effective use of biologicals.

Therefore, the provisions of the final rule requiring submission of promotional materials prior to approval under the accelerated approval procedures and subsequent to such approval are authorized by statutory provisions. FDA might also invoke the authority of section 502(n) of the act (21 U.S.C. 352(n)) to require prior approval of the content of any prescription drug advertisement in "extraordinary circumstances." Whether FDA could appropriately rely on section 502(n) of the act in promulgating §§ 314.550 and 601.45 need not be determined, however, because FDA is not relying upon section 502(n) of the act as legal authority for these (or any other) sections of the accelerated approval regulations.

The agency believes that advance submissions of promotional materials for accelerated approval products are warranted under the accelerated approval circumstances. The special circumstances under which drugs will be approved under these provisions and the possibility that promotional materials could adversely affect the sensitive risk/benefit balance justify review of promotional materials before and after approval. For example, if the promotional materials exaggerate the known benefits of the drug, wider and inappropriate use of the drug could be encouraged, with harmful results.

Similarly, high risk drugs that are approved based on postmarketing restrictions would not have been approved for use without those restrictions because the risk/benefit balance would not justify such approval. If promotional materials were to undermine the postmarketing restrictions, the health and safety of patients could be greatly jeopardized.

Although there is potential harm from any misleading promotion, and there is no reason to believe improper promotion is more likely in this setting than in others, the risk/benefit balance is especially sensitive in this setting. The relatively small data base available and the minimal published information available also can contribute to making the physician and patient populations particularly vulnerable under accelerated approval circumstances.

Reliance on court actions (such as seizures, injunctions, and criminal prosecutions) can be effective in ending false promotions, but can only be initiated after the fact, when harm has already occurred. Corrective efforts can

be helpful but are always somewhat delayed. Under the circumstances of accelerated approval, FDA believes that it is far preferable to avoid problems by reviewing the promotional materials in advance of drug approval and of dissemination of the materials.

17. Two comments supported the provision about submission of promotional materials. One comment urged the agency to require that specific patient information be included in promotional materials to indicate the fact that the drug's clinical benefit has not yet been established. For drugs approved under the restricted use provision, the comment recommended that the labeling specify in detail the exact restrictions placed on the drug. In both cases, the comment recommended that this patient information appear as boxed warnings.

Section 502(n) of the act and regulations at § 202.1(e)(1) (21 CFR 202.1(e)(1)) require prescription drug advertisements (promotional material) to contain, among other things, a true statement of information in brief summary relating to side effects, contraindications, and effectiveness, which would include warnings, precautions, and limitations on use. The information in brief summary relating to side effects, contraindications, and effectiveness is required to be based solely on the approved labeling. Therefore, to the extent that a drug's labeling reflects the extent of clinical exposure and includes appropriate warnings, a drug's promotional material would also include this information.

FDA regulations governing prescription drug labeling (21 CFR 201.56 and 201.57) require that serious adverse reactions and potential safety hazards, as well as limitations in use imposed by them, be included in the "Warning" section of the labeling. In the case of approval based upon effect on a surrogate endpoint, the "Indications and Usage" section of the labeling would reflect the nature of the demonstrated effect. If the approval is based on use restrictions, the label would also specify the restrictions.

FDA may require boxed warnings if there are special problems associated with a drug, particularly those that may lead to death or serious injury (21 CFR 201.57(e)). The agency does not agree that information related to clinical benefit or use restrictions for accelerated approval drugs would necessarily always require a boxed warning.

As indicated by §§ 314.550 and 601.45 of the final rule, applicants will be required to submit promotional materials prior to approval and in advance of dissemination subsequent to approval whether the product is a new drug, an antibiotic, or a biological product.

18. One comment contended that FDA review and approval of all promotional pieces before their use will indefinitely delay product marketing campaigns and other patient and physician educational activities, which are essential to market a product, thereby significantly diminishing the advantage of securing an early approval for the applicant. The comment further contended that the requirement to submit "all promotional materials * * * intended for dissemination or publication upon marketing approval" will be overly burdensome for FDA and will unnecessarily slow down the process for review of all materials, not just those for products subject to this proposed rule. The comment recommended that FDA only request for review the primary advertising pieces, such as the introductory letter to physicians, the main detail piece, and the main journal advertisement, but not the secondary materials, e.g., a letter to pharmacists, of the initial promotional campaign.

As previously discussed in this preamble, FDA will be reviewing an applicant's planned promotional materials both prior to approval of an application (reflecting the initial campaign) and subsequent to approval to ascertain whether the materials might adversely affect the drug's sensitive risk/benefit balance. Because all promotional materials, including those referred to by the comment as "secondary" materials, can have significant adverse effects if they are misleading, the agency does not agree that such materials should, as a matter of course, not be requested for review. Insofar as such materials may be directly derived from the introductory letter to physicians, or other materials characterized by the comment as "primary" materials, the additional time to review the derivative materials should not be extensive.

The agency does not agree with the comment's contention that the requirement to submit all promotional materials prior to and subsequent to approval will indefinitely delay marketing campaigns and educational activities or be overly burdensome to FDA reviewers. FDA is committed to rapid review and evaluation of all drugs considered for approval under this rule and will promptly review the promotional materials.

19. One comment suggested a passive, time-limited clearance system for review of advertising after the initial promotional campaign such as that used for review of IND's, which would allow the sponsor to proceed to use promotional materials after an allotted timeframe, such as 30 days, unless otherwise notified by FDA.

As indicated by this comment and others, additional clarification regarding both timing and content of the submissions of promotional materials seems useful. Therefore, the agency is revising proposed §§ 314.550 and 601.45 to make it clear that, unless otherwise informed by the agency, applicants must submit during the preapproval review period copies of all promotional materials intended for dissemination or publication within the first 120 days following marketing approval. The initial promotional campaign, sometimes referred to as the "launch campaign," often has a significant effect on the climate of use for a new product. As discussed elsewhere in this preamble, the risk/benefit balance of accelerated approval products is especially sensitive, and inappropriate promotion may adversely affect the balance with resulting harm.

There may be some instances in which promotional materials that had not been completed and submitted by the applicant prior to approval would be beneficial in fostering safe and effective use of the product during the first 120 days. Under revised §§ 314.550 and 601.45, FDA would have the discretion to consider such materials at a later time. An applicant who requested permission to include additional materials among those disseminated within the first 120 days following product approval would be notified of FDA's determination. If FDA agreed that dissemination of such materials was acceptable, the materials could then be disseminated or published upon notification.

For promotional materials intended for dissemination subsequent to the initial 120 days under §§ 314.550 and 601.45 FDA would review the submitted materials within 30 days of receipt. This 30-day period is meant to be time-limited; so that the applicant will be assured of no unnecessary delay. It will be important for the applicant to identify the materials being submitted appropriately, so that it is clear that the materials are subject to the 30-day review period. The agency intends to review all such materials promptly, and to notify the applicant of any identified problems as soon as possible. The agency expects that, if the agency notifies the applicant of significant objections to the proposed materials, no materials will be disseminated or published until the agency's objections are resolved. The applicant should plan to allow sufficient time after receiving

FDA's comments for resolving differences and incorporating requested changes in the submitted materials prior to dissemination or publication.

When FDA removes the requirement for advance submission of promotional material, the agency will continue to offer a prompt review of all voluntarily submitted promotional material.

*E. Postmarketing Restrictions*

FDA received many comments on the proposed requirement to limit distribution to certain facilities or physicians with special training or experience, or condition distribution on the performance of specified medical procedures if such restrictions are needed to counterbalance the drug's known safety concerns.

20. Several comments questioned FDA's authority to impose restrictions on distribution or use after an approved drug is marketed. Two comments disagreed with the statutory provisions cited by FDA in the proposed rule as its authority to impose restrictions on distribution or use stating that they refer only to FDA's general authority to ensure that drugs are not misbranded, which is an entirely separate issue. Another comment argued that section 503(b) of the act (21 U.S.C. 353(b)) contemplates that the issues warranting a restriction as to distribution are not factors in whether a drug product is "safe" for purposes of approval, but rather only whether the product must be limited to prescription status. Two comments said that, in the absence of specific statutory authority, the courts clearly have refused to permit FDA to impose restrictions on distribution and cited *American Pharmaceutical Association (APhA)* v. *Weinberger*, 377 F. Supp. 824, 829 n. 9 (D.D.C. 1974), *aff'd sub nom. APhA* v. *Mathews*, 530 F.2d 1054 (D.C. Cir 1976), a case concerning conditions placed on the approval of the drug methadone.

Some comments asserted that placing restrictions on the distribution of an approved drug to only certain facilities or physicians, or restricting use to certain medical procedures interferes with the practices of medicine and pharmacy, which the comments contended FDA does not have the authority to regulate.

The agency believes that the restrictions to ensure safe use contemplated for approvals under §§ 314.520 and 601.42 are authorized by statute. As discussed in the preamble to the proposed rule (57 FR 13234 at 13237), sections 501, 502, 503, 505, and 701 of the act provide broad authority for FDA to issue regulations to help

assure the safety and effectiveness of new drugs.

The agency does not agree with the comments' contention that the misbranding provisions of the act are irrelevant. Section 502(a) of the act prohibits false or misleading labeling of drugs, including (under section 201(n) of the act) failure to reveal material facts relating to potential consequences under customary conditions of use. Section 502(f) of the act requires drugs to have adequate directions for use and adequate warnings against unsafe use, such as methods of administration, that may be necessary to protect users. In addition, section 502(j) of the act prohibits use of drugs that are dangerous to health when used in the manner suggested in their labeling. Each of these misbranding provisions is intended, at least in significant part, to protect consumers against the marketing of drugs that would not be safe under certain conditions of use. Section 701(a) of the act authorizes FDA to issue regulations for the efficient enforcement of the act. The restrictions on use contemplated by §§ 314.520 and 601.42 help to ensure that products that would be misbranded under section 502 of the act are not marketed.

The restrictions on use imposed under section 503 of the act, which relate to prescription use limitations, primarily concern whether a drug is safe for use except under the supervision of a licensed practitioner. While the agency agrees that the restrictions imposed under §§ 314.520 and 601.42 concerning distribution to certain facilities or physicians with special training or experience would be in addition to ordinary prescription limitation, FDA believes these restrictions are consistent with the spirit of section 503 of the act, as well as the other provisions of the act referred to, in ensuring safe use.

New drugs may be approved under section 505(d) of the act only if they are safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling. In addition, for approval, a drug's labeling must not be false or misleading based on a fair evaluation of all material facts, which would include details about the conditions of use. For biological products, section 351(d) of the PHS Act also authorizes the imposition of restrictions through regulations "designed to insure the continued safety, purity, and potency" of the products.

The agency disagrees with the comments' implication that the courts' rulings in *American Pharmaceutical Association (APhA)* v. *Weinberger* mean

there is no statutory authority to impose restrictions on distribution for accelerated approval drugs. The situation considered in that case is readily distinguishable from the situation addressed in §§ 314.520 and 601.42 of the accelerated approval regulations. The *APhA* case concerned a regulation that withdrew approval of NDA's for methadone, but permitted distribution to certain maintenance treatment programs and certain hospital and community pharmacies. Because methadone is a controlled substance within the provisions of the Controlled Substances Act, which is implemented by the Drug Enforcement Administration with the Justice Department, the district court concluded that the question of permissible distribution of the drug was within the jurisdiction of the Justice Department, not FDA. The Court of Appeals determined that the type of misuse associated with methadone, i.e., misuse by persons who have no intent to try to use drugs for medical purposes, differed from safety issues contemplated for control under section 505 of the act. In contrast, the restrictions contemplated under §§ 314.520 and 601.42 are precisely those deemed necessary to ensure that section 505 criteria have been met, i.e., restrictions to ensure that the drug will be safe under its approved conditions of use. It is clearly FDA's responsibility to implement the statutory provisions regarding new drug approval.

Nor does FDA agree that the provisions placing restrictions on distribution to certain facilities or physicians, or conditioned on the performance of certain medical procedures, impermissibly interfere with the practice of medicine and pharmacy. There is no legal support for the theory that FDA may only approve sponsors' drugs without restriction because physicians or pharmacists may wish to prescribe or dispense drugs in a certain way. The restrictions under these provisions would be imposed on the sponsor only as necessary for safe use under the extraordinary circumstances of the particular drug and use. Without such restrictions, the drugs would not meet the statutory criteria, could not be approved for distribution, and would not be available for prescribing or dispensing. The agency, as a matter of longstanding policy, does not wish to interfere with the appropriate practice of medicine or pharmacy. In this instance, the agency believes that rather than interfering with physician or pharmacy practice, the regulations permit, in exceptional cases,

approval of drugs with restrictions so that the drugs may be available for prescribing or dispensing.

21. One comment asserted that postmarketing restrictions on distribution to certain facilities or physicians with certain training or experience should be limited to rare occasions in cases of extreme hazard to patient safety in which toxicity of a particular drug may require it, but should not be applied because of insufficient efficacy data. Some comments argued that safety issues in the context of drug use should be addressed through patient management and effective product labeling, not through restricted distribution. In support of this argument, the comments cited the labeling of oncologic drugs, which provides physicians with adequate warnings and recommendations for their use without limiting distribution.

FDA agrees with these comments in part and intends to impose restrictions on distribution or use under this rule only in those rare instances in which the agency believes carefully worded labeling for a product granted accelerated approval will not assure the product's safe use. As stated in the preamble to the proposed rule (57 FR 13234 at 13237), FDA believes that the safe use of most prescription drugs will continue to be assured through traditional patient management by health professionals and through necessary safety warnings in the drug's labeling.

22. Two comments asked who will determine if restricted distribution should occur and what facilities or physicians with special training or experience will participate. Several comments expressed concern that restricted distribution and/or conditional use may not include all health care professionals who should participate in safe and effective patient care. Two organizations representing pharmacists asked that FDA develop functional and objective criteria that clearly establish the activities of pharmacists, physicians, and others in the care of patients receiving a drug under restricted distribution. The comments asserted that any health care professional that met these criteria should be allowed to participate in distribution of the drug and care of the patient. One comment recommended that any postmarketing restrictions on distribution or use of a drug approved under the accelerated approval process be developed by appropriate FDA advisory committees or panels expanded to include physicians and pharmacists with expertise in the

therapeutic area being considered and in relevant drug distribution systems. Where appointment of pharmacists to these committees or panels is not feasible, the comment recommended that FDA use pharmacists in a consultant capacity. Another comment argued that current systems for drug distribution incorporate "checks and balances" such that prescribers and pharmacists work together to assure safe use of a drug by a patient. Two comments would oppose any restricted distribution system that allows manufacturers exclusively to deliver prescription drugs directly to patients. One comment asked whether FDA or the applicant would monitor the criteria for restricted distribution sites or physicians.

The medical reviewing divisions within FDA's CDER and CBER will determine if restricted distribution or use should be imposed. FDA will usually seek the advice of outside expert consultants or advisory committees before making this determination, and will, of course, consult with the applicant.

The agency does not agree that FDA should develop criteria that clearly establish the activities of health care professionals in the care of patients receiving a drug approved under this rule and for which restricted distribution has been imposed. Any postmarketing restrictions required under this rule will impose an obligation on the applicant to ensure that the drug or biological product is distributed only to the specified facilities or physicians. FDA will seek the advice of outside consultants with expertise in distribution systems or advisory committees when necessary in determining the need for or type of restricted distribution. The limitations on distribution or use imposed under this rule, including specific distribution systems to be used and the applicant's plan for monitoring compliance with the limitations, will have been agreed to by the applicant at the time of approval. The burden is on the applicant to ensure that the conditions of use under which the applicant's product was approved are being followed. As appropriate, FDA may monitor the sponsor's compliance with the specified terms of the approval and with the sponsor's obligations.

23. One comment recommended that proposed § 314.520 be modified to include therapeutic outcomes monitoring as a third example of a permissible postmarketing restriction. The comment defined therapeutic outcomes monitoring as the systematic and continual monitoring of the clinical and psychosocial effects of drug therapy

on a patient which achieves the objective of preventing problems with drug therapy. Some comments argued that through therapeutic outcomes monitoring, a physician, a pharmacist, and a patient can work together to prevent problems with drug therapy by being constantly alert to signs of trouble. One comment said that indicator data can be routinely reported to a central collection point for utilization review by health care professionals, followed by educational programs to further improve the efficacy of drug therapy.

The postmarketing restrictions set forth in the proposal and in this final rule are intended to enhance the safety of a drug whose risks would outweigh its benefits in the absence of the restriction. Therapeutic outcomes monitoring does not contribute to that enhancement, and would not be required under this rule.

24. Some comments asked that FDA clarify how products will move from restrictive status to a regular prescription drug status. The comments asserted that all conditions associated with accelerated approval should automatically terminate following completion of confirmatory clinical trials; one comment urged FDA to explicitly state this in the final rule. One comment asserted that restrictions should automatically be removed 180 days after a supplemental application containing the data from the postmarketing study has been filed if FDA has not yet acted upon the supplemental application and the product should be deemed approved as if by "traditional" procedures and all other provisions of the act should apply, e.g., the applicant must have a formal hearing before removal of the product from the market.

FDA will notify the applicant when a particular restriction is no longer necessary for safe use of the product. In the case of drugs approved with a requirement for postapproval studies, FDA would expect that all of the postapproval requirements set forth in this rule, i.e., submission of promotional material and use of expedited withdrawal procedures, would no longer apply after postmarketing studies have verified and described the drug's clinical benefit. Concurrent with the review of the postmarketing studies, if requested, FDA will also review the need to continue any restrictions on distribution that have been imposed. In the case where restrictions on distribution or use have been imposed, such restrictions would be eliminated only if FDA determines that safe use of the product can be assured without them, through appropriate labeling. In

some cases, however, that assurance could not be expected and the nature of the specific safety issue raised by the product might require continued restrictions. FDA has added new §§ 314.560 and 601.46 to state when postapproval requirements will no longer apply and state that the applicant may petition the agency, in accordance with 21 CFR 10.30, at any time to remove specific postapproval requirements.

With respect to the suggested time period for removing restrictions on distribution or use following submission of a supplemental application containing the data from a postmarketing study, FDA does not believe it should prescribe any specific time period. These applications will receive a priority rating and FDA is firmly committed to expedited review of an application considered for accelerated approval and all data submitted from a postmarketing study to verify clinical benefit and believes most reviews will be completed and action taken within 180 days.

25. One comment argued that, as proposed, it is not clear how accelerated approval would apply to drugs which fall under the conditions described in §§ 314.520 and 601.42, which state the postmarketing restrictions on distribution or use that FDA may apply, because the language of these sections explicitly states that the sections apply to products "shown to be effective," which are already adequately covered by the act. To the comment, the language "shown to be effective" implies that full Phase 3 efficacy trials have been conducted, assessed, and deemed to demonstrate that the drug is effective for its proposed use. If the clinical data demonstrate that the product has an acceptable safety profile, the safe use of the drug should be addressed in the product labeling. Thus, the comment argued that §§ 314.520 and 601.42 should not be included in new subpart H of part 314 and subpart E of part 601, respectively, which deal with accelerated approval because these sections explicitly apply to products shown to be effective under a full drug development program.

Sections 314.520 and 601.42 apply not only to drugs and biological products approved on the basis of an effect on a surrogate endpoint but also to drugs and biological products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses using clinical endpoints and that have serious toxicity. In either case, if the products are so potentially harmful that their safe use cannot be assured through carefully

worded labeling, FDA will approve the products for early marketing only if postmarketing restrictions on distribution or use are imposed. The phrase "shown to be effective" was not intended to distinguish drugs approved under new subpart H from drugs approved under any other subpart of the regulations. All drugs approved will have had effectiveness demonstrated on the basis of adequate and well-controlled studies, whether the endpoint of the studies is a surrogate endpoint or a clinical endpoint.

26. One comment expressed concern that the proposed restricted distribution or use provisions would restrict or eliminate the wholesale distribution of drugs approved through the accelerated approval process.

The limitations on distribution or use required under this rule are imposed on the applicant. Therefore, the burden is on the applicant to ensure that the conditions of use under which the applicant's product was approved are being followed. This rule does not specify how a manufacturer will distribute its product to those receiving the product under the approval terms. FDA will only determine which facilities or physicians may receive the drug, and the applicant will have agreed to this limitation on distribution or use.

27. One comment expressed concern that the proposed postmarketing restriction provision does not preclude a physician to whom restricted distribution applies from prescribing drugs approved under the accelerated approval process for unapproved (off-label) uses.

The comment is correct that this rule does not itself prevent a physician from prescribing a drug granted accelerated approval for an unapproved use. Under the act, a drug approved for marketing may be labeled, promoted, and advertised by the manufacturer only for those uses for which the drug's safety and effectiveness have been established and that FDA has approved. Physicians may choose to prescribe the drug for a condition not recommended in labeling. Such off-label use would, of course, be carried out under the restrictions imposed under this section. FDA also believes that physicians will be cognizant of the product's special risks and will use such drugs with particular care. The labeling of products approved under this rule will include all necessary warnings and full disclosure labeling would generally reflect the extent of clinical exposure to the drug.

*F. Postmarketing Studies*

28. Three comments argued that FDA does not have the authority to require

postmarketing studies to be performed as a condition of approval based on a "surrogate" endpoint. One comment stated that it is widely accepted that the act empowered the agency to define the type and extent of efficacy data necessary to approve a product application. If a surrogate marker can be shown to be sufficiently related to actual patient benefit, then, the comment asserted, data regarding the effect of a drug on a surrogate marker constitute acceptable proof of efficacy under the act. Two comments urged FDA to continue to ask applicants to agree voluntarily to perform postmarketing studies when medically warranted as is the current policy under the traditional approval process. One comment expressed concern that requiring postmarketing studies may become the norm rather than the exception.

The agency's response to comment 1. explained the circumstances in which FDA might conclude that a drug should be marketed on the basis of an effect on a surrogate endpoint reasonably likely to predict clinical benefit only if studies were carried out to confirm the presence of the likely benefit. As discussed in the preamble to the proposed rule (57 FR 13234 at 13236), FDA believes that it is authorized by law to require postmarketing studies for new drugs and biological products. Section 505(d) of the act provides for the approval of new drugs for marketing if they meet the safety and effectiveness criteria set forth in section 505(d) of the act and the implementing regulations (21 CFR part 314). As discussed in the proposed rule, to demonstrate effectiveness, the law requires evidence from adequate and well-controlled clinical studies on the basis of which qualified experts could fairly and responsibly conclude that the drug has the effect it is purported to have. Under section 505(e) of the act, approval of a new drug application is to be withdrawn if new information shows that the drug has not been demonstrated to be either safe or effective. Approval may also be withdrawn if new information shows that the drug's labeling is false or misleading.

Section 505(k) of the act authorizes the agency to promulgate regulations requiring applicants to make records and reports of data or other information that are necessary to enable the agency to determine whether there is reason to withdraw approval of an NDA. The agency believes that the referenced reports can include additional studies to evaluate the clinical effect of a drug approved on the basis of an effect on a surrogate endpoint. Section 701(a) of the act generally authorizes FDA to issue

regulations for the "efficient enforcement" of the act.

With respect to biological products, section 351 of the PHS Act provides legal authority for the agency to require postmarketing studies for these products. Licenses for biological products are to be issued only upon a showing that they meet standards "designed to insure the continued safety, purity, and potency of such products" prescribed in regulations (42 U.S.C. 262(d)). The "potency" of a biological product includes its effectiveness (21 CFR 600.3(s)).

The agency notes that it has in the past required postmarketing studies as a prerequisite for approval for some drugs (see 37 FR 201, January 7, 1972; and 37 FR 26790, December 15, 1972).

29. One comment recommended that FDA require that specific timelines for completion of the required postmarketing studies be included in the marketing application. The comment further suggested that, if the sponsor fails to meet its timelines, approval of its application be withdrawn, or in the event it is difficult to withdraw approval of drugs for serious or life-threatening diseases, FDA should establish substantial fines and penalties for sponsors that deliberately withhold information from FDA regarding the preliminary results and the progress of their postmarketing studies, or delay the completion of such studies. The comment also urged FDA to publish in the **Federal Register** identification of manufacturers who are not meeting their obligation to complete the required postmarketing studies on time. These recommendations were prompted by the comment's concern that once a manufacturer is granted approval for its product, the manufacturer will have little incentive to complete postmarketing studies in a timely manner, especially if the preliminary results of such studies indicate that the drug may not be safe and/or effective. Another comment urged FDA to include in the final rule language that requires the participation of pharmacists in postmarketing studies because pharmacists can serve as an additional source of information on therapeutic outcomes of patients taking drugs approved under this rule and monitoring for such drugs.

The agency expects that the requirement for postmarketing studies will usually be met by studies already underway at the time of approval and that there will be reasonable enthusiasm for resolving the questions posed by those studies. The plan for timely completion of the required postmarketing studies will be included

in the applicant's marketing application. In addition, in accord with the annual reporting requirements at § 314.81(b)(2)(vii) (21 CFR 314.81(b)(2)(vii), an NDA applicant is required to provide FDA with a statement of the current status of any postmarketing studies. FDA declines to impose the sanctions suggested by the comment for failure of an applicant to meet its plans for completion of a postmarketing study. FDA believes this rule applies appropriate regulatory sanctions. Under the proposed rule and this final rule, FDA may withdraw approval of an application if the applicant fails to perform the required postmarketing study with due diligence.

FDA believes that it is not within the scope of this rule to establish the role of pharmacists in postmarketing studies. That role should more properly be defined by the clinical investigator and each institution or facility at which a postmarketing study is conducted.

30. One comment asserted that the proposal sets forth an inherent contradiction between the way FDA evaluates the benefit and risk for drugs today and the way the proposal contemplates. The comment argued that now, if postmarketing data raise questions about the risk associated with a drug product, FDA considers that data along with the other data known about the product, and determines whether, based on the overall knowledge about the drug, there is a need to seek withdrawal of approval. Under this proposal, if the postmarketing study data raised questions about the risk of the product, FDA would seek withdrawal of approval, whether or not the new data really made a fundamental difference to what is known about the benefit and risk of the product.

FDA does not agree that the contradiction described by the comment exists. Under the circumstances of accelerated approval, approval would be based on a weighing of the benefit suggested by the effect on the surrogate endpoint against known and potential risks of the drug. Should well-designed postapproval studies fail to demonstrate the expected clinical benefit, the benefit expected at the time of approval (reasonably likely to exist) would no longer be expected and the totality of the data, showing no clinical benefit, would no longer support approval. This evaluation of the data is not different from considerations that would apply in evaluating data in the case of a drug approved under other provisions of the regulations.

31. Two comments expressed the view that the proposed requirement for postmarketing studies may raise

important ethical questions because once a drug product is approved, it may be unethical, depending on the circumstances, for a physician to conduct a study using a placebo control. One comment also contended that a postmarketing study requirement could compromise the NDA holder's ability to enroll sufficient numbers of patients in the study when the new approved drug and possible alternative therapies are widely available to patients.

Usually, and preferably, because of problems suggested in the comment, the requirement for postmarketing studies will be met by studies already underway at the time of approval, e.g., by completion of studies that showed an effect on the surrogate. FDA recognizes that ethical considerations will play a central role in the type of study carried out, a choice that will depend upon the type and seriousness of the disease being treated, availability of alternative therapies, and the nature of the drug and the patient population. There often are alternatives to use of a placebo control, including active control designs and dose-response studies that can satisfy both the demands of ethics and adequacy of design.

32. One comment contended that the term "postmarketing study" is used inconsistently in the proposed rule. The comment argued that "postmarketing study" is an accepted regulatory term of art which, to this point, has referred to studies conducted to confirm safety (not efficacy), after an approval has been granted, whereas in this proposal, a "postmarketing study" refers to a study required to establish clinical efficacy (i.e., a Phase 3 study), but not necessarily safety, although safety data will be collected. To prevent confusion and to differentiate between these required postmarketing confirmatory efficacy studies and safety studies traditionally conducted after approval and to clarify that products granted accelerated approval have been approved on the basis of Phase 2 (surrogate endpoint) data, the comment suggested changing the term "postmarketing study" to "Phase 3 study" in this rule except where traditional postmarketing studies are intended. The comment also suggested that the term "Phase 3 study" be defined as a study required to confirm findings of efficacy based upon surrogate data collected in Phase 2, which will be conducted after an accelerated approval has been granted and will be required before restrictions set forth in § 314.520 are removed.

The agency does not believe that the comment has accurately described accepted meanings of various terms.

EX. 22 pg.13

The term postmarketing study does not refer to any particular kind of study, but to studies carried out after a drug is marketed, often as part of an agreement by a sponsor to do so. These have included pharmacokinetic, drug-drug interaction, and pediatric studies, studies of dose-response or of higher doses, and studies of new uses. The term is not limited to safety studies. Moreover, Phase 2 and 3 studies are not distinguished by the endpoints chosen. Phase 3 hypertension studies, for example, still measure blood pressure, not stroke rate. The agency believes that the use of the "postmarketing study" in the final rule is appropriate and consistent.

## G. Withdrawal of Approval

33. One comment supported the proposed withdrawal of approval procedure. Other comments asserted that the proposed procedure does not provide the applicant with the procedural safeguard of a formal evidentiary hearing guaranteed by section 505 of the act and the Administrative Procedure Act (APA). As an example, the comments said that based on a finding of a single study failing to show clinical benefit or misuse of any promotional material, an approved new drug would be subject to withdrawal from the market with only a minimal opportunity for the NDA holder to be heard. The comments argued that section 505(e) of the act guarantees applicants "due notice and opportunity for a hearing" on withdrawal of an NDA in compliance with APA hearing standards, thus FDA must conduct hearings on withdrawals of NDA's using the formal adjudicatory procedures of the APA. One comment asserted that, under the proposed procedure, there is the absence of a discernible legal standard, an inability to cross-examine, the prosecuting attorney and judge are one and the same person, and there is a lack of even minimal formal evidentiary procedures. The comment expressed doubt that the proposed procedure would be sufficient to create a record suitable for review by a Court of Appeals, which must be able, on the basis of such a record, to determine whether the approval is supported by "substantial evidence."

FDA believes the withdrawal procedures set forth in proposed §§ 314.530 and 601.43 and in this final rule are consistent with relevant statutes and provide applicants adequate due process. As stated in the proposed rule, in issuing its general procedural regulations, FDA decided to afford NDA holders an opportunity for a formal evidentiary hearing even though the courts had not decided that such a hearing was necessarily legally required (see 40 FR 40682 at 40691, September 3, 1975). In promulgating its procedural regulations, FDA also determined that a formal evidentiary hearing is not required before withdrawing approval of biological products, but that it would be appropriate to apply the same procedures to biological products as to drug removal (see 40 FR 40682 at 40691).

Through the hearing process in this final rule, as in the proposed rule, applicants will be afforded the opportunity to present any data and information they believe to be relevant to the continued marketing of their product. The proposed process also would have permitted the presiding officer, the advisory committee members, a representative of the applicant, and a representative of the Center that initiates the withdrawal proceedings to question any person during or at the conclusion of the person's presentation. As discussed below in response to a comment, FDA has decided to allow up to three representatives of the applicant and of the Center to question presenters. Participants could comment on or rebut information and views presented by others. As with ordinary 21 CFR part 15 hearings, the hearing will be transcribed. Subsequent to the hearing, the Commissioner of Food and Drugs would render a final decision on the matter. The agency believes that the administrative record created through this process would be sufficient for judicial review.

The agency emphasizes that, as part of the approval process under this rule, applicants will have agreed that these withdrawal procedures apply to the drug for which they seek approval; applicants objecting to these procedures may forego approval under these regulations and seek approval under the traditional approval process. Under such circumstances, applicants would not have the benefit of accelerated approval; if the drug were subsequently approved, however, before withdrawal of the approval, the applicant would have an opportunity for a 21 CFR part 12 hearing.

34. One comment noted that the "imminent hazard" provision of section 505(e) of the act allows FDA to suspend approval of a product, immediately, if it is found to pose an imminent hazard to the public health. As an alternative to the proposed withdrawal procedure or in addition to the "imminent hazard" statutory provision, the comment suggested that, when confronted with a dangerous product on the market, FDA could request that the applicant voluntarily withdraw its product, and most applicants would comply if a legitimate hazard exists.

As noted in the proposed rule, FDA and applicants have often reached mutual agreement on the need to remove a drug from the market rapidly when significant safety problems have been discovered. However, applicants usually have been unwilling to enter into such agreements when doubts about effectiveness have arisen, such as following the review of effectiveness of pre-1962 approvals carried out under the Drug Efficacy Study Implementation (DESI) program. For drugs approved under the accelerated procedure regulations, the risk/benefit assessment is dependent upon the likelihood that the surrogate endpoint will correlate with clinical benefit or that postmarketing restrictions will enable safe use. If the effect on the surrogate does not translate into a clinical benefit, or if restrictions do not lead to safe use, the risk/benefit assessment for these drugs changes significantly. FDA believes that if that occurs, rapid withdrawal of approval as set forth in this rule is important to the public health.

35. Under the proposed withdrawal procedures, in addition to other persons, one representative of the Center that initiates the withdrawal proceedings may question participants at a withdrawal of approval hearing. One comment objected to limiting the Center to one representative because detailed knowledge about a drug product is likely to be available from several scientists.

The proposed limitation of questioning to single representatives of the initiating Center and the applicant was intended to make the proceedings manageable. On further consideration, the agency has determined that it would be appropriate and manageable to allow up to three persons to be designated as questioners for the applicant and for FDA. Sections 314.530(e)(2) and 601.43(e)(2) have been revised accordingly.

36. Some comments questioned FDA's ability to withdraw approval under the proposed procedures efficiently or effectively because of: (1) The lack of assurance that the results of postmarketing studies will be promptly provided to FDA; (2) limited agency resources to review study results and act upon them promptly; (3) the difficulties associated with establishing that an approved drug is "ineffective;" and (4) political pressure not to rescind the approval of NDA's for drug products that may lack evidence of effectiveness,

EX. 22 pg.14

Case 2:22-cv-00223-Z   Document 1-23   Filed 11/18/22   Page 16 of 20   PageID 504

especially if no clearly effective alternative treatments are available. One comment offered the opinion that where a drug shows only modest evidence of benefit, perhaps on a surrogate endpoint, and only shows equivocal evidence of clinical efficacy in postmarketing studies it would be difficult and socially disruptive to withdraw approval and remove the drug from the market if the drug has become well established and accepted, and there is no issue of toxicity. Another comment believed it would be difficult to withdraw approval of a drug that may be beneficial in a subpopulation but which, in fact, has not been shown to be efficacious in broader patient population studies. The comments suggested the need for a lesser sanction.

Another comment suggested that expediting removal of a product from the market could be accomplished by using a procedure like the "imminent hazard" provision of the act, i.e., immediate removal of the drug from the market if any of the conditions listed in proposed § 314.530 were met followed by a hearing.

Although the potential difficulties cited by the comments are real, they are not fundamentally different from determinations FDA regularly must make in carrying out its responsibilities. The new regulations provide for an expedited procedure to withdraw approval; they do not guarantee that results of studies will be wholly unambiguous or that FDA will always be able to prevail in its view as to the need for withdrawal, any more than current withdrawal procedures do. The studies being carried out under these provisions will be conspicuous and important and their completion will be widely known. There is no reason to believe their results would or could be long hidden. A study that fails to show clinical effectiveness does not prove a drug has no clinical effect but it is a study that, under § 314.530, will lead to a withdrawal procedure because it has failed to show that the surrogate endpoint on which approval was based can be correlated with a favorable clinical effect. This may have occurred because the study was poorly designed or conducted; while FDA will make every effort to avoid this, the commercial sponsor has the responsibility for providing the needed evidence confirming clinical benefit. As previously discussed, §§ 314.510 and 601.41 have been revised to clarify that required postmarketing studies must also be adequate and well-controlled. The possibility that an ineffective drug has become "accepted" is not a basis for continued marketing. FDA intends to

implement the provisions of § 314.530 as appropriate; data that are ambiguous will inevitably lead to difficult judgments.

A drug with clear clinical effectiveness in a subset of the population, but not in the population described in labeling, would have its labeling revised to reflect the data. Withdrawal would be inappropriate under such circumstances.

If an imminent hazard to the public health exists, the Secretary of Health and Human Services may suspend approval of an application and then afford the applicant an opportunity for an expedited hearing. In the absence of a significant hazard requiring immediate withdrawal, FDA believes the expedited procedure described in the rule satisfies the need for prompt action while, at the same time, allowing opportunity for discussion and debate before withdrawal.

37. One comment noted that the proposed rule would allow FDA to withdraw approval for failure to perform the required postmarketing studies with due diligence. The comment asserted that the act does not permit FDA to withdraw approval on this ground. Another comment, however, suggested that because proposed §§ 314.530 and 601.43 cite grounds for withdrawal of approval that are not grounds under the act, the language of these proposed sections should be revised to use language that closer aligns to that used in the act, e.g., describe a "postmarketing study" in statutory language.

FDA reaffirms the position expressed in the preamble to the proposal (57 FR 13234 at 13239) that there is adequate authority under the act to withdraw approval of an application for the reasons stated under proposed §§ 314.530 and 601.43, which include failure of an applicant to perform the required postmarketing study with due diligence. Section 505(e) of the act authorizes the agency to withdraw approval of an NDA if new information shows that the drug has not been demonstrated to be either safe or effective. Approval may also be withdrawn if the applicant has failed to maintain required records or make required reports. In addition, approval may be withdrawn if new information, along with the information considered when the application was approved, shows the labeling to be false or misleading.

For biological products, section 351(a) of the PHS Act authorizes approval of license applications under standards designed to ensure continued safety, purity, and potency. "Potency"

for biological products includes effectiveness (21 CFR 600.3(s)). The PHS Act does not specify license revocation procedures, except to state that licenses may be suspended and revoked "as prescribed by regulations."

For drugs approved under § 314.510, FDA will have determined that reports of postmarketing studies are critical to the risk/benefit balance needed for approval; if those reports are not forthcoming, then, under authority of section 505(d) of the act, the drug cannot on an ongoing basis meet the standards of safety and efficacy required for marketing under the act. Therefore, it is important to ensure that the applicant make a good faith effort to complete any required postmarketing studies in a timely manner so that FDA can rapidly determine whether the surrogate endpoint upon which the drug was approved has been confirmed to correlate with clinical benefit. Failure to submit the study results in a timely fashion would also constitute failure to make a required report. Similarly, without submission of the information from required postmarketing studies on biological products approved under these procedures, the biological product is not assured of continued safety and effectiveness. The license application may, therefore, appropriately be revoked as described in § 601.43.

FDA does not find the statements of the grounds for withdrawal of approval under §§ 314.530 and 601.43 of this rule inconsistent with statutory language or ambiguous. The agency notes that, in the event none of the grounds for withdrawal specifically listed in § 314.530 or § 601.43 applies, but another ground for withdrawal under section 505 of the act or section 351 of the PHS Act and implementing regulations at 21 CFR 314.150 or 601.5 does apply, the agency will proceed to withdraw approval under traditional procedures.

38. Two comments expressed concern that it may be difficult for the agency to enforce the requirement that postmarketing studies be pursued with due diligence. The comments asked what would happen if a sponsor using due diligence is unable to recruit enough patients, or if the sponsor questions the validity of the data from the required postmarketing study, and would clumsy data management be seen as sufficient reason to rescind approval for a marketed drug? Another comment stated that once a product is approved and, by definition, provides a "meaningful therapeutic benefit over existing therapies," study accrual may drop off dramatically as patients may refuse to receive the "old" therapy or

placebo, or physicians may consider it unethical not to treat all patients with the approved indication with the new drug or biological product. Under these circumstances, the comment expressed the opinion that neither the sponsor nor the product should be penalized, nor should there be a threat to withdraw approval. Based on FDA's past history in postmarketing studies, which one comment characterized as resulting in poorly done studies, studies conducted much later than agreed upon, or not at all, the comment expressed the opinion that the "due diligence" with which applicants are expected to carry out postmarketing studies may be an overly great expectation. One comment asked FDA to give examples of when it may withdraw approval if "other evidence demonstrates that the drug product is not shown to be safe or effective under its conditions of use" (proposed §§ 314.530(a)(6) and 601.43(a)(6)).

FDA does not agree that it will be difficult to enforce the "due diligence" provision of this rule. The "due diligence" provision was designed to ensure that the applicant makes a good faith effort to conduct a required postmarketing study in a timely manner to confirm the predictive value of the surrogate marker or other indicator. Any requirement for postmarketing studies will have been agreed to by the applicant at the time of approval, and if the study is not conducted in a timely manner as agreed to by the applicant, approval of the applicant's application will be withdrawn. FDA will expect any required postmarketing study to be conducted in consultation with the agency. Therefore, should the applicant encounter problems with subject enrollment in a study or ethical difficulties about the type of study to conduct, FDA expects the applicant to discuss these problems with the agency and reach agreement on their resolution.

Examples of other evidence demonstrating the drug product is not shown to be safe and effective could include further studies of the effect of the drug and the surrogate endpoint that fail to show the effect seen in previous studies, new evidence casting doubt on the validity of the surrogate endpoint as a predictor of clinical benefit, or new evidence of significant toxicity.

39. Some comments objected to withdrawal of approval of a drug product approved under the accelerated approval process because of perceived misconduct by the applicant, such as failure to perform a required postmarketing study with due diligence or use of promotional materials that are false or misleading. The comments argued that the primary purpose of the

accelerated approval process is to provide improved treatments to desperately ill patients at the earliest possible time, and withdrawal of approval of the new treatments for reasons not directly related to safety or efficacy undermines the purpose of the proposed rule. Two comments suggested that correction of the promotional material without interruption of access to the drug would be a better approach. Another comment suggested that there may be circumstances where continued access to the drug, if accompanied by informed consent, would be appropriate even if substantial questions arise about a product's safety and effectiveness. One comment urged that anticipated withdrawal of approval be preceded by measures to ensure that patients and their physicians will have an uninterrupted supply until alternative treatment arrangements can be made.

The need for "due diligence" in conducting the agreed to postmarketing studies is discussed in paragraph 37. The reasons for concern about misleading promotional materials are discussed under paragraph 16. With respect to promotional materials, FDA expects that, in most cases, any disagreements between the applicant and FDA will be resolved through discussion and modification of the materials, so that the drug or biological product can continue to be marketed. If, however, FDA concludes that the promotional materials adversely affect the risk/benefit conclusion supporting the drug's marketing, the agency intends to minimize the risk to the public health by removing the product from the market through the withdrawal procedures in this rule.

40. One comment expressed concern that the proposed withdrawal procedure may give the appearance of bias or preconceived notions on the part of the agency because the final decision to withdraw approval of a drug would be made by the Commissioner of Food and Drugs and the intention to withdraw approval of the drug will already have been determined by the agency.

Under the withdrawal provisions of this rule, FDA's CDER or CBER, rather than the Commissioner, will initiate the withdrawal proceedings. The withdrawal process will begin with a letter from CDER or CBER notifying the applicant that the Center proposes to withdraw marketing approval and stating the reasons for the proposed action. Although separation of functions will not apply under the provisions of §§ 314.530 or 601.43, the Commissioner's decision regarding withdrawal would not occur until after

the applicant had an opportunity for hearing as described in those sections. The Commissioner would then expect to review the issues with objectivity and fairness having had the benefit of the presentations and discussions at the hearing and of the advisory committee's recommendations.

## H. Safeguards for Patient Safety

41. One comment asked if drugs approved under the accelerated approval process will be held to the same standards concerning postmarketing safety as drugs approved by the traditional process.

As discussed in the preamble to the proposed rule, applicants gaining approval for new drugs through the accelerated approval procedures will also be expected to adhere to the agency's longstanding requirements for postmarketing recordkeeping and safety reporting (see 21 CFR 314.80 and 314.81). Information that comes to FDA from the applicant or elsewhere that raises potential safety concerns will be evaluated in the same manner that such information is evaluated for drugs approved under the agency's traditional procedures. If the postmarketing information shows that the risk/benefit assessment is no longer favorable, the agency will act accordingly to remove the drug from the market.

42. One comment urged FDA, if the proposed rule were adopted, to require written informed consent so that patients would know that the drugs with which they were being treated had risks and that the benefits had not been adequately established.

The agency does not agree that patients using drug products approved under the accelerated approval regulations should be asked to provide written informed consent. Drugs approved under these provisions are not considered experimental drugs for their approved uses. Like all approved drugs, drugs approved under these provisions will have both risks and benefits. As previously discussed in this preamble, for drugs approved based on studies showing an effect on a surrogate endpoint, the approved labeling will describe that effect. In addition, the labeling will contain information on known and potential safety hazards and precautionary information. As with all prescription drugs, the physician has the responsibility for appropriately advising the patient regarding the drug being prescribed.

43. One comment asked that FDA require manufacturers to maintain an updated list of names, addresses, and phone numbers of physicians prescribing their products approved

**58958**    **Federal Register / Vol. 57, No. 239 / Friday, December 11, 1992 / Rules and Regulations**

under this rule, and in the case of recall or withdrawal of approval, require manufacturers to contact these physicians and encourage them to notify their patients.

FDA does not believe such a procedure is necessary. Furthermore, maintaining such a registry for drugs prescribed through pharmacies would be very difficult. Agency experience with recalls and product withdrawals indicates that the methods of notification that have been developed for such circumstances are adequate.

44. One comment recommended that FDA require patient package inserts (PPI's) for all drugs granted accelerated approval that would state the specific restrictions placed on a drug product and/or the reason for requiring postmarketing studies. In addition, the comment recommended that FDA require the manufacturer to include an adverse drug reaction "hotline" phone number in the PPI along with an FDA phone number. The PPI should inform the patient to report immediately any adverse drug reaction experienced to his or her doctor, the manufacturer, and FDA, and the manufacturer should be required to contact FDA immediately after receiving a report of a serious adverse reaction.

FDA concludes that patient package inserts are not routinely needed for drugs granted accelerated approval, although if circumstances made one appropriate, one would be developed for a particular drug. As with any prescription drug, the approved labeling for a product granted accelerated approval will contain information about the safe and effective use of the product, including all necessary warnings and the extent of clinical exposure. In addition, the conditions of use will be carefully worded to reflect the nature of the data supporting the product's approval. Physicians have the responsibility to inform patients about the safe and effective use of an approved product. Labeling includes suggestions to the physician concerning information to be provided to patients.

The agency notes that in this final rule limited editorial changes have been made to the wording of the proposed rule. The agency has determined that these changes do not affect the intent of the proposed rule.

## V. Economic Impact

In accordance with Executive Order 12291, FDA has carefully analyzed the economic effects of this final rule and has determined that it is not a major rule as defined by the Order. Indeed, because firms will not be forced to use the accelerated approval mechanism,

applicants will most probably choose to take advantage of the program only where its use is expected to reduce net costs. Similarly, the final rule does not impose a significant economic impact on a substantial number of small entities so as to require a regulatory flexibility analysis under the requirements of the Regulatory Flexibility Act of 1980.

## VI. Environmental Impact

The agency has determined under 21 CFR 25.24(a)(8) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

## VII. Paperwork Reduction Act of 1980

This rule does not contain new collection of information requirements. Section 314.540 does refer to regulations that contain collection of information requirements that were previously submitted for review to the Director of the Office of Management and Budget (OMB) under section 3504 of the Paperwork Reduction Act of 1980 (Adverse Drug Experience Reporting, OMB No. 0190–0230).

## List of Subjects

### 21 CFR Part 314

Administrative practice and procedure, Confidential business information, Drugs, Reporting and recordkeeping requirements.

### 21 CFR Part 601

Biologics, Confidential business information.

Therefore, under the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, and under authority delegated to the Commissioner of Food and Drugs, 21 CFR parts 314 and 601 are amended as follows:

## PART 314—APPLICATIONS FOR FDA APPROVAL TO MARKET A NEW DRUG OR AN ANTIBIOTIC DRUG

1. The authority citation for 21 CFR part 314 continues to read as follows:

**Authority:** Secs. 201, 301, 501, 502, 503, 505, 506, 507, 701, 706 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321, 331, 351, 352, 353, 355, 356, 357, 371, 376).

2. Subpart H consisting of §§ 314.500 through 314.560 is added to read as follows:

Subpart H—Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses

Sec.
314.500   Scope.

Sec.
314.510   Approval based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity.
314.520   Approval with restrictions to assure safe use.
314.530   Withdrawal procedures.
314.540   Postmarketing safety reporting.
314.550   Promotional materials.
314.560   Termination of requirements

Subpart H—Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses

### § 314.500   Scope.

This subpart applies to certain new drug and antibiotic products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (e.g., ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy).

### § 314.510   Approval based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity.

FDA may grant marketing approval for a new drug product on the basis of adequate and well-controlled clinical trials establishing that the drug product has an effect on a surrogate endpoint that is reasonably likely, based on epidemiologic, therapeutic, pathophysiologic, or other evidence, to predict clinical benefit or on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity. Approval under this section will be subject to the requirement that the applicant study the drug further, to verify and describe its clinical benefit, where there is uncertainty as to the relation of the surrogate endpoint to clinical benefit, or of the observed clinical benefit to ultimate outcome. Postmarketing studies would usually be studies already underway. When required to be conducted, such studies must also be adequate and well-controlled. The applicant shall carry out any such studies with due diligence.

### § 314.520   Approval with restrictions to assure safe use.

(a) If FDA concludes that a drug product shown to be effective can be safely used only if distribution or use is restricted, FDA will require such postmarketing restrictions as are needed to assure safe use of the drug product, such as:

(1) Distribution restricted to certain facilities or physicians with special training or experience; or

EX. 22 pg.17

(2) Distribution conditioned on the performance of specified medical procedures.

(b) The limitations imposed will be commensurate with the specific safety concerns presented by the drug product.

§314.530  Withdrawal procedures.

(a) For new drugs and antibiotics approved under §§ 314.510 and 314.520, FDA may withdraw approval, following a hearing as provided in part 15 of this chapter, as modified by this section, if:

(1) A postmarketing clinical study fails to verify clinical benefit;

(2) The applicant fails to perform the required postmarketing study with due diligence;

(3) Use after marketing demonstrates that postmarketing restrictions are inadequate to assure safe use of the drug product;

(4) The applicant fails to adhere to the postmarketing restrictions agreed upon;

(5) The promotional materials are false or misleading; or

(6) Other evidence demonstrates that the drug product is not shown to be safe or effective under its conditions of use.

(b) *Notice of opportunity for a hearing.* The Director of the Center for Drug Evaluation and Research will give the applicant notice of an opportunity for a hearing on the Center's proposal to withdraw the approval of an application approved under § 314.510 or § 314.520. The notice, which will ordinarily be a letter, will state generally the reasons for the action and the proposed grounds for the order.

(c) *Submission of data and information.* (1) If the applicant fails to file a written request for a hearing within 15 days of receipt of the notice, the applicant waives the opportunity for a hearing.

(2) If the applicant files a timely request for a hearing, the agency will publish a notice of hearing in the Federal Register in accordance with §§ 12.32(e) and 15.20 of this chapter.

(3) An applicant who requests a hearing under this section must, within 30 days of receipt of the notice of opportunity for a hearing, submit the data and information upon which the applicant intends to rely at the hearing.

(d) *Separation of functions.* Separation of functions (as specified in § 10.55 of this chapter) will not apply at any point in withdrawal proceedings under this section.

(e) *Procedures for hearings.* Hearings held under this section will be conducted in accordance with the provisions of part 15 of this chapter, with the following modifications:

(1) An advisory committee duly constituted under part 14 of this chapter will be present at the hearing. The committee will be asked to review the issues involved and to provide advice and recommendations to the Commissioner of Food and Drugs.

(2) The presiding officer, the advisory committee members, up to three representatives of the applicant, and up to three representatives of the Center may question any person during or at the conclusion of the person's presentation. No other person attending the hearing may question a person making a presentation. The presiding officer may, as a matter of discretion, permit questions to be submitted to the presiding officer for response by a person making a presentation.

(f) *Judicial review.* The Commissioner's decision constitutes final agency action from which the applicant may petition for judicial review. Before requesting an order from a court for a stay of action pending review, an applicant must first submit a petition for a stay of action under § 10.35 of this chapter.

§314.540  Postmarketing safety reporting.

Drug products approved under this program are subject to the postmarketing recordkeeping and safety reporting applicable to all approved drug products, as provided in §§ 314.80 and 314.81.

§314.550  Promotional materials.

For drug products being considered for approval under this subpart, unless otherwise informed by the agency, applicants must submit to the agency for consideration during the preapproval review period copies of all promotional materials, including promotional labeling as well as advertisements, intended for dissemination or publication within 120 days following marketing approval. After 120 days following marketing approval, unless otherwise informed by the agency, the applicant must submit promotional materials at least 30 days prior to the intended time of initial dissemination of the labeling or initial publication of the advertisement.

§314.560  Termination of requirements.

If FDA determines after approval that the requirements established in § 314.520, § 314.530, or § 314.550 are no longer necessary for the safe and effective use of a drug product, it will so notify the applicant. Ordinarily, for drug products approved under § 314.510, these requirements will no longer apply when FDA determines that the required postmarketing study verifies and describes the drug product's clinical benefit and the drug product

would be appropriate for approval under traditional procedures. For drug products approved under § 314.520, the restrictions would no longer apply when FDA determines that safe use of the drug product can be assured through appropriate labeling. FDA also retains the discretion to remove specific postapproval requirements upon review of a petition submitted by the sponsor in accordance with § 10.30.

PART 601—LICENSING

3. The authority citation for 21 CFR part 601 continues to read as follows:

Authority: Secs. 201, 501, 502, 503, 505, 510, 513–516, 518–520, 701, 704, 706, 801 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321, 351, 352, 353, 355, 360, 360c–360f, 360h–360j, 371, 374, 376, 381); secs. 215, 301, 351, 352 of the Public Health Service Act (42 U.S.C. 216, 241, 262, 263); secs. 2–12 of the Fair Packaging and Labeling Act (15 U.S.C. 1451–1461).

4. Subpart E consisting of §§ 601.40 through 601.46 is added to read as follows:

Subpart E—Accelerated Approval of Biological Products for Serious or Life-Threatening Illnesses

Sec.
601.40  Scope.
601.41  Approval based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity.
601.42  Approval with restrictions to assure safe use.
601.43  Withdrawal procedures.
601.44  Postmarketing safety reporting.
601.45  Promotional materials.
601.46  Termination of requirements.

Subpart E—Accelerated Approval of Biological Products for Serious or Life-Threatening Illnesses

§601.40  Scope.

This subpart applies to certain biological products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (e.g., ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy).

§601.41  Approval based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity.

FDA may grant marketing approval for a biological product on the basis of adequate and well-controlled clinical trials establishing that the biological product has an effect on a surrogate endpoint that is reasonably likely, based on epidemiologic, therapeutic,

pathophysiologic, or other evidence, to predict clinical benefit or on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity. Approval under this section will be subject to the requirement that the applicant study the biological product further, to verify and describe its clinical benefit, where there is uncertainty as to the relation of the surrogate endpoint to clinical benefit, or of the observed clinical benefit to ultimate outcome. Postmarketing studies would usually be studies already underway. When required to be conducted, such studies must also be adequate and well-controlled. The applicant shall carry out any such studies with due diligence.

§ 601.42  Approval with restrictions to assure safe use.

(a) If FDA concludes that a biological product shown to be effective can be safely used only if distribution or use is restricted, FDA will require such postmarketing restrictions as are needed to assure safe use of the biological product, such as:

(1) Distribution restricted to certain facilities or physicians with special training or experience; or

(2) Distribution conditioned on the performance of specified medical procedures.

(b) The limitations imposed will be commensurate with the specific safety concerns presented by the biological product.

§ 601.43  Withdrawal procedures.

(a) For biological products approved under §§ 601.40 and 601.42, FDA may withdraw approval, following a hearing as provided in part 15 of this chapter, as modified by this section, if:

(1) A postmarketing clinical study fails to verify clinical benefit;

(2) The applicant fails to perform the required postmarketing study with due diligence;

(3) Use after marketing demonstrates that postmarketing restrictions are inadequate to ensure safe use of the biological product;

(4) The applicant fails to adhere to the postmarketing restrictions agreed upon;

(5) The promotional materials are false or misleading; or

(6) Other evidence demonstrates that the biological product is not shown to be safe or effective under its conditions of use.

(b) Notice of opportunity for a hearing. The Director of the Center for

Biologics Evaluation and Research will give the applicant notice of an opportunity for a hearing on the Center's proposal to withdraw the approval of an application approved under § 601.40 or § 601.41. The notice, which will ordinarily be a letter, will state generally the reasons for the action and the proposed grounds for the order.

(c) Submission of data and information. (1) If the applicant fails to file a written request for a hearing within 15 days of receipt of the notice, the applicant waives the opportunity for a hearing.

(2) If the applicant files a timely request for a hearing, the agency will publish a notice of hearing in the Federal Register in accordance with §§ 12.32(e) and 15.20 of this chapter.

(3) An applicant who requests a hearing under this section must, within 30 days of receipt of the notice of opportunity for a hearing, submit the data and information upon which the applicant intends to rely at the hearing.

(d) Separation of functions. Separation of functions (as specified in § 10.55 of this chapter) will not apply at any point in withdrawal proceedings under this section.

(e) Procedures for hearings. Hearings held under this section will be conducted in accordance with the provisions of part 15 of this chapter, with the following modifications:

(1) An advisory committee duly constituted under part 14 of this chapter will be present at the hearing. The committee will be asked to review the issues involved and to provide advice and recommendations to the Commissioner of Food and Drugs.

(2) The presiding officer, the advisory committee members, up to three representatives of the applicant, and up to three representatives of the Center may question any person during or at the conclusion of the person's presentation. No other person attending the hearing may question a person making a presentation. The presiding officer may, as a matter of discretion, permit questions to be submitted to the presiding officer for response by a person making a presentation.

(f) Judicial review. The Commissioner's decision constitutes final agency action from which the applicant may petition for judicial review. Before requesting an order from a court for a stay of action pending review, an applicant must first submit a

petition for a stay of action under § 10.35 of this chapter.

§ 601.44  Postmarketing safety reporting.

Biological products approved under this program are subject to the postmarketing recordkeeping and safety reporting applicable to all approved biological products.

§ 601.45  Promotional materials.

For biological products being considered for approval under this subpart, unless otherwise informed by the agency, applicants must submit to the agency for consideration during the preapproval review period copies of all promotional materials, including promotional labeling as well as advertisements, intended for dissemination or publication within 120 days following marketing approval. After 120 days following marketing approval, unless otherwise informed by the agency, the applicant must submit promotional materials at least 30 days prior to the intended time of initial dissemination of the labeling or initial publication of the advertisement.

§ 601.46  Termination of requirements.

If FDA determines after approval that the requirements established in § 601.42, § 601.43, or § 601.45 are no longer necessary for the safe and effective use of a biological product, it will so notify the applicant. Ordinarily, for biological products approved under § 601.41, these requirements will no longer apply when FDA determines that the required postmarketing study verifies and describes the biological product's clinical benefit and the biological product would be appropriate for approval under traditional procedures. For biological products approved under § 601.42, the restrictions would no longer apply when FDA determines that safe use of the biological product can be assured through appropriate labeling. FDA also retains the discretion to remove specific postapproval requirements upon review of a petition submitted by the sponsor in accordance with § 10.30.

Dated: December 7, 1992.

David A. Kessler,
Commissioner of Food and Drugs.
Louis W. Sullivan,
Secretary of Health and Human Services.
[FR Doc. 92-30129 Filed 12-9-92; 9:51 am]
BILLING CODE 4160-01-F

EX. 22 pg.19

# Exhibit 23

FDA Letter to Population Council re: NDA (Feb. 18, 2000)

/S/

NDA 20-687

FEB 1 8 2000

Population Council
Attention: Sandra P. Arnold
1230 York Avenue
New York, NY 10021

Dear Ms. Arnold:

Please refer to your new drug application (NDA) dated March 14, 1996, received March 18, 1996, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for mifepristone 200 mg tablets.

We acknowledge receipt of your submissions dated September 18 and 26, 1996; January 30, March 6 and 31, July 28, August 5, September 3 and 24, November 26, 1997; January 30, February 19, April 27, June 25, October 26, December 7 and 8, 1998; February 8, 22, March 31, April 28, May 10, 20, June 3 (2), 15, 25, 30, July 14, 22, August 3, 13, 18, 30, September 3, 8, 13, 30, October 5, 26, 28, November 16, 29 (2), December 6, 7, 23, 1999; January 21, 28 (2), and February 16, 2000. Your submission of August 18, 1999 constituted a complete response to our September 18, 1996 action letter.

We have completed the review of this application, as amended, and it is approvable. Before this application may be approved, however, it will be necessary for you to address the following:

**Chemistry**

Drug Substance

EX. 23 pg. 01

NDA 20-687
Mifepristone
Population Council
Page 2

Drug Product

EX. 23 pg. 02

# Redacted

# pages of trade

# secret and/or

# confidential

# commercial

# information

NDA 20-687
Mifepristone
Population Council
Page 4

**Labeling**

Address the recommendations in the enclosed draft labeling for the Physician Insert and Patient
Package Insert.

It will be necessary for you to submit revised draft labeling for the drug.  We recommend that the

NDA 20-687
Mifepristone
Population Council
Page 5

labeling be identical in content to the enclosed draft labeling (text for the Physician Package Insert and Patient Package Insert).

If additional information relating to the safety or effectiveness of this drug becomes available, revision of the labeling may be required.

**Phase 4 Commitments**

We remind you of your commitments dated September 16, 1996, to perform the following Phase 4 studies:

1.  To monitor the adequacy of the distribution and credentialing system,

2.  To follow-up on the outcome of a representative sample of mifepristone-treated women who have surgical abortion because of the method failure,

3.  To assess the long-term effects of multiple use of the regimen,

4.  To ascertain the frequency with which women follow the complete treatment regimen and the outcome of those who do not,

5.  To study the safety and efficacy of the regimen in women (1) under 18 years of age, (2) over age 35, and (3) who smoke,

6.  To ascertain the effect of the regimen on children born after treatment failure.

**Distribution Plan**

We have completed our review of this application, including the restrictions on the distribution and use of this product proposed in your January 21, 2000 submission, entitled "Distribution Plan". We have concluded that adequate information has not been presented to demonstrate that the drug, when marketed in accordance with the terms of distribution proposed, is safe and effective for use as recommended. The restrictions on distribution will need to be amended.

We have thus considered this application under the restricted distribution regulations contained in 21 CFR 314.500 (Subpart H) and have concluded that restrictions as per CFR 314.520 on the distribution and use of mifepristone are needed to assure safe use of this product.

NDA 20-687
Mifepristone
Population Council
Page 6

**Promotional Activities**

Please note that promotional activities for this NDA are subject to 21 CFR 314.550.  As such, please submit three copies of the introductory promotional materials that you propose to use for this product.  All proposed materials should be submitted in draft or mock-up form, not final print.  Please send one copy to the _____ and two copies of both the promotional materials and the package insert directly to:

Division of Drug Marketing, Advertising, and Communications, HFD-40
Food and Drug Administration
5600 Fishers Lane
Rockville, Maryland 20857

Under 21 CFR 314.50(d)(5)(vi)(*b*), we request that you update your NDA by submitting all safety information you have regarding your new drug.  Please provide updated information as

listed below. The update should cover all studies and uses of the drug including: (1) those involving indications not being sought in the present submission, (2) other dosage forms, and (3) other dose levels, etc.

1. Retabulation of all safety data including results of trials that were still ongoing at the time of NDA submission.  The tabulation can take the same form as in your initial submission. Tables comparing adverse reactions at the time the NDA was submitted versus now will certainly facilitate review.
2. Retabulation of drop-outs with new drop-outs identified.  Discuss, if appropriate.
3. Details of any significant changes or findings.
4. Summary of worldwide experience on the safety of this drug.

5. Case report forms for each patient who died during a clinical study or who did not complete a study because of an adverse event.

6. English translations of any approved foreign labeling not previously submitted.

7. Information suggesting a substantial difference in the rate of occurrence of common, but less serious, adverse events.

Within 10 days after the date of this letter, you are required to amend the application, notify us of your intent to file an amendment, or follow one of your other options under 21 CFR 314.110.  In the absence of any such action FDA may proceed to withdraw the application.  Any amendment should respond to all the deficiencies listed.  We will not process a partial reply as a major amendment nor will the review clock be reactivated until all deficiencies have been addressed.

NDA 20-687
Mifepristone
Population Council
Page 7

The drug product may not be legally marketed until you have been notified in writing that the application is approved.

If you have any questions, call

Sincerely,

/S/

Center for Drug Evaluation and Research

Enclosure

APPEARS THIS WAY
ON ORIGINAL