No. 23-10362

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALLIANCE FOR HIPPOCRATIC MEDICINE, ET AL.,
*Plaintiffs-Appellees,*
*v.*
U.S. FOOD AND DRUG ADMINISTRATION, ET AL.,
*Defendants-Appellants,*

and

DANCO LABORATORIES, LLC,
*Intervenor-Appellant.*

On Appeal from the United States District Court for the Northern
District of Texas, No. 2:22-cv-00223-Z

**APPENDIX OF EXHIBITS IN OPPOSITION TO AN EMERGENCY STAY
PENDING APPEAL VOLUME 5 (ALLIANCE.APP. 349-470)**

JULIE MARIE BLAKE
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jblake@adflegal.org

ERIK C. BAPTIST
JOHN J. BURSCH
ERIN M. HAWLEY
MATTHEW S. BOWMAN
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
ebaptist@adflegal.org
jbursch@adflegal.org
ehawley@adflegal.org
mbowman@adflegal.org

*Counsel for Plaintiffs-Appellees*

## TABLE OF EXHIBITS

| Description | App. Page No. |
|---|---|
| **Volume 1** | |
| Declaration of Dr. Christina Francis, ECF No. 1-8, Exhibit 7 to Complaint; MPI App. 191-200 | 001-010 |
| Declaration of Dr. Ingrid Skop, ECF No. 1-9, Exhibit 8 to Complaint; MPI App. 211-218 | 011-020 |
| Declaration of Dr. Nancy Wozniak, ECF No. 1-10, Exhibit 9 to Complaint; MPI App. 219-224 | 021-028 |
| Declaration of Dr. Steven A. Foley, ECF No. 1-11, Exhibit 10 to Complaint; MPI App. 862-868 | 029-034 |
| Defendants' Opposition to Plaintiffs Motion for a Preliminary Injunction, ECF No. 28 | 035-086 |
| Declaration of Dr. Tyler Johnson, ECF No. 1-50, Exhibit 49 to Complaint; MPI App. 869-875 | 087-093 |
| Declaration of Dr. Regina Frost-Clark, ECF No. 1-51, Exhibit 50 to Complaint; MPI App. 876-881 | 094-100 |
| Declaration of Dr. George Delgado, ECF No. 1-52, Exhibit 51 to Complaint; MPI App. 882-889 | 101-106 |
| Declaration of Dr. Shaun Jester, ECF No. 1-53, Exhibit 52 to Complaint; MPI App. 882-889 | 107-114 |
| **Volume 2** | |
| 2000 Letter from Danco to FDA (Jan. 21, 2000), ECF No. 121; MPI App. 908-914 | 115-121 |
| FDA, Center for Drug Evaluation and Research, Summary Review of Application Number: 020687Orig1s020 (March 29, 2016) (2016 Summary Review), ECF No. 1-33, Exhibit 32 to Complaint; MPI App. 624-652 | 122-150 |
| 2002 Citizen Petition of Am. Ass'n of Pro-Life Obstetricians & Gynecologists to U.S. Food & Drug Admin. (FDA) (Aug. 20, 2002), ECF No. 1-14, Exhibit 13 to Complaint; MPI App. 280-375 | Part 1 151-174 |
| **Volume 3** | |
| 2002 Citizen Petition of Am. Ass'n of Pro-Life Obstetricians & Gynecologists to U.S. Food & Drug Admin. (FDA) (Aug. 20, 2002), ECF No. 1-14, Exhibit 13 to Complaint; MPI App. 280-375 | Part 2 175-246 |

| | |
|---|---|
| 2021 FDA Letter to Am. Coll. of Obstetricians & Gynecologists and Soc'y for Maternal-Fetal Med. about Mifepristone REMS (Apr. 12, 2021),<br>    ECF No. 1-40, Exhibit 39 to Complaint; MPI App. 713-715 | 247-249 |
| **Volume 4** | |
| Declaration of Mario R. Dickerson,<br>    ECF No. 1-4, Exhibit 3 to Complaint; MPI App. 156-162 | 250-256 |
| Declaration of Dr. Donna Harrison,<br>    ECF No. 1-5, Exhibit 4 to Complaint; MPI App. 163-176 | 257-270 |
| Declaration of Dr. Jeffrey Barrows,<br>    ECF No. 1-6, Exhibit 5 to Complaint; MPI App. 177-183 | 271-277 |
| Declaration of Dr. Quentin Van Meter,<br>    ECF No. 1-7, Exhibit 6 to Complaint; MPI App. 184-190 | 278-284 |
| Marrit Niinimaki et al., *Immediate Complications After Medical Compared With Surgical Termination of Pregnancy*, 114 Obstetrics & Gynecology 795 (2009),<br>    ECF No. 1-17, Exhibit 16 to Complaint; MPI App. 398-408 | 285-295 |
| James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999-2015*, Health Servs. Rsch. & Managerial Epidemiology, Nov. 9, 2021,<br>    ECF No. 1-18, Exhibit 1 to Complaint; MPI App. 409-420 | 296-307 |
| Katherine A. Rafferty & Tessa Longbons, *#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives*. 36 Health Commc'n 1485 (2021),<br>    ECF No. 1-21, Exhibit 20 to Complaint; MPI App. 434-446 | 308-320 |
| New Drug, Antibiotic, and Biological Drug Product Regulations; Accelerated Approval, 57 Fed. Reg. 58,942 (Dec. 11, 1992),<br>    ECF No. 1-23, Exhibit 22 to Complaint; MPI App.489-508 | 321-340 |
| FDA Letter to Population Council re: NDA (Feb. 18, 2000),<br>    ECF No. 1-24, Exhibit 23 to Complaint; MPI App.509-516 | 341-348 |

| Volume 5 | |
|---|---|
| 2003 Citizen Petitioners' Response to Opposition Comments filed by The Population Council, Inc. and Danco Laboratories, LLC (Oct. 10, 2003),<br>    ECF No. 1-27, Exhibit 26 to Complaint; MPI App. 530-560 | 349-379 |
| Questions and Answers on FDA's Adverse Event Reporting System (FAERS), https://www.fda.gov/drugs/surveillance/questions-and-answers-fdas-adverse-event-reporting-system-faers,<br>    ECF No. 1-45, Exhibit 44 to Complaint; MPI App. 770-774 | 380-384 |
| Kathi A. Aultman et al., *Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 26 Law & Medicine 3 (2021),<br>    ECF 1-46, Exhibit 45 to Complaint; MPI App. 775-800 | 385-410 |
| Memorandum from FDA on Review of Supplemental Drug Applications Proposing Modifications to the Mifepristone REMS Program (Dec. 23, 2022),<br>    ECF No. 121; MPI App. 890 | 411 |
| Declaration of Dr. Donna Harrison,<br>    ECF No. 121; MPI App. 891-907 | 412-428 |
| Hannah Levintova, *The Abortion Pill's Secret Money Men*, Mother Jones, March-April 2023,<br>    ECF No. 121; MPI App. 929-938 | 429-438 |
| David C. Reardon & John M. Thorp, *Pregnancy associated death in record linkage studies relative to delivery, termination of pregnancy, and natural losses: A systematic review with a narrative synthesis and meta-analysis*, 5 SAGE Open Medicine 1 (2017),<br>    ECF No. 121; MPI App. 939-955 | 439-455 |
| 2019 FDA Abbreviated New Drug Application (ANDA) Approval Letter to GenBioPro, Inc. (Apr. 11, 2019),<br>    ECF No. 1-37, Exhibit 36 to Complaint; MPI App. 695 | 456-462 |
| 2019 FDA Supplemental Approval Letter to Danco Laboratories, LLC (Apr. 11, 2019),<br>    ECF No. 1-38, Exhibit 37 to Complaint; MPI App. 702 | 463-470 |

# Exhibit 26

2003 Citizen Petitioners' Response to Opposition
Comments filed by The Population Council, Inc. and
Danco Laboratories, LLC (Oct. 10, 2003)

# Kirkpatrick & Lockhart LLP

1800 Massachusetts Avenue, NW
Suite 200
Washington, DC  20036-1221
202.778.9000
202.778.9100 Fax
www.kl.com

October 10, 2003

VIA HAND DELIVERY

Dockets Management Branch
U.S. Food and Drug Administration
Document Control Room
5630 Fishers Lane, First Floor
Room 1061 (HFA-305)
Rockville, Maryland 20852

> **Re:** **Docket No. 02P-0377**
> **Response to Opposition Comments filed by The Population Council, Inc. and Danco Laboratories, LLC**

We submit these comments on behalf of The American Association of Pro Life Obstetricians and Gynecologists ("AAPLOG"), the Christian Medical Association ("CMA"), and Concerned Women for America ("CWA") (collectively, "the Petitioners"), in response to Opposition Comments filed by the makers/distributors of Mifeprex™ (mifepristone) 200 mg tablets (NDA 20-687).[1]  In particular, The Population Council, Inc. ("the Council") and Danco Laboratories, LLC ("Danco") (collectively, "the Sponsor") submitted comments on March 13, 2003 opposing the Citizen Petition and Request for Administrative Stay ("Petition") filed by the Petitioners on August 20, 2002.[2]

Not surprisingly, the Council and Danco ask the Food and Drug Administration ("FDA") to maintain the status quo, so that they can continue to sell Mifeprex, a "non-surgical" alternative to abortion.  By contrast, the Petitioners seek to protect women from the unknowing use of a dangerously unsafe drug by pursuing an immediate stay and withdrawal of FDA's approval of the new drug application ("NDA") for mifepristone.

Although opposing comments were inevitable, the Petitioners are concerned that the Sponsor has refused to acknowledge any problems regarding the safety, effectiveness and overall

---

[1]  Opposition of The Population Council, Inc. and Danco Laboratories, LLC to Citizen Petition and Request for Administrative Stay Regarding Mifeprex® (Mifepristone), Docket No. 02P-0377 (March 13, 2003) ("Opposition Comments") (available at: <http://www.fda.gov/ohrms/dockets/dailys/03/Mar03/031303/031303.htm>).

[2]  Citizen Petition of the American Association of Pro Life Obstetricians and Gynecologists, the Christian Medical Association, and Concerned Women for America, Request for Stay and Repeal of the Approval of Mifeprex (mifepristone) for the Medical Termination of Intrauterine Pregnancy through 49 Days' Gestation, Docket No. 02P-0377 (filed Aug. 20, 2002) (available at: <http://www.aaplog.org/newscitizenpetitionru486.htm>).

**Kirkpatrick & Lockhart LLP**

2

medical suitability of the Mifeprex Regimen.[3]  The Petitioners are not surprised, however, that
the Sponsor has failed to produce medical-scientific data and adequate explanations for the
administrative irregularities described in the Petition.  This failure is consistent with the
Petitioners' contention that the clinical data in support of the Mifeprex Regimen are scarce, not
the product of adequate and well-controlled trials, and cannot support a reasoned risk-benefit
analysis by FDA.  Instead, the available evidence points to the fact that Mifeprex should never
have been approved by FDA.

We have set forth below our responses to the Sponsor's Opposition Comments, along
with additional evidence that the safety and effectiveness of Mifeprex have not been established
in accordance with FDA's regulations.  In particular, the drug, which was not lawfully entitled to
consideration under Subpart H, could not have been approved apart from that provision's special
distribution restrictions; the clinical trials relied on to support the NDA were legally and
clinically insufficient; the inclusion of misoprostol in the Mifeprex Regimen without a
corresponding misoprostol approval was unlawful; and the Regimen's use is inherently unsafe,
as proven by recent life-threatening adverse events and even deaths.  With this evidence, FDA is
both statutorily empowered and obligated to grant an Administrative Stay to suspend the
Mifeprex NDA approval and expedite withdrawal proceedings.

I.      **The Safety and Effectiveness of Mifeprex Have Not Been Established in Accordance
        with FDA's Regulations.**

FDA's approval of a drug product must rest on the Agency's conclusion that the drug is
safe and effective for its labeled conditions for use.  In the case of Mifeprex, the Petitioners
previously provided evidence that the NDA should not have been approved, and the Sponsor's
Opposition Comments did not rebut that evidence.  In fact, as described below, although the
Opposition Comments reiterate the Sponsor's confidence in the safety and efficacy of the
Mifeprex Regimen, they also expose the dearth of pre- or post-approval evidence for that
position.  Consequently, given the body of evidence now before FDA, the Agency should
withdraw its approval of the Mifeprex NDA at this time.

A.      <u>**Subpart H Enables FDA to Place Special Restrictions on Especially Risky
        Drugs like Mifeprex.**</u>

Although Petitioners maintain their original position that FDA's reliance on Subpart H
was unlawful for this drug, the Sponsor's response that Mifeprex could have been approved
alternatively under Section 505 is incorrect.  The Sponsor's Opposition Comments repeat an
argument that the Sponsor made when it was trying to convince FDA not to use Subpart H – that
"[t]he restrictions FDA imposed under Subpart H could as well have been imposed (and
enforced) under Section 505 [of the FD&C Act][4] itself, without reference to Subpart H."[5]  The

---

[3]  When FDA approved the Population Council's NDA for mifepristone, it approved the drug for use in conjunction
with misoprostol.  In this Response, "Mifeprex Regimen" will refer to the combined use of Mifeprex and
misoprostol to effect an abortion.

[4]  Federal Food, Drug, & Cosmetic Act of 1938 ("FD&C Act"), Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified
as amended at 21 U.S.C. §§ 301 *et seq.*).

**Kirkpatrick & Lockhart** LLP

3

fact that FDA proceeded under Subpart H suggests that the Agency did not subscribe to this argument. Indeed, had FDA taken this position, it would not have promulgated the restricted distribution prong of Subpart H,[6] but would simply have relied on Section 505 to impose restrictions. When FDA adopted Subpart H, it noted that "the restrictions to ensure safe use contemplated for approvals under [Subpart H] are authorized by statute."[7] FDA went on to explain that Subpart H would enable the Agency to impose on drugs restrictions "necessary to ensure that section 505 criteria have been met, i.e., restrictions to ensure that the drug will be safe under its approved conditions of use."[8] Additional restrictions are necessary because Mifeprex and other Subpart H drugs carry greater risks than drugs approved through the typical new drug approval processes.[9] In short, when FDA adopted Subpart H, it added a new tool to its regulatory toolbox enabling it to approve drugs that otherwise could not have been approved because the safe usage mandates in Section 505 would not have been satisfied.[10] Therefore, the Sponsor errs in asserting that the approval of the Mifeprex NDA is independently grounded in Section 505(d).

The Sponsor also claimed that its cooperation with FDA to devise restrictions obviates the need to rely on Subpart H.[11] The Sponsor's unfailing confidence in the safety of mifepristone even in the face of scientific evidence to the contrary is part of the reason that restrictions under section 505 could not be effective. The Sponsor's bias in favor of Mifeprex clouds its analysis of the inherent hazards of the Regimen. In fact, the Sponsor refused to participate in devising restrictions that were designed to protect Mifeprex patients.

As "evidence" of its cooperation, the Sponsor pointed to the restricted distribution plan it proposed to an FDA advisory committee in 1996.[12] The FDA Advisory Committee's reaction to

---

[5]  *See* Opposition Comments at 3 (citing 21 U.S.C. § 355).  *See also* Letter, Sandra Arnold to FDA/CDER, Office of Drug Evaluation III, Division of Reproductive and Urologic Products (Sept. 6, 2000): at 3-5 [FDA FOIA Release: MIF 001333-49].

[6]  21 C.F.R. § 314.520.

[7]  New Drug, Antibiotic, and Biological Product Regulations; Accelerated Approval, *Final Rule*, 57 Fed. Reg. 58942, 58951, § 20 (Dec. 11, 1992) ("*Subpart H Final Rule*").

[8]  *Subpart H Final Rule*, 57 Fed. Reg. at 58951, § 20.  *See also* New Drug, Antibiotic, and Biological Product Regulations; Accelerated Approval, *Proposed Rule*, 57 Fed. Reg. 13234, 13237, sec. III.B.3. (April 15, 1992) ("*Subpart H Proposed Rule*") (noting that without Subpart H restrictions, the drug "would be adulterated under section 501 of the act, misbranded under section 502 of the act, or not shown to be safe under section 505 of the act").

[9]  *See Subpart H Final Rule*, 57 Fed. Reg. at 58952, § 23 ("The postmarketing restrictions set forth in the proposal and in this final rule are intended to enhance the safety of a drug whose risks would outweigh its benefits in the absence of the restriction.").

[10]  FDA explained that "rather than interfering with physician or pharmacy practice, the regulations permit, in exceptional cases, approval of drugs with restrictions so that the drugs may be available for prescribing or dispensing."  *Subpart H Final Rule*, 57 Fed. Reg. at 58951-52, § 20.

[11]  *See* Opposition Comments at 5-6.

[12]  *See* Opposition Comments at 4.  The Sponsor was referring to a plan presented to FDA's Reproductive Health Drugs Advisory Committee ("FDA Advisory Committee").  *See* FDA Advisory Committee, *Hearings on New Drug Application for the Use of Mifepristone for Interruption of Early Pregnancy*, at 7 (July 19, 1996) (*FDA Hearings Transcript*)[FDA FOIA Release: MIF 005200-90, MIF 005209].  The Petitioners will, at times, cite to documents

**Kirkpatrick & Lockhart** LLP

4

the proposal, however, reveals its inadequacy; the Advisory Committee stated that "[w]e agree in concept with the proposal but have serious reservations on how it is currently described in terms of assuring safe and adequate credentialing of providers."[13]  The Sponsor also cited to its "comprehensive distribution plan" submitted in January 2000 and to its revised distribution plan submitted to FDA in March 2000.[14]  The Sponsor indicated in its January 2000 submission that it was providing the proposal only "in light of the unique situation surrounding abortion provision in the United States and not out of any medical safety concerns,"[15] and the March 2000 submission was prefaced with a denial that mifepristone was "a highly toxic and risky drug."[16]  However, as the Petition explained, the plans that the Sponsor submitted on both occasions were not designed with the safety of the patient in mind and when FDA proposed a set of restrictions that focused on patient safety, the Sponsor balked.[17]  Further, even if the Sponsor had participated willingly in drawing up restrictions that embodied key safeguards for patients, FDA could not necessarily expect similar cooperation from future generic producers of mifepristone.[18]

Conclusion

As explained above, the Mifeprex approval cannot rest independently on Section 505(d) of the FD&C Act.  The Sponsor refused to acknowledge that there are serious risks associated with the Mifeprex Regimen, let alone to propose restrictions designed to counteract those risks.  FDA approved Mifeprex under Subpart H in order to impose mandatory safety restrictions on the distribution and use of the drug.  That being said, the proper course would have been for FDA to have rejected the NDA because Mifeprex is unsafe and ineffective under Section 505 and fails to satisfy the Subpart H prerequisites that it treat a serious or life-threatening illness and provide a meaningful therapeutic benefit above existing treatments.[19]

---

contained in FDA's January 31, 2002 public release of documents (approximately 9,000 pages in 94 files) made pursuant to a Freedom of Information Act ("FOIA") request ("FDA FOIA Release") filed by the non-profit organization, Judicial Watch.  These bracketed citations will reflect the page numbering FDA has stamped on the bottom of each page of the document cited, for example: [FDA FOIA Release: MIF 000001-05].  The FDA webpage posting the 94 files is: <http://www.fda.gov/cder/archives/mifepristone/default.htm>.

[13]  FDA Advisory Committee, Minutes of July 19, 1996 Meeting (approved July 23, 1996): at 7 [FDA FOIA Release: MIF 000539-45, MIF 000545] (citing statement voted on unanimously by the FDA Advisory Committee).

[14]  *See* Opposition Comments at 4-5.

[15]  Amendment 039 to the NDA, Cover Letter, Danco to FDA (Jan. 21, 2000): at 1 [FDA FOIA Release: MIF 000525-26, MIF 000525].  The Sponsor's reference to the "unique situation surrounding abortion provision in the United States" reveals the Sponsor's primary concern in proposing restrictions, namely that the safety and confidentiality of *abortion providers* be maintained, not that patient safety be maximized.

[16]  Responses by Population Council to "FDA Letter, [redacted] to Arnold, Sandra (February 18, 2000)" (Mar. 2000): at 1 [FDA FOIA Release: MIF 000523-24, MIF 000523].

[17]  *See* Section I.D. herein; *see also* Petition at 50-54.

[18]  *See* FDA, Memorandum, re: NDA 20-687 (Feb. 17, 2000): at 3 [FDA FOIA Release: MIF 000583-85, MIF 000585] ("Subpart H approval will also allow the FDA to impose similar distribution restrictions and system on any future generic mifepristone approved for this indication.").

[19]  *See* Petition at 18-23 (explaining why Mifeprex was an inappropriate candidate for Subpart H).

**Kirkpatrick & Lockhart LLP**

### B.   The Mifeprex Clinical Trials Were Legally and Clinically Insufficient.

The Petition describes numerous problems that plagued the clinical trials underlying the approval of Mifeprex.  The Sponsor's Opposition Comments, rather than demonstrating the sufficiency of the clinical trial data that formed the basis for the Mifeprex NDA, heightened the Petitioners' concerns about the legal and clinical sufficiency of the French and U.S. Clinical Trials (collectively, "Mifeprex Trials").  First, a close reading of the Sponsor's Opposition Comments reveals that the Mifeprex Trials were not historically controlled but, rather, were *uncontrolled*.[20]  Second, even if the Mifeprex trials were historically controlled, as the Sponsor maintains, the use of historically controlled trials to support this NDA violated clearly established FDA rules and agency policies.[21]  Finally, the Sponsor's additional arguments in support of the scientific adequacy of the Mifeprex trials do not answer the objections presented in the Petition.  Untested by adequate clinical trials, the Mifeprex Regimen cannot be deemed to be safe and effective; accordingly, the marketing of Mifeprex must be halted.

#### 1.   The Mifeprex Trials Were Uncontrolled.

A review of the record regarding the scope and methodology of the trials, prompted by the Sponsor's defense of the Mifeprex Trials,[22] reveals that the trials used to support the Mifeprex NDA were not historically controlled, but were *uncontrolled*.[23]  The Petition cited to the discussion between a member of FDA's Advisory Committee and an FDA official in which the Mifeprex Trials were characterized as "historically" controlled.[24]  The Petitioners noted, however, that the Mifeprex Trials appeared to have been uncontrolled.[25]

The French Clinical Trials consisted of two studies in which all participants were given a mifepristone-misoprostol regimen, and no concurrent control group underwent a different abortion treatment.[26]  The Sponsor did not describe any historical (or "external") control group,[27]

---

[20]  Because the Mifeprex Regimen was the first drug regimen that FDA approved to induce abortions, in order to scientifically demonstrate the safety and effectiveness of this drug regimen, the Sponsor should have compared this new drug regimen to surgical abortions performed during the first 49 days after a woman's last menstrual period.

[21]  The Petitioners believe that a longitudinal analysis of all past occasions on which FDA accepted uncontrolled and historically controlled trials as an adequate basis for an NDA and all past occasions on which it has rejected the use of uncontrolled or historically controlled clinical trials would demonstrate the inadequacy of the clinical trials underlying this NDA.  FDA is uniquely qualified to perform such an analysis.

[22]  *See* Opposition Comments at 6-9.

[23]  One consequence of the failure to conduct properly controlled trials is that a *statistical* evaluation of effectiveness could not be made.  As FDA's statistical reviewer noted, with reference to the French trials: "[i]n the absence of a concurrent control group in each of these studies, it is a matter of clinical judgment whether or not the sponsor's proposed therapeutic regimen is a viable alternative to uterine aspiration for the termination of pregnancy."  *See* FDA, Statistical Review and Evaluation (May 21, 1996): at 7-8.

[24]  Petition at 36, n.168 (referring to statements by Dr. Cassandra Henderson, a member of the FDA Advisory Committee, and FDA's Dr. Ridgely C. Bennett at the Advisory Committee Hearings).

[25]  Petition at 35.

[26]  Letter, C. Wayne Bardin, Population Council, to FDA/CDER (June 5, 1995) (Submission Serial Number: 131) at 3-4 ("Bardin Letter")[FDA FOIA Release: MIF 004746-47].  The patients in the French Clinical Trials took 600 mg of mifepristone followed by 400 µg of misoprostol.  In one of the French Clinical Trials, some patients received an

**Kirkpatrick & Lockhart** LLP

6

nor did the Sponsor indicate that any of the well-established scientific guidelines for selecting a proper control group before commencing a historically controlled study were used for the French Clinical Trials.[28] The Sponsor, nevertheless, informed FDA that "[a]ll studies conducted with mifepristone in the induction of abortion can be regarded as having historical controls which consist of the body of information available on abortion using surgical procedures."[29] This observation appears to be the only basis for the Sponsor's claim that the French Clinical Trials were historically controlled, and it is inadequate.

The U.S. Clinical Trial mimicked the design of the French Clinical Trials.[30] All participants were given a mifepristone-misoprostol regimen, and no concurrent control group underwent a different abortion treatment. Descriptions of the U.S. Clinical Trial do not mention a control group, historical or otherwise, or the procedures according to which a control group was selected.[31] The absence of any reference to a control group suggests that the U.S. Clinical Trial was not historically (externally) controlled.[32]

The Sponsor's failure to precisely identify a historical control group is fatal to its claim that the Mifeprex Trials were historically controlled. Postulating the existence of some generic,

---

extra 200 µg of misoprostol if the first 400 µg was not sufficient to complete the abortion. The approved Mifeprex Regimen consists of 600 mg of mifepristone followed by 400 µg of misoprostol.

[27] Bardin Letter at 3-4.

[28] FDA guidance lists "some approaches to design and conduct of externally controlled trials could lead them to be more persuasive and potentially less biased:"

> A control group should be chosen for which there is detailed information, including, where pertinent, individual patient data regarding demographics, baseline status, concomitant therapy, and course on study. The control patients should be as similar as possible to the population expected to receive the test drug in the study and should have been treated in a similar setting and in a similar manner, except with respect to the study therapy. Study observations should use timing and methodology similar to those used in the control patients. To reduce selection bias, selection of the control group should be made before performing comparative analyses; this may not always be feasible, as outcomes from these control groups may have been published. Any matching on selection criteria or adjustments made to account for population differences should be specified prior to selection of the control and performance of the study."

FDA, "Guidance for Industry: E10 Choice of Control Group and Related Issues in Clinical Trials," (Rockville, Md.: May 2001): at 27 (§ 2.5.2) (*ICH: E10*). *ICH: E10* is available at: <http://www.fda.gov/cder/guidance/4155fnl.pdf>.

[29] Bardin Letter at 4.

[30] For a description of the U.S. Clinical Trial, *see* Irving M. Spitz, M.D., C. Wayne Bardin, M.D., Lauri Benton, M.D., and Ann Robbins, "Early Pregnancy Termination with Mifepristone and Misoprostol in the United States," *New England Journal of Medicine* 338 (Apr. 30, 1998): 1241-47 ("Spitz Article") [FDA FOIA Release: MIF 006692-97].

[31] *See, e.g.,* Spitz Article.

[32] The Spitz Article does compare two groups, patients who are differentiated by the age of their pregnancies, but a comparison of that type does not generate data about whether mifepristone-misoprostol abortions are safe and effective. To the extent the Sponsor believed that a correlation existed between the age of the pregnancy and the safety and efficacy of mifepristone-misoprostol abortions, any historical control group that the Sponsor used should have been classified by, among other characteristics, gestational age.

**Kirkpatrick & Lockhart** LLP

7

undefined comparison group based on the literature about surgical abortion does not suffice.[33]  In sum, the Mifeprex Trials were uncontrolled and cannot support the Mifeprex NDA.[34]

> 2.    Mifeprex Is Not a Drug for Which Historically Controlled Trials Were Appropriate.

Assuming arguendo, as the Sponsor maintains, that the Mifeprex Trials were historically controlled, they were nevertheless not *adequately* controlled and did not provide an adequate basis for approving the Mifeprex NDA.  In its Opposition Comments, the Sponsor erroneously suggested that "historically controlled" trials yield data of the same quality as data generated in concurrently controlled trials.[35]  In fact, the scientific community (and FDA specifically) regard historically controlled studies to be little better than uncontrolled studies and, therefore, generally disfavor their use with a few well-defined exceptions.[36]

Mifepristone-misoprostol abortions do not fall within any of those exceptions.  The Rochester Glossary states that historical controls are "mainly used in the study of rare diseases" in which sample size would not be sufficient to support a randomized clinical trial.[37]  This exception is inapplicable because the number of pregnant women seeking to terminate their pregnancies is large enough to support randomized, concurrently controlled trials.  Section 314.126(b)(2)(v) of FDA's rules cautions that the use of historical controls is "usually reserved

---

[33]  In addition, the Sponsor, in its Opposition Comments, invented a historical control group *ex post facto* by comparing the rate of spontaneous abortions in the general population of pregnant women with the rate of abortions in patients who underwent a mifepristone-misoprostol regimen during the Mifeprex Trials.  *See* Opposition Comments at 6-7 ("In these major studies, 92-95% of the 2508 women evaluated for efficacy had complete abortions … . By comparison, the rate of spontaneous abortion in the first trimester is assumed to be about 10%.").  Using the general population as a historical control group and retrospectively assuming a rate of spontaneous abortion in this group is not a scientifically acceptable approach to identifying a control group, particularly when, as here, an established surgical treatment group could have been used as the control group.

[34]  Section 314.126(e) of FDA's rules states that "[u]ncontrolled studies or partially controlled studies *are not acceptable* as the *sole* basis for the approval of claims of effectiveness."  21 C.F.R. § 314.126.  A publicly available FDA staff presentation about clinical trials illustrates this point.  The presentation explained, under the heading "Phase 3 – Comparative trial to evaluate drug," "Comparator group important – Standard of care, placebo, never nothing in serious or life-threatening diseases (ICH E3, E9, E10)."  *See* Peter A. Lachenbruch, "Some Things You Always Wanted to Know about Clinical Trials but Were Afraid to Ask," Slide Presentation for *CBER 101: An Introduction to the Center for Biologics Evaluation and Research (CBER)* (March 24-26, 2003): at 5 (emphasis in original) (available at: http://www.fda.gov/cber/summaries/cber101032403pl.pdf).

[35]  *See* Opposition Comments at 6-8.

[36]  For example, the Research Subjects Review Board of the University of Rochester Medical Center authored a guidance document, which states that "[h]istorical controls are considered to be the least reliable because they compare results obtained in another time, in another place and by another investigator."  University of Rochester Medical Center, Research Subjects Review Board, "Glossary of Research Terms," at 2 ("Rochester Glossary") (available at: http://www.urmc.rochester.edu/rsrb/pdf/glossary.pdf ).  Similarly FDA has explained, "[t]he limitations of historical controls are well known (difficulty of assuring comparability of treated groups, inability to blind investigators to treatment, etc.) and deserve particular attention."  FDA/CDER, *Guideline for the Format and Content of the Clinical and Statistical Sections of an Application* (July 1988): at 54.

[37]  Rochester Glossary at 2 ("Historical controls are mainly used in the study of rare diseases where the **n** is not sufficient for a randomized clinical trial.").

**Kirkpatrick & Lockhart** LLP

8

for special circumstances" and cites "studies of diseases with high and predictable mortality (for example, certain malignancies) and studies in which the effect of the drug is self-evident (general anesthetics, drug metabolism)."[38]  Mifepristone-misoprostol abortions do not fit within either of these categories.  First, the Regimen does not treat a condition with "high and predictable mortality."  Second, the effects of the Regimen are not "self-evident" as in the case of general anesthetics.  The Sponsor's discussion of the adequacy of its trial data reflects the Sponsor's fundamental misconception that there are only two possible outcomes of the Mifeprex Regimen, both of which are self-evident: regimen failure (failed abortion) and regimen success (death and complete expulsion of the fetus).  The Sponsor's focus on this dyadic set of possibilities (failure (0) or success (1)) obscures a whole range of less easily measurable, but critically important, outcomes.  Such outcomes include tissue retention, life-threatening hemorrhaging, persistent bleeding, infection, teratogenicity, pain, continued fertility, and psychological effects.

The Sponsor's reliance on FDA Guidance, *ICH: E10*, is also misplaced.[39]  Although *ICH: E10* includes a discussion of situations in which externally controlled trials may be used, it also warns of their inherently problematic nature.[40]  The Sponsor's reliance on the acknowledgement in *ICH: E10* that historical controls are appropriate in some circumstances is misplaced.  *ICH: E10* explains:

> An externally controlled trial should generally be considered only when prior belief in the superiority of the test therapy to all available alternatives is so strong that alternative designs appear unacceptable and the disease or condition to be treated has a well-documented, highly predictable course.  It is often possible, even in these cases, to use alternative, randomized, concurrently controlled designs (see section 2.1.5).[41]

---

[38]  21 C.F.R. § 314.126(b)(2)(v) provides:

> *Historical control.*  The results of treatment with the test drug are compared with experience historically derived from the adequately documented natural history of the disease or condition, or from the results of active treatment, in comparable patients or populations.  Because historical control populations usually cannot be as well assessed with respect to pertinent variables as can concurrent control populations, historical control designs are usually reserved for special circumstances.  Examples include studies of diseases with high and predictable mortality (for example, certain malignancies) and studies in which the effect of the drug is self-evident (general anesthetics, drug metabolism).

[39]  Opposition Comments at 7.

[40]  *See ICH: E10* at 29 (§ 2.5.7)("The externally controlled study cannot be blinded and is subject to patient, observer, and analyst bias; these are major disadvantages. It is possible to mitigate these problems to a degree, but even the steps suggested in section 2.5.2 cannot resolve such problems fully, as treatment assignment is not randomized and comparability of control and treatment groups at the start of  treatment, and comparability of treatment of patients during the trial, cannot be ensured or well assessed. It is well documented that externally controlled trials tend to overestimate efficacy of test therapies. It should be recognized that tests of statistical significance carried out in such studies are less reliable than in randomized trials.").  *See also*  Henry Sacks, Ph.D., M.D., Thomas C. Chalmers, M.D., Harry Smith, Jr., Ph.D., "Randomized Versus Historical Controls for Clinical Trials," *The American Journal of Medicine* 72 (Feb. 1982): 233-240, 233 ("The data suggest that biases in patient selection may irretrievably weight the outcome of [historical controls] in favor of new therapies.").

[41]  *ICH: E10* at 28 (§ 2.5.4).

**Kirkpatrick & Lockhart LLP**

9

Even proponents of mifepristone-misoprostol abortions would not argue that such abortions are superior to alternative methods of abortion.[42]  In fact, the Mifeprex Regimen has been shown to be an inferior method of abortion.[43]  Absent a clear belief in the Regimen's superiority, concurrently controlled trials should have been performed.[44]  Furthermore, pregnancies often do not follow a "well-documented, highly predictable course."[45]  Mifepristone-misoprostol abortions do not satisfy either prong of the *ICH: E10* prerequisite for the use of historically controlled studies.[46]

### 3.    The Mifeprex Clinical Trials Did Not Establish a "Meaningful and Therapeutic Benefit" As Required By Subpart H.

Drugs, like Mifeprex, approved pursuant to Section 314.520 (Subpart H) of the Agency's rules,[47] must provide a "meaningful therapeutic benefit to patients over existing treatments."[48]  Subpart H drugs "will have had effectiveness demonstrated on the basis of adequate and well-controlled studies."[49]  The Sponsor argued that "meaningful therapeutic benefit" does not impose design features for the clinical trials required to support an NDA approved pursuant to Subpart H.[50]  The Sponsor's position is inconsistent with the plain meaning of the rule.  Subpart H is reserved for drugs that have a higher risk profile than drugs approved through standard FDA processes.  A meaningful therapeutic benefit over available therapies justifies the heightened risks, and only well-controlled clinical trials can demonstrate that such a benefit exists.[51]

---

[42]  *See, e.g.*, Richard Hausknecht, M.D., "Mifepristone and Misoprostol for Early Medical Abortion: 18 Months Experience in the United States," *Contraception* 67 (2003): 463-65, 465 ("Hausknecht Article") ("Which approach to early abortion, medical or surgical, is safer remains unknown but it does appear that medical abortion is as safe as early surgical abortion.  There are no recent data on failed surgical abortions but the failure rate of mifepristone/misoprostol medical abortions is higher than that reported decades ago for suction curettage.")

[43]  Petition at 21-22 (discussing Jeffrey T. Jensen, Susan J. Astley, Elizabeth Morgan, and Mark D. Nicols, "Outcomes of Suction Curettage and Mifepristone Abortion in the United States: A Prospective Comparison Study," *Contraception* 59 (1999): 153-159 [FDA FOIA Release: MIF 000438-44]).

[44]  The Petitioners believe that trials comparing mifepristone-misoprostol abortion with the surgical alternative were not conducted for precisely this reason *(i.e.,* such trials would have demonstrated that mifepristone-misoprostol abortions were inferior).  Because of its inferiority, the Mifeprex Regimen is contraindicated.

[45]  Even though pregnancy occurs regularly, complications arise during pregnancy on a frequent basis (*e.g.,* approximately 2% of pregnancies are ectopic and others involve such complications as high blood pressure, ruptured placenta, infection, cysts, abnormal pain, anemia, and fetal malposition).

[46]  Even if mifepristone-misoprostol abortion were deemed to be an acceptable candidate for historically-controlled testing, the Sponsor should have attempted to devise concurrently controlled trials anyway.  *ICH: E10* states that even when historically controlled testing may be appropriate, "[i]t is often possible … to use alternative, randomized, concurrently controlled designs."  *ICH: E10* at 28 (§ 2.5.4).

[47]  21 C.F.R. § 314.520.

[48]  21 C.F.R. § 314.500.

[49]  *See Subpart H Final Rule*, 57 Fed. Reg. at 58953, § 25.

[50]  Opposition Comments at 8.

[51]  The Sponsor also argued that by the time FDA decided to approve Mifeprex using Subpart H, the Sponsor had completed the Mifeprex Trials and that FDA could not have required the Sponsor to modify the trial design and perform new trials for Subpart H purposes.  *See* Opposition Comments at 9, n. 4.  FDA is under no obligation to

**Kirkpatrick & Lockhart** LLP

10

The Sponsor argued that two of the examples of "meaningful therapeutic benefit" listed in Section 314.500 ("ability to treat patients unresponsive to, or intolerant of, available therapy") present situations in which comparative trials with the existing therapy are not feasible.[52]  Yet, sponsors who intend their drugs to treat unresponsive or intolerant patients are not exempt from the requirement to conduct "well-controlled" trials.  In fact, Subpart H trials are routinely designed to compare, in unresponsive or intolerant patients, the safety and effectiveness of the new therapy with either the standard of care or a placebo.[53]

The Sponsor further claimed that FDA "routinely approves Subpart H drugs on the basis of study designs that do not compare the Subpart H drug directly to existing therapy."[54]  In support of this claim, the Sponsor offered one example, the Subpart H approval of the leprosy drug, Thalomid (thalidomide).[55]  That example is inapposite because the Thalomid NDA was supported by three controlled trials despite the existence of factors that might have supported an exemption from the standard trial requirements.[56]  In one of the three underlying trials, thalidomide plus the standard treatment was compared against the standard treatment alone plus a placebo.[57]  This study design allowed for a meaningful statistical analysis of the effectiveness of this drug in comparison with the current available standard of care – in direct contrast to the faulty study designs and minimal statistical analysis associated with the Mifeprex NDA.

<u>Conclusion</u>

By statute and agency regulation, drug applications must be supported by adequate and well-controlled studies.  The failure of the Sponsor to offer legally and scientifically sufficient trial data should have been fatal to its NDA and now requires withdrawal of that approval.[58]

---

approve an NDA at all, let alone to approve an NDA based on insufficient trial data.  It is not uncommon at any stage of the NDA review process for FDA to require a drug sponsor to correct or amend an NDA by conducting properly designed and executed studies.  Had the sponsor followed standard scientific norms and performed randomized, concurrently controlled trials comparing mifepristone-misoprostol abortion with surgical abortion it would have been able to supply comparative data.

[52] *See* Opposition Comments at 8-9.  Mifepristone-misoprostol abortions do not fall within either of these examples.  Because surgical abortion, the standard of care, is the backup procedure if the Mifeprex Regimen fails, *ipso facto* the Regimen cannot be used to treat patients unresponsive to or intolerant of the standard of care.

[53] Furthermore, in this instance, the Sponsor did not attempt to test the drug in populations that it identified as intolerant or unresponsive and, indeed, the Mifeprex Regimen is not an option for patients unresponsive to or intolerant of surgical abortion because surgical abortion is the back-up procedure for Mifeprex patients.

[54] Opposition Comments at 9.

[55] NDA 20-785.

[56] The fact that leprosy is a rare disease in the U.S. makes it difficult to perform clinical trials.  In addition, there are compassionate reasons for not awaiting the results of randomized, double-blinded comparator controlled clinical trials before treating patients suffering from leprosy.  The fact that well-controlled trials were employed despite the existence of these mitigating factors is evidence of the value that the scientific community places on well-controlled trials.

[57] *See* Petition at 39 (discussing the thalidomide trials).  In one study, all participants received either thalidomide or a placebo in addition to the standard dapsone treatment.

[58] *See* Petition at 30-35 (discussing statutory and regulatory requirements for clinical trials).

Alliance.App. 359

**Kirkpatrick & Lockhart** LLP

11

### C.    The Inclusion of Misoprostol in the Mifeprex Regimen Was Unlawful.

The Mifeprex Regimen combines the use of mifepristone and a second drug, misoprostol (Cytotec™).  Although FDA never approved misoprostol as a stand-alone abortifacient, it approved misoprostol for use as an abortifacient in combination with mifepristone and mandated this use in the Mifeprex Package Insert.  As explained in the Petition, FDA effectively sanctioned the use and promotion of misoprostol for an unapproved indication.[59]  The promotion of an unapproved use contradicts the FD&C Act, which takes the position that "a drug manufacturer may not promote [its] product for any use other than the ones for which the company received FDA approval."[60]

In its Comment, the Sponsor defended the *de facto* approval of misoprostol for a new indication as an abortifacient and asserted that "FDA routinely approves drugs for use in combination with previously approved drugs without requiring any change in the labeling of the previously approved drug."[61]  The Sponsor denied that this practice "puts either FDA or the sponsor of the later-approved drug in the position of 'promoting' off-label use of the previously approved drug."[62]  The Sponsor offered four examples to support its position that this practice is not uncommon.[63]

In fact, the Sponsor's four examples support the position set forth in the Petition that subsequently approved drugs (Drug Bs – like Mifeprex) may reference previously approved drugs (Drug As – like misoprostol) on Drug B's labeling only for *FDA-approved* indications.[64]

---

[59]  *See* Petition at 41-48.  The drug's manufacturer, G.D. Searle & Co. ("Searle"), did not file a supplemental NDA to obtain approval for misoprostol's use as an abortifacient.  Searle has subsequently been purchased, most recently, by Pfizer.  *See* Petition at 42, n.188.

[60]  *See* Elizabeth A. Weeks, "Is It Worth the Trouble?  The New Policy on Dissemination of Information on Off-Label Drug Use under the Food and Drug Modernization Act of 1997," *Food and Drug Law Journal* 54 (1999): 645-65, 645.

[61]  Opposition Comments at 9.

[62]  Opposition Comments at 10.

[63]  Opposition Comments at 9-10.

[64]  The first example offered by the Sponsor is the approval by FDA on September 10, 2001 of the combination of Xeloda (capecitabine) and Taxotere (docetaxel) for treating patients with metastatic breast cancer that has progressed after treatment with an anthracycline-containing cancer therapy.  FDA initially approved Xeloda, an oral therapy, for the treatment of breast cancer on April 30, 1998, and FDA approved Taxotere, an intravenous product, for the treatment of advanced breast cancer on May 15, l998.  *See* FDA Press Release, "FDA Approves Xeloda in Combination with Taxotere for Advanced Breast Cancer" (Sept. 10, 2001) (available at: <http://www.fda.gov/bbs/topics/ANSWERS/2001/ANS01101.html>).  Thus, when Xeloda and Taxotere are used together, each is being used for an FDA-approved use.
       The Sponsor's second example is FDA's approval on July 15, 1999 of Actos to improve glycemic control in patients with Type 2 diabetes.  Actos is indicated as a monotherapy and for use in combination with a sulfonylurea, metformin, or insulin "when diet and the single agent does not result in adequate glycemic control."  Letter, FDA/CDER to Mikihiko Obayashi, President, Takeda America Research & Development Center, Inc. (July 15, 1999).  When used alone or together to treat Type-2 diabetes, each drug is being used for one of its FDA-approved indications.

EX. 26 pg. 011

**Kirkpatrick & Lockhart LLP**

12

Each example describes drug products that are being used in combination to treat indications approved for the single drugs at issue.

Upon close examination, the Sponsor's four examples underscore the fact that FDA's approval of mifepristone for use in combination with misoprostol, a drug never approved as an abortifacient, constitutes a significant departure from FDA precedents.  As Professor Richard Merrill explained, "[i]n FDA's view, to promote any use of [its] new drug, the manufacturer must have agency approval – allowing that use to be included in the official labeling."[65]  The approval in this instance struck at the heart of FDA's long-held policy that in order for a new drug use to be promoted, the drug's sponsor must submit an application seeking to demonstrate the safety and effectiveness of that new use.[66]  It defies logic to imagine that Danco could be allowed to do with misoprostol what Searle could not do with its own drug – that is, promote an unapproved use of misoprostol.  Yet, that activity is exactly what FDA permitted in Mifeprex's case.  FDA's regulatory framework would be rendered toothless if third parties were permitted to behave in this manner.

In fact, Searle, which held the patent for misoprostol,[67] apparently *objected* to adding an indication for abortion to the Cytotec label.  Searle's objections were overridden because only the combined regimen was effective.  As the Sponsor explained, "[t]he fact is that mifepristone used as contemplated in 1983 was a failed drug – it was not sufficiently efficacious to have ever been approved."[68]  Perhaps to avoid having to obtain Searle's cooperation, in an unprecedented

---

The Sponsor's third example is FDA's approval on October 26, 2001 of Viread (tenofovir disoproxil fumarate), a nucleotide reverse transcriptase inhibitor of HIV, for combined use with other antiretroviral agents for the treatment of HIV-1 infection in adults.  The antiretroviral agents with which Viread is to be used have separately been approved for the treatment of HIV.  Letter, FDA/CDER to Rebecca Coleman, Gilead Sciences, Inc. (Oct. 26, 2001) (NDA 21-356).  The fact that Viread was not approved for use as a monotherapy in the treatment of HIV does not alter the analysis, but rather makes it a useful comparison for mifepristone, which has been approved as an abortifacient only in conjunction with misoprostol.  Thus, when used together, each drug is being used for one of its FDA-approved indications.

The Sponsor offers as its fourth example FDA's approval of Nexium (esomeprazole magnesium) on February 20, 2001 for the treatment of erosive esophagitis and other symptoms associated with GERD (Gastroesophageal Reflux Disease).  Letter, FDA/CDER to Kathryn D. Kross, AstraZeneca, LP (Feb. 20, 2001) (NDA 21-153; NDA 21-154).  For one of its approved indications, *H. pylori* eradication, Nexium is used in combination with amoxicillin and clarithromycin, both of which have been approved for treating *H. pylori*.  Thus, when they are used in combination with Nexium, each drug is simply being used for one of its approved indications.

[65]  Richard A. Merrill, "The Architecture of Government Regulation of Medical Products," *Univ. of Virginia Law Review*  82 (1996): 1753-1866, at 1766, n.40.  As noted in the Petition, former FDA general counsel, Peter Barton Hutt, observed that FDA's actions with respect to misoprostol "set[ ] an extraordinary precedent" because FDA was "seemingly encouraging a drug's unapproved use."  *See* Petition at 42-43 (Hutt's quotation was reported in Rachel Zimmerman, "Clash Between Pharmacia and FDA May Hinder the Use of RU-486," *Wall Street Journal* (Oct. 18, 2000): at B1).

[66]  A drug may be deemed "new" because of "[t]he newness of use of such drug in diagnosing, curing, mitigating, treating, or preventing a disease, or to affect a structure or function of the body, even though such drug is not a new drug when used in another disease or to affect another structure or function of the body."  21 C.F.R. § 310.3(h)(4).

[67]  The patent for misoprostol has since expired, but at the time the Mifeprex Regimen was approved, Searle held exclusive rights to that patent.

[68]  Population Council Response to the Request for Revision of the Regulatory Review Period Determination for MIFEPREX® Submitted by Corcept Therapeutics Inc., Docket No. 01E-0363 (July 2, 2002): at 3 ("Sponsor's

**Kirkpatrick & Lockhart** LLP

13

"joint decision" in July 1994, FDA and the Sponsor "determined that the NDA need not cover misoprostol as well as mifepristone."[69]   The Sponsor subsequently explained, however, that "there can be no doubt that the approved human drug product contemplates both mifepristone and misoprostol, as shown in the approved labeling,"[70] which "specifically states that administration of mifepristone must be followed by administration of misoprostol."[71]   The Sponsor added that "FDA has made clear on numerous occasions, FDA review of an NDA is 'inextricably intertwined' with the proposed labeling for the product."[72]   In so stating, the Sponsor speaks out of both sides of its mouth – acknowledging that combined use with misoprostol is necessary for Mifeprex's effectiveness and labeling, but "agreeing" with FDA that a corresponding misoprostol approval is not necessary.

Conclusion

In summary, the inclusion of misoprostol in the Mifeprex Regimen, outside of the NDA approval process for misoprostol, was unlawful.   In order to reverse the extraregulatory approval of misoprostol as an abortifacient, FDA must withdraw its approval of the Mifeprex NDA.

**D.**      **Mifeprex-Misoprostol Abortions Are Not Safe.**

The Sponsor continued in its Opposition Comments to defend the safety of Mifeprex, but has not allayed the concerns set forth in the Petition.[73]   Rather than address the scientific and medical issues raised in the Petition, the Sponsor has mischaracterized them.   As discussed above, the trials submitted by the Sponsor to support its NDA did not establish the safety of mifepristone-misoprostol abortions, and post-approval data on the Regimen have done no better - - serving only to raise the Petitioners' concerns about the safety of the Mifeprex Regimen.

1.      FDA Determined that Mifeprex Would Be Unsafe without Restrictions.

FDA approved mifepristone under the restricted distribution prong of Subpart H, which FDA reserves for drugs that "can be used safely only if distribution or use is modified or restricted."[74]   Accordingly, the Mifeprex Regimen includes a number of restrictions.[75]   As the

---

Response to Corcept").  In this document, the Sponsor responded to Corcept's June 10, 2002 request that FDA consider 1983 rather than August, 4, 1994 as the starting date for the regulatory review of the Mifeprex investigational new drug application ("IND").  The Sponsor sought to convince FDA that the appropriate period for determining patent length began on August 4, 1994, the date of the IND that allowed for the investigation of mifepristone plus misoprostol to induce abortions.  The Sponsor did not obtain the patent extension that it sought. The initial ruling in the Population Council's favor was reversed by FDA.  *See Note*, Determination of Regulatory Review Period for Purposes of Patent Extension; Mifeprex; Amendment, 67 Fed. Reg. 65358 (Oct. 24, 2002).

[69]   Sponsor's Response to Corcept at 2.

[70]   Sponsor's Response to Corcept at 3.

[71]   Sponsor's Response to Corcept at 2.

[72]   Sponsor's Response to Corcept at 2-3 (citation omitted).

[73]   *See* Opposition Comments at 10-14.

[74]   *Subpart H Final Rule*, 57 Fed. Reg. at 58942 ("Summary").

**Kirkpatrick & Lockhart** LLP

14

Petition explained, however, these restrictions were inadequate to make the drug safe.[76]
Moreover, the Sponsor never acknowledged the inherent dangers posed by the approved
Mifeprex Regimen, balked at implementing distribution restrictions, and dismissed out of hand
the challenges about the adequacy of the restrictions to reduce the dangers of the Mifeprex
Regimen.[77]  Now that it has FDA's imprimatur to market the drug, the Sponsor takes minimal, if
any, actions to carry out the required restrictions.[78]

Additionally, FDA's final decision to omit key restrictions from the approved Regimen
has subjected patients who use the Mifeprex Regimen to unnecessary risks.  A pre-procedure
ultrasound, for example, is necessary to evaluate the gestational age because the Mifeprex
Regimen has been shown to be less effective and riskier to the patient as gestational age
increases.[79]  Ultrasound is also necessary to identify women whose pregnancies are ectopic and
who should not undergo the Mifeprex Regimen.[80]  Further, because complications and failures
are common and predictable and can seriously endanger the health of the patient, FDA should

---

[75]  For a list of the restrictions, *see* Letter, FDA/CDER to Sandra P. Arnold, Population Council (Sept. 28, 2000): at
2 ("Mifeprex Approval Letter").  The Sponsor contends in its Opposition Comments that it cooperated with FDA by
proposing restrictions.  *See* Opposition Comments at 10-11.  This contention reflects the Sponsor's failure to
distinguish between restrictions on the distribution of a drug to prescribing physicians and restrictions designed to
ensure patient safety.  Furthermore, contrary to the Sponsor's suggestion that decisions about the restrictions in the
Mifeprex Regimen were the product of "discussion, negotiation, give and take, debate, even on occasion disputes,
between FDA and the Sponsors [that] is characteristic of the review process for many drugs" (Opposition Comments
at 11), the Sponsor went to great lengths to avoid including safety restrictions in the Mifeprex Regimen.  In fact,
after the Sponsor failed to suggest appropriate restrictions to protect Mifeprex patients, FDA proposed its own set of
restrictions.  Then, the Sponsor complained publicly about the allegedly onerous restrictions.  FDA relented and
inappropriately eliminated a number of key restrictions.  *See* Petition at 49-57 for a discussion of the development of
and the Sponsor's opposition to safety restrictions.

[76]  *See* Petition at 57-65.

[77]  *See* Opposition Comments at 10.  The Petition did not assert that the approved regimen must exactly follow the
regimen employed during the trials.  Nevertheless, if trials include important safeguards that are omitted from the
approved regimen, then the relevance of the data generated by those trials is undermined.  For this reason, a trial
should be designed to reflect the anticipated conditions under which a drug will be used.  *See* Petition at 75-76. For
example, had the Sponsor designed the trial to reflect anticipated conditions of use, misoprostol probably would
have been administered vaginally during the trials, which appears to be the standard method of administration now
that the Mifeprex Regimen is approved.  Had the trial protocol called for vaginal administration, it would have
drawn attention to the unlawful inclusion of misoprostol in the Regimen because misoprostol is approved only for
*oral* use.  As FDA has explained, "[i]n order to change or add a new dosing regimen to the labeling, the sponsor
must submit data to FDA from clinical trials that show the new regimen is safe and effective."  *See* FDA,
"Mifepristone Questions and Answers 4/17/2002" ("FDA Q & As") at Question 9 ("Why are physicians using
misoprostol 'off-label,' in other words, using misoprostol virginally at different doses?") (available at:
<http://www.fda.gov/cder/drug/infopage/mifepristone/mifepristone-qa_4_17_02.htm>).

[78]  *See* Section I.D.3, herein.

[79]  *See* Spitz Article at 1241 ("Results").

[80]  The Sponsor's Opposition Comments addressed the use of ultrasound only for the purpose of dating pregnancies.
As explained in the Petition, ectopic pregnancies cannot be treated by the Mifeprex Regimen and the symptoms of
ectopic pregnancy are likely to be mistaken as the normal effects of undergoing a Mifeprex abortion.  For a more
complete discussion of the necessity of using ultrasound to identify ectopic pregnancies, *see* Petition at 60-61.

EX. 26 pg. 014

**Kirkpatrick & Lockhart** LLP

15

have required prescribing physicians to be trained in mifepristone-misoprostol administration and surgical abortions and to have *admitting* privileges at a nearby emergency facility.[81]

FDA determined that Subpart H restrictions were necessary because, without them, mifepristone-misoprostol abortions were not safe. Thus, the Petitioners' concerns with the Regimen's safety rest on the belief that the weakness of the Regimen's restrictions is inconsistent with FDA's decision to approve the drug under Subpart H.

        2.    <u>Post-approval Evidence Confirms that the Approved Distribution Restrictions Were Insufficient to Adequately Protect Patients.</u>

The Sponsor's analysis inaccurately characterized the post-approval experience with the Mifeprex Regimen.[82] A number of life-threatening adverse events experienced by Mifeprex patients caused FDA to work with the Sponsor to issue a letter to health care providers.[83] The

---

[81] In fact, FDA proposed to include such restrictions in the Mifeprex Regimen. The set of restrictions proposed by FDA on June 1, 2000, would have required physicians prescribing Mifeprex to be "trained and authorized by law" to perform surgical abortions, to be trained in administering the Mifeprex Regimen and handling resulting adverse events, and to have "continuing access (*e.g.*, admitting privileges) to a medical facility equipped for instrumental pregnancy termination, resuscitation procedures, and blood transfusion at the facility or [one hour's] drive from the treatment facility." *See* FDA, "FDA Proposed Restricted Distribution System for NDA 20-687 on 6/1/00" (June 1, 2000) [FDA FOIA Release: MIF 000522]. *See also* American College of Obstetricians and Gynecologists, "Analysis of the Possible FDA Mifepristone Restrictions" (July 27, 2000): at 1 (setting forth FDA's second proposed restriction, which is redacted in the publicly available copy of FDA's proposal; also providing the redacted portion of the fifth restriction)[FDA FOIA Release: MIF 001366-69].

[82] Opposition Comments at 10, 13-14. The Sponsor pointed to a recent article authored by the medical director of Danco, Dr. Richard Hausknecht, as evidence that Mifeprex is safe. *See* Opposition Comments at 10 (citing Hausknecht Article); regarding Dr. Hausknecht, *see also* Petition at 71, n.309. Unfortunately, the article, which reports on the drug's use in the United States since approval, relies on data that are incomplete and of questionable quality. First, reliable data as to the number of patients who have undergone the Mifeprex Regimen is not available. Dr. Hausknecht used a figure of 80,000, which was derived from "sales figures [for Mifeprex] and known patterns of mifepristone utilization." Hausknecht Article at 464. This number may be too high as it may not take into account drugs that were ordered but not used. Second, the number of adverse events reported is likely to be significantly underestimated. Abortion clinics, which (according to Dr. Hausknecht's estimates) carried out approximately 90% of Mifeprex abortions, may have a disincentive to report adverse events from a procedure that they promote and may be less likely than physicians in private practice to report adverse events. In addition, it is likely that many patients were lost to follow up. In the U.S. Clinical Trial, 106 of the 2,121 patients (or nearly 5%) did not return for their third required visit. A higher "lost to follow up" number is to be expected outside of the clinical setting. Finally, the article's descriptions of the adverse events that were reported generally appear to be incomplete and tend to downplay any possible connection with the Mifeprex Regimen. For example, the article explained that a twenty-one year old woman had suffered a coronary artery occlusion five days after she received misoprostol. *See* Hausknecht Article at 464, col. 2. The article provided few details about her Mifeprex abortion and pointed to her "strong family history of heart disease" without also mentioning that there are no data on the safety of the Mifeprex Regimen in women with cardiac problems and these women were excluded from the Clinical Trials. In sum, an objective assessment of the safety and efficacy of mifepristone-misoprostol abortions would require a concurrently-controlled, randomized comparison of a mifepristone-misoprostol regimen reflecting actual conditions of use with surgical abortion. The Sponsor did not conduct or provide data from such trials in support of its application and Dr. Hausknecht's article – a very general overview without the first-hand, patient-level detail necessary to scientifically assess the safety of the Mifeprex Regimen – does not fill this void.

[83] Danco Laboratories, Open Letter to Health Care Providers (Apr. 19, 2002) ("Dear Doctor Letter") (available at: <http://www.fda.gov/medwatch/SAFETY/2002/mifeprex_deardoc.pdf>).

EX. 26 pg. 015

**Kirkpatrick & Lockhart LLP**

Petition discussed these life-threatening adverse events which included ruptured ectopic pregnancies, serious systemic bacterial infections, and a coronary event.[84]  The Sponsor, in its Opposition Comments, insisted that "FDA has not found any causal connection" between the Mifeprex Regimen and these adverse events.[85]  However, the clear implication of the issuance of the Dear Doctor Letter and FDA's accompanying "Questions and Answers" is that such a causal link does exist.

The serious adverse events reported to date are consistent with concerns about the drug regimen that were expressed prior to the approval.[86]  The recent death of Holly Patterson, an eighteen year old from Livermore, California, unfortunately epitomizes the concerns of the Petitioners.[87]  According to Ms. Patterson's father, at the time of his daughter's death, she was terminating her pregnancy with a Mifeprex Regimen prescribed by the Planned Parenthood in Hayward, California.  Apparently, Ms. Patterson started the abortion procedure on Wednesday, September 10, 2003, by taking mifepristone tablets.  On Saturday, September 13, 2003, she apparently took the misoprostol that the clinic had given her.  By Sunday she was having such severe cramping and bleeding that her boyfriend took her to the emergency room.  Ms. Patterson received pain killers and was sent home, but she continued to bleed severely and experienced acute pain that prevented her from walking.  Early Wednesday, September 17, 2003, Ms. Patterson's boyfriend took her back to the emergency room, where she died that afternoon.

According to Mr. Patterson, the doctor told him that his daughter "hadn't aborted all the fetus, and she had fragments left in her, and she had a massive systemic infection and went into septic shock."[88]  The results of the coroner's investigation are not expected to be released for several months, but Ms. Patterson's apparent death of a serious systemic bacterial infection is not the first such death since FDA approved Mifeprex.  As noted above, the Dear Doctor Letter

---

[84] *See* Petition at 65-71.  As the number of mifepristone-misoprostol abortions rises, the number of serious adverse events associated with these abortions is likely to increase as well.  Because the normal progression of the Mifeprex Regimen is characterized by prolonged bleeding, the patient bears the responsibility for determining how much bleeding is excessive and whether she needs to seek medical assistance.  Health care providers who are not experienced providers of abortion, generally, or mifepristone-misoprostol abortions, specifically, may be poorly equipped to assist the patient in determining whether medical intervention is necessary, let alone to provide the needed medical intervention.

[85] *See* Opposition Comments at 13.

[86] *See* Americans United for Life *et al.*, Citizen Petition (Feb. 28 1995) (requesting FDA's consideration of a number of potential hazards of mifepristone-misoprostol abortions) [FDA FOIA Release: MIF 006144-6248].

[87] Julian Guthrie, "Pregnant Teen's Death Under Investigation; East Bay Woman Had Taken RU-486, According to Father," *San Francisco Chronicle* (Sept. 19, 2003): at A21 (available at: http://www.sfgate.com).  *See also* Gina Kolata, "Death at 18 Spurs Debate Over a Pill for Abortion," *New York Times* (Sept. 24, 2003): at A24 ("There were 264 adverse reactions, including infections, bleeding, allergic reactions and tubal pregnancies.").

[88] *Id.  See also* Julian Guthrie, Sabin Russell, and Katherine Seligman, "After Daughter's Death, Father Wants Close Look at RU-486; Abortion Pill's Safety Defended by Doctors as Better than Surgery," *San Francisco Chronicle* (Sept. 20, 2003): at A17 (available at: http://www.sfgate.com/cgi-bin/article.cgi?file=/chronicle/archive/2003/09/ 20/BA310011.DTL) ("Patterson said the attending physician at Pleasanton's Valley Care Medical Center told him his daughter had died of septic shock – a severe bacterial infection.  'The doctor told me she had fragments of the fetus still left in her uterus and that caused the infection.'").

**Kirkpatrick & Lockhart** LLP

17

reported "[t]wo cases of serious systemic bacterial infection (one fatal)."[89]  The presence of retained products of conception can lead to the development of intrauterine or systemic infection, and it is possible that mifepristone could potentiate this possibility via negative effects on immune system function or normal protective mechanisms.[90]

In addition to questions about Mifeprex causation in this case, questions also have been raised about the role that Ms. Patterson or her local hospital emergency room may have played in contributing to her death.[91]  These questions cannot be answered without recognizing that patients and emergency room physicians may be unable to distinguish the normal progress of the Regimen from a life-threatening situation.  Consequently, it is not at all clear that emergency rooms will be able to rescue dangerously ill Mifeprex patients from the peril in which they have been placed by the Regimen.  Consider the plausible scenario described in the footnote below.[92]  The severity of the reported adverse events requires FDA action to remove Mifeprex from the market.

---

[89]  Dear Doctor Letter at 1.  The fatality apparently precipitated a halt in the Population Council's clinical trials of mifepristone in Canada.

[90]  Given the nature of the Mifeprex Regimen, the embryo or other products of conception will not be expelled from the uterus in a number of cases.  It is well known that the presence of retained necrotic products of conception can lead to intrauterine and systemic infection.  Furthermore, it is possible that mifepristone itself may alter the local immune response at the level of the endometrium or the cervix.  There are numerous alterations of the immune system during pregnancy, and progesterone can affect immune system function.  Therefore, it is plausible that a progesterone receptor antagonist like mifepristone could negatively affect the normal immune system within the uterus, or compromise antibacterial mechanisms of the cervix, making a woman more susceptible to infection. *See, e.g.*, World Health Organization (WHO), "Pregnancy Termination with Mifepristone and Gemeprost: A Multicenter Comparison between Repeated Doses and a Single Dose of Mifepristone," 56 Fertility & Sterility 32-40 (1991) (29.4% of patients with incomplete abortion compared with 2.6% of those with complete abortion received antibiotics during a six week follow-up period for suspected genitourinary infection; both groups combined accounted for 3.9% of the total study population).

[91]  *See, e.g.*, Gina Kolata, "Death at 18 Spurs Debate Over a Pill for Abortion," *New York Times* (Sept. 24, 2003): at A24 ("But it is unclear what happened to Holly Patterson.  Did she have enough medical supervision while taking the pills?  When did she seek medical attention?  Did she wait until it was too late?  Did she tell the doctors in the emergency room that she had taken mifepristone?  Why, in fact, did she die?").

[92]  A patient comes to the emergency room complaining of significant pelvic pain and cramps.  She reports that she has taken Mifeprex and misoprostol for a medical abortion.  At this time, she has no significant change in vital signs (*i.e.*, no fever or very low grade fever – which can be related to misoprostol – and no significant tachycardia, etc.).  The emergency room physician, knowing that this drug combination normally causes cramping at this stage in the process, assumes she has a personal low pain tolerance threshold, and, therefore, gives her pain medications to try to alleviate her discomfort until the abortion completes.  However, the patient may be in the early stage of an intrauterine infection even though she is not yet manifesting other signs of that condition aside from pain and bleeding which are both part of the Mifeprex abortion process.  At this stage, the emergency room physician has no good way to detect that an infection has begun.  Furthermore, even if the emergency room physician found evidence of retained tissue in the uterus, the physician would not be surprised or alarmed by that discovery given the nature of mifepristone-misoprostol abortions.  Unless the patient had significant hemorrhaging or evidence of infection, no intervention would be necessary or even warranted since one would presume that the abortion was going according to plan at that juncture (recall that bleeding can last up to several weeks duration).  So to continue this hypothetical scenario, the patient goes home, and the infection subsequently becomes systemic.  The patient goes into septic shock and is not able to be saved by the time she re-presents to the emergency room.  It would not be surprising if Ms. Patterson's death followed such a course given statements made to the press by her father.  In this credible scenario the Mifeprex Regimen, after having placed her in great danger, effectively camouflaged the seriousness of her condition from the emergency room physician.

**Kirkpatrick & Lockhart** LLP

18

Furthermore, FDA cannot rely on the "spotty" reporting of adverse events for the Mifeprex Regimen. The usual flow of post-approval adverse event information will not be forthcoming for this drug. It is questionable whether individual lawful distributors of Mifeprex, who tend to be outside the mainstream pharmaceutical wholesale distribution industry, will routinely report adverse events to FDA.[93] Also, because the drug is intended to be administered in physicians' offices, a pharmacist is unlikely to dispense the product or hear of drug-drug and drug-food interactions, or other adverse events. Moreover, the types of facilities that provide medical and surgical abortions are often staffed with social-work counselors and health care workers who are not medical doctors and have limited medical training. As such, they may be unfamiliar with the adverse event reporting procedure for medical professionals (*i.e.*, MedWatch).

Even for properly-licensed physicians, FDA's MedWatch reporting is voluntary.[94] Since privacy issues are often the primary concern of women who seek abortions, a physician may not file a MedWatch report in order to protect patient confidentiality. Accordingly, the Petitioners are concerned about the possibility that medical complications are not being reported. Finally, it is possible that other women who have suffered adverse events during a mifepristone-misoprostol abortion have sought assistance from crisis pregnancy centers, counselors, and charitable organizations,[95] which may not be familiar with the MedWatch reporting system. Given the foregoing, the Petitioners believe that FDA's continuing review of the safety profile of Mifeprex relies improperly on an incomplete database of post-approval adverse events.

3.     <u>The Sponsor Has Failed to Require Adherence to the Restrictions.</u>

The Sponsor insisted that it "will continue, as [it] always intended, to honor [its] commitments to carry out the program of restrictions imposed in the approval letter."[96] Yet, the Sponsor has broken its promise. The Sponsor apparently has not taken steps to ensure that Mifeprex is used in accordance with the approved Regimen and has continued to distribute the drug to providers that depart from the Mifeprex Regimen. For instance, the Sponsor has asserted, in its Opposition Comments, the erroneous position that the guidelines in the Prescriber's Agreement "do not state any specific dose or regimen for prescribing Mifeprex … ."[97] The Sponsor's statement reflects only one example of its continuing refusal to accept even FDA's minimal restrictions issued pursuant to Subpart H.

---

[93] Obviously, distributors of mifepristone who are outside the lawful channels of distribution are even less likely to report adverse events.

[94] *See* <http://www.fda.gov/medwatch/report/hcp.htm>.

[95] *Consider Estate of Brenda Vise vs. Volunteer Women's Medical Clinic, L.L.C., et al.* (Circuit Court of Hamilton County, Tennessee, filed August 14, 2002); *Danlin Tang, Albert Ng vs. Dr. Soon Chon Sohn, Family Planning Associates Medical Group, and Does 1 – 50* (Superior Court of the State of California for the County of Los Angeles, Central District, notice to file dated December 13, 2002).

[96] Opposition Comments at 6.

[97] Opposition Comments at 14.

Alliance.App. 367

**Kirkpatrick & Lockhart** LLP

19

In the face of this recalcitrance, FDA should exercise its enforcement authority, investigate the Sponsor's failed commitments under its NDA approval, and take appropriate action, as it has in other cases where risk management programs were deemed insufficient to protect patients.[98]  We note that, contemporaneous with the issuance of the Sponsor's Dear Doctor Letter, FDA underscored the possibility that if providers "do not follow the agreement, the distributor may discontinue distribution of the drug to them."[99]  Shortly after approving Mifeprex, the Agency wrote to a member of Congress and stated, "If restrictions are not adhered to, FDA may withdraw approval."[100]

Even assuming that the Sponsor's responsibilities extend only as far as ensuring that the prescriber is adhering to the Prescriber's Agreement, the Sponsor is failing to meet its due diligence obligation.[101]  The Prescriber's Agreement requires, *inter alia*, that the prescriber "must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and PATIENT AGREEMENT, give her an opportunity to read and discuss them, obtain her signature on the PATIENT AGREEMENT, and sign it yourself."[102]  The Patient Agreement, which both the patient and the prescriber sign, states that the patient "believe[s] I am no more than 49 days (7 weeks) pregnant."[103]  Yet numerous prescriber websites advertise the Mifeprex Regimen as being available for patients whose pregnancies have progressed beyond 49 days.[104]  The Patient

---

[98]  For example, GlaxoSmithKline voluntarily withdrew its NDA for Lotronex (alosetron hydrochloride) rather than accept restrictive risk management guidelines involving informing patients of risks, limiting access to closely monitored patients, and continued clinical research.  *See* "FDA and Glaxo Still Working on Lotronex's Return," *Dickinson's FDA Webview* (Jan. 24, 2002).  Bayer voluntarily withdrew Baycol (cerivastatin) after reports of deaths due to severe rhabdomyolysis, when risk management efforts of labeling changes and "Dear Healthcare Provider" letters had little impact on physicians who continued to prescribe the drug at unrecommended higher doses.  *See* "31 Baycol-related Deaths Cause the Drug's Withdrawal," *Dickinson's FDA Webview* (Aug. 8, 2001).  Warner Lambert withdrew Rezulin (troglizone) at FDA's urging after label restrictions and recommended monitoring of liver function failed to control inappropriate prescribing.  *See* "Rezulin Withdrawal a Defeat for FDA 'Labeling Can Do It' Theory", *Dickinson's FDA Webview* (Mar. 21,2000).

[99]  *See* FDA Q & As at Question 12.

[100]  *See* Letter, Melinda K. Plaisier, Associate Commissioner for Legislation (FDA) to Senator Tim Hutchinson (Oct. 20, 2000): at 2 [FDA FOIA Release: MIF 002648-52].

[101]  *See* Opposition Comments at 14-15.

[102]  Mifeprex™ (Mifepristone) Tablets, 200 mg Prescriber's Agreement ("Prescriber's Agreement").

[103]  *See* Item 4 of the Patient Agreement Mifeprex (mifepristone) Tablets ("Patient Agreement").  In addition, the Mifepristone Medication Guide ("Medication Guide") states that you should not take Mifeprex if "[i]t has been more than 49 days (7 weeks) since your last menstrual period began."

[104]  *See, e.g.,* All Women's Health Centers website (available at: <http://www.floridaabortion.com/services_abortion/nonsurgical.shtml>) (visited Sept. 5, 2003) ("Non-surgical abortions, sometimes called 'medical abortions,' are performed in the first 9 weeks of pregnancy.  Non-surgical abortion can be administered in pill form (otherwise known as Mifeprex or RU-486)."); Family Planning Associates Medical Group, Phoenix and Tempe Arizona, (available at: <http://www.fpamg.com/medical.html>) (visited Sept. 5, 2003) (noting that Mifeprex Regimens are "done until the 56th day of pregnancy"); Planned Parenthood Golden Gate (available at: http://www.ppgg.org/medical/abortion_medical.asp) (visited Oct. 1, 2003) ("Medical abortion is a way to end pregnancy without surgery. It is done with medications up to 63 days after the last period begins."; Seattle Medical and Wellness Clinic (available at: <http://www.smawc.com/html/services.html>) (visited Sept. 5, 2003) (including following description: "**Medical Abortion (9 weeks LMP or less):** We offer non-surgical abortion with Mifeprex (a.k.a. the Abortion Pill, RU486) and Cytotec (misoprostol).").

**Kirkpatrick & Lockhart** LLP

20

Agreement also states that the patient "will take misoprostol in [her] provider's office two days after [she] take[s] Mifeprex (Day 3)."[105]  Yet many prescribers' websites indicate that patients take misoprostol at home rather than at the provider's office.[106]  The discrepancies between the marketplace regimen being prescribed and the approved Regimen that the patient agrees to follow indicate that many prescribers are allowing patients to make false statements.  Under its NDA duties, the Sponsor has an obligation to conduct due diligence about the prescribers to whom it sells Mifeprex, and it must stop those sales if the approved Regimen is breached.  Furthermore, the Sponsor has a duty to keep records of these stopped distributions.[107]

Given that these discrepancies are freely published on prescriber websites, the Sponsor should be aware of them.[108]  Therefore, the Sponsor knowingly continues to supply prescribers who are not following the guidelines in the Prescriber's Agreement.  These prescribers are knowingly eviscerating the requirements to provide patients with the Medication Guide, to

---

[105]  *See* Patient Agreement, Item 6.  In addition, the Medication Guide states that the patient "**must return** to [her] provider on Day 3 and about Day 14" (emphasis in original).

[106]  *See, e.g.,* Family Planning Associates Medical Group, Phoenix and Tempe Arizona, (available at: <http://www.fpamg.com/medical.html>) (visited Sept. 5, 2003) (explaining that "[t]he patient inserts 4 tablets of Misoprostol into the vagina at home 2-3 days" after ingestion of Mifeprex); Little Rock Family Planning website < http://www.lrfps.com/RU486.html > (visited Sept. 5, 2003) (describing the regimen employed by the clinic, which is "one of these regimes [sic] which has been shown to be safe and is more convenient for women using the method": "**Step Two, at home (or motel)** … Six to 8 hours after the mifepristone pills have been swallowed 8 Cytotec tablets are placed in the vagina.  **Step Three, this will depend on how far you live from our clinic:**  A) *If you live within one hour of Little Rock* … If you have not passed the pregnancy by 24 hours after you put the Cytotec tablets in your vagina, you will put a [sic] 4 tablets in your vagina and still plan to keep your appointment for the following week. B) *If you live outside the Little Rock Area* … You will return at 9AM the following morning to  have an ultrasound to see if the abortion is complete.  If the abortion is complete you will be discharged home and asked to take a urine pregnancy test in 3 weeks. … If you have not had a complete abortion you will be given 4 Cytotec [sic] to place in your vagina … ."); Planned Parenthood Golden Gate (available at: <http://www.ppgg.org/ medical/abortion_medical.asp>) (visited Oct. 1, 2003) ("Medical abortion using Mifepristone involves three steps.  First, the doctor will give you mifepristone pills, which block progesterone, a hormone needed to maintain pregnancy.  Two days later, as directed by your clinician, you will insert another medication called misoprostol as a vaginal suppository.  Misoprostol causes the uterus to contract and empty which completes the abortion.  Finally, women must return to the clinic a few days after taking the misoprostol for a follow-up."); Women's Health Practice website (available at: <http://www.womenshealthpractice.com/abortion.htm>) (visited Sept. 5, 2003) (explaining, as part of the medical abortion regimen that the clinic describes as "most similar to the FDA-approved regimen," that "[t]he misoprostol will be provided to you with medication instructions that carefully explain the timing and route of administration.").

[107]  21 C.F.R. § 314.81(b)(2) (requiring NDA sponsors to submit an annual report describing distribution data).  State or federal agencies may need these data if patient deaths continue and the public outcry (and/or the plaintiffs' lawyers bar) demand investigations.

[108]  The Petition set forth a number of examples of Mifeprex provider websites that advertised noncompliance with the approved Mifeprex Regimen.  *See* Petition at nn. 309, 313, 315, 317.  Since the submission of the Petition, these websites have not been altered.  (These websites were visited most recently on September 5-7, 2003.  One of the website addresses changed and its content was updated, but it still states that "at home, the patient will insert four tablets [of misoprostol] into her vagina."  *See* <http://www.presidentialcenter.com/services_nonsurgical.html> (visited Sept. 7, 2003)).  It appears, therefore, that the Sponsor, alerted by the Petition to these instances of noncompliance, has not taken any steps to require compliance with the approved regimen.  Dr. Hausknecht, the medical director of Danco, operates one of the websites that continues to advertise a regimen that differs from the approved regimen.  *See* <http://www.safeabortion.com/procedure.htm> (visited Sept. 7, 2003).

**Kirkpatrick & Lockhart** LLP

21

obtain their signatures on the Patient Agreement, and to give them the opportunity to read and discuss these documents.  The Patient Agreement is intended by FDA to describe the Mifeprex Regimen as approved and to obtain the patient's informed consent to adhere to the approved Regimen, all for the protection of the patient.  Instead, some prescribers, with the Sponsor's tacit approval, are permitting patients to sign the Patient Agreement while effectively directing them not to adhere to its requirements.  In the face of such evidence, the Sponsor cannot be described as meeting its obligations with respect to the restrictions on Mifeprex.

Conclusion

Women are being told that Mifeprex is safe even if it is used in a manner different from the Regimen approved by FDA.  This is a cavalier approach to distributing a drug that was deemed by FDA to be too dangerous to approve without restrictions.  The Sponsor's refusal to restrict distribution to physicians who adhere to the approved Regimen represents the continuation of a pattern of overlooking the risks to women's health posed by Mifeprex.  FDA should halt the marketing of this unsafe drug.

### E.     The Sponsor's Revised Phase IV Commitments Are Inadequate.[109]

The Sponsor's Opposition Comments downplayed the significance of the changes prior to approval in the Sponsor's Phase IV commitments.[110]  As noted in the Petition, those changes by the Sponsor relegated certain study objectives to secondary status, eliminated the commitment to study the long-term effects of multiple uses of the Regimen, and weakened the commitment to monitor the adequacy of the distribution and credentialing system.[111]

The Sponsor's insistence that the range of topics to be studied was not narrowed contradicts statements made by the Sponsor when it proposed modifications of its Phase IV commitments in September 2000.[112]  The Sponsor, citing feasibility concerns, decided not to study the long-term effects of multiple uses of the Mifeprex Regimen.[113]  Moreover, combining multiple study objectives into one study reduced the value of the data that would be generated

---

[109]  The Petitioners requested, pursuant to FOIA, information about the Phase IV Mifeprex study protocols and any data arising from the Phase IV studies submitted by the Sponsor.  *See* FOIA Request, filed by Wendy Wright, Director of Communications, CWA (Sept. 14, 2001).  To date, the Petitioners have not received any responsive information.

[110]  *See* Opposition Comments at 15-16.  *See also* Letter, Sandra Arnold to FDA/CDER, Office of Drug Evaluation III, Division of Reproductive and Urologic Products (Sept. 15, 2000): at 1 [FDA FOIA Release: MIF 001326] (committing to conducting two Phase IV studies).

[111]  *See* Petition at 84-88.

[112]  *See* Letter, Sandra Arnold to FDA/CDER, Office of Drug Evaluation III, Division of Reproductive and Urologic Products (Sept. 6, 2000): at 5 [FDA FOIA Release: MIF 001333-49] ("As new data have become available, some of the studies originally proposed have become unnecessary.  Other studies, on reflection, seem unlikely to gather useful data at any reasonable cost or, in some cases, at any cost.").

[113]  *See* Memorandum, FDA/CDER to "NDA 20-687 MIFEPREX (mifepristone) Population Council" (Sept. 28, 2000): at 7 ("Mifeprex Approval Memo").  As discussed in the Petition, the Sponsor, in asking for the elimination of this commitment, was motivated in part by concerns that conducting such a study would be burdensome for the Sponsor – a reason that is not generally persuasive with FDA.  *See* Petition at 87.

**Kirkpatrick & Lockhart** LLP

22

with respect to the secondary study objectives.[114]  Given the importance of understanding the effect of a patient's age, the effect of a patient's smoking status, the rate of patient follow-up on Day 14, and the adequacy of the distribution and credentialing system, the Sponsor should not have been permitted to accord these study objectives secondary status.

The Sponsor defended the changes in the study requirements by citing FDA's approval memorandum for the proposition that the changes in the Phase IV Study commitments reflected changes to the distribution system and labeling.[115]  The Sponsor's argument is misleading.  By allowing the distribution of mifepristone to physicians who could not provide surgical intervention, an immediate need arose to study the effect of that major change; [116] accordingly, FDA added a primary study requirement.[117]  However, the September 2000 changes in distribution and labeling should have not have reduced or eliminated other primary Phase IV study commitments that were not related to the distribution or labeling changes.

Conclusion

FDA inappropriately granted the Sponsor's request to reduce its original Phase IV commitments.  As a consequence, key questions about the safety of the Mifeprex Regimen will remain unanswered.

**F.    The Approval of Mifeprex Without Supporting Pediatric Data Was Both Unlawful And Imprudent.**

In its Opposition Comments, the Sponsor admitted that it did not conduct clinical studies in the pediatric population, but relied instead on an FDA "waiver" of pediatric testing.  Yet, the FD&C Act and FDA's approval regulations for NDAs require safety and effectiveness testing to support a new drug's indications for use.  In a case where the Sponsor does not intend to restrict the drug's use in the pediatric population, FDA has only limited authority to cede the requirement for pediatric testing.  In the case of Mifeprex, FDA's decision to approve the NDA without pediatric data was arbitrary, capricious and unlawful agency action.

---

[114]  Specifically, the effects of age and smoking status and the frequency with which patients return for follow-up on Day 14 were to be studied as part of "[a] cohort-based study of safety outcomes of patients having medical abortion under the care of physicians with surgical intervention skills compare to physicians who refer their patients for surgical intervention." *See* Petition at 86 (citing Mifeprex Approval Letter at 3).  Furthermore, this study would be the only Phase IV study of another objective originally slated to be the focus of a separate Phase IV study, namely the adequacy of the distribution and credentialing system.  *See generally* Mifeprex Approval Memo at 7.

[115]  *See* Opposition Comments at 15-16 (citing Mifeprex Approval Memo at 7).

[116]  This change was deemed significant enough to require the addition of a "black box" warning to physicians  who could not perform surgical abortions.  The black box warning directed them to make arrangements for the provision of emergency surgical intervention.

[117]  FDA correctly noted the need for a new study objective when it approved this change: "To ensure that the quality of care is not different for patients who are treated by physicians who have the skill for surgical intervention (as in the clinical trials) compared to those treated by physicians who must refer patients for surgical intervention, FDA has proposed and the Population Council has agreed to structure a Phase 4 monitoring study."  Mifeprex Approval Memo at 5.

**Kirkpatrick & Lockhart** LLP

23

1.   <u>FDA's NDA Approval Regulations Required Pediatric Data.</u>

The law is clear that the clinical studies used to support an NDA must establish the drug's safety and efficacy for the proposed conditions of use.  Under the FD&C Act, a person may file an NDA requesting FDA approval of a new drug provided that the NDA contains, in relevant part, "full reports of investigations which have been made to show whether or not such drug is safe *for use* and such drug is effective *in use* . . . ."[118]  Likewise, FDA's NDA approval regulations require "a description and analysis of each controlled clinical study *pertinent to a proposed use* of the drug."[119]  This testing requirement exists separately from the so-called "Pediatric Rule,"[120] which also delineates pediatric testing requirements.

The Petitioners acknowledge that, as of October 17, 2002 and for the time being, FDA is enjoined from enforcing the Pediatric Rule.[121]  However, the Petitioners challenge the Sponsor's contention that the issue of FDA's proper administration of the Rule is moot, in light of the *AAPS* court's decision to grant an appeal of the case, which is now pending.[122]  Rather, the Mifeprex NDA was subject to the Pediatric Rule, which was finalized and became effective while FDA was reviewing the NDA,[123] and FDA should have administered it properly[124] or waived it properly.[125]

---

[118]  21 USC § 355(b)(1)(A) (emphasis added).

[119]  21 C.F.R. § 314.50(d)(5)(ii) (emphasis added).

[120]  *See* Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *Final Rule*, 63 Fed. Reg. 66632 (Dec. 2, 1998) (testing requirements set forth in 21 C.F.R. § 314.55).  *See also* Petition at 76-83 (discussing Pediatric Rule).

[121]  *Association of American Physicians and Surgeons v. FDA*, 226 F. Supp. 2d 204 (D.D.C. 2002) ("*AAPS*").

[122]  The Elizabeth Glaser Pediatric AIDS Foundation and the American Academy of Pediatrics filed a motion to appeal on December 16, 2002.  *See* Docket for Case No. 00-CV-2898 (entry no. 73).

[123]  The Pediatric Rule was promulgated on December 2, 1998 and became effective on April 1, 1999.  FDA reviewed the Mifeprex NDA from March 18, 1996 until September 28, 2000, when it was approved.

[124]  Under the Pediatric Rule, FDA's treatment of the Mifeprex NDA was improper, in part, because the agency did not require the Sponsor to submit supporting pediatric data.  The regulation stated that, "where the course of the disease and the effects of the drug are sufficiently similar in adults and pediatric patients, FDA may conclude that pediatric effectiveness can be extrapolated from adequate and well-controlled studies in adults *usually supplemented with other information obtained in pediatric patients, such as pharmacokinetic studies*."  21 C.F.R. § 314.55(a) (emphasis added).  This requirement also was articulated earlier by FDA in the Prescription Labeling regulation.  *See* 59 Fed. Reg. 64240 (Dec.13, 1994); 21 C.F.R. § 201.57(f)(9)(iv).  As noted elsewhere in this Response, the Petitioners also question whether the Sponsor's adult data were derived "from adequate and well-controlled studies."

[125]  It should be noted that even if FDA concluded that pediatric effectiveness of the Mifeprex Regimen could be extrapolated from adult studies, this would not be  an appropriate ground for an actual *waiver* of the Pediatric Rule.  The Pediatric Rule provides three grounds for waiver from the obligation imposed by the rule on drug sponsors to demonstrate that their drug is safe and effective for pediatric patients.  21 C.F.R. § 314.55(c).  In some instances, drug sponsors are able to provide sufficient adult data, usually supplemented by pediatric-specific data, from which pediatric safety and efficacy can be extrapolated.  21 C.F.R. § 314.55(a).  FDA stated that it was waiving the pediatric rule with respect to Mifeprex, yet did not cite to any of the bases for waiver provided in paragraph (c) of the Pediatric Rule.  Mifeprex Approval Letter at 3.  For a comprehensive discussion on the ineligibility of Mifeprex for a waiver from the Pediatric Rule, *see* the Petition at 78-82.

**Kirkpatrick & Lockhart** LLP

Irrespective of the current status of the *AAPS* case, at the time of the approval of the Mifeprex NDA the Agency was obligated to meet the requirements of its NDA approval regulations.  FDA erred in its failure to require the Sponsor to submit pertinent pediatric data and to assess those data in its review of the NDA for Mifeprex.  In so doing, the Agency abrogated its role of protecting and promoting the public health and safety.  This constitutes the type of "arbitrary and capricious" action that is generally prohibited under the Administrative Procedures Act ("APA").[126]

2.    The Drug's Expected Conditions of Use Included the Pediatric Population.

Mifeprex is intended for use by menstruating females.  The drug's labeling states "Mifeprex is indicated for the medical termination of intrauterine pregnancy through 49 days' pregnancy."  Nothing in the "Indication and Usage" section of the labeling limits the drug's use to adults.[127]  Likewise, Danco's marketing claims are not targeted to a particular age group, such as women "over age 18."  The patient population therefore logically includes all females who can become pregnant – that is, as of the age their first menstrual period begins (*i.e.*, "menarche") until they no longer have a menstrual period (*i.e.*, "menopause").  According to FDA, the average age of menarche in the United States is 12 years, although menstruation may commence in healthy females as early as age 10.[128]

Under the pediatric labeling regulations, the Agency defines "pediatric population(s)" and "pediatric patient(s)" as the age group "from birth to 16 years, including age groups often called … adolescents."[129]  Therefore, the population of menstruating females (*i.e.*, 10 or 12 and older) and the pediatric population (*i.e.*, up to 16) overlap by up to 6 years.  Based on Danco's labeling and marketing to the menstruating female population without any age restriction, pediatric use of this product was clearly contemplated.  Because Mifeprex will be used by some number of adolescent girls who become pregnant, FDA should have required the Sponsor to produce safety and effectiveness data for the pediatric population.

3.    FDA Should Have Required the Submission of Pediatric Study Data Prior to Approving Mifeprex.

Under its broad authority granted by the FD&C Act, not only may FDA require the submission of pediatric data as part of a product's NDA, but the Agency *must* require such data when the product's conditions of use warrant pediatric testing.  However, the Agency approved

---

[126]  5 USC § 706(2)(A).

[127]  Instead, the drug's labeling contains one non-constructive statement in the "Precautions" section of the labeling: "Safety and effectiveness in pediatric patients have not been established."  Given the logical reading of the drug's indication and the medical information on the age range of menstruation, this one sentence in a package insert of 15 pages is valueless.

[128]  *See On the Teen Scene: A Balanced Look at the Menstrual Cycle*, FDA Consumer Magazine (Dec. 1993) (available at: <http://www.fda.gov/fdac/reprints/ots_mens.html>).  In the U.S., the average age of the start of menopause is 51.  *See Taking Charge of Menopause*, FDA Consumer Magazine (Nov.-Dec. 1999) (available at: <http://www.fda.gov/fdac/features/1999/699_meno.html>).

[129]  21 C.F.R. § 201.57(f)(9).

**Kirkpatrick & Lockhart** LLP

Mifeprex without requiring the Sponsor to submit pediatric data or, apparently, any review of the pertinent scientific literature. When approving Mifeprex based solely on the data submitted in the NDA (*i.e.*, studies conducted in an adult population), FDA made the unsupported assumption that younger females (*i.e.*, children and adolescents) would have the same physiological response to this product as adult females.[130] Specifically, the Sponsor cited FDA's conclusion that "the drug regimen is expected to be as safe and effective for pregnant women under the age of 18 years as it is for those of the age of 18 ... ," despite the Agency's concession that most of the available data are from women 18 years and older.[131] Further, the Sponsor noted that FDA has not found any "biological reason to expect that menstruating females under age 18 to have a different physiological outcome with the regimen."[132]

As stated in the Petition, however, FDA's conclusion misreads the science. To assume, without specific data, that the effects of a potent antiprogesterone and a powerful prostaglandin analogue in pregnant adults will be the same for adolescents who are still developing in their physiologic, anatomic, and reproductive functions, is medically unsound. The relevant scientific evidence suggests that an assumption *cannot* be made that the effectiveness or safety of Mifeprex for adolescent girls is the same as for fully-developed adult women. Therefore, FDA's decision to the contrary lacks a sound and justified scientific basis.

Moreover, the Agency decision disregards decades of its own medical judgment. In the past, FDA has said that drugs should be studied directly in the pediatric population because "the action and adverse actions of pharmaceutical agents will vary as absorption, distribution, metabolism, and excretion, and receptor sensitivity are altered by the changes associated with growth and development."[133] For Mifeprex, these factors were not directly studied in children.

Studying the subpopulation of adolescents is even more important, according to FDA. For example, "[t]he development of puberty and the known effects of sex hormones on drug metabolism warrant consideration in drug evaluation in the adolescent."[134] Other "special problems" arise from the intense concern with self-image, leading to increased use (both admitted and denied) of prescription and over-the-counter drugs, dietary supplements, and cosmetics for such purposes as altering physical growth and sexual development, regulating mood and behavior, and influencing physical appearance.[135] FDA did not require a review of these adolescent-specific considerations with respect to the Mifeprex Regimen.

---

[130] *See* Mifeprex Approval Memo at 7.

[131] Opposition Comments at 15 (citing FDA, "Medical Officer's Review of Amendments 024 and 033: Final Reports for the U.S. Clinical Trials Inducing Abortion up to 63 Days Gestational Age and Complete Responses Regarding Distribution System and Phase 4 Commitments," at 28).

[132] Opposition Comments at 15 (citing Mifeprex Approval Memo at 7).

[133] FDA Guidance for Industry, "General Considerations for the Clinical Evaluation of Drugs in Infants and Children" (Sept. 1977), at 6 (hereafter, "Pediatric Study Guidance").

[134] Pediatric Study Guidance at 15.

[135] *See* Pediatric Study Guidance at 16-17.

**Kirkpatrick & Lockhart** LLP

In addition, FDA has said previously that a drug's safety profile may be different for adolescents because "medication may not be taken as prescribed.  The adolescent frequently omits doses of medication, takes it at erratic intervals, and may take more than prescribed. Safety considerations should be addressed not only to the therapeutic dosage, but also to the consequences of suboptimal dosage and overdosage."[136]  Given the two-drug-regimen and three-doctor-visit administration of the Mifeprex Regimen, a study of patient compliance issues in adolescents was warranted.

<u>Conclusion</u>

In summary, it is logical to conclude that Mifeprex is intended for use by a female population that, under the pertinent definitions adopted by FDA, includes pediatric females. Therefore, FDA should have required the submission of pediatric data with the NDA.  Without any consideration of pediatric data, FDA's approval of Mifeprex is an abrogation of its fundamental duty to conduct the drug approval process in a way that protects and promotes the public health and safety.  In so doing, the Agency acted in a way that was arbitrary, capricious, and contrary to law and its own regulations.

## II.     FDA Is Both Statutorily Empowered and Obligated to Grant an Administrative Stay of the Mifeprex NDA Approval.

The Sponsor's Opposition Comments contain three technical objections to the request for an administrative stay of the Mifeprex NDA approval.[137]  First, the Sponsor alleges that an administrative stay is not the appropriate method by which FDA could withdraw the Mifeprex NDA.  Second, the Sponsor alleges that the request is "untimely" because it was not filed within 30 days of the effective date for the Mifeprex NDA approval.  Third, the Sponsor makes a general allegation that the Petitioners do not meet the criteria for an administrative stay under FDA's regulations.  As described below, these allegations stem from an incorrect and overly restrictive reading of the Petitioners' request.  Instead of answering the serious substantive issues raised in the Petition, the Sponsor has focused on the way in which the Petitioners framed their request for FDA action.  Even more disconcerting, the Sponsor asks FDA to place administrative procedures above the Agency's statutory obligation to protect the public health.

### A.     <u>FDA Has the Statutory Authority to Suspend the Mifeprex NDA Pending the Outcome of a Decision to Withdraw the Application.</u>

The Petitioners' request for administrative stay of the Mifeprex NDA approval is equivalent to a request for FDA to use its authority under section 505(e) of the FD&C Act to "suspend the approval of [the] application immediately."[138]  The FD&C Act states that an NDA may be "suspended" whenever FDA makes a finding of "imminent hazard to the public

---

[136] Pediatric Study Guidance at 15.

[137] *See* Opposition Comments at 16-24.

[138] 21 U.S.C. § 355(e); *see also* 21 C.F.R. § 314.150(a)(1).

**Kirkpatrick & Lockhart** LLP

health."[139]  In the Petition and in this Response, the Petitioners have provided extensive evidence that Mifeprex poses, under FDA's definition, "a significant threat of danger to health, [and] creates a public health situation . . . that should be corrected immediately to prevent injury."[140]  Furthermore, an emergency or "crisis" situation is not required, but merely a "substantial likelihood that serious harm will be experienced during . . . any realistic projection of the administrative process."[141]  In interpreting this definition, a court upheld an FDA decision similar to that which the Petitioners are requesting.  Specifically, even though "respectable scientific authority [could] be found on both sides of this question", and "much of the raw data used by the [Agency] in arriving at its conclusion had been available for some length of time," these facts did not preclude FDA's use of the data in finding an imminent hazard when "the magnitude of [the drug's] risk was determined only after an extensive *re-evaluation of the data*."[142]

FDA's authority is resolute and can be exercised immediately, notwithstanding any related issues regarding how the matter was initially raised (*e.g.*, a Citizen Petition), who exercised the authority (*e.g.*, HHS Secretary or FDA), and what actions follow it (*e.g.*, notice and hearing).[143]  FDA should disregard the Sponsor's attempt to redirect the Agency away from the substance of the Petition toward a focus on the administrative requirements of delegating authority, providing notice, and holding a hearing.  Clearly, FDA's suspension of the Mifeprex approval could occur during the pendency of any notice period or hearing which the Sponsor so forcefully claims to be entitled to under the FD&C Act, the APA and Constitutional due process provisions.  Given the situation, the Petitioners are dismayed at the Sponsor's insistence that its "property right to produce and market Mifeprex,"[144] outweighs any concern for the safety of the patients that the Sponsor is seeking to "treat."

Furthermore, even if FDA finds that an imminent hazard does not exist in this case, FDA may still summarily withdraw approval of an NDA in certain circumstances.  During its four-page discussion on notice and hearings, the Sponsor fails to mention that the FD&C Act's "due notice and hearing" provision does not guarantee an NDA Sponsor a hearing, and also leaves FDA with discretion regarding the type of notice that is provided.[145]  Rather, FDA may proceed by summary judgment to withdraw an NDA in certain circumstances – for example, when there

---

[139]  *See id.*

[140]  21 C.F.R. § 2.5.

[141]  *Forsham v. Califano*, 442 F. Supp. 203, 208 (D.D.C. 1977) (citing *Environmental Defense Fund v. EPA*, 510 F.2d 1292, 1297 (D.C. Cir 1975)).

[142]  *Forsham v. Califano*, 442 F. Supp. 203, 209 (D.D.C. 1977) (emphasis added).

[143]  *Forsham v. Califano*, 442 F. Supp. 203 (D.D.C. 1977) (on petition raised by a consumer health organization, the HHS Secretary referred the matter to FDA, which withdrew approval of a drug with notice but no formal hearing, based on a finding of imminent hazard to the public health).

[144]  Opposition Comments at 18.  When the Sponsor included misoprostol as part of the Mifeprex Regimen, it did not demonstrate any concern for the property rights of Searle over misoprostol.

[145]  *See John D. Copanos and Sons, Inc. v. FDA*, 854 F.2d 510, 518, 520 (D.C. Cir. 1988) ("It is well settled that this [notice and hearing] provision does not guarantee the applicant a hearing in all circumstances." and "The requirements of 'due notice' must depend upon the context of the agency's action."); *Brandenfels v. Heckler*, 716 F.2d 553, 555 (9th Cir. 1983) ("The FDA is authorized to satisfy its own notice requirements by providing holders of new drug applications with either general or specific notice of opportunity for hearing.").

**Kirkpatrick & Lockhart** LLP

is no genuine and substantial issue of fact, when the applicant does not meet the minimum regulatory requirements, or when it appears conclusively from the applicant's pleadings that the applicant cannot succeed.[146]

The Petitioners' request for administrative stay contains ample evidence to support a finding in this case of imminent hazard or the requisite basis for summary withdrawal. Millions of women are being misled to believe that the Mifeprex Regimen is safe, while in actuality neither the data submitted in the original NDA nor the subsequent marketing history can support a safety profile that justifies the continued marketing of the drug product. There is simply no legal basis to assert that FDA lacks the authority to grant the requested remedy of a "stay" (*i.e.*, suspension) of the NDA pending resolution of a formal NDA withdrawal process.

### B. The Request for Administrative Stay Was Timely Filed.

An NDA is not a "static" document. Rather, it is a "living" document that is constantly being supplemented, updated, and reviewed by FDA.[147] Therefore, FDA is constantly making a "decision" to allow an NDA approval to stand in light of new information that is submitted to the Agency. Likewise, a drug's safety and efficacy profile and risk/benefit profile also require constant re-analysis by FDA. For example, over time "newer" medical evidence comes to light and adverse reactions are recorded in the patient population. FDA's approval decisions on NDAs are not "stuck in time." Instead, "FDA has an obligation to judge a drug's effectiveness by contemporary scientific standards. If those standards change to the extent that it is questionable whether a drug can be regarded as having been shown to be effective, FDA may under the act appropriately review the drug's status."[148]

FDA's regulations state that a stay of action must be filed within 30 days of the "date of the *decision involved*" unless FDA permits a later filing for "good cause."[149] In this instance, the "decision involved" is FDA's decision to uphold the Mifeprex NDA and to *not* suspend the approval despite the influx of new information. This decision is ongoing. The Petitioners are requesting that FDA "stay" that decision and suspend the NDA approval immediately in response to the imminent hazard presented by the Mifeprex Regimen.

---

[146] *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 620-1 (1973) (withdrawing approval of NDA without a hearing based on lack of evidence negating "new drug" status); *John D. Copanos and Sons, Inc. v. FDA*, 854 F.2d 510, 518 (D.C. Cir. 1988) (withdrawing approval of NDA without a hearing based on failure to comply with current good manufacturing practices); *Cooper Laboratories, Inc. v. FDA*, 501 F.2d 772, 780 (D.C. Cir 1974) (withdrawing approval of NDA without a hearing based on insufficient evidence of efficacy).

[147] *See, e.g.*, 21 C.F.R. §§ 314.70, 314.72, 314.80, 314.81. At the very least, the Sponsor of the Mifeprex NDA is required to submit an annual report to FDA each year. 21 C.F.R. § 314.81(b)(2). The Sponsor's misdirection on this matter is revealed by the fact that, under their interpretation of the "30 days" filing requirement, the Petitioners could "cure" the alleged timeliness defect by merely submitting the Petition within 30 days of any Mifeprex NDA Supplement or Annual Report.

[148] 50 Fed. Reg. 7452, 7488 (Feb. 22, 1985) (FDA's rejection of an industry suggestion, on withdrawal of approval of an application under 21 C.F.R. § 314.150, that FDA's conclusion concerning a drug product "should remain unchanged even if FDA later adopted new standards").

[149] 21 C.F.R. § 10.35(b) (emphasis added).

**Kirkpatrick & Lockhart** LLP

Even if the request were considered to be "untimely" from a technical perspective, FDA should nevertheless still grant the requested stay pursuant to either (1) the Agency's "imminent hazard" authority under section 505(e), which contains no time limitation; or (2) the "good cause" exception of 21 C.F.R. § 10.35(b). In fact, the "imminent hazard" authority and the "good cause" exception were included in the statute and regulations for the very reasons outlined in the Petitioners' request. Namely, these provisions allow FDA to move quickly to protect the public from unsafe drug products without being slowed by overly technical readings of the regulations. Additionally, if FDA deemed the request to be untimely filed, the Agency still may stay its action on the NDA on its own initiative *at any time*. In other words, if FDA determines that the Petition's underlying request has merit, FDA may suspend approval and/or initiate withdrawal proceedings independent of the Petitioners' request.

### C.     The Petitioners Comply with the Spirit and Letter of the Requirements for an Administrative Stay.

As supported by the original submission, the Petitioners' request for an administrative stay meets all of the requirements of 21 C.F.R. § 10.35(e). In particular, the Petitioners have demonstrated irreparable harm to American women and an overwhelming public policy reason for removing the Mifeprex drug product from the market. The Petitioners' request is clearly not frivolous, and is being pursued in good faith. In response, the Sponsor has raised minor technical challenges that obfuscate and mischaracterize the issues raised by the Petitioners. Despite the evidence contained in the Petition concerning the harm that Mifeprex is inflicting on American women, and the Petitioners' direct interest as their physicians in speaking for these women, the Sponsor has alleged that there is insufficient injury to justify an administrative stay. Specifically, the Sponsor argued that the Petitioners are not the *actual* injured party.[150] Yet, that response is a mischaracterization of the Petitioners' request. The Petition clearly stated that the Petitioners were seeking Agency action to prevent further injury to women seeking to terminate their pregnancies.[151] The evidence submitted in the Petition and in this submission unequivocally demonstrates that women are being harmed by this drug product. In light of this fact, FDA is obliged to investigate whether the Mifeprex NDA approval should be suspended and ultimately withdrawn.

---

[150]  *See* Opposition Comments at 21-22.

[151]  Just as the Petitioners have with their Petition, patient advocacy groups routinely utilize the Citizen Petition process to request that FDA overturn its safety and effectiveness decision for drug products and, ultimately, withdraw them from the market. *See* Letter to FDA from AIDS Healthcare Foundation, August 19, 2003 (Docket number not assigned), requesting market removal of Trizivir (abacavir sulfate/lamivudine/zidovudine) due to poor efficacy results in post-approval clinical studies letter; Docket No. 02P-1778, Citizen Petition from Public Citizen and Arizona Arthritis Center, March 28, 2002, requesting market removal of Arava (leflunomide) due to patient deaths and severe liver failure; Docket No. 02P-0120, Citizen Petition from Public Citizen, March 19, 2002, requesting market removal of Meridia (sibutramine) due to patient deaths related to cardiovascular adverse effects. Many of these Citizen Petitions are ultimately successful. *See e.g.*, Rezulin (troglitazone), banned March 2000 after a July 1998 Petition (Docket No. 98-0622); and Lotronex (alosetron HCl), banned November 2000 after an August 2000 Petition (Docket No. 00P-1499).

**Kirkpatrick & Lockhart** LLP

30

III.     **Conclusion.**

For the foregoing reasons, the Petitioners respectfully request that FDA immediately suspend the approval of the NDA for Mifeprex and enter an administrative stay to halt any further distribution and marketing of Mifeprex until final Agency action is taken to withdraw the NDA approval for Mifeprex.  For copies of any of the reference materials cited herein, please contact the undersigned.

Respectfully submitted,


Gary L. Yingling


Rebecca L. Dandeker

# Exhibit 44

Questions and Answers on FDA's Adverse Event
Reporting System (FAERS),
https://www.fda.gov/drugs/surveillance/questions-and-
answers-fdas-adverse-event-reporting-system-faers

# Questions and Answers on FDA's Adverse Event Reporting System (FAERS)

## What is FAERS?

The FDA Adverse Event Reporting System (FAERS) is a database that contains adverse event reports, medication error reports and product quality complaints resulting in adverse events that were submitted to FDA. The database is designed to support the FDA's post-marketing safety surveillance program for drug and therapeutic biologic products. The informatic structure of the FAERS database adheres to the international safety reporting guidance issued by the International Conference on Harmonisation (ICH E2B (/drugs/guidances-drugs/international-council-harmonisation-efficacy)). Adverse events and medication errors are coded using terms in the Medical Dictionary for Regulatory Activities (MedDRA) (http://www.meddra.org/) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) terminology.

## How does FDA use the information in FAERS?

FAERS is a useful tool for FDA for activities such as looking for new safety concerns that might be related to a marketed product, evaluating a manufacturer's compliance to reporting regulations and responding to outside requests for information. The reports in FAERS are evaluated by clinical reviewers, in the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER), to monitor the safety of products after they are approved by FDA. If a potential safety concern is identified in FAERS, further evaluation is performed. Further evaluation might include conducting studies using other large databases, such as those available in the Sentinel System. (/sentinel-initiative-transforming-how-we-monitor-product-safety) Based on an evaluation of the potential safety concern, FDA may take regulatory action(s) to improve product safety and protect the public health, such as updating a product's labeling information, restricting the use of the drug, communicating new safety information to the public, or, in rare cases, removing a product from the market.

## Who sends reports to FAERS?

Healthcare professionals, consumers, and manufacturers submit reports to FAERS. FDA receives voluntary reports directly from healthcare professionals (such as physicians, pharmacists, nurses and others) and consumers (such as patients, family members, lawyers and others). Healthcare professionals and consumers may also report to the products' manufacturers. If a manufacturer receives a report from a healthcare professional or consumer, it is required to send the report to FDA as specified by regulations.

## How can I report an adverse event or medication error to FDA?

The MedWatch (https://www.fda.gov/Safety/MedWatch/default.htm) website provides information about voluntary and mandatory reporting (https://www.fda.gov/Safety/MedWatch/HowToReport/default.htm).

## Can mandatory reporters submit adverse events electronically?

Yes, the FDA Adverse Events Reporting System (FAERS) Electronic Submissions (/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-electronic-submissions) website provides drug and therapeutic biological product manufacturers, distributors, packers, and other interested parties with information about FDA Adverse Event Reporting System (FAERS) electronic submissions and instructions on how to electronically submit post-marketing individual case safety reports (ICSRs), with and without attachments.

Alliance.App. 381

EX. 44 pg. 01

## Does FAERS data have limitations?

Yes, FAERS data does have limitations. First, there is no certainty that the reported event (adverse event or medication error) was due to the product. FDA does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event. Furthermore, FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether an event will be reported, such as the time a product has been marketed and publicity about an event. There are also duplicate reports where the same report was submitted by a consumer and by the sponsor. Therefore, FAERS data cannot be used to calculate the incidence of an adverse event or medication error in the U.S. population. For more information, please refer to the question " What points should I consider while viewing the dashboard content? (https://fis.fda.gov/extensions/fpdwidgets/2e01da82-13fe-40e0-8c38-4da505737e36.html#_Toc493751926)"

## Is FAERS data available to the public?

FAERS data is available to the public in the following ways:

- FAERS dashboard (/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard): a highly interactive web-based tool that allows for the querying of FAERS data in a user friendly fashion.

- FAERS data files (/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-latest-quarterly-data-files): provides raw data consisting of individual case safety reports extracted from the FAERS database. A simple search of FAERS data cannot be performed with these files by persons who are not familiar with the creation of relational databases.

- Individual case safety reports from the FAERS database can also be obtained by sending a Freedom of Information (FOI) request to FDA (/how-make-foia-request).

## How do I find or confirm my report is in FAERS?

To confirm that your report is in FAERS, please send a Freedom of Information (FOI) request to FDA (/how-make-foia-request).

## What are the benefits of the FAERS public dashboard?

This tool makes the data easier to query and produces user-friendly information and charts. For example, users can view a summary of adverse event reports received from 1968 to the present or for a specific timeframe. In addition, users can search on a product of interest within a specific timeframe.

## Will there be a tutorial so I can learn how to use this database?

Yes, a recorded webinar (/about-fda/pharmacy-student-experiential-program/fda-drug-topics-fda-adverse-events-reporting-system-faers-public-dashboard-january-30-2018) is available which reviews the capabilities, and limitations, of the FAERS public dashboard.

## Is the FAERS public dashboard accessible on an Android™ or iPhone®?

Yes, but the user interface layout may not be very user friendly. FDA will continue to work on the dashboard to make the user interface Android and iPhone friendly.

## Can I download my search results from the dashboard?

Yes, you will be able to export a limited set of search data to an Excel® spreadsheet and then download it. FDA will still continue to provide the FAERS Latest Quarterly Data Files (/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-latest-quarterly-data-files) online.

Note: The data fields listed on the FAERS Dashboard currently is a subset of the data fields available in the FAERS Quarterly Data files. Future release of the FAERS Dashboard plans to make the other data fields available. Also the data displayed in the FAERS Dashboard may not be identical to the data in the FAERS Quarterly Data files due to different data extraction dates.

## Where else can I find safety information?

- Potential Signals of Serious Risks/New Safety Information Identified from the FDA Adverse Event Reporting System (FAERS): quarterly reports on potential serious side effects identified by FAERS. (/drugs/fda-adverse-event-reporting-system-faers/potential-signals-serious-risksnew-safety-information-identified-fda-adverse-event-reporting-system)

- Post-marketing Drug and Biologic Safety Evaluations (/drugs/surveillance/postmarket-drug-and-biologic-safety-evaluations): provides summary information about ongoing and completed post-marketing safety evaluations of adverse experience reports made to FDA for New Drug Applications (NDAs) and Biologic License Applications (BLAs) approved since September 27, 2007.

- Center for Drug Evaluation and Research (CDER): Drug Safety and Availability (https://www.fda.gov/Drugs/DrugSafety/default.htm)

- Post-market Drug Safety Information for Patients and Providers (https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/default.htm)

- MedWatch: The FDA Safety Information and Adverse Event Reporting Program (https://www.fda.gov/Safety/MedWatch/default.htm)

## How are versions of a case in FAERS handled?

Each unique submission of a case received is assigned a version number (for example, Case #1234567, version 1). The initial version received will be version 1. If a follow up is received on a previously submitted case, then that version of the case will be version 2, and so on. The latest version of a case represents the most current information about that case.

The data is updated quarterly.

## What points should I consider while viewing the dashboard content?

When you view the website output of reported reactions (side effects or adverse drug reactions) for a drug product, it is important to consider the following points:

- **Data Quality:** There are many instances of duplicative reports and some reports do not contain all the necessary information. Duplicate reporting occurs when the same report is submitted by the consumer and the sponsor. The information in FAERS evolves daily and the number of individual cases may increase or decrease. It is therefore possible that the information on this website may change over time.

- **Existence of a report does not establish causation:** For any given report, there is no certainty that a suspected drug caused the reaction. While consumers and healthcare professionals are encouraged to report adverse events, the reaction may have been related to the underlying disease being treated, or caused by some other drug being taken concurrently, or occurred for other reasons. The information in these reports reflects only the reporter's observations and opinions.

- **Information in reports has not been verified:** Submission of a report does not mean that the information included in it has been medically confirmed nor it is an admission from the reporter that the drug caused or contributed the event.

- **Rates of occurrence cannot be established with reports:** The number of suspected reactions in FAERS should not be used to determine the likelihood of a side effect occurring. The FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether an event will be reported, such as the time a product has been marketed and publicity about an event. Therefore, information in these reports cannot be used to estimate the incidence (occurrence rates) of the reactions reported.

- **Patients should talk to their doctor** before stopping or changing how they take their medications.

- **Patient Outcomes received in FAERS**: These data describe the outcome of the patient as defined in U.S. reporting regulations (21 CFR 310.305, 314.80, 314.98, 600.80). Serious means that one or more of the following outcomes were documented in the report: death, hospitalization, life-threatening, disability, congenital anomaly, and/or other serious outcome. Documenting one or more of these outcomes in a report does not necessarily mean that the suspect product(s) named in the report was the cause of the outcomes.

Importantly, the FAERS data by themselves are not an indicator of the safety profile of the drug.

# Exhibit 45

Kathi A. Aultman, et al., *Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 26 Law & Medicine 3 (2021).

# *Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019*

Kathi A. Aultman M.D.,[*] Christina A. Cirucci M.D.,
Donna J. Harrison M.D.,[**] Benjamin D. Beran M.D.,[***]
Michael D. Lockwood D.O.,[****] Sigmund Seiler M.D.[*****]

ABSTRACT: *Objectives:* Primary: Analyze the Adverse Events (AEs) reported to the Food and Drug Administration (FDA) after use of mifepristone as an abortifacient. Secondary: Analyze maternal intent after ongoing pregnancy and investigate hemorrhage after mifepristone alone.

*Methods*: Adverse Event Reports (AERs) for mifepristone used as an abortifacient, submitted to the FDA from September 2000 to February 2019, were analyzed using the National Cancer Institute's Common Terminology Criteria for Adverse Events (CTCAEv3).

*Results*: The FDA provided 6158 pages of AERs. Duplicates, non-US, or AERs previously published (Gary, 2006) were excluded.  Of the remaining, there were 3197 unique, US-only AERs of which there were 537 (16.80%) with insufficient information to determine clinical severity, leaving 2660 (83.20%) Codable US AERs (Figure 1). Of these, 20 were Deaths, 529 were Life-threatening, 1957 were Severe, 151 were Moderate, and 3 were Mild.

[*]  Associate Scholar with the Charlotte Lozier Institute.

[**]  Executive Director, American Association of Pro-Life Obstetricians and Gynecologists, PO Box 395 Eau Claire, Michigan 49111-0395. Ph 202 230-0997.  donna@aaplog.org.

[***]  Department of Obstetrics and Gynecology, Medical College of Wisconsin, Milwaukee, WI.

[****]  Department of Osteopathic Manipulative Medicine, Liberty University College of Osteopathic Medicine.

[*****]  Associate Professor of Family Medicine, Liberty University College of Osteopathic Medicine.

EX. 45 pg.01

Case: 23-10362     Document: 95-5     Page: 43     Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 1-46   Filed 11/18/22   Page 3 of 26   PageID 777

*4*                          *Issues in Law & Medicine, Volume 36, Number 1, 2021*

The deaths included: 9 (45.00%) sepsis, 4 (20.00%) drug toxicity/ overdose, 1 (5.00%) ruptured ectopic pregnancy, 1 (5.00%) hemorrhage, 3 (15.00%) possible homicides, 1 (5.00%) suicide, 1 (5.00%) unknown (Table 1).

Retained products of conception and hemorrhage caused most morbidity.  There were 75 ectopic pregnancies, including 26 ruptured ectopics (includes one death).

There were 2243 surgeries including 2146 (95.68%) D&Cs of which only 853 (39.75%) were performed by abortion providers.

Of 452 patients with ongoing pregnancies, 102 (22.57%) chose to keep their baby, 148 (32.74%) had terminations, 1 (0.22%) miscarried, and 201 (44.47%) had unknown outcomes.

Hemorrhage occurred more often in those who took mifepristone and misoprostol (51.44%) than in those who took mifepristone alone (22.41%).

*Conclusions*: Significant morbidity and mortality have occurred following the use of mifepristone as an abortifacient. A pre-abortion ultrasound should be required to rule out ectopic pregnancy and confirm gestational age. The FDA AER system is inadequate and significantly underestimates the adverse events from mifepristone.

A mandatory registry of ongoing pregnancies is essential considering the number of ongoing pregnancies especially considering the known teratogenicity of misoprostol.

At the very least, the FDA should reinstate the original 2011 REMS and strengthen the reporting requirements.

*Conflict of Interest Statement*: The authors did not report any potential conflicts of interest. Authors note that although Dr. Harrison is an associate editor for Issues in Law and Medicine, she recused herself from any involvement in the peer review process for this manuscript.

*Keywords*: Mifepristone, Mifeprex, RU-486, Misoprostol, Abortifacient, Medical Abortion, Abortion Pill, Medical Abortion Complications, No touch abortion, DIY Abortion, Self-Administered Abortion, Adverse Events, Adverse Event Reports, Post-marketing Surveillance, FAERS, Drug Safety, Emergency Medicine, FDA, REMS, Risk Evaluation Mitigation Strategy.

---

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*    5

# Introduction

The application for mifepristone (RU-486, RU-38486, Mifeprex) as an abortifacient was submitted to the Food and Drug Administration (FDA) in 1996 by the Population Council, which was given the manufacturing and distribution rights from Roussel Uclaf.[1] The Population Council partnered with Danco Laboratories, newly created in 1995, and gave them the manufacturing, marketing, and distribution rights. The FDA approved mifepristone in September 2000 under restricted distribution regulations (Subpart H) due to the FDA's conclusion that restrictions "on the distribution and use of mifepristone are needed to ensure safe use of this product."[2]

Included in these restrictions was the requirement that all serious Adverse Events (AEs), after the use of mifepristone as an abortifacient, be reported to the FDA by Danco as part of post-marketing surveillance. According to the FDA,[3] the purpose of such post-marketing surveillance includes identification of potential risks recognized after the time of approval, identification of unexpected deaths, causal attribution of AEs based on the product's known pharmacological action, and AEs for which a Risk Evaluation Mitigation Strategy (REMS) is intended to mitigate the risk.

In 2006, in response to the deaths of 4 women from a rare bacterial sepsis from *Clostridium sordellii (C. sordellii)*, the FDA and CDC convened a workshop, during which mifepristone alteration of the immune system was detailed, and they concluded that such alteration could lead to impaired ability to respond to *C. sordellii* toxin.[4]

---

[1] Citizen petition re: Request for Stay and Repeal of the Approval of Mifeprex (mifepristone) for the Medical Termination of Intrauterine Pregnancy through 49 Day's Gestation Final. Before the Department of Health and Human Services: Food and Drug Administration. AAPLOG. 2002. 7-10. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/Documents/2002%20Aug%20%20Citizen%20Petition_Mifeprex.pdf

[2] Center for Drug Evaluation and Research. Approval Letter for Mifeprex NDA 20-687. February 18, 2000. Food and Drug Administration. p 5. Accessed November 16, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687approvable00.pdf

[3] US Department of Health and Human Services, Food and Drug Administration Center for Drug Evaluation and Research, Center for Biologics Evaluation and Research. Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff. November 2019. p 7-8. Accessed Jan 16 2021. https://www.fda.gov/media/130216/download p7-8

[4] Emerging Clostridial Disease Workshop: May 11, 2006, Atlanta, GA. Department of Health and Human Services, Centers for Disease Control and Prevention, Food and Drug Administration, National Institutes of Health. 2006. p. 109,110. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/2006%20CDC%20FDA%20Clostridial%20Disease%20Transcript.pdf

There is evidence that both mifepristone[5,6,7] and misoprostol[8] can suppress immune response to *C. sordellii* in animal models.

In response to the septic deaths, Planned Parenthood changed their off-label protocol from vaginal administration of misoprostol to buccal in 2006.[9,10] Yet, as we found in our analysis, sepsis deaths from *C. sordellii* and other bacteria continued to occur after 2007. All sepsis deaths occurred with either vaginal or buccal misoprostol, which were both off label routes of administration until the buccal route was authorized in 2016.[11]

In 2011, the FDA approved a Risk Evaluation and Mitigation Strategy (REMS) for Mifepristone incorporating the original restrictions.[12] In May 2015, Mifepristone's sponsor submitted a supplemental new drug application to the FDA to obtain approval to revise the drug's labeling, which the FDA approved in 2016.[13,14] The 2016 changes in the Regimen and Prescriber Agreement extended the original gestational age limit from 49 days to 70 days, changed the mifepristone dose from 600 mg to 200 mg orally, changed the misoprostol dose from 400 mcg orally on Day 3 to 800 mcg buccally on Day 2 or 3, allowed non-physicians to become prescribers, reduced the number of required office visits from 3 to just one initial office visit, and allowed a repeat dose of misoprostol if complete expulsion did not occur.[15] The prescriber agreement was changed so

---

[5] Emerging Clostridial Disease Workshop: May 11, 2006, Atlanta, GA. Department of Health and Human Services, Centers for Disease Control and Prevention, Food and Drug Administration, National Institutes of Health. 2006. p. 109, 110 Accessed November 13, 2020.
https://aaplog.wildapricot.org/resources/2006%20CDC%20FDA%20Clostridial%20Disease%20Transcript.pdf

[6] Webster JI, Sternberg EM. Role of the hypothalamic-pituitary-adrenal axis, glucocorticoids and glucocorticoid receptors in toxic sequelae of exposure to bacterial and viral products. J Endocrinol. 2004;181(2):212, 213, 216, 217. doi.org/10.1677/joe.0.1810207

[7] Hawes AS, Rock CS, Keogh CV, Lowry SF, Calvano SE. In vivo effects of the antiglucocorticoid RU 486 on glucocorticoid and cytokine responses to Escherichia coli endotoxin. Infect Immun. 1992;60(7):2645, 2646. doi:10.1128/IAI.60.7.2641-2647.1992

[8] Aronoff DM, Hao Y, Chung J, et al. Misoprostol impairs female reproductive tract innate immunity against Clostridium sordellii. J Immunol. 2008;180(12):8227-8229. https://doi.org/10.4049/jimmunol.180.12.8222

[9] Trussell, J, Nucatola, D, Fjerstad, M, Lichtenberg, ES. Reduction in infection-related mortality since modifications in the regimen of medical abortion. Contraception, 2014;89(3):193-196. https://doi.org/10.1016/j.contraception.2013.11.020

[10] Fjerstad M, Trussell, J, Sivin, I, Lichtenberg, ES, Rates of Serious Infection after Changes in Regimens for Medical Abortion. N Engl J Med. 2009 July 9;361(2):148-149. July 9, 2009 N Engl J Med 2009; 361:145-151. doi:10.1056/NEJMoa0809146

[11] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p. 7. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

[12] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2011. 1-11. Reference ID: 2957855. Published June 8, 2011. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2011-06-08_Full.pdf

[13] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p. 1. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

[14] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2016. 1-8. Reference ID: 3909592. Published March 29, 2016. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf

[15] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p.7. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*    7

that instead of being required to "report any hospitalization, transfusion or other serious event to Danco Laboratories,"[16] providers were only required to report deaths.[17] The requirement to report ongoing pregnancies that are not terminated was also eliminated. "The FDA approved GenBioPro, Inc.'s abbreviated new drug application (ANDA) for generic Mifeprex on April 11, 2019" and "established a single, shared system REMS for mifepristone products" without substantially changing the REMS.[18]

During the COVID-19 pandemic the Maryland District Court issued a preliminary injunction prohibiting the FDA from enforcing the in-person dispensing and signature requirements contained in the mifepristone REMS.[19] This decision eliminated the need for an initial office visit for dispensing the medication and opened the door for dispensing of the drug via telehealth with no actual clinician contact. On January 12, 2021, the Supreme Court enabled the FDA to enforce the mifepristone REMS.[20] These requirements are essential for the safety of women and must be kept in place.

The first systematic analysis of these Adverse Event Reports (AERs) obtained by the Freedom of Information Act (FOIA), was published by Gary and Harrison in 2006.[21] This paper extends that analysis to AERs not previously published and augments the scant published literature on mifepristone safety.

## *Objectives*

Primary: To analyze and codify the significant adverse events and their treatment after the use of mifepristone as an abortifacient, extending the previously published analysis by Gary in 2006.[22] Secondary: To examine maternal decisions in the case of ongoing pregnancy after attempted mifepristone termination, and to determine if failing to take misoprostol after mifepristone increased the risk of hemorrhage.

---

[16] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2011. p. 7. Reference ID: 2957855. Published June 8, 2011. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2011-06-08_Full.pdf

[17] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2016. p. 6. Reference ID: 3909592. Published March 29, 2016. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf

[18] Questions and Answers on Mifeprex. Food and Drug Administration. March 28, 2018. Updated 4-12-2019. Accessed November 13, 2020. https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifeprex

[19] American College of Obstetricians and Gynecologists, et al., v. Food and Drug Administration, et al., No. 20-1320, 2020 WL 3960625 (D. Md. July 13, 2020). Accessed November 16th, 2020. https://www.courthousenews.com/wp-content/uploads/2020/07/093111166803.pdf

[20] FDA v ACOG. SCOTUS. 20a34_3f14. Accessed January 20, 2021. https://www.supremecourt.gov/opinions/20pdf/20a34_3f14.pdf

[21] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

[22] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

EX. 45 pg.05

## Materials and Methods

FDA AERs related to the use of mifepristone from September 2000 to February 2019 were obtained through the Freedom of Information Act (FOIA) from the FDA, and a comparison was made with FDA reports available online on the FDA Adverse Events Reporting System (FAERS) Dashboard.[23]  Duplicate AERs were identified by comparing FDA case identification numbers, manufacturer identification numbers, dates of treatment, patient age, and descriptions of case scenarios to ensure that each case was included only once in this analysis. The authors excluded duplicates, cases originating outside of the United States, and cases previously published in the Gary analysis[24]  (Figure 1).

One of the concerns in looking at AEs is the risk of falsely assigning causality. The FDA does not give guidance for determining causality for AEs in the AERs but does give guidance for selecting AEs for inclusion in the Adverse Reaction section of the Drug Label.[25]  They recommend that, "Decisions on whether there is some basis to believe there is a causal relationship are a matter of judgment and are based on factors such as" the "frequency of reporting," "the extent to which the adverse event is consistent with the pharmacology of the drug," "the timing of the event relative to the time of drug exposure," and other factors.  Although a causal relationship cannot be attributed with certainty to all reported AEs for a drug, a causal relationship seems probable for each of the categories of AEs we chose to analyze based on these factors, except for ectopic pregnancies and some of the deaths.  Ectopic pregnancies were included in our analysis not because there is a causal relationship, but because ectopic pregnancy is a contraindication to the use of mifepristone and the diagnosis was missed, putting women's lives at risk. The deaths must be evaluated individually to determine causality.

Because reporting is often voluntary and sporadic, there is no denominator for how many mifepristone abortions are performed in the U.S.  It was therefore impossible to calculate complication rates for mifepristone and misoprostol abortions based on AER data. For clarity, we specified the denominator used in each case. Coding for severity was done using the National Cancer Institute's Common Terminology Criteria for Adverse Events (CTCAEv3),[26]  since this was

---

[23] FDA Adverse Events Reporting System (FAERS) Public Dashboard. Food and Drug Administration. Accessed November 13, 2020. https://fis.fda.gov/sense/app/d10be6bb-494e-4cd2-82e4-0135608ddc13/sheet/33a0f68e-845c-48e2-bc81-8141c6aaf772/state/analysis

[24] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

[25] Guidance for Industry Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products — Content and Format. U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER); January 2006. P. 8. Accessed January 8, 2021. https://www.fda.gov/media/72139/download

[26] Common Terminology Criteria for Adverse Events v3.0 (CTCAE). Cancer Center Therapy Evaluation Program (CTEP); 2003. 1-77. Published December 12, 2003. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/CTCAEv3.pdf

EX. 45 pg.06

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*    9

the methodology used in the original analysis of the first 607 Adverse Events.[27] The five levels of coding are: Mild, Moderate, Severe, Life-threatening, and Death.

Overall severity (Figure 1) for each unique AER was determined independently by two board-certified physicians (Obstetrics and Gynecology or Family Medicine). Since within each AER, a patient may have experienced several Adverse Events (AEs), the overall severity of the AER was based on the highest severity of its AEs. For the diagnoses we analyzed (Table 1), each AE was coded in the same manner and stratified according to type, severity, and treatment. Disagreements were resolved by discussion or review by a third board-certified Obstetrician-Gynecologist who also reviewed coding for uniformity. Surgeries, transfusions, providers, and location of treatment were analyzed and tabulated.

Ruptured ectopic pregnancies were coded as Life-threatening and unruptured ectopic pregnancies as Severe.

Infections were coded as Life-threatening when evidence of sepsis was present, or ICU-level treatment was required. They were coded as Severe if parenteral/IV antibiotics were given and Moderate if oral antibiotics were prescribed.

Life-threatening hemorrhage was defined, as in the previous analysis, to be transfusion of two or more units of packed red blood cells (PRBCs), hemoglobin less than 7, or documented large volume, rapid blood loss with clinical symptomatology of acute blood loss anemia (e.g., syncope, tachycardia, hypotension). Severe hemorrhage was defined as requiring surgical intervention and/or less than 2 U PRBCs. Moderate hemorrhage was defined as management with fluids/medication alone.

Retained Products of Conception (RPOC) was coded as Severe if a dilatation and curettage/evacuation (D&C) was performed. Ongoing viable intrauterine pregnancy was considered equivalent in severity to RPOC requiring curettage and thus Severe. When the ultimate outcome was unknown, the pregnancy was considered ongoing if "ongoing pregnancy" was noted or ultrasound showed cardiac motion or significant growth.

AEs which did not contain sufficient information to assign an accurate severity code were deemed "Uncodable." AERs lacking any codable information were deemed overall Uncodable.

The percent of women with significant hemorrhage after mifepristone alone was compared to those who took both mifepristone and misoprostol, to investigate the validity of the assertion that lack of subsequent misoprostol administration was a causative factor in hemorrhage after mifepristone use.[28]

---

[27] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

[28] Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone Antagonization With Progester-one to Prevent Medical Abortion: A Randomized Controlled Trial. Obstet Gynecol. 2020;135(1):158-165. doi:10.1097/AOG.0000000000003620

EX. 45 pg.07

Case: 23-10362    Document: 95-5    Page: 49    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 1-46   Filed 11/18/22   Page 9 of 26   PageID 783

*10*                                        *Issues in Law & Medicine, Volume 36, Number 1, 2021*

# Results

### Adverse Event Report Overall Severity

Figure 1 summarizes the handling of the AERs provided by the FDA and their severity coding. The FDA provided 6158 pages of AERs. Of these, any duplicates, non-US, or AERs previously published in the Gary paper were excluded from the analysis.  There were 3197 unique, US-only AERs of which 537 had insufficient information to determine clinical severity, leaving 2660 Codable US-only AERs. Of these, 20 were Deaths, 529 were Life-threatening, 1957 were Severe, 151 were Moderate, and 3 were Mild.

### Deaths (Table 1)

Our analysis identified 23 of the 24 deaths reported by the FDA as of 2018.[29] Three of those deaths were previously published in the Gary paper[30]   leaving 20 deaths (Table 1).  Our analysis yielded a total of 7 sepsis deaths. These included five cases of *C. sordellii* and one case of *Clostridium perfringens*, all consistent with those reported by the FDA.  There was an additional death which we categorized as a sepsis death whereas the FDA labeled this case as "delayed onset toxic shock-like syndrome" but did not include it as a sepsis death. The patient had an exploratory laparotomy revealing green pus, which was culture positive for *prevotella* and *peptostreptococcus,* and she died intraoperatively.[31]

---

[29] RCM # 2007-525 NDA 20-687 Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018. FDA. 1-2. Reference ID: 4401215. Accessed November 13, 2020. https://www.fda.gov/media/112118/download

[30] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

[31] Individual Case Safety Report number 4734082-4-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received August 4, 2005. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/Peptostreptococcus%20death%209.10277-8.pdf

EX. 45 pg.08

Case: 23-10362    Document: 95-5    Page: 50    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 1-46   Filed 11/18/22   Page 10 of 26   PageID 784

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*    11

## Figure 1.  AER Distribution



*Note:* From 2000 to 2016 FDA only required the manufacturer to report AEs which were severe, life-threatening or had fatal outcomes.  Since 2016, FDA only requires the manufacturer to report fatal outcomes.

We categorized two deaths as suspicious for infectious death.  One case was labeled by the FDA as "undetermined natural causes," however, the AER reported the cause of death as "acute visceral and pulmonary (1420 grams) congestion and edema," [32] which is consistent with the clinical findings for sepsis/Acute Respiratory Distress Syndrome (ARDS).  This patient had autopsy-proven retained products of conception and blood cultures which grew *Strep viridans* isolated at less than 24 hours incubation.  One additional case which the FDA labeled "methadone overdose"[33,34] we considered suspicious for sepsis. Prior to her death, this patient had fever and chills and was treated by an outside physician with cephalexin, which would have been ineffective against infections from *C. sordellii* or anaerobic gram-negative bacilli.  There was no autopsy report or toxicology report in the AER.

Non-infectious deaths include one death that the FDA listed as "natural," caused by "pulmonary emphysema."[35]  This patient was a 40-year-old chronic smoker who died within hours of misoprostol ingestion and had a contusion on her head consistent with a fall, a scenario possibly related to a cardiac event or acute respiratory reaction to misoprostol. She had an intact fetus at the time of

---

[32] Individual Case Safety Report number 9587011-03-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received May 21, 2014. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/death%20Visc%20pul%20cong.pdf

[33] Individual Case Safety Report number 4970303-0-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received April 21, 2014. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/death%2023%20yo%20meth%20overdose%20fever%20and%20chills.pdf

[34] Individual Case Safety Report number 5063156-8-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received July 27, 2006. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/methadone%20AER%20(1).pdf

[35] Individual Case Safety Report number 11283049-02-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received December 8, 2015. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/emphysema.pdf

*12*                                    *Issues in Law & Medicine, Volume 36, Number 1, 2021*

autopsy.  Other non-infectious deaths included one death from a ruptured ectopic pregnancy, one from hemorrhage, 3 possible homicides, one suicide, and 4 deaths from drug toxicity/overdose. It is unknown whether the 8 women who died by homicide, suicide, or drug toxicity/overdose were screened for domestic violence, drug addiction, or depression prior to the abortion.

### Infection (Table 1)

Infection was the leading cause of mortality. There were 502 cases of infection, which included 9 Deaths, 39 had Life-threatening sepsis, 249 were Severe infections, 132 Moderate infections, and 73 infections which were Uncodable.

### Ectopic Pregnancy (Table 1)

There were 75 ectopic pregnancies. Of these, 26 were ruptured, including 1 death. Twenty-four were unruptured, and there were 25 for which the rupture status was not given. Fifty-six ectopic pregnancies were treated surgically and 11 were treated with methotrexate. The management was not documented in 7 cases. The patient who died received no treatment as she died on the way to the hospital.

### Retained Products of Conception (RPOC) (Tables 1 and 2)

RPOC was the leading cause of morbidity. There were 977 confirmed cases of RPOC, including 2 molar pregnancies, and 1506 likely cases of RPOC (documentation was inadequate for confirmation). Of the 2146 total D&Cs, most were for RPOC, including 897 for confirmed RPOC, 1058 for bleeding or presumed RPOC, but no pathology was provided, and 2 for molar pregnancy.  A small percentage of RPOC had medical treatment or no treatment.

### Hemorrhage/Bleeding (Table 1)

There were 1639 bleeding events including one death. These included 466 Life-threatening and 642 Severe events. There were also 106 events coded as Moderate, while 424 reports of bleeding were Uncodable given the information in the database.

### Ongoing Pregnancy (Table 1)

There were 452 ongoing pregnancies. Of these 102 chose to keep their baby, 148 chose termination, 1 miscarried, and 201 had an unknown outcome. Of those with an unknown outcome, there were 44 patients referred or scheduled for termination, who did not follow through (39 no-showed, 3 canceled, 2 did not schedule).

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*     13

### Surgeries (Table 2)

There were 2243 surgeries including 2146 D&Cs, 76 laparoscopies/laparotomies without hysterectomy, 7 hysterectomies, and 14 other surgeries. Of the hysterectomies, 3 were performed for sepsis, 2 for hemorrhage, 1 for a cervical ectopic, and 1 for placenta accreta.  There were 1291 surgeries performed in the hospital or ER and 952 in an outpatient setting. Of the 2146 D&Cs, 1194 were performed in the hospital or ER, and 952 in an outpatient setting. Of the 2146 D&Cs, 1194 were provided by the Hospital or ER, 853 by the abortion provider, and 99 by another outpatient provider.

### Transfusions (Table 2)

Four hundred and eighty-one patients required blood transfusion following medical abortions. Of these, 365 received 1 to 10 units packed red blood cells (PRBCs) alone, 1 received fresh frozen plasma (FFP) alone, 8 received a combination of PRBCs and FFP, and 107 received an unknown amount of blood product.

### Relationship of Misoprostol Use to Hemorrhage (Table 3)

The use of mifepristone with misoprostol was associated with a higher incidence of hemorrhage than the use of mifepristone alone.  Of the 3056 women who took both mifepristone and misoprostol, 1572 (51.44%) hemorrhaged, whereas, among the 58 women who did not take misoprostol, only 13 (22.41%) hemorrhaged. It was unclear whether 84 patients took misoprostol or not. Fifty-four (64.29%) of them hemorrhaged. The hemorrhage rate was higher for the mifepristone with misoprostol group as compared to the mifepristone alone group even if all the unknowns were assigned to the mifepristone alone group or vice versa.

Case: 23-10362    Document: 95-5    Page: 53    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 1-46   Filed 11/18/22   Page 13 of 26   PageID 787

*14*                                    *Issues in Law & Medicine, Volume 36, Number 1, 2021*

## Table 1 - Diagnoses[a]

| Deaths | Deaths (n) | Deaths (%) | Deaths: % of (3197) Unique US AERs (%) | Organism (%) |
|---|---|---|---|---|
| Sepsis | 9 | 45.00% | 0.28% | |
|   Sepsis confirmed | 7 | 35.00% | 0.22% | 100% |
|     *Clostridium sordellii* | *5* | *25.00%* | *0.16%* | *71.43%* |
|     *Clostridium perfringens / Peptostreptococcus* | *1* | *5.00%* | *0.03%* | *14.29%* |
|     *Peptostreptococcus* | *1* | *5.00%* | *0.03%* | *14.29%* |
|   Sepsis Likely, Unknown Organism | 2 | 10.00% | 0.06% | |
|     *Visceral and Pulmonary Congestion consistent with ARDS / sepsis* | 1 | 5.00% | 0.03% | |
|     *Fever / chills treated with cephalexin, found dead[b]* | 1 | 5.00% | 0.03% | |
| Ruptured Ectopic Pregnancy | 1 | 5.00% | 0.03% | |
| Hemorrhage | 1 | 5.00% | 0.03% | |
| Possible Homicide | 3 | 15.00% | 0.09% | |
| Suicide | 1 | 5.00% | 0.03% | |
| Drug Toxicity/Overdose | 4 | 20.00% | 0.13% | |
| Unknown[c] | 1 | 5.00% | 0.03% | |
| **Total Deaths** | **20** | **100%** | **0.63%** | |

| Infections, Level of Severity | Infections (n) | Infections (%) | Infections: % of (3197) Unique US AERs (%) | |
|---|---|---|---|---|
| Death | 9 | 1.79% | 0.28% | |
| Life threatening infection/sepsis | 39 | 7.77% | 1.22% | |
| Severe infection (IV anitbiotics) | 249 | 49.60% | 7.79% | |
| Moderate infection (oral antibiotics) | 132 | 26.29% | 4.13% | |
| Uncodable[d] | 73 | 14.54% | 2.28% | |
| **Total Infections** | **502** | **100%** | **15.70%** | |

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*     15

## Table 1 – Diagnoses (Continued)

| Ectopic Pregnancies, Rupture Status | Ectopic Pregnancies (n) | Ectopic Pregnancies (%) | Ectopic Pregnancies: % of (3197) Unique US AERs (%) |
|---|---|---|---|
| Ruptured[e] | 26 | 34.67% | 0.81% |
| Unruptured[f] | 24 | 32.00% | 0.75% |
|    Surgical Treatment | 13 | 17.33% | 0.41% |
|    Methotrexate Treatment | 11 | 14.67% | 0.34% |
| Unknown Rupture Status[g] | 25 | 33.33% | 0.78% |
|    Surgical Treatment | 18 | 24.00% | 0.56% |
|    Unknown Treatment | 7 | 9.33% | 0.22% |
| **Total Ectopic Pregnancies** | **75** | **100%** | **2.35%** |

| Ectopic Pregnancies, Level of Severity | Ectopic Pregnancies (n) | Ectopic Pregnancies (%) | Ectopic Pregnancies: % of (3197) Unique US AERs |
|---|---|---|---|
| Death | 1 | 1.33% | 0.03% |
| Life Threatening (Ruptured, survived) | 25 | 33.33% | 0.78% |
| Severe (Not Ruptured) | 24 | 32.00% | 0.75% |
| Uncodable | 25 | 33.33% | 0.78% |
| **Total Ectopic Pregnancies** | **75** | **100%** | **2.35%** |

Case: 23-10362    Document: 95-5    Page: 55    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 1-46   Filed 11/18/22   Page 15 of 26   PageID 789

*16*                              *Issues in Law & Medicine, Volume 36, Number 1, 2021*

## Table 1 – Diagnoses  (Continued)

| Retained Products of Conception (RPOC) | RPOC (n) | RPOC (%) | RPOC:  % of (3197) Unique US AERs (%) |
|---|---|---|---|
| RPOC confirmed | 977 | 39.35% | 30.56% |
| RPOC confirmed (by pathology or ultrasound); Had D&C | 891 | 35.88% | 27.87% |
| RPOC confirmed by U/S but D&C not documented | 29 | 1.17% | 0.91% |
| RPOC treated medically | 27 | 1.09% | 0.84% |
| Tissue at os (no D&C)[h] | 27 | 1.09% | 0.84% |
| Molar Pregnancy | 2 | 0.08% | 0.06% |
| No Treatment, RPOC on autopsy | 1 | 0.04% | 0.03% |
| RPOC Likely | 1506 | 60.65% | 47.11% |
| Had D&C, no pathology provided | 1056 | 42.53% | 33.03% |
| Unknown[i] | 450 | 18.12% | 14.08% |
| **Total RPOCs** | **2483** | **100%** | **77.67%** |

| Bleeding Events, Level of Severity | Bleeding Events (n) | Bleeding Events (%) | Bleeding Events: % of (3197) Unique US AERs |
|---|---|---|---|
| Death | 1 | 0.06% | 0.03% |
| Life threatening or Disabling: 2U or more transfusion or Hgb<7 or witnessed massive blood loss | 466 | 28.43% | 14.58% |
| Severe: surgical intervention and/or 1 U transfusion | 642 | 39.17% | 20.08% |
| Moderate: medical intervention | 106 | 6.47% | 3.32% |
| Uncodable[j] | 424 | 25.87% | 13.26% |
| **Total Bleeding Events** | **1639** | **100%** | **51.27%** |

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*    17

## Table 1 – Diagnoses  (Continued)

| Ongoing Pregnancies, Outcome | Ongoing Pregnancies (n) | Ongoing Pregnancies | Ongoing Pregnancies: % of (3197) Unique US AERs (%) | Ongoing Pregnancies with Unknown Outcome (%) |
|---|---|---|---|---|
| Desired to Keep Pregnancy | 102 | 22.57% | 3.19% | |
| Kept Pregnancy | 101 | 22.35% | 3.16% | |
| Kept Pregnancy but baby died in-utero | 1 | 0.22% | 0.03% | |
| Terminated Pregnancy | 148 | 32.74% | 4.63% | |
| Surgical Termination[k] | 139 | 30.75% | 4.35% | |
| Medical Termination | 9 | 1.99% | 0.28% | |
| Unknown Intent, miscarried[l] | 1 | 0.22% | 0.03% | |
| Unknown Outcome | 201 | 44.47% | 6.29% | 100% |
| Referred D&C but did not show | 39 | 8.63% | 1.22% | 19.40% |
| Referred D&C but cancelled | 3 | 0.66% | 0.09% | 1.49% |
| Told to schedule/referred D&C did not go | 2 | 0.44% | 0.06% | 1.00% |
| Unknown outcome, no other information[m] | 157 | 34.73% | 4.91% | 78.11% |
| **Total** | **452** | **100%** | **14.14%** | |

[a]  Because of rounding, percentages may not appear to add up exactly.
[b]  FDA attributed to methadone overdose.
[c]  40 year old smoker died within hours of misoprostol ingestion. Per FDA, "natural causes due to severe pulmonary emphysema."
[d]  Patients with documented infection but inadequate information to determine severity.
[e]  One of the ruptured ectopics died on the way to the hospital. The other 25 were treated surgically.
[f]  The unruptured ectopics include two cornual ectopics, one treated surgically and one treated medically.
[g]  Includes two cervical ectopics, one treated with D&C/Hysterectomy/massive transfusion and one with unknown treatment.
[h]  Either with path provided, or described as RPOC, placental fragments, fetus, or tissue.
[i]  Suspected RPOC indicating D&C needed, but not documented as being done.
[j]  Patients with documented bleeding but inadequate information to determine severity.
[k]  Includes one hysterotomy for pregnancy in non-communicating horn.
[l]  After no show for surgical termination.
[m]  Includes 10 with known gestational age 20-29 weeks.

## Table 2 – Treatment[a]

| Type of Surgery | Type of surgery (n) | Type of surgery (%) | Surgery: % of (3197) Unique US AERs (%) |
|---|---|---|---|
| D&C[b] | 2146 | 95.68% | 67.13% |
| **Hysterectomy** | **7** | **0.31%** | **0.22%** |
| Sepsis (includes 2 deaths) | 3 | 0.13% | 0.09% |
| Hemorrhage after uterine perforation | 2 | 0.09% | 0.06% |
| Hemorrhage - Cervical Ectopic | 1 | 0.04% | 0.03% |
| Placenta accreta | 1 | 0.04% | 0.03% |
| **Laparoscopy/Laparotomy without hysterectomy** | **76** | **3.39%** | **2.38%** |
| Ectopic (Actual or Suspected) | 66 | 2.94% | 2.06% |
| Infection | 7 | 0.31% | 0.22% |
| Uterine Perforation | 1 | 0.04% | 0.03% |
| Salpingo oophorectomy  for Torsion | 1 | 0.04% | 0.03% |
| Hysterotomy for pregnancy in non-communicating horn | 1 | 0.04% | 0.03% |
| **Other Surgeries** | **14** | **0.62%** | **0.44%** |
| Uterine Artery Embolization | 1 | 0.04% | 0.03% |
| Vaginal sutures (after 15 week surgical termination for ongoing pregnancy) | 1 | 0.04% | 0.03% |
| Paracenteses (multiple, same patient, death) | 1 | 0.04% | 0.03% |
| Necrotozing fasciitis debridement and below knee amputation | 1 | 0.04% | 0.03% |
| Upper and lower endoscopy for bright red bleeding | 1 | 0.04% | 0.03% |
| Unknown surgery for deep venous thrombosis | 1 | 0.04% | 0.03% |
| Angioplasty | 1 | 0.04% | 0.03% |
| Cholecystectomy | 2 | 0.09% | 0.06% |
| Appendectomy | 1 | 0.04% | 0.03% |
| Laceration repair (scalp, chin) | 2 | 0.09% | 0.06% |
| Unknown Surgery | 2 | 0.09% | 0.06% |
| **Total** | **2243** | **100%** | **70.16%** |

Case: 23-10362    Document: 95-5    Page: 58    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 1-46   Filed 11/18/22   Page 18 of 26   PageID 792

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*    19

## Table 2 – Treatment (Continued)

| Location of Surgery | Location of Surgery (n) | Location of Surgery (%) |
|---|---|---|
| **All Surgeries** | **2243** | **100.00%** |
| Hospital or ER | 1291 | 57.56% |
| Outpatient | 952 | 42.44% |
| **D&C** | **2146** | **100.00%** |
| Hospital or ER | 1194 | 55.64% |
| Outpatient | 952 | 44.36% |
| | | |

| Surgical Provider for D&C | Surgical Provider (n) | Surgical Provider (%) |
|---|---|---|
| Hospital/ER | 1194 | 55.64% |
| Abortion Provider | 853 | 39.75% |
| Other Provider | 99 | 4.61% |
| **Total** | **2146** | **100%** |
| | | |

| Indication for D&Cs | Indication for D&C (n) | Indication for D&C (%) |
|---|---|---|
| **Confirmed D&C[c]** | **2146** | **100%** |
| RPOC (confirmed by pathology or ultrasound) | 897 | 41.80% |
| RPOC/Bleeding (no pathology provided) | 1058 | 49.30% |
| Ongoing pregnancy, surgical termination by D&C | 139 | 6.48% |
| RPOC ruled out | 34 | 1.58% |
| Ectopic evaluation | 12 | 0.56% |
| Molar pregnancy | 2 | 0.09% |
| Not able to take misoprostol | 4 | 0.19% |
| **Possible D&C** | **680** | |
| Possible RPOC, unknown treatment, possible D&C | 450 | |
| RPOC confirmed by U/S but D&C not documented | 29 | |
| Ongoing pregnancy Unknown outcome, possible D&C | 201 | |
| **TOTAL (Confirmed and Possible)** | **2826** | |

20                          *Issues in Law & Medicine, Volume 36, Number 1, 2021*

## Table 2 – Treatment (Continued)

| Transfusions | Transfusions (n) | Transfusions (%) | Transfusion: % of (3197) Unique US AERs (%) |
|---|---|---|---|
| **PRBC alone** | **365** | **75.88%** | **11.42%** |
| 1U | 32 | 6.65% | 1.00% |
| 1-2U | 1 | 0.21% | 0.03% |
| 2U | 246 | 51.14% | 7.69% |
| 2.5U | 1 | 0.21% | 0.03% |
| 3U | 45 | 9.36% | 1.41% |
| 4U | 27 | 5.61% | 0.84% |
| 5U | 5 | 1.04% | 0.16% |
| 6U | 5 | 1.04% | 0.16% |
| 7U | 2 | 0.42% | 0.06% |
| 10U | 1 | 0.21% | 0.03% |
| **Other Blood products** | **9** | **1.87%** | **0.28%** |
| 1 U FFP | 1 | 0.21% | 0.03% |
| 2 U PRBC/1 U FFP | 1 | 0.21% | 0.03% |
| 2 U PRBC/ 4 U FFP | 1 | 0.21% | 0.03% |
| 3 U PRBC/ 1 U FFP | 1 | 0.21% | 0.03% |
| 4 U PRBC/ 1 U FFP | 1 | 0.21% | 0.03% |
| 4 U PRBC/ 2 U FFP | 1 | 0.21% | 0.03% |
| 5 U PRBC/ 4 U FFP | 1 | 0.21% | 0.03% |
| 6 U PRBC/ 2 U FFP | 1 | 0.21% | 0.03% |
| 7 U PRBC/ FFP and Platelets unknown amount | 1 | 0.21% | 0.03% |
| **Unknown amount (documented as given, units not recorded)** | **107** | **22.25%** | **3.35%** |
| **Total[d]** | **481** | **100%** | **15.05%** |

[a]  Because of rounding, percentages may not appear to add up exactly.
[b]  With or without suction, one with hysteroscopy.
[c]  There were 8 patients who had 2 D&Cs and one who required uterine artery embolization. There were 4 perforations: two had resultant hysterectomies, one had a laparoscopy, and one received 2 U PRBCs but no documented surgery.
[d]  Additionally there were 7 patients who likely received transfusion, but was not recorded, 3 patients who refused transfusion, and 1 patient for whom transfusion was considered but not given.

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*     21

## Table 3 – Relationship of Misoprostol to Hemorrhage[a]

| | Mifepristone + Misoprostol | | Mifepristone alone | | Unknown | | Mifepristone + Misoprostol + unknown[b] | | Mifepristone alone + unknown[c] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | n | % |
| No Hemorrhage | 1484 | 48.56% | 45 | 77.59% | 30 | 35.71% | 1514 | 48.23% | 75 | 52.82% |
| Hemorrhage | 1572 | 51.44% | 13 | 22.41% | 54 | 64.29% | 1625 | 51.77% | 67 | 47.18% |
| Death | 1 | 0.03% | 0 | 0.00% | 0 | 0.00% | 1 | 0.03% | 0 | 0.00% |
| Life threatening | 441 | 14.43% | 5 | 8.62% | 20 | 23.81% | 461 | 14.69% | 25 | 17.61% |
| Severe | 633 | 20.71% | 3 | 5.17% | 6 | 7.14% | 639 | 20.36% | 9 | 6.34% |
| Moderate | 101 | 3.30% | 1 | 1.72% | 4 | 4.76% | 105 | 3.35% | 5 | 3.52% |
| Uncodable | 396 | 12.96% | 4 | 6.90% | 24 | 28.57% | 420 | 13.38% | 28 | 19.72% |
| Total US AERs | 3056 | 100% | 58 | 100% | 84 | 100% | 3139 | 100% | 142 | 100% |

[a] Because of rounding, percentages may not appear to add up exactly.
[b] Assumes all unknowns took both mifepristone and misoprostol.
[c] Assumes all unknowns took mifepristone, but not misoprostol.

## Discussion

This article is critically important considering the paucity of published literature on mifepristone safety and the minimal analysis done on the AERs by the FDA.

### *Ectopic Pregnancies*

Although reported as AEs, ectopic pregnancies are not a direct adverse event from the medication, but rather a contraindication to its administration. They were reported as adverse events because the ectopic pregnancies were missed.

The American College of Obstetricians and Gynecologists (ACOG) notes that "According to the Centers for Disease Control and Prevention, ectopic pregnancy accounts for approximately 2% of all reported pregnancies. However, the true current incidence of ectopic pregnancy is difficult to estimate because many patients are treated in an outpatient setting where events are not tracked, and national surveillance data on ectopic pregnancy have not been updated since 1992. Despite improvements in diagnosis and management, ruptured ectopic pregnancy continues to be a significant cause of pregnancy-related mortality and morbidity. In 2011–2013, ruptured ectopic pregnancy accounted for 2.7% of all pregnancy-related deaths and was the leading cause of hemorrhage-related mortality."[36]

[36] ACOG Practice Bulletin No. 193: Tubal Ectopic Pregnancy, Obstet Gynecol: March 2018; 131(3): e91-e103. doi:10.1097/AOG.0000000000002560

EX. 45 pg.19

Case: 23-10362     Document: 95-5     Page: 61     Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 1-46   Filed 11/18/22   Page 21 of 26   PageID 795

*22*                          *Issues in Law & Medicine, Volume 36, Number 1, 2021*

Confirmed/suspected ectopic pregnancy and undiagnosed adnexal mass are contraindications to mifepristone use under current prescribing requirements. The label warnings state: "Ectopic pregnancy: exclude before treatment." [37] Unfortunately, it is difficult to rule out ectopic pregnancy by history alone because, "half of all women who receive a diagnosis of an ectopic pregnancy do not have any known risk factors."[38]  According to ACOG Practice Bulletin No. 193, "The minimum diagnostic evaluation of a suspected ectopic pregnancy is a transvaginal ultrasound evaluation and confirmation of pregnancy." Of the 75 reported ectopic pregnancies in the FDA AERs we analyzed, over a third were known to be ruptured including one death. Clearly, an ultrasound should be required prior to the administration of mifepristone to document that the pregnancy is located within the uterus. Although not 100% effective, this will screen for ectopic pregnancy, confirm gestational age, which can be inaccurate based on menstrual history alone,[39]  and screen for adnexal masses, another contraindication to mifepristone use.[40]

## Ongoing pregnancies

Of the women with an ongoing pregnancy, less than a third were known to have proceeded with termination of the pregnancy, and almost a quarter were known to have kept their pregnancy; in almost half, the outcome was unknown. The significant percentage of women with ongoing pregnancy who changed their mind and chose to keep their pregnancy, after initially choosing termination, raises concerns regarding the pre-abortion counseling and informed consent they received.  Women undergoing abortion should receive the same quality of informed consent and pre-procedural counseling that is standard of care prior to other medical treatment or surgery. It is imperative that women considering abortion be provided adequate and complete information and counseling on risks, advantages, disadvantages, and alternative options.

Additionally, the high percentage of women with ongoing pregnancies for whom there is no follow up or known outcome is concerning.  As health care providers we are to continue to care for our patients and manage any complications, yet in the AERs we reviewed this was not typically the case for the abortion provider.  Furthermore, a federal registry of known outcomes and birth defects is imperative. One of the initial FDA post-marketing requirements for

---

[37] MIFEPREX. Package insert. Danco; 2016. Approved March 2016. p. 1. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf

[38] ACOG Practice Bulletin No. 193: Tubal Ectopic Pregnancy, Obstet Gynecol: March 2018; 131(3): e91-e103. doi: 10.1097/AOG.0000000000002560

[39] Shipp, Thomas D. 2020. Overview of ultrasound examination in obstetrics and gynecology. Lit Rev current through Dec 2020. UpToDate. Edited by Barss A Vanessa. Wolters Kluwer. June 10, 2020. Accessed January 11, 2021. https://www.uptodate.com/contents/ectopic-pregnancy-clinical-manifestations-and-diagnosis/print?source=history_widget.

[40] MIFEPREX. Package insert. Danco; 2016. Approved March 2016. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf

Case: 23-10362     Document: 95-5     Page: 62     Date Filed: 04/11/2023
Case 2:22-cv-00223-Z     Document 1-46     Filed 11/18/22     Page 22 of 26     PageID 796

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*     23

Danco was a surveillance study of outcomes of ongoing pregnancies.[41]  The FDA released them from this post-marketing commitment in January 2008 because Danco reported that only one or two ongoing pregnancies per year were followed for final outcomes in part because of consent requirements.[42] This is disturbing in light of the percentage of women in our analysis who kept their pregnancies, as well as those with ongoing pregnancy and unknown outcomes, all of whom could have been followed for final outcomes. The significant lack of follow-up of ongoing pregnancies (44.47% with unknown outcomes) and the very minimal information on those who chose to keep the pregnancy, highlights the need for a national registry especially considering the teratogenicity of misoprostol.[43]

## Relationship of Misoprostol to Hemorrhage

The Creinin study of abortion pill reversal was stopped for safety concerns due to hemorrhage in 3 of the 12 study participants.[44]  One of the conclusions of that study was that "Patients who use mifepristone for a medical abortion should be advised that not using misoprostol could result in severe hemorrhage, even with progesterone treatment."[45]  The authors hypothesized that the absence of misoprostol caused these women to hemorrhage.  The women who had documented use of misoprostol in our database hemorrhaged at a higher rate than those documented not to have taken misoprostol.

## Reporting of Adverse Events

Although not the initial goal of this study, the analysis of the AERs revealed glaring deficiencies in the AE reporting system making it difficult to properly evaluate adverse events. When mifepristone was approved in 2000, FDA required that providers "must report any hospitalization, transfusion or other serious event to Danco Laboratories."[46] This created an inherent conflict of interest as it is not in the best interest of the entities or providers to report adverse events to those regulating them. Because only severe events were reportable, this requirement likely resulted in an underestimation of moderate and mild AEs.  It

[41] Center for Drug Evaluation and Research. NDA 20-687. Approval Letter for MIFEPREX (mifepristone) Tablets, 200 mg to Population Council. Food and Drug Administration. Written September 28, 2000. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.htm

[42] 2016 03 20 FDA resp to Cit Pet.pdf. Docket No. FDA-2002-P-0364. FDA. March 29, 2016. p. 31. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/2016%2003%2020%20FDA%20resp%20to%20Cit%20Pet.pdf

[43] Cytotec (misoprostol tablets). Package insert. G.D. Searle; Revised November 2012. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/019268s047lbl.pdf

[44] Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial. Obstet Gynecol. 2020;135(1):158-165. doi:10.1097/AOG.0000000000003620

[45] Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial. Obstet Gynecol. 2020;135(1):5. doi:10.1097/AOG.0000000000003620

[46] M I F E P R E X™(Mifepristone) Tablets, 200 mg Prescriber's agreement. Food and Drug Administration. September 28, 2000, 1-2. Accessed November 16, 2020. http://wayback.archive-it.org/7993/20170113112742/http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationfor PatientsandProviders/ucm111364.pdf

is also likely that some of the AEs that we coded as Mild or Moderate were actually Severe but there was not enough information in the AER for us to justify coding them as Severe. In March 2016, the FDA substantially reduced the prescribing requirements and changed the drug protocol[47] and yet at the same time eliminated reporting requirements except for deaths.[48] With the relaxation of reporting requirements, the ability to perform any relevant post-marketing evaluation of mifepristone was lost. It is imperative for the safety of women that the FDA restore and strengthen the 2011 REMS requirements.

The information in the AERs is almost exclusively obtained from abortion providers, rather than the physician treating the complication, yet in this analysis, abortion providers managed only 39.75% of surgical complications (a number which is likely much lower since these are only the cases which are known to the abortion provider). Throughout the reports, there was also a lack of detail and many patients who were simply "lost to follow-up." This resulted in 16.80% of the AERs being Uncodable as to severity and likely under-coding of many AERs and AEs, as coding could only be assigned based on the scant information provided. Many of the AEs experienced by women were unknown to the abortion provider until the follow-up examination, which is troubling considering the poor follow-up rate and elimination of the requirement for an in-office follow up visit. Some of the patient deaths were not known to the abortion provider until they saw the death in an obituary or were contacted by an outside source. Because of this, in addition to abortion providers, hospitals, emergency departments, and private practitioners should be required to report AEs.

Complications occur in the best of hands in all areas of medicine, but as physicians, we are responsible to manage those complications and follow our patients through to resolution. The findings that: 1. the most common outcome of ongoing pregnancy was unknown outcome, 2. abortion providers performed less than half the D&Cs done for complications, and 3. a third of ectopic pregnancies (missed prior to administering the abortifacient) had unknown rupture status, leave us deeply concerned regarding the care these women received. A post-marketing requirement was that there be a "cohort-based study of safety outcomes of patients having medical abortion under the care of physicians with surgical intervention skills compared to physicians who refer their patients for surgical intervention."[49] The applicant was released from this requirement because they stated that because there were so few providers

---

[47] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p. 7. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

[48] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2016. p. 3, 6. Reference ID: 3909592. Published March 29, 2016. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf

[49] Center for Drug Evaluation and Research. NDA 20-687. Approval Letter for MIFEPREX (mifepristone) Tablets, 200 mg to Population Council. Food and Drug Administration. Written September 28, 2000. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.htm

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*     25

without surgical intervention skills, no meaningful study could be done.[50]  Yet, that same year the FDA changed the provider agreement to allow non-physicians to become prescribers.[51]  These findings highlight the importance of follow-up and management of complications by the abortion provider.  Allowing any further relaxation of mifepristone prescribing requirements will put women at an even higher risk of adverse events

### *Limitations and Strengths*

It was not possible to calculate complication rates for mifepristone and misoprostol abortions based on AER data because there is no denominator for how many mifepristone abortions are performed in the U.S. since reporting is often voluntary and sporadic. For clarity, we specified the denominators we used.

Our analysis was limited by the fact that the number of AEs for which we received reports is likely a gross underestimation of the actual number of AEs that occurred.  In our analysis, the surgical management of over half the complications was performed by someone other than the abortion provider, yet treating physicians are not required to report complications.  Few reports were generated by those in Emergency Departments and hospitals who treated the complications.

Our analysis was also limited by the lack of information in the AERs, including redaction of critical dates, a paucity of diagnosis and treatment information, and lack of follow up.

Our study has several strengths. Our data comes from information provided to the FDA and is the largest analysis of AERs for mifepristone abortions. This data is publicly available under the Freedom of Information Act so that anyone can verify the data for themselves. This analysis reviews all AERs not reported in the first study by Gary.[52] Although heavily redacted, there was sufficient information in over 80% of the AERs to evaluate severity. An objective standardized system, CTCAEv3, was used to code for severity, and each AER was coded by at least two board-certified obstetrician-gynecologists or family medicine physicians.

## Conclusions and Relevance

This article is important because it augments the scant published literature on mifepristone safety.

Due to the lack of adequate reporting of adverse events, especially by those treating them, these unique AERs represent a fraction of the actual adverse events occurring in American women.

---

[50] 2016 03 20 FDA resp to Cit Pet.pdf. Docket No. FDA-2002-P-0364. FDA. March 29, 2016. p. 31. Accessed November 13, 2020.
https://aaplog.wildapricot.org/resources/2016%2003%2020%20%20FDA%20resp%20to%20Cit%20Pet.pdf

[51] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p. 7. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

[52] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

EX. 45 pg.23

Significant morbidity and mortality have occurred with the use of mifepristone as an abortifacient, including at least 24 US deaths reported by the FDA from September 2000 to December 2018. Because of this and the significant morbidity associated with this drug, the FDA should consider at a minimum reinstating the original 2011 REMS and strengthening the reporting requirements. The reporting of transfusions, hospitalizations, and other serious adverse events are essential.

Given the morbidity and mortality of undiagnosed ectopic pregnancy, a clear contraindication to the use of mifepristone, an ultrasound to confirm pregnancy location is essential before mifepristone is dispensed.

Considering the significant percentage of women with ongoing pregnancies who chose to continue their pregnancy, there must be reasonable waiting periods, parental involvement, and adequate pre-abortion counseling on all pregnancy options.  It is also critical that a pregnancy registry be established.

In our analysis, the patients who used mifepristone alone had a lower rate of hemorrhage than those using mifepristone followed by misoprostol.

The FDA Adverse Event Reporting System is woefully inadequate to determine the post-marketing safety of mifepristone due to its inability to adequately assess the frequency or severity of adverse events.  The reliance solely on interested parties to report, the large percentage of uncodable events, the redaction of critical clinical information unrelated to personally identifiable information, and the inadequacy of the reports highlight the need to overhaul the current AER System.

This analysis evaluated 3197 adverse events resulting from the use of mifepristone as an abortifacient and brought to light serious concerns about the safety requirements and care of women undergoing mifepristone abortion. Although complications may occur in the best of hands, and no medical procedure is without risks, safety measures must be employed to minimize these adverse outcomes.  Women undergoing abortion should receive the same quality of informed consent and pre-procedural counseling that is standard of care prior to other medical treatment or surgery.  It is imperative that women considering abortion be provided adequate and complete information and counseling on risks, advantages, disadvantages, and alternative options.  Although there may be disagreements about the ethics of abortion, there must be total agreement that our patients—whether undergoing a medical abortion or otherwise—deserve the highest standard of medical care.

## Acknowledgments:

Authors would like to acknowledge the other members of the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) Mifeprex Adverse Events Coding Team:  Jennifer J. Barr M.D., Brent Boles M.D., Watson A. Bowes, Jr. M.D., Steven Braatz M.D., Byron Calhoun M.D., Myles Dotto M.D.,  Steve Foley M.D., R. Scott French M.D., Victoria Gerthe OMSIV, Mary Jo Heinrichs M.D., Maureen Kennedy M.D., Sarah Kennedy M.D., Paul LaRose M.D., Daniel Lickness

M.D., Jenny Mao D.O., Patrick Marmion M.D., Richard Moutvic M.D., Mary O'Sullivan M.D., Catherine Reese M.D., AnnaLisa Schmitz M.D., Ingrid Skop M.D., Barbara Talamo M.D., Michael T. Valley M.D., Marilyn J. Vanover M.D., Elizabeth Wehlage M.D., Belinda Williams M.D, Jerry Wittingen M.D.

Authors would also like to acknowledge Christopher Gacek of the Family Research Council for assistance with FOIA requests to the FDA over 2 decades.

Authors would also like to acknowledge William Marshall of Judicial Watch for assistance with FOIA requests to the FDA.

Authors would also like to acknowledge The Charlotte Lozier Institute, especially Genevieve Plaster and Dr. John Fisher, for support for data processing.

MEMORANDUM          DEPARTMENT OF HEALTH AND HUMAN SERVICES
                    PUBLIC HEALTH SERVICE
                    FOOD AND DRUG ADMINISTRATION
                    CENTER FOR DRUG EVALUATION AND RESEARCH

---

TO:        FILE

FROM:      [redacted] (b) (6)    [redacted] (b) (6)    Digitally signed by [redacted] (b) (6)
                                                       Date: 2022.12.23 13:11:43 -05'00'

DATE:      December 23, 2022

SUBJECT:   Review of Supplemental Drug Applications Proposing Modifications to the
           Mifepristone REMS Program

FDA is currently reviewing a supplemental new drug application from Danco Laboratories, LLC
(Danco) and a supplemental abbreviated new drug application from GenBioPro, Inc. (GBP) that
propose to modify the Mifepristone Risk Evaluation and Mitigation Strategy (REMS) Program
as approved under Danco's new drug application for Mifeprex (mifepristone) (NDA 020867) and
GBP's abbreviated new drug application for Mifepristone Tablets 200 mg (ANDA 091178).
Citing the Comstock Act, 18 U.S.C. §§ 1461, 1462, Plaintiffs in *Alliance for Hippocratic
Medicine v. U.S. Food and Drug Administration*, No. 2:22-cv-00223-Z (N.D. Tex.), have alleged
that FDA's actions regarding mifepristone do not comply with "federal laws that expressly
prohibit the mailing or delivery by any letter carrier, express company, or other common carrier
of any substance or drug intended for producing abortion" and also that FDA "failed to
acknowledge and address" those laws. Complaint ¶¶ 22, 392 (Nov. 18, 2022).  This
memorandum notes that the Office of Legal Counsel of the United States Department of Justice,
which provides controlling advice to Executive Branch officials on questions of law, has
concluded that the Comstock Act provisions cited by Plaintiffs "[do] not prohibit the mailing of
mifepristone or misoprostol where the sender lacks the intent that the recipient will use them
unlawfully. And in light of the many lawful uses of mifepristone and misoprostol, the fact that
these drugs are being mailed to a jurisdiction that significantly restricts abortion is not a
sufficient basis for concluding that the mailing violates [these provisions]."  Memorandum for
Thomas J. Marshall, General Counsel, United States Postal Service, from Christopher H.
Schroeder, Assistant Attorney General, Office of Legal Counsel, *Re: Application of the
Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions*, at 15
(December 23, 2022).[1]  Thus, even if the Comstock Act provisions bear on FDA's analysis of
the pending supplemental drug applications, in light of the conclusions set forth by the Office of
Legal Counsel, they pose no issue for FDA's approval of the applications.

---

[1] The Office of Legal Counsel's analysis applies to 18 U.S.C. § 1461 and § 1462. *See id.* at 1 n.3.

Reference ID: 5100604

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its member organizations, their members, and these members' patients, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION**, et al.,<br><br>    Defendants. | **Case No. 2:22-cv-00223-Z** |

## DECLARATION OF DR. DONNA HARRISON

I, Donna Harrison, a citizen of the United States of America and a resident of Berrien Center, Michigan, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified obstetrician and gynecologist.

3. I received my medical degree from the University of Michigan and completed my residency at a University of Michigan affiliate hospital, St. Joseph Mercy Hospital.

4. I am a diplomate of the American Board of Obstetrics and Gynecology.

5. I serve as the Chief Executive Officer of Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG).

1

6. I also serve as the Chair of the Board of Plaintiff Alliance for Hippocratic Medicine (AHM).

7. I am familiar with AAPLOG, its members, their fields of practice, and AAPLOG's policies and positions, including as set forth in the complaint, which I have reviewed.

8. AAPLOG is the largest organization of pro-life obstetricians and gynecologists ("OB/Gyns") in the world and is headquartered in Fort Wayne, Indiana. AAPLOG membership includes more than 6,000 medical professionals nationwide and more than 300 members in Texas. AAPLOG members practice in accordance with the Hippocratic oath, which forbids physician participation in killing their preborn patients in elective abortion. AAPLOG members are committed to the care and well-being of both of their patients including both pregnant women and the human beings in their womb. AAPLOG members are concerned about the serious adverse impacts of chemical abortion on both of their patients as well as on the practice of medicine.

9. I am also familiar with AHM, its members, their members' fields of practice, and AHM's policies and positions, including as set forth in the complaint, which I have reviewed.

10. AHM is a nonprofit organization that upholds and promotes the fundamental principles of Hippocratic medicine, which includes a prohibition on physician

Alliance.App. 413                                                    MPI App. 892

involvement in killing their patients. AHM is incorporated in the State of Texas and has its registered agent in Amarillo, Texas.

11. AHM's members include the American Association of Pro-Life Obstetricians and Gynecologists, American College of Pediatricians, Catholic Medical Association, Christian Medical and Dental Associations, and Coptic Medical Association of North America. In opposing chemical abortion, AHM's members are concerned about the safety and well-being of pregnant women and girls, their preborn children, and chemical abortion's adverse impacts on the practice of medicine.

12. Through my work at AAPLOG and now AHM, I reviewed the studies on which the FDA has relied to make its 2016 Major Changes. The FDA identified these studies in its Summary Review document. App. 624–52.

13. The 2016 Summary Review "serves as the Division's decisional memorandum." *Id.* 628. The FDA noted that "[a]s these major changes are interrelated, in some cases data from a given study were relied on to provide evidence to support multiple changes." *Id.* 630.

14. As stated in Plaintiffs Complaint, App. 055–56, and Brief in Support of the Motion for Preliminary Injunction, p. 19, *none* of the studies on which the FDA relied were designed to evaluate the safety and effectiveness of chemical abortion drugs for use under the conditions prescribed, recommended, or suggested in the proposed labeling.

3

Alliance.App. 414

15. Not only did the FDA rely on studies that evaluated a drug regimen that did
    not match the labeling in the 2016 Major Changes, but the agency also took a
    piecemeal approach to evaluating the safety and effectiveness of its removal
    of necessary safeguards. App. 055–56. Safety must be evaluated under the
    totality of the proposed conditions of use, not each change in isolation of the
    other conditions. None of the cited studies actually mirrored the totality of
    changes in conditions of use allowed by the FDA 2016 Major Changes. Thus,
    none of the cited studies provides meaningful safety data to support the
    sweeping changes FDA made in 2016.

16. In Column A of the chart below, I have identified the studies that the FDA
    cited in its Summary Review. Column B identifies the major changes in the
    2016 regimen for which FDA cited that study as support. Column C shows
    the conditions of use in the study that significantly differ from the conditions
    of use allowed in the approved 2016 label. Thus, Column C demonstrates why
    the particular cited study fails to show the safety of chemical abortion drugs
    for use under the conditions prescribed, recommended, or suggested in the
    proposed labeling of the 2016 Major Changes.

| Study | FDA cited the study in support of the following Major Change(s) | Aspects of the study which significantly deviate from the conditions of use allowed by the 2016 Major Changes, rendering the citation invalid for showing safety under the 2016 label changes |
|---|---|---|
| Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectiveness and acceptability of medical abortion provided through telemedicine. Obstet Gynecol 2011;118:296-303. | • Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally<br>• Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex<br>• Follow-up, although still needed, not restricted to in clinic at 14 days after Mifeprex | • All patients had their gestational age confirmed by an ultrasound, which ruled out ectopic pregnancy and determined the exact gestational age.<br>• All patients had witnessed ingestion of mifepristone but unknown time interval between mifepristone ingestion and misoprostol ingestion.<br>• All patients had an in-person follow-up visit at 2 weeks after taking mifepristone, and an ultrasound was performed to ensure completion of the abortion.<br>• The study was limited to 63 days' gestation or less. |

| | | |
|---|---|---|
| Goldstone P, Michelson J, Williamson E. Early medical abortion using low-dose mifepristone followed by buccal misoprostol: A large Australian observational study. Med J Austral 2012; 197: 282-6. | • Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally | • Retrospective chart review study conducted in Australia.<br>• All patients had gestational age and pregnancy location confirmed by ultrasound.<br>• All patients had witnessed ingestion of mifepristone but unknown time interval between mifepristone ingestion and misoprostol ingestion.<br>• 85% of patients who completed the study had in-person follow-up exam with ultrasound to confirm completion of abortion.<br>• The study was limited to 63 days' gestation or less.<br>• All women who were Rh negative received Rhogam.<br>• Women at high risk of infection received prophylactic antibiotics. |
| Upadhyay UD, Desai S, Lidar V, Waits TA, Grossman D, Anderson P, Taylor D. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-183. 21 | • Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally | • Retrospective study reviewed Medicaid diagnosis codes for complications treated in the ER after abortion, but study failed to provide the conditions to determine applicability to proposed labeling.<br>• The study was limited 63 days' gestation or less. |

| | | |
|---|---|---|
| Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008;112(6):1303-1310. | • Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally<br>• Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed<br>• Increase the maximum gestational age from 49 days to 70 days | • Women required to be at least 18 years old.<br>• Ultrasound performed to confirm gestational age of 57-70 days.<br>• All patients had access to emergency transportation and a telephone.<br>• Some patients were given antibiotics while others were not.<br>• All patients had in person follow-up exam at the facility 7-14 days after mifepristone and had ultrasound to check for retained tissue. |
| Middleton T, et al. Randomized trial of mifepristone and buccal or vaginal misoprostol for abortion through 56 days of last menstrual period. Contraception 2005; 72: 328-32 | • Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally | • All women had ultrasound to determine gestational age.<br>• The study was limited to 56 days' gestation or less.<br>• Women required to be at least 18 years old, or at least 16 years old with one parent's consent.<br>• All women had observed ingestion of mifepristone in person.<br>• All women who were Rh negative received Rhogam.<br>• All women returned for an in-person follow-up exam before 15 days, which included an ultrasound to evaluation retained tissue. |

| | | |
|---|---|---|
| Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273 | • Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally<br>• Removal of the instruction that administration of misoprostol must be done in clinic, to allow for administration at home or other location convenient for the woman<br>• Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex<br>• Increase in the maximum gestational age from 49 days to 70 days | • All patients had an ultrasound to determine gestational age.<br>• All patients ingested mifepristone in the clinic.<br>• All patients returned for in-person follow up visit at 10-14 days after taking mifepristone.<br>• All patients received prophylactic antibiotics. |
| Raymond EG & Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol 2012; 119: 215-9 | • Removal of the instruction that administration of misoprostol must be done in clinic, to allow for administration at home or other location convenient for the woman | • This study has nothing whatsoever to do with misoprostol administration. |

| | | |
|---|---|---|
| Raymond EG, et. al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013; 87(1): 26-37. | • Removal of the instruction that administration of misoprostol must be done in clinic, to allow for administration at home or other location convenient for the woman<br>• Follow-up, although still needed, not restricted to in clinic at 14 days after Mifeprex<br>• Increase in the maximum gestational age from 49 days to 70 days | • This is not a clinical trial but rather a re-analysis of different studies under different non-comparable conditions at multiple locations around the world.<br>• Of the 87 trials reviewed, only 19 were performed in the United States.<br>• Of those 19 trials, 11 studied vaginal misoprostol exclusively. Of the remaining trials, only four studies analyzed buccal misoprostol. In one study the buccal misoprostol was administered simultaneously with mifepristone.<br>• Gestational age determined by ultrasound or clinical examination.<br>• Half of trial groups required ultrasound to assess failure.<br>• The study limited to 63 days' gestation or less. |
| Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. Obstet Gynecol 2015;126:22-8. | • Removal of the instruction that administration of misoprostol must be done in clinic, to allow for administration at home or other location convenient for the woman<br>• Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex | • All patients had an ultrasound to determine gestational age.<br>• Patients given mifepristone in the clinic at time of visit.<br>• All patients had one week follow-up exam with ultrasonography.<br>• The study limited to 63 days' gestation or less. |

| | | |
|---|---|---|
| Wedisinghe L and Elsandabesee D. Flexible mifepristone and misoprostol administration interval for first-trimester medical termination. Contraception 2010; 81(4): 269-74. doi: 10.1016/ j.contraception.2009.09. 007. Epub Oct 29, 2009. | • Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex | • This is not a clinical trial but rather a review of other studies. Five studies were reviewed. None of the 5 studies looked at buccal misoprostol.<br>• Studies included in-person follow-up office visit with ultrasound after taking drugs. |
| Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859 | • Administration of misoprostol at 24-48 hours instead of 48 hours after mifepristone<br>• Addition that an 800 mcg buccal dose of misoprostol may be used if needed. | • This study examined vaginal administration of misoprostol, not buccal administration.<br>• All women had an ultrasound to determine gestational age.<br>• All women had in-person evaluations to rule out contraindications including labs for anemia and Rh type.<br>• All women who were Rh negative received Rhogam.<br>• Patients returned for two in-person follow-up visits (7 days and 14 days) where an ultrasound was performed at each visit. |

| Shaw KA, Topp NJ, Shaw JG, Blumenthal PB. Mifepristone-misoprostol dosing interval and effect on induction abortion times. Obstet Gynecol 2013;121(6):1335-1347 | • Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex | • This is not a clinical trial but rather a review of other studies.<br>• All of the studies reviewed used mifepristone and misoprostol for gestational ages between 12 and 20 weeks.<br>• Most studies in this review were not conducted in United States.<br>• Studies included buccal, vaginal, and oral routes of administration. |
| --- | --- | --- |
| Phelps RH, et al. Mifepristone abortion in minors. Contraception 2001;64:339-343. | • Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex | • Pilot study included only 28 girls (ages 14-17 years old).<br>• Study examined vaginal, not buccal, administration of misoprostol.<br>• All girls had an in-person examination including ultrasound to determine gestational age.<br>• The study was limited to 56 days or less gestation.<br>• All were checked for anemia and Rh type.<br>• If Rh- then patient received Rhogam.<br>• Almost 1/3 of the girls had in-person administration of vaginal misoprostol with a 4-hour observation period after.<br>• Girls needed to live within 1 hour of research site. |

| | | |
|---|---|---|
| Niinimaki M, et. al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011; 342: d2111. | • Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex | • Data from Finnish national database for abortions in Finland. |
| Ngoc NTN, et al. Acceptability and feasibility of phone follow-up after early medical abortion in Vietnam: A randomized controlled trial. Obstet Gynecol 2014;123:88-95. | • Follow-up, although still needed, not restricted to in clinic at 14 days after Mifeprex | • Study conducted in Vietnam.<br>• Patients screened at in-person first visit.<br>• The study was limited to 63 days' gestation or less.<br>• Standard care compared with phone follow up only. Standard care entailed 2-week follow up in person with exam and ultrasound. Women with phone follow-up had to complete a semiquantitative urine pregnancy test and if the urine hCG dropped by one interval, the abortion was considered "a success." |
| Cameron ST, Glasier A, Johnstone A, Dewart H, Campbell A. Can women determine the success of early medical termination of pregnancy themselves? Contraception 2015;91:6-11. | • Follow-up, although still needed, not restricted to in clinic at 14 days after Mifeprex | • Gestational age determined by ultrasound<br>• Data collected from Scotland.<br>• The regimen used vaginal, not buccal, administration. |

| Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6 | • Increase in the maximum gestational age from 49 days to 70 days<br>• Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed | • Gestational age confirmed by ultrasound.<br>• Women were at least 18 years old.<br>• Study required in-person follow-up visit with ultrasound.<br>• Providers intervened surgically if necessary or at woman's request. |
|---|---|---|
| Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011; 16: 61-6 | • Increase in the maximum gestational age from 49 days to 70 days<br>• Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed | • Gestational age confirmed by ultrasound.<br>• Study conducted in Curacao. |
| Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015; 22: 75-82 | • Increase in the maximum gestational age from 49 days to 70 days | • Study performed in Mexico.<br>• Women had initial in person visit where they swallowed mifepristone in the clinic. |

| | | |
|---|---|---|
| Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, Garcia SG, Pérez M, Bousieguez M, Sanhueza P. Nurse versus physician-provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World Health Organ 2015; 93: 249-258 | • Increase in the maximum gestational age from 49 days to 70 days | • Study performed in Mexico.<br>• All participants received in-person examination and ultrasound at first visit to determine gestational age and rule out ectopic pregnancy and other contraindications.<br>• All participants had an in-person follow-up visit at 7-14 days with ultrasound to confirm complete passage of tissue. |
| Chen MJ, Creinin MD. Mifepristone with Buccal Misoprostol for Medical Abortion Obstet Gynecol: a Systematic Review. Obstet Gynecol 2015; 126(1): 12-21 | • Increase in the maximum gestational age from 49 days to 70 days | • This is not a clinical trial but rather a review of published studies, including many of which are independently reviewed in this spreadsheet.<br>• The study was limited to 63 days' gestation or less. |

| | | |
|---|---|---|
| Louie KS, Tsereteli T, Chong E, Ailyeva F, Rzayeva G, Winikoff B. Acceptability and feasibility of mifepristone medical abortion in the early first trimester in Azerbaijan. Eur J Contracept Reprod Health Care 2014; 19(6): 457-464 | • Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed | • The study was performed in Azerbaijan.<br>• The study included only women 63 days' gestation or less.<br>• Participants had gestational age evaluated by history, exam, or ultrasound, but no data was included on what percent had these determinations.<br>• Study included women ages 18 or older.<br>• Women swallowed mifepristone in person in the clinic and then either took misoprostol buccally immediately in the clinic, or took later at home. Later study changed to sending women home with mifepristone and misoprostol.<br>• Two-week in-person follow-up exam at which time some women were evaluated with ultrasound (unknown %). |

| | | |
|---|---|---|
| Chong E, Tsereteli T, Nguyen NN, Winikoff B. A randomized controlled trial of different buccal misoprostol doses in mifepristone medical abortion. Contraception 2012; 86: 251-256 | • Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed | • The study was conducted in the Republic of Georgia and in Vietnam. <br>• The study included only women 63 days' gestation or less. <br>• Ultrasound was required at in-person visit. <br>• Contraindications excluded from study. <br>• Women swallowed the mifepristone at the clinic. Then randomized to 400 buccal misoprostol or 800 buccal misoprostol to be taken at home. <br>• Women had in-person follow-up visit at two weeks. |
| Coyaji K, Krishna U, Ambardekar S, Bracken H, Raote V, Mandlekar A, Winikoff B. Are two doses of misoprostol after mifepristone for early abortion better than one? BJOG 2007;114:271-278. | • Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed | • The study was performed in India. <br>• The study had an inclusion criteria "8 weeks of amenorrhea." <br>• Gestational aged determined by clinical exam, LMP, and at times ultrasound (used as needed to determine age and ectopic pregnancy). <br>• Misoprostol dose was not comparable to U.S. regimen: women were given 400 mcg of oral misoprostol, not buccal. Then the oral dose was repeated. <br>• Women were observed up to 6 hours in the clinic. <br>• Required in-person visit in 2 weeks with ultrasound for some. |

Alliance.App. 427                    MPI App. 906

| | | |
|---|---|---|
| Gallo MF, Cahill S, Castelman L, Mitchell EMH. A systematic review of more than one dose of misoprostol after mifepristone for abortion up to 10 weeks gestation. Contraception 2006;74:36-41. | • Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed | • This is not a clinical trial but rather a review of three studies, which investigated repeat misoprostol doses.<br>• None of those studies looked at buccal administration of misoprostol. |
| Warriner IK, Wang D, Huong NTM, Thapa K, Tamang A, Shah I et al. Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors? A randomized controlled equivalence trial in Nepal. Lancet 2011; 377: 1155-61 | • Change of "physician" to "healthcare provider" in the label and Risk Evaluation and Mitigation Strategies (REMS) document | • The study was conducted in Nepal.<br>• The study was limited to 63 days' gestation or less and age confirmed by pelvic exam and LMP.<br>• In-person vaginal administration three days later of misoprostol by the assigned abortion provider. After misoprostol placement, the woman was observed in the hospital for 3 hours.<br>• Women had an in-person return visit in 10-14 days. |
| Kopp Kallner H, Fiala C, Stephansson O, Gemzell-Danielsson K. Home self-administration of vaginal misoprostol for medical abortion at 50-63 days compared with gestation of below 50 days. Human Reprod 2010;25(5):1153-1157. | • Change of "physician" to "healthcare provider" in the label and Risk Evaluation and Mitigation Strategies (REMS) document | • The study was conducted in Sweden.<br>• Gestational age confirmed by ultrasound and exam.<br>• Mifepristone administered in the hospital under direct observation.<br>• Women self-administered vaginal misoprostol at home.<br>• Women had an in-person follow-up exam after 2 weeks.<br>• The study was limited to gestational ages between 50-63 days. |

Executed this February 24, 2023.

By: _Donna Harrison_ MD

Donna Harrison, M.D.

17



REPRODUCTIVE RIGHTS

# The Abortion Pill's Secret Money Men

*The untold story of the private equity investors behind Mifeprex—and their escalating legal battle to cash in post-Dobbs.*

**HANNAH LEVINTOVA    MARCH+APRIL 2023 ISSUE**

*Fight disinformation: Sign up for the free* Mother Jones Daily *newsletter and follow the news that matters.*

**In 1993, a group of activists** rented a warehouse in suburban Westchester County, New York.

It was smaller than they'd hoped and had limited ventilation, but the two other locations they'd tried to rent belonged to universities and required jumping through too many bureaucratic hoops—the exact sort of paper trail this group was trying to avoid.

Led by renowned pro-choice activist Lawrence Lader, their goal was to replicate RU-486, the revolutionary abortion pill developed in the 1980s by French manufacturer Roussel-Uclaf—which was unwilling to navigate American abortion politics to bring the pill stateside. Lader's group, code-named ARM Research Council, set up shop just months after Dr. David Gunn was shot and killed outside his Florida clinic, the first US physician to be murdered by an anti-abortion activist. Perhaps unsurprisingly, no US manufacturer wanted to wade into the increasingly fraught abortion debate to bring the medication to American women, either. So with the help of lawyers and activists, Lader had smuggled RU-486 into the United States, and his group was going to try to reproduce it.

In their warehouse, they got to work building an underground drug laboratory, complete with a huge, customized ventilation hood, fire prevention devices, and specially designed sinks. The whole project "had the trappings of a CIA operation," Lader would later write. They figured out a system for replenishing their near-constant need for dry ice from a supplier 15 miles away, and crafted a strategy to avoid detection by anti-abortion groups, the garbage collector, and their landlord. If anyone asked what they were up to, the group—which included a doctor who lived 1,000 miles

away and asked to go by Dr. X, a Columbia University chemist working for free, and two assistants—agreed on a cover story: They were working on a new treatment for cancer.

Meanwhile, Roussel-Uclaf and its parent company were in a drawn-out negotiation with a Manhattan-based reproductive health nonprofit, called the Population Council, over the official patent for RU-486. The same month that the French company finally agreed to give the Council the patent, Lader's secret lab announced that it had successfully developed its own copy of the drug, whose scientific name is mifepristone. The two groups knew of each other's work, and Lader had even reached out to the Population Council about collaborating, but the Council had demurred.

---

## The tale of who funded this effort to legally bring mifepristone to women across the country, and what benefits those funders might reap, has been mostly kept quiet.

Lader's group knew American women could not wait the many years it would take for the Council to arrange an official manufacturing operation with full approval from the Food and Drug Administration. So, it got its own permission from the FDA to conduct limited testing, which would allow it to start distributing small batches of the drug to a network of 10 clinics. There, patients could get both mifepristone and misoprostol, a common ulcer drug, which, when taken in tandem, can cause a medication abortion. For the few who were able to try it, it was an emotional and physical relief: It meant they could have an abortion privately and without a vacuum aspiration machine, whose suction "feels like you're getting the life sucked out of you," as one early mifepristone recipient described it to the *Boston Globe*.

All the while, the Council was working to find a manufacturer willing to make the drug, win full FDA authorization, and sell it across America.

When the FDA finally approved mifepristone seven years later, the Council's distribution venture, which came to be called Danco Labs, was ready to go. Within two months, the drug was shipped out to doctors. At the clinics brave enough to be early adopters, women began showing up from farther and farther away; in some places the medicine was double the cost of a surgical abortion, but that hardly seemed to matter. By 2020, the pill had become the most popular way to get an abortion in the United States.

---

## How Private Equity Looted America

Read more from our May+June 2022 issue on vulture capitalists, their political enablers, and the working people fighting back:

- The Smash-and-Grab Economy

- Real Estate Predators Tried to Cash In on the Pandemic. Then Tenants Fought Back.

- Everything Everywhere All at Once: How Private Equity Rules Your World

- Biden and Trump Both Trashed Private Equity's Favorite Tax Dodge. Surprise! It's Still Here.

- These Are Congress' Biggest Private Equity Investors

- The Fight to Keep Their "Poor People's Paradise" out of Private Equity's Hands

- My Newspaper Was Gutted by Journalism's Biggest Bogeyman

Over the last two decades, mifepristone's dramatic origin story has made its way into books and the pages of the *New York Times*. But the tale of who funded this effort to legally bring it to women across the country, and what benefits the funders might reap from their investments, has been mostly kept quiet. This was in part because the 1990s were the apex of anti-abortion violence, so investors required secrecy. It was also because the funding sources seemed like a minor plot point in a project that had the potential to transform reproductive health care for millions.

"I don't think anybody thinks they're going to make a lot of money," Peg Yorkin, one of the activists crucial to the US mifepristone campaign, told the *Los Angeles Times* when the pill became available. "We're just happy that it's going to be happening."

But the small group of investors who backed the Population Council's drive to manufacture and distribute the drug since its earliest days have made a lot of money on the mifepristone business—tens of millions of dollars, according to court filings. Their windfall has come through a byzantine corporate structure set up in the 1990s by a private equity fund, now called MedApproach Holdings, to allow investors to pour money into Danco Labs—until 2019 the only US retailer of mifepristone—without disclosing their identities. As states have imposed ever-stricter limits on abortion access, their investments have generated hefty returns.

On the heels of the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization* last June, undoing the federal right to abortion—and the FDA's announcement, in January, that retail pharmacies can now sell abortion pills —these investors are likely to earn even more, as medication abortion becomes the only option for millions of women living in the 26 states where abortion is now illegal or severely restricted. The potential is so promising that two of the primary investors have engaged in a bitter court battle to take control of the investment, and Danco itself.

Their story has a dizzying plot that involves Cayman Islands shell companies, LLCs named after racehorses, a shadowy priest, a disbarred attorney, and a finance whiz behind an infamous Wall Street hedge fund collapse. The legal battle, which has been fought in three states and cost millions in attorneys' fees, shows how investors have come to view the desperation of pregnant women as an important problem to solve—but also a golden ticket.

**In 1986, a North Carolina** lawyer named Joseph Pike purchased one of the earliest manufacturers of intrauterine devices for $1.1 million. The company, Finishing Enterprises Inc., was making IUDs for another business called GynoPharma. At the time, GynoPharma wasn't selling IUDs in the United States—American women shunned them after the Dalkon Shield, a different IUD, was found to cause severe injuries in the '80s. Its copper IUDs were primarily being purchased by governments and NGOs for distribution in developing nations, but Pike spent the next five years

helping to bring this IUD, the Paragard, to the United States. After it hit the market, he sold FEI for a reported $65 million—an astounding return of more than 5,800 percent. "It was a good play for me," he says.

A multimillionaire at just 41, Pike ditched his lawyer job and moved to La Jolla, one of San Diego's most exclusive neighborhoods, to "enjoy life." He took up golf and played as often as he felt like it. But soon Pike heard from the Population Council about a business proposition: It wanted to develop and market medication abortion in the United States. At that time, advocates were flying lobbyists to Europe and picketing outside the New Jersey office of the French pill's parent company to get them to sell the drug in America. As Pike saw it, it was another opportunity to make some real money—and do some good along the way.

Pike was the Council's go-to because they'd worked together on the copper IUD. The Council had developed it and then granted GynoPharma the license, and it collected royalties as Pike successfully built up the IUD business and sold it. Pike had proved himself to be a businessman who could breathe life, and dollars, into a controversial women's health product. The Council gave him the exclusive right to sell mifepristone in the US and tasked him with drumming up investors.

---

## The controversy surrounding mifepristone meant that neither the government nor mainstream companies would go anywhere near it.

Typically, drugs in the United States are not funded by private individuals. Instead, the federal government finances initial research, while later stages of development are paid for by pharmaceutical companies. Venture capitalists and private equity investors usually only get involved in drugs developed to treat rare diseases—those that affect fewer than 200,000 people per year—because pharma companies are unlikely to invest in these typically less-profitable treatments. But mifepristone was far from a "rare disease" drug—in the 1990s, about 1.5 million American women were having abortions annually. (That number has since come down to just under a million, thanks to the growing availability of contraceptives.) Yet the controversy surrounding mifepristone meant that neither the government nor mainstream companies would go anywhere near it.

In 1994, Pike got to work, traveling the country with Susan Allen, a doctor and abortion provider he'd brought on to be the face of the abortion pill effort. Pike recalls that they spent their time pitching wealthy liberals, including Susan Buffett, Gloria Vanderbilt, a George Soros representative, and a handful of other celebrities. His fundraising overlapped with the O.J. Simpson murder trial, and Pike says he even met with one of Simpson's defense lawyers, Bob Shapiro. Pike won't say which, if any, of these people invested in the project, but he estimates that altogether there were about 50 pitch meetings.

One of the investors who did sign on was Greg Hawkins, a veteran of the major investment bank Salomon Brothers, who was then helping run the hedge fund Long-Term Capital Management. (Hawkins did not comment for this story.) Pike met Hawkins in New York City in 1995 and told him what he'd told everyone else: To protect investors' privacy, he would craft a corporate structure that would be based offshore and involve a slew of sub-entities—in essence, a Russian nesting doll of holding companies that would quietly fund the mifepristone effort. The project did not have FDA authorization yet, which meant there was no immediate way to bring in revenue. But eventually, they would pay back their investors, and then some. Hawkins decided he wanted in.



Pike set about creating a dizzying chain of intermediate companies registered around the world. First, he filed paperwork to create Danco Laboratories Inc. as a Cayman Islands company, also registered in Delaware. (Danco was named after Pike's son.) Then he listed an intermediate company in California, Danco LP. He also registered another intermediate company, ND Management, in the Cayman Islands.

Each entity controlled the next one: ND Management oversaw Danco LP, which owned Danco Labs, the company that would actually sell the abortion drug whose backers this tangle of entities was set up to obscure. The secrecy was paramount, given the threat of reputational or financial consequences—or worse—for anyone publicly tied to the project; anti-abortion violence was continuing to escalate. Extremists murdered abortion providers in Florida and Massachusetts, and anti-abortion groups threatened a boycott of more than 70 medications made by affiliates of RU-486's manufacturer, Roussel. Pike, who'd been identified in news stories, got death threats himself.

Pike had already found someone to help build this financial vehicle: an experienced health care financier from Nashville named Brad Daniel. Daniel had started two biotech hedge funds, as well as a private equity fund, called Bio-Pharm Investments, that specialized in providing seed money to pharmaceutical ventures. Like Pike, Daniel would later recall that his motivations were twofold: He believed in the social benefits of mifepristone, and in the enormous financial potential. (Daniel did not comment for this story.)

Daniel created a fund, MedApproach, where investors would plunk their money in Danco's mifepristone business. His private equity fund, Bio-Pharm, would oversee MedApproach, receiving a 1 percent management fee and 20 percent of all profit distributions that MedApproach's investors got from their stakes in Danco's business.

All this was happening when private equity investing was becoming in vogue. It began in the 1980s, when a generation of shrewd financiers popularized a type of business takeover, called a leveraged buyout, that secured private equity's status as a new place for wealthy investors to grow their money. They had also kicked off a broader philosophical shift —one where the main value of a business lies less in the benefit a product offered customers and other stakeholders, and more in the financial returns extracted for its shareholders.

By the 1990s, when the mifepristone venture was getting off the ground, this new attitude had propelled private equity investment into new sectors, like health care, technology, and pharmaceuticals. The pill presented an obvious financial opportunity: the rare sort of drug that they'd never have trouble selling, for a condition that would never cease to exist.

---

### *The pill presented an obvious financial opportunity: the rare sort of drug that they'd never have trouble selling, for a condition that would never cease to exist.*

Within two years, Pike and Daniel found a handful of willing investors who together put more than $13 million into MedApproach. Hawkins was the largest investor funding the Russian nesting doll of financial entities, pitching in $1.5 million, so that, by 1996, he owned three-quarters of MedApproach. Over the next two years, he loaned the Danco project an additional $4 million, according to his declarations in court.

But then the project hit a roadblock. The Population Council discovered in 1997 that Pike had an unsavory history that they worried could tank the abortion pill project just as it was in the middle of clinical trials and its campaign for FDA approval. The prior year, as he'd been ramping up the mifepristone investments, Pike had pleaded guilty to a misdemeanor forgery charge in North Carolina, tied to a 1985 real estate deal. He'd gotten a suspended two-year sentence, 18 months of probation, and a fine. He had also been stripped of his law license.

(Pike explains that the charge came from a disgruntled former client he'd once helped buy land. When the client wanted to get rid of it years later, Pike couldn't help because he had retired from practicing law. The client claimed Pike had misrepresented facts; Pike says he pleaded guilty to make the case go away.)

The Population Council wanted the mifepristone project to be squeaky clean. If Pike stayed on, they felt that years of work, the $13.3 million in investments he'd secured, and FDA approval could all be in danger. Keeping him involved in the project, they said, would mean that "another weapon with which to attack [the abortion pill] will be furnished to its ideological opponents."

**It took a lawsuit** to get Pike off the project. As part of his exit, the Population Council insisted that the investors Pike had found have the chance to leave, since the Council could no longer guarantee the promises Pike had made to them. Spooked by the disarray and the fact that Danco still did not have government approval to sell its only product, many investors opted to pull their funds. But Hawkins stayed in and paid $3.5 million to buy out most of Pike's investment. Daniel also stayed involved, securing more control over the company and further compensation that would amount to hundreds of thousands annually. (Pike, meanwhile, fought to keep a 25 percent stake, $1.5 million in consulting fees, and a portion of the future profits on the shares he'd given up, capped at $21 million.) Hawkins also pledged up to $13.7 million to buy up shares ditched by other investors, potentially giving him a majority of the entire investment.

Three months later, in July 1998, Hawkins invited Daniel to visit him at his home in Saratoga, New York. Over lunch at the Saratoga Race Course's private club, he told Daniel that something was "terribly wrong." His hedge fund was having liquidity issues and would have little or no additional funds to invest in MedApproach—meaning he would not be able to cover the nearly $14 million commitment he'd made to buy out investors.

Hawkins asked to transfer his existing stake to his wife, Sharon—to protect himself, his family, and that investment from whatever might come next at his hedge fund. Daniel agreed. Later, Hawkins told Daniel that he would solicit other investors to cover the millions he'd committed to MedApproach but now could not come up with.

Over the next two months, Hawkins' hedge fund, Long-Term Capital Management, collapsed. Famed on Wall Street for sophisticated math that delivered huge returns, it lost billions in a matter of weeks, thanks to a mix of events that included Russia's default on a chunk of its Treasury debt, which LTCM had heavily invested in. At its peak, LTCM had controlled 5 percent of assets on the global market, so its downfall roiled the worldwide financial system. Soon, the Federal Reserve stepped in to organize a $3.5 billion bailout financed by the leading Wall Street banks.

Amid all that, Daniel and Hawkins began having weekly talks to figure out how to move forward with the mifepristone investment. The buyout of the original investors would wrap up in the summer of 1999, and Hawkins was scouting new funders.

### *According to Daniel, Hawkins said that he had heard from a Catholic priest who wanted to invest in medication abortion but required absolute anonymity.*

In these calls, Hawkins told Daniel about an idea: He'd created five different LLCs, several named after his racehorses, where new investors could put money for the abortion pill project while staying unidentified. One LLC in particular, Shiroyama, he said, required extra care. According to Daniel, Hawkins said that he had heard from a Catholic priest who wanted to invest in medication abortion but required absolute anonymity. So sensitive was this investment that Hawkins needed to entice the priest with a $320,000 sweetener. He asked Daniel to move that sum from his wife's stake into the Shiroyama LLC—forfeiting some of the Hawkinses' own investment in the deal and passing it to the priest to entice the clergyman to invest further. By approving the transfer, Daniel said he was also losing out financially: Less of the money invested this way would end up in his pocket, because the LLC would not have to pay his private equity fund's 1 percent management fee (or 20 percent of any profits it accrued). But it seemed that both Daniel and Hawkins were giving something up to help the project get on its feet, in hopes of reaping the rewards later.

After the sweetener, the priest seemed to come through—according to Daniel, Shiroyama LLC invested just shy of $950,000 over the next year. Later on, Hawkins asked Daniel to move another $1.7 million of his wife's interest into three of the LLCs, as additional enticements for more investors he was drumming up. Yet another LLC plowed $700,000 into the project.

The LLC investments came just in time: On September 28, 2000, the FDA officially approved Mifeprex, the commercial name for Danco's mifepristone pill. These investors' financial bet was finally on track to pay dividends.

**Within three years,** the Danco project had earned enough on Mifeprex to start repaying investors. Several Supreme Court cases soon made it easier for states to enact abortion restrictions, an opportunity that conservative states took up with gusto—sending ever more women looking for the discreet pill they could take at home. By 2010, about a quarter of early abortions were done with mifepristone, and Danco had paid everyone back. Now that everyone had been made whole, it was time to finally start making a profit, which was great news for both investors and Daniel's

private equity fund, now named MedApproach Holdings, which would get somewhere between 10 and 20 percent of profits made by investors, as well as the management fees it had deferred while the project got off the ground.

Daniel contacted Hawkins to get clearer information on all of the investors so he could pay them their portions of the profits. He says he sent multiple emails, heard nothing for five months, and eventually mailed him a letter. That's when Hawkins called Daniel, who recalls Hawkins angrily reiterating that Shiroyama's investor was a priest who required absolute confidentiality. "You are never going to find out who he is," he said, "and it is none of your business!" In a second call, Daniel says Hawkins offered to pay him money instead of providing any documentation revealing the identities of the investors he'd brought in. (A source with knowledge of the proceedings says that Hawkins never made this offer.)

That started a snowball of suspicion, and within a matter of months, Daniel filed a lawsuit against Hawkins in federal court. The proceedings led to a stunning revelation: There never was a priest. The money that had passed through the Shiroyama LLC had been from the purportedly broke Hawkinses. (In federal court documents, Hawkins maintained that he never called the investor a priest; rather, he had merely said he was a religious friend. This friend had planned to invest but backed out due to his faith and fear of anti-abortion reprisals, forcing Hawkins to use his own money to cover the investment. The friend filed a declaration in court supporting much of Hawkins' account, though he contests that he'd ever committed to an investment in the first place.) The whole thing looked like a scheme by the Hawkinses to expand their investment in medication abortion and reap its returns—while paying less in management fees and sharing fewer profits. Daniel claimed that the demise of LTCM had been a hit on the Hawkinses' wealth, and the tale of the secret, abortion-supporting priest was a way to make some of it back. The Hawkinses disagreed, saying they'd never misled Daniel, and that their investment in the Shiroyama LLC was aboveboard and never intended as a profitable runaround. Eventually, Daniel and the Hawkinses opted to settle for an undisclosed amount.

## *Documents filed by Daniel as part of a lawsuit say that the Hawkinses' investment in MedApproach has made a return on investment of 228.79 percent.*

Both parties have made a fortune on Mifeprex. Documents filed by Daniel as part of a different lawsuit say that the Hawkinses' investment in MedApproach has made a return on investment of 228.79 percent. The actual dollar amount has been fastidiously redacted in all the case's legal filings, but based on the Hawkinses' disclosures of their total investment in the mifepristone project—between $9 million and $11 million—their earnings would come to between $20.5 million and $25.1 million. (A source familiar with the suit disputes this return on investment, arguing it is far lower.)

Those same filings say that the average return on investment for everyone who invested in Danco was about 452 percent over 23 years. Even in the high-flying world of private equity—where the average annual return over the last 20 years has been about 10.5 percent—that's nothing to sneeze at. In a 2022 deposition, the CFO of Danco confirmed that "the Project has ultimately become quite successful," and investments have "been extremely profitable."

**Since the Supreme Court** gutted *Roe*, demand for medication abortion has skyrocketed. One study analyzed nearly 43,000 medication requests from 30 states and found the average number of daily requests nearly tripled, driven primarily by increases in the 12 states where lawmakers have banned abortion completely. Meanwhile, two of the main digital health startups offering medication abortion by mail—Hey Jane and Choix—reported enormous jumps in interest from potential customers. Choix raised $1 million in venture capital funding in the weeks following the leak of the Supreme Court decision. In October, Hey Jane raised $6.1 million from venture capital investors, after seeing a

ninefold increase in new telehealth patients per day. During the fundraising round, venture capitalists wanted to invest more in the company than Hey Jane had asked for.

All of that suggests that Danco's business is set to remain profitable, even as a cheaper generic version of mifepristone has cut into Mifeprex's business over the past few years. Just how profitable is anyone's guess—but valuable enough that Daniel and the Hawkinses have kept fighting about it. In May 2021, the Hawkinses filed a lawsuit in Delaware to wrest control of Danco from Daniel. Their goal was to put an end to what they see as Daniel's extractive, autocratic management of the company by installing a proper board to oversee him. The lawsuit also had the potential to secure more profits for the Hawkinses.

When the Danco project was restructured in the '90s and the Hawkinses' shares got moved around, a restriction was appended to their stake: Daniel, whose private equity fund controlled the investment, would hold votes attached to the shares. In other words, the Hawkinses' investment gave them the right to partake in Danco's profits, but they could not have a say in the operations of the company. That right stayed with Daniel, in the form of a proxy vote. The Hawkinses' lawsuit sought to win back their votes, ostensibly to sell their stake at a better price. (Shares that don't have votes attached are worth a lot less.)



For Daniel, the stakes are enormous. His proxy vote affords him control over company operations and, combined with his role as executive chair of Danco's board of directors—which gives him final approval of the company's budget—

earns him about $455,000 in annual fees and compensation. He earns an extra $75,000 each year for work related to particular entities that are part of Danco's complex financing structure, as well as tens of thousands more for other Danco-related business. All told, Daniel has earned about $10.3 million in fees alone.

This past January, the Delaware Supreme Court sided with the Hawkinses. The consequences of the decision are still unfolding. But now that the Hawkinses have regained their shares' voting power, they have additional authority to push for changes at Danco. "This has been an incredibly challenging ordeal for Mrs. Hawkins," her spokesperson said in a statement. "Her focus has always been on preserving women's right to safe, reproductive health care. The battle over corporate governance has threatened women's ability to receive the full benefit of this impactful medicine. We are deeply grateful that the courts in Delaware have cleared the way for that to happen."

For both sides, each of these lawsuits have been a fight to preserve the wealth they've built through the mifepristone project, and to pave the way for earning even more—while keeping the other party from wresting away money and control. A source close to the Hawkinses, for example, called Daniel a "control freak" who hoards money from Danco for himself. Meanwhile, one of Danco's other major investors accused the Hawkinses of trying to steal the business.

Pike told me something similar. "Greg, this is basically his only asset," he said. "His billion dollars he thought he had [through LTCM], he doesn't have, and he's obsessed with not being able to control his destiny."

That destiny could not be more promising. The end of *Roe v. Wade*, mixed with the FDA's new approval of retail sales for mifepristone, could unlock immense profit. Their product's mission may be a social good, but creating value for investors—themselves—seems to have become a driving motivation: one where women faced with impossible circumstances are reduced to the impersonal language of customer capture.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Copyright © 2023 Mother Jones and the Foundation for National Progress. All Rights Reserved.

Systematic Review

SAGE Open Medicine

SAGE Open Medicine
Volume 5: 1–17
© The Author(s) 2017
Reprints and permissions:
sagepub.co.uk/journalsPermissions.nav
DOI: 10.1177/2050312117740490
journals.sagepub.com/home/smo

# Pregnancy associated death in record linkage studies relative to delivery, termination of pregnancy, and natural losses: A systematic review with a narrative synthesis and meta-analysis

David C Reardon[1] and John M Thorp[2]

## Abstract

**Objectives:** Measures of pregnancy associated deaths provide important guidance for public health initiatives. Record linkage studies have significantly improved identification of deaths associated with childbirth but relatively few have also examined deaths associated with pregnancy loss even though higher rates of maternal death have been associated with the latter. Following PRISMA guidelines we undertook a systematic review of record linkage studies examining the relative mortality risks associated with pregnancy loss to develop a narrative synthesis, a meta-analysis, and to identify research opportunities.
**Methods:** MEDLINE and SCOPUS were searched in July 2015 using combinations of: mortality, maternal death, record linkage, linked records, pregnancy associated mortality, and pregnancy associated death to identify papers using linkage of death certificates to independent records identifying pregnancy outcomes. Additional studies were identified by examining all citations for relevant studies.
**Results:** Of 989 studies, 11 studies from three countries reported mortality rates associated with termination of pregnancy, miscarriage or failed pregnancy. Within a year of their pregnancy outcomes, women experiencing a pregnancy loss are over twice as likely to die compared to women giving birth. The heightened risk is apparent within 180 days and remains elevated for many years. There is a dose effect, with exposure to each pregnancy loss associated with increasing risk of death. Higher rates of death from suicide, accidents, homicide and some natural causes, such as circulatory diseases, may be from elevated stress and risk taking behaviors.
**Conclusions:** Both miscarriage and termination of pregnancy are markers for reduced life expectancy. This association should inform research and new public health initiatives including screening and interventions for patients exhibiting known risk factors.

## Keywords

Maternal mortality, pregnancy associated death, longevity, pregnancy loss, termination of pregnancy, abortion, miscarriage, risk factors, pregnancy screening, health policy

Date received: 9 November 2016; accepted: 9 October 2017

## Introduction

Maternal deaths associated with pregnancy are a major public health concern. Death rate calculations based on death certificates alone, however, consistently miss cases due to the fact that registrars often lack information about the deceased's woman's complete pregnancy history. This problem can be alleviated in part by linking death certificates to birth certificates, fetal death records, termination of pregnancy (TOP) registries, and medical treatment records.

Without such record linkage only 26% of deaths during pregnancy or after live birth or stillbirth would have been

[1]Elliot Institute, Springfield, IL, USA
[2]Department of Obstetrics and Gynecology, School of Medicine, University of North Carolina at Chapel Hill, Chapel Hill, NC, USA

**Corresponding author:**
David C Reardon, Elliot Institute, PO Box 7348, Springfield, IL 63376, USA.
Email: elliotinstitute@gmail.com

Creative Commons Non Commercial CC BY-NC: This article is distributed under the terms of the Creative Commons Attribution-NonCommercial 4.0 License (http://www.creativecommons.org/licenses/by-nc/4.0/) which permits non-commercial use, reproduction and distribution of the work without further permission provided the original work is attributed as specified on the SAGE and Open Access pages (https://us.sagepub.com/en-us/nam/open-access-at-sage).

Case: 23-10362      Document: 95-5      Page: 96      Date Filed: 04/11/2023
Case 2:22-cv-00223-Z    Document 121    Filed 02/24/23    Page 52 of 67    PageID 4217

2                                                                                          *SAGE Open Medicine*

identified from the death registry or death certificates alone, according to a Finnish study.[1] Using death certificates alone, only 12% of deaths following miscarriage or ectopic pregnancy and just 1% of deaths following termination of pregnancy (TOP) could be identified without record linkage.[1] The importance of systematically using record linkage to identify deaths associated with pregnancy losses (TOP, miscarriage, and ectopic pregnancies) is further demonstrated by the same study's findings, which demonstrate that the mortality rate in the year following a pregnancy loss was two to four times higher than that of delivering women.

Record linkage studies are therefore clearly necessary to properly identify the effects of pregnancy on the health and longevity of women. This methodology is especially important to understanding mortality rates associated with TOP and natural pregnancy losses precisely because such deaths are (a) much more common than deaths during pregnancy or after delivery, and (b) less likely to be identified on death certificates alone.[1]

Compared to women who deliver, those who miscarry or have TOP face significantly elevated rates of psychiatric disorders,[2–10] substance use,[5,6,10–13] suicidal behaviors,[5,6,13–16] sleep disorders,[17] post-traumatic stress disorders,[7,18,19] a decline in general health,[20] and elevated rates of recourse to medical treatments in general,[21,22] most of which have been observed within the first through ten years following the pregnancy loss. Any and all of the aforementioned conditions may shorten longevity. It is therefore especially important from a public health and economic viewpoint to improve investigations regarding the mortality rates associated with pregnancy losses.

While the importance of research on maternal mortality is widely recognized, it has appeared increasingly evident to the authors that insufficient attention has been devoted to examining the subset of women's deaths following pregnancy losses. Greater insight into this subset of deaths may help to guide and prioritize the development of proactive health initiatives that can save women's lives and improve health.

Therefore, the authors identified the need for a systematic review which would provide (a) a description and synthesis of all the available qualifying literature, including proposals for research priorities and actionable interventions based on the best available evidence, and (b) a quantitative meta-analysis of the available evidence. To meet these goals, we determined that we should first seek to identify all record linkage studies examining mortality rates associated with pregnancy outcome regardless, without any limitation on time frame. This initial assessment would help us to identify any missed opportunities for examining pregnancy loss associated mortality. Second, we seek to identify all record linkage studies that have specifically examined death rates associated with pregnancy losses, including voluntary and therapeutic terminations. Using this subset of studies, we would then (a) develop a narrative synthesis of the common and specific findings of the relevant studies and (b) undertake a meta-analysis of any comparative mortality rates associated with different pregnancy outcomes which are appropriate to the methods of meta-analyses.

The importance of this investigation is underscored by numerous studies which have found that that parity and the exposure to various pregnancy outcomes has significant effects on life expectancy.[23–25] Record linkage studies examining pregnancy associated life expectancy are needed to help to identify how the number of pregnancies, number of deliveries, and types of pregnancy outcomes may affect the health and longevity of women. These findings, in turn, may then contribute to better screening to identify the subsets of women who may most benefit from interventions to ameliorate any harmful effects and/or to enhance any beneficial effects associated with pregnancy and pregnancy management.

## Definitions

*Pregnancy loss*, as used herein, includes all pregnancy outcomes that do not end in a live birth.[2]

*Natural loss* is a subset that includes all pregnancy losses except TOP. While the vast majority of natural losses are miscarriages, it should be noted that some researchers have chosen to report only on miscarriages while others have included ectopic pregnancies, still births and other natural losses together. Still other investigators have grouped women who had stillbirths with women who had live births since these pregnancies continued to term or near term.[1]

*Pregnancy associated death*, has been defined by the American College of Obstetricians and Gynecologists (ACOG) and the United States' Centers for Disease Control (CDC) to include all deaths during pregnancy or within one year of a pregnancy outcome regardless of presumed cause of death.[26] The identification of pregnancy associated deaths has been recognized as an important precursor to efforts to identify maternal deaths, which are defined to include only those deaths for which there is a medical opinion that some aspect of the pregnancy or pregnancy management was a contributing cause of death.[26]

*Pregnancy associated long-term mortality* is defined to include all deaths following one or more pregnancy outcomes without an imposed time limit. While the time limits used in each study reporting pregnancy associated long-term mortality should always be noted, this definition avoids establishing any arbitrary time limits and prepares the way toward calculating pregnancy associated mortality and life expectancy rates relative to variables such as gravidity, parity, live births, and exposure to pregnancy losses.

*Abortion related deaths* are defined by the CDC as any "death from a direct complication of an [induced] abortion (legal or illegal), an indirect complication caused by a chain of events initiated by an abortion, or an aggravation of a preexisting condition by the physiologic or psychologic effects

of abortion."[27] The deliberate choice to place no time limit on the definition of TOP related deaths reflects the fact that there is no clear temporal limit on physiological and psychological effects that may contribute to subsequent death.

*TOP associated deaths (or abortion associated deaths)* are herein defined as the subset of pregnancy associated deaths which are within one year of a TOP. The one year limit corresponds to that for "pregnancy associated deaths."

TOP *associated long-term mortality* is an extension of the CDC's "abortion related deaths" and include all deaths among women with a history of TOP without regard to time. Just as the systematic identification of early and late maternal deaths must be preceded by a systematic identification of pregnancy history, so the identification of *abortion related deaths* should be preceded by the systematic identification of TOP history without a predefined time limit.

## Materials and methods

PRISMA guidelines were consulted and employed where appropriate in the development and writing of this review.

### Eligibility criteria

The first level of predefined eligibility criteria were: (1) the study was available in English; (2) the study examined mortality rates of women relative to one or more pregnancy outcomes; and (3) the study included systematic linking of death certificates to independent records used to identify if the deceased had one or more pregnancy outcomes within a year of her death. The independent records might be one of the following: birth certificates, fetal death certificates, TOP registries, paid insurance claims, or comprehensive hospital or medical records documenting treatments related to pregnancy.

The second level of eligibility criteria was to identify all publications meeting the first level of inclusion criteria which reported on death rates associated with any form of pregnancy loss (miscarriage, legal TOP, ectopic pregnancy, still birth, or any other failed pregnancy) as identified through records independent of the death certificates. This step eliminated studies that examined only mortality rates associated with childbirth, or which failed to distinguish between deaths associated with childbirth and pregnancy loss. This step helped to both identify missed research opportunities and to identify the eligible studies which do have information regarding mortality rates associated with pregnancy loss but failed to report this data.

The third step was to identify studies eligible for inclusion in a meta-analysis. This subset was drawn from the list of studies meeting the second level of eligibility. This third level of eligible studies included only those that (a) report mortality rates within one year for all three pregnancy outcomes of interest (childbirth, natural losses, and TOP) and (b) provided the most recently relevant data, thereby excluding duplication of results when the same population of women were examined in more than one study.

### Information sources and search terms

In July of 2015, a SCOPUS search was conducted using the search ( ( ( TITLE-ABS-KEY ( maternal mortality ) OR TITLE-ABS-KEY ( maternal death ) ) ) AND ( ( TITLE-ABS-KEY ( record linkage ) OR TITLE-ABS-KEY ( linked records ) ) ) ) OR ( ( ( TITLE-ABS-KEY ( pregnancy associated mortality ) OR TITLE-ABS-KEY ( pregnancy associated death ) ) ) AND ( ( TITLE-ABS-KEY ( record linkage ) OR TITLE-ABS-KEY ( linked records ) ) ) ). A total of 458 records of potential interest was returned.

A MEDLINE search was conducted using the search (("pregnancy associated mortality" OR "pregnancy associated death") AND ("record linkage" OR "linked records")) OR (("record linkage" OR "linked records") AND ("maternal mortality" OR "maternal death")). This search returned 20 references.

Additional candidates were identified using the "snowball method," the review of all references cited by eligible papers plus citations from other maternal mortality reviews.

*Study selection.* After elimination of duplicates, all titles and abstracts were examined to identify publications with a prospect for meeting the predefined inclusion criteria. Those deemed candidates for inclusion were retrieved for full text review and studied to determine which articles met the predetermined inclusion criteria. Assessments of those studies qualifying for both levels of inclusion criteria were conducted by two reviewers, with disagreements resolved by discussion.

*Risk of bias.* Studies qualifying for both levels of inclusion were scored for bias using the Newcastle-Ottawa Quality Assessment Scale (NOQAS) for cohort studies.

*Data collection for descriptive summary of literature.* Each study meeting the second level of eligibility was entered into a table identifying the source, population size, time period examined, types of pregnancy outcomes examined, means of identifying deaths and pregnancy outcomes, any confounding variables that were examined in the study, NOQAS score, and a summary of major findings. The table was completed by two reviewers, with disagreements resolved by discussion.

*Data collection for meta analysis.* To calculate the age adjusted number of deaths in the first year for each subgroup's population for our meta-analysis we extracted data relative to the reported age adjusted risk of death during the first year following the pregnancy outcome from each country. To avoid duplication of cases, only the most recent study for each country

Case: 23-10362    Document: 95-5    Page: 98    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z    Document 121    Filed 02/24/23    Page 54 of 67    PageID 4219

4    SAGE Open Medicine



**Figure 1.** Flow chart of search results, reasons for exclusion, and three levels of inclusion.

was used in the meta-analysis. Using the age adjusted mortality rate of delivering women as the control in each case, odds ratios and confidence limits for each subgroup (TOP vs birth, and natural losses vs birth) and for each study were calculated using EpiInfo 7's StatCalc. These results were then entered into the Comprehensive Meta Analysis software package to produce results using the fixed effects model.

## Results

After removal of duplicates, a total of 989 titles were identified by the combination of search terms and review of additional references (Figure 1). Review of abstracts eliminated 904 references. At the second level of review, 14 more were

eliminated after full text review because they did not identify pregnancy history using record linkage. Three non-English studies were also identified, but their abstracts indicated that none included data on pregnancy loss associated mortality so English translations were not sought. Thus, a total of 17 studies were eliminated at this stage.

A total of 68 studies examining populations in 11 countries met the criteria for the first level of eligibility. All of the studies identified significantly more maternal deaths than would have been identified by reliance on death certificates alone.

Of the 68 studies identified, 57 included record linkage of only birth and death records. In other words, they lacked any data on deaths associated with pregnancy losses. The distribution by country of these studies was as follows: one in

Bangladesh,[28] one in Brazil,[29] two in Canada,[30,31] one in Denmark,[32] one in Italy,[33] three in Netherlands,[34–36] four in Sweden,[37–39] one in Taiwan,[40] six in the United Kingdom,[41–46] thirty-four in the United States including Puerto Rico,[47–79] and three reporting data from multiple countries for which at least one country's study used record linkage which met our criteria for inclusion.[80–82]

The remaining 11 studies met the criteria for the second level of eligibility: reporting results of linkage of death certificates to independent records of pregnancy loss. These included seven studies from Finland,[1,83–88] two from Denmark,[89,90] and two from the United States.[91,92] Two of these investigated only deaths in the year following TOP.[88,91] The remainder investigated pregnancy associated deaths and/or pregnancy associated long-term mortality relative to both birth and pregnancy loss.

Details of the eleven studies are summarized in Table 1. The column labelled "Confounding Variables Examined" identifies factors which were either (a) controlled for statistically, such as was commonly done in regard to age of the woman, or (b) controlled for by study design, such as restriction of the population to only the lowest economic class, or exclusion of women with prior psychiatric history, or (c) controlled for by showing segregated results for discrete groups, such as married and unmarried. The NOQAS assessment revealed that quality of these studies was very high, with low risk of bias. With a possible range from 0-9, (high corresponding to the highest quality) only the one very earliest study scored below 8.

Figure 2 shows the mortality rate per 100,000 person years for each outcome reported by the latest studies from each of Finland, Denmark, and the United States, showing cumulative mortality rates for both one year and two years. The graph illustrates that mortality rates remain elevated after pregnancy loss beyond one year. Notably, the mortality rate over two years, comparing results from Denmark and California, suggest that low income women are at higher risk but that socioeconomic effects do not fully explain the results. Alternatively, the difference may be due to only first pregnancies being examined in the Denmark study.

Figure 3 shows that the risk of death after pregnancy loss is most elevated in regard to deaths from external causes: suicide, homicide, and accidents compared to both delivering women and women who have not recently been pregnant.[87,92] The implication that psychological effects associated with pregnancy loss may contribute to deaths resulting from self-destructive or risk taking behavior is further supported by a finding of higher rates of death attributed to mental illness (RR = 3.21, 94% CI 1.11–9.27) following TOP, even after controlling for prior psychiatric history.[92]

As several the eleven studies undertook examined associations from a different perspective, a summary of their most important findings, including figures illustrating many of these findings, is provided below:

- Pregnancy loss associated mortality may be over twice that of birth associated mortality.[1] TOP associated

  mortality is higher than miscarriage associated mortality, which is higher than pregnancy and delivery associated mortality. (Figure 2)
- TOP associated mortality rates are higher than birth associated mortality during the first 180 days[89] and remains higher for six or more years.[89,90,92] (Figure 4)
- Differences in pregnancy associated life expectancy vary according to the type and number of exposures to various outcomes. Successful deliveries may mitigate some of the effects of pregnancy loss.[90,92] (Figure 5)
- There is a dose effect, whereby exposure to multiple pregnancy losses increases the negative effect on life expectancy whereas multiple births increases life expectancy.[90] (Figure 6)
- The risk of death associated with pregnancy loss remains elevated even after controlling for psychological differences and economic class.[92] (Figure 2)
- While the risk of death after pregnancy loss is most elevated in regard to deaths from violent causes,[87,92] there is also evidence that when risk of death after pregnancy loss is tracked beyond one year a significant higher risk is also associated with specific causes of natural death, such as circulatory disease (RR = 2.87, 95% CI 1.68–4.89)[92]

The meta-analysis used age adjusted mortality rates for each pregnancy outcome reported in most recent studies of the population of Finland[86] and Denmark.[89] While the eleven studies included data on women in three countries, neither American study reported age adjusted mortality rates for the first year after pregnancy outcome.

Figure 7 shows results of the meta-analysis using the fixed effects model. It illustrates the comparative risk of death in the first year after TOP compared to delivery and for the first year after natural losses compared to delivery. The risk of death during pregnancy and one year after a delivery the age adjusted pregnancy associated risk of death was 170 percent higher following a TOP (RR = 2.705; 2.243 < 95% CI < 3.263), and 84 percent higher following natural losses (RR = 1.843; 1.420 < 95% CI < 2.392). For all pregnancy losses compared to delivery, the risk was 137% higher (RR = 2.374; 2.038 < 95% < 2.764; Q-value = 8.220, P = .042). The I² statistic indicates that about 63% of the variation in the overall results is due to heterogeneity rather than chance.

## Discussion

Our systematic review found 68 studies employing record linkage of death certificates to independent records of pregnancy and pregnancy outcomes. In nearly every case, the authors reported that record linkage significantly improved the identification of maternal deaths and pregnancy associated deaths compared to reliance on death certificates alone. We concur with the opinion that the direct and indirect effects of pregnancy on women's mortality rates cannot be accurately accessed without record linkage between death certificates and other medical records.[1]

Case: 23-10362   Document: 95-5   Page: 100   Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 121   Filed 02/24/23   Page 56 of 67   PageID 4221

6                                                                                                    SAGE Open Medicine

**Table 1.** Record linkage studies examining deaths associated with one or more types of pregnancy loss with notes regarding key findings.

| Study (year) Country | Population & Time Period (Births / TOP / Natural Losses / Deaths) | Records Examined and Linked | Confounding Variables Examined | Quality Score* Range 0–9 | Summary of Major Findings |
|---|---|---|---|---|---|
| Shelton and Schoenbucher[91] (1978) United States | All fertile-aged Georgia women in 1975–Feb 1976 (NA / 19,877 / NA / 1,610) | death certificates TOP certificates | none | 6 | In this exploratory study Georgia death certificates were used to identify ten deaths preceded by an abortion. With an average observation period of 8 months, the one year abortion associated mortality rate was 75.5 per 100,000 cases. Deaths included 2 suicides (one four days after the TOP), 3 homicides (all within 4 months,) 3 attributed to accidents, one sudden death from "coronary occlusion," and one death from ovarian cancer (the woman was receiving chemotherapy at time of TOP). Record linkage was incomplete due to limited information on the TOP certificates. |
| Gissler et al.[83] (1996) Finland | All fertile-aged women, 1987–1994. (513,472 / 93,807 / 71,701 / 9,192) | death certificates birth certificates TOP registry hospital discharge | age social class marital status | 9 | National suicide study. 1,347 suicides identified. No suicides while pregnant were found. Compared to women not pregnant in the year prior to suicide, women who aborted were three times more likely to commit suicide (3.08, 95%CI 1.57 to 6.03), pregnant and delivering women were half as likely (0.52, 95%CI 0.19 to 1.41), and women who miscarried were not significantly different. Suicide risk was highest in first two months following the pregnancy outcome. |
| Gissler et al.[84] (1997) Finland | All fertile-aged women, 1987–1994. (513,472 / 93,807 / 71,701 / 9,192) | death certificates birth certificates TOP registry hospital discharge | age | 8 | All death certificates were linked to medical and TOP registry to identify pregnancy within a year prior to death. Only 22% of pregnancies were identified on death certificates. Record linkage to TOP and hospital discharge records doubled number of deaths identified compared to linkage to birth certificates alone. Compared to women not pregnant, the age adjusted mortality ratio was half for delivering women (0.50, 95%CI 0.32 to 0.78) and significantly higher following TOP (1.76, 95%CI 1.27 to 2.42). |
| Gissler and Hemminki[85] (1999) Finland | All fertile-aged women, 1987–1994. (513,472 / 93,807 / 71,701 / 9,192) | death certificates birth certificates TOP registry hospital discharge | age | 8 | Compared to women who were not pregnant in the year before death, women who had TOPs had an 81% higher rate of death (1.81, 95%CI 1.31 to 2.50), women who gave birth had a 53% lower risk of death (0.47, 95%CI 0.30 to 0.74), and those who miscarried were not significantly different (0.85, 95%CI 0.58 to 1.24). 34% of deaths were from external causes. Women who had TOPs had significantly elevated risk of death from suicide, accidents, and homicides. Risk of death from natural causes was significantly lower for women giving birth (0.47, 95%CI 0.25 to 0.86) and for women who miscarried (0.39, 95%CI 0.20 to 0.75). |

Reardon and Thorp    7

**Table I.** (Continued)

(Continued)

| Study (year) Country | Population & Time Period (Births / TOP / Natural Losses / Deaths) | Records Examined and Linked | Confounding Variables Examined | Quality Score* Range 0–9 | Summary of Major Findings |
|---|---|---|---|---|---|
| Reardon et al.[92] (2002) United States | Medicaid eligible and fertile aged women in California with pregnancy outcome in 1989 (116,936 / 56,343/ NA / 1,294) | death certificates all paid medical claims | age economic class 12–18 months prior psychiatric history | 9 | Medical records for women with a Medicaid treated pregnancy in 1989 were linked to death certificates. After controlling for psychiatric history and age, women who had a TOP were at significantly higher risk of death. The relative risk was 2.03 (95%CI 1.33 to 3.10) in the first two years following pregnancy outcome, 1.98 (95%CI 1.25 to 3.15) in years three and four, and declined to an insignificant 1.35 (95%CI 0.89 to 2.05) in the fifth and sixth years, and 1.29 (95%CI 0.84 to 1.96) in the seventh and eighth years. Multiple pregnancy outcomes significantly affected mortality rates. During the eight years following pregnancy, women who aborted had a significantly higher age-adjusted relative risk of death compared to delivering women from all causes (1.61, 95%CI 1.30 to 1.99), suicide (3.12, 95%CI 1.25 to 7.78), and homicide (1.93, 95%CI 1.11 to 3.33), as well as from natural causes (1.44, 95%CI 1.08 to 1.91), circulatory diseases (2.00, 95%CI 1.00 to 3.99), and cerebrovascular disease (4.42, 95%CI 1.06 to 18.48). |
| Gissler et al.[1] (2004) Finland | All fertile-aged women, 1987–2000. (865,988 / 156,789 / 118,490 / 15,823) | death certificates birth certificates TOP registry hospital discharge | age | 8 | All death certificates were examined. A total of 419 deaths were among women pregnant in the year prior to death. Without record linkage, 73% of pregnancy associated deaths would have been missed. Following live or still birth, 27% of deaths within 42 days and 78% of deaths from 43–364 days would have been missed without record linkage. Following TOP 71% of deaths within 42 days and 97% of deaths between 43–364 days would have been missed without record linkage. Following miscarriage or ectopic pregnancy, 54% of deaths within 42 days of pregnancy outcome and 94% of deaths between 43–364 days would have been missed. |
| Gissler[86] (2004) Finland | All fertile-aged women, 1987–2000. (865,988 / 156,789 / 118,490 / 15,823) | death certificates birth certificates TOP registry hospital discharge | age | 8 | One-year age adjusted mortality rates were calculated for women not pregnant in the year prior to death and compared to age adjusted mortality rates of three groups of women who were pregnant at death or during the year prior to death. The death per 100,000 was 57.0 for not recently pregnant women, 28.2 for delivering or pregnant women (RR 0.49, 95% CI 0.43–0.56), 51.9 for women who miscarried (RR 0.91, 95% CI 0.71 to 1.17), and 83.1 for women who had TOPs (RR 1.45, 95% CI 1.22 to 1.73). Women aged 25–34 who had TOPs were significantly more likely to die of circulatory system disease compared to not recently pregnant women, delivering women, and those who miscarried (rates per 100,000, respectively: 8.7; 4.4; 3.3; 1.5). |

Alliance.App. 445    MPI App. 945

Case: 23-10362   Document: 95-5   Page: 102   Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 121   Filed 02/24/23   Page 58 of 67   PageID 4223

8

SAGE Open Medicine

**Table 1.** (Continued)

| Study (year) Country | Population & Time Period (Births / TOP / Natural Losses / Deaths) | Records Examined and Linked | Confounding Variables Examined | Quality Score* Range 0–9 | Summary of Major Findings |
|---|---|---|---|---|---|
| Gissler et al.[87] (2005) Finland | All fertile-aged women, 1987–2000. (865,988 / 156,789 / 118,490 / 15,823) | death certificates birth certificates TOP registry hospital discharge | age | 8 | This study examined only deaths from external causes. The death rate from external causes per 100,000 was 24.2 for women who had not been pregnant, 10.2 for those giving birth, 35.2 for those with natural losses, and 60.3 for those who had TOPs. The tables present segregated results show death rates from suicide, homicide, and those classified as accidental varied significantly by age and pregnancy outcome. The authors endorse recommendations for routine post-TOP checkup screening for depression and psychosis in the weeks following a TOP. |
| Reardon and Coleman[89] (2012) Denmark | All fertile-aged women whose first pregnancy was in 1980–2004. (318,646 / 119,179 / 25,648 / 2,238) | death certificates birth certificates TOP registry hospital discharge | first pregnancy age at time of pregnancy; year of woman's birth | 9 | Age and maternal birth year adjusted mortality rates following first pregnancy outcomes were calculated over numerous time periods. Deaths rates for the first and second year are shown in Figure 1. Cumulative TOP associated mortality was significantly higher for every time period examined from 180 days to 10 years for both early and later TOP. The cumulative odds ratio for early TOP declined from a high at 180 days (2.03, 95% CI 1.11 to 3.71) to a low at ten years (1.39, 95% CI 1.22 to 1.60). Mortality rates associated with miscarriages were lower than for TOP and were significantly higher than for birth for periods over four years. |
| Coleman et al.[90] (2013) Denmark | All fertile-aged women, 1980–2004. (438,134 / 171,582 / 111,205 / 5,137) | death certificates birth certificates TOP registry hospital discharge | year of woman's birth age at last pregnancy number of births number of TOPs number natural losses | 9 | This study examined all causes of death using 25 years of data using numerous control variables, displaying exposure rate to various pregnancy outcomes. A dose effect was observed as shown in Figure 6. Exposure to various combinations of pregnancy outcomes was significant. The rate per 100,000 was 352 experiencing only births, 365 for those with both birth and natural losses, 541 for those with both births and TOP, 549 for those with no pregnancies, 550 for those with births, TOP and natural losses, 805 for those with only natural losses, and 1281 for those with only TOP. These findings suggest that TOP combined with natural loss compounds the risk of reduced longevity while a successful birth may reduce the risks associated with pregnancy loss. |
| Gissler et al.[88] (2014) Finland | All fertile-aged women, 1987–2012. (NA / 284,751 / NA / 3,798) | death certificates TOP registry | age | 8 | Based on prior research associating TOP with higher suicide rates, unofficial guidelines in Sweden recommended 2–3 week post-TOP assessments of psychological adjustment. These guidelines were made official in 2001. This study sought to examine if the guidelines adopted in 1996 may have reduced TOP associated suicide rates. The elevated risk of suicide after TOP declined from 2.84 (95% CI, 2.05 to 2.93) before 1997 to 2.44 (1.80 to 3.32) for 1997 thru 2012, but the drop was not statistically significant. |

*Details of the Quality Score assessment can be viewed at: https://docs.google.com/spreadsheets/d/1T0GySPuff4tMXnuTNwmlDgcqHfJyh66dJIsoIAoITP8IQ/edit?usp=sharing

Case: 23-10362     Document: 95-5     Page: 103     Date Filed: 04/11/2023
Case 2:22-cv-00223-Z   Document 121   Filed 02/24/23   Page 59 of 67   PageID 4224

*Reardon and Thorp*                                                                9



**Figure 2.** Cumulative Age Adjusted, All Cause Mortality Rates per 100,000 Women for One and Two Year Periods Following Pregnancy Outcome.

This systematic review also revealed that every record linkage study examining mortality rates relative to different pregnancy outcomes has revealed that pregnancy loss is associated with a higher risk of death than childbirth. These studies also show that this elevated mortality risk persists over many years, is multiplied by repeat exposure to pregnancy loss, and may be reduced by successful deliveries. The quality of these eleven studies is very high, with all but the one earliest attempt scoring 8 or above on the NCQAS (with a range 0–9).

Overall, the meta-analysis revealed that pregnancy loss associated mortality is more than double that of delivery associated mortality. Notably, the Danish data used in the meta-analysis included *only* first pregnancy outcomes while the Finnish data included all pregnancy outcomes. This may explain the higher pregnancy loss mortality rate observed in the Finnish data since a significant portion of the Finnish subjects would have been exposed to multiple pregnancy losses for which a dose effect of increased mortality risk has been observed.[90]

A disproportionate share of pregnancy loss associated deaths are due to suicides, accidents, or homicide.[83,86,87,92] In case study reports from mental health professionals and surveys of women struggling with pregnancy loss issues heightened risk taking and self-destructive behaviors are reported which may contribute to rates of accidents and homicide, in addition to suicide.[93] Risk of death from accidents and homicide may also be impacted by the elevated risk of substance abuse associated with TOP.[10–12] This hypothesis is supported by one U.K. study of pregnancy associated deaths that reported that[1] a major portion of accidental deaths were due to drug overdose, and[2] of eight women who died after being struck by cars as pedestrians, seven were drug users.[43] These findings underscore the importance of record linkage as a precursor to efforts to evaluate "abortion related deaths," as defined by the CDC.[27]

### Strengths and weaknesses

A strength of the narrative portion of this review is that while only 11 of 68 record linkage studies of mortality rates associated with pregnancy included examination of deaths associated with pregnancy losses, these eleven examined a

Case: 23-10362    Document: 95-5    Page: 104    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z    Document 121    Filed 02/24/23    Page 60 of 67    PageID 4225

10                                                                          SAGE Open Medicine



**Figure 3.** Cumulative Age Adjusted, Violent Cause Mortality Rates per 100,000 Women for One and Two Year Periods Following Pregnancy Outcome.
*Mortality rates shown were also adjusted for one year pre-pregnancy psychiatric history.

variety of different time frames and confounding variables, including economic class, marital status, age, number and types of prior pregnancy outcomes, and prior psychiatric history. At the same time, however, it is also a weakness that all of these confounding variable were not addressed in every study. The fact that all of these studies, despite variations, showed a consistent trend in findings indicates that the trend is a real one and is likely to replicated if applied to other populations.

Clearly, a priority of future research should examine a broader number of confounding variables across more populations to better understand the direct and indirect pathways and co-occurring risk factors that may guide future interventions. Future studies should seek to control for potential confounders including: income inequality, psychiatric history, access to medical care including birth control, intimate partner violence, intentionality of pregnancy, and level of maternal attachment to the pregnancy.

A major weakness of our meta-analysis is that data on mortality rates in the first year following pregnancy losses were only available from two countries, which highlights the failure of most researchers to address this issue. In addition, a minor weakness is that the Danish study included stillbirths in the natural loss grouping while in the Finnish study stillbirths were included in delivery category. Since the number of stillbirths were not reported, we could not adjust for this difference. But given the expected low number of stillbirths, this difference in categorization is very unlikely to have a major impact on the results. Another inconsistency is that all the studies from Finland included deaths during pregnancy in with deaths following a delivery (live or stillbirth), potentially adding nine months mortality risk to the one-year post-delivery mortality rate. This would tend to inflate deaths associated with delivery. Reporting deaths during pregnancy as a separate item would be preferable. These points highlight why more consistent classification standards would be helpful in future research.

*Reardon and Thorp*                                                                                          11



Data points from Reardon DC, Coleman PK. Short and long term mortality rates associated with first pregnancy outcome: population register based study for Denmark 1980-2004. *Med Sci Monit*. 2012;18(9):PH71-PH76. Table 1 with 180-day data from Table 2.

**Figure 4.** Death rates following first pregnancy outcome through 180 days and during each of the first through tenth years after pregnancy outcome.



Data points from Coleman PK, Reardon DC, Calhoun BC. Reproductive history patterns and long-term mortality rates: A Danish, population-based record linkage study. Eur J Public Health. 2013;23(4):569-574; Table 2.

**Figure 5.** Adjusted odds ratios for pregnancy associated long-term mortality by exposure to types of pregnancy outcomes. Adjusting for age at last pregnancy and number of pregnancies.

In our opinion, any pregnancy that fails to produce a live birth should be treated as a pregnancy loss since there may be grief issues impacting future health. Rare cases of multiple gestations including both live birth and fetal loss are confounding and should be excluded from more general analyses or treated as a separate group.

### Future research and missed opportunities

Unfortunately, many opportunities to investigate pregnancy associated mortality and long-term mortality have been missed, to date. Our literature review found that only 11 of 68 record linkage studies (and only 2 of 37 studies in the United States) explored mortality rates associated with pregnancy loss.

This oversight can and should be corrected. Even in countries without central TOP registries, such as exist in Finland and Denmark, exposure to TOP and miscarriage can be identified through medical records and insurance claims, as shown by researchers in the United Kingdom,[15] Canada,[22] and in the United States.[91,92] Unfortunately, except for these rare exceptions, most of the leading investigations into pregnancy associated deaths in Canada, the United Kingdom and the USA have failed to use these same techniques to investigate deaths associated with TOP or miscarriage.

Another missed opportunity appears to have occurred in a study of Italian women[33] in which researchers report that they did, in fact, link death certificates to records of terminations and miscarriages, but unfortunately their published analyses failed to provide any breakdown of death rates relative to each pregnancy outcome. Our request for a breakdown of deaths associated with each type of pregnancy outcome was rejected.

The failure of so many studies to report on pregnancy loss associated deaths indicates that there may be a risk of reporting bias. For example, social, political, or academic



All data from Table 4 of Coleman PK et al, Reproductive history patterns and long-term mortality rates: A Danish, population-based record linkage study. *Eur J Public Health.* 2013;23(4):569-574.

**Figure 6.** Adjusted Odds Ratios for Pregnancy Associated Long Term Mortality Rates by Frequency of Exposure to Each Pregnancy Outcome—Denmark 1980–2004.
Group 1. The odds ratios for exposure to abortion are adjusted for age at last pregnancy, number of births and number of natural losses.
Group 2. The odds ratios for exposure to natural loss are adjusted for age at last pregnancy, number of births and number of abortions.
Group 3. The odds ratios for exposure to birth are adjusted for age at last pregnancy, number of natural losses and number of abortions.
All data from Table 4 of Coleman PK et al.[90]



**Figure 7.** Meta-Analysis of Age Adjusted One Year Mortality Rates Associated with Comparative Pregnancy Outcomes.

sensitivities relative to efforts to promote legalization of safe abortion in developing countries may produce a bias against investigating and/or publishing findings that may show TOP is associated with an increase in mortality rates.[94,95] On the other hand, even though such findings have been reported since at least 1997,[83,84] there may also be lack of sufficient awareness among researchers regarding the elevated mortality rates associated with pregnancy loss. In either case, it is clear that in most countries where record linkage studies have been performed there *are no structural obstacles* to expanding record linkage studies to include pregnancy loss associated mortality. What is required is simply the academic and/or political will to undertake such investigations.

Case: 23-10362    Document: 95-5    Page: 107    Date Filed: 04/11/2023
Case 2:22-cv-00223-Z    Document 121    Filed 02/24/23    Page 63 of 67    PageID 4228

Reardon and Thorp                                                                                                    13

What is already sufficiently clear is that mortality rates and longevity are significantly affected by exposure to pregnancy losses, whether natural or induced. Therefore, in the interests of patients, future investigations into pregnancy associated mortality should *all* include efforts to identify and report on the comparative effects associated with prior exposure to TOP, miscarriage, and other natural losses. Such research is necessary to guide the development of better screening and treatment strategies for those subsets of women who may most benefit from targeted interventions.

## Incidental or causal relationships?

As discussed above, termination of pregnancy remains a sensitive and politically charged issue, for both those who defend it as a fundamental woman's right and those who oppose it for moral reasons. In our experience, these passions often inspire a hypercritical level of suspicion regarding any epidemiological findings which run counter to preconceived expectations.

For readers to access their own biases regarding this subject matter, simply imagine if our results were all reversed and the risk of death in the year following a TOP was half that associated with childbirth. Would the reader consider such reversed results more comfortable or more disturbing? Would such results provoke more confidence in the value of record linkage studies or more suspicion?

In either event, it is important to interpret these findings in as balanced a perspective as possible. Correlation does not prove causation. There may be common risk factors for pregnancy loss which explain the elevated risks.[96] Indeed, given the fact that a disproportionate number of deaths associated with prior pregnancy loss are due to suicide and accidents, it would appear that causal contribution would most likely be indirect and chiefly mediated by psychological effects which are known to occur among women who experience a pregnancy loss.[2–10,17–19] Moreover, the finding that there pregnancy loss has a dose effect on increased risk of death[90] (Figure 6) strongly parallels the finding of pregnancy loss having a dose effect on increased risk of mental illness.[2,5,13]

But even if the elevated risks can be entirely explained by common risk factors, it is critically important to acknowledge that these findings are still clinically relevant and very useful. Why?

Because a history of pregnancy loss is at least a *useful marker* for identifying women who may need additional screening, counselling and care. Therefore, alert clinicians can and should screen for a history of pregnancy loss in order to use this actionable information as detailed in our clinical recommendations below. How this marker may be used to provide better screening and referrals will be discussed more fully in the next section.

Additional support for a causal interpretation is found in studies which have identified the first onset of psychological problems, such as sleep disorders[17] or substance abuse,[97] soon after a pregnancy loss among women who did *not*

previously have these problems.[13] Another important study examined hospital admission rates for attempted suicide rates prior to pregnancy and after a TOP[15] and revealed a significant and dramatic shift from a "normal" rate of suicide attempts to an elevated rate after TOP, as seen in Figure 8. These findings led the researchers to conclude that "the increased risk of suicide after an induced abortion may therefore be a consequence of the procedure itself."

Another factor to consider regarding the question of causality is that negative effects may be substantially limited to small subgroups of women who are at greater risk. For example, experts on "both sides" of the legal abortion controversy are actually in agreement regarding the evidence that women who feel coerced or pressured into unwanted TOP are at greater risk of serious complications, including elevated self-destructive tendencies.[98] If we were to hypothesize, then, that all of the elevated risk of death associated with TOP reported in the studies we examined are limited to cases of coerced TOP, it would then follow that the findings reported herein may be an indirect measure of the frequency of coerced TOP. Such a conclusion would only further underscore the importance of the clinical recommendations offered in the next section.

Perhaps the most powerful evidence that pregnancy loss contributes directly to mental health problems is the frequency with which self-aware, introspective women specifically attribute the onset or worsening of substance use, depression, flashbacks, sexual dysfunction, self-destructive tendencies and other issues to their pregnancy loss experiences.[93,99,100] These self-assessments are further validated by therapists treating women for pregnancy loss related issues.[101,102] Additionally, evidence that post-abortion counselling programs reduce symptoms of psychological illness[103] also support the hypothesis that TOP can trigger or exacerbate psychological illness; after all, an effective treatment is evidence for an accurate diagnosis.

We are not asserting that pregnancy loss is the *sole* cause of the elevated risk of death identified in these studies, but rather that there is ample evidence to believe pregnancy loss can be a *contributing* cause. The discussion above is therefore intended to emphasize the importance of research designed to better understand the causal pathways and co-occurring risk factors which can then be used to better identify women who may benefit from appropriate interventions.

## Clinical recommendations

Clinician's should be alert to the fact that a history of any pregnancy loss may impact many aspects of women's lives. Prior pregnancy losses, voluntary or involuntary, are also sensitive issues for many women which they may hesitate to dicuss. Therefore, it is highly recommended that as a standard intake question, or in periodic updating with patients, clinicians should make a gentle, non-judgmental query: "Have you had any pregnancy losses, like a miscarriage,

Case: 23-10362     Document: 95-5     Page: 108     Date Filed: 04/11/2023
Case 2:22-cv-00223-Z     Document 121     Filed 02/24/23     Page 64 of 67     PageID 4229

14                        *SAGE Open Medicine*



**Figure 8.** Rate of treatments for attempted suicide before and after delivery or TOP.

abortion, or still birth?" This query, which non-judgmentally names each type of pregnancy loss, gives women permission to discuss any sensitive feelings regarding past pregnancy losses and also opens up opportunities to discuss any lingering or intermittent concerns.

When women do report a prior pregnancy loss, or for women considering a termination of pregnancy, we recommend that clinicians should then investigate if additional risk factors are present. Especially useful in this regard, at least 15 risk factors for more severe reactions following TOP which have been identified by American Psychological Association Task Force on Mental Health and Abortion.[104] With slight modification, these risk factors can also be applied to miscarriage and other natural losses. They are:

- terminating a pregnancy that is wanted or meaningful
- perceived pressure from others to terminate a pregnancy
- perceived opposition to the abortion from partners, family, and/or friends
- lack of perceived social support from others
- various personality traits (e.g., low self-esteem, a pessimistic outlook, low-perceived control over life)
- a history of mental health problems prior to the pregnancy
- feelings of stigma; perceived need for secrecy
- exposure to antiabortion picketing
- use of avoidance and denial coping strategies
- feelings of commitment to the pregnancy
- ambivalence about the abortion decision
- low perceived ability to cope with the abortion
- history of prior abortion
- late term abortion.

These risk factors can and should be used to identify women who may need more counselling and other services. Given the dose effects observed, screening for a history of pregnancy loss is especially important in preparing treatment plans for women in all subsequent pregnancies. Therefore, we recommend the

APA identified screening criteria should be used on at least four occasions: (a) when women seeking mental health care report any history of pregnancy loss, (b) when women are seeking care in anticipation of becoming pregnant, (c) upon diagnosis of a pregnancy, and (d) before termination of a pregnancy.

## Summary

Deaths associated with pregnancy, both within the first year and beyond, are significantly different relative to pregnancy outcome. Births have a positive effect on longevity while pregnancy losses have a negative effect, with negative effect of TOP being greater than that of natural losses. Multiple pregnancy losses are especially problematic. Pregnancy loss is at least a marker for adverse maternal outcomes, but is most likely a contributing risk factor driven by psychological stresses related to pregnancy loss.[2–22]

Many opportunities to investigate pregnancy loss associated long-term mortality rates have been missed. Future investigations into maternal mortality and pregnancy associated mortality should include systematic record linkage to medical and insurance records to identify pregnancy losses so that these patterns and risk factors can be better understood.

Screening for a history of pregnancy loss (induced or natural) is highly recommended as a means of identifying women who may benefit from additional counselling and interventions. Screening for risk factors associated with more severe maladjustments following TOP, as identified by the APA,[104] is also highly recommended.

### Declaration of conflicting interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author(s) disclosed receipt of the following financial support for the research, authorship, and/or publication of this article: No grants or outside funding were used. David Reardon's efforts were funded as part of his regular duties as Director of Research with the Elliot Institute. John Thorp's efforts were not funded.

## Ethical approval

Ethical approval was not sought for the present study because it is a literature review and does involve any original research using human or animal subjects.

## Informed consent

Informed consent was not sought for the present study because it is a literature review and does not involve any original research using human subjects.

## Supplemental files submitted

- Prisma Checklist.
- Spreadsheet of Newcastle - Ottawa Quality Assessment Scale: Cohort Studies.

## Trial registration

This was not a randomized clinical trial therefore it was not registered as such.

## References

1. Gissler M, Berg C, Bouvier-Colle M-H, et al. Methods for identifying pregnancy-associated deaths: population-based data from Finland 1987–2000. *Paediatr Perinat Epidemiol* 2004; 18(6): 448–455.
2. Giannandrea SAM, Cerulli C, Anson E, et al. Increased risk for postpartum psychiatric disorders among women with past pregnancy loss. *J Womens Health* 2013; 22(9): 760–768.
3. Broen AN, Moum T, Bødtker AS, et al. The course of mental health after miscarriage and induced abortion: a longitudinal, five-year follow-up study. *BMC Med* 2005; 3: 18.
4. Munk-Olsen T, Bech BH, Vestergaard M, et al. Psychiatric disorders following fetal death: a population-based cohort study. *BMJ Open* 2014; 4: 1–6.
5. Fergusson DM, Horwood LJ and Boden JM. Does abortion reduce the mental health risks of unwanted or unintended pregnancy? A re-appraisal of the evidence. *Aust N Z J Psychiatry* 2013; 47(9): 819–827.
6. Coleman PK. Abortion and mental health: quantitative synthesis and analysis of research published 1995–2009. *Br J Psychiatry* 2011; 199: 180–186.
7. Van den Akker OB. The psychological and social consequences of miscarriage. *Expert Rev Obstet Gynecol* 2011; 6(3): 295–304.
8. Reardon DC, Cougle JR, Rue VM, et al. Psychiatric admissions of low-income women following abortion and childbirth. *CMAJ* 2003; 168(10): 1253–1256.
9. Coleman PK, Reardon DC, Rue VM, et al. State-funded abortions versus deliveries: a comparison of outpatient mental health claims over 4 years. *Am J Orthopsychiatry* 2002; 72(1): 141–152.
10. Fergusson DM, Horwood LJ and Boden JM. Abortion and mental health disorders: evidence from a 30-year longitudinal study. *Br J Psychiatry* 2008; 193(6): 444–451.
11. Coleman PK. Induced abortion and increased risk of substance abuse: a review of the evidence. *Curr Womens Health Rev* 2005; 1(1): 21–34.
12. Steinberg JR, McCulloch CE and Adler NE. Abortion and mental health: findings from the national comorbidity survey-replication. *Obstet Gynecol* 2014; 123(2 Pt 1): 263–270.
13. Sullins DP. Abortion, substance abuse and mental health in early adulthood: thirteen-year longitudinal evidence from the United States. *SAGE Open Med* 2016; 4: 2050312116665997.
14. Shadigian E and Bauer ST. Pregnancy-associated death: a qualitative systematic review of homicide and suicide. *Obstet Gynecol Surv* 2005; 60(3): 183–190.
15. Morgan CL, Evans M and Peters JR. Suicides after pregnancy. Mental health may deteriorate as a direct effect of induced abortion. *BMJ* 1997; 314(7084): 902.
16. Tishler CL. Adolescent suicide attempts following elective abortion: a special case of anniversary reaction. *Pediatrics* 1981; 68(5): 670–671.
17. Reardon DC and Coleman PK. Relative treatment rates for sleep disorders and sleep disturbances following abortion and childbirth: a prospective record-based study. *Sleep* 2006; 29(1): 105–106.
18. Daugirdaitė V, van den Akker O and Purewal S. Posttraumatic stress and posttraumatic stress disorder after termination of pregnancy and reproductive loss: a systematic review. *J Pregnancy* 2015; 2015: 646345.
19. Zulčić-Nakić V, Pajević I, Hasanović M, et al. Psychological problems sequalae in adolescents after artificial abortion. *J Pediatr Adolesc Gynecol* 2012; 25(4): 241–247.
20. Ney PG, Fung T, Wickett AR, et al. The effects of pregnancy loss on women's health. *Soc Sci Med* 1994; 38(9): 1193–1200.
21. Berkeley D, Humphreys PC and Davidson D. Demands made on general practice by women before and after an abortion. *J R Coll Gen Pract* 1984; 34(263): 310–315.
22. Østbye T, Wenghofer EF, Woodward CA, et al. Health services utilization after induced abortions in Ontario: a comparison between community clinics and hospitals. *Am J Med Qual* 2001; 16(3): 99–106.
23. Dior UP, Hochner H, Friedlander Y, et al. Association between number of children and mortality of mothers: results of a 37-year follow-up study. *Ann Epidemiol* 2013; 23(1): 13–18.
24. Sun F, Sebastiani P, Schupf N, et al. Extended maternal age at birth of last child and women's longevity in the long life family study. *Menopause* 2015; 22(1): 26–31.
25. McArdle PF, Pollin TI, O'Connell JR, et al. Does having children extend life span? A genealogical study of parity and longevity in the Amish. *J Gerontol A Biol Sci Med Sci* 2006; 61(2): 190–195.
26. Atrash HK, Rowley D and Hogue CJ. Maternal and perinatal mortality. *Curr Opin Obstet Gynecol* 1992; 4(1): 61–71.
27. Pazol K, Creanga AA, Burley KD, et al. Abortion surveillance – United States, 2010. *MMWR Surveill Summ* 2013; 62(8): 1–44.
28. Khlat M and Ronsmans C. Deaths attributable to childbearing in Matlab, Bangladesh: indirect causes of maternal mortality questioned. *Am J Epidemiol* 2000; 151(3): 300–306.
29. Sousa MH, Cecatti JG, Hardy EE, et al. Severe maternal morbidity (near miss) as a sentinel event of maternal death. An attempt to use routine data for surveillance. *Reprod Health* 2008; 5(1): 6.
30. Turner LA, Cyr M, Kinch RAH, et al. Under-reporting of maternal mortality in Canada: a question of definition. *Chronic Dis Can* 2002; 23(1): 22–30.
31. Turner LA, Kramer MS, Liu S, et al. Cause-specific mortality during and after pregnancy and the definition of maternal death. *Chronic Dis Can* 2002; 23(1): 31–36.

Case: 23-10362     Document: 95-5     Page: 110     Date Filed: 04/11/2023
Case 2:22-cv-00223-Z     Document 121     Filed 02/24/23     Page 66 of 67     PageID 4231

16                                                                          SAGE Open Medicine

32. Andersen BR, Westergaard HB, Bødker B, et al. Maternal mortality in Denmark, 1985–1994. *Eur J Obstet Gynecol Reprod Biol* 2009; 142(2): 124–128.

33. Donati S, Senatore S and Ronconi A. Maternal mortality in Italy: a record-linkage study. *BJOG* 2011; 118(7): 872–879.

34. Schutte JM, Hink E, Heres MHB, et al. Maternal mortality due to psychiatric disorders in the Netherlands. *J Psychosom Obstet Gynecol* 2008; 29(3): 150–153.

35. Schutte JM, de Jonge L, Schuitemaker NWE, et al. Indirect maternal mortality increases in the Netherlands. *Acta Obstet Gynecol Scand* 2010; 89(6): 762–768.

36. Schutte JM, Steegers E, a P, et al. Rise in maternal mortality in the Netherlands. *BJOG* 2010; 117(4): 399–406.

37. Samuelsson E, Hellgren M and Högberg U. Pregnancy-related deaths due to pulmonary embolism in Sweden. *Acta Obstet Gynecol Scand* 2007; 86(4): 435–443.

38. Kvarnstrand L, Milsom I, Lekander T, et al. Maternal fatalities, fetal and neonatal deaths related to motor vehicle crashes during pregnancy: a national population-based study. *Acta Obstet Gynecol Scand* 2008; 87(9): 946–952.

39. Esscher A, Högberg U, Haglund B, et al. Maternal mortality in Sweden 1988-2007: more deaths than officially reported. *Acta Obstet Gynecol Scand* 2013; 92(1): 40–46.

40. Chang C-C, Chiu H-F and Yang C-Y. Parity, age at first birth, and risk of death from pancreatic cancer: evidence from a cohort in Taiwan. *Pancreas* 2010; 39(5): 567–571.

41. Lewis G and Drife J (eds). *Why mothers die 1997–1999: the confidential enquiries into maternal deaths in the United Kingdom*. London: RCOG press, 2001.

42. Oates M. Perinatal psychiatric disorders: a leading cause of maternal morbidity and mortality. *Br Med Bull* 2003; 67: 219–229.

43. Lewis G and Drife J (eds). *Why mothers die 2000–2002: confidential enquiry into maternal and child health*. London: RCOG press, 2004.

44. Lewis G (ed.). *Saving mothers' lives: reviewing maternal deaths to make motherhood safer 2003–2005*. London: CEMACH, 2007.

45. Cantwell R, Clutton-Brock T, Cooper G, et al. Saving mothers' lives: reviewing maternal deaths to make motherhood safer: 2006–2008. The eighth report of the confidential enquiries into maternal deaths in the United Kingdom. *BJOG* 2011; 118(Suppl. 1): 1–203.

46. Hastie CE, Smith GCS, Mackay DF, et al. Maternal risk of ischaemic heart disease following elective and spontaneous pre-term delivery: retrospective cohort study of 750 350 singleton pregnancies. *Int J Epidemiol* 2011; 40(4): 914–919.

47. Rubin G, McCarthy B, Shelton J, et al. The risk of childbearing re-evaluated. *Am J Public Health* 1981; 71(7): 712–716.

48. Benedetti TJ, Starzyk P and Frost F. Maternal deaths in Washington state. *Obstet Gynecol* 1985; 66(1): 99–101.

49. Starzyk P, Frost F and Kobayashi J. Misclassification of maternal deaths – Washington state. *MMWR Morb Mortal Wkly Rep* 1986; 35(39): 621–623.

50. Comas A, Navarro A, Conde J, et al. Misreporting of maternal mortality in Puerto Rico. *Bol Asoc Med P R* 1990; 82(8): 343–346.

51. Allen MH, Chavkin W and Marinoff J. Ascertainment of maternal deaths in New York city. *Am J Public Health* 1991; 81(3): 380–382.

52. May W, Buescher P and Murray A. Enhanced maternal mortality surveillance – North Carolina, 1988 and 1989. *MMWR Morb Mortal Wkly Rep* 1991; 40(28): 469–471.

53. Dye TD, Gordon H, Held B, et al. Retrospective maternal mortality case ascertainment in West Virginia, 1985 to1989. *Am J Obstet Gynecol* 1992; 167(1): 72–76.

54. Floyd V, Hadley C, Lavoie M, et al. Pregnancy-related mortality – Georgia, 1990–1992. *MMWR Morb Mortal Wkly Rep* 1995; 44(5): 93–96.

55. Jocums S, Mitchel EF, Entman SS, et al. Monitoring maternal mortality using vital records linkage. *Am J Prev Med* 1995; 11(2): 75–78.

56. Harper M and Parsons L. Maternal deaths due to homicide and other injuries in North Carolina: 1992–1994. *Obstet Gynecol* 1997; 90(6): 920–923.

57. Dietz PM, Rochat RW, Thompson BL, et al. Differences in the risk of homicide and other fatal injuries between postpartum women and other women of childbearing age: implications for prevention. *Am J Public Health* 1998; 88(4): 641–643.

58. Jocums SB, Berg CJ, Entman SS, et al. Postdelivery mortality in Tennessee, 1989–1991. *Obstet Gynecol* 1998; 91(5 Pt 1): 766–770.

59. Fang J, Madhavan S and Alderman MH. Maternal mortality in New York city: excess mortality of black women. *J Urban Heal* 2000; 77(4): 735–744.

60. Horon IL and Cheng D. Enhanced surveillance for pregnancy-associated mortality - Maryland, 1993–1998. *J Am Med Assoc* 2001; 285(11): 1455–1459.

61. Lydon-Rochelle M, Holt VL, Easterling TR, et al. Cesarean delivery and postpartum mortality among primiparas in Washington State, 1987–1996. *Obstet Gynecol* 2001; 97(2): 169–174.

62. Buescher PA, Harper M and Meyer RE. Enhanced surveillance of maternal mortality in North Carolina. *N C Med J* 2002; 63(2): 76–79.

63. Nannini A, Weiss J, Goldstein R, et al. Pregnancy-associated mortality at the end of the twentieth century: Massachusetts, 1990–1999. *J Am Med Womens Assoc* 2002; 57(3): 140–143.

64. Chang J, Elam-Evans LD, Berg CJ, et al. Pregnancy-related mortality surveillance – United States, 1991–1999. *MMWR Morb Mortal Wkly Rep* 2003; 52(2): 1–8.

65. Baker N, Fogarty C, Stroud D, et al. Enhanced pregnancy-associated mortality surveillance: Minnesota, 1990–1999. *Minn Med* 2004; 87(1): 45–47.

66. Harper MA, Espeland MA, Dugan E, et al. Racial disparity in pregnancy-related mortality following a live birth outcome. *Ann Epidemiol* 2004; 14(4): 274–279.

67. Horon IL, Cheng D, Chang J, et al. Underreporting of maternal deaths on death certificates and the magnitude of the problem of maternal mortality. *Am J Public Health* 2005; 95(3): 478–482.

68. Wolfe EL, Davis T, Guydish J, et al. Mortality risk associated with perinatal drug and alcohol use in California. *J Perinatol* 2005; 25(2): 93–100.

69. Rosenberg D, Geller SE, Studee L, et al. Disparities in mortality among high risk pregnant women in Illinois: a population based study. *Ann Epidemiol* 2006; 16(1): 26–32.

70. Watson A, Thompson D, Burch D, et al. *Pregnancy-related mortality report, Florida 1999–2005*. Tallahassee, FL: Florida Department of Health, 2008.

71. Kavanaugh VM, Fierro MF, Suttle DE, et al. Psychosocial risk factors as contributors to pregnancy-associated death in Virginia, 1999–2001. *J Womens Health* 2009; 18(7): 1041–1048.

72. Horon IL and Cheng D. Effectiveness of pregnancy check boxes on death certificates in identifying pregnancy-associated mortality. *Public Health Rep* 2011; 126(2): 195–200.

73. Tran T, Roberson E, Borstell J, et al. Evaluation of pregnancy mortality in louisiana using enhanced linkage and different indicators defined by WHO and CDC/ACOG: challenging and practical issues. *Matern Child Health J* 2011; 15(7): 955–963.

74. Burch D, Noell D, Hill WC, et al. Pregnancy-associated mortality review: the Florida experience. *Semin Perinatol* 2012; 36(1): 31–36.

75. Burlingame J, Horiuchi B, Ohana P, et al. Sauvage LMM. The contribution of heart disease to pregnancy-related mortality according to the pregnancy mortality surveillance system. *J Perinatol* 2012; 32(3): 163–169.

76. Mitchell C, Lawton E, Morton C, et al. California pregnancy-associated mortality review: mixed methods approach for improved case identification, cause of death analyses and translation of findings. *Matern Child Health J* 2014; 18(3): 518–526.

77. Main EK, McCain CL, Morton CH, et al. Pregnancy-related mortality in California: causes, characteristics, and improvement opportunities. *Obstet Gynecol* 2015; 125(4): 938–947.

78. Hardt N, Wong TD, Burt MJ, et al. Prevalence of prescription and illicit drugs in pregnancy-associated non-natural deaths of florida mothers, 1999–2005. *J Forensic Sci* 2013; 58(6): 1536–1541.

79. Hardt NS, Eliazar J, Burt M, et al. Use of a prenatal risk screen to predict maternal traumatic pregnancy-associated death: program and policy implications. *Womens Health Issues*; 23(3): e187–e193.

80. Salanave B, Bouvier-Colle M-H, Varnoux N, Alexander S, et al. Classification differences and maternal mortality: a European study. *Int J Epidemiol* 1999; 28(1): 64–69.

81. Deneux-Tharaux C, Berg C, Bouvier-Colle MH, et al. Underreporting of pregnancy-related mortality in the United States and Europe. *Obstet Gynecol* 2005; 106(4): 684–692.

82. Gissler M, Deneux-Tharaux C, Alexander S, et al. Pregnancy-related deaths in four regions of Europe and the United States in 1999-2000: characterisation of unreported deaths. *Eur J Obstet Gynecol Reprod Biol* 2007; 133(2): 179–185.

83. Gissler M, Hemminki E, Lönnqvist J, et al. Suicides after pregnancy in Finland, 1987-94: register linkage study. *BMJ* 1996; 313(7070): 1431–1434.

84. Gissler M, Kauppila R, Meriläinen J, et al. Pregnancy-associated deaths in Finland 1987–1994 – definition problems and benefits of record linkage. *Acta Obstet Gynecol Scand* 1997; 76(7): 651–657.

85. Gissler M and Hemminki E. Pregnancy-related violent deaths. *Scand J Public Health* 1999; 27: 54–55.

86. Gissler M, Berg C, Bouvier-Colle M-H, et al. Pregnancy-associated mortality after birth, spontaneous abortion, or induced abortion in Finland, 1987–2000. *Am J Obstet Gynecol* 2004; 190(2): 422–427.

87. Gissler M, Berg C, Bouvier-Colle M-H, et al. Injury deaths, suicides and homicides associated with pregnancy, Finland 1987–2000. *Eur J Public Health* 2005; 15(5): 459–463.

88. Gissler M, Karalis E and Ulander V-M. Decreased suicide rate after induced abortion, after the Current Care Guidelines in Finland 1987–2012. *Scand J Public Health* 2014; 43(1): 99–101.

89. Reardon DC and Coleman PK. Short and long term mortality rates associated with first pregnancy outcome: population register based study for Denmark 1980–2004. *Med Sci Monit* 2012; 18(9): PH71–PH76.

90. Coleman PK, Reardon DC and Calhoun BC. Reproductive history patterns and long-term mortality rates: a Danish, population-based record linkage study. *Eur J Public Health* 2013; 23(4): 569–574.

91. Shelton JD and Schoenbucher AK. Deaths after legally induced abortion linkage. *Public Health Rep* 1978; 93(4): 375–378.

92. Reardon DC, Ney PG, Scheuren F, et al. Deaths associated with pregnancy outcome: a record linkage study of low income women. *South Med J* 2002; 95(8): 834–841.

93. Burke T and Reardon DC. *Forbidden grief: the unspoken pain of abortion*. Springfield IL: Acorn Books, 2007, p. 334.

94. Raymond EG and Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. *Obstet Gynecol* 2012; 119(2 Pt 1)215–219.

95. Grimes DA, Benson J, Singh S, et al. Unsafe abortion: the preventable pandemic. *Lancet* 2006; 368: 1908–1919.

96. Major B. Psychological implications of abortion – highly charged and rife with misleading research. *CMAJ* 2003; 168(10): 1257–1258.

97. Reardon DC and Ney PG. Abortion and subsequent substance abuse. *Am J Drug Alcohol Abuse* 2000; 26(1): 61–75.

98. Coyle CT. Coercion and/or pressure. In: Macnair RM (ed.) *Peace psychology perspectives on abortion*. Kansas City, MO: Feminism & Nonviolence Studies Association, 2016.

99. Stotland NL. Abortion: social context, psychodynamic implications. *Am J Psychiatry* 1998; 155(7): 964–967.

100. Rue VM, Coleman PK, Rue JJ, et al. Induced abortion and traumatic stress: a preliminary comparison of American and Russian women. *Med Sci Monit* 2004; 10(10): SR5–SR16.

101. De Puy C and Dovitch D. *The healing choice: your guide to emotional recovery after an abortion*. New York: Simon & Schuster, 1997.

102. Torre-Bueno A. *Peace after abortion*. San Diego, CA: Pimpernel Press, 1997.

103. Layer SD. Postabortion grief: evaluating the possible efficacy of a spiritual group intervention. *Res Soc Work Pract* 2004; 14(5): 344–350.

104. Major B, Appelbaum M, Beckman L, et al. *Report of the APA task force on mental health and abortion*. Washington, DC: American Psychological Association, 2008, p. 105.

# Exhibit 36

2019 FDA Abbreviated New Drug Application (ANDA)
Approval Letter to GenBioPro, Inc. (Apr. 11, 2019)

ANDA 091178

**ANDA APPROVAL**

(b) (6), (b) (4)

GenBioPro, Inc.

(b) (6), (b) (4)

Attention:          (b) (6), (b) (4)

Dear Sir:

This letter is in reference to your abbreviated new drug application (ANDA) received for review on February 3, 2009, submitted pursuant to section 505(j) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) for Mifepristone Tablets, 200 mg.

Reference is also made to the complete response letter issued by this office on February 23, 2018, and to any amendments thereafter.

We have completed the review of this ANDA and have concluded that adequate information has been presented to demonstrate that the drug is safe and effective for use as recommended in the submitted labeling.  Accordingly, the ANDA is **approved**, effective on the date of this letter.  The                    (b) (6) has determined your Mifepristone Tablets, 200 mg, to be bioequivalent and, therefore, therapeutically equivalent to the reference listed drug (RLD), Mifeprex Tablets, 200 mg, of Danco Laboratories, LLC.

Under section 506A of the FD&C Act, certain changes in the conditions described in this ANDA require an approved supplemental application before the change may be made.

## RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS

Section 505-1 of the FD&C Act authorizes FDA to require the submission of a risk evaluation and mitigation strategy (REMS), if FDA determines that such a strategy is necessary to ensure that the benefits of the drug outweigh the risks [section 505-1(a)].  In accordance with section 505-1(i) of the FD&C Act, a drug that is the subject of an ANDA under section 505(j) is subject to certain elements of the REMS required for the applicable listed drug.

The details of the REMS requirements were outlined in our letter dated June 15, 2011. In that letter, you were also notified that pursuant to section 505-1(i) of the FD&C Act, a drug that is the subject of an ANDA and the listed drug it references must use a single, shared system for elements to assure safe use (ETASU), unless FDA waives that requirement.

Your REMS, known as the Mifepristone REMS Program, submitted on May 30, 2017; is approved, and will be posted on the FDA REMS website: http://www.fda.gov/rems

The REMS consists of ETASU and an implementation system.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

Alliance.App. 457

EX. 36 pg. 01

ANDA 091178
Page 2

Your REMS must be fully operational before you introduce Mifepristone Tablets, 200 mg, into interstate commerce.

The Mifepristone REMS uses a single, shared system for the ETASU. This single, shared system REMS Program currently includes the products listed on the FDA REMS website, available at http://www.fda.gov/rems.  Other products may be added in the future if additional NDAs or ANDAs are approved.

Under section 505-1(g)(2)(C) of the FD&C Act, FDA can require the submission of a REMS assessment if FDA determines an assessment is needed to evaluate whether the REMS should be modified to ensure the benefits of the drug outweigh the risks or to minimize the burden on the healthcare delivery system of complying with the REMS.

We remind you that you must include an adequate rationale to support a proposed REMS modification for the addition, modification, or removal of any goal or element of the REMS, as described in section 505-1(g)(4) of the FD&C Act.

We also remind you that section 505-1(f)(8) of the FD&C Act prohibits holders of an approved covered application from using any element to assure safe use to block or delay approval of an application under section 505(b)(2) or (j). A violation of this provision in 505-1(f) could result in enforcement action.

Prominently identify any submission containing a REMS assessment or proposed modifications of the REMS with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

**ANDA 091178 REMS ASSESSMENT**

**NEW SUPPLEMENT FOR ANDA 091178/S-000**
**CHANGES BEING EFFECTED IN 30 DAYS**
**PROPOSED MINOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR ANDA 091178/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR ANDA 091178/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED REMS MODIFICATIONS DUE TO SAFETY LABELING CHANGES**
**SUBMITTED IN SUPPLEMENT XXX**

Should you choose to submit a REMS revision, prominently identify the submission containing the REMS revisions with the following wording in bold capital letters at the top of the first page of the submission:

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

Alliance.App. 458

EX. 36 pg. 02

ANDA 091178
Page 3

### REMS REVISION FOR ANDA 091178

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

### SUBMISSION OF REMS DOCUMENT IN SPL FORMAT

In addition to submitting the proposed REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS submission.

For more information on submitting REMS in SPL format, please email REMSWebsite@fda.hhs.gov

### REPORTING REQUIREMENTS

Postmarketing reporting requirements for this ANDA are set forth in 21 CFR 314.80-81 and 314.98 and at section 506I of the FD&C Act. The Agency should be advised of any change in the marketing status of this drug or if this drug will not be available for sale after approval. In particular, under section 506I(b) of the FD&C Act, you are required to notify the Agency in writing within 180 days from the date of this letter if this drug will not be available for sale within 180 days from the date of approval. As part of such written notification, you must include (1) the identity of the drug by established name and proprietary name (if any); (2) the ANDA number; (3) the strength of the drug; (4) the date on which the drug will be available for sale, if known; and (5) the reason for not marketing the drug after approval.

### PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling materials prior to publication or dissemination. Please note that these submissions are voluntary. To do so, submit, in triplicate, a cover letter requesting advisory comments, the proposed materials in draft or mock-up form with annotated references, and the package insert (PI), Medication Guide, and patient PI (as applicable) to:

>           OPDP Regulatory Project Manager
>           Food and Drug Administration
>           Center for Drug Evaluation and Research
>           Office of Prescription Drug Promotion
>           5901-B Ammendale Road
>           Beltsville, MD 20705

Alternatively, you may submit a request for advisory comments electronically in eCTD format. For more information about submitting promotional materials in eCTD format, see the draft Guidance for Industry (available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM443702.pdf).

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

Alliance.App. 459

ANDA 091178
Page 4

You must also submit final promotional materials and package insert(s), accompanied by a
Form FDA 2253, at the time of initial dissemination or publication [21 CFR 314.81(b)(3)(i)].
Form FDA 2253 is available at
http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf.
Information and Instructions for completing the form can be found at
http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf.  For
more information about submission of promotional materials to the Office of Prescription Drug
Promotion (OPDP), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

## ANNUAL FACILITY FEES

The Generic Drug User Fee Amendments of 2012 (GDUFA) (Public Law 112-144, Title III)
established certain provisions[1] with respect to self-identification of facilities and payment of
annual facility fees.  Your ANDA identifies at least one facility that is subject to the
self-identification requirement and payment of an annual facility fee.  Self-identification must
occur by June 1st of each year for the next fiscal year.  Facility fees must be paid each year by
the date specified in the *Federal Register* notice announcing facility fee amounts.

All finished dosage forms (FDFs) or active pharmaceutical ingredients (APIs) manufactured in a
facility that has not met its obligations to self-identify or to pay fees when they are due will be
deemed misbranded.  This means that it will be a violation of federal law to ship these products
in interstate commerce or to import them into the United States.  Such violations can result in
prosecution of those responsible, injunctions, or seizures of misbranded products.  Products
misbranded because of failure to self-identify or pay facility fees are subject to being denied
entry into the United States.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

EX. 36 pg. 04

ANDA 091178
Page 5

## CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, submit, using the FDA automated drug registration and listing system (eLIST), the content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format, as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm, that is identical in content to the approved labeling (including the package insert, and any patient package insert and/or Medication Guide that may be required).  Information on submitting SPL files using eLIST may be found in the guidance for industry titled "SPL Standard for Content of Labeling Technical Qs and As" at http://www.fda.gov/downloads/DrugsGuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.  The SPL will be accessible via publicly available labeling repositories.

Sincerely yours,

*{See appended electronic signature page}*

(b) (6)

Center for Drug Evaluation and Research

---

1  Some of these provisions were amended by the Generic Drug User Fee Amendments of 2017 (GDUFA II) (Public Law 115-52, Title III).

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

EX. 36 pg. 05

Digitally signed by (b) (6)
Date: 4/11/2019 02:22:21PM
GUID: 54078879000a1b9e15dd31ed6f0343ca

EX. 36 pg. 06

# Exhibit 37

2019 FDA Supplemental Approval Letter to Danco
Laboratories, LLC (Apr. 11, 2019)

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring MD 20993**

NDA 020687/S-022

**SUPPLEMENT APPROVAL**

Danco Laboratories, LLC
(b) (4), (b) (6)

P.O. Box 4816
New York, NY 10185

Dear (b) (4), (b) (6) :

Please refer to your Supplemental New Drug Application (sNDA) dated November 4, 2015, received November 5, 2015, and your amendments, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Mifeprex (mifepristone) Tablets.

This Prior Approval supplemental new drug application proposes modifications to the approved risk evaluation and mitigation strategy (REMS) for Mifeprex to establish a single, shared system (SSS) REMS for mifepristone products for the medical termination of intrauterine pregnancy and updates to the approved Prescribing Information, Medication Guide, and REMS materials including the Prescriber Agreement and Patient Agreement Forms to incorporate language reflecting the proposed SSS REMS.

**APPROVAL & LABELING**

We have completed our review of this supplemental application, as amended. It is approved, effective on the date of this letter, for use as recommended in the enclosed, agreed-upon labeling text.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, submit the content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using the FDA automated drug registration and listing system (eLIST), as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm. Content of labeling must be identical to the enclosed labeling (text for the Prescribing Information and Medication Guide), with the addition of any labeling changes in pending "Changes Being Effected" (CBE) supplements, as well as annual reportable changes not included in the enclosed labeling.

Information on submitting SPL files using eList may be found in the guidance for industry titled "SPL Standard for Content of Labeling Technical Qs and As" at:

Alliance.App. 464

EX. 37 pg. 01

NDA 020687/S-022
Page 2

http://www.fda.gov/downloads/DrugsGuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible from publicly available labeling repositories.

Also within 14 days, amend all pending supplemental applications that include labeling changes for this NDA, including CBE supplements for which FDA has not yet issued an action letter, with the content of labeling [21 CFR 314.50(l)(1)(i)] in Microsoft Word format, that includes the changes approved in this supplemental application, as well as annual reportable changes. To facilitate review of your submission(s), provide a highlighted or marked-up copy that shows all changes, as well as a clean Microsoft Word version. The marked-up copy should provide appropriate annotations, including supplement number(s) and annual report date(s).

**RISK EVALUATION AND MITIGATION STRATEGY REQUIREMENTS**

The REMS for Mifeprex (mifepristone) Tablets was originally approved on June 8, 2011. The most recent modification was approved on March 29, 2016. The REMS consists of elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS. Your proposed modifications to the REMS establish a SSS REMS for the elements to assure safe use and the implementation system required for the reference listed drug (RLD) Mifeprex and ANDAs referencing Mifeprex, called the Mifepristone REMS Program.

Your proposed modified REMS, submitted on January 25, 2018, and appended to this letter, is approved.

The timetable for submission of assessments of the REMS must be revised to one year from the date of the initial approval of the SSS REMS (04/11/19) and every three years thereafter.

The revised REMS assessment plan must include, but is not limited to, the following:

Both cumulative data from the date of the initial approval of the SSS REMS (04/11/19) and data from the reporting period (i.e., from the preceding Mifeprex REMS assessment cut-off date to the cut-off date for the Mifepristone REMS Program.)

**REMS Assessment Plan**
Provide each metric for the current reporting period and cumulative for the RLD and ANDA(s):
1. Number of prescribers enrolled
2. Number of prescribers ordering mifepristone
3. Number of healthcare providers who attempted to order mifepristone who were not enrolled; describe actions taken
4. Number of women exposed to mifepristone
5. Summary and analysis of any program deviations and corrective action taken
6. Based on the information reported, an assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed

Alliance.App. 465

EX. 37 pg. 02

NDA 020687/S-022
Page 3

The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether 1 or more such goals or such elements should be modified.

We remind you that in addition to the REMS assessments submitted according to the timetable in the approved REMS, you must include an adequate rationale to support any proposed REMS modification for the addition, modification, or removal of any of goal or element of the REMS, as described in section 505-1(g)(4) of the FDCA.

We also remind you that you must submit a REMS assessment when you submit any future supplemental application for a new indication for use as described in section 505-1(g)(2)(A) of the FDCA. This assessment should include:

a) An evaluation of how the benefit-risk profile will or will not change with the new indication;

b) A determination of the implications of a change in the benefit-risk profile for the current REMS;

c) *If the new indication for use introduces unexpected risks*: A description of those risks and an evaluation of whether those risks can be appropriately managed with the currently approved REMS.

d) *If a REMS assessment was submitted in the 18 months prior to submission of the supplemental application for a new indication for use*: A statement about whether the REMS was meeting its goals at the time of that the last assessment and if any modifications of the REMS have been proposed since that assessment.

e) *If a REMS assessment has not been submitted in the 18 months prior to submission of the supplemental application for a new indication for use:* Provision of as many of the currently listed assessment plan items as is feasible.

f) *If you propose a REMS modification based on a change in the benefit-risk profile or because of the new indication of use, submit an adequate rationale to support the modification, including*: Provision of the reason(s) why the proposed REMS modification is necessary, the potential effect on the serious risk(s) for which the REMS was required, on patient access to the drug, and/or on the burden on the health care delivery system; and other appropriate evidence or data to support the proposed change. Additionally, include any changes to the assessment plan necessary to assess the proposed modified REMS. *If you are not proposing REMS modifications*, provide a rationale for why the REMS does not need to be modified.

If the assessment instruments and methodology for your REMS assessments are not included in the REMS supporting document, or if you propose changes to the submitted assessment instruments or methodology, you should update the REMS supporting document to include specific assessment instrument and methodology information at least 90 days before the assessments will be conducted. Updates to the REMS supporting document may be included in a new document that references previous REMS supporting document submission(s) for unchanged portions. Alternatively, updates may be made by modifying the complete previous

EX. 37 pg. 03

Reference ID: 4418041

NDA 020687/S-022
Page 4

REMS supporting document, with all changes marked and highlighted. Prominently identify the submission containing the assessment instruments and methodology with the following wording in bold capital letters at the top of the first page of the submission:

**NDA 020687 REMS CORRESPONDENCE**
**(insert concise description of content in bold capital letters, e.g.,**
**UPDATE TO REMS SUPPORTING DOCUMENT - ASSESSMENT**
**METHODOLOGY**

An authorized generic drug under this NDA must have an approved REMS prior to marketing. Should you decide to market, sell, or distribute an authorized generic drug under this NDA, contact us to discuss what will be required in the authorized generic drug REMS submission.

We remind you that section 505-1(f)(8) of FDCA prohibits holders of an approved covered application with elements to assure safe use from using any element to block or delay approval of an application under section 505(b)(2) or (j). A violation of this provision in 505-1(f) could result in enforcement action.

Prominently identify any submission containing the REMS assessments or proposed modifications of the REMS with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

**NDA 020687 REMS ASSESSMENT**

**NEW SUPPLEMENT FOR NDA 020687/S-000/ SECONDARY TRACKING**
**NUMBER**
**CHANGES BEING EFFECTED IN 30 DAYS**
**PROPOSED MINOR REMS MODIFICATION**

*Or*

**NEW SUPPLEMENT FOR NDA 020687/S-000/ SECONDARY TRACKING**
**NUMBER**
**PRIOR APPROVAL SUPPLEMENT**
     **PROPOSED REMS MODIFICATIONS DUE TO SAFETY LABEL**
     **CHANGES SUBMITTED IN SUPPLEMENT XXX**

*Or*

**NEW SUPPLEMENT (NEW INDICATION FOR USE)**
  **FOR NDA 020687/S-000**
     **REMS ASSESSMENT**
     **PROPOSED REMS MODIFICATION (if included)**

Should you choose to submit a REMS revision, prominently identify the submission containing the REMS revisions with the following wording in bold capital letters at the top of the first page

Reference ID: 4418041

EX. 37 pg. 04

NDA 020687/S-022
Page 5

of the submission:

### REMS REVISIONS FOR NDA 020687

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

### SUBMISSION OF REMS DOCUMENT IN SPL FORMAT

FDA can accept the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, as soon as possible, but no later than 14 days from the date of this letter, submit the REMS document in SPL format using the FDA automated drug registration and listing system (eLIST).

For more information on submitting REMS in SPL format, please email REMS_Website@fda.hhs.gov.

### REQUIRED PEDIATRIC ASSESSMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Because none of these criteria apply to your application, you are exempt from this requirement.

### REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call                                                          (b) (6)



Sincerely,

*{See appended electronic signature page}*

Center for Drug Evaluation and Research

Reference ID: 4418041

NDA 020687/S-022
Page 6

ENCLOSURES:
  Content of Labeling
    Prescribing Information
    Medication Guide
  REMS

Alliance.App. 469

EX. 37 pg. 06

----------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

----------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b) (6)

04/11/2019 02:13:59 PM

Alliance.App. 470