NO. 23-10362

## IN THE UNITED STATES COURT
## OF APPEALS FOR THE FIFTH CIRCUIT

Alliance for Hippocratic Medicine, et al.,
*Plaintiffs-Appellees*
v.
Food & Drug Administration, et al.,
*Defendants-Appellants*
Danco Laboratories, LLC*,*
*Intervenor Defendant-Appellant*

On Appeal from the United States District Court for the Northern District of Texas,
Amarillo Division, No. 2:22-cv-00223

## BRIEF OF *AMICI CURIAE* DOCTORS FOR AMERICA AND THE
## REPRODUCTIVE HEALTH COALITION IN SUPPORT OF
## DEFENDANTS-APPELLANTS

Thomas S. Leatherbury
THOMAS S. LEATHERBURY LAW, PLLC
Cumberland Hill School Building
1901 N. Akard St
Dallas, TX 75201
Tel.: (214) 213-5004
Tom@tsleatherburylaw.com

*Counsel for Amici Curiae*
*Doctors for America and*
*The Reproductive Health Coalition*

## <u>SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS</u>

1. No. 23-10362, *Alliance for Hippocratic Medicine, et al., v. Food & Drug Administration*, *et al.*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellants' Certificate of Interested Persons—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

***<u>Amici Curiae</u>***
Doctors for America
The Reproductive Health Coalition

***<u>Attorneys for Amici Curiae</u>***
Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Christopher J. Morten
Columbia Law School Science, Health & Information Clinic

No publicly traded company has an ownership interest of 10% in any of the entities listed above.

Respectfully submitted*,*
*/s/ Thomas S. Leatherbury*

Thomas S. Leatherbury
*Counsel for Amici Curiae Doctors for America & The Reproductive Health Coalition*

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES.................................................................................... iii

I.   INTEREST OF AMICI CURIAE ...................................................................1

II.  SUMMARY OF ARGUMENT.......................................................................4

III. ARGUMENT ..................................................................................................5

   A. Providers affirm the safety and effectiveness of mifepristone........................5

   B. Providers underscore that mifepristone is a standard treatment option not only for abortion, but also for early pregnancy loss.............................................8

   C. Providers emphasize that the availability of mifepristone is essential to protect patient autonomy.....................................................................................12

IV.  CONCLUSION .............................................................................................17

# TABLE OF AUTHORITIES

**Regulatory Documents**

U.S. Food & Drug Admin. Ctr. For Drug Evaluation & Rsch., Approval Letter for mifepristone (MIFEPREX) tablets ........................................................................4

U.S. FOOD & DRUG ADMIN. CTR. FOR DRUG EVALUATION & RSCH., MEDICAL OFFICER'S REVIEW OF AMENDMENTS 024 AND 033 FINAL REPORTS FOR THE U.S. CLINICAL TRIALS INDUCING ABORTION UP TO 63 DAYS GESTATIONAL AGE AND COMPLETE RESPONSES REGARDING DISTRIBUTION SYSTEM AND PHASE 4 COMMITMENTS ..........................................................................................................5

**Other Authorities**

*Adolescents: Safety and Effectiveness*, IPAS ...........................................................14

American College of Obstetricians and Gynecologists, *ACOG Committee Opinion No. 390, December 2007. Ethical decision making in obstetrics and gynecology*, 110 OBSTETRICS & GYNECOLOGY 1479 ................................................................12

American College of Obstetricians and Gynecologists, *ACOG Practice Bulletin No. 200: Early Pregnancy Loss*, 132 OBSTETRICS & GYNECOLOGY e197 ............2

Melissa J. Chen & Mitchell D. Creinin, *Mifepristone With Buccal Misoprostol for Medical Abortion: A Systematic Review.*, 126 OBSTETRICS & GYNECOLOGY 12 ..6

*Citizen Petition from the American College of Obstetricians and Gynecologists* ....2

Kelly Cleland et al., *Significant Adverse Events and Outcomes After Medical Abortion*, 121 OBSTETRICS & GYNECOLOGY 166 ....................................................5

Greer Donley, *Medication Abortion Exceptionalism*, 107 CORNELL L. REV. 627 ....6

Decl. of Katherine B. Glaser, M.D., Ex. 7, *Alliance for Hippocratic Medicine et al v. U.S. Food and Drug Administration et al.*, No. 2:22-cv-00223 (N.D. Tex. Jan. 13, 2023), *appeal docketed*, No. 23-10362 (5th Cir. Apr. 10, 2023), ECF No. 28 ................................................................................................................................12

*The Harms of Denying a Woman a Wanted Abortion Findings from the Turnaway Study*, ANISH .....................................................................................................13

Jillian T. Henderson et al., *Safety of mifepristone abortions in clinical use*, 72 CONTRACEPTION 175 .............................................................................................7

SAUL D. HOFFMAN & REBECCA A. MAYNARD, KIDS HAVING KIDS: ECONOMIC
    COSTS AND SOCIAL CONSEQUENCES OF TEEN PREGNANCY (2d ed. 2008)...........14

Katherine Kortsmit et al., *Abortion Surveillance – United States, 2019*, 70(9)
    SURVEILLANCE SUMMARIES 1 ............................................................................14

Lawrence Leeman et al., *Can mifepristone medication abortion be successfully
    integrated into medical practices that do not offer surgical abortion?*, 76
    CONTRACEPTION 96 ...............................................................................................7

Man-Wa Lui & Pak-Chung Ho, *First trimester termination of pregnancy,* 63 BEST
    PRACTICE & RESEARCH CLINICAL OBSTETRICS & GYNAECOLOGY 13 (2020) .......6

Honor Macnaughton, Melissa Nothnagle & Jessica Early, *Mifepristone and
    Misoprostol for Early Pregnancy Loss and Medication Abortion*, 103 AM. FAM.
    PHYSICIAN 473........................................................................................................8

Andrea Palmer, *Abortion Restrictions Rob Our Patients of Self-Determination*,
    MEDPAGE TODAY ................................................................................................15

Rachel H. Phelps, Eric A. Schaff, Stephen L. Fielding, *Mifepristone Abortion in
    Minors*, 64(6) CONTRACEPTION 339, 339 (2001) ................................................14

Reshma Ramachandran, *Written Testimony of Reshma Ramachandran, M.D.,
    M.P.P. at Hearing on "FDA User Fee Reauthorization: Ensuring Safe and
    Effective Drugs and Biologics" Subcommittee on Health*, DOCTORS FOR
    AMERICA (2022) ...................................................................................................2

*Safety and Effectiveness of First-trimester Medication Abortion in the United
    States*, ADVANCING NEW STANDARDS IN REPROD. HEALTH..................................5

Courtney A. Schreiber et al., *Mifepristone Pretreatment for the Medical
    Management of Early Pregnancy Loss*, 378 NEW ENG. J. MED. 2161 ............8, 11

## I.    INTEREST OF AMICI CURIAE

*Amici* Doctors for America ("DFA") and The Reproductive Health Coalition

("RHC") file this Amicus Brief in support of Defendants-Appellants' emergency

motions for a stay of the district court's order pending appeal.[1]

DFA is a nonpartisan, not-for-profit, 501(c)(3) organization of over 27,000

physician and medical student advocates in all 50 states, representing all medical

specialties. DFA mobilizes doctors and medical students to be leaders in putting

patients over politics to improve the health of patients, communities, and the nation.

DFA takes a special interest in access to affordable care, community health and

prevention, and health justice and equity. DFA focuses solely on what is best for

patients, not on the business side of medicine, and does not accept any funding from

pharmaceutical or medical device companies. This uniquely positions DFA as a

medical organization that puts *patients over politics* and *patients over profits*.

In support of its mission, DFA formed an FDA Task Force to educate,

mobilize, and empower a multispecialty group of clinicians to provide unbiased

expertise in evaluating and responding to the FDA regulatory process in a way that

maximizes meaningful clinical outcomes for patients. To support an FDA that puts

patients first, the FDA Task Force has advocated in support of patient-centered

---

[1] This brief is submitted with the consent of all parties. Undersigned counsel for amici curiae
certify that this brief was not authored in whole or part by counsel for any of the parties; no party
or party's counsel contributed money for the brief; and no one other than amici and their counsel
have contributed money for this brief.

1

regulatory reform through public testimony, op-eds, educational meetings with policymakers, and more. For example, DFA's FDA Task Force has written letters, testified, and met with policymakers to advocate for reforms to the Prescription Drug User Fee Act ("PDUFA") to make user fee agreements more patient-centered in order to ensure timely access to drugs and biologic medicines proven to be effective and safe.[2] Recently, the FDA Task Force has also advocated for the addition of miscarriage[3] management as an indication to mifepristone's label "[t]o ensure access to the safest and most effective treatments for miscarriage, and to preserve patient choice in miscarriage management."[4]

The RHC comprises a wide range of health professional associations and allied organizations, collectively representing over 150 million members, who advocate with a unified voice to protect access to reproductive care. The RHC was founded in June 2022 by the executive directors of Doctors for America and the American Medical Women's Association. The RHC's member organizations

---

[2] *Written Testimony of Reshma Ramachandran, M.D., M.P.P. at Hearing on "FDA User Fee Reauthorization: Ensuring Safe and Effective Drugs and Biologics" Subcommittee on Health*, DOCTORS FOR AMERICA (2022),
https://doctorsforamerica.org/written-testimony-of-reshma-ramachandran-m-d-m-p-p-athearing-on-fda-user-fee-reauthorization-ensuring-safe-and-effective-drugs-and-biologics-subcommittee-on-health/ (last visited Feb. 7, 2023).

[3] The terms "miscarriage" and "early pregnancy loss" are used interchangeably. *See* American College of Obstetricians and Gynecologists, *ACOG Practice Bulletin No. 200: Early Pregnancy Loss*, 132 OBSTETRICS & GYNECOLOGY e197 (2018).

[4] *Citizen Petition from the American College of Obstetricians and Gynecologists*,
https://emaaproject.org/wp-content/uploads/2022/10/Citizen-Petition-from-the-American-College-of-Obstetrician-and-Gynecologists-et-al-10.3.22-EMAA-website.pdf (last visited Feb. 7, 2023).

include Doctors for America, American Medical Women's Association, ACT Access, American College of Physicians, American Pediatric Surgical Association, Civic Health Alliance, Daré Bioscience, Doctors For Fertility, Genius Shield, Georgia Health Professionals for Reproductive Justice, GLMA: Health Professionals Advancing LGBTQ+ Equality, Healthcare Across Borders, Indiana Pelvic Pain Specialists, Medical Students for Choice, National Association of Nurse Practitioners in Women's Health, National Coalition on Health Care, National Medical Association, Nurses for America, Patient Care Heroes, Renalis Health, Shattering Glass, The Innovators Law Firm, Vot-ER, Women in Medicine®, and Women in Medicine, Inc. The RHC's work focuses on a patient's right to dignity, autonomy, privacy, and the expectation of a trusted relationship with their clinician; protection of the clinician's ethical obligation to provide care, including their access to comprehensive training; and a commitment to an evidence-based approach to policy and practice. The RHC supports the rights of all individuals to have access to the full scope of reproductive healthcare, including abortion.

*Amici* have a strong interest in protecting the autonomy of patients and providers and upholding evidence-based medical care. *Amici* submit this brief to highlight the ways in which mifepristone, which has been approved for use in the

3

United States for over twenty years,[5] supports the practice of physicians across the United States. The stay of mifepristone's approval could disrupt medical practice nationwide, including care for conditions beyond induced abortion, such as the management of early pregnancy loss.

## II.    SUMMARY OF ARGUMENT

Doctors across the country wish to express to this Court their concerns about the potential stay of mifepristone's FDA approval, which could have grave ramifications. This amicus brief contains first-hand accounts from physicians across many practice areas about the harms that a stay of mifepristone's approval could cause.[6] In the series of narratives that follows, providers affirm the safety and effectiveness of mifepristone; underscore that mifepristone is a standard treatment option not only for abortion, but also for early pregnancy loss (miscarriage); and emphasize that the availability of mifepristone is essential to protect patient autonomy. These accounts, in providers' own words, describe how loss of access to mifepristone would jeopardize physicians' ability to provide safe and effective healthcare, undermine the patient-physician relationship, and impose upon doctors

---

[5] U.S. Food & Drug Admin. Ctr. For Drug Evaluation & Rsch., Approval Letter for mifepristone (MIFEPREX) tablets (Sep. 28, 2000), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.htm.

[6] The accounts presented in this amicus brief were provided directly to counsel by the doctors quoted. All the doctors quoted are members of Doctors for America.

an unacceptable choice between compliance with their ethical obligations and compliance with the law.

## III.   ARGUMENT

### A. Providers affirm the safety and effectiveness of mifepristone.

Medical research has consistently demonstrated that mifepristone is safe and effective and that adverse events and outcomes are exceedingly rare, occurring in less than a fraction of 1% of cases.[7] The safety and effectiveness of mifepristone has been demonstrated through rigorous investigation conducted prior to the FDA's approval of mifepristone and further confirmed by a large volume of scientific literature published after its approval. Studies supplied to the FDA at the time of approval in 2000 found adverse events requiring hospitalization in less than 1% of a sample size of over 2,000 patients.[8]

Many studies have shown that serious adverse incidents occur in less than 0.5% of medication abortions in the United States.[9] Moreover, adverse events data tracked by the FDA reveals that mifepristone has a very low mortality rate of 0.65

---

[7] Kelly Cleland et al., *Significant Adverse Events and Outcomes After Medical Abortion*, 121 OBSTETRICS & GYNECOLOGY 166, 166 (2013).

[8] U.S. FOOD & DRUG ADMIN. CTR. FOR DRUG EVALUATION & RSCH., MEDICAL OFFICER'S REVIEW OF AMENDMENTS 024 AND 033 FINAL REPORTS FOR THE U.S. CLINICAL TRIALS INDUCING ABORTION UP TO 63 DAYS GESTATIONAL AGE AND COMPLETE RESPONSES REGARDING DISTRIBUTION SYSTEM AND PHASE 4 COMMITMENTS (2000), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_medr_P1.pdf.

[9] *Safety and Effectiveness of First-trimester Medication Abortion in the United States*, ADVANCING NEW STANDARDS IN REPROD. HEALTH (June 2021), https://www.ansirh.org/sites/default/files/2021-06/medication-abortion-safety_2021_FINAL.pdf.

per 100,000.[10] Mifepristone has a lower mortality rate than other common medications such as sildenafil (Viagra), which has a mortality rate more than six times greater than mifepristone, and penicillin, which has a mortality rate three times greater than mifepristone.[11] Furthermore, numerous studies have shown the combined mifepristone/misoprostol regimen to be more than 95% effective.[12] The providers' accounts presented here affirm that mifepristone has proven safe and effective in providers' practices. If mifepristone were to be made unavailable, it would not make treatment safer but would instead endanger the health of pregnant people.

Dr. Cheryl Hamlin is an obstetrician-gynecologist who now practices in Massachusetts. She attended medical school at the University of Illinois and completed her residency at Boston Medical Center. Dr. Hamlin provides a first-hand account of mifepristone's safety profile and its ability to expand access to care:

> Mifepristone is widely used both as a medication used to terminate a pregnancy as well as for medical management of a miscarriage. While misoprostol is widely available globally, the combination of mifepristone and misoprostol is more effective. Patients who wish to avoid a surgical procedure have the option of medical management for both miscarriage and termination of pregnancy or an aspiration

---

[10] Greer Donley, *Medication Abortion Exceptionalism*, 107 CORNELL L. REV. 627, 651-52 (2022).

[11] *Id.*

[12] *See, e.g.*, Melissa J. Chen & Mitchell D. Creinin, *Mifepristone With Buccal Misoprostol for Medical Abortion: A Systematic Review.*, 126 OBSTETRICS & GYNECOLOGY 12 (2015); Man-Wa Lui & Pak-Chung Ho, *First trimester termination of pregnancy,* 63 BEST PRACTICE & RESEARCH CLINICAL OBSTETRICS & GYNAECOLOGY 13, 20 (2020).

procedure. Eliminating the option of mifepristone would significantly affect the options and therefore the health of those in need of this treatment.

Patients have a wide range of reasons to choose medication management over an aspiration procedure. Some choose medication abortion because they are afraid of a surgical procedure. Others, who are driving long distances, may not be able to get a ride. They then have the option of a procedure without anesthesia.

Most importantly, mifepristone means improved access to care. Outpatient offices which may not have the capability of providing aspiration procedures may be able to readily provide medication abortion.[13] Advanced practitioners and providers other than OB/GYNs may be more comfortable providing medical procedures. It can be and should be easy for providers to offer medication abortion in the office setting.

As well, there is a mountain of evidence that mifepristone is extremely safe. Mifepristone has been used since 2000 in the United States and longer in Europe. The risk of serious complications is extremely rare and certainly far less likely than the risks of childbirth.[14] Most of the complications associated with medical abortions are due to the process itself, not the mifepristone. Mifepristone blocks progesterone, which disrupts the lining of the uterus. This, in fact, is what happens monthly to stimulate a menses: sudden withdrawal of progesterone. If mifepristone were inadvertently given to a non-menstruating person, it would likely have no effect.

Not having the full range of options to offer my patients would adversely affect my patients, potentially delaying care, causing them to

---

[13] Lawrence Leeman et al., *Can mifepristone medication abortion be successfully integrated into medical practices that do not offer surgical abortion?*, 76 CONTRACEPTION 96 (2007).

[14] Jillian T. Henderson et al., *Safety of mifepristone abortions in clinical use*, 72 CONTRACEPTION 175 (2005).

require more invasive procedures and subjecting them to the associated risks. Mifepristone must remain readily available to those for whom the best option is a medication procedure.

As Dr. Hamlin described, the safety and effectiveness of mifepristone is substantiated by scientific evidence showing that complications are extremely rare. A stay of the approval of mifepristone could endanger the health of patients by curtailing the availability of a safe and effective treatment option and inhibit the ability of physicians to provide evidence-based treatment grounded in the robust scientific data proving that mifepristone is safe and effective.

### B. Providers underscore that mifepristone is a standard treatment option not only for abortion, but also for early pregnancy loss.

The most effective treatment option for medication management of early pregnancy loss includes mifepristone taken in combination with misoprostol.[15] For successful management of early pregnancy loss, mifepristone followed by treatment with misoprostol is over 83% effective and results in complications requiring blood transfusion in only 2% of women.[16] A stay of the approval of mifepristone would curtail the availability of an evidence-based treatment that is the safest and best option for many patients. As physicians describe *infra*, inaccessibility of

---

[15] Honor Macnaughton, Melissa Nothnagle & Jessica Early, *Mifepristone and Misoprostol for Early Pregnancy Loss and Medication Abortion*, 103 Am. Fam. Physician 473 (2021).

[16] Courtney A. Schreiber et al., *Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss*, 378 New Eng. J. Med. 2161, 2161 (2018).

mifepristone would undermine their ability to provide safe and effective management of early pregnancy loss.

Dr. Cynthia Davis is an obstetrician-gynecologist in South Dakota. She attended medical School at the University of Florida and completed her residency at the University of Colorado. Dr. Davis conveys the importance of mifepristone for treating early pregnancy loss and the significant health and ethical harms that would occur were mifepristone to be removed as an option for treatment:

> I speak from the experience of an obstetrician-gynecologist in a state where it has always been very difficult to obtain mifepristone. I am not an abortion provider, but I can tell you that the difficulty of obtaining this drug in treating pregnancy loss has significantly harmed many of my patients. When it is clear that a woman has lost her pregnancy but has not passed the tissue, the use of mifepristone combined with misoprostol is over 90% effective in resolving the missed pregnancy loss, compared to the 75% success rate of misoprostol alone. Given how common first-trimester pregnancy loss is, this treatment delay, often resulting in significant bleeding, infection, and psychological trauma, is devastating. I have seen this result in women requiring blood transfusions and surgeries they otherwise would not have needed. I have seen women avoid any future pregnancies for fear of this situation's recurring trauma.
>
> Of course, other options exist to treat the clinical situations mentioned above. However, expectant management can result in acute bleeding episodes, increased risk of infection, anxiety, and depression, which I have witnessed in multiple patients over the years. Surgical management is often more expedient for clinical management. Still, there are risks, including bleeding, infection, uterine scarring resulting in infertility, and uterine perforation with possible damage to the bowel,

bladder, or blood vessels. In addition, the costs associated with surgical management are often more than the family can absorb.

And although there can be complications related to any medication, I have found mifepristone to be effective and safe in my many years of experience (over 30 years). It is heartbreaking to watch a family go through the difficulties related to pregnancy loss and, more so, to watch harm come to our women patients. Interference in the doctor-patient relationship by removing mifepristone as an approved drug disrespects a woman's autonomy and the sacred relationship between doctor and patient, much less the expertise in a physician's medical training.

Dr. Amy Kaleka is a family medicine provider in Wisconsin. She attended medical school at Central America Health Sciences University and completed her residency in family medicine at Virginia Tech Carilion School of Medicine. Dr. Kaleka explains the harms that inaccessibility of mifepristone would have on the management of early miscarriage, for which a standard treatment involves mifepristone:

I am a family medicine and obstetrics provider in a state where an abortion ban already exists and has resulted in unsafe care for pregnant patients as it is, but a ban on mifepristone would prevent me from being able to safely manage miscarriages in early pregnancy without hospitalizations. Having to stop providing abortion care to patients in Wisconsin for the past six months has revealed further difficulties for patients in rural settings, which are the same settings where no maternity wards exist in the hospital. These patients are now being forced to birth, so the risks of bleeding and poor fetal and maternal outcomes have significantly risen. Mifepristone is vital to providing safe care for early pregnancy loss.

Increasing restrictions on medications that can improve safety outcomes of pregnant patients will inevitably lead to worse maternal outcomes. As providers, we do our best to perform safe and high quality care to prevent complications. The availability of mifepristone allows me to provide safe and high quality miscarriage management care to patients, reducing their likelihood of complications which ultimately reduces health care costs by avoiding hospitalizations. The use of this medicine is vital for medication management of miscarriages per the latest medical guidelines.[17] I hope to continue to provide safe obstetric care, which involves mifepristone as an option for pregnant patients for both miscarriage and abortion care.

As Dr. Davis and Dr. Kaleka highlight, mifepristone is critical for managing early pregnancy loss. Loss of FDA approval of mifepristone could result in misoprostol being the only option for management of early pregnancy by medication. Medicine is practiced as a shared decision-making process between the physician and patient. For certain patients, mifepristone and misoprostol in combination may be the best option based on their individual therapeutic and psychological needs. For other patients, offering misoprostol alone or pursuing expectant or surgical management might be the indicated course of care that a physician and their patient agree upon. A stay of FDA approval of mifepristone could limit providers' ability to provide the evidence-based care that is best for individual patients, worsening maternal outcomes.

---

[17] *Id.* at 2162.

## C. Providers emphasize that the availability of mifepristone is essential to protect patient autonomy.

Respect for patient autonomy is a core tenet of physicians' professional ethics. The principle of respect for patient autonomy "acknowledges an individual's right to hold views, to make choices, and to take actions based on her own personal values and beliefs."[18] Respect for patient autonomy requires respect for the right of patients to make their own health care choices. It is therefore critical, and central to medical ethics, that patients have the option to choose the treatment that best suits them.

For many patients, a combined mifepristone/misoprostol regimen is the best option. Patients may prefer or require medication abortion over surgical abortion for a variety of reasons, including pre-existing medical conditions, privacy, time constraints, transportation, the desire to avoid an invasive procedure, or other practical concerns. For instance, patients who are victims of abuse, including rape or incest, may prefer medication abortion to avoid retraumatization.[19]

Dr. H.Y. Stephanie Liou is a pediatrician in Chicago. She attended medical school at the University of Washington School of Medicine and completed her residency in pediatrics at the University of Chicago Comer Children's Hospital. Dr.

---

[18] American College of Obstetricians and Gynecologists, *ACOG Committee Opinion No. 390, December 2007. Ethical decision making in obstetrics and gynecology*, 110 OBSTETRICS & GYNECOLOGY 1479, 1481 (Dec. 2007, reaff'd 2016).

[19] *See* Decl. of Katherine B. Glaser, M.D., Ex. 7, at 6, *Alliance for Hippocratic Medicine et al v. U.S. Food and Drug Administration et al.*, No. 2:22-cv-00223 (N.D. Tex. Jan. 13, 2023), *appeal docketed*, No. 23-10362 (5th Cir. Apr. 10, 2023), ECF No. 28. (Defendants-Appellants' Add.338, at Add.343.)

Liou describes the importance of pregnant persons' ability to make autonomous medical decisions and the unique harms that could result to children and families if mifepristone was made inaccessible.

> I became a pediatrician because I love caring for children of all ages, from newborns to teenagers, and building relationships with families. I have also witnessed how physically and emotionally difficult it is to be a parent. Much of the rhetoric around abortion ignores the reality that many women wish to end a pregnancy because they are seeking to be the best possible mother to the children they already have. My patients' mothers are sole breadwinners, unable to take time off from work. They already have children with special needs, who require round-the-clock attention. Others have already risked their lives for motherhood due to medical conditions that make pregnancy incredibly dangerous and have cried with me about their fear of leaving their child without a mother. Studies have shown that women who are turned away from receiving an abortion are more likely to experience bankruptcy or eviction, become or remain victims of physical violence, and develop life-threatening pregnancy complications such as eclampsia and hemorrhage.[20] Their resulting children are also more likely to live in poverty and have poorer developmental outcomes.[21] This is why I believe it is crucial that all pregnant people are afforded the right to choose whether they wish to carry out a pregnancy.
>
> One of my patients was a young toddler who had been diagnosed with asthma after numerous hospitalizations. His mother, a single parent, was struggling to make ends meet. She unexpectedly became pregnant and, after much thought and prayer, decided the right thing to do as a mother was to have an abortion. She was already stretched thin trying

---

[20] *The Harms of Denying a Woman a Wanted Abortion Findings from the Turnaway Study*, ANISH,

https://www.ansirh.org/sites/default/files/publications/files/the_harms_of_denying_a_woman_a_wanted_abortion_4-16-2020.pdf (last visited April 10, 2023).

[21] *Id.*

to give her toddler his medications multiple times a day while working two jobs to move out of their old, mold-filled apartment. Thanks to safe and timely access to mifepristone and misoprostol, she had an uneventful medical abortion at home while continuing to care for her son. Recently, she had her second child—a healthy baby boy—who was welcomed to this world by a very excited older brother in their beautiful, clean new apartment.

As a pediatrician in a country with one of the highest adolescent birth rates (as a result of inconsistent access to sex education and contraception), I have also witnessed firsthand how making mifepristone inaccessible would disproportionately affect adolescents. Approximately 1/3 of pregnant teenagers in the United States choose abortion, which accounts for around 9% of all abortions.[22] My teen patients depend on medication abortion, given the added cost, time, travel, and logistical support needed to receive a surgical procedure. Multiple large-scale studies involving thousands of adolescents across the world have demonstrated that medication abortion with mifepristone and misoprostol is safe and effective in this age group.[23]

On the other hand, adolescent pregnancy and parenting pose significant short- and long-term risks to the physical and emotional health of the mother and the child. My clinical experiences are supported by a large body of research, which shows lower rates of school completion, higher rates of single motherhood, higher rates of preterm birth and low birth weight, increased rates of incarceration among male children, and increased rates of teen motherhood among female children born to adolescent mothers.[24] Without safe access to mifepristone, our nation's

[22] Rachel H. Phelps, Eric A. Schaff, Stephen L. Fielding, *Mifepristone Abortion in Minors*, 64(6) CONTRACEPTION 339, 339 (2001); Katherine Kortsmit et al., *Abortion Surveillance – United States, 2019*, 70(9) SURVEILLANCE SUMMARIES 1, 13 (2021).

[23] *Adolescents: Safety and Effectiveness*, IPAS, https://www.ipas.org/clinical-update/english/recommendations-for-abortion-before-13-weeks-gestation/adolescents-safety-and-effectiveness/ (last visited April 10, 2023).

[24] SAUL D. HOFFMAN & REBECCA A. MAYNARD, KIDS HAVING KIDS: ECONOMIC COSTS AND SOCIAL CONSEQUENCES OF TEEN PREGNANCY (2d ed. 2008).

most vulnerable patients—children and adolescents—are the ones who will suffer the most. This is the absolute opposite of health equity.

Dr. Andrea Palmer is an obstetrician-gynecologist who lives and practices in Texas. She attended medical school at the University of Oklahoma College of Medicine and completed her residency at the University of Oklahoma Health Sciences Center. Dr. Palmer wishes to share with the Court an example of how loss of access to mifepristone would provide women with even fewer options following sexual assault or rape, restricting patient autonomy[25]:

> As I glanced at my schedule, I noticed with delight a familiar patient, Josie,[26] scheduled for a new OB appointment. However, the moment I walked in the room, I knew this was not a typical new pregnancy visit. Josie's appointment brought unexpected and devastating news. Two weeks ago, she had joined a group of girlfriends for a night out to celebrate a coworker's birthday. Like any dedicated infertility couple, she and her husband had been timing their intercourse around her ovulation time and had sex that day. Tragically, that night of celebration ended with her as a victim of the most personally violating crime. That night she was drugged and raped.
>
> Like most rape victims, Josie had stayed silent about her assault. Now two weeks after living with the shame, guilt, and pain of her attack she found out she was pregnant. Months and months of trying, years of hoping, and dozens of negative pregnancy tests later, and this was the one that was positive. Josie could not know who the father of this pregnancy was—her husband or the rapist. Obviously if this pregnancy

---

[25] A version of Dr. Palmer's account was originally published on Medpage Today: Andrea Palmer, *Abortion Restrictions Rob Our Patients of Self-Determination*, MEDPAGE TODAY (2022), https://www.medpagetoday.com/opinion/second-opinions/98103 (last visited Feb 7, 2023).
[26] Patient names have been changed to protect their privacy.

were conceived with her husband, this would be the beginning of the next phase of their life together. But there was an unfortunate chance that this pregnancy was a product of rape. Understandably, she could not bear the thought of carrying that pregnancy to term.

The soonest paternity could have been established was 7 weeks gestation. However, Josie lives, and I practice, in Texas. This was November 2021, just a few months after passage of SB8 which banned abortion in the state of Texas after 6 weeks. As Josie and I cried together, we reviewed her options. She could choose to terminate now, but time was running out. At this point, she was just over 4 weeks gestation. She could choose to wait and determine paternity, but if she were pregnant as a product of her rape, she would need to travel out of state for termination. This was not something that she had the resources to do. She could not afford the time off work interstate travel would have required, and the waitlist for appointments in surrounding states was growing daily. Waiting was not an option for her. Carrying a pregnancy and raising a baby that was a product of rape from a random stranger was not an option for her. Josie sought out medication abortion before her sixth week.

Josie barely had time to begin to process the trauma of her attack before she had to make an unwinnable, unfathomable choice. Her most precious dreams were stolen by a rapist, and her agency and options for self-determination were stolen by a legislature out to limit access to reproductive care without thought of the innumerable consequences they could not fathom, because they do not have to. Without access to mifepristone, more women may be forced to make unwinnable, unfathomable choices of their own.

The millions of nuanced reasons that women seek and consider abortion, sometimes ending very desired pregnancies, should be considered. The decision about pregnancy should be left to women and the doctors who counsel them, care for them, cry with them, celebrate and mourn with them.

As Dr. Liou and Dr. Palmer describe, respect for patient autonomy requires respect for the right of patients to make the difficult and nuanced choice to obtain a medication abortion. A stay of the FDA approval of mifepristone would intrude into the patient-physician relationship and deny patients the ability to make autonomous medical choices.

## IV.     CONCLUSION

For the foregoing reasons, DFA respectfully asks the Court to grant Defendants-Appellants' motions to extend the administrative stay and subsequently stay the district court's order pending appeal.

Dated: April 11, 2023                    Respectfully submitted,[27]

By:     */s/ Thomas S. Leatherbury*
        Thomas S. Leatherbury
        THOMAS S. LEATHERBURY LAW,
        PLLC.
        Cumberland Hill School Building
        1901 N. Akard St
        Dallas, TX 75201
        Tel.: (214) 213-5004
        Tom@tsleatherburylaw.com
        *Counsel of Record*
        *Counsel for Amici Curiae Doctors for*
        *America & The Reproductive Health*
        *Coalition*

---

[27] Counsel thanks the Columbia Law School Science, Health & Information Clinic for its many contributions to this brief and associated papers, including clinic students Emily M. Davidson, Matthew R. Tracy, and David O. Ratnoff and clinic director Christopher J. Morten.

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Thomas S. Leatherbury*
Thomas S. Leatherbury
*Counsel of Record*
*Counsel for Amici Curiae Doctors for America & The Reproductive Health Coalition*

## CERTIFICATE OF COMPLIANCE

This brief contains 4,475 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). In their attached motion for leave, amici curiae Doctors for America and The Reproductive Health Coalition have included a request for leave to submit an amici curiae brief of 4,475 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman font size 14.

> */s/ Thomas S. Leatherbury*
> Thomas S. Leatherbury
> *Counsel of Record*
> *Counsel for Amici Curiae Doctors for America & The Reproductive Health Coalition*