No. 23-10362

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR HIPPOCRATIC MEDICINE; AMERICAN ASSOCIATION OF
PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; AMERICAN COLLEGE OF
PEDIATRICIANS; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; SHAUN
JESTER, D.O.; REGINA FROST-CLARK, M.D.; TYLER JOHNSON, D.O.;
GEORGE DELGADO, M.D.,

Plaintiffs-Appellees,

v.

U.S. FOOD & DRUG ADMINISTRATION; ROBERT M. CALIFF, Commissioner of
Food and Drugs; JANET WOODCOCK, M.D., in her official capacity as Principal
Deputy Commissioner, U.S. Food and Drug Administration; PATRIZIA
CAVAZZONI, M.D., in her official capacity as Director, Center for Drug Evaluation
and Research, U.S. Food and Drug Administration; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA,
Secretary, U.S. Department of Health and Human Services,

Defendants-Appellants,

v.

DANCO LABORATORIES, L.L.C.,

Intervenor-Appellant.

On Appeal from the United States District Court
for the Northern District of Texas

## RECORD EXCERPTS

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

LEIGHA SIMONTON
*United States Attorney*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

MICHAEL S. RAAB
CYNTHIA A. BARMORE
*Civil Division, Appellate Staff
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530*

# TABLE OF CONTENTS

**Page**

Tab 1:  Docket Sheet.......................................................................ROA.1-73

Tab 2:  Notice of Appeal (Federal Appellants).......................ROA.4374-75

Tab 3:  Notice of Appeal (Intervenor Danco Laboratories) ..ROA.4376-77

Tab 4:  District Court Order and Opinion ............................ROA.4307-73

Tab 5:  Fifth Circuit Stay Decision  ..................................ROA.4378-4419

Certificate of Service

**TAB 1**

Docket Sheet

APPEAL

# U.S. District Court
# Northern District of Texas (Amarillo)
# CIVIL DOCKET FOR CASE #: 2:22-cv-00223-Z

| | |
|---|---|
| Alliance for Hippocratic Medicine et al v. U.S. Food and Drug Administration et al | Date Filed: 11/18/2022 |
| Assigned to: Judge Matthew J. Kacsmaryk | Jury Demand: None |
| Case in other court:  USCA5, 23-10362 | Nature of Suit: 899 Other Statutes: Administrative Procedure Act/Review or Appeal of Agency Decision |
| Cause: 05:702 Administrative Procedure Act | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **Alliance for Hippocratic Medicine** | represented by | **Erik Christopher Baptist** |
| | | Alliance Defending Freedom |
| | | 440 First Street NW |
| | | Washington, DC 20001 |
| | | 202-393-8690 |
| | | Email: ebaptist@adflegal.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Christian D Stewart** |
| | | Morgan Williamson LLP |
| | | 701 S Taylor |
| | | Suite 440 LB 103 |
| | | Amarillo, TX 79101 |
| | | 806-358-8116 |
| | | Fax: 806-358-1901 |
| | | Email: cstewart@mw-law.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Denise Harle** |
| | | Alliance Defending Freedom |
| | | 1000 Hurricane Shoals Rd., NE |
| | | Ste D1100 |
| | | Lawrenceville, GA 30043 |
| | | 770-339-0774 |
| | | Fax: 770-339-6744 |
| | | Email: dharle@adflegal.org |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Erica Steinmiller-Perdomo** |
| | | Alliance Defending Freedom |
| | | 440 First Street NW |
| | | Suite 600 |
| | | Washington, DC 20001 |

202-393-8690
Email: esteinmiller@adflegal.org
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
Alliance Defending Freedom
440 First Street NW
Suite 600
Washington, DC 20001
571-707-4655
Email: ehawley@adflegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
Alliance Defending Freedom
44180 Riverside Pkwy
Landsdowne, VA 20176
571-707-4655
Fax: 571-707-4790
Email: jblake@adflegal.org
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
Alliance Defending Freedom
440 First Street NW
Suite 600
Washington, DC 20001
202-393-8690
Fax: 202-346-3622
Email: mbowman@adflegal.org
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Plaintiff**</u>

**American Association of Pro-Life**          represented by     **Erik Christopher Baptist**
**Obstetricians & Gynecologists**                              (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*
                                                               *Bar Status: Admitted/In Good Standing*

                                                               **Christian D Stewart**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*
                                                               *Bar Status: Admitted/In Good Standing*

                                                               **Denise Harle**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*
                                                               *Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**American College of Pediatricians**          represented by   **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**Christian Medical & Dental Associations**          represented by   **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**Shaun Jester, D.O.**          represented by   **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**Regina Frost-Clark, M.D.**                represented by    **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

Tyler Johnson, D.O.                    represented by    **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**George Delgado, M.D.**                    represented by    **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Defendant**

**US Food and Drug Administration**          represented by    **Noah T Katzen**
DOJ-Civ
450 5th St NW
Washington, DC 20530
202-305-2428
Email: noah.t.katzen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
DOJ-Civ
Federal Programs Branch
1100 L Street, NW
Ste 12310
Washington, DC 20005
202-305-0568
Email: christopher.a.eiswerth@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
1100 L Street NW
Room 11532
Washington, DC 20002
202-305-8693
Fax: 202-616-8470
Email: daniel.s.schwei@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202-305-0167
Email: emily.b.nestler@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
US Dept of Justice Civil Div Federal
Programs Branch
1100 L Street NW, Room 11514
Washington, DC 20005
202-353-7633
Fax: 202-616-8470
Email: Julie.StrausHarris@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
US Department of Justice -Civil Division
1100 L Street NW
Washington, DC 20005
202-305-5267
Email: kate.talmor@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

represented by

**Robert M. Califf, M.D.**
*in his official capacity as Commissioner of*
*Food and Drugs, U.S. Food and Drug*
*Administration*

**Noah T Katzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Janet Woodcock, M.D.**
*in her official capacity as Principal Deputy*
*Commissioner, U.S. Food and Drug*
*Administration*

represented by **Noah T Katzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>**Defendant**</u>

**Patrizia Cavazzoni, M.D.**                    represented by    **Noah T Katzen**
*in her official capacity as Director, Center*                (See above for address)
*for Drug Evaluation and Research, U.S.*                *LEAD ATTORNEY*
*Food and Drug Administration*                *ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>**Defendant**</u>

**U.S. Department of Health and Human**          represented by    **Noah T Katzen**
**Services**                                (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Xavier Becerra**                                    represented by   **Noah T Katzen**
*in his official capacity as Secretary, U.S.*                          (See above for address)
*Department of Health and Human Services*                             *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

V.

**Intervenor Defendant**

**Danco Laboratories LLC**                    represented by    **Catherine Emily Stetson**
Hogan Lovells US LLP
555 13th Street NW
Washington DC, DC 20004
202-637-5491
Email: cate.stetson@hoganlovells.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jessica Lynn Ellsworth**
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
202-637-5886
Email: jessica.ellsworth@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kaitlyn Golden**
Hogan Lovells US LLP
555 13th St NW
Washington, DC 20004
202-637-5864
Email: kaitlyn.golden@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lynn Whipkey Mehler**
Hogan Lovells US LLP
555 13th Street NW
District of Columbia, DC 20004
202-637-6419
Email: lynn.mehler@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Marlan Golden**
Hogan Lovells US LLP
555 13th St NW
Washington, DC 20004
202-637-5600
Email: marlan.golden@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Philip Katz**
Hogan Lovells
555 Thirteenth Street NW
Washington, DC 20004
202-637-5632
Email: philip.katz@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Ryan Patrick Brown**
Ryan Brown Attorney at Law
1222 S Fillmore St
Amarillo, TX 79101
806-372-5711
Email: ryan@ryanbrownattorneyatlaw.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**The Chattanooga National Memorial for the Unborn**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Darald John Schaffer**
Samples Jennings Clem & Fields PLLC
130 Jordan Avenue
Chattanooga, TN 37421
(423) 892-2006
Fax: (423) 892-1919
Email: dschaffer@sampleslaw.com
*TERMINATED: 01/09/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Michael S Jennings**
Samples Jennings Clem & Fields PLLC
130 Jordan Drive
Chattanooga, TN 37421
423-892-2006
Email: mjennings@sampleslaw.com
*TERMINATED: 01/17/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>**Amicus**</u>

**Doctors for America**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Christopher Morten**
Columbia Law School
435 W 116th St
(Jerome Greene Hall)
New York, NY 10027

212-854-1845
Email: cjm2002@columbia.edu
*TERMINATED: 02/09/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Thomas S Leatherbury**
Thomas S Leatherbury Law PLLC
1901 N Akard St
Dallas, TX 75201
214-213-5004
Email: tom@tsleatherburylaw.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**American Center for Law and Justice**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Edward Lawrence White, III**
American Center for Law & Justice
3001 Plymouth Road
Suite 203
Ann Arbor, MI 48105
734-680-8007
Fax: 734-680-8006
Email: elwhite3@yahoo.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**State of Missouri**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Joshua Divine**
Office of The Missouri Attorney General
207 W High St
PO Box 899
Jefferson City, MO 65102
573-751-8870
Email: josh.divine@ago.mo.gov
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**Human Coalition**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Elissa Michelle Graves**
1907 Bonanza Drivce
Sachse, TX 75048
2147333213
Email: elissamgraves@gmail.com
*TERMINATED: 02/10/2023*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Mississippi**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Justin Lee Matheny**
Mississippi Attorney General Office
550 High Street
Suite 1200
Jackson, MS 39205
601-359-3680
Fax: 601-359-2003
Email: justin.matheny@ago.ms.gov
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of New York**
*States of New York California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Washington, Wisconsin, Washington DC*

represented by   **Galen Sherwin**
NYS Office of The Attorney General
Executive
State Capital
Albany, NY 12224
212-416-8059
Email: galen.sherwin@ag.ny.gov
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**State of Alabama**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Alaska**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Arkansas**

represented by   **Justin Lee Matheny**

*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Florida**                    represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Georgia**                    represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Idaho**                      represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Indiana**                    represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Iowa**                       represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Kansas**                     represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed*

(See above for address)
*TERMINATED: 02/10/2023*

*filings.)*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**State of Louisiana**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**State of Kentucky**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**State of Montana**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**State of Nebraska**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**State of Ohio**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**State of Oklahoma**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of South Carolina**                           represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*                         (See above for address)
*been terminated to restrict access to sealed*                        *TERMINATED: 02/10/2023*
*filings.)*                                                            *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of South Dakota**                             represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*                         (See above for address)
*been terminated to restrict access to sealed*                        *TERMINATED: 02/10/2023*
*filings.)*                                                            *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Tennessee**                                represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*                         (See above for address)
*been terminated to restrict access to sealed*                        *TERMINATED: 02/10/2023*
*filings.)*                                                            *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Texas**                                    represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*                         (See above for address)
*been terminated to restrict access to sealed*                        *TERMINATED: 02/10/2023*
*filings.)*                                                            *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Utah**                                     represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*                         (See above for address)
*been terminated to restrict access to sealed*                        *TERMINATED: 02/10/2023*
*filings.)*                                                            *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Wyoming**                                  represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*                         (See above for address)
*been terminated to restrict access to sealed*                        *TERMINATED: 02/10/2023*
*filings.)*                                                            *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

**Amicus**

**Life Collective Inc**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.).*

represented by   **Darren L McCarty**
McCarty Law PLLC
1410B W 51st Street
Austin, TX 78756
512-827-2902
Email: darren@mccartylawpllc.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Family Research Council**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Michael F Smith**
The Smith Appellate Law Firm
1717 Pennsylvania Ave Nw
Suite 1025
Washington, DC 20006
202-454-2860
Fax: 202-747-5630
Email: smith@smithpllc.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Judicial Watch Inc**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Meredith Di Liberto**
Judicial Watch Inc
425 Third Street SW, Suite 800
Washington, DC 20024
202-646-5172
Email: mdiliberto@judicialwatch.org
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Advancing American Freedom**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **John Marc Wheat**
Advancing American Freedom
801 Pennsylvania Ave NW
Suite 930
Washington, DC 20004
703-258-9823
Email:
mwheat@advancingamericanfreedom.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Concerned Women for America**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Mario Diaz**
Concerned Women for America Legal
1000 N Payne St
Alexandria, VA 22314
202-488-7000
Email: mdiaz@cwfa.org
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Greer Donley**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
424-332-4800
Fax: 424-332-4749
Email: rwinson@cov.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
Mullin Hoard & Brown LLP
500 S Taylor
Suite 800
Amarillo, TX 79101
806-372-5050
Fax: 806-372-5086
Email: acordova@mhba.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
Covington & Burling LLP
850 10th Street NW
Washington, DC 20001
202-662-5864
Email: bbraiterman@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
Covington and Burling LLP
850 10th Street NW
Washington, DC 20001
202-662-5562
Email: desposito@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
850 10th St NW
Washington, DC 20268
847-964-3246
Email: ekatz@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
Covington & Burling
850 Tenth Street NW
Washington, DC 20001
202-640-8446
Email: gjulian@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
Covington & Burling LLP
850 Tenth Street NW
Washington, DC 20001
202-662-5249
Email: jpost@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
Covington & Burling LLP
850 10th St., NW
Washington, DC 20268
703-582-4543
Email: lgrossman@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Richard Biggs**
Mullin Hoard & Brown LLP
500 S Taylor
Suite 800
Amarillo, TX 79109
806-372-5050
Email: rbiggs@mhba.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202-662-5612
Email: rlong@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Patricia Zettler**
*Party and attorney are active (attorney has
been terminated to restrict access to sealed
filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**R. Alta Charo**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**I. Glenn Cohen**                                    represented by   **Robert John Winson**
*Party and attorney are active (attorney has*                          (See above for address)
*been terminated to restrict access to sealed*                         *TERMINATED: 02/10/2023*
*filings.)*                                                            *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Admitted/In Good Standing*

                                                                       **Alysia Brianna Cordova**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/10/2023*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Admitted/In Good Standing*

                                                                       **Beth E Braiterman**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/10/2023*
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

                                                                       **Denise Esposito**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/10/2023*
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

                                                                       **Emile Katz**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/10/2023*
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

                                                                       **Guillaume Julian**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/10/2023*
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

                                                                       **Julia F Post**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/10/2023*
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Marsha Cohen**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Nathan Cortez**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Rebecca Eisenberg**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Henry Greely**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**George Horvath**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**

(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Peter Barton Hutt**                    represented by    **Robert John Winson**
*Party and attorney are active (attorney has*                (See above for address)
*been terminated to restrict access to sealed*               *TERMINATED: 02/10/2023*
*filings.)*                                                    *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*

*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Joan Krause**                                represented by    **Robert John Winson**
*Party and attorney are active (attorney has*                   (See above for address)
*been terminated to restrict access to sealed*                  *TERMINATED: 02/10/2023*
*filings.)*                                                      *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Bar Status: Admitted/In Good Standing*

                                                                **Alysia Brianna Cordova**
                                                                (See above for address)
                                                                *TERMINATED: 02/10/2023*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Bar Status: Admitted/In Good Standing*

                                                                **Beth E Braiterman**
                                                                (See above for address)
                                                                *TERMINATED: 02/10/2023*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Bar Status: Not Admitted*

                                                                **Denise Esposito**
                                                                (See above for address)
                                                                *TERMINATED: 02/10/2023*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Bar Status: Not Admitted*

                                                                **Emile Katz**
                                                                (See above for address)
                                                                *TERMINATED: 02/10/2023*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Bar Status: Not Admitted*

                                                                **Guillaume Julian**
                                                                (See above for address)
                                                                *TERMINATED: 02/10/2023*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Bar Status: Not Admitted*

                                                                **Julia F Post**

(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Holly Fernandez Lynch**                    represented by    **Robert John Winson**
*Party and attorney are active (attorney has*                (See above for address)
*been terminated to restrict access to sealed*                *TERMINATED: 02/10/2023*
*filings.)*                                    *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*
                                              *Bar Status: Admitted/In Good Standing*

                                              **Alysia Brianna Cordova**
                                              (See above for address)
                                              *TERMINATED: 02/10/2023*
                                              *ATTORNEY TO BE NOTICED*
                                              *Bar Status: Admitted/In Good Standing*

                                              **Beth E Braiterman**
                                              (See above for address)
                                              *TERMINATED: 02/10/2023*
                                              *PRO HAC VICE*
                                              *ATTORNEY TO BE NOTICED*
                                              *Bar Status: Not Admitted*

                                              **Denise Esposito**
                                              (See above for address)
                                              *TERMINATED: 02/10/2023*
                                              *PRO HAC VICE*
                                              *ATTORNEY TO BE NOTICED*
                                              *Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Elizabeth McCuskey**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*

*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)

*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Jennifer Oliva**                                    represented by    **Robert John Winson**
*Party and attorney are active (attorney has*                     (See above for address)
*been terminated to restrict access to sealed*                    *TERMINATED: 02/10/2023*
*filings.)*                                                        *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Admitted/In Good Standing*

                                                                  **Alysia Brianna Cordova**
                                                                  (See above for address)
                                                                  *TERMINATED: 02/10/2023*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Admitted/In Good Standing*

                                                                  **Beth E Braiterman**
                                                                  (See above for address)
                                                                  *TERMINATED: 02/10/2023*
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Not Admitted*

                                                                  **Denise Esposito**
                                                                  (See above for address)
                                                                  *TERMINATED: 02/10/2023*
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Not Admitted*

                                                                  **Emile Katz**
                                                                  (See above for address)
                                                                  *TERMINATED: 02/10/2023*
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Not Admitted*

                                                                  **Guillaume Julian**
                                                                  (See above for address)
                                                                  *TERMINATED: 02/10/2023*
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Not Admitted*

                                                                  **Julia F Post**
                                                                  (See above for address)
                                                                  *TERMINATED: 02/10/2023*
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Jordan Paradise**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Christopher Robertson**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)

*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Joanna Sax**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Allison Whelan**                                represented by   **Robert John Winson**
*Party and attorney are active (attorney has*                     (See above for address)
*been terminated to restrict access to sealed*                    *TERMINATED: 02/10/2023*
*filings.)*                                                        *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)

*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Diana Winters**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

| | | |
|---|---|---|
| **American College of Obstetricians and Gynecologists**<br>*Party and attorney are active (attorney has been terminated to restrict access to sealed* | represented by | **Molly A Meegan**<br>Acog<br>General Counsel's Office<br>409 12th Street SW |

*filings.)*

Washington
Washington, DC 20024
202-863-2581
Email: mmeegan@acog.org
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Adam Bresler Aukland-Peck**
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000
Email: aauklandpeck@debevoise.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
McCarn & Weir
905 S. Fillmore
Suite 530
Amarillo, TX 79101
806-350-5395
Email: msherwood@mwlawfirm.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Ste 500
Washington, DC 20004
202-383-8000
Email: mmcguiggan@debevoise.com
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000
Fax: 212-909-6836
Email: srselden@debevoise.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Murphy Klasing**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
Weycer, Kaplan, Pulaski & Zuber, P.C.
11 Greenway Plaza
Suite 1400
Houston, TX 77046
7139619045
Fax: 7139615341
Email: mklasing@wkpz.com
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Susan B. Anthony Pro-Life America**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Catholic Health Care Leadership Alliance**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**The National Catholic Bioethics Center**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Catholic Bar Association**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Catholic Benefits Association**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Christ Medicus Foundation**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**67 Members of Congress**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Fernando M Bustos**
Bustos Law Firm PC
PO Box 1980
Lubbock, TX 79408-1980
806-780-3976
Fax: 806-780-3800
Email: fbustos@bustoslawfirm.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Carolyn McDonnell**
Americans United for Life
1150 Connecticut Ave. NW
Ste 500
Washington, DC 20036
202-289-1478
Email: carolyn.mcdonnell@aul.org
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**American Medical Association**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Society of Maternal and Fetal Medicine**             represented by   **Adam Bresler Aukland-Peck**
*Party and attorney are active (attorney has*                          (See above for address)
*been terminated to restrict access to sealed*                         *TERMINATED: 02/10/2023*
*filings.)*                                                            *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**American Academy of Family Physicians**             represented by   **Adam Bresler Aukland-Peck**
*Party and attorney are active (attorney has*                          (See above for address)
*been terminated to restrict access to sealed*                         *TERMINATED: 02/10/2023*
*filings.)*                                                            *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**American Gynecological & Obstetrical Society**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**American Society for Reproductive Medicine**
*Party and attorney are active (attorney has*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*

*been terminated to restrict access to sealed filings.)*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Council of University Chairs of Obstetrics & Gynecology**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**North American Society for Pediatric
and Adolescent Gynecology**
*Party and attorney are active (attorney has
been terminated to restrict access to sealed
filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Nurse Practitioners in Women's Health**
*Party and attorney are active (attorney has
been terminated to restrict access to sealed
filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/23/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Amicus**

**Society of Family Planning**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Society of Gynecologic Oncology**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**

(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Society of OB/GYN Hospitalists**                    represented by    **Adam Bresler Aukland-Peck**
*Party and attorney are active (attorney has*                          (See above for address)
*been terminated to restrict access to sealed*                         *TERMINATED: 02/10/2023*
*filings.)*                                                             *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

                                                                       **Matthew W Sherwood**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/10/2023*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Admitted/In Good Standing*

                                                                       **Megan McGuiggan**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/13/2023*
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

                                                                       **Shannon Rose Selden**
                                                                       (See above for address)
                                                                       *TERMINATED: 02/10/2023*
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

**Amicus**

**Ethics and Public Policy Center**                    represented by    **M Edward Whelan**
*Party and attorney are active (attorney has*                          1730 M Street NW
*been terminated to restrict access to sealed*                         Suite 910
*filings.)*                                                             Washington, DC 20036
                                                                       202-682-1200
                                                                       Fax: 202-408-0632
                                                                       *TERMINATED: 02/10/2023*
                                                                       *LEAD ATTORNEY*
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

                                                                       **Charles W Fillmore**
                                                                       The Fillmore Law Firm LLP
                                                                       201 Main Street
                                                                       Suite 801
                                                                       Fort Worth, TX 76102

817/332-2351
Fax: 817/870-1859
Email: chad@fillmorefirm.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**H Dustin Fillmore, III**
The Fillmore Law Firm LLP
201 Main Street
Suite 801
Fort Worth, TX 76102
817/332-2351
Fax: 817/870-1859
Email: dusty@fillmorefirm.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>Amicus</u>

**Texas Business Leaders**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **John Clay Sullivan**
S|L Law PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
469-523-1351
Fax: 469-613-0891
Email: john.sullivan@the-sl-lawfirm.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>Amicus</u>

**Charlotte Lozier Institute**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Cristina Martinez Squiers**
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060
Fax: 202-776-0136
Email: csquiers@schaerr-jaffe.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Gene C Schaerr**
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060
Fax: 202-776-0136

Email: gschaerr@schaerr-jaffe.com
*TERMINATED: 02/16/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Coalition For Jewish Values Healthcare**      represented by    **Murphy S Klasing**
**Council**                                                      (See above for address)
*Party and attorney are active (attorney has*                    *TERMINATED: 02/17/2023*
*been terminated to restrict access to sealed*                   *LEAD ATTORNEY*
*filings.)*                                                       *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Arizona**                           represented by    **Joshua Bendor**
*Party and attorney are active (attorney has*                    Office of the Arizona Attorney General
*been terminated to restrict access to sealed*                   2005 N Central Avenue
*filings.)*                                                       Phoenix, AZ 85004
                                                                 602-542-8958
                                                                 Email: joshua.bendor@azag.gov
                                                                 *TERMINATED: 02/21/2023*
                                                                 *LEAD ATTORNEY*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Not Admitted*

V.

**Objector**

**News Media Coalition**                       represented by    **Peter Blackmer Steffensen**
*Party and attorney are active (attorney has*                    SMU Dedman School of Law
*been terminated to restrict access to sealed*                   PO Box 750116
*filings.)*                                                       Dallas, TX 75275-0116
                                                                 214-768-4077
                                                                 Fax: 214-768-1611
                                                                 Email: psteffensen@mail.smu.edu
                                                                 *TERMINATED: 03/13/2023*
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2022 | 1 (p.74) | COMPLAINT against Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD filed by George Delgado, MD, Regina Frost-Clark, MD, American College of Pediatricians, American Association of Pro-Life Obstetricians & Gynecologists, Christian Medical & Dental Associations, Alliance for Hippocratic Medicine, Tyler Johnson, DO, Shaun Jester, DO. (Filing |

| | | |
|---|---|---|
| | | fee $402; Receipt number ATXNDC-13312692) Plaintiff will submit summons(es) for issuance. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.74) Table of Exhibits, # 2 (p.967) Exhibit(s) 1, # 3 (p.973) Exhibit(s) 2, # 4 (p.989) Exhibit(s) 3, # 5 (p.991) Exhibit(s) 4, # 6 (p.1027) Exhibit(s) 5, # 7 (p.1035) Exhibit(s) 6, # 8 (p.1067) Exhibit(s) 7, # 9 (p.1960) Exhibit(s) 8, # 10 (p.1967) Exhibit(s) 9, # 11 (p.1968) Exhibit(s) 10, # 12 (p.1969) Exhibit(s) 11, # 13 (p.1974) Exhibit(s) 12, # 14 (p.1975) Exhibit(s) 13, # 15 (p.1978) Exhibit(s) 14, # 16 (p.1979) Exhibit(s) 15, # 17 (p.1985) Exhibit(s) 16, # 18 (p.1988) Exhibit(s) 17, # 19 (p.2000) Exhibit(s) 18, # 20 (p.2041) Exhibit(s) 19, # 21 (p.2051) Exhibit(s) 20, # 22 (p.2053) Exhibit(s) 21, # 23 (p.2059) Exhibit(s) 22, # 24 (p.2064) Exhibit(s) 23, # 25 (p.2069) Exhibit(s) 24, # 26 (p.2074) Exhibit(s) 25, # 27 (p.2079) Exhibit(s) 26, # 28 (p.2086) Exhibit(s) 27, # 29 (p.2512) Exhibit(s) 28, # 30 (p.2513) Exhibit(s) 29, # 31 (p.2514) Exhibit(s) 30, # 32 (p.2521) Exhibit(s) 31, # 33 (p.2522) Exhibit(s) 32, # 34 (p.2525) Exhibit(s) 33, # 35 (p.2526) Exhibit(s) 34, # 36 (p.2527) Exhibit(s) 35, # 37 (p.2528) Exhibit(s) 36, # 38 (p.2529) Exhibit(s) 37, # 39 (p.2530) Exhibit(s) 38, # 40 (p.2531) Exhibit(s) 39, # 41 (p.2538) Exhibit(s) 40, # 42 (p.2544) Exhibit(s) 41, # 43 (p.2565) Exhibit(s) 42, # 44 (p.2566) Exhibit(s) 43, # 45 (p.2570) Exhibit(s) 44, # 46 (p.2590) Exhibit(s) 45, # 47 (p.2595) Exhibit(s) 46, # 48 (p.2600) Exhibit(s) 47, # 49 (p.2724) Exhibit(s) 48, # 50 (p.2727) Exhibit(s) 49, # 51 (p.2761) Exhibit(s) 50, # 52 (p.2801) Exhibit(s) 51, # 53 (p.2805) Exhibit(s) 52, # 54 (p.2810) Cover Sheet) (Baptist, Erik) (Entered: 11/18/2022) |
| 11/18/2022 | 2 (p.967) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO. (Clerk QC note: No affiliate entered in ECF). (Baptist, Erik) (Entered: 11/18/2022) |
| 11/18/2022 | 3 (p.973) | Request for Clerk to issue Summons filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO. (Attachments: # 1 (p.74) Summons for Robert M. Califf, # 2 (p.967) Summons for Janet Woodcock, # 3 (p.973) Summons for Patrizia Cavazzoni, # 4 (p.989) Summons for U.S. Department of Health and Human Services, # 5 (p.991) Summons for Xavier Becerra, # 6 (p.1027) Summons for US Attorney Chad Meacham, # 7 (p.1035) Summons for USAG Merrick Garland) (Baptist, Erik) (Entered: 11/18/2022) |
| 11/18/2022 | 4 (p.989) | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (No magistrate judge assigned). Clerk to provide copy to plaintiff if not received electronically. (nht) (Entered: 11/18/2022) |
| 11/18/2022 | 5 (p.991) | Summons issued as to Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug |

| | | |
|---|---|---|
| | | Administration, Janet Woodcock, MD, U.S. Attorney, and U.S. Attorney General. (nht) (Entered: 11/18/2022) |
| 11/18/2022 | 6 (p.1027) | MOTION for Preliminary Injunction filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO (Attachments: # 1 (p.74) Proposed Order) (Baptist, Erik) Modified title on 12/8/2022 (daa). (Entered: 11/18/2022) |
| 11/18/2022 | 7 (p.1035) | Brief/Memorandum in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 6 (p.1027) MOTION for Injunction (Baptist, Erik) (Entered: 11/18/2022) |
| 11/18/2022 | 8 (p.1067) | Appendix in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 6 (p.1027) MOTION for Injunction , 7 (p.1035) Brief/Memorandum in Support of Motion, (Attachments: # 1 (p.74) Appendix pt. 2, # 2 (p.967) Appendix pt. 3, # 3 (p.973) Appendix pt. 4) (Baptist, Erik) (Entered: 11/18/2022) |
| 11/30/2022 | 9 (p.1960) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Erin Morrow Hawley (Filing fee $100.00, Receipt Number ATXNDC-13334273) filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO (Attachments: # 1 (p.74) Proposed Order, # 2 (p.967) Payment Receipt) (Baptist, Erik) Modified to add payment information on 12/1/2022 (cea). (Entered: 11/30/2022) |
| 12/01/2022 | 10 (p.1967) | ORDER granting 9 (p.1960) Application for Admission Pro Hac Vice of Erin Hawley. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 12/1/2022) (daa) (Entered: 12/01/2022) |
| 12/02/2022 | 11 (p.1968) | NOTICE of Attorney Appearance by Noah T Katzen on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Katzen, Noah) (Entered: 12/02/2022) |
| 12/02/2022 | 12 (p.1969) | Joint MOTION to Extend Time to Respond to Motion and Set Briefing Schedule filed by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD (Attachments: # 1 (p.74) Proposed Order) (Katzen, Noah) (Entered: 12/02/2022) |
| 12/08/2022 | 13 (p.1974) | ORDER granting 12 (p.1969) Plaintiffs' Joint Motion to Extend Deadlines and Set Briefing Schedule. Defendants must respond to Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) on or before January 13, 2023. Plaintiffs may reply to Defendants' response on or before February 10, 2023. (Ordered by Judge Matthew J. Kacsmaryk on 12/8/2022) (daa) (Entered: 12/08/2022) |

| 12/27/2022 | 14 (p.1975) | Consent MOTION for Leave to File Briefs With Extended Page Limits filed by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD (Attachments: # 1 (p.74) Proposed Order) (Katzen, Noah) (Entered: 12/27/2022) |
|---|---|---|
| 01/03/2023 | 15 (p.1978) | ORDER granting 14 (p.1975) Defendants' Consent Motion for Leave to File Briefs with Extended Page Limits. (Ordered by Judge Matthew J. Kacsmaryk on 1/3/2023) (daa) (Entered: 01/03/2023) |
| 01/09/2023 | 16 (p.1979) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13426239) filed by The Chattanooga National Memorial for the Unborn (Attachments: # 1 (p.74) Additional Page(s) Certificates of Good Standing)Attorney Darald John Schaffer added to party The Chattanooga National Memorial for the Unborn(pty:am) (Schaffer, Darald) (Entered: 01/09/2023) |
| 01/09/2023 | 17 (p.1985) | MOTION to Waive Local Counsel Requirement re 16 (p.1979) Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13426239) filed by The Chattanooga National Memorial for the Unborn (Schaffer, Darald) (Entered: 01/09/2023) |
| 01/09/2023 | 18 (p.1988) | MOTION for Leave to File Amicus Curiae Brief filed by The Chattanooga National Memorial for the Unborn with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Amicus Brief) (Schaffer, Darald) (Entered: 01/09/2023) |
| 01/13/2023 | 19 (p.2000) | Unopposed MOTION to Intervene filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Exhibit(s) Danco's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, # 2 (p.967) Exhibit(s) Exhibit 2 - Appendix, # 3 (p.973) Proposed Order Proposed Order). Party Danco Laboratories, LLC added.Attorney Ryan Patrick Brown added to party Danco Laboratories, LLC(pty:intvd) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 20 (p.2041) | Brief/Memorandum in Support filed by Danco Laboratories, LLC re 19 (p.2000) Unopposed MOTION to Intervene (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 21 (p.2051) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Danco Laboratories, LLC. (Clerk QC note: No affiliate entered in ECF). (Brown, Ryan) (Main Document 21 replaced with flattened image on 1/17/2023) (nht). (Entered: 01/13/2023) |
| 01/13/2023 | 22 (p.2053) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Jessica Ellsworth (Filing fee $100; Receipt number ATXNDC-13441871) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 23 (p.2059) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Kaitlyn Golden (Filing fee $100; Receipt number ATXNDC-13442009) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 24 (p.2064) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Philip Katz (Filing fee $100; Receipt number ATXNDC-13442025) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | | |

| | 25 (p.2069) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Marlan Golden (Filing fee $100; Receipt number ATXNDC-13442066) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
|---|---|---|
| 01/13/2023 | 26 (p.2074) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Lynn Mehler (Filing fee $100; Receipt number ATXNDC-13442092) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 27 (p.2079) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Catherine Stetson (Filing fee $100; Receipt number ATXNDC-13442104) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 28 (p.2086) | RESPONSE in Opposition filed by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD re: 6 (p.1027) MOTION for Preliminary Injunction. ***FILED USING EMERGENCY EMAIL*** (Attachments: # 1 (p.74) Exhibit(s) Katzen, # 2 (p.967) Exhibit(s) Lindo, # 3 (p.973) Exhibit(s) Ireland, # 4 (p.989) Exhibit(s) Kieltyka, # 5 (p.991) Exhibit(s) Zite, # 6 (p.1027) Exhibit(s) Glaser, # 7 (p.1035) Exhibit(s) McHugh) (twd) (Entered: 01/17/2023) |
| 01/17/2023 | 29 (p.2512) | ORDER granting 16 (p.1979) Application for Admission Pro Hac Vice of Darald John Schaffer, Michael S Jennings. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 1/17/2023) (daa) (Entered: 01/17/2023) |
| 01/17/2023 | 30 (p.2513) | ORDER granting 17 (p.1985) Motion ; granting 18 (p.1988) The Chattanooga National Memorial for the Unborn's Motion for Leave to File a Brief as Amicus Curiae in Support of Plaintiff's Complaint and Motion for Temporary Injunction. (Ordered by Judge Matthew J. Kacsmaryk on 1/17/2023) (daa) (Entered: 01/17/2023) |
| 01/17/2023 | 31 (p.2514) | AMICUS Brief in Support filed by The Chattanooga National Memorial for the Unborn re 1 (p.74) Complaint. (daa) (Entered: 01/19/2023) |
| 02/03/2023 | 32 (p.2521) | ORDER: On or before February 10, 2023, the parties are ORDERED to submit separate briefs on whether the Court should consolidate the injunction hearing and the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). (Ordered by Judge Matthew J. Kacsmaryk on 2/3/2023) (awc) (Entered: 02/03/2023) |
| 02/06/2023 | 33 (p.2522) | ORDER granting 19 (p.2000) Danco Laboratories, LLC's ("Danco") Unopposed Motion for Leave to Intervene. (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/06/2023) |
| 02/06/2023 | 34 (p.2525) | ORDER granting 27 (p.2079) Application for Admission Pro Hac Vice of Catherine Emily Stetson. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 35 (p.2526) | ORDER granting 26 (p.2074) Application for Admission Pro Hac Vice of Lynn Whipkey Mehler. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a |

| | | case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
|---|---|---|
| 02/06/2023 | 36 (p.2527) | ORDER granting 25 (p.2069) Application for Admission Pro Hac Vice of Marlan Golden. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 37 (p.2528) | ORDER granting 24 (p.2064) Application for Admission Pro Hac Vice of Philip Katz. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 38 (p.2529) | ORDER granting 23 (p.2059) Application for Admission Pro Hac Vice of Kaitlyn Golden. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 39 (p.2530) | ORDER granting 22 (p.2053) Application for Admission Pro Hac Vice of Jessica Lynn Ellsworth. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/09/2023 | 40 (p.2531) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13504121) filed by Doctors for America (Attachments: # 1 (p.74) Proposed Order). Party Doctors for America added.Attorney Christopher Morten added to party Doctors for America(pty:am) (Morten, Christopher) (Entered: 02/09/2023) |
| 02/09/2023 | 41 (p.2538) | MOTION to Waive Local Counsel Requirement filed by Doctors for America (Attachments: # 1 (p.74) Proposed Order) (Morten, Christopher) (Entered: 02/09/2023) |
| 02/09/2023 | 42 (p.2544) | Unopposed MOTION for Leave to File Amicus Brief filed by Doctors for America (Attachments: # 1 (p.74) Amicus Brief of Doctors for America, # 2 (p.967) Proposed Order) (Morten, Christopher) (Entered: 02/09/2023) |
| 02/09/2023 | 43 (p.2565) | ORDER: On February 6, 2023, the Court granted Danco Laboratories, LLC's ("Danco") motion to intervene. ECF No. 33. Accordingly, the Court hereby ORDERS Danco to promptly file its brief in opposition to Plaintiff's motion for a preliminary injunction (ECF No. 19-1 ). Plaintiffs may file any reply to Defendants' responses to the motion for preliminary injunction on or before February 24, 2023. (Ordered by Judge Matthew J. Kacsmaryk on 2/9/2023) (daa) (Entered: 02/09/2023) |
| 02/10/2023 | 44 (p.2566) | MOTION to Waive Local Rule 83.10(a) (Unopposed) filed by American Center for Law and Justice (Attachments: # 1 (p.74) Proposed Order)Attorney Edward Lawrence White, III added to party American Center for Law and Justice(pty:am) (White, Edward) (Entered: 02/10/2023) |
| 02/10/2023 | 45 (p.2570) | Unopposed MOTION for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction filed by American Center for Law and Justice (Attachments: # 1 (p.74) Amicus Curiae Brief, # 2 (p.967) Proposed Order) (White, |

| | | Edward) (Entered: 02/10/2023) |
|---|---|---|
| 02/10/2023 | 46 (p.2590) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13507946) filed by State of Missouri (Attachments: # 1 (p.74) Proposed Order). Party State of Missouri added.Attorney Joshua Divine added to party State of Missouri(pty:am) (Divine, Joshua) (Entered: 02/10/2023) |
| 02/10/2023 | 47 (p.2595) | MOTION for Leave to File Motion for Leave to Proceed without Local Counsel filed by State of Missouri (Attachments: # 1 (p.74) Proposed Order) (Divine, Joshua) (Entered: 02/10/2023) |
| 02/10/2023 | 48 (p.2600) | Unopposed MOTION for Leave to File Amicus Brief filed by State of Missouri (Attachments: # 1 (p.74) Proposed Order, # 2 (p.967) Attachment: Amicus Brief, # 3 (p.973) Attachment: Appendix) (Divine, Joshua) (Entered: 02/10/2023) |
| 02/10/2023 | 49 (p.2724) | NOTICE of Attorney Appearance by Elissa Michelle Graves on behalf of Human Coalition. (Filer confirms contact info in ECF is current.) (Graves, Elissa) (Entered: 02/10/2023) |
| 02/10/2023 | 50 (p.2727) | RESPONSE filed by Danco Laboratories, LLC re: 6 (p.1027) MOTION for Injunction (Brown, Ryan) (Entered: 02/10/2023) |
| 02/10/2023 | 51 (p.2761) | MOTION for Leave to File Brief Amicus Curiae filed by Human Coalition (Attachments: # 1 (p.74) Proposed Amicus Brief, # 2 (p.967) Proposed Order) (Graves, Elissa) (Entered: 02/10/2023) |
| 02/10/2023 | 52 (p.2801) | Appendix in Support filed by Danco Laboratories, LLC re 50 (p.2727) Response/Objection *to Plaintif's Motion for Preliminary Injunction* (Brown, Ryan) (Entered: 02/10/2023) |
| 02/10/2023 | 53 (p.2805) | MOTION for Leave to File Motion for Leave to Proceed Without Local Counsel filed by State of Mississippi (Attachments: # 1 (p.74) Proposed Order). Party States of Mississippi, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming added.Attorney Justin Lee Matheny added to party State of Mississippi(pty:am) (Matheny, Justin) (Entered: 02/10/2023) |
| 02/10/2023 | 54 (p.2810) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney M. Edward Whelan III (Filing fee $100; Receipt number ATXNDC-13508325) filed by Ethics and Public Policy Center (Attachments: # 1 (p.74) Proposed Order). Party Ethics and Public Policy Center added.Attorney Charles W Fillmore added to party Ethics and Public Policy Center(pty:!!!) (Fillmore, Charles) (Main Document 54 replaced on 2/10/2023) (daa). (Attachment 1 replaced on 2/10/2023) (daa). (Entered: 02/10/2023) |
| 02/10/2023 | 55 (p.2816) | Unopposed MOTION for Leave to File Motion for Leave to File Amicus Brief filed by State of Mississippi (Attachments: # 1 (p.74) Exhibit(s) Proposed Amicus Brief, # 2 (p.967) Proposed Order) (Matheny, Justin) (Entered: 02/10/2023) |
| 02/10/2023 | 56 (p.2846) | MOTION for Leave to File Amicus Brief on Behalf of Ethics and Public Policy Center in Support of Plaintiffs filed by Ethics and Public Policy Center with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s) Amicus Brief on Behalf of Ethics and Public Policy Center in Support of Plaintiffs, # 2 (p.967) Proposed Order) (Fillmore, Charles) (Entered: 02/10/2023) |

| | | |
|---|---|---|
| 02/10/2023 | 57 (p.2867) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13508285) filed by State of New York (Attachments: # 1 (p.74) Declaration(s), # 2 (p.967) Proposed Order)Attorney Galen Sherwin added to party State of New York(pty:am) (Sherwin, Galen) (Entered: 02/10/2023) |
| 02/10/2023 | 58 (p.2877) | MOTION for Leave to File Brief of Amicus Curiae Life Collective Inc. filed by Life Collective Inc. (Attachments: # 1 (p.74) Exhibit(s) Proposed Amicus Brief). Party Life Collective Inc. added.Attorney Darren L McCarty added to party Life Collective Inc.(pty:am) (McCarty, Darren) (Entered: 02/10/2023) |
| 02/10/2023 | 59 (p.2888) | Unopposed MOTION for Leave to File Brief as Amici Curiae in Support of Defendants and in Opposition to Plaintiffs' Motion for Preliminary Injunction filed by State of New York with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s), # 2 (p.967) Proposed Order) (Sherwin, Galen) (Entered: 02/10/2023) |
| 02/10/2023 | 60 (p.2928) | MOTION Waiver of Local Rule 83.10(a) filed by Life Collective Inc. (McCarty, Darren) (Entered: 02/10/2023) |
| 02/10/2023 | 61 (p.2931) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13508815) filed by Family Research Council (Attachments: # 1 (p.74) Proposed Order). Party Family Research Council added.Attorney Michael F Smith added to party Family Research Council(pty:am) (Smith, Michael) (Entered: 02/10/2023) |
| 02/10/2023 | 62 (p.2940) | MOTION Waive Local Counsel Requirement of LR 83.10 filed by Family Research Council (Attachments: # 1 (p.74) Proposed Order) (Smith, Michael) (Entered: 02/10/2023) |
| 02/10/2023 | 63 (p.2944) | Unopposed MOTION for Leave to File Amicus Curiae brief filed by Family Research Council with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s) Amicus Brief, # 2 (p.967) Proposed Order) (Smith, Michael) (Entered: 02/10/2023) |
| 02/10/2023 | 64 (p.3055) | MOTION for Leave to File Waive Requirement for Local Counsel filed by Judicial Watch (Attachments: # 1 (p.74) Proposed Order). Party Judicial Watch, Inc. added.Attorney Meredith Di Liberto added to party Judicial Watch(pty:am) (Di Liberto, Meredith) (Entered: 02/10/2023) |
| 02/10/2023 | 65 (p.3059) | Unopposed MOTION for Leave to File to File An Amicus Curiae Brief in Support of Plaintiffs filed by Judicial Watch with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s) Amicus Curiae Brief of Judicial Watch, Inc. in Support of Plaintifss, # 2 (p.967) Exhibit(s) Appendix to Amicus Curiae Brief of Judicial Watch in Support of Plaintiffs, # 3 (p.973) Proposed Order) (Di Liberto, Meredith) (Entered: 02/10/2023) |
| 02/10/2023 | 66 (p.3201) | Unopposed MOTION for Leave to File AAF Amicus Brief filed by Advancing American Freedom with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s) AAF Amicus brief). Party Advancing American Freedom added.Attorney Marc Wheat added to party Advancing American Freedom(pty:am) (Wheat, Marc) (Entered: 02/10/2023) |
| 02/10/2023 | 67 (p.3235) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13509386) filed by Advancing American Freedom (Attachments: # 1 (p.74) Exhibit(s) Good Standing Virginia cert.) (Wheat, Marc) (Entered: 02/10/2023) |

| | | |
|---|---|---|
| 02/10/2023 | 68 (p.3240) | Brief/Memorandum in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 32 (p.2521) Order Setting Deadline/Hearing, *re Consolidating the Preliminary Injunction Hearing with a Trial on the Merits Under Rule 65(a)(2)* (Blake, Julie) (Entered: 02/10/2023) |
| 02/10/2023 | 69 (p.3253) | Application for Admission Pro Hac Vice without Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13509192) filed by Concerned Women for America with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Motion for Leave to File as Amicus Curiae, # 2 (p.967) Amicus Curiae Brief). Party Concerned Women for America added.Attorney Mario Diaz added to party Concerned Women for America(pty:am) (Diaz, Mario) (Entered: 02/10/2023) |
| 02/10/2023 | 70 (p.3268) | MOTION for Leave to File Brief of Food and Drug Law Scholars as Amici Curiae in Support of Defendants Opposition to Plaintiff's Motion for Preliminary Injunction filed by Greer Donley, Patricia Zettler, R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters (Attachments: # 1 (p.74) Brief of Food and Drug Law Scholars as Amici Curiae in Support of Defendants Opposition to Plaintiffs Motion for Preliminary Injunction) Attorney Robert John Winson added. (Winson, Robert) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 71 (p.3307) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Lewis A. Grossman (Filing fee $100; Receipt number ATXNDC-13509907) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 72 (p.3311) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Denise Esposito (Filing fee $100; Receipt number ATXNDC-13509965) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 73 (p.3315) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Robert A. Long (Filing fee $100; Receipt number ATXNDC-13509987) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 74 (p.3319) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Julia F. Post (Filing fee $100; Receipt number ATXNDC-13510002) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, |

| | | |
|---|---|---|
| | | Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 75 (p.3323) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Beth Braiterman (Filing fee $100; Receipt number ATXNDC-13510021) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 76 (p.3327) | **STRICKEN per 106 (p.3961) ** REPLY filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re: 6 (p.1027) MOTION for Injunction (Baptist, Erik) Modified on 2/13/2023 (nht). (Entered: 02/10/2023) |
| 02/10/2023 | 77 (p.3359) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Emile Katz (Filing fee $100; Receipt number ATXNDC-13510042) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 78 (p.3363) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13509981) filed by American College of Obstetricians and Gynecologists (Attachments: # 1 (p.74) Proposed Order, # 2 (p.967) Exhibit(s)). Party American College of Obstetricians and Gynecologists added.Attorney Molly A Meegan added to party American College of Obstetricians and Gynecologists(pty:am) (Meegan, Molly) (Main Document 78 replaced with flattened document on 2/13/2023) (awc). (Attachment 1 replaced with flattened document on 2/13/2023) (awc). (Entered: 02/10/2023) |
| 02/10/2023 | 79 (p.3368) | **STRICKEN per 106 (p.3961) ** Appendix in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 76 (p.3327) Reply, *in Support of Motion for Preliminary Injunction* (Baptist, Erik) Modified on 2/13/2023 (nht). (Entered: 02/10/2023) |
| 02/10/2023 | 80 (p.3437) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Guillaume Julian (Filing fee $100; Receipt number ATXNDC-13510079) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |

| 02/10/2023 | 81 (p.3441) | MOTION for Leave to File Amicus Brief filed by Murphy Klasing, Susan B. Anthony Pro-Life America, Catholic Health Care Leadership Alliance, The National Catholic Bioethics Center, Catholic Bar Association, Catholic Benefits Association, Christ Medicus Foundation with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Proposed Order). Attorney Murphy S Klasing added. (Klasing, Murphy) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
|---|---|---|
| 02/10/2023 | 82 (p.3448) | Amicus Brief filed by Catholic Bar Association, Catholic Benefits Association, Catholic Health Care Leadership Alliance, Christ Medicus Foundation, Susan B. Anthony Pro-Life America, The National Catholic Bioethics Center re 6 (p.1027) MOTION for Injunction . (Klasing, Murphy) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 83 (p.3479) | Unopposed MOTION for Leave to File Brief as Amici Curiae in Support of Plaintiffs' Motion for a Preliminary Injunction filed by 67 Members of Congress with Brief/Memorandum in Support. Attorney Fernando M Bustos added to party 67 Members of Congress(pty:am) (Bustos, Fernando) (Entered: 02/10/2023) |
| 02/10/2023 | 84 (p.3483) | Brief/Memorandum in Support filed by 67 Members of Congress re 83 (p.3479) Unopposed MOTION for Leave to File Brief as Amici Curiae in Support of Plaintiffs' Motion for a Preliminary Injunction (Bustos, Fernando) (Entered: 02/10/2023) |
| 02/10/2023 | 85 (p.3504) | Appendix in Support filed by 67 Members of Congress re 84 (p.3483) Brief/Memorandum in Support of Motion (Bustos, Fernando) (Entered: 02/10/2023) |
| 02/10/2023 | 86 (p.3509) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Carolyn McDonnell (Filing fee $100; Receipt number ATXNDC-13510239) filed by 67 Members of Congress (Bustos, Fernando) (Entered: 02/10/2023) |
| 02/10/2023 | 87 (p.3513) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13510418) filed by American College of Obstetricians and Gynecologists, American Medical Association, Society of Maternal and Fetal Medicine, American Academy of Family Physicians, American Gynecological & Obstetrical Society, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of OB/GYN Hospitalists. Party American College of Obstetricians and Gynecologists added. Attorney Shannon Rose Selden added. (Selden, Shannon) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 88 (p.3519) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13510608) filed by American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Gynecological & Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of Maternal and Fetal Medicine, Society of OB/GYN Hospitalists Attorney Adam Bresler Aukland-Peck added. (Aukland-Peck, Adam) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | | |

| | | |
|---|---|---|
| | 89 (p.3524) | Unopposed MOTION for Leave to File Brief of Amici Curiae in Support of Plaintiffs' Motion for Preliminary Injunction filed by Texas Business Leaders (Attachments: # 1 (p.74) Exhibit(s) Amicus Brief, # 2 (p.967) Proposed Order Proposed Order). Attorney John Clay Sullivan added. (pty:am) (Sullivan, John) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 90 (p.3542) | MOTION Proceed without Local Counsel filed by Texas Business Leaders (Sullivan, John) (Entered: 02/10/2023) |
| 02/10/2023 | 91 (p.3545) | Unopposed MOTION for Leave to File to File Amici Curiae filed by American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Gynecological & Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of Maternal and Fetal Medicine, Society of OB/GYN Hospitalists (Attachments: # 1 (p.74) Exhibit(s) Amicus Brief, # 2 (p.967) Proposed Order Proposed Order) (Sherwood, Matthew) (Entered: 02/10/2023) |
| 02/10/2023 | 92 (p.3588) | Brief/Memorandum in Support filed by Danco Laboratories LLC re 32 (p.2521) Order Setting Deadline/Hearing, *Notice of Danco's Position on Consolidation Under Rule 65(a)(2)* (Ellsworth, Jessica) (Entered: 02/10/2023) |
| 02/10/2023 | 93 (p.3597) | NOTICE of Attorney Appearance by Kate Talmor-DOJ on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Talmor-DOJ, Kate) (Entered: 02/10/2023) |
| 02/10/2023 | 94 (p.3598) | ORDER granting 40 (p.2531) Application for Admission Pro Hac Vice ; granting 41 (p.2538) Motion to Waive Local Counsel ; granting 42 (p.2544) Motion for Leave to File ; granting 44 (p.2566) Motion to Waive Local Counsel ; granting 45 (p.2570) Motion for Leave to File ; granting 46 (p.2590) Application for Admission Pro Hac Vice ; granting 47 (p.2595) Motion for Leave to File ; granting 48 (p.2600) Motion for Leave to File ; granting 51 (p.2761) Motion for Leave to File ; granting 53 (p.2805) Motion for Leave to File ; granting 54 (p.2810) Application for Admission Pro Hac Vice ; granting 55 (p.2816) Motion for Leave to File ; granting 56 (p.2846) Motion for Leave to File ; granting 57 (p.2867) Application for Admission Pro Hac Vice ; granting 58 (p.2877) Motion for Leave to File ; granting 59 (p.2888) Motion for Leave to File ; granting 60 (p.2928) Motion to Waive Local Counsel ; granting 61 (p.2931) Application for Admission Pro Hac Vice ; granting 62 (p.2940) Motion to Waive Local Counsel ; granting 63 (p.2944) Motion for Leave to File ; granting 64 (p.3055) Motion for Leave to File ; granting 65 (p.3059) Motion for Leave to File ; granting 66 (p.3201) Motion for Leave to File ; granting 67 (p.3235) Application for Admission Pro Hac Vice ; granting 69 (p.3253) Application for Admission Pro Hac Vice ; granting 70 (p.3268) Motion for Leave to File ; granting 71 (p.3307) Application for Admission Pro Hac Vice ; granting 72 (p.3311) Application for Admission Pro Hac Vice ; granting 73 (p.3315) Application for Admission Pro Hac Vice ; granting 74 (p.3319) Application for Admission Pro Hac Vice ; granting 75 (p.3323) Application for Admission Pro Hac Vice ; granting 77 (p.3359) Application for Admission Pro Hac Vice ; granting 80 (p.3437) Application for Admission Pro Hac Vice ; granting 81 (p.3441) Motion for Leave to File ; granting 83 (p.3479) Motion for Leave to File ; granting 86 (p.3509) Application for Admission Pro Hac Vice. NOTICE TO ATTORNEYS - IMPORTANT REMINDER: Unless excused |

| | | |
|---|---|---|
| | | for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/10/2023) (daa) (Entered: 02/10/2023) |
| 02/10/2023 | 95 (p.3599) | Amicus Brief filed by Family Research Council re 6 (p.1027) MOTION for Injunction, 1 (p.74) Complaint. (Smith, Michael) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 96 (p.3706) | Amicus Brief filed by Human Coalition re 6 (p.1027) MOTION for Injunction. (Graves, Elissa) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 97 (p.3739) | MOTION for Leave to File Amicus Brief and Exceed Page Limit filed by Charlotte Lozier Institute with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Brief of Proposed Amicus Curiae Charlotte Lozier Institute in Support of Plaintiffs' Motion for Preliminary Injunction, # 2 (p.967) Proposed Order). Party Charlotte Lozier Institute added.Attorney Cristina Martinez Squiers added to party Charlotte Lozier Institute(pty:am) (Squiers, Cristina) (Entered: 02/10/2023) |
| 02/10/2023 | 98 (p.3801) | OBJECTION filed by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD re: 32 (p.2521) Order Setting Deadline/Hearing, (Talmor-DOJ, Kate) (Entered: 02/10/2023) |
| 02/13/2023 | 99 (p.3812) | Amicus Brief filed by Doctors for America. (Morten, Christopher) Docket text modified on 2/13/2023 (twd). (Entered: 02/13/2023) |
| 02/13/2023 | 100 (p.3826) | Amicus Brief filed by State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Montana, State of Nebraska, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, State of Wyoming re 6 (p.1027) MOTION for Injunction. (Matheny, Justin) Docket text modified on 2/13/2023 (twd). (Entered: 02/13/2023) |
| 02/13/2023 | 101 (p.3852) | ORDER granting 78 (p.3363) Application for Admission Pro Hac Vice; granting 87 (p.3513) Application for Admission Pro Hac Vice; granting 88 (p.3519) Application for Admission Pro Hac Vice; granting 89 (p.3524) Motion for Leave to File; granting 90 (p.3542) Motion; granting 91 (p.3545) Motion for Leave to File; granting 97 (p.3739) Motion for Leave to File. NOTICE TO ATTORNEYS - IMPORTANT REMINDER: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). Amici are hereby ORDERED to promptly file their amicus brief with the Court. (Ordered by Judge Matthew J. Kacsmaryk on 2/13/2023) (nht) (Entered: 02/13/2023) |
| 02/13/2023 | 102 (p.3853) | AMICUS BRIEF filed by State of New York re 6 (p.1027) MOTION for Preliminary Injunction. (Sherwin, Galen) Modified title and linkage on 2/15/2023 (awc). (Entered: 02/13/2023) |
| 02/13/2023 | 103 (p.3886) | AMICUS BRIEF filed by Charlotte Lozier Institute re 6 (p.1027) MOTION for Injunction (Amicus Brief) (Squiers, Cristina) Modified title on 2/15/2023 (awc). (Entered: 02/13/2023) |
| 02/13/2023 | 104 (p.3943) | NOTICE of Attorney Appearance by Thomas S Leatherbury on behalf of Doctors for America. (Filer confirms contact info in ECF is current.) (Leatherbury, Thomas) (Entered: 02/13/2023) |

| | | |
|---|---|---|
| 02/13/2023 | 105 (p.3944) | AMICUS CURIAE Brief/Memorandum in Support filed by American Center for Law and Justice re 6 (p.1027) MOTION for Injunction *Amicus Brief of the ACLJ* (White, Edward) Modified title on 2/16/2023 (nht). (Entered: 02/13/2023) |
| 02/13/2023 | 106 (p.3961) | ORDER: The Court hereby ORDERS: On or before February 24, 2023, Plaintiffs may file one Reply that consolidates (1) Plaintiffs' reply to the FDA's response (ECF No. 28) and (2) Plaintiffs' reply to Danco's Response (ECF No. 50). The Court therefore STRIKES Plaintiffs' reply (ECF Nos. 76, 79) without prejudice to Plaintiffs re-filing a reply in accordance with this order. (Ordered by Judge Matthew J. Kacsmaryk on 2/13/2023) (nht) (Entered: 02/13/2023) |
| 02/13/2023 | 107 (p.3962) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13514248) filed by American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Gynecological & Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of Maternal and Fetal Medicine, Society of OB/GYN Hospitalists. Attorney Megan McGuiggan added. (McGuiggan, Megan) Docket text modified on 2/14/2023 (twd). (Entered: 02/13/2023) |
| 02/13/2023 | 108 (p.3967) | AMICUS BRIEF filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler re: 6 (p.1027) MOTION for Preliminary Injunction (Winson, Robert) Modified title and linkage on 2/16/2023 (nht). (Entered: 02/13/2023) |
| 02/14/2023 | 109 (p.4000) | AMICUS BRIEF filed by American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Gynecological & Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of Maternal and Fetal Medicine, Society of OB/GYN Hospitalists re 6 (p.1027) MOTION for Preliminary Injunction. (Sherwood, Matthew) Modified title and linkage on 2/15/2023 (awc). (Entered: 02/14/2023) |
| 02/14/2023 | 110 (p.4034) | AMICUS CURIAE Brief/Memorandum in Support filed by State of Missouri re 6 (p.1027) MOTION for Injunction (Divine, Joshua) Modified title on 2/14/2023 (daa). (Entered: 02/14/2023) |
| 02/16/2023 | 111 (p.4153) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13523664) filed by Charlotte Lozier Institute (Attachments: # 1 (p.74) Proposed Order)Attorney Gene C Schaerr added to party Charlotte Lozier Institute(pty:am) (Schaerr, Gene) (Entered: 02/16/2023) |
| 02/17/2023 | 112 (p.4159) | MOTION Join the Brief of Amici Curiae, Susan B. Anthony Pro-Life America, et. al. re 6 (p.1027) MOTION for Injunction , 82 (p.3448) Brief/Memorandum in Support of Motion, filed by Coalition For Jewish Values Healthcare Council with Brief/Memorandum in Support.. Party Coalition for Jewish Values Healthcare Council added.Attorney Murphy S Klasing added to party Coalition For Jewish Values Healthcare Council(pty:am) (Klasing, Murphy) (Entered: 02/17/2023) |

| | | |
|---|---|---|
| 02/21/2023 | 113 (p.4162) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13532651) filed by State of Arizona Attorney Joshua Bendor added to party State of Arizona(pty:am) (Bendor, Joshua) (Entered: 02/21/2023) |
| 02/21/2023 | 114 (p.4167) | AMICUS BRIEF in Support filed by Ethics and Public Policy Center re 6 (p.1027) MOTION for Injunction *Amicus Brief* (Fillmore, Charles) Modified title on 2/23/2023 (nht). (Entered: 02/21/2023) |
| 02/21/2023 | 115 (p.4184) | MOTION for Leave to File Motion to Waive LR 83.10(A) Local Counsel Requirement filed by State of Arizona (Attachments: # 1 (p.74) Proposed Order Granting Admission Pro Hac Vice and Motion to Waive LR 83.10(A) Local Counsel Requirement) (Bendor, Joshua) (Entered: 02/21/2023) |
| 02/21/2023 | 116 (p.4188) | Unopposed MOTION for Leave to File Motion to Join Amicus Brief of Amici States New York, et al. In Support of Defendants filed by State of Arizona (Attachments: # 1 (p.74) Proposed Order Granting Motion to Join Amicus Brief of Amici States New York, et al. In Support of Defendants) (Bendor, Joshua) (Entered: 02/21/2023) |
| 02/21/2023 | 117 (p.4192) | ORDER: On February 3, 2023, the Court ordered parties to submit separate briefs on whether the Court should consolidate the injunction hearing and the trial on the merits under Federal Rule of Civil Procedure 65(a)(2). Having considered the briefing and relevant law, the Court determines that consolidation would not be appropriate in this case. (Ordered by Judge Matthew J. Kacsmaryk on 2/21/2023) (nht) (Entered: 02/21/2023) |
| 02/21/2023 | 118 (p.4193) | ORDER granting 107 (p.3962) Application for Admission Pro Hac Vice of Megan McGuigan. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/21/2023) (nht) (Entered: 02/21/2023) |
| 02/21/2023 | 119 (p.4194) | ORDER granting 111 (p.4153) Application for Admission Pro Hac Vice of Gene C. Schaerr. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/21/2023) (nht) (Entered: 02/21/2023) |
| 02/24/2023 | 120 (p.4195) | REPLY filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re: 6 (p.1027) MOTION for Injunction (Baptist, Erik) (Entered: 02/24/2023) |
| 02/24/2023 | 121 (p.4228) | Appendix in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 120 (p.4195) Reply, *in Support of Motion for Preliminary Injunction* (Baptist, Erik) (Entered: 02/24/2023) |
| 02/28/2023 | 122 (p.4295) | ORDER granting 112 (p.4159) Motion Join the Brief of Amici Curiae, Susan B. Anthony Pro-Life America, et. al. (Ordered by Judge Matthew J. Kacsmaryk on 2/28/2023) (awc) (Entered: 02/28/2023) |
| 02/28/2023 | | |

| | | |
|---|---|---|
| | 123 (p.4296) | ORDER granting 113 (p.4162) Application for Admission Pro Hac Vice of Joshua D. Bendor. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g).; granting 116 (p.4188) Motion for Leave to File. (Ordered by Judge Matthew J. Kacsmaryk on 2/28/2023) (nht) (Entered: 03/01/2023) |
| 03/10/2023 | 125 (p.4297) | NOTICE of Attorney Appearance by Julie Straus Harris on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Straus Harris, Julie) (Entered: 03/10/2023) |
| 03/10/2023 | 128 | ELECTRONIC Minute Entry for proceedings held before Judge Matthew J. Kacsmaryk: Telephone Conference held on 3/10/2023. Written Order to follow. Attorney Appearances: Plaintiff - Erik Baptist/Erin Hawley; Defense - Noah Katzen/Julie Straus Harris/Kate Talmor Intervenor - Jessica Ellsworth/Catherine Stetson/Ryan Patrick Brown/Kaitlyn Golden. (Court Reporter: Todd Anderson) (No exhibits) Time in Court - :31. (vls) (Entered: 03/13/2023) |
| 03/13/2023 | 126 (p.4298) | NOTICE of Attorney Appearance by Peter Blackmer Steffensen on behalf of News Media Coalition. (Filer confirms contact info in ECF is current.). Party News Media Coalition added. (Steffensen, Peter) (Entered: 03/13/2023) |
| 03/13/2023 | 127 (p.4299) | NOTICE of Objection filed by News Media Coalition (Steffensen, Peter) (Entered: 03/13/2023) |
| 03/13/2023 | 129 (p.4301) | ORDER: Motion Hearing set for 3/15/2023 09:00 AM in US Courthouse, Courtroom 1st Floor, 205 S. E. 5th Ave., Amarillo, TX 79101-1559 before Judge Matthew J. Kacsmaryk. (Ordered by Judge Matthew J. Kacsmaryk on 3/13/2023) (nht) (Entered: 03/13/2023) |
| 03/13/2023 | 130 (p.4303) | NOTICE of Attorney Appearance by Daniel Schwei on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Schwei, Daniel) (Entered: 03/13/2023) |
| 03/13/2023 | 131 (p.4304) | NOTICE of Attorney Appearance by Christopher A. Eiswerth on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Eiswerth, Christopher) (Entered: 03/13/2023) |
| 03/13/2023 | 132 (p.4306) | NOTICE of Attorney Appearance by Emily Brooke Nestler on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Nestler, Emily) (Entered: 03/13/2023) |
| 03/14/2023 | 133 (p.4423) | Notice of Filing of Official Electronic Transcript of Status Conference Proceedings held on 3-10-23 before Judge Kacsmaryk. Court Reporter/Transcriber Todd Anderson, Telephone number 214-753-2170. Parties are notified of their duty to review the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office. If the transcript contains personal identifiers that must be redacted under MO 61, Fed.R.Civ.P. 5.2 or Fed.R.Crim.P. 49.1, or if the transcript contains the name of a minor child victim or a minor child witness that must be redacted |

| | | |
|---|---|---|
| | | under 18 U.S.C. § 3509, file a <u>Redaction Request - Transcript</u> within 21 days. If no action is taken, the entire transcript will be made available through PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. (21 pages) Redaction Request due 4/4/2023. Redacted Transcript Deadline set for 4/14/2023. Release of Transcript Restriction set for 6/12/2023. (jta) (Entered: 03/14/2023) |
| 03/14/2023 | 134 | NOTICE OF AUDIO STREAM AVAILABILITY: The audio broadcast for the hearing on Plaintiffs' Motion for Preliminary Injunction set for Wednesday, March 15, 2023 at 9:00 AM will be live-streamed in the Dallas Division of the Northern District of Texas, located at 1100 Commerce Street, Courtroom 1351, Dallas, TX 75242. No electronic devices will be permitted in the courtroom. No recording devices will be permitted in the courtroom. It is impermissible under Judicial Conference Policy and local rules of the court (see LCR 83.18 and Miscellaneous Order No. 63) to record or rebroadcast court proceedings. Violators will be subject to sanctions. (ctf) (Entered: 03/14/2023) |
| 03/15/2023 | 135 | ELECTRONIC Minute Entry for proceedings held before Judge Matthew J. Kacsmaryk: Motion Hearing held on 3/15/2023 re <u>6 (p.1027)</u> Motion for Injunction. Written Order to follow. Attorney Appearances: Plaintiff - Erik Baptist/Erin Hawley; Defense - Julie Straus Harris/Daniel Schwei Intervenor - Jessica Ellsworth. (Court Reporter: Mechelle Daniel) (No exhibits) Time in Court - 4:15. (vls) (Entered: 03/15/2023) |
| 03/17/2023 | <u>136 (p.4445)</u> | Notice of Filing of Official Electronic Transcript of Hearing on Motion for Preliminary Injunction held on 03/15/2023 before Judge Matthew J. Kacsmaryk. Court Reporter/Transcriber Mechelle Daniel, Telephone number 806.744.7667. Parties are notified of their <u>duty to review</u> the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office. If the transcript contains personal identifiers that must be redacted under MO 61, Fed.R.Civ.P. 5.2 or Fed.R.Crim.P. 49.1, or if the transcript contains the name of a minor child victim or a minor child witness that must be redacted under 18 U.S.C. § 3509, file a <u>Redaction Request - Transcript</u> within 21 days. If no action is taken, the entire transcript will be made available through PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. (155 pages) Redaction Request due 4/7/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/15/2023. (kmd) (Entered: 03/17/2023) |
| 04/07/2023 | <u>137 (p.4307)</u> | Memorandum Opinion and Order (Ordered by Judge Matthew J. Kacsmaryk on 4/7/2023) (vls) (Entered: 04/07/2023) |
| 04/07/2023 | <u>138 (p.4374)</u> | NOTICE OF INTERLOCUTORY APPEAL as to <u>137 (p.4307)</u> Memorandum Opinion and Order to the Fifth Circuit by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. T.O. form to appellant electronically at <u>Transcript Order Form</u> or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions <u>here</u>. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Schwei, Daniel) |

| | | (Entered: 04/07/2023) |
|---|---|---|
| 04/07/2023 | 139 (p.4376) | NOTICE OF INTERLOCUTORY APPEAL as to 137 (p.4307) Memorandum Opinion and Order to the Fifth Circuit by Danco Laboratories LLC. Filing fee $505, receipt number ATXNDC-13649338. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Ellsworth, Jessica) (Entered: 04/07/2023) |
| 04/10/2023 | 140 | USCA Case Number 23-10362 in USCA5 for 138 (p.4374) Notice of Appeal, filed by Robert M. Califf, M.D., Xavier Becerra, Patrizia Cavazzoni, M.D., Janet Woodcock, M.D., U.S. Department of Health and Human Services, US Food and Drug Administration, 139 (p.4376) Notice of Appeal, filed by Danco Laboratories LLC. (nht) (Entered: 04/10/2023) |
| 04/12/2023 | 141 (p.4378) | UNPUBLISHED ORDER of USCA5 as to 138 (p.4374) Notice of Appeal, filed by Robert M. Califf, M.D., Xavier Becerra, Patrizia Cavazzoni, M.D., Janet Woodcock, M.D., U.S. Department of Health and Human Services, US Food and Drug Administration, 139 (p.4376) Notice of Appeal, filed by Danco Laboratories LLC. (Attachments: # 1 (p.74) USCA5 Letter) (nht) (Entered: 04/13/2023) |

**TAB 2**

Notice of Appeal (Federal Appellants)

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| Alliance for Hippocratic Medicine, *et al.*, <br><br> Plaintiffs, <br><br> *v.* <br><br> U.S. Food and Drug Administration, *et al.*, <br><br> Defendants. | Case No. 2:22-cv-00223-Z |

### Defendants' Notice of Appeal

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the Fifth Circuit from this Court's Memorandum Opinion and Order, entered at ECF No. 137 and dated April 7, 2023.

April 7, 2023

Of Counsel:

Samuel R. Bagenstos
General Counsel

Mark Raza
Associate General Counsel
U.S. Department of Health
  and Human Services
Chief Counsel
Food and Drug Administration

Respectfully submitted,

Brian M. Boynton
Principal Deputy Assistant Attorney General

Eric B. Beckenhauer
Assistant Director

*/s/ Daniel Schwei*
Daniel Schwei
Special Counsel
Julie Straus Harris
Senior Trial Counsel
Christopher A. Eiswerth
Emily Nestler
Kate Talmor
Trial Attorneys
Federal Programs Branch
Civil Division
U.S. Department of Justice
1100 L St., NW

Washington, DC 20005
202-305-8693
daniel.s.schwei@usdoj.gov


ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Acting Director

HILARY K. PERKINS
Assistant Director

NOAH T. KATZEN
Trial Attorney
Consumer Protection Branch

23-10362.4375

**TAB 3**

Notice of Appeal (Intervenor Danco Laboratories)

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| ALLIANCE FOR HIPPOCRATIC MEDICINE, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 2:22-cv-00223-Z |
| U.S. FOOD AND DRUG ADMINISTRATION, *et al.*, | § § § | |
| Defendants, | § § § | |
| DANCO LABORATORIES, LLC, | § § | |
| Intervenor-Defendant. | § § § | |

## DANCO LABORATORIES, LLC'S NOTICE OF APPEAL

Notice is given that Intervenor-Defendant Danco Laboratories, LLC hereby appeals to the United States Court of Appeals for the Fifth Circuit from this Court's Memorandum Opinion and Order, entered into on April 7, 2023 at ECF No. 137.

Dated: April 7, 2023

Respectfully submitted,

*/s/ Jessica L. Ellsworth*

Ryan Brown
RYAN BROWN ATTORNEY AT LAW
Texas Bar No. 24073967
ryan@ryanbrownattorneyatlaw.com
1222 S. Fillmore Street
Amarillo, Texas 79101
Tel: (806) 372-5711

Jessica L. Ellsworth*
Catherine E. Stetson*
Philip Katz*
Lynn W. Mehler*
Kaitlyn A. Golden*

1

Marlan Golden*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Tel:  (202) 637-5600
jessica.ellsworth@hoganlovells.com

*admitted *pro hac vice*

*Counsel for Danco Laboratories, LLC*

## CERTIFICATE OF SERVICE

I certify that on April 7, 2023, I electronically filed the foregoing Notice of Appeal using the CM/ECF system.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties of record.

/s/ *Jessica L. Ellsworth*

**TAB 4**

District Court Order and Opinion

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

ALLIANCE FOR HIPPOCRATIC
MEDICINE, *et al.*,

        Plaintiffs,

v.                                                    2:22-CV-223-Z

U.S. FOOD AND DRUG
ADMINISTRATION, *et al.*,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs' Motion for Preliminary Injunction ("Motion") (ECF No. 6), filed on November 18, 2022. The Court **GRANTS** the Motion **IN PART**.

### BACKGROUND

Over twenty years ago, the United States Food and Drug Administration ("FDA") approved chemical abortion ("2000 Approval"). The legality of the 2000 Approval is now before this Court. Why did it take *two decades* for judicial review in federal court? After all, Plaintiffs' petitions challenging the 2000 Approval date back to the year 2002, right?

Simply put, FDA stonewalled judicial review — until now. Before Plaintiffs filed this case, FDA ignored their petitions for over sixteen years, even though the law requires an agency response within "180 days of receipt of the petition." 21 C.F.R. § 10.30(e)(2)). But FDA waited 4,971 days to adjudicate Plaintiffs' first petition and 994 days to adjudicate the second. *See* ECF Nos. 1-14, 1-28, 1-36, 1-44 ("2002 Petition," "2019 Petition," respectively). Had FDA responded to Plaintiffs' petitions within the 360 total days allotted, this case would have been in federal court *decades* earlier. Instead, FDA postponed and procrastinated for nearly **6,000 days**.

Plaintiffs are doctors and national medical associations that provide healthcare for pregnant and post-abortive women and girls. Plaintiffs sued Defendants to challenge multiple administrative actions culminating in the 2000 Approval of the chemical abortion regimen for mifepristone. ECF No. 1 at 2. Mifepristone — also known as RU-486 or Mifeprex — is a synthetic steroid that blocks the hormone progesterone, halts nutrition, and ultimately starves the unborn human until death. ECF No. 7 at 7–8.[1] Because mifepristone alone will not always complete the abortion, FDA mandates a two-step drug regimen: mifepristone to kill the unborn human, followed by misoprostol to induce cramping and contractions to expel the unborn human from the mother's womb. *Id.* at 8.

In 1996, the Population Council[2] filed a new drug application ("NDA") with FDA for mifepristone. ECF No. 1 at 35. Shortly thereafter, FDA reset the NDA from "standard" to "priority review." *Id.* In February 2000, FDA wrote a letter to the Population Council stating that "adequate information ha[d] *not* been presented to demonstrate that the drug, when marketed in accordance with the terms of distribution proposed, is safe and effective for use as recommended." ECF No. 1-24 at 6 (emphasis added). FDA also noted the "restrictions on distribution will need to be amended." *Id.*

---

[1] Jurists often use the word "fetus" to inaccurately identify unborn humans in *un*scientific ways. The word "fetus" refers to a specific gestational stage of development, as opposed to the zygote, blastocyst, or embryo stages. *See* ROBERT P. GEORGE & CHRISTOPHER TOLLEFSEN, EMBRYO 27–56 (2008) (explaining the gestational stages of an unborn human). Because other jurists use the terms "unborn human" or "unborn child" interchangeably, and because both terms are inclusive of the multiple gestational stages relevant to the FDA Approval, 2016 Changes, and 2021 Changes, this Court uses "unborn human" or "unborn child" terminology throughout this Order, as appropriate.

[2] The Population Council was founded by John D. Rockefeller in 1952 after he convened a conference with "population activists" such as Planned Parenthood's director and several well-known eugenicists. MATTHEW CONNELLY, FATAL MISCONCEPTION: THE STRUGGLE TO CONTROL WORLD POPULATION 156 (2008). The conference attendees discussed "the problem of 'quality.'" John D. Rockefeller, *On the Origins of the Population Council*, 3 POPULATION AND DEV. REV. 493, 496 (1977). They concluded that "[m]odern civilization had reduced the operation of natural selection by saving more 'weak' lives and enabling them to reproduce," thereby resulting in "a downward trend in . . . genetic quality." *Id.*

Mere months later, FDA approved the chemical abortion regimen under Subpart H, commonly known as "accelerated approval" and originally designed to expedite investigational HIV medications during the AIDS epidemic.[3] Subpart H accelerates approval of drugs "that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (*e.g.*, ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy)." 21 C.F.R. § 314.500.

FDA then imposed post-approval restrictions "to assure safe use." *See* 21 C.F.R. § 314.520. These restrictions were later adopted when Subpart H was codified as a Risk Evaluation and Mitigation Strategy ("REMS") "to ensure that the benefits of the drug outweigh the risks." 21 U.S.C. § 355-1(a)(1)–(2). The drugs were limited to women and girls with unborn children aged seven-weeks gestation or younger. ECF No. 7 at 9. FDA also required three (3) in-person office visits: the first to administer mifepristone, the second to administer misoprostol, and the third to assess any complications and ensure there were no fetal remains in the womb. *Id.* Additionally, abortionists were required to be properly trained to administer the regimen and to report *all* adverse events from the drugs. *Id.*

Plaintiffs American Association of Pro-Life Obstetricians & Gynecologists ("AAPLOG") and Christian Medical & Dental Associations filed the 2002 Petition with FDA challenging the 2000 Approval. *Id.* In 2006, the U.S. House Subcommittee on Criminal Justice, Drug Policy, and Human Resources expressed the same concerns and held a hearing to investigate FDA's handling

---

[3] *See, e.g.*, Jessica Holden Kloda & Shahza Somerville, *FDA's Expedited Review Process: The Need for Speed*, 35 APPLIED CLINICAL TRIALS 17, 17–18 (2015) ("In 1992, in response to a push by AIDS advocates to make the investigational anti-AIDS drug azidothymidine (AZT) accessible, the FDA enacted 'Subpart H' commonly referred to as accelerated approval; giving rise to expedited review of drugs by the FDA.").

of mifepristone and its subsequent monitoring of the drug.[4] Then-Chairman Souder remarked that mifepristone was "associated with the deaths of at least 8 women, 9 life-threatening incidents, 232 hospitalizations, 116 blood transfusions, and 88 cases of infection."[5] Additionally, Chairman Souder noted "more than 950 adverse event cases" associated with mifepristone "out of only 575,000 prescriptions, at most."[6] The subsequent Staff Report concluded that FDA's approval and monitoring of mifepristone was "substandard and necessitates the withdrawal of this dangerous and fatal product before more women suffer the known and anticipated consequences or fatalities."[7] The report stated the "unusual approval" demonstrated a lower standard of care for women, "and [mifepristone's] withdrawal from the market is justified and necessary to protect the public's health."[8]

FDA rejected the 2002 Petition on March 29, 2016 — nearly *fourteen* years after it was filed. ECF No. 7 at 9. That same day, FDA approved several changes to the chemical abortion drug regimen, including the removal of post-approval safety restrictions for pregnant women and girls. *Id.* at 10. FDA increased the maximum gestational age from seven-weeks gestation to ten-weeks gestation. *Id.* And FDA also: (1) changed the dosage for chemical abortion; (2) reduced the number of required in-person office visits from three to one; (3) allowed non-doctors to prescribe and administer chemical abortions; and (4) eliminated the requirement for prescribers to report non-fatal adverse events from chemical abortion. *Id.*

---

[4] *See The FDA and RU-486: Lowering the Standard for Women's Health: Hearing Before the Subcomm. on Crim. Just., Drug Pol'y, & Hum. Res. of the H. Comm. on Gov't Reform*, 109th Cong. 3 (2006) ("Subcommittee Report").

[5] The transcript of the hearing before the House Subcommittee is available at https://www.govinfo.gov/content/pkg/CHRG-109hhrg31397/html/CHRG-109hhrg31397.htm.

[6] *Id.*

[7] Subcommittee Report at 40.

[8] *Id.*

In March 2019, Plaintiffs AAPLOG and American College of Pediatricians filed the 2019 Petition challenging FDA's 2016 removal of safety restrictions. *Id.* On April 11, 2019, FDA approved GenBioPro, Inc.'s abbreviated new drug application ("ANDA") for a generic version of mifepristone without requiring or reviewing *new* peer-reviewed science ("2019 Generic Approval"). *Id.* Two years later, on April 12, 2021, FDA announced it would "exercise enforcement discretion" to allow "dispensing of mifepristone through the mail . . . or through a mail-order pharmacy" during the COVID pandemic — notwithstanding the nearly 150-year-old Comstock Act banning the *mailing* of "[e]very article, instrument, substance, drug, medicine or thing" that produces "abortion." *Id.* Finally, on December 16, 2021, FDA denied most of Plaintiff's 2019 Petition. *Id.* at 11. Specifically, FDA expressly rejected the 2019 Petition's request to keep the in-person dispensing requirements and announced that the agency would *permanently* allow chemical abortion by mail. *Id.*

After Plaintiffs filed suit, Danco Laboratories, LLC ("Danco") — the holder of the NDA for mifepristone — moved to intervene as a defendant. ECF No. 19. On February 6, 2023, this Court granted Danco's motion. ECF No. 33. Plaintiffs now seek a preliminary injunction ordering Defendants to withdraw or suspend: (1) FDA's 2000 Approval and 2019 Approval of mifepristone tablets, 200 mg, thereby removing both from the list of Approved Drugs; (2) FDA's 2016 Changes and 2019 Generic Approval; and (3) FDA's April 12, 2021, Letter and December 16, 2021, Response to the 2019 Petition concerning the in-person dispensing requirement for mifepristone. ECF No. 7 at 12. Additionally, Plaintiffs seek to enjoin Defendants from taking actions inconsistent with these orders. *Id.*

LEGAL STANDARD

A court may issue a preliminary injunction when a movant satisfies the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) the threatened injury outweighs any harm that will result if the injunction is granted; and (4) the grant of an injunction is in the public interest. *See Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). The same standards apply "to prevent irreparable injury" under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 705; *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021).

ANALYSIS

**A. Plaintiffs Have Standing**

The judicial power of federal courts is limited to certain "Cases" and "Controversies." U.S. CONST. art. III, § 2. The case-or-controversy requirement requires a plaintiff to establish he has standing to sue. *See Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). To have standing, the party invoking federal jurisdiction must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Courts should assess whether the alleged injury to the plaintiff has a "close relationship" to harm "traditionally" recognized as providing a basis for a lawsuit in American courts. *Id.* at 2204. "[S]tanding is not dispensed in

gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 2208.

### 1.  *Plaintiff Medical Associations have Associational Standing*

"An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'" *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Under a theory of "associational standing," an association "has standing to bring a suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

Here, the associations' members have standing because they allege adverse events from chemical abortion drugs can overwhelm the medical system and place "enormous pressure and stress" on doctors during emergencies and complications.[9] ECF No. 7 at 14. These emergencies "consume crucial limited resources, including blood for transfusions, physician time and attention, space in hospital and medical centers, and other equipment and medicines." ECF No. 1-5 at 9. This is especially true in maternity-care "deserts" — geographical areas with limited physician availability. *Id.* These emergencies force doctors into situations "in which they feel complicit in the elective chemical abortion by needing to remove a baby with a beating heart or pregnancy

---

[9] *See* James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999-2015*, 8 HEALTH SERV. RSCH. MGMT. EPIDEMIOLOGY 8 (2021) ("ER visits following mifepristone abortion grew from 3.6% of all postabortion visits in 2002 to 33.9% of all postabortion visits in 2015. The trend toward increasing use of mifepristone abortion requires all concerned with health care utilization to carefully follow the ramifications of ER utilization.").

tissue as the only means to save the life of the woman or girl." ECF No. 1 at 85. Members of Plaintiff medical associations "oppose being forced to end the life of a human being in the womb for no medical reason, including by having to complete an incomplete elective chemical abortion." *Id.* at 86; *see also Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 3639525, at *12 (N.D. Tex. Aug. 23, 2022) (unwanted participation in elective abortions is cognizable under Article III).

Plaintiffs also argue the challenged actions "prevent Plaintiff doctors from practicing evidence-based medicine" and have caused Plaintiffs to face increased exposure to allegations of malpractice and potential liability, along with higher insurance costs. ECF No. 7 at 15. The lack of information on adverse events "harms the doctor-patient relationship" because women and girls are prevented from giving informed consent to providers. *Id.*; *see also* American Medical Association Code of Medical Ethics, *Opinion 2.1.1: Informed Consent* (informed consent is "fundamental in both ethics and law"). To obtain informed consent, physicians must "[a]ssess the patient's ability to understand relevant medical information" and present to their patient "relevant information accurately and sensitively," including the burdens and risks of the procedure. *Id.*

Women also perceive the harm to the informed-consent aspect of the physician-patient relationship. In one study, fourteen percent of women and girls reported having received insufficient information about (1) side effects, (2) the intensity of the cramping and bleeding, (3) the next steps after expelling the aborted human, and (4) potential negative emotional reactions like fear, uncertainty, sadness, regret, and pain. *See* Katherine A. Rafferty & Tessa Longbons, *#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives*, 36 HEALTH COMMC'N. 1485, 1485–94 (2021). Plaintiff physicians' lack of pertinent information on chemical abortion harms their physician-patient relationships because they *cannot* receive informed consent from the women and

girls they treat in their clinics. Plaintiffs allege these actions have "radically altered the standard of care." ECF No. 1-6 at 7.

Additionally, Plaintiff medical associations have associational standing via their members' third-party standing to sue on behalf of their patients. *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988) ("It does not matter what specific analysis is necessary to determine that the members could bring the same suit."); *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 293 (3d Cir. 2002) ("So long as the association's members have or will suffer sufficient injury to merit standing and their members possess standing to represent the interests of third-parties, then associations can advance the third-party claims of their members without suffering injuries themselves."); *Ohio Ass'n of Indep. Schs. v. Goff*, 92 F.3d 419, 422 (6th Cir. 1996) (associational standing via member schools' third-party standing to assert constitutional rights of parents to direct their children's education); 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.9.3 (3d ed. 2022) ("Doctors regularly achieve standing to protect the rights of patients and their own related professional rights.").

The requirements for third-party standing are met here because: (1) the patients have "endure[d] many intense side effects and suffer[ed] significant complications requiring medical attention" and "suffer distress and regret";[10] (2) the patients have a "close relation" to the physician members of the Plaintiff medical associations; and (3) "some hindrance" exists to the patients' ability to protect their interests. *See* ECF No. 7 at 13; *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (women seeking abortions may be chilled "by a desire to protect the very privacy of [their] decision from the publicity of a court suit");

---

[10] *Cf. TransUnion*, 141 S. Ct. at 2211 ("Nor did those plaintiffs present evidence that . . . they suffered some other injury (such as an emotional injury)"); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006).

*Pa. Psychiatric*, 280 F.3d at 290 ("[A] party need not face insurmountable hurdles to warrant third-party standing."). The injuries suffered by patients of the Plaintiff medical associations' members are sufficient to confer associational standing.

Here, the physician-patient dynamic favors third-party standing. Unlike abortionists suing on behalf of women seeking abortions, here there are no potential conflicts of interest between the Plaintiff physicians and their patients. *See June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2167 (2020) (Alito, J., dissenting), *abrogated by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (abortionists have a "financial interest in avoiding burdensome regulations," while women seeking abortions "have an interest in the preservation of regulations that protect their health"). And the case for a close physician-patient relationship is even stronger here than in the abortion context. *See id.* at 2168 ("[A] woman who obtains an abortion typically does not develop a close relationship with the doctor who performs the procedure. On the contrary, their relationship is generally brief and very limited."); *see also* ECF No. 1-9 at 7 ("[I]n many cases there is no doctor-patient relationship [between a woman and an abortionist], so [women] often present to overwhelmed emergency rooms in their distress, where they are usually cared for by physicians other than the abortion prescriber."); ECF No. 1-11 at 4 (because there "is no follow-up or additional care provided to patients" by abortionists, there is "no established relationship with a physician" and "patients are simply left to report to the emergency room"). Plaintiff physicians often spend several hours treating post-abortive women, even hospitalizing them overnight or providing treatment throughout several visits. *See* ECF No. 1-8 at 5–6. Given the Supreme Court's jurisprudence on the close relationship between abortionists and women, the facts of this case indicate that Plaintiffs' relationships with their patients are at least as close — if not closer — for purposes of third-party standing.

Finally, women who have *already* obtained an abortion may be *more* hindered than women who challenge restrictions on abortion. Women who have aborted a child — especially through chemical abortion drugs that necessitate the woman seeing her aborted child once it passes — often experience shame, regret, anxiety, depression, drug abuse, and suicidal thoughts because of the abortion. *See* ECF No. 96 at 25; David C. Reardon et al., *Deaths Associated with Pregnancy Outcome: A Record Linkage Study of Low Income Women*, 95 S. MED. J. 834, 834–41 (2002) (women who receive abortions have a 154% higher risk of death from suicide than if they gave birth, with persistent tendencies over time and across socioeconomic boundaries, indicating "self-destructive tendencies, depression, and other unhealthy behavior aggravated by the abortion experience"); Priscilla K. Coleman, *Abortion and Mental Health: Quantitative Synthesis and Analysis of Research Published 1995–2009*, 199 BRITISH J. PSYCHIATRY 180, 180–86 (2011) (same). Subsequently, *in addition to* the typical privacy concerns present in third-party standing in abortion cases, adverse abortion experiences that are often deeply traumatizing pose a hindrance to a woman's ability to bring suit. In short, Plaintiffs — rather than their patients — are most likely the "least awkward challenger[s]" to Defendants' actions. *Craig v. Boren*, 429 U.S. 190, 197 (1976).

### 2. *Plaintiff Medical Associations have Organizational Standing*

"'[O]rganizational standing' does not depend on the standing of the organization's members." *OCA*, 867 F.3d at 610. The organization can establish standing in its own name if it "meets the same standing test that applies to individuals." *Id.* (internal marks omitted). An organization can have standing if it has "proven a drain on its resources resulting from counteracting the effects of the defendant's actions." *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000); *see also Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir.

2018) (changing one's "plans or strategies in response to an allegedly injurious law can itself be a sufficient injury to confer standing"). "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (internal marks omitted).

One way an organization can establish standing is by "identifying specific projects that [it] had to put on hold or otherwise curtail in order to respond to the [challenged action]." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022) (internal marks omitted). This is "not a heightening of the *Lujan* standard,[11] but an example of how to satisfy it by pointing to a non-litigation-related expense." *OCA*, 867 F.3d at 612. Plaintiffs "need not identify specific projects that they have placed on hold or otherwise curtailed."[12] *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 3052489, at *31 (W.D. Tex. Aug. 2, 2022). Rather, this is simply the "most secure foundation" to establish organizational standing. 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.9.5 (3d ed. 2022). Furthermore, "'[a]t the pleading stage,' we 'liberally' construe allegations of injury." *Bezet v. United States*, 714 Fed. Appx. 336, 339 (5th Cir. 2017) (quoting *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009)).

Here, Plaintiff medical associations have standing via diversionary injury. Because of FDA's failure to require reporting of all adverse events, Plaintiffs allege FDA's actions have frustrated their ability to educate and inform their member physicians, their patients, and the public on the dangers of chemical abortion drugs. ECF No. 7 at 12. As a result, Plaintiffs attest they have

---

[11] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

[12] At the hearing, Danco argued *Elfant* held there was no standing where organizations failed to identify specific projects put on hold. ECF No. 136 at 125. This is incorrect. The Fifth Circuit in *Elfant* assumed without deciding the plaintiffs pled an injury-in-fact but held they did not have standing because the causation and redressability elements were not met. *See* 52 F.4th at 255.

diverted valuable resources away from advocacy and educational efforts to compensate for the lack of information. *See* ECF No. 1 at 91. Such diversions expend considerable time, energy, and resources, to the detriment of other priorities and functions and impair Plaintiffs' ability to carry out their educational purpose. *Id.* at 92; *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010).[13] Similarly, Plaintiffs allege their efforts to respond to FDA's actions have "tak[en] them away from other priorities such as fundraising and membership recruitment and retention." ECF Nos. 1-4 at 6, 1-5 at 11. Consequently, Plaintiffs have re-calibrated their outreach efforts to spend extra time and money educating their members about the dangers of chemical abortion drugs. Combined, these facts are sufficient to confer organizational standing. *See OCA*, 867 F.3d at 612 (finding organizational standing even where the injury "was not large"); *Fowler*, 178 F.3d at 356 (injuries in fact "need not measure more than an 'identifiable trifle'") (internal marks omitted).

### 3. *Plaintiffs' alleged Injuries are Concrete and Redressable*

Defendants contend that Plaintiffs' theories of standing "depend upon layer after layer of speculation." ECF No. 28 at 20. But Plaintiffs allege FDA's chemical abortion regimen "caused" intense side effects and significant complications for their patients requiring medical intervention and attention. ECF No. 7 at 13; *see id.* ("The harms that the FDA has wreaked on women and girls have also injured, and will continue to injure, Plaintiff doctors and their medical practices."); *id.* at 14 ("The FDA's actions have placed enormous pressure and stress on Plaintiff doctors during these

---

[13] It is true that Plaintiffs must allege their activities in response to the challenged actions differ from their "routine" activities. *See, e.g.*, *City of Kyle*, 626 F.3d at 238. But Plaintiffs have done so. For example, Plaintiffs argue they conducted independent studies and analyses of available data to the detriment of their advocacy, educational, and recruitment efforts. ECF No. 1-8 at 8. The Fifth Circuit has found diversionary injuries to constitute injuries-in-fact even where it was less clear the plaintiffs diverted from routine activities. *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999) (injury-in-fact where organization regularly conducted voter registration drives and "expended resources registering voters in low registration areas who would have already been registered" if not for the challenged actions).

emergency situations."); *id.* at 15 ("The FDA has caused Plaintiff doctors to face increased exposure to allegations of malpractice and potential liability, along with higher insurance costs."). In fact, Plaintiffs' declarations list specific events where Plaintiff physicians provided emergency care to women suffering from chemical abortion. *See* ECF Nos. 1-8 at 5–6, 1-9 at 4–9, 1-10 at 6–7, 1-11 at 5–6. And Defendants even concede the existence of adverse events related to chemical abortion drugs. *See* ECF No. 28 at 21. Consequently, Defendants misconstrue Plaintiffs' pleadings and mischaracterize Plaintiffs' evidence as "speculative." It is not.

Past injuries thus distinguish this case from *Clapper v. Amnesty Int'l USA*, where the Supreme Court held a "threatened injury must be certainly impending to constitute injury in fact." 568 U.S. 398, 410 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 157–58 (1990)). Were there no past injuries in this case, the alleged future harms are still less attenuated than those in *Clapper. See id.* (finding "a highly attenuated chain of" *five* separate possibilities needed to align for the alleged harm to occur); *McCardell v. U.S. Dep't of Hous. & Urb. Dev.*, 794 F.3d 510, 520 (5th Cir. 2015) ("[U]nlike in *Clapper*, where the alleged injury depended on a long and tenuous chain of contingent events, the chain-of-events framework in this case involves fewer steps and no unfounded assumptions.") (internal marks omitted). *See also* ECF No. 1-31 at 10 (roughly eight percent of women who use abortion pills will require surgical abortion); ECF No. 1-14 at 23 (discussing a study in which 18.3 percent of women required surgical intervention after chemical abortion). And as post-*Whitmore* cases have demonstrated, the "certainly impending" standard for an "imminent" injury is not as demanding as it sounds. *See TransUnion*, 141 S. Ct. at 2197 (material risk of future harm can suffice "so long as the risk of harm is sufficiently imminent and substantial"); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or* there is a 'substantial

risk' that the harm will occur.") (emphasis added); *Clapper*, 568 U.S. at 414 n.5; *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 n.23 (2007) ("Even a small probability of injury is sufficient . . . provided of course that the relief sought would, if granted, reduce the probability."); *Deanda v. Becerra*, No. 2:20-CV-092-Z, 2022 WL 17572093, at *2 (N.D. Tex. Dec. 8, 2022) (collecting cases).[14]

For similar reasons, Defendants' reliance on *City of Los Angeles v. Lyons* also fails. 461 U.S. 95 (1983). There, the Supreme Court held Lyons did not have standing to seek injunctive relief because "[t]here was no finding that Lyons faced a real and immediate threat of again being illegally choked" by Los Angeles police. *Id.* at 110. The *Lyons* holding "is based on the obvious proposition that a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past." *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992). "No such reluctance, however, is warranted here." *Hernandez v. Cremer*, 913 F.2d 230, 234 (5th Cir. 1990). Considering FDA's 2021 decision to permit "mail-in" chemical abortion, many women and girls will consume mifepristone without physician supervision. And in maternity-care "deserts," women may not have ready access to emergency care. In sum, there are fewer safety restrictions for women and girls today than ever before. Plaintiffs have good reasons to believe their alleged injuries will continue in the future, and possibly with greater frequency than in the past.

---

[14] Defendants' reliance on *Spokeo, Inc. v. Robins* is also unavailing. 578 U.S. 330 (2016). Courts should indeed assess whether the alleged injury to the plaintiff has a "close relationship" to harm "traditionally" recognized as the basis for a lawsuit in American courts. *See TransUnion*, 141 S. Ct. at 2204. But "a plaintiff doesn't need to demonstrate that the level of harm he has suffered would be actionable under a similar, common-law cause of action." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022). Rather, Plaintiffs only need to show the *type* of harm allegedly suffered "is similar in kind to a type of harm that the common law has recognized as actionable." *Id.*; *see also Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 940 (5th Cir. 2022) (Ho, J, concurring) (evidence of injury required by *TransUnion* is not burdensome). Harm resulting from unsafe drugs is similar to harm actionable under the common law.

Defendants next argue Plaintiffs' theories depend on "unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." ECF No. 28 at 20 (quoting *Lujan*, 504 U.S. at 562). "[A] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976) ("In other words, the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.").

In this case, a favorable decision would likely relieve Plaintiffs of at least some of the injuries allegedly caused by FDA. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[Plaintiffs] need not show that a favorable decision will relieve [their] *every* injury."); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978) (a "substantial likelihood" of the requested relief redressing the alleged injury is enough); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (a plaintiff "need only show that a favorable ruling could potentially lessen its injury"); *Texas v. Becerra*, 577 F. Supp. 3d 527, 560 (N.D. Tex. 2021) ("That the plaintiffs have brought forth specific evidence and examples of how they *will* be harmed . . . distinguishes this case from others where a third party's actions *might* have hurt the plaintiff."). And redressability is satisfied even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g., Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019) ("[T]hird parties will likely react in

16

predictable ways."); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (defendants' actions need not be "the very last step in the chain of causation"); *Larson*, 456 U.S. at 242–44; *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015). Therefore, Plaintiffs' alleged injuries are fairly traceable to Defendants and redressable by a favorable decision.

### 4. *Plaintiffs are within the "Zone of Interests"*

Plaintiffs are also within the zone of interests of the Federal Food, Drug, and Cosmetic Act ("FFDCA") and the Comstock Act. Plaintiffs suing under the APA must assert an interest that is "arguably within the zone of interests to be protected or regulated by the statute that they say was violated." *Texas v. United States*, 809 F.3d 134, 162 (5th Cir. 2015) (internal marks omitted). The zone-of-interests test "is not meant to be especially demanding" and is applied "in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Id.* (internal marks omitted). The zone-of-interests test "looks to the law's substantive provisions to determine what interests (and hence which plaintiffs) are protected." *Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 669 (5th Cir. 2020). "That interest, at times, may reflect aesthetic, conservational, and recreational as well as economic values." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).

A federal court's obligation to hear and decide cases within its jurisdiction is "virtually unflagging." *Lexmark*, 572 U.S. at 126 (internal marks omitted). And "the trend is toward enlargement of the class of people who may protest administrative action." *Camp*, 397 U.S. at 154. No "explicit statutory provision" is necessary to confer standing. *Id.* at 155. "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Texas v. United States*, 809 F.3d at 162 (internal marks omitted). In other words, "[t]here is

no presumption against judicial review and in favor of administrative absolutism unless that purpose is fairly discernible in the statutory scheme." *Camp*, 397 U.S. at 157 (internal marks omitted); *see also Barlow v. Collins*, 397 U.S. 159, 165 (1970) (courts "must decide if Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion").

Defendants argue that Plaintiffs identify no particular provision of the FFDCA protecting their interests. ECF No. 28 at 26. But Plaintiffs' interests are *not* "marginally related" to the purposes implicit in the FFDCA. The statute's substantive provisions protect the safety of physicians' patients and the integrity of the physician-patient relationship. *See generally* 21 U.S.C. § 355. Furthermore, this Court finds Plaintiffs have third-party standing on behalf of their patients. Plaintiffs' patients are within the zone of interest of the FFDCA because patients seek safe and effective medical procedures.

Likewise, Plaintiffs are within the zone of interests of the Comstock Act. This statute "indicates a national policy of discountenancing abortion as inimical to the national life." *Bours v. United States*, 229 F. 960, 964 (7th Cir. 1915); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.19 (1983) (the "thrust" of the Comstock Act was "to prevent the mails from being used to corrupt the public morals"). There is no evidence that Congress "sought to preclude judicial review of administrative rulings" by FDA "as to the legitimate scope of activities" available concerning chemical abortion drugs under these statutes. *Camp*, 397 U.S. at 157. For all the aforementioned reasons, Plaintiffs have standing.

**B. Plaintiffs' Claims Are Reviewable**

Defendants aver that "[a]ll of Plaintiffs' claims are untimely or unexhausted except their challenge to FDA's December 16, 2021, response to the 2019 citizen petition." ECF No. 28 at 26.

This includes Plaintiffs' challenges to: (1) the 2000 Approval and FDA's 2016 Response to the 2002 Petition challenging that approval; (2) the 2019 Generic Approval; and (3), the April 2021 letter. As for FDA's December 2021 Response to the 2019 Petition, Defendants maintain review is limited to the narrow issues presented in the 2019 Petition — which did not include arguments concerning the Comstock Act. *Id.* at 27–28.[15] The Court disagrees with each of these arguments.

### 1. FDA "Reopened" its Decision in 2016 and 2021

FDA's final decision on a citizen petition constitutes "final agency action" under the APA. 21 C.F.R. § 10.45(c). Challenges to agency actions have a six-year statute of limitations period. *See* 28 U.S.C. § 2401(a). Therefore, the statute of limitations for challenging the 2000 Approval began running on March 29, 2016 — the date of FDA's denial of the 2002 Petition. Because the 2016 Denial of the 2002 Petition occurred more than six years before Plaintiffs filed this suit, Defendants argue the challenge is untimely. ECF No. 28 at 26. But if "the agency opened the issue up anew, and then reexamined and reaffirmed its prior decision," the agency's second action — rather than the original decision — starts the limitations period. *See Texas v. Biden*, 20 F.4th 928, 951 (5th Cir. 2021), *rev'd in part on other grounds*, 142 S. Ct. 2528 (2022).

The reopening doctrine arises "where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision."[16] *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 345 (D.C. Cir. 2018); *see also Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017 (D.C. Cir. 2016) ("The reopener doctrine allows an otherwise untimely challenge

---

[15] The Court refers to the 2000 Approval, the 2016 Changes and denial of the 2002 Petition, and the 2019 Generic Approval collectively as FDA's "Pre-2021 Actions." Similarly, the Court refers to FDA's April 2021 letter and December 2021 Response as FDA's "2021 Actions."

[16] Courts have even applied the doctrine where agencies decide *not* to engage in rulemaking and then revisit and reaffirm that decision. *See Pub. Citizen v. Nuclear Regul. Comm'n*, 901 F.2d 147, 152 (D.C. Cir. 1990).

to proceed where an agency has — either explicitly or implicitly — undertaken to reexamine its former choice.") (internal marks omitted); *CTIA-Wireless Ass'n v. F.C.C.*, 466 F.3d 105, 112 (D.C. Cir. 2006) (agency "reconsidered" policy by reaffirming policy and offering "two new justifications" not found in prior orders).

In the rulemaking context, courts have identified four non-exhaustive factors to apply the doctrine where the agency: (1) proposed to make some change in the rules or policies; (2) called for comment on new or changed provisions, but at the same time; (3) explained the unchanged, republished portions; and (4) responded to at least one comment aimed at the previously decided issue. *Tripoli Rocketry Ass'n, Inc. v. U.S. Bureau of Alcohol, Tobacco & Firearms*, No. 00CV0273(RBW), 2002 WL 33253171, at *6 (D.D.C. June 24, 2002) (internal marks omitted). But a court "cannot stop there" — it "must look to the entire context of the rulemaking including all relevant proposals and reactions of the agency to determine whether an issue was in fact reopened." *Pub. Citizen*, 901 F.2d at 150. For example, an agency can reopen a prior action if it removes restrictions or safeguards related to the first action or affects a "sea change" in the regulatory scheme. *See Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008); *Nat'l Biodiesel*, 843 F.3d at 1017 (declining to apply doctrine when "the basic regulatory scheme remain[ed] unchanged"); *Pub. Citizen*, 901 F.2d at 152 (agency reopens decision when it reiterates a policy in such a way as to render the policy "subject to renewed challenge on any substantive grounds").

In the adjudication context, an agency need not solicit or respond to comments to reopen a decision because adjudication does not require notice and comment procedures. *See* 5 U.S.C. §§ 553(c), 554. The reopening doctrine has been applied in the adjudication context where an agency undertakes a "serious, substantive reconsideration" of "a prior administrative decision." *Chenault v. McHugh*, 968 F. Supp. 2d 268, 275 (D.D.C. 2013); *see also Battle v. Sec'y U.S. Dep't*

*of Navy*, 757 Fed. Appx. 172, 175 (3d Cir. 2018) (a petition for reconsideration can restart Section 2401(a)'s limitation period if the agency reopens the action based on a finding of "new evidence" or that the petition reflects some "changed circumstances"); *Peavey v. United States*, 128 F. Supp. 3d 85, 100 (D.D.C. 2015), *aff'd,* No. 15-5290, 2016 WL 4098768 (D.C. Cir. 2016) (reopening in 2011 occurred where agency "elected to conduct a substantive review" of servicemember's 1968 application to correct military records). For formal agency adjudications, even an order stating "only that it is denying reconsideration" is not conclusive if the agency has "altered its original decision." *Sendra Corp. v. Magaw*, 111 F.3d 162, 167 (D.C. Cir. 1997).

The standard for reopening is satisfied here. FDA's requirements for distribution in its 2000 Approval originally included:

- In-person dispensing from the doctor to the patient;

- Secure shipping procedures;

- Tracking system ability;

- Use of authorized distributors and agents; and

- Provision of the drug through direct, confidential physician distribution systems that ensures only qualified physicians will receive the drug for patient dispensing.

*See* ECF No. 1 at 40. FDA's 2016 Changes to this regulatory scheme included the following alterations:

- Extending the maximum gestational age at which a woman or girl can abort her unborn child from 49 days to 70 days;

- Altering the mifepristone dosage from 600 mg to 200 mg, the misoprostol dosage from 400 mcg to 800 mcg, and misoprostol administration from oral to buccal;

- Eliminating the requirement that administration of misoprostol occur in-clinic;

- Broadening the window for misoprostol administration to include a range of 24–48 hours after taking mifepristone, instead of 48 hours afterward;

- ▪ Adding a repeat 800 mcg buccal dose of misoprostol in the event of incomplete chemical abortion;

- ▪ Removing the requirement for an in-person follow-up examination after an abortion;

- ▪ Allowing "healthcare providers" other than physicians to dispense and administer the chemical abortion drugs; and

- ▪ Eliminating the requirement for prescribers to report all non-fatal serious adverse events from chemical abortion drugs.

*Id.* at 53–54. And in 2021, FDA removed the "in-person dispensing requirement" and signaled that it will soon allow pharmacies to dispense chemical abortion drugs. *Id.* at 68. Plaintiffs warn that without this requirement, "there is a dramatically reduced chance that the prescriber can confirm pregnancy and gestational age, discover ectopic pregnancies, and identify a victim of abuse or human trafficking being coerced into having a chemical abortion." ECF No. 120 at 19.

FDA's 2016 and 2021 Changes thus significantly departed from the agency's original approval of the abortion regimen. FDA repeatedly altered its original decision by removing safeguards and changing the regulatory scheme for chemical abortion drugs. *Sierra Club*, 551 F.3d at 1025; *Nat'l Biodiesel*, 843 F.3d at 1017. Additionally, FDA's response to the 2019 Petition *explicitly* states FDA "undertook a *full review* of the Mifepristone REMS Program" in 2021. ECF No. 1-44 at 7 (emphasis added);[17] *see also Peavey*, 128 F. Supp. 3d at 100–02 (agency reopened decision by conducting "thorough review" of the merits, even where the order did not state it was a "reconsideration" and did not reference prior decision). And FDA even granted the 2019 Petition in part. ECF No. 1-44 at 3. A "full review" of a REMS for a drug with known serious risks necessarily considers the possibility that a drug is too dangerous to be on the market, any mitigation

---

[17] *See also Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, FDA (Jan. 4, 2023), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation (describing the 2021 review as "comprehensive").

strategy notwithstanding. FDA has the authority to withdraw an approved drug application on this basis. *See* 21 U.S.C. § 355(e). Because the agency reaffirmed its prior actions after undertaking a substantive reconsideration of those actions, the limitations period for those actions starts in 2021. *See Pub. Citizen*, 901 F.2d at 152 (an agency reconsidering and reaffirming original policy "necessarily raises the lawfulness of the original policy, for agencies have an everpresent duty to insure that their actions are lawful").[18]

Alternatively, the Court finds Plaintiffs' claims are not time-barred under the equitable tolling doctrine. *See United States v. Patterson*, 211 F.3d 927, 931 (5th Cir. 2000) (courts "must be cautious not to apply the statute of limitations too harshly"); *P & V Enters. v. U.S. Army Corps of Engr's*, 466 F. Supp. 2d 134, 149 (D.D.C. 2006), *aff'd,* 516 F.3d 1021 (D.C. Cir. 2008) (a "rebuttable presumption of equitable tolling" applies to lawsuits governed by the six-year limitations period of Section 2401(a)); *Bornholdt v. Brady*, 869 F.2d 57, 64 (2d Cir. 1989) ("The existence of § 2401 as a catchall provision . . . does not necessarily mean that Congress intended the six-year period to be applied whenever a substantive statute does not specify a limitations period."). "[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (internal marks omitted); *see also Holland v. Florida*, 560 U.S. 631, 650 (2010) ("The flexibility inherent in equitable procedure enables courts

---

[18] To date, it is unclear whether the reopening doctrine has been applied in the precise context of FDA's approval of an NDA. However, much of the rationale courts have applied in both the rulemaking and adjudication context applies here. And the Court is unaware of any legal principle that would preclude the doctrine from being applied to these facts. Assuming *arguendo* Plaintiffs' allegations are true, a contrary holding would mean there is *no* judicial remedy to FDA's insistence on keeping an unsafe drug on the market, so long as enough time has passed.

to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct particular injustices.") (cleaned up).

Equitable tolling is appropriate here in large part because of FDA's unreasonable delay in responding to Plaintiff's 2002 and 2019 Petitions. *See WildEarth Guardians v. U.S. Dep't of Just.*, 181 F. Supp. 3d 651, 670 (D. Ariz. 2015) (it is "grossly inappropriate" to apply a statute of limitations where the agency unreasonably delayed a claim because the agency "could immunize its allegedly unreasonable delay from judicial review simply by extending that delay for six years") (internal marks omitted). It took FDA 13 years, 7 months, and 9 days to respond to the 2002 Petition. FDA then moved the goalposts by substantially changing the regulatory scheme on the *same day* it issued its Response. And it took FDA 2 years, 8 months, and 17 days to respond to the 2019 Petition which challenged those changes. Thus, in the 20 years between the 2002 Petition and the filing of this suit, Plaintiffs were waiting on FDA for over 16 of those years. *See Hill Dermaceuticals, Inc. v. U.S. Food & Drug Admin.*, 524 F. Supp. 2d 5, 9 (D.D.C. 2007) ("Once citizen petitions are submitted, the FDA Commissioner is required to respond in one of three manners 'within 180 days of receipt of the petition.'") (quoting 21 C.F.R. § 10.30(e)(2)).[19]

Additionally, statutes of limitations "are primarily designed to assure fairness to defendants," and "to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence is lost, memories have faded, and witnesses have disappeared." *Clymore v. United States*, 217 F.3d 370, 376 (5th Cir. 2000), *as corrected on reh'g* (Aug. 24, 2000) (internal marks omitted). But it "has not been argued, and cannot seriously be, that the government was unfairly surprised" when Plaintiffs filed this suit. *Id.* Plaintiffs have been

---

[19] Incidentally, the delayed FDA Response is extreme but not unprecedented. *See, e.g.*, *Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, 942 F. Supp. 2d 17, 22 (D.D.C. 2013) (FDA had yet to respond to a 2006 petition when it approved a related ANDA in 2013).

reasonably diligent in pursuing their claims. *See, e.g.*, ECF No. 1-4 at 6 (after years of waiting for FDA to respond to the Petition, Plaintiff "called upon" FDA to issue a response in 2005 and again in 2015). And the public interest in this case militates toward resolving Plaintiffs' claims on the merits. Accordingly, Plaintiffs' challenges to FDA's Pre-2021 Actions concerning chemical abortion drugs are not time-barred.

### 2. FDA's April 2021 Decision on In-Person Dispensing Requirements is not "Committed to Agency Discretion by Law"

Defendants also argue any challenge to FDA's decision regarding the in-person dispensing requirement is foreclosed under *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). ECF No. 28 at 30. In *Heckler*, the Supreme Court held that FDA's decision not to recommend civil or criminal enforcement action to prevent violations of the FFDCA was "committed to agency discretion by law." 470 U.S. at 837–38; *see also Texas v. Biden*, 20 F.4th at 982 ("In other words, a litigant may not waltz into court, point his finger, and demand an agency investigate (or sue, or otherwise enforce against) 'that person over there.'"). "[T]he Supreme Court and the Fifth Circuit have consistently read *Heckler* as sheltering one-off nonenforcement decisions rather than decisions to suspend entire statutes." *Texas v. Biden*, 20 F.4th at 983. The "committed to agency discretion by law" exception to judicial review is a "very narrow exception" that applies *only* where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

That is not the case here. The Secretary has the authority to determine that drugs with "known serious risks" may be dispensed "only in certain health care settings, such as hospitals." *See* 21 U.S.C. § 355-1(f)(3)(C); *Gomperts v. Azar*, No. 1:19-CV-00345-DCN, 2020 WL 3963864, at *1 (D. Idaho July 13, 2020) ("[T]hese restrictions mandate that Mifeprex be dispensed only in

certain healthcare settings").[20] The statute also provides other "elements to assure safe use" of dangerous drugs. 21 U.S.C. § 355-1(f)(1), (3). The Secretary must publicly explain "how such elements will mitigate the observed safety risk." 21 U.S.C. § 355-1(f)(2). The Secretary must also consider whether the elements would "be unduly burdensome on patient access to the drug" and must "minimize the burden on the health care delivery system." *Id.* Additionally, the elements "shall include [one] or more goals to mitigate a specific serious risk listed in the labeling of the drug." 21 U.S.C. § 355-1(f)(3). And as the Court will later explain, federal law prohibits the mailing of chemical abortion drugs. Thus, unlike in *Heckler*, there *is* "law to apply" to FDA's decision. *See Texas v. Biden*, 20 F.4th at 982 ("[T]he executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand."). And even if Defendants have significant discretion in how they administer Section 355-1, that does not mean *all* related actions are immune to judicial review under Section 701(a)(2) of the APA.

In sum, Defendants cannot shield their decisions from judicial review merely by characterizing the challenged action as exercising "enforcement discretion." ECF No. 28 at 15; *see also Texas v. Biden*, 20 F.4th at 987 ("The Government is still engaged in enforcement — even if it chooses to do so in a way that ignores the statute. That's obviously not nonenforcement."); *id.* at 985 ("*Heckler* cannot apply to agency actions that qualify as rules under 5 U.S.C. § 551(4)."); *Heckler*, 470 U.S. at 833 n.4 (a decision to consciously and expressly adopt a general policy that is "so extreme as to amount to *abdication* of its statutory responsibilities" is not "committed to agency discretion") (emphasis added). Furthermore, the suggestion that FDA has full discretion

---

[20] *See also Frequently Asked Questions (FAQS) about REMS*, FDA (Jan. 26, 2018), https://www.fda.gov/drugs/risk-evaluation-and-mitigation-strategies-rems/frequently-asked-questions-faqs-about-rems ("A REMS is required to ensure the drug is administered only in a health care facility with personnel trained to manage severe allergic reactions and immediate access to necessary treatments and equipment to managing such events.").

under Section 355-1 to not require *any* REMS for dangerous drugs would likely present nondelegation problems even under a modest view of that doctrine. *See, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). So too the notion that FDA could exercise its non-enforcement discretion in violation of other federal laws. Therefore, FDA's decision to not enforce the in-person dispensing requirement is reviewable because the decision is not committed to agency discretion by law.

### 3. *Plaintiffs' Failure to Exhaust Certain Claims is Excusable*

Plaintiffs allege FDA's 2021 Decision to dispense mifepristone through the mail did not acknowledge or address federal criminal laws that "expressly prohibit[] such downstream distribution." ECF No. 7 at 26. Defendants maintain Plaintiffs' argument is unexhausted because they failed to present it at any stage of any administrative proceeding. ECF No. 28 at 38. Similarly, Plaintiffs have not exhausted their challenge to FDA's approval of the supplemental NDA for generic mifepristone. *Id*. at 26. These failures to exhaust claims do not preclude judicial review.

"The general rule of nonreviewability is not absolute." *Myron v. Martin*, 670 F.2d 49, 52 (5th Cir. 1982). To begin, exhaustion is not required where the agency action is "in excess of" the agency's authority. *Id.* And a court will review for the first time "a particular challenge to an agency's decision which was not raised during the agency proceedings" where the agency action is "likely to result in individual injustice" or is "contrary to an important public policy extending beyond the rights of the individual litigants." *Id.*; *see also Mathews v. Eldridge*, 424 U.S. 319, 330 (1976) ("[C]ases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate."); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967) (injunctive remedies applied to administrative determinations should evaluate "both the fitness of the issues for judicial decision and the hardship

to the parties of withholding court consideration"); *Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 606 (5th Cir. 2007) (exhaustion may be excused when "irreparable injury will result absent immediate judicial review"); *Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068, 1072 (5th Cir. 1969) (exceptional circumstances include "where injustice might otherwise result").

Courts have also excused a claimant's failure to exhaust administrative remedies where exhaustion "would be futile because the administrative agency will clearly reject the claim." *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 176 (5th Cir. 2012) (internal marks omitted); *see also Oregon Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1159 (D. Or. 2011) (exceptional circumstances include evidence of administrative bias). Additionally, courts will consider any issue that was "raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, whether the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." *Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 942 (9th Cir. 2020). In short, "there is no bright-line standard as to when this requirement has been met." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010). Finally, "[a]dministrative remedies that are inadequate need not be exhausted." *Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 587 (1989) (a lack of reasonable time limits in the claims procedure renders the procedure inadequate).

### a. Contrary to Public Policy

Judicial review of Plaintiffs' unexhausted claims is appropriate for several reasons. First, Defendants' alleged violation of the Comstock Act would be "contrary to an important public policy." *Myron*, 670 F.2d at 52. As a case Defendants rely upon explains, the word "abortion" in the statute "indicates a national policy of discountenancing abortion as inimical to the national

28

life." *See Bours*, 229 F. at 964; ECF No. 28-1 at 206. And twenty-two states filed an amicus brief arguing FDA's decision to permit mail-in chemical abortion harms the public interest by undermining states' ability to enforce laws regulating abortion.[21] ECF No. 100 at 17.

> *b. Individual Injustice and Irreparable Injury*

Second, the agency's actions are "likely to result in individual injustice" or cause "irreparable injury." *Myron*, 670 F.2d at 52; *Dawson*, 504 F.3d at 606. Plaintiffs allege "many intense side effects" and "significant complications requiring medical attention" resulting from Defendants' actions.[22] ECF No. 7 at 13. Many women also experience intense psychological trauma and post-traumatic stress from excessive bleeding and from seeing the remains of their aborted children. *See* ECF No. 96 at 25–29; Pauline Slade et al., *Termination of pregnancy: Patient's perception of care*, J. OF FAMILY PLANNING & REPRODUCTIVE HEALTH CARE Vol. 27, No. 2, 72–77 (2001) ("Seeing the foetus, in general, appears to be a difficult aspect of the medical termination process which can be distressing, bring home the reality of the event and may influence later emotional adaptation."). Parenthetically, said "individual justice" and "irreparable injury" analysis also arguably applies to the unborn humans extinguished by mifepristone — especially in

---

[21] *See* David S. Cohen et al., *Abortion Pills*, 76 STAN. L. REV. 1, 9 (forthcoming 2024) ("Despite state laws, mailed medication abortion can cross borders in ways that undermine state laws . . . A new organization, Mayday Health, for example, focuses on those who live in states with abortion bans, giving users step-by-step instructions on how to set up temporary addresses in an abortion permissive state and forward the mail into the banned state.") (internal marks omitted).

[22] At least 4,213 adverse events from chemical abortion drugs have been reported. *See* ECF No. 96 at 12 n.16. But the actual number is likely far higher because non-fatal adverse events are no longer required to be reported, and because more than 60 percent of women and girls' emergency room visits after chemical abortions are miscoded as miscarriages. *See* James Studnicki et al., *A Post Hoc Exploratory Analysis: Induced Complications Mistaken for Miscarriage in the Emergency Room are a Risk Factor for Hospitalization*, 9 HEALTH SERV. RSCH. MGMT. EPIDEMIOLOGY 1, 1 (2022); *see also* ECF No. 1-8 at 7 (describing Plaintiffs' difficulty in submitting adverse event reports to mifepristone manufacturer Danco). Other data sources such as the Center for Disease Control and Prevention Abortion Surveillance Reports are "profoundly flawed" because state reporting "is voluntary, with many states reporting intermittently and some not at all." Studnicki et al., *supra* note 9, at 2. One Plaintiff physician alleges that when she reported an adverse event to her state's health department, the "report was rejected because the State said it was not a 'true' adverse event because the patient ultimately recovered." ECF No. 1-10 at 7.

the post-*Dobbs* era. *See Dobbs*, 142 S. Ct. at 2261 ("Nothing in the Constitution or in our Nation's legal traditions authorizes the Court to adopt [the] theory of life" that States are *required* "to regard a fetus as lacking even the most basic human right — to live — at least until an arbitrary point in a pregnancy has passed.") (internal marks omitted); Brief of *Amici Curiae* Scholars of Jurisprudence John M. Finnis and Robert P. George in Support of Petitioners, *Dobbs*, 142 S. Ct. 2228 (2022) (arguing unborn humans are constitutional "persons" entitled to equal protection).

### c.  *Administrative Procedures are Inadequate*

Third, FDA's combined response time of over sixteen years to Plaintiffs' two petitions shows their procedures have been inadequate. *See Coit*, 489 U.S. at 587; *Bowen v. City of New York*, 476 U.S. 467, 476 (1986) ("[T]he harm imposed by exhaustion would be irreparable."). FDA slow-walked — or rather, *snail*-walked — its response to the 2002 Petition by waiting nearly *fourteen years* to deny the petition. ECF No. 7 at 9. Requiring Plaintiffs to exhaust their administrative remedies may equate to another decade-plus of waiting for the agency to give them the time of day.

### d.  *Exhaustion would be Futile*

Alternatively, any attempt by Plaintiffs to challenge Defendants' actions would likely be futile. Even if Plaintiffs did not endure sixteen years of delay, dawdle, and dithering, their efforts would surely "be futile because the administrative agency will clearly reject the claim." *Gulf Restoration Network*, 683 F.3d at 176. "President Biden has emphasized the need to protect access to mifepristone" since the day of the Supreme Court's decision in *Dobbs*.[23] President Biden stated that "protecting reproductive rights is essential to our Nation's health, safety, and

---

[23] *See FACT SHEET: President Biden to Sign Memorandum on Ensuring Safe Access to Medication Abortion*, THE WHITE HOUSE (Jan. 22, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/01/22/fact-sheet-president-biden-to-sign-presidential-memorandum-on-ensuring-safe-access-to-medication-abortion/.

progress."[24] He also criticized States' efforts to impose restrictions on mifepristone because such efforts "have stoked confusion, sowed fear, and may prevent patients from accessing safe and effective FDA-approved medication."[25] Thus, it is unlikely FDA would reverse course on its "mail-order" abortion regimen. ECF No. 7 at 7. Defendants' position on the Comstock Act in this litigation only confirms that fact. *See* ECF No. 28 at 38 ("Plaintiffs misconstrue the Comstock Act.").[26]

### e. The Comstock Act was raised with Sufficient Clarity

Finally, the Comstock Act issue was "raised with sufficient clarity." *Ross*, 976 F.3d at 942. This is because: (1) the 2019 Petition requested FDA to retain the in-person requirement for dispensing of chemical abortion drugs; and (2) the Comstock Act issue was also raised by the United States Postal Service and the Department of Health & Human Services on July 1, 2022, "[i]n the wake of" *Dobbs*.[27] The Office of Legal Counsel specifically mentioned FDA's regimen for chemical abortion drugs when concluding "the mere mailing of such drugs to a particular jurisdiction is an insufficient basis for concluding that the sender intends them to be used unlawfully." OLC Memo at *1. This shows not only that the issue was raised with sufficient clarity, but also the *futility* of raising the issue before the agency. Therefore, Plaintiffs' failure to exhaust their claims does not preclude judicial review.

---

[24] *Memorandum on Further Efforts to Protect Access to Reproductive Healthcare Services*, THE WHITE HOUSE (Jan. 22, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/01/22/memorandum-on-further-efforts-to-protect-access-to-reproductive-healthcare-services/.

[25] *Id.*

[26] The D.C. Circuit has hinted that the futility doctrine is ordinarily predicated on the "worthlessness of an argument before an agency that *has rejected it* in the *past*" rather than the likelihood that "the agency *would reject it* in the *future*." *Tesoro Refin. & Mktg. Co. v. FERC*, 552 F.3d 868, 874 (D.C. Cir. 2009). But in this case, there is no principled distinction between the two scenarios. Defendants do not even pretend the agency might have accepted Plaintiffs' arguments. Other cases may involve uncertainty about *future* agency rejection, but it is not this case.

[27] *See Application of the Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions*, 2022 WL 18273906 (O.L.C. Dec. 23, 2022) ("OLC Memo").

### C. Plaintiffs' Challenges to FDA's 2021 Actions Have a Substantial Likelihood of Success on the Merits

"To satisfy the first element of likelihood of success on the merits," Plaintiffs "must present a prima facie case but need not show that [they are] certain to win." *Janvey v. Alguire*¸ 647 F.3d 585, 595–96 (5th Cir. 2011) (internal marks omitted). Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) & (C).

The Court will first address FDA's 2021 Actions that eliminated the in-person dispensing requirement and announced that FDA would allow abortionists to dispense chemical abortion drugs by mail or mail-order pharmacy. Plaintiffs have a substantial likelihood of success on their claims that these actions violate federal law.

#### 1. *The Comstock Act prohibits the Mailing of Chemical Abortion Drugs*

The Comstock Act declares "[e]very obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance" to be "nonmailable matter" that "shall not be conveyed in the mails or delivered from any post office or by any letter carrier." 18 U.S.C. § 1461. The next clauses declare nonmailable "[e]very article or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; and [e]very article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose." *Id.* Similarly, Section 1462 forbids the use of "any express company or other common carrier" to transport chemical abortion drugs "in interstate or foreign commerce."

Defendants' argument that the Comstock Act does not prohibit the mailing of chemical abortion drugs relies on the "reenactment canon." That is, courts may distill a statute's meaning

when "federal courts of appeals settled upon a consensus view" and "Congress never modified the relevant statutory text to reject or displace this settled construction." ECF No. 28 at 39. This purported "consensus view" is that the Comstock Act does not prohibit the mailing of items designed to produce abortions "where the sender does not intend them to be used unlawfully." *Id.* This argument is unpersuasive for several reasons.

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). But "[t]here is an obvious trump to the reenactment argument": "'[w]here the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction.'" *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (quoting *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 576 (2011) ("[W]e have no warrant to ignore clear statutory language on the ground that other courts have done so."). Additionally, the presumption only applies when the judicial or administrative gloss "represented settled law when Congress reenacted the [language in question]." *Keene Corp. v. United States*, 508 U.S. 200, 212 (1993); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 349 (2005) (presumption applies only when the supposed judicial consensus at the time of reenactment was "so broad and unquestioned that we must presume Congress knew of and endorsed it"); *Davis v. United States*, 495 U.S. 472, 482 (1990); *Fed. Deposit Ins. Corp. v. Phila. Gear Corp.*, 476 U.S. 426, 437 (1986); *United States v. Powell*, 379 U.S. 48, 55 n.13 (1964).[28]

---

[28] *See also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 325 (2012) ("But how numerous must the lower-court opinions be, or how prominent and long-standing the administrative interpretation, to justify the level of lawyerly reliance that justifies the canon? What about two intermediate-court decisions? (We doubt it — though some cases have relied on just a single intermediate-court decision.) Or seven courts of first instance? (Perhaps.)").

23-10362.4339

The canon is easily overcome for one simple reason: it is a dubious means of ascertaining congressional intent. "There are plenty of reasons to reenact a statute that have nothing to do with codifying the glosses that courts have already put on the statute." CALEB NELSON, STATUTORY INTERPRETATION 481 (2011). For example, perhaps the original statute contained a "sunset" provision. Maybe Congress wanted to change the statute in some other respects but found it easier to communicate those changes by reenacting a modified version of the complete statute "than by casting each discrete change as an amendment to the existing language." *Id.* at n.14. Or Congress was perhaps conducting "a more general codification or reorganization of the statutes in a particular field, for the sake of making the structure of its statutes easier to follow." *Id.* "Or maybe Congress simply wanted to enact the relevant title of the United States Code into positive law." *Id.* "To the extent that Congress reenacts statutory language for one of those other reasons, members of Congress may well not mean to be expressing any view at all about the glosses that have piled up in the meantime." *Id.*; *see also* HENRY M. HART, JR., & ALBERT M. SACKS, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1367 (William N. Eskridge, Jr., & Philip P. Frickey eds., 1994) (tent. ed. 1958) (criticizing the canon for adding to the costs of the legislative process in counterproductive ways).

Here, the plain text of the Comstock Act controls. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1749 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *Lawson v. FMR LLC*, 571 U.S. 429, 441 (2014) ("Absent any textual qualification, we presume the operative language means what it appears to mean."). The Comstock Act declares "nonmailable" every "article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use it or apply it for producing *abortion.*" 18 U.S.C. § 1461 (emphasis added). It is indisputable that chemical abortion drugs are both

"drug[s]" and are "for producing abortion." Therefore, federal criminal law declares they are "nonmailable." *See Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 3639525, at *26 n.21 (N.D. Tex. Aug. 23, 2022) ("[F]ederal law bar[s] the importation or delivery of any device or medicine designed to produce an abortion.").

The statute plainly does *not* require intent on the part of the seller that the drugs be used "unlawfully." To be sure, the statute does contain a catch-all provision that prohibits the mailing of such things "for producing abortion, *or for any indecent or immoral purpose*." 18 U.S.C. § 1461 (emphasis added). But "or" is "almost always disjunctive." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018) (internal marks omitted). Additionally, the "or" in Section 1461 is preceded by a comma, further disjoining the list of nonmailable matter. Thus, the Court does not read the "or" as an "and." Similarly, the Act requires that the defendant "knowingly uses the mails for the mailing" of anything declared by the Act "to be nonmailable." 18 U.S.C. § 1461. A defendant could satisfy this *mens rea* requirement by mailing mifepristone and knowing it is for producing abortion. The statute does not require anything more. *See, e.g.*, *United States v. Lamott*, 831 F.3d 1153, 1157 (9th Cir. 2016) (where Congress "intends to legislate a specific intent crime," the statute typically uses the phrase "with the intent to") (internal marks omitted).

Even if the statute were ambiguous, the legislative history also supports this interpretation.[29] *See* H.R. Rep. No. 91-1105, at 2 (1970) ("Existing statutes completely prohibit the importation, interstate transportation, and mailing of contraceptive materials, or the mailing of advertisement or information concerning how or where such contraceptives may be obtained or how conception may be prevented."). Congress unsuccessfully tried to modify Section 1461 to

---

[29] This Court reviews the legislative history as mere evidence of the ordinary public meaning of the current statutory language. *See* Antonin Scalia, A Matter of Interpretation 17 (1997) ("It is the *law* that governs, not the intent of the lawgiver . . . Men may intend what they will; but it is only the laws that they enact which bind us.").

prohibit mailing drugs "intended by the offender . . . to be used to produce an *illegal* abortion." *See* REP. OF THE SUBCOMM. ON CRIM. JUST., 95TH CONG., REP. ON RECODIFICATION OF FED. CRIM. LAW 40 (Comm. Print 1978) (emphasis added); *Bostock*, 140 S. Ct. at 1824 (Kavanaugh, J., dissenting) ("In the face of the unsuccessful legislative efforts . . . judges may not rewrite the law simply because of their own policy views.").[30] In fact, the House Subcommittee Report on the proposed amendment acknowledged the plain meaning of the statute: "[U]nder current law, the offender commits an offense whenever he 'knowingly' mails any of the designated abortion materials," and the proposed amendment would "require proof that the offender *specifically intended* that the mailed materials be used to produce an illegal abortion."[31] If Congress believed the statute *already* contained the "intentionality" requirement gloss in prior reenactments, there is little reason why Congress would amend the provision to *include* that requirement.

Defendants aver Plaintiffs' interpretation of the Comstock Act is foreclosed by the Food and Drug Administration Amendments Act of 2007 ("FDAAA") for one reason: "Congress was well aware that it was directing mifepristone's preexisting distribution scheme to continue" in enacting the FDAAA. ECF No. 28 at 40. But neither "critics [of FDA's 2000 Approval of mifepristone] nor anyone else in the congressional debate mentioned the Comstock Act." OLC Memo at *7 n.18; *see also In re Lively*, 717 F.3d 406, 410 (5th Cir. 2013) ("Repeals by implication are disfavored and will not be presumed unless the legislature's intent is 'clear and manifest.'") (internal marks omitted). Because the Comstock Act is not even implicitly mentioned

---

[30] *Bostock*'s majority opinion warns that "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." 140 S. Ct. at 1747. But the opinion does not suggest judges can "rewrite the law." Instead, *Bostock*'s stated rationale was that the disputed term was implicit in the statutory text all along. No such "textualist" analysis could plausibly justify Defendants' interpretation of the Comstock Act, and Defendants offer none.

[31] REP. OF THE SUBCOMM. ON CRIM. JUST., 95TH CONG., REP. ON RECODIFICATION OF FED. CRIM. LAW 40 (Comm. Print 1978) (emphasis added).

in the FDAAA's enactment, there is no repeal by implication. And in any case, Defendants' arguments based on legislative history cannot overcome clear statutory text.

Consequently, reenactment of the Comstock Act does not constitute an adoption of prior constructions because "the law is plain." *Brown*, 513 U.S. at 121 (1994). Even if that were not the case, the reenactment canon does not apply here because the relevant judicial glosses do not represent a "broad and unquestioned" consensus. *Jama*, 543 U.S. at 349. Defendants rely heavily on the OLC Memo that purports to establish this "consensus." But none of the cases cited in the OLC Memo support the view that the Comstock Act bars the mailing of abortion drugs only when the sender has the specific intent that the drugs be used unlawfully.

On the contrary, the Seventh Circuit reasoned that the word "abortion" in the context of the Act indicates "a national policy of discountenancing abortion as inimical to the national life." *Bours*, 229 F. at 964. *Bours* further declared "it is immaterial what the local statutory definition of abortion is, what acts of abortion are included, or what excluded." *Id.* Similarly, the Sixth Circuit's decision in *Davis v. United States* only suggests that legitimate uses of drugs should not fall within the scope of the statute "merely because they are capable of illegal uses." 62 F.2d 473, 474 (6th Cir. 1933). In other words, the *Davis* holding reflects the position that *legitimate* uses — uses beyond the purposes the statute condemns — should be excluded from the scope of the statute, *not* that whatever uses are *lawful under state law* should be. ECF No. 114 at 10. Likewise, the Second Circuit interpreted the statute to embrace articles the 1873 Congress "would have denounced as immoral if it had understood all the conditions under which they were to be used." *United States v. One Package*, 86 F.2d 737, 739 (2d Cir. 1936). The court further observed that "[t]he word 'unlawful' would make this clear as to articles for producing abortion." *Id.*; *see also* James S. Witherspoon, *Reexamining Roe: Nineteenth-Century Abortion Statutes and the Fourteenth*

*Amendment*, 17 ST. MARY'S L.J. 29, 33 (1985) (explaining that thirty of thirty-seven states had statutory abortion prohibitions in 1868 — just five years before Congress enacted the Comstock Act).

Defendants maintain "the legality of the agency actions needs to be judged at the time of the decision, all of which occurred when *Roe* and *Casey* were still good law." ECF No. 136 at 109. Even assuming that is true in all cases, *Roe* did not prohibit *all* restrictions on abortions. And it is not obvious that enforcement of the Comstock Act post-*Casey* would have necessarily run afoul of *Casey*'s "arbitrary 'undue burden' test." *Dobbs*, 142 S. Ct. at 2266. Therefore, there is no reason why the Act should not have at least been considered. In any case, the Comstock Act plainly forecloses mail-order abortion in the present, and Defendants have stated no present or future intention of complying with the law. Defendants cannot immunize the illegality of their actions by pointing to a small window in the past where those actions might have been legal.

In sum, the reenactment canon is inapplicable here because the law is plain. Even if that were not true, the cases relied on in the OLC Memo do not support Defendants' interpretation. And even if they did, a small handful of cases cannot constitute the "broad and unquestioned" consensus required under the reenactment canon. Therefore, Plaintiffs have a substantial likelihood of prevailing on their claim that Defendants' decision to allow the dispensing of chemical abortion drugs through mail violates unambiguous federal criminal law.

### 2. *FDA's 2021 Actions violate the Administrative Procedure Act*

Because FDA's 2021 Actions violate the Comstock Act, they are "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Additionally, the actions were likely "arbitrary and capricious." *Id.* FDA relied on FDA Adverse Event Reporting System data despite the agency's 2016 decision to eliminate the requirement for abortionists to report non-fatal "adverse events."

ECF No. 7 at 25. Defendants maintain that "Plaintiffs offer no explanation for why it was impermissible to rely on the reported data." ECF No. 28 at 33. The explanation should be obvious — it is circular and self-serving to practically eliminate an "adverse event" reporting requirement and then point to a low number of "adverse events" as a justification for removing even *more* restrictions than were already omitted in 2000 and 2016. In other words, it is a predetermined conclusion in search of non-data — a database designed to produce a null set. But even if FDA's explanation were well-reasoned, the actions would still run afoul of the Comstock Act and therefore violate the APA.

### D. Plaintiffs' Challenges to FDA's Pre-2021 Actions Have a Substantial Likelihood of Success on the Merits

#### 1. *FDA's 2000 Approval violated Subpart H*

In 1992, FDA issued regulations "needed to assure safe use" of *new* drugs designed to treat life-threatening diseases like HIV and cancer. *See* 57 Fed. Reg. 58,942, 58,958 (Dec. 11, 1992) (codified at 21 C.F.R. § 314.520). Subpart H — titled "Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses" — applies to drugs that satisfy two requirements. First, the drug must have been "studied for [its] safety and effectiveness in treating serious or life-threatening illnesses." 21 C.F.R. § 314.500. And second, the drug must "provide [a] meaningful therapeutic benefit to patients over existing treatments." *Id.* "These rules were promulgated by FDA . . . as part of an attempt to correct perceived deficiencies in FDA's approval process made apparent by the need to quickly develop drugs for HIV/AIDS patients." ECF No. 1-13 at 20.

"When FDA originally approved Mifeprex, the agency relied upon Subpart H to place certain restrictions on the manufacturer's distribution of the drug product to assure its safe use." ECF No. 28 at 14; *see also* ECF No. 1-13 at 9 (the American Medical Association explained that "[Mifepristone] poses a severe risk to patients unless the drug is administered as part of a complete

treatment plan under the supervision of a physician"). Thus, to satisfy Subpart H, FDA deemed pregnancy a "serious or life-threatening illness[]" and concluded that mifepristone "provide[d] [a] meaningful therapeutic benefit to patients over existing treatments." *See* 21 C.F.R. §§ 314.500; 314.560. FDA was wrong on both counts.

### a.  Pregnancy is not an "Illness"

Pregnancy is a normal physiological state most women experience one or more times during their childbearing years — a natural process essential to perpetuating human life. Defendants even admit pregnancy is not an "illness." FDA claims the Final Rule explained Subpart H was available for serious or life-threatening "conditions," whether or not they were understood colloquially to be "illnesses." ECF No. 28 at 36. But the Final Rule says no such thing. "One comment asserted that neither depression nor psychosis is a disease, nor is either one serious or life-threatening." 57 Fed. Reg. 58,946. FDA responded to the comment that "signs of these diseases are readily studied" and that its reference to depression and psychosis "was intended to give examples of conditions or diseases that can be serious for certain populations or in some or all of their phases." *Id.* In other words, FDA's response to this comment was *not* that depression and psychosis qualify because they are "conditions" even though they are not colloquially understood as "illnesses." Rather, FDA simply disagreed with the comment's characterization of these conditions and explained that they *were* examples of "diseases" that can be "serious." Nothing in the Final Rule supports the interpretation that pregnancy is a serious or life-threatening illness.

FDA's 2016 Denial of the 2002 Petition is similarly unpersuasive. For example, FDA noted that approximately fifty percent of pregnancies in the United States are unintended and that unintended pregnancies may cause depression and anxiety. ECF No. 1-28 at 5. But categorizing

complications or negative psychological experiences arising *from* pregnancy as "illnesses" is materially different than classifying pregnancy *itself* as a serious or life-threatening illness *per se*. Tellingly, FDA never explains how or why a "condition" would *not* qualify as a "serious or life-threatening illness." Suppose that a woman experiences depression because of lower back pain that inhibits her mobility. Under FDA's reading, a new drug used to treat lower back pain — which can cause depression, just like unplanned pregnancy — could obtain accelerated approval under Subpart H.

Defendants cite zero cases reading Subpart H like FDA reads Subpart H. On the contrary, courts have read "serious or life-threatening illnesses" to mean what it says. *See, e.g.*, *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 182 (E.D.N.Y. 2013) ("Whether an illness is 'serious or life-threatening' 'is based on its impact on such factors as survival, day-to-day functioning, or the likelihood that the disease, if left untreated, will progress from a less severe condition to a more serious one.'") (quoting 57 Fed. Reg. at 13235). The preamble to the final rule also clarified the terms "would be used as FDA has defined them in the past." 57 Fed. Reg. at 13235.

Likewise, the Final Rule expressly stated this nomenclature "is the same as FDA defined and used the terms" in two rulemakings: the first in 1987; the second in 1988. 57 Fed. Reg. at 58,945. In the 1988 rulemaking, FDA defined "life-threatening" to include *diseases or conditions* "where the likelihood of death is high unless the course of the disease is interrupted (*e.g.*, AIDS and cancer), as well as diseases or conditions with potentially fatal outcomes where the end point of clinical trial analysis is survival (*e.g.*, increased survival in persons who have had a stroke or heart attack)." *See* 53 Fed. Reg. at 41517; *id.* at 41516 (referencing "AIDS, cancer, Parkinson's disease, and other serious conditions"); *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 294 (2011) (the canon of *ejusdem generis* "limits general terms that follow specific ones to matters

similar to those specified") (internal marks omitted). Therefore, "diseases" and "conditions" are used interchangeably, and even "conditions" must be "serious" or "life-threatening" as defined.

Food and Drug scholars have understood Subpart H's scope the same way. *See, e.g.*, Charles Steenburg, *The Food and Drug Administration's Use of Postmarketing (Phase IV) Study Requirements: Exception to the Rule?*, 61 FOOD & DRUG L.J. 295, 323 (2006) (Subpart H "extend[s] only to drugs and biological products that target[] 'serious or life-threatening illnesses' and offer[] a 'meaningful' benefit over existing treatments"). Even the Population Council argued to FDA that "the imposition of Subpart H is unlawful" because "[t]he plain meaning of these terms does not comprehend normal, everyday occurrences such as pregnancy and unwanted pregnancy." ECF No. 1-14 at 21. This reading is also consistent with the fact that aside from mifepristone, FDA had approved fewer than forty NDAs under Subpart H by early 2002. *See id.* at 20. And of those *other* approvals, twenty were for the treatment of HIV and HIV-related diseases, nine were for the treatment of various cancers and their symptoms, four were for severe bacterial infections, one was for chronic hypertension, and one was for leprosy. *Id.* "One of these things is not like the others, one of these things just doesn't belong." *See Sesame Street*.

### b. Defendants are not entitled to Auer Deference

Courts sometimes extend *Auer* deference "to agencies' reasonable readings of genuinely ambiguous regulations." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019). *Auer* deference is rooted in an "always rebuttable" presumption "that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities." *Id.* at 2412. "*Auer* deference is sometimes appropriate and sometimes not." *Id.* at 2408. "First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* at 2415. "And before concluding that a rule is genuinely ambiguous, a court must exhaust all the traditional tools of construction." *Id.*

(internal marks omitted). "That means a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read." *Id.* If genuine ambiguity remains, the agency's reading must still be "reasonable." *Id.* And even if the regulation is genuinely ambiguous, the agency's interpretation "must in some way implicate its substantive expertise." *Id.* at 2417. Finally, an agency's reading of a rule must reflect "fair and considered judgment" to receive *Auer* deference. *Id.* (internal marks omitted).

Here, *Auer* deference is not appropriate because "the language of [the] regulation is plain and unambiguous." *McCann v. Unum Provident*, 907 F.3d 130, 144 (3d Cir. 2018). As explained, FDA's definitions in prior rulemakings foreclose its interpretation of Subpart H. If there is any ambiguity in "serious or life-threatening illnesses," the ordinary meaning principle resolves that ambiguity. *See Bostock*, 140 S. Ct. at 1825 (Kavanaugh, J, dissenting) ("The ordinary meaning principle is longstanding and well settled."). "[C]ommon parlance matters in assessing the ordinary meaning" of a statute or regulation "because courts heed how most people would have understood the text." *Id.* at 1828 (internal marks omitted). The word "illness" refers to "poor health; sickness," or "a specific sickness or disease, or an instance of such."[32] Merriam-Webster invokes the definition for "sickness" — "an unhealthy condition of body or mind."[33] Likewise, a Wikipedia search for "illness" re-directs to the entry for "Disease," which is defined as "a particular *abnormal* condition that negatively affects the structure or function of all or part of an organism, and that is not immediately due to any external injury."[34] Pregnancy, on the other

---

[32] *Illness*, Dictionary.com, https://www.dictionary.com/browse/illness (last visited Mar. 22, 2023); *see also Bostock*, 140 S. Ct. at 1766 (Alito, J, dissenting) ("Dictionary definitions are valuable because they are evidence of what people at the time of a statute's enactment would have understood its words to mean.").

[33] *Illness*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/illness (last visited Mar. 22, 2023).

[34] *Disease*, Wikipedia, https://en.wikipedia.org/wiki/Disease (emphasis added) (last visited Mar. 22, 2023).

hand, is defined as "the time during which one or more offspring develops (gestates) inside a woman's uterus (womb)."[35]

Most readers would not define pregnancy to be a serious or life-threatening illness. Even FDA does not earnestly defend that position. True, complications can arise during pregnancy, and said complications *can* be serious or life-threatening. But that does not make pregnancy *itself* an illness. *See* ECF No 1-13 at 21. And even if the regulation were genuinely ambiguous after exhausting all traditional tools of statutory construction, Defendants' interpretation: (1) is *not* reasonable; (2) does not implicate their substantive expertise; and (3) does not reflect fair and considered judgment. Accordingly, Defendants are not entitled to *Auer* deference on their interpretations of "serious or life-threatening illnesses." By interpreting Subpart H's scope as reaching any state or side effect that can be considered an undefined "condition," Defendants broaden the regulation on accelerated approval of new drugs farther than the text of the regulation would ever suggest. Therefore, FDA's approval of chemical abortion drugs under Subpart H exceeded its authority under the regulation's first requirement.

### c. Chemical Abortion Drugs do not provide a "Meaningful Therapeutic Benefit"

FDA also exceeded its authority under the second requirement of Subpart H. In addition to treating a serious or life-threatening illness, chemical abortion drugs must also provide a "meaningful therapeutic benefit" to patients over surgical abortion. 21 C.F.R. § 314.500. As explained, this cannot be the case because chemical abortion drugs do not treat "serious or life-threatening illnesses" — a prerequisite to reaching the second requirement. *Id.* Similarly, chemical abortion drugs cannot be "therapeutic" because the word relates to the treatment or curing of disease.[36] But even putting that aside, chemical abortion drugs do not provide a meaningful

---

[35] *Pregnancy*, Wikipedia, https://en.wikipedia.org/wiki/Pregnancy (last visited Mar. 22, 2023).
[36] *Therapeutic*, Dictionary.com, https://www.dictionary.com/browse/illness (last visited Mar. 28, 2023).

23-10362.4350

therapeutic benefit over surgical abortion. *See* 21 C.F.R. § 314.500 (examples include where the benefit is the "ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy"). To the extent surgical abortion can be considered a "therapy," the clinical trials did not compare chemical abortion with surgical abortion to find such a benefit. ECF No. 1 at 44.

Defendants argue just one "meaningful therapeutic benefit": chemical abortion drugs avoided "an invasive surgical procedure and anesthesia in 92 percent of" patients in the trial. ECF No. 28 at 37. But "[b]y defining the 'therapeutic benefit' solely as the avoidance of the current standard of care's delivery mechanism, FDA effectively guarantees that a drug will satisfy this second prong of Subpart H as long as it represents a different method of therapy." ECF No. 1-14 at 22. And even if that *were* a benefit, chemical abortions are over fifty percent more likely than surgical abortion to result in an emergency room visit within thirty days. ECF No. 7 at 21.[37] Consequently, the number of chemical abortion-related emergency room visits increased by over *five hundred percent* between 2002 and 2015. ECF No. 1 at 19.

One study revealed the overall incidence of adverse events is "fourfold higher" in chemical abortions when compared to surgical abortions.[38] Women who underwent chemical abortions also experienced far higher rates of hemorrhaging, incomplete abortion, and unplanned surgical evacuation.[39] Chemical abortion patients "reported significantly higher levels of pain, nausea,

---

[37] Some studies report that the exact number is *fifty-three* percent. *See* Studnicki et al., *supra* note 22.

[38] *See* Maarit Niinimäki et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 OBSTETRICS & GYNECOLOGY 795 (2009). FDA agrees with this study but finds it "not surprising" given that chemical abortion "is associated with longer uterine bleeding." ECF No. 1-44 at 38. *See also* ECF No 1-13 at 15, n.68–72 (collecting studies demonstrating the far higher rates of adverse events in chemical abortion over surgical abortion).

[39] *Id.*

45

vomiting and diarrhea during the actual abortion than did surgical patients . . . Post-abortion pain occurred in 77.1% of mifepristone patients compared with only 10.5% of surgical patients." ECF No 1-13 at 24. And before the approval, an FDA medical officer recognized the "medical regimen had *more* adverse events, particularly bleeding, than did surgical abortion. Failure rates exceeded those for surgical abortion . . . This is a serious potential disadvantage of the medical method." *Id.* at 23 (emphasis added).

Other studies show eighty-three percent of women report that chemical abortion "changed" them — and seventy-seven percent of those women reported a *negative* change.[40] Thirty-eight percent of women reported issues with anxiety, depression, drug abuse, and suicidal thoughts because of the chemical abortion.[41] Bleeding from a chemical abortion, unlike surgical abortion, can last up to several weeks.[42] And the mother seeing the aborted human "appears to be a difficult aspect of the medical termination process which can be distressing, bring home the reality of the event and may influence later emotional adaptation."[43] "For example, one woman was surprised and saddened to see that her aborted baby 'had a head, hands, and legs' with '[d]efined fingers and toes.'" ECF No. 1 at 21. The entire abortion process takes place within the mother's home, without physician oversight, potentially leading to undetected ectopic pregnancies, failure of rH factor incompatibility detection, and misdiagnosis of gestational age — all leading to severe or even fatal

---

[40] *See* Katherine A. Rafferty & Tessa Longbons, *#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives*, 36 HEALTH COMM. 1485, 1485–94 (2021), https://www.tandfonline.com/doi/full/10.1080/10410236.2020.1770507.

[41] *Id.*

[42] *After Mifepristone: When bleeding will start and how long will it last?*, WOMEN ON WEB, https://www.womenonweb.org/en/page/484/when-will-you-start-bleeding-and-howlong-will-it-last. *See also* ECF No. 1-28 at 25 ("Up to 8% of all subjects may experience some type of bleeding for 30 days or more.").

[43] Pauline Slade et al., *Termination of Pregnancy: Patient's Perception of Care*, 27 J. OF FAMILY PLANNING & REPRODUCTIVE HEALTH CARE 72, 76 (2001).

consequences. *See* ECF No. 96 at 15–17. Contrary to popular belief and talking points, the evidence shows chemical abortion is *not* "as easy as taking Advil." *Id.* at 20.

Compelling evidence suggests the statistics provided by FDA on the adverse effects of chemical abortion *understate* the negative impact the chemical abortion regimen has on women and girls. When women seek emergency care after receiving the chemical abortion pills, the abortionist that prescribed the drugs is usually *not* the provider to manage the mother's complications.[44] Consequently, the treating physician may not know the adverse event is due to mifepristone. *Id.* at 13. Studies support this conclusion by finding *over sixty percent* of women and girls' emergency room visits after chemical abortions are miscoded as "miscarriages" rather than adverse effects to mifepristone.[45] Simply put, FDA's data are incomplete and potentially misleading, as are the statistics touted by mifepristone advocates.

Lastly, chemical abortion does not "treat patients unresponsive to, or intolerant of, available therapy." *See* 21 C.F.R. § 314.500. "To the contrary, because 'medical abortion failures should be managed with surgical termination' the option for surgical abortion must be available for any Mifeprex patient." ECF No. 1-14 at 23 (quoting the Mifeprex "Warnings" label). One study showed that 18.3 percent of women required surgical intervention after the chemical abortion regimen failed. *Id.* Hence, "any patient who would be intolerant of surgical abortion, if such a class of patients exists, cannot use the Mifeprex Regimen." *Id.* at 24. On balance, the data reflect little to no benefit over surgical abortion — much less a "meaningful therapeutic" benefit.

---

[44] Kathi Aultman et al., *Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 36 ISSUES IN LAW & MED., 3–26 (2021).

[45] Studnicki et al., *supra* note 9.

47

### d. Defendants' Misapplication of Subpart H has not been Cured by Congress

Defendants contend "Plaintiffs' arguments about Subpart H have been overtaken by congressional action." ECF No. 28 at 35. In the FDAAA, "Congress specifically directed" that drugs with elements to assure safe use "in effect on the effective date on this Act" would be "deemed to have in effect an approved" REMS. *Id.* (citing Pub. L. No. 110-85, § 909(b)(1)). But the sponsors of such drugs were also required to submit a proposed REMS within 180 days. *See* Pub. L. No. 110-85, § 909(b)(3). Hence, Congress "deemed" preexisting safety requirements to be a sufficient REMS until a *new* REMS was approved. The FDAAA did not affect, however, whether an NDA was properly approved or authorized under Subpart H in the first place. Rather, the FDAAA required that such drugs needed continued restrictions in place to mitigate risks. Implementation of a REMS under the FDAAA does not somehow repeal or supplant the approval process under Subpart H or 21 U.S.C. § 355(d). The FDAAA only eased the regulatory transition from Subpart H to the REMS provision. Simply stated, Congress's *general* reiteration that dangerous drugs should carry a REMS did not codify FDA's *specific* approval of the mifepristone NDA. It did not consider the chemical abortion approval at all.

In sum, Subpart H doubly forecloses FDA's approval of mifepristone. *At most*, FDA might have lawfully approved mifepristone under Subpart H for cases where a pregnant woman's life or health is in danger. But even a limited approval of this sort would still not render pregnancy an "illness." And surgical abortion — a statistically far safer procedure — would still be available to her. But in any case, that is not what FDA did. Instead, FDA manipulated and misconstrued the text of Subpart H to greenlight elective chemical abortions on a wide scale. Therefore, Plaintiffs have a substantial likelihood of prevailing on their claim that Defendants violated Subpart H.

23-10362.4354

### 2. *FDA's Pre-2021 Actions were Arbitrary and Capricious*

Under the FFDCA, a pharmaceutical company seeking to market a new drug must first obtain FDA approval via an NDA. *See* 21 U.S.C. § 355(a), (b). The NDA must include "adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d). The trials must "provide an adequate basis for physician labeling." 21 C.F.R. § 312.21(c). In those trials, "the drug is used *the way it would be administered when marketed*."[46] The Secretary must deny the NDA if "he has insufficient information to determine whether such drug is safe for use under such conditions." 21 U.S.C. § 355(d)(4).

Here, the U.S. trials FDA relied upon when approving mifepristone required that: (1) each woman receive an ultrasound to confirm gestational age and exclude an ectopic pregnancy;[47] (2) physicians have experience in performing surgical abortions and admitting privileges at medical facilities that provide emergency care; (3) all patients be within one hour of emergency facilities or the facilities of the principal investigator; and (4) women be monitored for four hours to check for adverse events after taking misoprostol. ECF No. 7 at 23. However, FDA included *none* of these requirements — which were explicitly stated in the clinical trial FDA relied on most — in the 2000 Approval. *Id.* Likewise, FDA's 2016 Changes omitted the requirements of the underlying tests: (1) gestational age confirmed by ultrasounds; (2) participants required to return for clinical assessment; and (3) surgical intervention if necessary. *Id.* at 24.

---

[46] *Glossary*, WEILL CORNELL MEDICINE, https://research.weill.cornell.edu/compliance/human-subjects-research /institutional-review-board/glossary-faqs-medical-terms-lay-3 (last visited Mar. 22, 2023) (emphasis added).

[47] The 2016 Denial of the 2002 Petition briefly notes the two French clinical trials did not *require* an ultrasound but instead left the decision to the investigator's discretion. ECF No. 1-28 at 19 n.47. Defendants do not explain how many investigators chose to perform an ultrasound. The higher that number is, the more it supports Plaintiffs' argument. But in any case, the U.S. trial was larger than the two French trials combined and is therefore the more reliable study. *Id.* at 9.

Defendants maintain "there is no legal basis for Plaintiffs' contention that the approved conditions of use of a drug must duplicate the protocol requirements for the clinical trials supporting its approval." ECF No. 28 at 35. But FDA's actions must not be arbitrary and capricious.[48] *See* 5 U.S.C. § 706(2)(A); *United States v. An Article of Device . . . Diapulse*, 768 F.2d 826, 832–33 (7th Cir. 1985) (concluding FDA's denial was not arbitrary and capricious because the proposed labeling did not "specify conditions of use that are similar to those followed in the studies"). "The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal marks omitted). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal marks omitted); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (judicial review of agency action "is not toothless"). Courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal marks omitted). An agency's action is "arbitrary and capricious" if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Defendants fail this test.

---

[48] Plaintiffs also frame what the Court characterized as the "study-match problem" as a statutory violation of the FFDCA. *See* ECF No. 7 at 22. The Court does not read 21 U.S.C. § 355(d) as necessarily *requiring* an exact "match" between trial conditions and the conditions on the approved labeling of a new drug. But Section 355(d) does mandate the Secretary "issue an order refusing to approve the application" if he finds the investigations do not show the drug is safe for use under the suggested conditions in the proposed labeling. FDA made such a finding yet did not deny the Application. *See* ECF No. 1-24 at 6 ("We have concluded that adequate information has not been presented to demonstrate that the drug, when marketed in accordance with the terms of distribution proposed, is safe and effective for use as recommended."). Thus, even if Defendants could survive "arbitrary and capricious" analysis of the "study-match problem," Defendants still violated Section 355(d) on their own terms.

### a.  The 2000 Approval

To begin, FDA "entirely failed to consider an important aspect of the problem" by omitting any evaluation of the psychological effects of the drug or an evaluation of the long-term medical consequences of the drug. *State Farm*, 463 U.S. at 43; ECF No. 84 at 12. Considering the intense psychological trauma and post-traumatic stress women often experience from chemical abortion, this failure should not be overlooked or understated. Nor was the drug tested for under-18 girls undergoing reproductive development.[49] But that is not all. Clinical trial protocols in the United States for the 2000 Approval required a transvaginal ultrasound for each patient to accurately date pregnancies and identify ectopic pregnancies. ECF No. 1-28 at 19. But FDA ultimately concluded that "a provider can accurately make such a determination by performing a pelvic examination and obtaining a careful history." *Id.* Thus, FDA determined it was inappropriate "to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy." ECF No. 1-28 at 19. FDA believed "it is reasonable to expect that the women's providers would not have prescribed Mifeprex if a pelvic ultrasound examination had clearly identified an ectopic pregnancy." *Id.* at 20.

FDA thus assumes physicians will ascertain gestational age. But put another way, there is simply *no requirement* that *any* procedure is done to rule out an ectopic pregnancy — which *is* a serious and life-threatening situation. This is arbitrary and capricious. The mere fact that other clinical methods can be used to date pregnancies does not support the view that it should be the

---

[49] In 1998, FDA issued the "Pediatric Rule," which "mandated that drug manufacturers evaluate the safety and effectiveness of their products on pediatric patients, absent an applicable exception." *Ass'n of Am. Physicians & Surgeons, Inc. v. U.S. Food & Drug Admin.*, 391 F. Supp. 2d 171, 173–74 (D.D.C. 2005). Two years after approving mifepristone, FDA was enjoined from enforcing the Pediatric Rule because it lacked statutory authority in issuing the rule. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 226 F. Supp. 2d 204, 222 (D.D.C. 2002). In response, Congress enacted the Pediatric Research Equity Act of 2003 to codify the Pediatric Rule. *See* 21 U.S.C. § 355c. In the 2000 Approval, FDA clarified that the Mifeprex NDA was covered by the Pediatric Rule. *See* ECF No. 1-26 at 4. However, FDA fully waived the rule's requirements without explanation. ECF No. 1-28 at 30.

provider's decision to decide which method — if any — is used to make this determination. FDA has never denied that an ultrasound is the *most accurate* method to determine gestational age and identify ectopic pregnancies. *See* ECF No. 1-14 at 62. And the fact that other clinical methods can be used does not mean that all such methods are equal in their accuracy and reliability.[50] FDA did rely on a study showing that clinicians rarely underestimate gestational age. ECF No. 1-28 at 19 n.49. But this study does nothing to support FDA's view that a transvaginal ultrasound is not necessary to diagnose ectopic pregnancies. To this point, FDA merely argues that even transvaginal ultrasounds do not *guarantee* an existing ectopic pregnancy will be identified. *Id.* at 19. If that is the case, it does not follow that it should be left to the provider's discretion to employ less reliable methods — or no methods at all.

Correct diagnosis of gestational age and ectopic pregnancies is vital. The error in FDA's judgment is borne out by myriad stories and studies brought to the Court's attention. One woman alleged she did not receive an ultrasound or any other physical examination before receiving chemical abortion drugs from Planned Parenthood. ECF No. 1 at 22. "The abortionist misdated the baby's gestational age as six weeks, resulting in the at-home delivery of a 'lifeless, fully-formed baby in the toilet,' later determined to be around *30-36 weeks old*." *Id.*; *see also Patel v. State*, 60 N.E.3d 1041, 1043 (Ind. Ct. App. 2016) (woman who used chemical abortion drugs "delivered a live baby of approximately twenty-five to thirty weeks gestation who died shortly after birth"). Another woman was given chemical abortion drugs during an ectopic pregnancy because her ultrasound "was not even that of a uterus but was of a bladder."[51] ECF No. 31 at 5.

---

[50] Studies reflect that women recurrently miscalculate their unborn child's gestational age. *See* P. Taipale & V. Hiilesmaa, *Predicting delivery date by ultrasound and last menstrual period in early gestation*, 97 OBSTETRICS GYN. 189 (2001); David A. Savitz et al., *Comparison of pregnancy dating by last menstrual period, ultrasound scanning, and their combination*, 187 AM. J. OBSTETRICS GYN. 1660 (2002).

[51] This incident also demonstrates that even where ultrasounds are used, only a qualified provider can assure they are done properly.

The resulting rupture "led to massive infection and a collapse of her vital systems." *Id.* Amicus Human Coalition identified four of their clients who were unknowingly ectopic when they arrived at their clinic "with abortion pills in hand." ECF No. 96 at 20. And at least two women died from chemical abortion drugs last year. *See* ECF No. 120 at 30 n.5. One of those women was an estimated twenty-one weeks pregnant. *See id.* Presumably, the fact that the woman obtained chemical abortion drugs more than two months past FDA's gestational age cutoff suggests that no adequate procedures confirmed the gestational age in her case.

FDA has also reported at least ninety-seven cases where women with ectopic pregnancies took mifepristone.[52] But these data are likely incomplete because FDA now only requires reporting on deaths. *See* ECF No. 1 at 4. And as noted above, hospitals often miscode complications from chemical abortions as miscarriages. Studies show that women are thirty percent more likely to die from a ruptured ectopic pregnancy while seeking abortions if the condition remains undiagnosed.[53] A woman may interpret the warning signs of an ectopic pregnancy — cramping and severe bleeding — as side effects of mifepristone. In reality, the symptoms indicate her life is in danger.[54] Another study revealed that of 5,619 chemical abortion visits, 452 patients had a pregnancy of "unknown location" and 31 were treated for ectopic pregnancy — including 4 that were ruptured.[55] Yet another study examined 3,197 unique, U.S.-only adverse event reports dated September 2000

---

[52] FDA, *Mifepristone US. Post-Marketing Adverse Events Summary Through 6/30/2022,* http://www.fda.gov/media/164331/download.

[53] H.K. Atrash et al., *Ectopic pregnancy concurrent with induced abortion: incidence and mortality*, 162 AM. J. OBSTETRICS GYN. 726 (1990).

[54] *Id.*

[55] Alisa B. Goldberg et al., *Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location*, 139 OBSTETRICS GYN. 771, 775 (2022).

to February 2019.[56] That study noted 20 deaths, 529 life-threatening events, and 1,957 *severe* adverse events before concluding that a pre-abortion ultrasound "should be required to rule out ectopic pregnancy and confirm gestational age."[57]

The record confirms FDA once shared these concerns. After all, many tragedies could be avoided by auditing physician qualifications and requiring ultrasounds. In 1996, the FDA Advisory Committee expressed to the Population Council "serious reservations" on how the drugs were described "in terms of assuring safe and adequate credentialing of providers." ECF No. 1-14 at 51. Population Council initially committed to conducting post-approval studies in 1996, and FDA reiterated these requirements mere months before the September 2000 approval. *See* ECF No. 1-24 at 6 ("We remind you of your commitments dated September 16, 1996, to perform the . . . Phase 4 studies."). Those protocols would have required, *inter alia*, that the Population Council: (1) assess the long-term effects of multiple uses of mifepristone; (2) ascertain the frequency with which women follow the regimen and outcomes of those that do not; (3) study the safety and efficacy of chemical abortion in girls under the age of eighteen; and (4) ascertain the regimen's effects on children born after treatment failure.[58] ECF No. 1-28 at 32.

---

[56] Aultman et al., *supra* note 44.

[57] *Id.*

[58] *See* 153 Cong. Rec. S5765 (daily ed. May 9, 2007) (statement of Sen. Coburn) ("I recently learned of a woman who was given RU-486 after she had a seizure. Her physicians assumed that the seizure was life-threatening to the baby she was carrying and gave her RU-486 for a therapeutic abortion. RU–486 was not effective in her case and the woman carried the baby to term. When the baby was born at a low birth weight, it also suffered from failure to thrive. That baby has had three subsequent brain surgeries due to hydrocephalus. The baby also suffers from [idiopathic lymphocytic colitis] — an inflammatory disease of the colon, which is extremely rare in children. It is clear that RU-486 not only is unsafe in women, but it is also not completely effective. And when it is not effective, the results are devastating.").

Similarly, on February 18, 2000 — months before chemical abortion approval — FDA informed the Population Council that "adequate information ha[d] *not* been presented to demonstrate that the drug, when marketed in accordance with the terms of distribution proposed, is safe and effective for use as recommended." ECF No. 1-24 at 6 (emphasis added). FDA then stated the "restrictions on distribution will need to be amended." *Id.* Accordingly, FDA informed the Population Council that it would proceed under Subpart H — the *only* provision that could implement the requisite restrictions on distribution. *Id.* But as explained above, that was the improper regulation for the approval of chemical abortion. Regardless, the restrictions were insufficient to ensure safe use.

On June 1, 2000, FDA privately delivered to the Population Council a set of proposed restrictions to rectify the safety issues. Said proposal required physicians who were: (1) "trained and authorized by law" to perform surgical abortions; (2) trained in administering mifepristone and treating adverse events; and (3) allowed "continuing access (*e.g.*, admitting privileges) to a medical facility equipped for instrumental pregnancy termination, resuscitation procedures, and blood transfusion at the facility or [one hour's] drive from the treatment facility." *See* ECF No. 1-14 at 53–54. When FDA's proposal was leaked to the press, a political and editorial backlash ensued.[59] In response, the Population Council rejected the proposal and repudiated the restrictions the sponsor *itself* proposed in 1996 — what FDA deemed a "very significant change" in the sponsor's position. *Id.* at 50. Because "[t]he whole idea of mifepristone was to increase access," abortion advocates argued that restrictions on mifepristone "would effectively eliminate" the drug's "main advantage" and would "kill[] the drug."[60]

---

[59] Sheryl Gay Stolberg, *FDA Adds Hurdles in Approval of Abortion Pill*, THE NEW YORK TIMES (June 8, 2000), https://www.nytimes.com/2000/06/08/us/fda-adds-hurdles-in-approval-of-abortion-pill.html.

[60] *Id.*

In September 2000, FDA abandoned its safety proposals and acquiesced to the objections of the Population Council and Danco. Despite its "serious reservations" about mifepristone's safety, FDA approved a regimen that relied on a self-certification that a prescribing physician has the *ability* to diagnose ectopic pregnancies. *Id.* at 51, 62; *see also* ECF No. 1-28 at 21 ("[W]e concluded that there was no need for special certification programs or additional restrictions."). FDA later released the applicant *entirely* from its Phase 4 duties — *twelve years* after the 1996 commitment. ECF Nos. 1-24 at 6, 1-28 at 32; *see also* 21 C.F.R. § 314.510 ("Approval under this section will be subject to the requirement that the applicant study the drug further, to verify and describe its clinical benefit, where there is uncertainty . . . of the observed clinical benefit to ultimate outcome. Postmarketing studies would usually be studies *already underway*.") (emphasis added).

FDA *must* refuse to approve a drug if the agency determines there is "insufficient information to determine whether such drug is safe for use" or a "lack of substantial evidence that the drug will have the effect it purports or is represented to have" under the conditions of use in the proposed label. 21 U.S.C. § 355(d)(4)–(5); *see also* 21 C.F.R. § 314.125(b). FDA is therefore required to deny an NDA if it makes the exact findings FDA made in its 2000 review. "[A]n agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009). The agency must ordinarily "display awareness that it *is* changing position," and "must show that there are good reasons for the new policy." *Id.* at 515. And "if the agency's decision was in any material way influenced by political concerns it should not be upheld." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 768 (9th Cir. 2007). FDA's only acknowledgments of its prior proposals were that "FDA and the applicant were not always in

full agreement about the distribution restrictions" and that fulfilling the Phase 4 commitments "would not be feasible." ECF No. 1-28 at 18, 32–33.

The Court does not second-guess FDA's decision-making lightly. But here, FDA acquiesced on its legitimate safety concerns — in violation of its statutory duty — based on plainly unsound reasoning and studies that did not support its conclusions. There is also evidence indicating FDA faced significant political pressure to forego its proposed safety precautions to better advance the *political* objective of increased "access" to chemical abortion — which was the "whole idea of mifepristone."[61] As President Clinton's Secretary for Health & Human Services ("HHS") explained to the White House, it was *FDA* that arranged the meeting between the French pharmaceutical firm — who owned the mifepristone patent rights — and the eventual drug sponsor Population Council. The purpose of the FDA-organized meeting was "to facilitate an agreement between those parties to work together to test [mifepristone] and file a new drug application." ECF No. 95 at 14. HHS also "initiated" another meeting "to assess how the United States Government" — *i.e.*, the Clinton Administration — "might facilitate successful completion of the negotiations" between the French firm and the American drug sponsor to secure patent rights and eventual FDA approval. *Id.* at 16. In fact, for their "negotiations [to be] successfully concluded," the HHS Secretary believed American pressure on the French firm was necessary.[62] *Id.*

Whether FDA abandoned its proposed restrictions because of political pressure or not, one thing is clear: the lack of restrictions resulted in many deaths and many more severe or life-

---

[61] Stolberg, *supra* note 59.

[62] *See also* Lars Noah, *A Miscarriage in the Drug Approval Process?: Mifepristone Embroils the FDA in Abortion Politics*, 36 WAKE FOREST L. REV. 571, 576 (2001) ("The Clinton administration went to great lengths to bring mifepristone into the United States. From pressuring the hesitant manufacturer to apply for approval, and utilizing a specialized review procedure normally reserved for life-saving drugs, to imposing unusual restrictions on distribution, and promising to keep the identity of the manufacturer a secret, the FDA's approval process deviated from the norm in several respects.").

threatening adverse reactions. Due to FDA's lax reporting requirements, the exact number is not ascertainable. But it is likely far higher than its data indicate for reasons previously mentioned. Whatever the numbers are, they likely would be considerably lower had FDA not acquiesced to the pressure to increase access to chemical abortion at the expense of women's safety. FDA's failure to *insist* on the inclusion of its proposed safety restrictions was not "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52. To hold otherwise would be "tantamount to abdicating the judiciary's responsibility under the [APA] to set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995) (quoting 5 U.S.C. § 706(2)(A)). Finally, the 2000 Approval was also arbitrary and capricious because it violated Subpart H.[63]

### b. The 2016 Changes

FDA made numerous substantial changes to the chemical abortion regimen in 2016. These changes include but are not limited to: (1) eliminating the requirement for prescribers to report *all* nonfatal serious adverse events; (2) extending the maximum gestational age from 49 days to 70 days; (3) eliminating the requirement that administration of misoprostol occurs in-clinic; (4) removing the requirement for an in-person follow-up exam; and (5) allowing "healthcare providers" other than physicians to dispense chemical abortion drugs. ECF No. 1 at 53–54. Plaintiffs allege the 2016 Changes were also arbitrary and capricious "because *none* of the studies on which FDA relied were designed to evaluate the safety and effectiveness of chemical abortion

---

[63] As one scholar noted, "the agency took this route so that it could better justify imposing otherwise unauthorized restrictions on the use and distribution of the drug." *See* Noah, *supra* note 62, at 582. And "while agency action may generally be 'entitled to a presumption of regularity,' here FDA itself acknowledges that its action has not been regular: it failed to respond to the Citizen Petition for years." *Bayer*, 942 F. Supp. 2d at 25 (internal marks omitted). At the hearing, Defendants' leading argument for Subpart H was that "none of it really matters" because of the FDAAA. *See* ECF No. 136 at 100. "This is not the argument of an agency that is confident in the legality of its actions." ECF No. 100 at 15.

drugs for use under the conditions prescribed, recommended, or suggested in the proposed labeling." ECF No. 7 at 24.

For similar reasons as the 2000 Approval, the Court agrees. Unlike the crucial studies FDA relied upon to extend the maximum gestational age, change the dosing regimen, and authorize a repeat dose of misoprostol, the labeling approved by FDA in 2016 did *not* require: (1) an ultrasound; (2) an in-person follow-up exam; or (3) the ability of abortionists to personally perform a surgical abortion if necessary. *Id.* Simply put, FDA built on its already-suspect 2000 Approval by removing *even more* restrictions related to chemical abortion drugs that were present during the final phase of the investigation. And it did so by relying on studies that included the very conditions FDA refused to adopt.[64] None of the studies compared the safety of the changes against the then-current regimen, nor under the labeled conditions of use. Moreover, FDA shirked any responsibility for the consequences of its actions by eliminating any requirement that non-fatal adverse events be reported. Thus, FDA took its chemical abortion regimen — which had already culminated in *thousands* of adverse events suffered by women and girls — and removed what little restrictions protected these women and girls, systematically ensuring that almost all new adverse events would go unreported or underreported.

Defendants aver that "Plaintiffs point to no statutory provision requiring the conditions of use in a drug's approved labeling to duplicate the protocol requirements used in the studies supporting its approval." ECF No. 28 at 32. "The [FFDCA] thus requires FDA to apply its scientific expertise in determining whether a drug has been shown to be safe and effective under particular conditions of use, and the application of that expertise is owed substantial deference." *Id.* But FDA does not have unfettered discretion to approve dangerous drugs under substantially

---

[64] *See* ECF No. 1-35.

different conditions than the tests, trials, and studies cited. To be clear, the Court does not hold that *any* difference between approval conditions and testing conditions — no matter how well-justified — means the approval fails as a matter of law. But the agency "must cogently explain why it has exercised its discretion in a given manner," and that explanation must be "sufficient to enable [the Court] to conclude that the [agency's action] was the product of reasoned decisionmaking." *A.L. Pharma*, 62 F.3d at 1491 (quoting *State Farm*, 463 U.S. at 52). Defendants have not done so here. FDA's 2016 Actions were not the product of reasoned decision-making.

### c. *The 2019 Generic Approval*

The FFDCA allows a generic drug manufacturer to submit an ANDA for premarket review and approval. 21 U.S.C. § 355(j); 21 C.F.R. § 314.94. The generic sponsor must show that: (1) the conditions of use prescribed, recommended, or suggested in the labeling have been previously approved; and (2) the drug product is chemically the same as the already approved drug — allowing it to rely on FDA's previous finding of safety and effectiveness for the approved drug. *Id.* On April 11, 2019, FDA approved GenBioPro, Inc.'s ANDA for a generic version of mifepristone. ECF No. 7 at 10. In doing so, FDA relied on Mifeprex's safety data. *Id.*

Plaintiffs argue the 2019 Approval was unlawful because FDA relied on the unlawful 2000 Approval and its unlawful 2016 Changes when approving generic mifepristone. ECF No. 7 at 27. If FDA withdraws the listed drug on which the ANDA-approved generic drug is based, the agency is generally required to withdraw the generic drug as well. 21 U.S.C. § 355(j)(6); 21 C.F.R. § 314.151. Because the Court agrees that Plaintiffs have a substantial likelihood of success in their challenges to the 2000 and 2016 Actions, the Court is inclined to agree with Plaintiffs on this claim as well.

### E.  There Is a Substantial Threat of Irreparable Harm

To satisfy the second element of the preliminary injunction standard, Plaintiffs "must demonstrate that if the district court denied the grant of a preliminary injunction, irreparable harm would result." *Janvey*, 647 F.3d at 600 (internal marks omitted). "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Id.* (internal marks omitted). "When determining whether injury is irreparable, it is not so much the magnitude but the irreparability that counts." *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 433–34 (5th Cir. 2016) (internal marks omitted). Where "the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for preliminary injunction." *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C.Cir. 1985) (per curiam)). Plaintiffs' Motion satisfies this standard.

For reasons already stated, Plaintiffs are likely to suffer irreparable harm if the Motion is not granted. At least two women died from chemical abortion drugs just last year. *See* ECF No. 120 at 30 n.5;[65] *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (finding irreparable harm to third-party pregnant women). "The physical and emotional trauma that chemical abortion inflicts on women and girls cannot be reversed or erased." ECF No. 7 at 28; *see also E.E.O.C. v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984) (affirming irreparable harm for plaintiffs' "emotional distress"). "The crucial time that doctors need to treat these injured women and girls cannot be replaced." *Id.* "The mental and monetary costs to these doctors cannot be repaid." *Id.* "And the time, energy and resources that Plaintiff medical associations expend in

---

[65] One of those women was reportedly twenty-one weeks pregnant, which is well past the cutoff for gestational age even after the 2016 Changes. *See id.* The other maternal death occurred while the woman was seven weeks pregnant, which falls within FDA's current restrictions. *Id.*

response to FDA's actions on chemical abortion drugs cannot be recovered." *Id.*; *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (obstacles that make it more difficult for an organization to accomplish its mission provide injury for both standing *and* irreparable harm).

Defendants' respond that the drugs at issue have been on the market for more than twenty years. ECF No. 28 at 41. This argument ignores that many restrictions and safeguards — which no longer exist — were in place for most of that time. Defendants also argue "Plaintiffs' extreme delay" in filing suit shows they face no irreparable harm. *Id.* at 42. But the time between the allegedly unlawful actions and the filing of a suit "is not determinative" of whether relief should be granted. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975). Here, eleven months does not constitute an "extreme" delay. *See, e.g.*, *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 720 (E.D. Tex. 2020) (eleven-month delay did not militate against equitable relief because "the Court can presume that Plaintiff needed ample time to evaluate its claims").[66] "[T]emporary injunctive relief may still be of great value to protect against ongoing harms, even if the initial harm is in the distant past." *N.L.R.B. v. Hartman & Tyner, Inc.*, 714 F.3d 1244, 1252 (11th Cir. 2013).

The Court also disagrees that Plaintiffs' theories of injury "are too speculative to even show standing." ECF No. 28 at 42. Plaintiffs have credibly alleged past and future harm resulting from the removal of restrictions for chemical abortion drugs. "Although a court's analysis of likelihood of success in the context of an injunctive relief request is governed by the deferential APA's arbitrary and capricious standard, a court does not always owe deference to federal agencies' positions concerning irreparable harm, balance of hardships, or public interest." *San Luis & Delta-*

---

[66] To clarify, the eleven months referenced here is the approximate time between FDA's "final agency action" in the December 2021 Denial of the 2019 Petition and the commencement of this case.

*Mendota Water Auth. v. Jewell*, 969 F. Supp. 2d 1211, 1215 (E.D. Cal. 2013); *see also R.J. Reynolds Vapor Co. v. FDA*, No. 23-60037 (5th Cir. Mar. 23, 2023)[67] (noting FDA's public interest argument was "obviously colored by the FDA's view of the merits"); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011) ("If the federal government's experts were always entitled to deference concerning the equities of an injunction, substantive relief against federal government policies would be nearly unattainable, as government experts will likely attest that the public interest favors the federal government's preferred policy.").

### F.  Preliminary Injunction Would Serve the Public Interest

The third and fourth factors — assessing the harm to the opposing party and weighing the public interest — "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he public interest weighs strongly in favor of preventing unsafe drugs from entering the market." *Hill Dermaceuticals*, 524 F. Supp. 2d at 12. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (internal marks omitted). And "there is a strong public interest in meticulous compliance with the law by public officials." *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993); *see also State v. Biden*, 10 F.4th at 559. "Indeed, the Constitution itself declares a prime public interest that the President and, by necessary inference, his appointees in the Executive Branch 'take Care that the Laws be faithfully executed.'" *Id.* (internal marks omitted). Additionally, Defendants' actions harm States' efforts to regulate chemical abortion "in the interests of life, health, and liberty." ECF No. 100 at 21. "The Court appreciates FDA's institutional interest but, given its long-standing disregard of [Plaintiffs'] Citizen Petition[s], its argument has a hollow center." *Bayer HealthCare*, 942 F. Supp. 2d at 26. To the extent Defendants

---

[67] https://www.ca5.uscourts.gov/opinions/pub/23/23-60037-CV0.pdf.

and third parties would be harmed by an injunction, the Court still balances these factors in favor of ensuring that women and girls are protected from unnecessary harm and that Defendants do not disregard federal law.

For these reasons, a preliminary injunction would serve the public interest. Defendants maintain that *unaborted* children of the women "who seek but are unable to obtain an abortion" are "expected to do worse in school," "to have more behavioral and social issues, and ultimately to attain lower levels of completed education." ECF No. 28-2 at 7. "They are also expected to have lower earnings as adults, poorer health, and an increased likelihood of criminal involvement." *Id.* But "[u]sing abortion to promote eugenic goals is morally and prudentially debatable." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting); *see also Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1790 (2019) (Thomas, J., concurring) ("[A]bortion has proved to be a disturbingly effective tool for implementing the discriminatory preferences that undergird eugenics."). Though eugenics were once fashionable in the Commanding Heights and High Court, they hold less purchase after the conflict, carnage, and casualties of the *last* century revealed the bloody consequences of Social Darwinism practiced by would-be Übermenschen. *Cf. Buck v. Bell*, 274 U.S. 200, 207 (1927) ("It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes.").

Defendants are correct that one purpose of injunctive relief is to preserve the status quo. *See, e.g.*, *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). But the "status quo" to be restored is "the last peaceable uncontested status existing between the parties before the

dispute developed." *Texas v. Biden*, No. 2:21-CV-067-Z, 2022 WL 17718634, at *9 (N.D. Tex. Dec. 15, 2022) (internal marks omitted); *see also Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (the relevant status quo is the one "absent the unlawful agency action"); *Wages & White Lion*, 16 F.4th at 1144 ("In other words, 'the relief sought here would simply suspend *administrative* alteration of the *status quo*.'") (quoting *Nken*, 556 U.S. at 430 n.1); *Callaway*, 489 F.2d at 576 ("If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury."). "[P]arties could otherwise have no real opportunity to seek judicial review except at their peril." Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1157–58 (2020). Chemical abortion is only the status quo insofar as Defendants' unlawful actions and their delay in responding to Plaintiffs' petitions have made it so. The fact that injunctive relief could upset this "status quo" is therefore an insufficient basis to deny injunctive relief.

### G. A Stay Under Section 705 of the APA Is More Appropriate Than Ordering Withdrawal or Suspension of FDA's Approval

The Motion asks for injunctive relief but goes as far as requesting the Court to order Defendants to "withdraw or suspend the approvals of chemical abortion drugs, and remove them from the list of approved drugs." ECF No. 7 at 7. Singular equitable relief is "commonplace" in APA cases and is often "necessary to provide the plaintiffs" with "complete redress." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (internal marks omitted). Although the Court finds Plaintiffs have a substantial likelihood of prevailing on the merits, the Court instead exercises its authority under the APA to order less drastic relief. Section 705 of the APA provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, *may issue all necessary and appropriate process to postpone the effective date of an agency action* or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705 (emphasis added).

The Fifth Circuit has acknowledged "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *Texas v. Biden*, 2022 WL 17718634 at *7 (quoting *Texas v. United States*, 40 F.4th at 219). Whereas an injunction "tells someone what to do or not to do," a vacatur only reinstates "the status quo absent the unlawful agency action and neither compels nor restrains further agency decision-making." *Id.* (internal marks omitted). A Section 705 stay can "be seen as an interim or lesser form of vacatur under Section 706." *Id.* "Just as a preliminary injunction is often a precursor to a permanent injunction, a stay under Section 705 can be viewed as a precursor to vacatur under Section 706." *Id.*; *see also Nken*, 556 U.S. at 428–29 (a stay "temporarily suspend[s] the source of authority to act — the order or judgment in question — not by directing an actor's conduct"). "Motions to stay agency action pursuant to [Section 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* at *10 (citing *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010)); *see also Nken*, 556 U.S. at 434; *Texas v. U.S. Env't Prot. Agency*, 829 F.3d at 435. Because the Court finds injunctive relief is generally appropriate, Section 705 plainly authorizes the lesser remedy of issuing "all necessary and appropriate process" to postpone the effective date of the challenged actions. "Courts — including the Supreme Court — routinely stay *already-effective* agency action under Section 705." *Id.* at *8 (emphasis added) (collecting cases).

Accordingly, the Court hereby **STAYS** the effective date of FDA's September 28, 2000, Approval of mifepristone and all subsequent challenged actions related to that approval — *i.e.*, the 2016 Changes, the 2019 Generic Approval, and the 2021 Actions. This Court acknowledges that its decision in *Texas v. Biden* has been appealed to the Fifth Circuit. *See* 2:21-CV-067-Z, ECF No. 184 (Feb. 13, 2023). If the Fifth Circuit reverses this Court's Section 705 analysis, the Court clarifies that it alternatively would have ordered Defendants to suspend the chemical abortion approval and all subsequent challenged actions related to that approval until the Court can render a decision on the merits.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion **IN PART**. FDA's approval of mifepristone is hereby **STAYED**. The Court **STAYS** the applicability of this opinion and order for seven (7) days to allow the federal government time to seek emergency relief from the United States Court of Appeals for the Fifth Circuit.

**SO ORDERED**.

April 7, 2023

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

67

23-10362.4373

**TAB 5**

Fifth Circuit Stay Decision

# United States Court of Appeals for the Fifth Circuit

_____

No. 23-10362

_____

ALLIANCE FOR HIPPOCRATIC MEDICINE; AMERICAN
ASSOCIATION OF PRO-LIFE OBSTETRICIANS &
GYNECOLOGISTS; AMERICAN COLLEGE OF PEDIATRICIANS;
CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; SHAUN
JESTER, D.O.; REGINA FROST-CLARK, M.D.; TYLER JOHNSON,
D.O.; GEORGE DELGADO, M.D.,

*Plaintiffs—Appellees*,

*versus*

FOOD & DRUG ADMINISTRATION; ROBERT M. CALIFF,
*Commissioner of Food and Drugs*; JANET WOODCOCK, M.D., *in her
official capacity as Principal Deputy Commissioner, U.S. Food and Drug
Administration*; PATRIZIA CAVAZZONI, M.D., *in her official capacity as
Director, Center for Drug Evaluation and Research, U.S. Food and Drug
Administration*; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; XAVIER BECERRA, *Secretary, U.S. Department of
Health and Human Services*,

*Defendants—Appellants*,

*versus*

DANCO LABORATORIES, L.L.C.,

*Intervenor—Appellant.*

23-10362.4378

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:22-CV-223

———————————————————————

UNPUBLISHED ORDER

Before Haynes,[*] Engelhardt, and Oldham, *Circuit Judges*.

Per Curiam:

For the reasons given below, IT IS ORDERED that defendants'
motions for a stay pending appeal are GRANTED IN PART. At this
preliminary stage, and based on our necessarily abbreviated review, it appears
that the statute of limitations bars plaintiffs' challenges to the Food and Drug
Administration's approval of mifepristone in 2000. In the district court,
however, plaintiffs brought a series of alternative arguments regarding
FDA's actions in 2016 and subsequent years. And the district court
emphasized that its order separately applied to prohibit FDA's actions in and
after 2016 in accordance with plaintiffs' alternative arguments. As to those
alternative arguments, plaintiffs' claims are timely. Defendants have not
shown that plaintiffs are unlikely to succeed on the merits of their timely
challenges. For that reason, and as more fully explained below, defendants'
motions for a stay pending appeal are DENIED IN PART. Defendants'
alternative motions for an administrative stay are DENIED AS MOOT.
Plaintiffs' motion to dismiss the appeal is DENIED. The appeal is
EXPEDITED to the next available Oral Argument Calendar.

———————————————

[*] Judge Haynes concurs only in part: she concurs in the grant of the expedited
appeal and the denial of the motion to dismiss. With respect to the request for a stay of the
district court's order, as a member of the motions panel, she would grant an administrative
stay for a brief period of time and defer the question of the stay pending appeal to the oral
argument merits panel which receives this case.

2

## I.

## A.

Congress delegated to the Food and Drug Administration ("FDA") the responsibility to ensure that "new drugs" are "safe and effective." 21 U.S.C. §§ 321(p), 355; *see also id.* § 393(b)(2)(B). When making its approval determination, FDA evaluates whether a new drug application ("NDA") includes scientific evidence demonstrating that the drug is safe and effective for its intended uses. *Id.* § 355(d); *see also* 21 C.F.R. §§ 314.50, 314.105(c). Similarly, when a sponsor submits a supplemental new drug application ("SNDA") proposing changes to the conditions of approval for a drug (such as changes to a drug's labeling or FDA-imposed restrictions), FDA reviews the scientific evidence to support the changes. *See* 21 C.F.R. § 314.70. To approve a generic version of a previously approved drug, FDA reviews whether an abbreviated new drug application ("ANDA") contains information showing that the proposed generic drug is materially the "same" as the approved drug. 21 U.S.C. § 355(j)(2).

In 1992, FDA promulgated the so-called "Subpart H" regulations. Subpart H accelerates approval of drugs "that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (*e.g.*, ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy)." 21 C.F.R. § 314.500. Originally, Subpart H was intended to promote rapid approval for life-saving HIV-AIDS drugs. But given that Subpart H approvals were accelerated, FDA recognized that it would need *post*-approval safety measures. These post-approval safety measures would "assure safe use" of the quickly approved Subpart H drugs. *Id.* § 314.520. In 2007, Congress ratified these post-approval safety measures as "risk evaluation and

mitigation strategies" ("REMS"), which "ensure that the benefits of the drug outweigh the risks." 21 U.S.C. § 355-1(a)(1)–(2).

### B.

In 2000, FDA approved mifepristone to be marketed with the brand name Mifeprex under Subpart H (the "2000 Approval"). *See* 21 C.F.R. § 314.500; FDA Add. 181.[1] In the 2000 Approval, FDA concluded that pregnancy is a "life-threatening illness," triggering an accelerated approval of mifepristone under Subpart H. FDA Add. 186. FDA also concluded that a variety of post-approval restrictions on Mifeprex were required "to assure safe use." 21 C.F.R. § 314.520. As noted in the previous section, today we call such post-approval restrictions "REMS." The 2000 Approval imposed several REMS, including: (1) limiting the drug to pregnant women and girls for use through 49 days gestation; (2) requiring three in-person office visits, the first to administer mifepristone, the second to administer misoprostol, and the third to assess any complications and ensure there were no fetal remains in the womb; (3) requiring the supervision of a qualified physician; and (4) requiring the reporting of all adverse events from the drugs. FDA Add. 181–91. FDA granted Danco Laboratories, LLC, an exclusive license to manufacture, market, and distribute Mifeprex in the United States. FDA Add. 109.

In 2002, two of the plaintiff associations in this case filed a citizen petition challenging the 2000 Approval (the "2002 Citizen Petition"). *See* 21 C.F.R. § 10.25(a); PI App. 280–375. Roughly fourteen years later, FDA denied the 2002 Citizen Petition (the "2016 Petition Denial"). FDA Add.

---

[1] Citations to the addendum to FDA's emergency motion for a stay pending appeal are denoted "FDA Add." Citations to the appendix to plaintiffs' motion for a preliminary injunction are denoted "PI App."

804–36. And on the very same day in March 2016, FDA approved several major changes to mifepristone's approved conditions of use, including its REMS. Specifically, FDA removed four of the original safety restrictions by (1) increasing the maximum gestational age at which a woman can use the drug from 49 to 70 days; (2) reducing the number of required in-person office visits from three to one; (3) allowing non-doctors to prescribe and administer the chemical abortions drugs; and (4) eliminating the requirement for prescribers to report non-fatal adverse events from chemical abortion (the "2016 Major REMS Changes"). FDA Add. 777–802.

In March 2019, one of the plaintiff associations filed a second citizen petition challenging the 2016 Major REMS Changes (the "2019 Citizen Petition"). FDA Add. 192–217. That petition asked FDA to "restore" the 2000 Approval's REMS and "retain" a requirement that mifepristone be dispensed to patients in person. FDA Add. 192.

In April 2019, FDA approved GenBioPro, Inc's ANDA for a generic version of mifepristone (the "2019 Generic Approval"). PI App. 694–708. GenBioPro's generic version of mifepristone has the same labeling and REMS requirements as Danco's Mifeprex.

In April 2021, FDA announced that it would "exercise enforcement discretion" to allow "dispensing mifepristone through the mail . . . or through a mail-order pharmacy" during the COVID-19 pandemic (the "2021 Mail-Order Decision"). PI App. 713–15. FDA took this action in response to a letter from the American College of Obstetricians and Gynecologists and the Society for Maternal-Fetal Medicine. PI App. 710–11.

Later that year, in December 2021, FDA denied almost all of the 2019 Citizen Petition (the "2021 Petition Denial"). FDA Add. 837–76. In particular, FDA expressly rejected the 2019 Citizen Petition's request to keep the in-person dispensing requirements and announced that the agency

No. 23-10362

had concluded that "the in-person dispensing requirement is no longer necessary." FDA Add. 842.

Finally, in January 2023, FDA approved a modified REMS for mifepristone lifting the in-person dispensing requirement. *See REMS Single Shared System for Mifepristone 200 mg* (Jan. 2023), https://perma.cc/MJT5-35LF (the "2023 Mail-Order Decision").[2]

C.

In November 2022, plaintiffs (physicians and physician organizations) filed this suit against FDA, HHS, and a several agency heads in the official capacities. Plaintiffs first challenged FDA's 2000 Approval of the drug. But they also requested multiple grounds of alternative relief for FDA's subsequent actions. Immediately after filing, plaintiffs moved for a preliminary injunction ordering FDA to withdraw or suspend (1) FDA's 2000 Approval and 2019 Generic Approval, (2) FDA's 2016 Major REMS Changes, and (3) FDA's 2021 Mail-Order Decision and its 2021 Petition Denial of the 2019 Citizen Petition. If that's confusing, we hope this chart helps:

─────────────────────

[2] Danco suggests the 2023 Mail-Order Decision moots part of plaintiffs' claims. *See* Danco Stay App. 22. We disagree. The Supreme Court has explicitly instructed this court to review a new agency action finalized after litigation commenced and while the appeal was pending because this decision was a "final agency action" for purposes of 5 U.S.C. § 704. *Biden v. Texas*, 142 S. Ct. 2528, 2544-45 (2022) (quotation omitted).

23-10362.4383

No. 23-10362

| Event | Citation | Description |
|---|---|---|
| 2000 Approval | FDA Add. 181–91 | Approved mifepristone with these REMS: (1) pregnancies under 50 days gestation; (2) three in-person office visits; (3) supervision of a qualified physician; and (4) reporting of all adverse events |
| 2002 Citizen Petition | PI App. 280–375 | Plaintiffs' challenge to 2000 Approval |
| 2016 Petition Denial | FDA Add. 804–36 | FDA denial of 2002 Citizen Petition |
| 2016 Major REMS Changes | FDA Add. 768, 777–802 | FDA changed four of the 2000 Approval's REMS: (1) increased maximum gestational age to 70 days; (2) reduced required in-person office visits to one; (3) allowed non-doctors to prescribe and administer mifepristone; and (4) eliminated reporting of non-fatal adverse events |
| 2019 Citizen Petition | FDA Add. 192–217 | Plaintiffs' challenge to 2016 Major REMS Changes |
| 2019 Generic Approval | PI App. 694–708 | FDA ANDA Approval Letter for mifepristone generic to GenBioPro, Inc. |
| 2021 Mail-Order Decision | PI App. 713–15 | FDA announces "enforcement discretion" to allow mifepristone to be dispensed through the mail during COVID-19 |
| 2021 Petition Denial | FDA Add. 837–76 | FDA denial of almost all of the 2019 Citizen Petition, including plaintiffs' request to keep the in-person dispensing requirements |
| 2023 Mail-Order Decision | https://perma.cc/MJT5-35LF | FDA permanently removed the in-person dispensing REMS |

23-10362.4384

No. 23-10362

On April 7, 2023, the district court entered an order staying the effective date of the 2000 Approval and each of the subsequent challenged actions.[3] The district court stayed its own order for seven days to allow the defendants time to appeal.

## II.

FDA and Danco ("stay applicants" or "applicants") ask us to stay the district court's order pending appeal. Our power to grant a stay is inherent. *See In re McKenzie*, 180 U.S. 536, 551 (1901); *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 10–14 (1942). It's also statutory. *See* Fed. R. App. P. 8; 28 U.S.C. § 1651; 5th Cir. R. 27.3; *see also* 16A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3954 (5th ed. Apr. 2022 update).

But we grant stays "only in extraordinary circumstances." *Williams v. Zbaraz*, 442 U.S. 1309, 1311 (1979) (Stevens, J., in chambers); *see also Graves v. Barnes*, 405 U.S. 1201, 1203 (1972) (Powell, J., in chambers) (same); *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1316 (1983) (Blackmun, J., in chambers) (same). This rule reflects the fact that "a stay is not a matter of right, even if irreparable injury might otherwise result." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). Instead, a stay requires "an exercise of judicial discretion." *Ibid.* A "decree creates a strong presumption of its own correctness," which often counsels against a stay. *Id.* at 673.

-------

[3] As both parties recognize, this order would have the practical effect of an injunction because it would remove mifepristone from the market. Plaintiffs filed a motion to dismiss applicants' appeal on the theory that § 705 stays are not sufficient to trigger our interlocutory appellate jurisdiction under 28 U.S.C. § 1292(a). We disagree. *See Abbott v. Perez*, 138 S. Ct. 2305, 2319–20 (2018) (explaining that the "practical effect" test of 28 U.S.C. §§ 1292(a)(1) and 1293 "prevents [the] manipulation" that could occur "if the availability of interlocutory review depended on the district court's use of the term 'injunction'").

No. 23-10362

The Supreme Court has prescribed "four traditional stay factors" that govern this equitable discretion in most civil cases. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2487 (2021) (quotation omitted); *see also Hilton v. Braunskill*, 481 U.S. 770, 776–77 (1987); *Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022) (reversing stay of an injunction after the court of appeals failed to analyze the traditional stay factors). Those factors are:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton*, 481 U.S. at 776); *see also Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021). Although no factor is dispositive, the likelihood of success and irreparable injury factors are "the most critical." *Nken*, 556 U.S. at 434. Success on either factor requires that the stay seeker make a strong not merely "possib[le]" showing. *Ibid.*

In these respects, stays might appear identical to preliminary injunctions. Similar factors govern both and both require an "extraordinary" deployment of judicial discretion. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). But the two are not "one and the same." *Nken*, 556 U.S. at 434. A stay "operates upon the judicial proceeding itself," not on the conduct of a particular actor. *Id.* at 428. And, once one party has won an injunction, proof burdens reverse. It is the enjoined party who seeks a stay, or FDA and Danco here, who must carry the burden of proving that the *Nken* factors command us to issue one. *See Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936).

If the stay applicants show that circumstances require a stay of some but not all of the district court's order, we may, in our discretion, "tailor a stay so that it operates with respect to only some portion of the proceeding."

No. 23-10362

*Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam) (quoting *Nken*, 556 U.S. at 428).

We find that FDA and Danco succeed only in part.

III.

Regarding likelihood to succeed on the merits, the stay applicants raise four arguments. They contend (A) plaintiffs are unlikely to defend the district court's stay because they lack standing. They next contend (B) plaintiffs' claims are untimely. Then they claim (C) plaintiffs' claims are unexhausted. Finally, applicants contend (D) FDA's actions are not arbitrary, capricious, or otherwise contrary to law. We consider each in turn.

A.

We begin with Article III standing. To bring their claims in federal court, plaintiffs must satisfy the familiar tripartite test: they must show they suffered an injury in fact, that's fairly traceable to the defendants, and that's likely redressable by a favorable decision. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). Importantly, only one plaintiff needs to have standing to present a valid case or controversy. *See Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

Plaintiffs and the district court offered numerous theories of standing. At this preliminary, emergency stage, we are unpersuaded by applicants' contentions that all of these theories fail to create a justiciable case or controversy. We need only consider two: (1) injuries to doctors and (2) injuries to the plaintiff medical associations.[4]

---

[4] We are cognizant of the fact that the Supreme Court has disavowed the theories of third-party standing that previously allowed doctors to raise patients' claims in abortion

10

No. 23-10362

### 1.

First, it appears that the individual plaintiffs and doctors in plaintiff associations have standing to challenge FDA's actions.

To allege an injury in fact, these doctors must show they have suffered an "invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotation omitted). Plaintiffs must identify specific injuries that go beyond "general averments" or "conclusory allegations." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (quoting *Lujan*, 497 U.S. at 888). Where a plaintiff seeks prospective relief and hence points to future injuries, the Supreme Court has emphasized that "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted).

Here, FDA-approved the "Patient Agreement Form," which is part of the REMS for mifepristone, provides:

---

cases. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275 & n.61 (2022). So we express no opinion on plaintiffs' third-party standing theories.

## PATIENT AGREEMENT FORM

Mifepristone Tablets, 200 mg

**Healthcare Providers:** Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.

**Patient Agreement:**

1. I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

2. I understand:
   a. I will take mifepristone on Day 1.
   b. I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

3. My healthcare provider has talked with me about the risks, including:
   - heavy bleeding
   - infection

4. I will contact the clinic/office/provider right away if in the days after treatment I have:
   - a fever of 100.4°F or higher that lasts for more than four hours
   - heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
   - severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol
   — these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

   My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

5. I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

6. I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

7. If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

8. I have the MEDICATION GUIDE for mifepristone.

9. My healthcare provider has answered all my questions.

Patient Signature: _____   Patient Name (print): _____   Date: _____

2023 Mail-Order Decision at 10. FDA thus cannot deny that serious complications from mifepristone are certainly impending. Those complications are right there on the "Patient Agreement Form" that FDA itself approved and that Danco requires every mifepristone user to sign. According to the applicants, more than 5,000,000 women have taken this drug since the 2000 Approval. FDA Stay App. 1. That means that, again according to the applicants' own information, between 100,000 (2%) and

Case 23-10362   Document 00516731035   Page: 13   Date Filed: 04/20/2023
Case 2:22-cv-00223-Z   Document 141   Filed 04/12/23   Page 13 of 42   PageID 4506

No. 23-10362

350,000 (7%) of mifepristone users had unsuccessful chemical abortions and had to "talk with [their] provider[s] about a surgical procedure to end [their] pregnanc[ies]." 2023 Mail-Order Decision at 10. And where did those hundreds of thousands of women go for their "surgical procedures"? Again, we need not speculate because the 2016 Major REMS Changes, the 2021 Petition Denial, and the 2023 Mail-Order Decision all allow non-doctors to prescribe mifepristone. The women who use this drug cannot possibly go back to their non-doctor-prescribers for surgical abortions, so again, as the "Patient Agreement Form" itself says, they must instead seek "emergency care" from a qualified physician.

The plaintiff emergency room doctors have a concrete, particularized injury since they have provided—and with certainty will continue to provide—the "emergency care" that applicants specified in the "Patient Agreement Form." PI App. 167, 169, 194, 206. Mifepristone users who present themselves to the plaintiffs have required blood transfusions, overnight hospitalization, intensive care, and even surgical abortions. PI App. 205–06. As one doctor testified:

> For example, in one month while covering the emergency room, my group practice admitted three women to the hospital. Of the three women admitted in one month due to chemical abortion complications, one required admission to the intensive care unit for sepsis and intravenous antibiotics, one required a blood transfusion for hemorrhage, and one required surgical completion for the retained products of conception (*i.e.*, the doctors had to surgically finish the abortion with a suction aspiration procedure).

PI App. 206.

Another doctor testified:

> [O]ne of my patients had obtained mifepristone and misoprostol from a website, without an in-person

23-10362.4390

> visit. . . . After taking the chemical abortion drugs, she began
> having very heavy bleeding followed by significant abdominal
> pain and a fever. When I saw her in the emergency room, she
> had evidence of retained pregnancy tissue along with
> endometritis, an infection of the uterine lining. She also had
> acute kidney injury, with elevate creatinine. She required a
> dilation and curettage (D&C) surgery to finish evacuating her
> uterus of the remaining pregnancy tissue and hospitalization
> for intravenous (IV) antibiotics, IV hydration, and a blood
> transfusion. I spent several hours with her the day of her
> surgery/hospital admission, keeping me from my primary
> patient responsibilities in the labor and delivery unit and
> requiring me to call in an additional physician to help cover
> those responsibilities.

PI App. 194–95. As a result of FDA's failure to regulate this potent drug, these doctors have had to devote significant time and resources to caring for women experiencing mifepristone's harmful effects. This harm is sufficiently concrete.

A second independent injury from the adverse effects of mifepristone is the "enormous stress and pressure" physicians face in treating these women. PI App. 215. One doctor said the strain "is some of the most emotionally taxing work I have done in my career." PI App. 880. Thus, this is an independent injury because FDA's actions "significantly affect[]" the doctors' "quality of life." *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972).

The doctors offered specific facts to explain this stress. Women who take these drugs are susceptible to "torrential bleeding." PI App. 170, 215. In fact, "the risk of severe bleeding with chemical abortion is five times higher than from surgical abortion." PI App. 879. And these situations can quickly go from bad to worse. As one doctor testified:

> One of my patients, who was about nine weeks pregnant, had
> previously been treated by hospital staff for a pulmonary

No. 23-10362

> embolism with anti-coagulants. She was advised that she could
> not seek a chemical abortion because it was contraindicated
> due to the medications; yet the woman left the hospital and
> sought an abortion at Planned Parenthood of Indiana. The
> woman was given mifepristone by the doctor at Planned
> Parenthood and took the drug. The woman called an Uber for
> a ride home from Planned Parenthood. The woman began to
> experience bleeding and other adverse effects from the
> mifepristone. The woman's Uber driver did not take her home
> because she was so ill and instead brought her to the hospital's
> emergency department. At the hospital, the woman came
> under my care. The woman had not yet taken the second
> abortion drug, misoprostol. I treated the patient for the adverse
> effects she suffered and told her not to take the misoprostol
> given to her by Planned Parenthood because of the grave risk
> that she could bleed out and die.

PI App. 216–17. Another doctor recounted an experience where he treated a patient—who "suffered from two weeks of moderate to heavy bleeding, and then developed a uterine infection"—by providing her "with intravenous antibiotics" and performing a D&C procedure. PI App. 886. If the patient waited a few more days to go to the hospital, the doctor predicted that "she could have been septic and died." PI App. 886. Another doctor testified that he has encountered "at least a dozen cases of life-threatening complications" from these drugs, and the frequency of these emergency situations has only increased over time. PI App. 865.

The risks are only exacerbated for women who have ectopic pregnancies. PI App. 207. This occurs in approximately two percent of pregnancies. PI App. 539. As one doctor explained:

> Chemical abortion drugs will not effectually end an ectopic
> pregnancy because they exert their effects on the uterus, which
> leaves women at risk of severe harm from hemorrhage due to
> tubal rupture, in need of emergent surgery or potentially at risk

Case: 23-10362    Document: 00516713035    Page: 167    Date Filed: 04/20/2023
Case 2:22-cv-00223-Z    Document 141    Filed 04/12/23    Page 16 of 42    PageID 4509

No. 23-10362

of death. Failure to perform an ultrasound prior to prescribing
abortion drugs will cause some women to remain undiagnosed
and at high risk for these adverse outcomes.

PI App. 208. The risks are greater under FDA's relaxed standards. That is
because "without an in-person examination, it is impossible to rule out an
ectopic pregnancy," placing a woman "at an increased risk of rupture or even
death." PI App. 886.

The doctors also face an injury from the irreconcilable choice between
performing their jobs and abiding by their consciences. These doctors
structured their careers so they would not have to administer abortions. And
yet, because women often come to hospitals when they experience
complications from these drugs, these doctors sometimes have no other
choice but to perform surgical abortions. As one doctor testified:

The FDA's expansion of chemical abortions also harms my
conscience rights because it could force me to have to surgically
finish an incomplete elective chemical abortion. I object to
abortion because it ends a human life. My moral and ethical
obligation to my patients is to promote human life and health.
But the FDA's actions may force me to end the life of a human
being in the womb for no medical reason.

PI App. 209–10. And this harm is not speculative. Several doctors confirmed
that they have had to surgically complete an abortion or remove an unborn
child. PI App. 886, 205. As one doctor testified: "In my practice, I have cared
for at least a dozen women who have required surgery to remove retained
pregnancy tissue after a chemical abortion. Sometimes this includes the
embryo or fetus, and sometimes it is placental tissue that has not been
completely expelled." PI App. 205. That same doctor described how she had
to "perform[] a suction aspiration procedure" on one patient who took the
pill but needed surgery to complete the abortion. PI App. 206. Others have
seen it firsthand. One doctor recounted a time where a woman came to the

23-10362.4393

No. 23-10362

emergency room "with heavy vaginal bleeding and unstable vital signs as a result of taking chemical abortion drugs." PI App. 195. When the woman arrived in the emergency room, the baby in her womb was not dead; the doctors were "able to detect a fetal heartbeat." PI App. 195. But due to the mother's unstable condition, the doctors "had no choice but to perform an emergency D&C." PI App. 196. The doctor testified that her colleague "felt as though she was forced to participate in something that she did not want to be a part of—completing the abortion." PI App. 196.

And not only have these doctors suffered injuries in the past, but it's also inevitable that at least one doctor in one of these associations will face a harm in the future. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Here, the plaintiff-doctors have "'set forth' by affidavit or other evidence 'specific facts'" that they are certain to see more patients. *Clapper*, 568 U.S. at 411 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). That's because FDA has removed almost all of mifepristone's REMS and thus enabled women to (1) get the drug without *ever* talking to a physician, (2) take the drug without *ever* having a physical exam to ensure gestational age and/or an ectopic pregnancy, and (3) attempt to complete the chemical abortion regimen at home; FDA has also (4) directed the hundreds of thousands of women who have complications to seek "emergency care" from the plaintiffs and plaintiffs' hospitals. Several doctors testified that they have seen an increasing number of women coming to the emergency room with complications from chemical abortions due to FDA's virtual elimination of controls on the dispensing and administration of the drugs. PI App. 194, 205, 215, 866. And given how many women these doctors have seen in emergency departments in the past, these doctors quite reasonably know with statistical certainty—again, a statistic estimated on Mifeprex's own "Patient Agreement Form"—that women will continue needing plaintiffs' "emergency care." *See* PI App. 205, 215, 868. The crisis is "concededly

ongoing." *Friends of the Earth*, 528 U.S. at 184. Accordingly, plaintiffs face a "substantial risk" of recurrence. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted).

And even if one of the named doctors never sees another patient, it's inevitable that one of the thousands of doctors in plaintiff associations will. For example, one of the plaintiff associations, the American Association of Pro-Life Obstetricians & Gynecologists, "is the largest organization of pro-life obstetricians and gynecologists" and has "more than 7,000 medical professionals nationwide." PI App. 165. The Christian Medical and Dental Association has "more than 600 physicians and approximately 35 OBGYNs." PI App. 179. The American College of Pediatricians has a membership of "more than 600 physicians and other healthcare professionals." PI App. 187. These associations presented affidavits from individual members, elucidating the various harms discussed herein. *See Friends of the Earth*, 528 U.S. at 183–84. Thus, they have associational standing to sue on behalf of their members. *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988); *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). That means that so long as one doctor among the thousands of members in these associations faces an injury, Article III is satisfied. *See Rumsfeld*, 547 U.S. at 52 n.2.

The doctors can also show that these injuries are traceable to FDA regulations and redressable by this court. *See Defs. of Wildlife*, 504 U.S. at 560–61. That's because the 2016 Major REMS Changes, the 2021 Petition Denial, and the 2023 Mail-Order Decision all empower *non-doctors* to prescribe mifepristone and thus shift the costs of the drug onto the plaintiff physicians who must manage the aftermath. *See, e.g.*, PI App. 218 ("I spent a significant amount of time that day working to save her life from unnecessary complications due to the irresponsible administration and use of mifepristone and misoprostol. As a result of the significant time that I devoted to that

Case 23-10362 Document 00516703105 Page: 19 Date Filed: 04/12/2023
Case 2:22-cv-00223-Z   Document 141   Filed 04/12/23   Page 19 of 42   PageID 4512

No. 23-10362

patient, my time and attention was taken away from other patients, who also need my care."); PI App. 867 ("Because more women [who take mifepristone] are unnecessarily presenting in the emergency department, more of my time and attention is taken away from other patients who need it."). In this way, "[t]he FDA's actions have created a culture of chaos for emergency room physicians." PI App. 867. And we're capable of redressing plaintiffs' injuries by restoring the 2000 Approval's REMS. Accordingly, at this stage, applicants have not shown that all of the plaintiffs lack standing.

We hasten to emphasize the narrowness of this holding. We do not hold that doctors necessarily have standing to raise their patients' claims. *See supra* n.4. We do not hold that doctors have constitutional standing whenever they're called upon to do their jobs. And we do not hold that doctors have standing to challenge FDA's actions whenever the doctor sees a patient experiencing complications from an FDA-approved drug. Rather, we hold that on the record before us applicants know that hundreds of thousands of women *will*—with applicants' own statistical certainty—need emergency care on account of applicants' actions. And because applicants chose to cut out doctors from the prescription and administration of mifepristone, plaintiff doctors and their associations will necessarily be injured by the consequences. This is an exceedingly unusual regime. In fact, as far as the record before us reveals, FDA has not structured the distribution of any comparable drug in this way.

FDA's principal contention to the contrary is that mifepristone is comparable to "ibuprofen." FDA Stay App. 1. The theory appears to be that we cannot recognize plaintiffs' standing here without opening a pandora's box in which doctors have standing to litigate everything at all times, including the banalities of over-the-counter Advil.

No. 23-10362

We disagree because FDA's own documents show that mifepristone bears no resemblance to ibuprofen. In the 2000 Approval, FDA imposed a "Black Box" warning on mifepristone. FDA requires "Black Box" warnings when a drug "may lead to death or serious injury." 21 C.F.R. § 201.57(c)(1). In its 2000 Approval, FDA conditioned its approval of mifepristone on the inclusion of this "Black Box" warning:

> "If Mifeprex results in incomplete abortion, surgical intervention may be necessary. Prescribers should determine in advance whether they will provide such care themselves or through other providers. Prescribers should also give patients clear instructions of whom to call and what to do in the event of an emergency following administration of Mifeprex.
>
> Prescribers should make sure the patients receive and have an opportunity to discuss the Medication Guide and Patient Agreement."

FDA Add. 182. The 2016 Major REMS Changes relaxed many of the requirements for marketing and using mifepristone. But it retained this "Black Box" warning:

23-10362.4397

No. 23-10362

<div style="border:1px solid black; padding:1em;">

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use. No causal relationship between the use of MIFEPREX and misoprostol and these events has been established.

- Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis *[see Warnings and Precautions (5.1)]*.

- Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding *[see Warnings and Precautions (5.2)]*.

Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the MIFEPREX REMS Program *[see Warnings and Precautions (5.3)]*.

Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if she experiences sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if she experiences abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting or diarrhea) for more than 24 hours after taking misoprostol.

Advise the patient to take the Medication Guide with her if she visits an emergency room or a healthcare provider who did not prescribe MIFEPREX, so that the provider knows that she is undergoing a medical abortion.

</div>

https://perma.cc/R56J-BHW4.

Ibuprofen's label, which FDA helpfully provided in its stay addendum, obviously bears no resemblance to the "Black Box" warning on mifepristone's label. FDA Add. 465–68. To the contrary, FDA has a special regulation regarding ibuprofen so all manufacturers of that over-the-counter medicine include the same information on their labels. *See* 21 C.F.R. § 201.326. It says nothing about REMS, surgery, emergencies, Emergency Rooms, or death.

In sum, applicants' own documents—from the "Patient Agreement Form" to the "Black Box" warning that have accompanied mifepristone

23-10362.4398

Case: 23-10362   Document: 00516733103   Page: 22   Date Filed: 04/20/2023
Case 2:22-cv-00223-Z   Document 141   Filed 04/12/23   Page 22 of 42   PageID 4515

No. 23-10362

ever since the 2000 Approval up to and including today—prove that emergency room care is statistically certain in hundreds of thousands of cases. Plaintiff doctors have provided that emergency room care and are statistically certain to provide it in the future.

2.

Second, the associations have standing. As previously discussed, they have associational standing to sue on behalf of their members. *See N.Y. State Club Ass'n, Inc.*, 487 U.S. at 9; *Hunt*, 432 U.S. at 343. The associations presented affidavits from individual member doctors who have suffered harms. *See Friends of the Earth*, 528 U.S. at 183–84. Accordingly, they have standing to sue on their members' behalf.

Plaintiff associations have also suffered independent injuries because FDA's actions have frustrated their organizational efforts to educate their members and the public on the effects of mifepristone. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that housing non-profit had standing to challenge racial steering practices that impaired its ability "to provide counseling and referral services for low-and-moderate-income homeseekers"). As a result, plaintiff associations have expended "time, energy, and resources to compensate for this lack of information by conducting their own studies and analyses of available data" to "the detriment of other advocacy and educational efforts." PI App. 174. The Supreme Court has previously stated that such a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests," *Havens*, 455 U.S. at 379, even where the organizational interest is purely "noneconomic," *id.* at 379 n.20. Rather, under these circumstances, "there can be no question that the organization has suffered an injury in fact." *Id.* at 379.

23-10362.4399

Case 23-10362   Document 00516713035   Page: 23   Date Filed: 04/20/2023
Case 2:22-cv-00223-Z   Document 141   Filed 04/12/23   Page 23 of 42   PageID 4516

No. 23-10362

This injury is also traceable to FDA's elimination of non-fatal adverse events in the 2016 Major REMS Changes. And it's redressable by an order vacating those changes. Accordingly, these associations also have standing.

### B.

Next we turn to timeliness.

Everyone acknowledges that 28 U.S.C. § 2401(a)'s six-year limitations period applies to all of this case's challenged actions. And plaintiffs' right of action against the lion's share of the challenged actions are squarely within the six-year window. That includes all of plaintiffs' alternative arguments challenging the 2016 Major REMS Changes, the 2019 Generic Approval, the 2021 Mail-Order Decision, and the 2021 Petition Denial of the 2019 Citizen Petition.

True, FDA's March 2016 Major REMS Changes were promulgated more than six years before plaintiffs filed suit in November 2022. But Section 2401(a) instructs that the six-year period begins when "the right of action first accrues." "And '[t]he right of action first accrues on the date of the final agency action.'" *Texas v. Biden*, 20 F.4th 928, 951 n.3 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022) (quoting *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 342 (D.C. Cir. 2018)). Though FDA promulgated the Major REMS Changes in 2016, the Agency didn't respond to plaintiffs' 2019 Petition challenging those changes until December 16, 2021. So plaintiffs' right of action against FDA's final decision first accrued in December of 2021. *See* 21 C.F.R. § 10.45. That's less than a year before plaintiffs sued, which is well within the limitations period.

Next, applicants claim that plaintiffs' primary challenges to the 2000 Approval and FDA's 2016 Petition Denial to their 2002 Citizen Petition are time-barred. Though admittedly a close question, we ultimately agree with applicants at this preliminary juncture.

No. 23-10362

Plaintiffs' right of action against the 2000 Approval and 2016 Petition Denial first accrued on March 29, 2016—the date FDA issued its final decision rejecting their 2002 Petition challenging the 2000 Approval. *See* 21 C.F.R. § 10.45. But plaintiffs didn't file suit until November 18, 2022, more than six months beyond the statute of limitations. The district court nevertheless found timely the plaintiffs' challenges to the 2000 Approval and the 2016 Petition Denial. How? First, the district court held that FDA "reopened" those decisions in 2016 and 2021, thus restarting the statute of limitations. Second—and alternatively—the district court decided plaintiffs were entitled to equitable tolling.

We consider each justification in turn.

First, reopening. "The reopen[ing] doctrine allows an otherwise untimely challenge to proceed where an agency has—either explicitly or implicitly—undertaken to reexamine its former choice." *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017 (D.C. Cir. 2016) (quotation omitted). Put simply, the purpose of the reopening doctrine is "to pinpoint an agency's final action in cases where the agency has addressed the same issue multiple times." *Texas v. Biden*, 20 F.4th at 951. The limitations period runs from the agency's earlier decision unless the later decision "opened the issue up anew." *Ibid.* (quotation omitted). This makes good sense: Because a key step in the timeliness inquiry is determining when an agency action became final, it's sometimes necessary to determine whether an agency's subsequent action "actually reconsidered" its former action, *Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021) (per curiam) (quotation omitted), or merely "reaffirm[ed] its prior position," *Sierra Club v. EPA*, 551 F.3d 1019, 1024 (D.C. Cir. 2008) (quotation omitted); *see also Texas v. Biden*, 20 F.4th at 951 ("If the agency opened the issue up anew, and then reexamined and reaffirmed its prior decision, the agency's second action (the reaffirmance) is reviewable. . . . But if the agency merely reaffirmed its decision without

23-10362.4401

No. 23-10362

*really* opening the decision back up and reconsidering it, the agency's initial action is the only final agency action to review." (quotation omitted)).

Courts have articulated various tests for determining whether an agency has reopened a prior decision. These tests fall into two general categories.

Under the first, courts look "to the entire context of the [relevant agency action] including all relevant proposals and reactions of the agency to determine whether an issue was in fact reopened." *Pub. Citizen v. Nuclear Regul. Comm'n*, 901 F.2d 147, 150 (D.C. Cir. 1990); *see also, e.g., id.* at 150–53; *Growth Energy*, 5 F.4th at 21–22; *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141–46 (D.C. Cir. 1998). An agency can reopen an earlier decision in many ways, but the quintessential example of this type of reopening is when an agency "hold[s] out [its prior rule] as a proposed regulation, offer[s] an explanation for its language, solicit[s] comments on its substance, and respond[s] to the comments in promulgating the regulation in its final form." *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 397 (D.C. Cir. 1989). Under the second reopening category, courts consider whether an agency "constructively reopened" its prior decision. *Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191, 1214–15 (D.C. Cir. 1996). They do so by evaluating whether "the revision of accompanying regulations significantly alters the stakes of judicial review as the result of a change that could have not been reasonably anticipated." *NRDC v. EPA*, 571 F.3d 1245, 1266 (D.C. Cir. 2009) (quotation omitted).

Although a close call, we are unsure at this preliminary juncture and after truncated review that FDA reopened the 2000 Approval in its 2016 Major REMS Changes and its 2021 Petition Denial.

As for the first reopening test, neither the 2016 Major REMS Changes nor the 2021 Petition Denial appears to "substantive[ly] reconsider[]"

No. 23-10362

FDA's 2000 Approval. *Growth Energy*, 5 F.4th at 21. FDA's 2016 decision to relax many of the REMS was issued in response to Danco's supplemental application requesting as much. *See* PI App. 615–52. And FDA's 2021 Petition Denial was issued in response to plaintiffs' 2019 Citizen Petition asking FDA to "restore" the pre-2016 REMS—not revoke or reconsider FDA's underlying 2000 Approval. *See* PI App. 667–93. Therefore neither of the "relevant proposals" prompted FDA to reopen and reconsider its 2000 Approval. *Pub. Citizen*, 901 F.2d at 150.

That said, the district court correctly noted that FDA nevertheless "undertook a full review of the Mifepristone REMS Program" when it reviewed plaintiffs' 2019 Citizen Petition—even though the plaintiffs only asked FDA to restore the pre-2016 status quo ante. *See* PI App. 735–76; FDA Add. 22. In FDA's words:

> In 2021, FDA also undertook a full review of the Mifepristone REMS Program. In conducting this review, FDA reviewed multiple different sources of information, including published literature, safety information submitted to the Agency during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, the first REMS assessment report for the Mifepristone REMS Program, and information provided by advocacy groups, individuals, and the Plaintiffs in ongoing litigation, as well as information submitted by the sponsors of the NDA and the ANDA[.]

PI App. 735. And after conducting this unrequested "full review" of the REMS Program, FDA (*inter alia*) added two modifications to the REMS Program that plaintiffs never even mentioned in their 2019 Citizen Petition, including "a requirement that pharmacies that dispense the drug be specially certified." PI App. 736; *see also id.* at 735 n.11 (acknowledging that "this was not raised in your Petition"). All of this suggests FDA went back to the beginning, including its very first REMS report, and conducted an

independent review that far exceeded the issues raised in the 2019 Citizen Petition.

Especially because the dangerousness of a drug is grounds to withdraw its approval, *see* 21 U.S.C. § 355(e)—and REMS are required to "ensure that the benefits of the drug outweigh the risks," *id.* § 355-1(a)(1)–(2)—plaintiffs reasonably argue that FDA's 2021 "full review" of the entire REMS Program was in effect a reconsideration of FDA's 2000 Approval. Indeed, plaintiffs might very well prevail on that claim later in this litigation. But at this early juncture—and in light of our necessarily truncated review—we are not yet confident enough to say that viewed in "the entire context," FDA "has undertaken a serious, substantive reconsideration of the [2000 Approval]" rather than "incremental adjustments to existing regulations." *Texas v. Biden*, 20 F.4th at 952–93 (quotation omitted).

The result is the same under the second reopening test. Recall that under the second test, "[a] constructive reopening occurs if the revision of accompanying regulations significantly alters the stakes of judicial review as the result of a change that could have not been reasonably anticipated." *Sierra Club*, 551 F.3d at 1025 (quotation omitted).

*Sierra Club* is the seminal case. In 1994, EPA adopted a rule that exempted major sources of air pollution from the Clean Air Act's emission standards during startups, shutdowns, and malfunctions (the "SSM exemption"). *Id.* at 1022. But the 1994 rule also required sources to develop an SSM plan in order to receive the benefit of the SSM exemption. *Ibid.* An SSM plan required "the source to demonstrate how it will do its reasonable best to maintain compliance with the standards, even during SSMs." *Ibid.* (quotation omitted). SSM plans were publicly available and were incorporated into the sources' permits under Title V of the Clean Air Act. *Ibid.*

27

No. 23-10362

In a series of rulemakings between 2002 and 2006, EPA substantially weakened the requirement that sources maintain and follow an SSM plan in order to benefit from the SSM exemption. It removed the requirement that a source's Title V permit incorporate its SSM plan; it stopped making SSM plans publicly available; and it ultimately retracted the requirement that sources implement their SSM plans during SSM periods. *Id.* at 1023.

The Sierra Club filed suit in 2007. But the Sierra Club did not challenge the changes to the SSM plan requirements that EPA had adopted in its 2002, 2003, and 2006 rulemakings. Instead, it challenged the legality of the SSM exemption itself. *Id.* at 1024. EPA had adopted that exception in 1994 and had not considered rescinding it in any of its rulemakings during the 2000s. Rather, those rulemakings had treated the SSM exemption as a given—in fact, they had strengthened it by weakening the SSM plan requirements. *See id.* at 1022–23.

The D.C. Circuit nonetheless held that the Sierra Club's challenge to the SSM exemption was timely. Even though EPA had not expressly reopened its decision to create a SSM exemption, it had constructively reopened that decision "by stripping out virtually all of the SSM plan requirements that it created to contain that exemption." *Id.* at 1025 (quotation omitted). Because EPA had allegedly abandoned these "necessary safeguards" limiting the SSM exemption, its rulemakings had "changed the calculus for petitioners in seeking judicial review and thereby constructively reopened consideration of the exemption." *Id.* at 1025–26 (quotation omitted).

*Sierra Club* thus establishes that an agency can constructively reopen a decision if it removes essential safeguards that had previously limited or contained the impact of that decision. In making this determination, the D.C. Circuit looks to the extent to which the agency has "alter[ed] th[e] regulatory

No. 23-10362

framework" and whether the agency has "work[ed] a change that [plaintiffs] could not have reasonably anticipated." *Nat'l Biodiesel Bd.*, 843 F.3d at 1017.

Under *Sierra Club* and its progeny, FDA's 2016 Major REMS Changes and 2021 Petition Denial seemingly reopened its 2000 Approval decision. Of course, FDA did not expressly reconsider its mifepristone approval. But it eliminated the "necessary safeguards," *Sierra Club*, 551 F.3d at 1025, that had accompanied and limited the impact of that approval for two decades. The in-person dispensing requirement, for example, was critical to FDA's initial approval of mifepristone in 2000, which relied on the in-person dispensing requirement to dismiss concerns about provider qualifications, improper use, illicit distribution, and detection of adverse events. *See* PI App. 519–23. And the in-person dispensing requirement was also the cornerstone of the REMS for mifepristone that FDA approved in 2011 and then relied on in its 2016 rejection of plaintiffs' 2002 Citizen Petition. *See* PI App. 578–82, 605, 608.

Thus FDA's elimination of the in-person distribution requirement—not to mention various other REMS—arguably worked a "sea change" in the legal framework governing mifepristone distribution that plaintiffs "could not have reasonably anticipated" and that "significantly alters the stakes of judicial review." *Nat'l Biodiesel Bd.*, 843 F.3d at 1017 (quotation omitted). That's because the in-person dispensing requirement was FDA's primary tool for ensuring the safe distribution and use of mifepristone, so plaintiffs arguably had little reason to anticipate this important change before 2021. FDA does not argue otherwise, appearing to concede that its 2021 announcement was a stark departure from previous regulatory approaches. And because this change eliminates a major safeguard against complications and adverse effects arising from improper mifepristone use, it can be said to "significantly alter[] the stakes of judicial review" for plaintiff doctors who treat patients with these complications. *Ibid.* (quotation omitted).

No. 23-10362

Even so, we ultimately hold at this early and emergency stage that these alterations didn't constructively reopen the 2000 Approval for review. That's because there's at least a colorable argument that plaintiffs "could have . . . reasonably anticipated" changes like those in 2016 and 2021 by dint of the statutorily defined supplemental application process and other similar revision mechanisms. *NRDC v. EPA*, 571 F.3d at 1266 (quotation omitted); *see, e.g.*, 21 C.F.R. § 314.71(b). We also recognize that it's somewhat of a strain to say that the 2016 Major REMS Changes and 2021 Petition Denial (and related changes) altered the regulatory landscape to such a degree that the prior rule is only now "worth challenging" when it otherwise might "not have been." *Sierra Club*, 551 F.3d at 1025–26 (quotation omitted). After all, plaintiffs *did* challenge the 2000 Approval well before the 2016 and 2021 changes were even proposed. But again, plaintiffs could very well prevail on this reopening claim.

In the alternative, the district court held that plaintiffs were entitled to equitable tolling of the statute of limitations. FDA Add. 23–25. We are unpersuaded. "[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)). Here, no "extraordinary circumstance" prevented plaintiffs from filing within six years of FDA's 2016 Petition Denial. The district court is of course correct that FDA took "13 years, 7 months, and 9 days" to render that March 2016 ruling, FDA Add. 24, but that delay had no impact on the length of the statute-of-limitations period or plaintiffs' capacity to challenge the 2016 Petition Denial.

## C.

Next exhaustion. Stay applicants contend they are likely to succeed on the merits because plaintiffs failed to exhaust their claims before FDA. We disagree.

"As a general rule, claims not presented to the agency may not be made for the first time to a reviewing court." *Wash. Ass'n for Television & Child. v. FCC*, 712 F.2d 677, 680 (D.C. Cir. 1983); *cf. United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952). For challenges to FDA actions, the general administrative exhaustion requirement is codified at 21 C.F.R. § 10.45(b). Section 10.45(b) states that a "request that the [FDA] Commissioner take or refrain from taking any form of administrative action must first be the subject of a final administrative decision based on a petition submitted under § 10.25(a)." *See id.* § 10.25(a) ("An interested person may petition the [FDA] Commissioner to issue, amend, or revoke a regulation or order, or to take or refrain from taking any other form of administrative action.").

No one disputes that every argument the plaintiffs raised in their 2019 Citizen Petition is exhausted. That includes all of plaintiffs' challenges to the 2016 Major REMS Changes and everything fairly embraced by those challenges. For example, the 2019 Citizen Petition argued explicitly that FDA should "[c]ontinue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals." FDA Add. 193, 209–16. When FDA rejected that request in the 2021 Petition Denial, it expressly reaffirmed its commitment to mail-order abortion drugs. As such, plaintiffs have properly exhausted their challenge to FDA's by-mail distribution regime by raising it in the 2019 Citizen Petition.

Even if plaintiffs failed to exhaust their claims, courts retain "discretion to waive exhaustion" where one of the "traditionally

recognized" exceptions applies. *Wash. Ass'n for Television & Child.*, 712 F.2d at 681–82. Two exceptions are relevant here: futility and administrative abuse of process.

Start with futility. Plaintiffs need not exhaust claims where they can demonstrate "the futility or inadequacy of administrative review." *Gardner v. Sch. Bd. Caddo. Par.*, 958 F.2d 108, 112 (5th Cir. 1992); *see also Honig v. Doe*, 484 U.S. 305, 327 (1988). The futility exception applies when exhaustion would be "clearly useless" and "it is certain [a] claim will be denied." *Tesoro Refin. & Mktg. Co. v. FERC*, 552 F.3d 868, 874 (D.C. Cir. 2009) (quotation omitted); *see also Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021) ("[T]his Court has consistently recognized a futility exception to exhaustion requirements.").

Given FDA's 2016 Petition Denial and its 2021 Petition Denial, it would have been futile for plaintiffs to include a challenge to the 2000 Approval in their 2019 Citizen Petition. FDA rejected this exact challenge in its 2016 Petition Denial. So it would have been "clearly useless" to raise the precise challenge again in the 2019 Citizen Petition. Further, this exact reasoning applies with equal force to plaintiffs' challenge to the 2019 Generic Approval because it's entirely dependent on the underlying 2000 Approval. Thus, plaintiffs' challenges to the 2000 Approval and the 2019 Generic Approval are not barred by exhaustion.

Next, administrative abuse of process. It's well-established that where an agency fails to follow its own regulations, exhaustion may not be required. *See Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359–60 (D.C. Cir. 1979); *see also Wash. Ass'n for Television & Child.*, 712 F.2d at 681. That's especially true "where the obvious result would be a plain miscarriage of justice." *Hormel v. Helvering*, 312 U.S. 552, 558 (1941). Here, FDA was required by its own regulations to respond to citizen petitions within 180

No. 23-10362

days. *See* 21 C.F.R. § 10.30(e)(2). Instead of timely responding, FDA responded to plaintiffs' first petition fourteen years after it was filed. And it responded to the second petition over two years after it was filed. FDA plainly and repeatedly refused to follow its own regulations here. Even assuming any of plaintiffs' challenges were unexhausted and that it wasn't futile to raise them before FDA, FDA's repeated failure to follow its own regulations indicates that the district court did not abuse its "discretion to waive exhaustion." *Wash. Ass'n for Television & Child.*, 712 F.2d at 681.

## D.

As applicants recognize, FDA's actions are constrained by the APA's arbitrary-and-capricious standard. *See* 5 U.S.C. § 706(2)(A). Under that standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (judicial review of agency action "is not toothless"). We must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43 (quotation omitted). An agency's action is "arbitrary and capricious" if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ibid.*

When an agency acts, it must "reasonably consider[] the relevant issues and reasonably explain[]" its actions. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see also ibid.* ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably

23-10362.4410

Case: 23-10362      Document: 00516731035      Page: 34      Date Filed: 04/12/2023
Case 2:22-cv-00223-Z      Document 141      Filed 04/12/23      Page 34 of 42      PageID 4527

No. 23-10362

explained."); *Michigan v. EPA*, 576 U.S. 743, 750, 752 (2015) ("[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspect[s] of the problem." (quotation omitted)). Of course, we cannot "substitute" our "own policy judgment for that of the agency." *Prometheus*, 141 S. Ct. at 1158. We nonetheless must still carefully ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Ibid.* The upshot is that we "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Here, applicants have failed to carry their burden at this preliminary stage to show that FDA's actions[5] were not arbitrary and capricious. We have two principal concerns in that regard. First, FDA failed to "examine the relevant data" when it made the 2016 Major REMS changes. *State Farm*, 463 U.S. at 43. That's because FDA eliminated REMS safeguards based on studies that *included those very safeguards*. FDA Add. 59, 122–23, 171. Imagine that an agency compiles studies about how cars perform when they have passive restraint systems, like automatic seatbelts. *See State Farm*, 463 U.S. at 34–36. For nearly a decade, the agency collects those studies and continues studying how cars perform with passive safety measures. Then one day the agency changes its mind and *eliminates* passive safety measures based only on existing data of how cars perform *with* passive safety measures. *Cf. id.* at 47–

---

[5] Here we limit our discussion to FDA's decisions in the 2016 Major REMS Changes and its subsequent agency actions. As described above in Part III.B, it appears at this preliminary juncture that plaintiffs' challenges to the 2000 Approval and 2016 Petition Denial are untimely.

23-10362.4411

No. 23-10362

49. That was obviously arbitrary and capricious in *State Farm*. And so too here. The fact that mifepristone might be safe when used with the 2000 Approval's REMS (a question studied by FDA) says nothing about whether FDA can eliminate those REMS (a question not studied by FDA).

True, FDA studied the safety consequences of eliminating one or two of the 2000 Approval's REMS in *isolation*. But it relied on zero studies that evaluated the safety-and-effectiveness consequences of the 2016 Major REMS Changes *as a whole*. This deficiency shows that FDA failed to consider "an important aspect of the problem" when it made the 2016 Major REMS Changes. *Michigan v. EPA*, 576 U.S. at 752 (quotation omitted).

Second, the 2016 Major REMS Changes eliminated the requirement that non-fatal adverse events must be reported to FDA. After eliminating that adverse-event reporting requirement, FDA turned around in 2021 and declared the absence of non-fatal adverse-event reports means mifepristone is "safe." *See, e.g.*, FDA Add. 861–76 (explaining that FDA's FAERS database, which collates data on adverse events, indicated that the 2016 Major REMS Changes hadn't raised "any new safety concerns"). This ostrich's-head-in-the-sand approach is deeply troubling—especially on a record that, according to applicants' own documents, necessitates a REMS program, a "Patient Agreement Form," and a "Black Box" warning. *See supra* Part III.A. And it suggests FDA's actions are well "outside the zone of reasonableness." *Prometheus*, 141 S. Ct. at 1160. It's unreasonable for an agency to eliminate a reporting requirement for a thing and then use the resulting absence of data to support its decision.

These actions make it unlikely that plaintiffs' arbitrary-and-capricious challenges will fail on the merits, at least as far as they challenge FDA's decisions including and following the 2016 Major REMS Changes.

23-10362.4412

No. 23-10362

IV.

Beyond likelihood of success on the merits, we also must consider the other three factors for granting a stay. Those are "[A] whether the applicant will be irreparably injured absent a stay; [B] whether issuance of the stay will substantially injure the other parties interested in the proceeding; and [C] where the public interest lies." *Nken*, 556 U.S. at 434 (quotation omitted). We address each in turn. And we (D) discuss how the Comstock Act, 18 U.S.C. §§ 1461, 1462 affects the stay inquiry. Outside of the 2000 Approval, we find that the applicants fail to make a strong showing on any of these factors for a stay.

A.

Of the remaining three factors, irreparable injury matters most. *See Nken*, 556 U.S. at 434. FDA argues that the plaintiffs fail to show irreparable injury. But the irreparable injury factor asks whether "*the [stay] applicant* will be irreparably injured" absent a stay, not whether the plaintiff would be irreparably injured absent an injunction. *Ibid.* (emphasis added) (quotation omitted). Similarly, FDA's assertion that the district court's injunction will harm pregnant women or other members of the public does not speak to the irreparable injury factor (although it may speak to other factors), because those persons are not stay applicants in this case.

Since FDA does not articulate any irreparable harm that *FDA* will suffer absent a stay, it makes no showing on this "critical" prong. *Ibid.* We may not need to address the merits of the applicants' stay request any further, because failure to show irreparable injury often "decides the [stay] application." *Whalen v. Roe*, 423 U.S. 1313, 1318 (1975) (Marshall, J., in chambers).

Danco by contrast does claim it will suffer irreparable injury, albeit in just one paragraph. Danco notes that mifepristone is its sole product and

No. 23-10362

argues that it may have to shut down absent relief. We have held that catastrophic financial losses "*may* be sufficient to show irreparable injury." *Wages & White Lion Investments, LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (emphasis added) (quotation omitted). Of course, irreparable injury alone does not entitle Danco to a stay. *See Virginian Ry. Co.*, 272 U.S. at 672.

And even if it did, neither FDA nor Danco articulates why this, or any other, injury would require a stay of *all* of the district court's order, rather than only part. Recall that we may narrowly "tailor a stay" to impact "only some portion of the proceeding." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (quotation omitted). The applicants' arguments suggest, at best, that they require relief only from the district court's treatment of the 2000 Approval. They make no argument as to why the district court's treatment of the 2016 Major REMS Changes and later FDA activity irreparably harms anyone.

Applicants' forfeiture of this contention is understandable because the world operated under the 2000 Approval for sixteen years, apparently without problems. And neither applicant contends that it'll be irreparably injured without a stay so long as the 2000 Approval and its associated REMS remain in effect. Thus, the irreparable injury factor counsels against a stay.

B.

The next *Nken* factor asks whether "issuance of the stay will substantially injure the other parties interested in the proceeding." 556 U.S. at 434 (quoting *Hilton*, 481 U.S. at 776); *see also Ala. Ass'n of Realtors*, 141 S. Ct. at 2487 (same); *Planned Parenthood v. Abbott*, 134 S. Ct. 506, 506–08 (2013) (mem.) (opinions of seven Justices using the same standard). This language again focuses on harm from the *stay*, not the injunction. *Cf. Whole Woman's Health*, 141 S. Ct. at 2495 (using less specific "balance of the equities" language). To succeed on this prong, applicants must show that the

37

Case 23-10362 Document 00516713035 Page: 38 Date Filed: 04/12/2023
Case 2:22-cv-00223-Z   Document 141   Filed 04/12/23   Page 38 of 42   PageID 4531

No. 23-10362

requested stay will not harm the opposing appellees or other interested parties.

Applicants discuss at length their view that *the district court's order* might harm various persons, but mostly decline to address the apposite question, which is why *the requested stay* would not harm relevant persons. What points the applicants do make on this relevant question distill down to two arguments.

First, applicants briefly argue that the injuries the plaintiffs would suffer from a stay are speculative or minimal. But we have already addressed why plaintiffs' injuries are non-speculative. *See supra* Part III.A. We have also addressed the specific risks impacting women and the plaintiffs that stem from the 2016 Major REMS Changes and other post-2016 FDA decisions that the district court enjoined. *See supra* Part III.A, D. The applicants' abbreviated argument focuses on consequences flowing from the district court's treatment of the 2000 Approval and largely ignores plaintiffs' alternative arguments regarding the 2016 Major REMS Changes and what followed.

Second, the applicants argue that the plaintiffs' failure to bring litigation sooner undercuts any contention that they would be harmed from a stay. That contention is untenable given FDA's *fourteen-year delay* in adjudicating the 2002 Citizen Petition. But, even setting aside FDA's own delays, the applicants do not explain why the plaintiffs' alleged procrastination warrants a stay of the entirety of the district court's order, rather than just the portion of the order impacted by long litigation delay (the 2000 Approval).

To the extent applicants make any showing that the third *Nken* factor favors a stay, they do so only with respect to the 2000 Approval and do not address plaintiffs' alternative arguments.

No. 23-10362

## C.

The last *Nken* factor asks "where the public interest lies." 556 U.S. at 434 (quotation omitted). The stay applicants make three principal arguments.

First, the applicants argue that "procedural irregularity" in the court below favors relief. But the applicants do not explain why any specific alleged irregularity necessarily speaks to public (versus their own private) interest. Even if we assume away that problem, it is not clear to us, on our accelerated review, that any litigation below was irregular. And even if we assume, which we do not, that the district court or the plaintiffs departed from acceptable procedure, it's unclear on this record that applicants have embraced "the principles of equity and righteous dealing" in the twenty-one years since the filing of the 2002 Citizen Petition. *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 416 (5th Cir. 2021) (quotation omitted) (noting that a party's own imperfect conduct can prejudice their request for equitable relief).

Second, Danco argues that avoidance of "judicial conflict" warrants a stay given the order of an out-of-circuit district court. Comity between federal courts is a cognizable interest. *See Def. Distrib. v. Platkin*, 55 F.4th 486, 495–96 (5th Cir. 2022). We have every respect for fellow federal courts. But we cannot embrace an argument that would, in effect, allow the decision of an out-of-circuit district court to impel us towards "extraordinary" relief that would be otherwise inappropriate. *Williams*, 442 U.S. at 1311 (quotation omitted).

Third, the stay applicants warn us of significant public consequences should the district court's order result in the withdrawal of mifepristone from the market. These consequences, the applicants say, include injury to pregnant women, to public healthcare systems, and to the sense of order that governs FDA drug approvals. But these concerns center on the district

court's removal of mifepristone from the market. The applicants make no arguments as to why the 2016 Major REMS Changes, the 2019 Generic Approval, or the 2021 and 2023 Mail Order Decisions are similarly critical to the public even though they were on notice of plaintiffs' alternative requests for relief. And it would be difficult for applicants to argue that the 2016 Major REMS Changes and subsequent FDA activity were so critical to the public given that the Nation operated—and mifepristone was administered to millions of women—without them for sixteen years following the 2000 Approval.

The applicants have made some showing that the public interest warrants equitable relief from the district court's treatment of the 2000 Approval. Motivated in part by the accelerated posture of our review, we credit their showing.

## D.

The parties vehemently dispute how their competing interpretations of the Comstock Act of 1873 might impact the validity of the district court's order. The Comstock Act prohibits the carriage in interstate commerce of "any drug, medicine, article, or thing designed, adapted or intended for producing abortion." 18 U.S.C. § 1462. It similarly prohibits the mailing of any "article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion." *Id.* § 1461.

Both statutory provisions specify a *mens rea* of "knowingly." *Id.* §§ 1461–62. The plain text does not require that a user of the mails or common interstate carriage intend that an abortion actually occur. Rather, a user of those shipping channels violates the plain text merely by knowingly making use of the mail for a prohibited abortion item.

No. 23-10362

The applicants' principal defense against the Comstock Act is that FDA was not required to consider it. After all, say the applicants, 21 U.S.C. §§ 355 and 355-1 guide FDA's discretion over drug approval and REMS, and those statutes do not explicitly require consideration of other statutes like 14 U.S.C. § 1462.

Even assuming that's true, however, the Comstock Act nevertheless undermines applicants' showing on the final three *Nken* factors. For example, if the Comstock Act is construed in-line with its literal terms, then Danco cannot say it is irreparably harmed by the district court's order, because Danco has no interest in continuing to violate the law, which (under a plain view of the Act) it does every time it ships mifepristone. For further example, if the Comstock Act is strictly understood, then applicants may lose the public interest prong entirely, because there is no public interest in the perpetuation of illegality. *See Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022).

The applicants raise other defenses. For example, they argue that the Food and Drug Administration Amendments Act, Pub. L. No. 110-85, 121 Stat. 823 (2007) ("FDAAA") *sub silentio* repealed the Comstock Act, at least where mifepristone is concerned. That's because the FDAAA in 2007 created a statutory framework governing REMS and drugs with then-existing distribution restrictions. *See id.* § 909(b). Mifepristone was one such drug. So, say applicants, the FDAAA acted to legalize shipment of mifepristone, regardless of what the Comstock Act might say. But "repeals by implication are not favored." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (quotation omitted). We regard each of Congress's statutes as effective unless either "intention to repeal" one of them is "clear and manifest" or the two laws are "irreconcilable." *Ibid.* (quotation omitted). Section 909(b) did not expressly legalize mifepristone; agency action (not statute) did that. Section 909(b)'s brief text makes no mention of

Case 1:23-cv-10362 Document 005 157 305 Page: 42 Date Filed: 04/20/2023
Case 2:22-cv-00223-Z   Document 141   Filed 04/12/23   Page 42 of 42   PageID 4535

No. 23-10362

mifepristone at all. So, there is no "irreconcilable" conflict. And we hesitate to find "clear and manifest" intention to repeal a 150-year-old statute that Congress has otherwise repeatedly declined to alter in the far reaches of a single section of the cavernous FDAAA.

Failing all else, the applicants argue that the Comstock Act does not mean what it says it means. Or rather, that judicial gloss and lax enforcement over the past century act to graft relevant exceptions onto it. The applicants rely on a memo authored by the Office of Legal Counsel to press this position. *See* FDA Add. 258–78. That memo's thorough exploration of this topic notes that a variety of aging out-of-circuit opinions and a single footnote within one Supreme Court dissent favor the applicants' position. FDA Add. 262–68).

The speed of our review does not permit conclusive exploration of this topic. To the extent the Comstock Act introduces uncertainty into the ultimate merits of the case, that uncertainty favors the plaintiffs because the applicants bear the burden of winning a stay. *See Landis*, 299 U.S. at 255. Since plaintiffs already prevail on most *Nken* factors concerning most of the agency items effectively enjoined by the district court's order, we need not definitively interpret the Comstock Act to resolve this stay application.

\* \* \*

As the stay applicants, defendants bear the burden of showing why "extraordinary circumstances" demand that we exercise discretion in their favor. To the extent the defendants make any such showing, they do so *only* with respect to the 2000 Approval—*not* the plaintiffs' alternative arguments challenging FDA's 2016 Major REMS Changes and all subsequent actions. Our decision to grant partial relief does not reflect our view on any merits question. The defendants' motions to stay the district court's order are GRANTED IN PART and DENIED IN PART. The appeal is EXPEDITED to the next available Oral Argument Calendar.

23-10362.4419

# CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2023, I electronically filed the foregoing record excerpts with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Cynthia A. Barmore*
Cynthia A. Barmore