No. 23-10362

# In the United States Court of Appeals for the Fifth Circuit

ALLIANCE FOR HIPPOCRATIC MEDICINE; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; AMERICAN COLLEGE OF PEDIATRICIANS; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; SHAUN JESTER, D.O.; REGINA FROST-CLARK, M.D.; TYLER JOHNSON, D.O.; GEORGE DELGADO, M.D.,

*Plaintiffs-Appellees*

v.

U.S. FOOD & DRUG ADMINISTRATION; ROBERT M. CALIFF, Commissioner of Food and Drugs; JANET WOODCOCK, M.D., in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration; PATRIZIA CAVAZZONI, M.D., in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, Secretary, U.S. Department of Health and Human Services,

*Defendants-Appellants*

v.

DANCO LABORATORIES, L.L.C.,

*Intervenor-Appellant*

On Appeal from the United States District Court for the Northern District of Texas, Amarillo Division, Case No. 2:22-cv-00223-Z, Judge Matthew J. Kacsmaryk

## RECORD EXCERPTS FOR INTERVENOR-APPELLANT DANCO LABORATORIES, LLC

PHILIP KATZ
LYNN W. MEHLER
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

EVA M. SCHIFINI
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067

JESSICA L. ELLSWORTH
CATHERINE E. STETSON
KAITLYN A. GOLDEN
DANIELLE DESAULNIERS STEMPEL
MARLAN GOLDEN
DELIA SCOVILLE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Intervenor-Appellant*

# TABLE OF CONTENTS

**Tab**                                                                 **Pages**

1.    District Court Docket Sheet...............................................................ROA.1-73

2.    Notice of Interlocutory Appeal filed by FDA
      (4/7/2023), Dkt. 138 ...............................................................ROA.4374-4375

3.    Notice of Interlocutory Appeal filed by Danco
      Laboratories LLC (4/7/2023), Dkt. 139 ................................ROA.4376-4377

4.    Memorandum Opinion and Order (4/7/2023),
      Dkt. 137 ...................................................................................ROA.4307-4373

5.    Complaint Exhibit 24 – 2000 FDA Approval
      Memorandum re: NDA 20-687 Mifeprex (mifepristone)
      (Sept. 28, 2000) (filed 11/18/22), Dkt. 1-25 (excerpt) ...................... ROA.591

6.    Complaint Exhibit 27 – 2016 Petition Denial
      (Mar. 29, 2016) (filed 11/18/22), Dkt. 1-28
      (excerpts) .........................................................................ROA.635, 641-647

7.    Complaint Exhibit 43 – 2021 FDA Response
      to 2019 Citizen Petition (Dec. 16, 2021)
      (filed 11/18/22), Dkt. 1-44 (excerpts)................. ROA.803, 827-829, 833-836

8.    Katzen Declaration Exhibit 1A – CDER,
      Clinical Review (Mar. 29, 2016) (filed 1/13/23),
      Dkt. 28-1 (excerpts)....................................................ROA.2143, 2170-2174,
      2179-2180, 2182-2183,
      2185-2186, 2189, 2198-2199,
      2201-2204, 2224-2227

# 1.   District Court Docket Sheet

APPEAL

# U.S. District Court
## Northern District of Texas (Amarillo)
## CIVIL DOCKET FOR CASE #: 2:22-cv-00223-Z

Alliance for Hippocratic Medicine et al v. U.S. Food and Drug Administration et al
Assigned to: Judge Matthew J. Kacsmaryk
Case in other court: USCA5, 23-10362
Cause: 05:702 Administrative Procedure Act

Date Filed: 11/18/2022
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedure Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| **Alliance for Hippocratic Medicine** | represented by | **Erik Christopher Baptist** |
| | | Alliance Defending Freedom |
| | | 440 First Street NW |
| | | Washington, DC 20001 |
| | | 202-393-8690 |
| | | Email: ebaptist@adflegal.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Christian D Stewart** |
| | | Morgan Williamson LLP |
| | | 701 S Taylor |
| | | Suite 440 LB 103 |
| | | Amarillo, TX 79101 |
| | | 806-358-8116 |
| | | Fax: 806-358-1901 |
| | | Email: cstewart@mw-law.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Denise Harle** |
| | | Alliance Defending Freedom |
| | | 1000 Hurricane Shoals Rd., NE |
| | | Ste D1100 |
| | | Lawrenceville, GA 30043 |
| | | 770-339-0774 |
| | | Fax: 770-339-6744 |
| | | Email: dharle@adflegal.org |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Erica Steinmiller-Perdomo** |
| | | Alliance Defending Freedom |
| | | 440 First Street NW |
| | | Suite 600 |
| | | Washington, DC 20001 |

202-393-8690
Email: esteinmiller@adflegal.org
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
Alliance Defending Freedom
440 First Street NW
Suite 600
Washington, DC 20001
571-707-4655
Email: ehawley@adflegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
Alliance Defending Freedom
44180 Riverside Pkwy
Landsdowne, VA 20176
571-707-4655
Fax: 571-707-4790
Email: jblake@adflegal.org
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
Alliance Defending Freedom
440 First Street NW
Suite 600
Washington, DC 20001
202-393-8690
Fax: 202-346-3622
Email: mbowman@adflegal.org
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

| | | |
|---|---|---|
| **American Association of Pro-Life Obstetricians & Gynecologists** | represented by | **Erik Christopher Baptist**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |
| | | **Christian D Stewart**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |
| | | **Denise Harle**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**American College of Pediatricians**    represented by    **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**Christian Medical & Dental Associations**    represented by    **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**Shaun Jester, D.O.**    represented by    **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**Regina Frost-Clark, M.D.**          represented by  **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

Tyler Johnson, D.O.                    represented by    **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**George Delgado, M.D.**                          represented by   **Erik Christopher Baptist**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christian D Stewart**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Denise Harle**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erica Steinmiller-Perdomo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Erin Morrow Hawley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Marie Blake**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew S Bowman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Defendant**

**US Food and Drug Administration**              represented by   **Noah T Katzen**
DOJ-Civ
450 5th St NW
Washington, DC 20530
202-305-2428
Email: noah.t.katzen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
DOJ-Civ
Federal Programs Branch
1100 L Street, NW
Ste 12310
Washington, DC 20005
202-305-0568
Email: christopher.a.eiswerth@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
1100 L Street NW
Room 11532
Washington, DC 20002
202-305-8693
Fax: 202-616-8470
Email: daniel.s.schwei@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202-305-0167
Email: emily.b.nestler@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
US Dept of Justice Civil Div Federal
Programs Branch
1100 L Street NW, Room 11514
Washington, DC 20005
202-353-7633
Fax: 202-616-8470
Email: Julie.StrausHarris@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
US Department of Justice -Civil Division
1100 L Street NW
Washington, DC 20005
202-305-5267
Email: kate.talmor@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

represented by

**Robert M. Califf, M.D.**
*in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration*

**Noah T Katzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Janet Woodcock, M.D.**
*in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration*

represented by **Noah T Katzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Patrizia Cavazzoni, M.D.**                          represented by    **Noah T Katzen**
*in her official capacity as Director, Center*                         (See above for address)
*for Drug Evaluation and Research, U.S.*                               *LEAD ATTORNEY*
*Food and Drug Administration*                                        *ATTORNEY TO BE NOTICED*
                                                                       *Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**U.S. Department of Health and Human**                represented by    **Noah T Katzen**
**Services**                                                            (See above for address)
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*
                                                                        *Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**<u>Defendant</u>**

**Xavier Becerra**
*in his official capacity as Secretary, U.S.
Department of Health and Human Services*

represented by **Noah T Katzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Christopher A. Eiswerth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Daniel Schwei**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emily Brooke Nestler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Straus Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kate Talmor-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

V.

**Intervenor Defendant**

**Danco Laboratories LLC**                             represented by **Catherine Emily Stetson**
Hogan Lovells US LLP
555 13th Street NW
Washington DC, DC 20004
202-637-5491
Email: cate.stetson@hoganlovells.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jessica Lynn Ellsworth**
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
202-637-5886
Email: jessica.ellsworth@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kaitlyn Golden**
Hogan Lovells US LLP
555 13th St NW
Washington, DC 20004
202-637-5864
Email: kaitlyn.golden@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lynn Whipkey Mehler**
Hogan Lovells US LLP
555 13th Street NW
District of Columbia, DC 20004
202-637-6419
Email: lynn.mehler@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Marlan Golden**
Hogan Lovells US LLP
555 13th St NW
Washington, DC 20004
202-637-5600
Email: marlan.golden@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Philip Katz**
Hogan Lovells
555 Thirteenth Street NW
Washington, DC 20004
202-637-5632
Email: philip.katz@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Ryan Patrick Brown**
Ryan Brown Attorney at Law
1222 S Fillmore St
Amarillo, TX 79101
806-372-5711
Email: ryan@ryanbrownattorneyatlaw.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**The Chattanooga National Memorial for the Unborn**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Darald John Schaffer**
Samples Jennings Clem & Fields PLLC
130 Jordan Avenue
Chattanooga, TN 37421
(423) 892-2006
Fax: (423) 892-1919
Email: dschaffer@sampleslaw.com
*TERMINATED: 01/09/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Michael S Jennings**
Samples Jennings Clem & Fields PLLC
130 Jordan Drive
Chattanooga, TN 37421
423-892-2006
Email: mjennings@sampleslaw.com
*TERMINATED: 01/17/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Doctors for America**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Christopher Morten**
Columbia Law School
435 W 116th St
(Jerome Greene Hall)
New York, NY 10027

212-854-1845
Email: cjm2002@columbia.edu
*TERMINATED: 02/09/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Thomas S Leatherbury**
Thomas S Leatherbury Law PLLC
1901 N Akard St
Dallas, TX 75201
214-213-5004
Email: tom@tsleatherburylaw.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**American Center for Law and Justice**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Edward Lawrence White, III**
American Center for Law & Justice
3001 Plymouth Road
Suite 203
Ann Arbor, MI 48105
734-680-8007
Fax: 734-680-8006
Email: elwhite3@yahoo.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**State of Missouri**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Joshua Divine**
Office of The Missouri Attorney General
207 W High St
PO Box 899
Jefferson City, MO 65102
573-751-8870
Email: josh.divine@ago.mo.gov
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

<u>**Amicus**</u>

**Human Coalition**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Elissa Michelle Graves**
1907 Bonanza Drivce
Sachse, TX 75048
2147333213
Email: elissamgraves@gmail.com
*TERMINATED: 02/10/2023*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Mississippi**                     represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*              Mississippi Attorney General Office
*been terminated to restrict access to sealed*            550 High Street
*filings.)*                                                Suite 1200
                                                          Jackson, MS 39205
                                                          601-359-3680
                                                          Fax: 601-359-2003
                                                          Email: justin.matheny@ago.ms.gov
                                                          *TERMINATED: 02/10/2023*
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of New York**                        represented by   **Galen Sherwin**
*States of New York California, Colorado,*                 NYS Office of The Attorney General
*Connecticut, Delaware, Hawaii, Illinois,*                 Executive
*Maine, Maryland, Massachusetts,*                          State Capital
*Michigan, Minnesota, Nevada, New Jersey,*                 Albany, NY 12224
*New Mexico, North Carolina, Oregon,*                      212-416-8059
*Pennsylvania, Rhode Island, Washington,*                  Email: galen.sherwin@ag.ny.gov
*Wisconsin, Washington DC*                                 *TERMINATED: 02/10/2023*
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Not Admitted*

**Amicus**

**State of Alabama**                         represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*              (See above for address)
*been terminated to restrict access to sealed*            *TERMINATED: 02/10/2023*
*filings.)*                                                *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Alaska**                          represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has*              (See above for address)
*been terminated to restrict access to sealed*            *TERMINATED: 02/10/2023*
*filings.)*                                                *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Arkansas**                        represented by   **Justin Lee Matheny**

*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Florida**                          represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Georgia**                          represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Idaho**                            represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Indiana**                          represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Iowa**                             represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Kansas**                           represented by   **Justin Lee Matheny**
*Party and attorney are active (attorney has been terminated to restrict access to sealed*

(See above for address)
*TERMINATED: 02/10/2023*

*filings.)*
                                                       *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Louisiana**                         represented by  **Justin Lee Matheny**
*Party and attorney are active (attorney has*                       (See above for address)
*been terminated to restrict access to sealed*              *TERMINATED: 02/10/2023*
*filings.)*                                                  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Kentucky**                         represented by  **Justin Lee Matheny**
*Party and attorney are active (attorney has*                       (See above for address)
*been terminated to restrict access to sealed*              *TERMINATED: 02/10/2023*
*filings.)*                                                  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Montana**                         represented by  **Justin Lee Matheny**
*Party and attorney are active (attorney has*                       (See above for address)
*been terminated to restrict access to sealed*              *TERMINATED: 02/10/2023*
*filings.)*                                                  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Nebraska**                         represented by  **Justin Lee Matheny**
*Party and attorney are active (attorney has*                       (See above for address)
*been terminated to restrict access to sealed*              *TERMINATED: 02/10/2023*
*filings.)*                                                  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Ohio**                               represented by  **Justin Lee Matheny**
*Party and attorney are active (attorney has*                       (See above for address)
*been terminated to restrict access to sealed*              *TERMINATED: 02/10/2023*
*filings.)*                                                  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Oklahoma**                         represented by  **Justin Lee Matheny**
*Party and attorney are active (attorney has*                       (See above for address)
*been terminated to restrict access to sealed*              *TERMINATED: 02/10/2023*
*filings.)*                                                  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of South Carolina**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of South Dakota**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Tennessee**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Texas**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Utah**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Wyoming**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Justin Lee Matheny**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Life Collective Inc**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.).*

represented by **Darren L McCarty**
McCarty Law PLLC
1410B W 51st Street
Austin, TX 78756
512-827-2902
Email: darren@mccartylawpllc.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Family Research Council**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Michael F Smith**
The Smith Appellate Law Firm
1717 Pennsylvania Ave Nw
Suite 1025
Washington, DC 20006
202-454-2860
Fax: 202-747-5630
Email: smith@smithpllc.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Judicial Watch Inc**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Meredith Di Liberto**
Judicial Watch Inc
425 Third Street SW, Suite 800
Washington, DC 20024
202-646-5172
Email: mdiliberto@judicialwatch.org
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Advancing American Freedom**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **John Marc Wheat**
Advancing American Freedom
801 Pennsylvania Ave NW
Suite 930
Washington, DC 20004
703-258-9823
Email:
mwheat@advancingamericanfreedom.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Concerned Women for America**                    represented by    **Mario Diaz**
*Party and attorney are active (attorney has*                        Concerned Women for America
*been terminated to restrict access to sealed*                       Legal
*filings.)*                                                           1000 N Payne St
                                                                     Alexandria, VA 22314
                                                                     202-488-7000
                                                                     Email: mdiaz@cwfa.org
                                                                     *TERMINATED: 02/10/2023*
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     *Bar Status: Not Admitted*

**Amicus**

**Greer Donley**                                   represented by    **Robert John Winson**
*Party and attorney are active (attorney has*                        Covington & Burling LLP
*been terminated to restrict access to sealed*                       1999 Avenue of the Stars
*filings.)*                                                           Los Angeles, CA 90067-4643
                                                                     424-332-4800
                                                                     Fax: 424-332-4749
                                                                     Email: rwinson@cov.com
                                                                     *TERMINATED: 02/10/2023*
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     *Bar Status: Admitted/In Good Standing*

                                                                     **Alysia Brianna Cordova**
                                                                     Mullin Hoard & Brown LLP
                                                                     500 S Taylor
                                                                     Suite 800
                                                                     Amarillo, TX 79101
                                                                     806-372-5050
                                                                     Fax: 806-372-5086
                                                                     Email: acordova@mhba.com
                                                                     *TERMINATED: 02/10/2023*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     *Bar Status: Admitted/In Good Standing*

                                                                     **Beth E Braiterman**
                                                                     Covington & Burling LLP
                                                                     850 10th Street NW
                                                                     Washington, DC 20001
                                                                     202-662-5864
                                                                     Email: bbraiterman@cov.com
                                                                     *TERMINATED: 02/10/2023*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     *Bar Status: Not Admitted*

**Denise Esposito**
Covington and Burling LLP
850 10th Street NW
Washington, DC 20001
202-662-5562
Email: desposito@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
850 10th St NW
Washington, DC 20268
847-964-3246
Email: ekatz@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
Covington & Burling
850 Tenth Street NW
Washington, DC 20001
202-640-8446
Email: gjulian@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
Covington & Burling LLP
850 Tenth Street NW
Washington, DC 20001
202-662-5249
Email: jpost@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
Covington & Burling LLP
850 10th St., NW
Washington, DC 20268
703-582-4543
Email: lgrossman@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Richard Biggs**
Mullin Hoard & Brown LLP
500 S Taylor
Suite 800
Amarillo, TX 79109
806-372-5050
Email: rbiggs@mhba.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202-662-5612
Email: rlong@cov.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Patricia Zettler**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**R. Alta Charo**                    represented by    **Robert John Winson**
*Party and attorney are active (attorney has*          (See above for address)
*been terminated to restrict access to sealed*         *TERMINATED: 02/10/2023*
*filings.)*                                             *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**I. Glenn Cohen**
*Party and attorney are active (attorney has*
*been terminated to restrict access to sealed*
*filings.)*

represented by   **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Marsha Cohen**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Nathan Cortez**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Rebecca Eisenberg**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Henry Greely**                          represented by    **Robert John Winson**
*Party and attorney are active (attorney has*                (See above for address)
*been terminated to restrict access to sealed*               *TERMINATED: 02/10/2023*
*filings.)*                                                   *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*
                                                             *Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**George Horvath**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**

(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Peter Barton Hutt**                represented by   **Robert John Winson**
*Party and attorney are active (attorney has*                    (See above for address)
*been terminated to restrict access to sealed*                   *TERMINATED: 02/10/2023*
*filings.)*                                                        *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*

*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Joan Krause**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by   **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**

(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Holly Fernandez Lynch**                    represented by    **Robert John Winson**
*Party and attorney are active (attorney has*                  (See above for address)
*been terminated to restrict access to sealed*                 *TERMINATED: 02/10/2023*
*filings.)*                                                     *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*
                                                               *Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

23-10362.35

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Elizabeth McCuskey**                                        represented by     **Robert John Winson**
*Party and attorney are active (attorney has*                                    (See above for address)
*been terminated to restrict access to sealed*                                   *TERMINATED: 02/10/2023*
*filings.)*                                                                       *LEAD ATTORNEY*
                                                                                 *ATTORNEY TO BE NOTICED*
                                                                                 *Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*

*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)

*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Jennifer Oliva**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Jordan Paradise**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Christopher Robertson**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)

*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Joanna Sax**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by    **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Allison Whelan**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Robert John Winson**
(See above for address)
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alysia Brianna Cordova**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Beth E Braiterman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)

*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Diana Winters**                          represented by   **Robert John Winson**
*Party and attorney are active (attorney has*              (See above for address)
*been terminated to restrict access to sealed*            *TERMINATED: 02/10/2023*
*filings.)*                                                *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Admitted/In Good Standing*

                                                          **Alysia Brianna Cordova**
                                                          (See above for address)
                                                          *TERMINATED: 02/10/2023*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Admitted/In Good Standing*

                                                          **Beth E Braiterman**
                                                          (See above for address)
                                                          *TERMINATED: 02/10/2023*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Not Admitted*

**Denise Esposito**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Emile Katz**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Guillaume Julian**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julia F Post**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Lewis A Grossman**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Richard Biggs**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Robert A Long, Jr**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**American College of Obstetricians and Gynecologists**
*Party and attorney are active (attorney has been terminated to restrict access to sealed*

represented by **Molly A Meegan**
Acog
General Counsel's Office
409 12th Street SW

*filings.)*

Washington
Washington, DC 20024
202-863-2581
Email: mmeegan@acog.org
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Adam Bresler Aukland-Peck**
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000
Email: aauklandpeck@debevoise.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
McCarn & Weir
905 S. Fillmore
Suite 530
Amarillo, TX 79101
806-350-5395
Email: msherwood@mwlawfirm.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Ste 500
Washington, DC 20004
202-383-8000
Email: mmcguiggan@debevoise.com
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000
Fax: 212-909-6836
Email: srselden@debevoise.com
*TERMINATED: 02/10/2023*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Murphy Klasing**                          represented by  **Murphy S Klasing**
*Party and attorney are active (attorney has*              Weycer, Kaplan, Pulaski & Zuber, P.C.
*been terminated to restrict access to sealed*             11 Greenway Plaza
*filings.)*                                                  Suite 1400
                                                            Houston, TX 77046
                                                            7139619045
                                                            Fax: 7139615341
                                                            Email: mklasing@wkpz.com
                                                            *TERMINATED: 02/17/2023*
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Bar Status: Admitted/In Good Standing*

**Amicus**

**Susan B. Anthony Pro-Life America**       represented by  **Murphy S Klasing**
*Party and attorney are active (attorney has*              (See above for address)
*been terminated to restrict access to sealed*             *TERMINATED: 02/17/2023*
*filings.)*                                                  *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Bar Status: Admitted/In Good Standing*

**Amicus**

**Catholic Health Care Leadership**         represented by  **Murphy S Klasing**
**Alliance**                                                (See above for address)
*Party and attorney are active (attorney has*              *TERMINATED: 02/17/2023*
*been terminated to restrict access to sealed*             *LEAD ATTORNEY*
*filings.)*                                                  *ATTORNEY TO BE NOTICED*
                                                            *Bar Status: Admitted/In Good Standing*

**Amicus**

**The National Catholic Bioethics Center**  represented by  **Murphy S Klasing**
*Party and attorney are active (attorney has*              (See above for address)
*been terminated to restrict access to sealed*             *TERMINATED: 02/17/2023*
*filings.)*                                                  *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Bar Status: Admitted/In Good Standing*

**Amicus**

**Catholic Bar Association**                represented by  **Murphy S Klasing**
*Party and attorney are active (attorney has*              (See above for address)
*been terminated to restrict access to sealed*             *TERMINATED: 02/17/2023*
*filings.)*                                                  *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Bar Status: Admitted/In Good Standing*

**Amicus**

**Catholic Benefits Association**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Christ Medicus Foundation**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Murphy S Klasing**
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**67 Members of Congress**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Fernando M Bustos**
Bustos Law Firm PC
PO Box 1980
Lubbock, TX 79408-1980
806-780-3976
Fax: 806-780-3800
Email: fbustos@bustoslawfirm.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Carolyn McDonnell**
Americans United for Life
1150 Connecticut Ave. NW
Ste 500
Washington, DC 20036
202-289-1478
Email: carolyn.mcdonnell@aul.org
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**American Medical Association**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>Amicus</u>

**Society of Maternal and Fetal Medicine**          represented by   **Adam Bresler Aukland-Peck**
*Party and attorney are active (attorney has*                        (See above for address)
*been terminated to restrict access to sealed*                       *TERMINATED: 02/10/2023*
*filings.)*                                                           *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     *Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>Amicus</u>

**American Academy of Family Physicians**          represented by   **Adam Bresler Aukland-Peck**
*Party and attorney are active (attorney has*                        (See above for address)
*been terminated to restrict access to sealed*                       *TERMINATED: 02/10/2023*
*filings.)*                                                           *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     *Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>**Amicus**</u>

**American Gynecological & Obstetrical Society**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by  **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>**Amicus**</u>

**American Society for Reproductive Medicine**
*Party and attorney are active (attorney has*

represented by  **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*

*been terminated to restrict access to sealed filings.)*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Council of University Chairs of Obstetrics & Gynecology**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**North American Society for Pediatric
and Adolescent Gynecology**
*Party and attorney are active (attorney has
been terminated to restrict access to sealed
filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>**Amicus**</u>

**Nurse Practitioners in Women's Health**
*Party and attorney are active (attorney has
been terminated to restrict access to sealed
filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/23/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Amicus**

**Society of Family Planning**                 represented by    **Adam Bresler Aukland-Peck**
*Party and attorney are active (attorney has*                    (See above for address)
*been terminated to restrict access to sealed*                   *TERMINATED: 02/10/2023*
*filings.)*                                                       *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Not Admitted*

                                                                 **Matthew W Sherwood**
                                                                 (See above for address)
                                                                 *TERMINATED: 02/10/2023*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Admitted/In Good Standing*

                                                                 **Megan McGuiggan**
                                                                 (See above for address)
                                                                 *TERMINATED: 02/13/2023*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Not Admitted*

                                                                 **Shannon Rose Selden**
                                                                 (See above for address)
                                                                 *TERMINATED: 02/10/2023*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Not Admitted*

**Amicus**

**Society of Gynecologic Oncology**           represented by    **Adam Bresler Aukland-Peck**
*Party and attorney are active (attorney has*                    (See above for address)
*been terminated to restrict access to sealed*                   *TERMINATED: 02/10/2023*
*filings.)*                                                       *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Not Admitted*

                                                                 **Matthew W Sherwood**
                                                                 (See above for address)
                                                                 *TERMINATED: 02/10/2023*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Admitted/In Good Standing*

                                                                 **Megan McGuiggan**
                                                                 (See above for address)
                                                                 *TERMINATED: 02/13/2023*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*
                                                                 *Bar Status: Not Admitted*

                                                                 **Shannon Rose Selden**

(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Society of OB/GYN Hospitalists**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Adam Bresler Aukland-Peck**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Matthew W Sherwood**
(See above for address)
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan McGuiggan**
(See above for address)
*TERMINATED: 02/13/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shannon Rose Selden**
(See above for address)
*TERMINATED: 02/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Ethics and Public Policy Center**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **M Edward Whelan**
1730 M Street NW
Suite 910
Washington, DC 20036
202-682-1200
Fax: 202-408-0632
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Charles W Fillmore**
The Fillmore Law Firm LLP
201 Main Street
Suite 801
Fort Worth, TX 76102

817/332-2351
Fax: 817/870-1859
Email: chad@fillmorefirm.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**H Dustin Fillmore, III**
The Fillmore Law Firm LLP
201 Main Street
Suite 801
Fort Worth, TX 76102
817/332-2351
Fax: 817/870-1859
Email: dusty@fillmorefirm.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Texas Business Leaders**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **John Clay Sullivan**
S|L Law PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
469-523-1351
Fax: 469-613-0891
Email: john.sullivan@the-sl-lawfirm.com
*TERMINATED: 02/10/2023*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**Charlotte Lozier Institute**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Cristina Martinez Squiers**
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060
Fax: 202-776-0136
Email: csquiers@schaerr-jaffe.com
*TERMINATED: 02/10/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Gene C Schaerr**
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060
Fax: 202-776-0136

Email: gschaerr@schaerr-jaffe.com
*TERMINATED: 02/16/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Coalition For Jewish Values Healthcare Council**          represented by   **Murphy S Klasing**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*
(See above for address)
*TERMINATED: 02/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Amicus**

**State of Arizona**          represented by   **Joshua Bendor**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*
Office of the Arizona Attorney General
2005 N Central Avenue
Phoenix, AZ 85004
602-542-8958
Email: joshua.bendor@azag.gov
*TERMINATED: 02/21/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

V.

**Objector**

**News Media Coalition**          represented by   **Peter Blackmer Steffensen**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*
SMU Dedman School of Law
PO Box 750116
Dallas, TX 75275-0116
214-768-4077
Fax: 214-768-1611
Email: psteffensen@mail.smu.edu
*TERMINATED: 03/13/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2022 | 1 (p.74) | COMPLAINT against Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD filed by George Delgado, MD, Regina Frost-Clark, MD, American College of Pediatricians, American Association of Pro-Life Obstetricians & Gynecologists, Christian Medical & Dental Associations, Alliance for Hippocratic Medicine, Tyler Johnson, DO, Shaun Jester, DO. (Filing |

fee $402; Receipt number ATXNDC-13312692) Plaintiff will submit summons(es) for issuance. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the  Judges Copy Requirements and  Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here:  Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.74) Table of Exhibits, # 2 (p.967) Exhibit(s) 1, # 3 (p.973) Exhibit(s) 2, # 4 (p.989) Exhibit(s) 3, # 5 (p.991) Exhibit(s) 4, # 6 (p.1027) Exhibit(s) 5, # 7 (p.1035) Exhibit(s) 6, # 8 (p.1067) Exhibit(s) 7, # 9 (p.1960) Exhibit(s) 8, # 10 (p.1967) Exhibit(s) 9, # 11 (p.1968) Exhibit(s) 10, # 12 (p.1969) Exhibit(s) 11, # 13 (p.1974) Exhibit(s) 12, # 14 (p.1975) Exhibit(s) 13, # 15 (p.1978) Exhibit(s) 14, # 16 (p.1979) Exhibit(s) 15, # 17 (p.1985) Exhibit(s) 16, # 18 (p.1988) Exhibit(s) 17, # 19 (p.2000) Exhibit(s) 18, # 20 (p.2041) Exhibit(s) 19, # 21 (p.2051) Exhibit(s) 20, # 22 (p.2053) Exhibit(s) 21, # 23 (p.2059) Exhibit(s) 22, # 24 (p.2064) Exhibit(s) 23, # 25 (p.2069) Exhibit(s) 24, # 26 (p.2074) Exhibit(s) 25, # 27 (p.2079) Exhibit(s) 26, # 28 (p.2086) Exhibit(s) 27, # 29 (p.2512) Exhibit(s) 28, # 30 (p.2513) Exhibit(s) 29, # 31 (p.2514) Exhibit(s) 30, # 32 (p.2521) Exhibit(s) 31, # 33 (p.2522) Exhibit(s) 32, # 34 (p.2525) Exhibit(s) 33, # 35 (p.2526) Exhibit(s) 34, # 36 (p.2527) Exhibit(s) 35, # 37 (p.2528) Exhibit(s) 36, # 38 (p.2529) Exhibit(s) 37, # 39 (p.2530) Exhibit(s) 38, # 40 (p.2531) Exhibit(s) 39, # 41 (p.2538) Exhibit(s) 40, # 42 (p.2544) Exhibit(s) 41, # 43 (p.2565) Exhibit(s) 42, # 44 (p.2566) Exhibit(s) 43, # 45 (p.2570) Exhibit(s) 44, # 46 (p.2590) Exhibit(s) 45, # 47 (p.2595) Exhibit(s) 46, # 48 (p.2600) Exhibit(s) 47, # 49 (p.2724) Exhibit(s) 48, # 50 (p.2727) Exhibit(s) 49, # 51 (p.2761) Exhibit(s) 50, # 52 (p.2801) Exhibit(s) 51, # 53 (p.2805) Exhibit(s) 52, # 54 (p.2810) Cover Sheet) (Baptist, Erik) (Entered: 11/18/2022)

| 11/18/2022 | 2 (p.967) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO. (Clerk QC note: No affiliate entered in ECF). (Baptist, Erik) (Entered: 11/18/2022) |
| 11/18/2022 | 3 (p.973) | Request for Clerk to issue Summons filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO. (Attachments: # 1 (p.74) Summons for Robert M. Califf, # 2 (p.967) Summons for Janet Woodcock, # 3 (p.973) Summons for Patrizia Cavazzoni, # 4 (p.989) Summons for U.S. Department of Health and Human Services, # 5 (p.991) Summons for Xavier Becerra, # 6 (p.1027) Summons for US Attorney Chad Meacham, # 7 (p.1035) Summons for USAG Merrick Garland) (Baptist, Erik) (Entered: 11/18/2022) |
| 11/18/2022 | 4 (p.989) | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (No magistrate judge assigned). Clerk to provide copy to plaintiff if not received electronically. (nht) (Entered: 11/18/2022) |
| 11/18/2022 | 5 (p.991) | Summons issued as to Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug |

| | | |
|---|---|---|
| | | Administration, Janet Woodcock, MD, U.S. Attorney, and U.S. Attorney General. (nht) (Entered: 11/18/2022) |
| 11/18/2022 | 6 (p.1027) | MOTION for Preliminary Injunction filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO (Attachments: # 1 (p.74) Proposed Order) (Baptist, Erik) Modified title on 12/8/2022 (daa). (Entered: 11/18/2022) |
| 11/18/2022 | 7 (p.1035) | Brief/Memorandum in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 6 (p.1027) MOTION for Injunction (Baptist, Erik) (Entered: 11/18/2022) |
| 11/18/2022 | 8 (p.1067) | Appendix in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 6 (p.1027) MOTION for Injunction , 7 (p.1035) Brief/Memorandum in Support of Motion, (Attachments: # 1 (p.74) Appendix pt. 2, # 2 (p.967) Appendix pt. 3, # 3 (p.973) Appendix pt. 4) (Baptist, Erik) (Entered: 11/18/2022) |
| 11/30/2022 | 9 (p.1960) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Erin Morrow Hawley (Filing fee $100.00, Receipt Number ATXNDC-13334273) filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO (Attachments: # 1 (p.74) Proposed Order, # 2 (p.967) Payment Receipt) (Baptist, Erik) Modified to add payment information on 12/1/2022 (cea). (Entered: 11/30/2022) |
| 12/01/2022 | 10 (p.1967) | ORDER granting 9 (p.1960) Application for Admission Pro Hac Vice of Erin Hawley. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 12/1/2022) (daa) (Entered: 12/01/2022) |
| 12/02/2022 | 11 (p.1968) | NOTICE of Attorney Appearance by Noah T Katzen on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Katzen, Noah) (Entered: 12/02/2022) |
| 12/02/2022 | 12 (p.1969) | Joint MOTION to Extend Time to Respond to Motion and Set Briefing Schedule filed by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD (Attachments: # 1 (p.74) Proposed Order) (Katzen, Noah) (Entered: 12/02/2022) |
| 12/08/2022 | 13 (p.1974) | ORDER granting 12 (p.1969) Plaintiffs' Joint Motion to Extend Deadlines and Set Briefing Schedule. Defendants must respond to Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) on or before January 13, 2023. Plaintiffs may reply to Defendants' response on or before February 10, 2023. (Ordered by Judge Matthew J. Kacsmaryk on 12/8/2022) (daa) (Entered: 12/08/2022) |

| 12/27/2022 | 14 (p.1975) | Consent MOTION for Leave to File Briefs With Extended Page Limits filed by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD (Attachments: # 1 (p.74) Proposed Order) (Katzen, Noah) (Entered: 12/27/2022) |
|---|---|---|
| 01/03/2023 | 15 (p.1978) | ORDER granting 14 (p.1975) Defendants' Consent Motion for Leave to File Briefs with Extended Page Limits. (Ordered by Judge Matthew J. Kacsmaryk on 1/3/2023) (daa) (Entered: 01/03/2023) |
| 01/09/2023 | 16 (p.1979) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13426239) filed by The Chattanooga National Memorial for the Unborn (Attachments: # 1 (p.74) Additional Page(s) Certificates of Good Standing)Attorney Darald John Schaffer added to party The Chattanooga National Memorial for the Unborn(pty:am) (Schaffer, Darald) (Entered: 01/09/2023) |
| 01/09/2023 | 17 (p.1985) | MOTION to Waive Local Counsel Requirement re 16 (p.1979) Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13426239) filed by The Chattanooga National Memorial for the Unborn (Schaffer, Darald) (Entered: 01/09/2023) |
| 01/09/2023 | 18 (p.1988) | MOTION for Leave to File Amicus Curiae Brief filed by The Chattanooga National Memorial for the Unborn with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Amicus Brief) (Schaffer, Darald) (Entered: 01/09/2023) |
| 01/13/2023 | 19 (p.2000) | Unopposed MOTION to Intervene filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Exhibit(s) Danco's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, # 2 (p.967) Exhibit(s) Exhibit 2 - Appendix, # 3 (p.973) Proposed Order Proposed Order). Party Danco Laboratories, LLC added.Attorney Ryan Patrick Brown added to party Danco Laboratories, LLC(pty:intvd) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 20 (p.2041) | Brief/Memorandum in Support filed by Danco Laboratories, LLC re 19 (p.2000) Unopposed MOTION to Intervene (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 21 (p.2051) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Danco Laboratories, LLC. (Clerk QC note: No affiliate entered in ECF). (Brown, Ryan) (Main Document 21 replaced with flattened image on 1/17/2023) (nht). (Entered: 01/13/2023) |
| 01/13/2023 | 22 (p.2053) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Jessica Ellsworth (Filing fee $100; Receipt number ATXNDC-13441871) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 23 (p.2059) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Kaitlyn Golden (Filing fee $100; Receipt number ATXNDC-13442009) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 24 (p.2064) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Philip Katz (Filing fee $100; Receipt number ATXNDC-13442025) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | | |

| | 25 (p.2069) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Marlan Golden (Filing fee $100; Receipt number ATXNDC-13442066) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
|---|---|---|
| 01/13/2023 | 26 (p.2074) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Lynn Mehler (Filing fee $100; Receipt number ATXNDC-13442092) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 27 (p.2079) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Catherine Stetson (Filing fee $100; Receipt number ATXNDC-13442104) filed by Danco Laboratories, LLC (Attachments: # 1 (p.74) Proposed Order) (Brown, Ryan) (Entered: 01/13/2023) |
| 01/13/2023 | 28 (p.2086) | RESPONSE in Opposition filed by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, U.S. Food and Drug Administration, Janet Woodcock, MD re: 6 (p.1027) MOTION for Preliminary Injunction. ***FILED USING EMERGENCY EMAIL*** (Attachments: # 1 (p.74) Exhibit(s) Katzen, # 2 (p.967) Exhibit(s) Lindo, # 3 (p.973) Exhibit(s) Ireland, # 4 (p.989) Exhibit(s) Kieltyka, # 5 (p.991) Exhibit(s) Zite, # 6 (p.1027) Exhibit(s) Glaser, # 7 (p.1035) Exhibit(s) McHugh) (twd) (Entered: 01/17/2023) |
| 01/17/2023 | 29 (p.2512) | ORDER granting 16 (p.1979) Application for Admission Pro Hac Vice of Darald John Schaffer, Michael S Jennings. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 1/17/2023) (daa) (Entered: 01/17/2023) |
| 01/17/2023 | 30 (p.2513) | ORDER granting 17 (p.1985) Motion ; granting 18 (p.1988) The Chattanooga National Memorial for the Unborn's Motion for Leave to File a Brief as Amicus Curiae in Support of Plaintiff's Complaint and Motion for Temporary Injunction. (Ordered by Judge Matthew J. Kacsmaryk on 1/17/2023) (daa) (Entered: 01/17/2023) |
| 01/17/2023 | 31 (p.2514) | AMICUS Brief in Support filed by The Chattanooga National Memorial for the Unborn re 1 (p.74) Complaint. (daa) (Entered: 01/19/2023) |
| 02/03/2023 | 32 (p.2521) | ORDER: On or before February 10, 2023, the parties are ORDERED to submit separate briefs on whether the Court should consolidate the injunction hearing and the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). (Ordered by Judge Matthew J. Kacsmaryk on 2/3/2023) (awc) (Entered: 02/03/2023) |
| 02/06/2023 | 33 (p.2522) | ORDER granting 19 (p.2000) Danco Laboratories, LLC's ("Danco") Unopposed Motion for Leave to Intervene. (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/06/2023) |
| 02/06/2023 | 34 (p.2525) | ORDER granting 27 (p.2079) Application for Admission Pro Hac Vice of Catherine Emily Stetson. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 35 (p.2526) | ORDER granting 26 (p.2074) Application for Admission Pro Hac Vice of Lynn Whipkey Mehler. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a |

| | | |
|---|---|---|
| | | case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 36 (p.2527) | ORDER granting 25 (p.2069) Application for Admission Pro Hac Vice of Marlan Golden. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 37 (p.2528) | ORDER granting 24 (p.2064) Application for Admission Pro Hac Vice of Philip Katz. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 38 (p.2529) | ORDER granting 23 (p.2059) Application for Admission Pro Hac Vice of Kaitlyn Golden. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/06/2023 | 39 (p.2530) | ORDER granting 22 (p.2053) Application for Admission Pro Hac Vice of Jessica Lynn Ellsworth. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/6/2023) (daa) (Entered: 02/07/2023) |
| 02/09/2023 | 40 (p.2531) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13504121) filed by Doctors for America (Attachments: # 1 (p.74) Proposed Order). Party Doctors for America added.Attorney Christopher Morten added to party Doctors for America(pty:am) (Morten, Christopher) (Entered: 02/09/2023) |
| 02/09/2023 | 41 (p.2538) | MOTION to Waive Local Counsel Requirement filed by Doctors for America (Attachments: # 1 (p.74) Proposed Order) (Morten, Christopher) (Entered: 02/09/2023) |
| 02/09/2023 | 42 (p.2544) | Unopposed MOTION for Leave to File Amicus Brief filed by Doctors for America (Attachments: # 1 (p.74) Amicus Brief of Doctors for America, # 2 (p.967) Proposed Order) (Morten, Christopher) (Entered: 02/09/2023) |
| 02/09/2023 | 43 (p.2565) | ORDER: On February 6, 2023, the Court granted Danco Laboratories, LLC's ("Danco") motion to intervene. ECF No. 33. Accordingly, the Court hereby ORDERS Danco to promptly file its brief in opposition to Plaintiff's motion for a preliminary injunction (ECF No. 19-1 ). Plaintiffs may file any reply to Defendants' responses to the motion for preliminary injunction on or before February 24, 2023. (Ordered by Judge Matthew J. Kacsmaryk on 2/9/2023) (daa) (Entered: 02/09/2023) |
| 02/10/2023 | 44 (p.2566) | MOTION to Waive Local Rule 83.10(a) (Unopposed) filed by American Center for Law and Justice (Attachments: # 1 (p.74) Proposed Order)Attorney Edward Lawrence White, III added to party American Center for Law and Justice(pty:am) (White, Edward) (Entered: 02/10/2023) |
| 02/10/2023 | 45 (p.2570) | Unopposed MOTION for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction filed by American Center for Law and Justice (Attachments: # 1 (p.74) Amicus Curiae Brief, # 2 (p.967) Proposed Order) (White, |

| | | Edward) (Entered: 02/10/2023) |
|---|---|---|
| 02/10/2023 | 46 (p.2590) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13507946) filed by State of Missouri (Attachments: # 1 (p.74) Proposed Order). Party State of Missouri added.Attorney Joshua Divine added to party State of Missouri(pty:am) (Divine, Joshua) (Entered: 02/10/2023) |
| 02/10/2023 | 47 (p.2595) | MOTION for Leave to File Motion for Leave to Proceed without Local Counsel filed by State of Missouri (Attachments: # 1 (p.74) Proposed Order) (Divine, Joshua) (Entered: 02/10/2023) |
| 02/10/2023 | 48 (p.2600) | Unopposed MOTION for Leave to File Amicus Brief filed by State of Missouri (Attachments: # 1 (p.74) Proposed Order, # 2 (p.967) Attachment: Amicus Brief, # 3 (p.973) Attachment: Appendix) (Divine, Joshua) (Entered: 02/10/2023) |
| 02/10/2023 | 49 (p.2724) | NOTICE of Attorney Appearance by Elissa Michelle Graves on behalf of Human Coalition. (Filer confirms contact info in ECF is current.) (Graves, Elissa) (Entered: 02/10/2023) |
| 02/10/2023 | 50 (p.2727) | RESPONSE filed by Danco Laboratories, LLC re: 6 (p.1027) MOTION for Injunction (Brown, Ryan) (Entered: 02/10/2023) |
| 02/10/2023 | 51 (p.2761) | MOTION for Leave to File Brief Amicus Curiae filed by Human Coalition (Attachments: # 1 (p.74) Proposed Amicus Brief, # 2 (p.967) Proposed Order) (Graves, Elissa) (Entered: 02/10/2023) |
| 02/10/2023 | 52 (p.2801) | Appendix in Support filed by Danco Laboratories, LLC re 50 (p.2727) Response/Objection *to Plaintiff's Motion for Preliminary Injunction* (Brown, Ryan) (Entered: 02/10/2023) |
| 02/10/2023 | 53 (p.2805) | MOTION for Leave to File Motion for Leave to Proceed Without Local Counsel filed by State of Mississippi (Attachments: # 1 (p.74) Proposed Order). Party States of Mississippi, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming added.Attorney Justin Lee Matheny added to party State of Mississippi(pty:am) (Matheny, Justin) (Entered: 02/10/2023) |
| 02/10/2023 | 54 (p.2810) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney M. Edward Whelan III (Filing fee $100; Receipt number ATXNDC-13508325) filed by Ethics and Public Policy Center (Attachments: # 1 (p.74) Proposed Order). Party Ethics and Public Policy Center added.Attorney Charles W Fillmore added to party Ethics and Public Policy Center(pty:!!!) (Fillmore, Charles) (Main Document 54 replaced on 2/10/2023) (daa). (Attachment 1 replaced on 2/10/2023) (daa). (Entered: 02/10/2023) |
| 02/10/2023 | 55 (p.2816) | Unopposed MOTION for Leave to File Motion for Leave to File Amicus Brief filed by State of Mississippi (Attachments: # 1 (p.74) Exhibit(s) Proposed Amicus Brief, # 2 (p.967) Proposed Order) (Matheny, Justin) (Entered: 02/10/2023) |
| 02/10/2023 | 56 (p.2846) | MOTION for Leave to File Amicus Brief on Behalf of Ethics and Public Policy Center in Support of Plaintiffs filed by Ethics and Public Policy Center with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s) Amicus Brief on Behalf of Ethics and Public Policy Center in Support of Plaintiffs, # 2 (p.967) Proposed Order) (Fillmore, Charles) (Entered: 02/10/2023) |

| | | |
|---|---|---|
| 02/10/2023 | 57 (p.2867) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13508285) filed by State of New York (Attachments: # 1 (p.74) Declaration(s), # 2 (p.967) Proposed Order)Attorney Galen Sherwin added to party State of New York(pty:am) (Sherwin, Galen) (Entered: 02/10/2023) |
| 02/10/2023 | 58 (p.2877) | MOTION for Leave to File Brief of Amicus Curiae Life Collective Inc. filed by Life Collective Inc. (Attachments: # 1 (p.74) Exhibit(s) Proposed Amicus Brief). Party Life Collective Inc. added.Attorney Darren L McCarty added to party Life Collective Inc.(pty:am) (McCarty, Darren) (Entered: 02/10/2023) |
| 02/10/2023 | 59 (p.2888) | Unopposed MOTION for Leave to File Brief as Amici Curiae in Support of Defendants and in Opposition to Plaintiffs' Motion for Preliminary Injunction filed by State of New York with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s), # 2 (p.967) Proposed Order) (Sherwin, Galen) (Entered: 02/10/2023) |
| 02/10/2023 | 60 (p.2928) | MOTION Waiver of Local Rule 83.10(a) filed by Life Collective Inc. (McCarty, Darren) (Entered: 02/10/2023) |
| 02/10/2023 | 61 (p.2931) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13508815) filed by Family Research Council (Attachments: # 1 (p.74) Proposed Order). Party Family Research Council added.Attorney Michael F Smith added to party Family Research Council(pty:am) (Smith, Michael) (Entered: 02/10/2023) |
| 02/10/2023 | 62 (p.2940) | MOTION Waive Local Counsel Requirement of LR 83.10 filed by Family Research Council (Attachments: # 1 (p.74) Proposed Order) (Smith, Michael) (Entered: 02/10/2023) |
| 02/10/2023 | 63 (p.2944) | Unopposed MOTION for Leave to File Amicus Curiae brief filed by Family Research Council with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s) Amicus Brief, # 2 (p.967) Proposed Order) (Smith, Michael) (Entered: 02/10/2023) |
| 02/10/2023 | 64 (p.3055) | MOTION for Leave to File Waive Requirement for Local Counsel filed by Judicial Watch (Attachments: # 1 (p.74) Proposed Order). Party Judicial Watch, Inc. added.Attorney Meredith Di Liberto added to party Judicial Watch(pty:am) (Di Liberto, Meredith) (Entered: 02/10/2023) |
| 02/10/2023 | 65 (p.3059) | Unopposed MOTION for Leave to File to File An Amicus Curiae Brief in Support of Plaintiffs filed by Judicial Watch with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s) Amicus Curiae Brief of Judicial Watch, Inc. in Support of Plaintiffss, # 2 (p.967) Exhibit(s) Appendix to Amicus Curiae Brief of Judicial Watch in Support of Plaintiffs, # 3 (p.973) Proposed Order) (Di Liberto, Meredith) (Entered: 02/10/2023) |
| 02/10/2023 | 66 (p.3201) | Unopposed MOTION for Leave to File AAF Amicus Brief filed by Advancing American Freedom with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Exhibit(s) AAF Amicus brief). Party Advancing American Freedom added.Attorney Marc Wheat added to party Advancing American Freedom(pty:am) (Wheat, Marc) (Entered: 02/10/2023) |
| 02/10/2023 | 67 (p.3235) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13509386) filed by Advancing American Freedom (Attachments: # 1 (p.74) Exhibit(s) Good Standing Virginia cert.) (Wheat, Marc) (Entered: 02/10/2023) |

| | | |
|---|---|---|
| 02/10/2023 | 68<br>(p.3240) | Brief/Memorandum in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 32 (p.2521) Order Setting Deadline/Hearing, *re Consolidating the Preliminary Injunction Hearing with a Trial on the Merits Under Rule 65(a)(2)* (Blake, Julie) (Entered: 02/10/2023) |
| 02/10/2023 | 69<br>(p.3253) | Application for Admission Pro Hac Vice without Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13509192) filed by Concerned Women for America with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Motion for Leave to File as Amicus Curiae, # 2 (p.967) Amicus Curiae Brief) Party Concerned Women for America added.Attorney Mario Diaz added to party Concerned Women for America(pty:am) (Diaz, Mario) (Entered: 02/10/2023) |
| 02/10/2023 | 70<br>(p.3268) | MOTION for Leave to File Brief of Food and Drug Law Scholars as Amici Curiae in Support of Defendants Opposition to Plaintiff's Motion for Preliminary Injunction filed by Greer Donley, Patricia Zettler, R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters (Attachments: # 1 (p.74) Brief of Food and Drug Law Scholars as Amici Curiae in Support of Defendants Opposition to Plaintiffs Motion for Preliminary Injunction) Attorney Robert John Winson added. (Winson, Robert) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 71<br>(p.3307) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Lewis A. Grossman (Filing fee $100; Receipt number ATXNDC-13509907) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 72<br>(p.3311) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Denise Esposito (Filing fee $100; Receipt number ATXNDC-13509965) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 73<br>(p.3315) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Robert A. Long (Filing fee $100; Receipt number ATXNDC-13509987) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 74<br>(p.3319) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Julia F. Post (Filing fee $100; Receipt number ATXNDC-13510002) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, |

| | | |
|---|---|---|
| | | Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 75 (p.3323) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Beth Braiterman (Filing fee $100; Receipt number ATXNDC-13510021) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 76 (p.3327) | **STRICKEN per 106 (p.3961) ** REPLY filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re: 6 (p.1027) MOTION for Injunction (Baptist, Erik) Modified on 2/13/2023 (nht). (Entered: 02/10/2023) |
| 02/10/2023 | 77 (p.3359) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Emile Katz (Filing fee $100; Receipt number ATXNDC-13510042) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |
| 02/10/2023 | 78 (p.3363) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13509981) filed by American College of Obstetricians and Gynecologists (Attachments: # 1 (p.74) Proposed Order, # 2 (p.967) Exhibit(s)). Party American College of Obstetricians and Gynecologists added.Attorney Molly A Meegan added to party American College of Obstetricians and Gynecologists(pty:am) (Meegan, Molly) (Main Document 78 replaced with flattened document on 2/13/2023 (awc). (Attachment 1 replaced with flattened document on 2/13/2023) (awc). (Entered: 02/10/2023) |
| 02/10/2023 | 79 (p.3368) | **STRICKEN per 106 (p.3961) ** Appendix in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 76 (p.3327) Reply, *in Support of Motion for Preliminary Injunction* (Baptist, Erik) Modified on 2/13/2023 (nht). (Entered: 02/10/2023) |
| 02/10/2023 | 80 (p.3437) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Guillaume Julian (Filing fee $100; Receipt number ATXNDC-13510079) filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler (Attachments: # 1 (p.74) Certificate of Good Standing) (Winson, Robert) (Entered: 02/10/2023) |

| | | |
|---|---|---|
| 02/10/2023 | 81 (p.3441) | MOTION for Leave to File Amicus Brief filed by Murphy Klasing, Susan B. Anthony Pro-Life America, Catholic Health Care Leadership Alliance, The National Catholic Bioethics Center, Catholic Bar Association, Catholic Benefits Association, Christ Medicus Foundation with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Proposed Order). Attorney Murphy S Klasing added. (Klasing, Murphy) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 82 (p.3448) | Amicus Brief filed by Catholic Bar Association, Catholic Benefits Association, Catholic Health Care Leadership Alliance, Christ Medicus Foundation, Susan B. Anthony Pro-Life America, The National Catholic Bioethics Center re 6 (p.1027) MOTION for Injunction . (Klasing, Murphy) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 83 (p.3479) | Unopposed MOTION for Leave to File Brief as Amici Curiae in Support of Plaintiffs' Motion for a Preliminary Injunction filed by 67 Members of Congress with Brief/Memorandum in Support. Attorney Fernando M Bustos added to party 67 Members of Congress(pty:am) (Bustos, Fernando) (Entered: 02/10/2023) |
| 02/10/2023 | 84 (p.3483) | Brief/Memorandum in Support filed by 67 Members of Congress re 83 (p.3479) Unopposed MOTION for Leave to File Brief as Amici Curiae in Support of Plaintiffs' Motion for a Preliminary Injunction (Bustos, Fernando) (Entered: 02/10/2023) |
| 02/10/2023 | 85 (p.3504) | Appendix in Support filed by 67 Members of Congress re 84 (p.3483) Brief/Memorandum in Support of Motion (Bustos, Fernando) (Entered: 02/10/2023) |
| 02/10/2023 | 86 (p.3509) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Carolyn McDonnell (Filing fee $100; Receipt number ATXNDC-13510239) filed by 67 Members of Congress (Bustos, Fernando) (Entered: 02/10/2023) |
| 02/10/2023 | 87 (p.3513) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13510418) filed by American College of Obstetricians and Gynecologists, American Medical Association, Society of Maternal and Fetal Medicine, American Academy of Family Physicians, American Gynecological & Obstetrical Society, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of OB/GYN Hospitalists. Party American College of Obstetricians and Gynecologists added. Attorney Shannon Rose Selden added. (Selden, Shannon) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 88 (p.3519) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13510608) filed by American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Gynecological & Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of Maternal and Fetal Medicine, Society of OB/GYN Hospitalists Attorney Adam Bresler Aukland-Peck added. (Aukland-Peck, Adam) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | | |

| | 89 (p.3524) | Unopposed MOTION for Leave to File Brief of Amici Curiae in Support of Plaintiffs' Motion for Preliminary Injunction filed by Texas Business Leaders (Attachments: # 1 (p.74) Exhibit(s) Amicus Brief, # 2 (p.967) Proposed Order Proposed Order). Attorney John Clay Sullivan added. (pty:am) (Sullivan, John) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
|---|---|---|
| 02/10/2023 | 90 (p.3542) | MOTION Proceed without Local Counsel filed by Texas Business Leaders (Sullivan, John) (Entered: 02/10/2023) |
| 02/10/2023 | 91 (p.3545) | Unopposed MOTION for Leave to File to File Amici Curiae filed by American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Gynecological & Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of Maternal and Fetal Medicine, Society of OB/GYN Hospitalists (Attachments: # 1 (p.74) Exhibit(s) Amicus Brief, # 2 (p.967) Proposed Order Proposed Order) (Sherwood, Matthew) (Entered: 02/10/2023) |
| 02/10/2023 | 92 (p.3588) | Brief/Memorandum in Support filed by Danco Laboratories LLC re 32 (p.2521) Order Setting Deadline/Hearing, *Notice of Danco's Position on Consolidation Under Rule 65(a)(2)* (Ellsworth, Jessica) (Entered: 02/10/2023) |
| 02/10/2023 | 93 (p.3597) | NOTICE of Attorney Appearance by Kate Talmor-DOJ on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Talmor-DOJ, Kate) (Entered: 02/10/2023) |
| 02/10/2023 | 94 (p.3598) | ORDER granting 40 (p.2531) Application for Admission Pro Hac Vice ; granting 41 (p.2538) Motion to Waive Local Counsel ; granting 42 (p.2544) Motion for Leave to File ; granting 44 (p.2566) Motion to Waive Local Counsel ; granting 45 (p.2570) Motion for Leave to File ; granting 46 (p.2590) Application for Admission Pro Hac Vice ; granting 47 (p.2595) Motion for Leave to File ; granting 48 (p.2600) Motion for Leave to File ; granting 51 (p.2761) Motion for Leave to File ; granting 53 (p.2805) Motion for Leave to File ; granting 54 (p.2810) Application for Admission Pro Hac Vice ; granting 55 (p.2816) Motion for Leave to File ; granting 56 (p.2846) Motion for Leave to File ; granting 57 (p.2867) Application for Admission Pro Hac Vice ; granting 58 (p.2877) Motion for Leave to File ; granting 59 (p.2888) Motion for Leave to File ; granting 60 (p.2928) Motion to Waive Local Counsel ; granting 61 (p.2931) Application for Admission Pro Hac Vice ; granting 62 (p.2940) Motion to Waive Local Counsel ; granting 63 (p.2944) Motion for Leave to File ; granting 64 (p.3055) Motion for Leave to File ; granting 65 (p.3059) Motion for Leave to File ; granting 66 (p.3201) Motion for Leave to File ; granting 67 (p.3235) Application for Admission Pro Hac Vice ; granting 69 (p.3253) Application for Admission Pro Hac Vice ; granting 70 (p.3268) Motion for Leave to File ; granting 71 (p.3307) Application for Admission Pro Hac Vice ; granting 72 (p.3311) Application for Admission Pro Hac Vice ; granting 73 (p.3315) Application for Admission Pro Hac Vice ; granting 74 (p.3319) Application for Admission Pro Hac Vice ; granting 75 (p.3323) Application for Admission Pro Hac Vice ; granting 77 (p.3359) Application for Admission Pro Hac Vice ; granting 80 (p.3437) Application for Admission Pro Hac Vice ; granting 81 (p.3441) Motion for Leave to File ; granting 83 (p.3479) Motion for Leave to File ; granting 86 (p.3509) Application for Admission Pro Hac Vice. NOTICE TO ATTORNEYS - IMPORTANT REMINDER: Unless excused |

| | | |
|---|---|---|
| | | for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/10/2023) (daa) (Entered: 02/10/2023) |
| 02/10/2023 | 95 (p.3599) | Amicus Brief filed by Family Research Council re 6 (p.1027) MOTION for Injunction, 1 (p.74) Complaint. (Smith, Michael) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 96 (p.3706) | Amicus Brief filed by Human Coalition re 6 (p.1027) MOTION for Injunction. (Graves, Elissa) Docket text modified on 2/13/2023 (twd). (Entered: 02/10/2023) |
| 02/10/2023 | 97 (p.3739) | MOTION for Leave to File Amicus Brief and Exceed Page Limit filed by Charlotte Lozier Institute with Brief/Memorandum in Support. (Attachments: # 1 (p.74) Brief of Proposed Amicus Curiae Charlotte Lozier Institute in Support of Plaintiffs' Motion for Preliminary Injunction, # 2 (p.967) Proposed Order). Party Charlotte Lozier Institute added.Attorney Cristina Martinez Squiers added to party Charlotte Lozier Institute(pty:am) (Squiers, Cristina) (Entered: 02/10/2023) |
| 02/10/2023 | 98 (p.3801) | OBJECTION filed by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD re: 32 (p.2521) Order Setting Deadline/Hearing, (Talmor-DOJ, Kate) (Entered: 02/10/2023) |
| 02/13/2023 | 99 (p.3812) | Amicus Brief filed by Doctors for America. (Morten, Christopher) Docket text modified on 2/13/2023 (twd). (Entered: 02/13/2023) |
| 02/13/2023 | 100 (p.3826) | Amicus Brief filed by State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Montana, State of Nebraska, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, State of Wyoming re 6 (p.1027) MOTION for Injunction. (Matheny, Justin) Docket text modified on 2/13/2023 (twd). (Entered: 02/13/2023) |
| 02/13/2023 | 101 (p.3852) | ORDER granting 78 (p.3363) Application for Admission Pro Hac Vice; granting 87 (p.3513) Application for Admission Pro Hac Vice; granting 88 (p.3519) Application for Admission Pro Hac Vice; granting 89 (p.3524) Motion for Leave to File; granting 90 (p.3542) Motion; granting 91 (p.3545) Motion for Leave to File; granting 97 (p.3739) Motion for Leave to File. NOTICE TO ATTORNEYS - IMPORTANT REMINDER: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). Amici are hereby ORDERED to promptly file their amicus brief with the Court. (Ordered by Judge Matthew J. Kacsmaryk on 2/13/2023) (nht) (Entered: 02/13/2023) |
| 02/13/2023 | 102 (p.3853) | AMICUS BRIEF filed by State of New York re 6 (p.1027) MOTION for Preliminary Injunction. (Sherwin, Galen) Modified title and linkage on 2/15/2023 (awc). (Entered: 02/13/2023) |
| 02/13/2023 | 103 (p.3886) | AMICUS BRIEF filed by Charlotte Lozier Institute re 6 (p.1027) MOTION for Injunction *(Amicus Brief)* (Squiers, Cristina) Modified title on 2/15/2023 (awc). (Entered: 02/13/2023) |
| 02/13/2023 | 104 (p.3943) | NOTICE of Attorney Appearance by Thomas S Leatherbury on behalf of Doctors for America. (Filer confirms contact info in ECF is current.) (Leatherbury, Thomas) (Entered: 02/13/2023) |

| | | |
|---|---|---|
| 02/13/2023 | 105 (p.3944) | AMICUS CURIAE Brief/Memorandum in Support filed by American Center for Law and Justice re 6 (p.1027) MOTION for Injunction *Amicus Brief of the ACLJ* (White, Edward) Modified title on 2/16/2023 (nht). (Entered: 02/13/2023) |
| 02/13/2023 | 106 (p.3961) | ORDER: The Court hereby ORDERS: On or before February 24, 2023, Plaintiffs may file one Reply that consolidates (1) Plaintiffs' reply to the FDA's response (ECF No. 28) and (2) Plaintiffs' reply to Danco's Response (ECF No. 50). The Court therefore STRIKES Plaintiffs' reply (ECF Nos. 76, 79) without prejudice to Plaintiffs re-filing a reply in accordance with this order. (Ordered by Judge Matthew J. Kacsmaryk on 2/13/2023) (nht) (Entered: 02/13/2023) |
| 02/13/2023 | 107 (p.3962) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13514248) filed by American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Gynecological & Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of Maternal and Fetal Medicine, Society of OB/GYN Hospitalists. Attorney Megan McGuiggan added. (McGuiggan, Megan) Docket text modified on 2/14/2023 (twd). (Entered: 02/13/2023) |
| 02/13/2023 | 108 (p.3967) | AMICUS BRIEF filed by R. Alta Charo, I. Glenn Cohen, Marsha Cohen, Nathan Cortez, Greer Donley, Rebecca Eisenberg, Henry Greely, George Horvath, Peter Barton Hutt, Joan Krause, Holly Fernandez Lynch, Elizabeth McCuskey, Jennifer Oliva, Jordan Paradise, Christopher Robertson, Joanna Sax, Allison Whelan, Diana Winters, Patricia Zettler re: 6 (p.1027) MOTION for Preliminary Injunction (Winson, Robert) Modified title and linkage on 2/16/2023 (nht). (Entered: 02/13/2023) |
| 02/14/2023 | 109 (p.4000) | AMICUS BRIEF filed by American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Gynecological & Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Council of University Chairs of Obstetrics & Gynecology, North American Society for Pediatric and Adolescent Gynecology, Nurse Practitioners in Women's Health, Society of Family Planning, Society of Gynecologic Oncology, Society of Maternal and Fetal Medicine, Society of OB/GYN Hospitalists re 6 (p.1027) MOTION for Preliminary Injunction. (Sherwood, Matthew) Modified title and linkage on 2/15/2023 (awc). (Entered: 02/14/2023) |
| 02/14/2023 | 110 (p.4034) | AMICUS CURIAE Brief/Memorandum in Support filed by State of Missouri re 6 (p.1027) MOTION for Injunction (Divine, Joshua) Modified title on 2/14/2023 (daa). (Entered: 02/14/2023) |
| 02/16/2023 | 111 (p.4153) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13523664) filed by Charlotte Lozier Institute (Attachments: # 1 (p.74) Proposed Order)Attorney Gene C Schaerr added to party Charlotte Lozier Institute(pty:am) (Schaerr, Gene) (Entered: 02/16/2023) |
| 02/17/2023 | 112 (p.4159) | MOTION Join the Brief of Amici Curiae, Susan B. Anthony Pro-Life America, et. al. re 6 (p.1027) MOTION for Injunction , 82 (p.3448) Brief/Memorandum in Support of Motion, filed by Coalition For Jewish Values Healthcare Council with Brief/Memorandum in Support.. Party Coalition for Jewish Values Healthcare Council added.Attorney Murphy S Klasing added to party Coalition For Jewish Values Healthcare Council(pty:am) (Klasing, Murphy) (Entered: 02/17/2023) |

| 02/21/2023 | 113 (p.4162) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13532651) filed by State of Arizona Attorney Joshua Bendor added to party State of Arizona(pty:am) (Bendor, Joshua) (Entered: 02/21/2023) |
|---|---|---|
| 02/21/2023 | 114 (p.4167) | AMICUS BRIEF in Support filed by Ethics and Public Policy Center re 6 (p.1027) MOTION for Injunction *Amicus Brief* (Fillmore, Charles) Modified title on 2/23/2023 (nht). (Entered: 02/21/2023) |
| 02/21/2023 | 115 (p.4184) | MOTION for Leave to File Motion to Waive LR 83.10(A) Local Counsel Requirement filed by State of Arizona (Attachments: # 1 (p.74) Proposed Order Granting Admission Pro Hac Vice and Motion to Waive LR 83.10(A) Local Counsel Requirement) (Bendor, Joshua) (Entered: 02/21/2023) |
| 02/21/2023 | 116 (p.4188) | Unopposed MOTION for Leave to File Motion to Join Amicus Brief of Amici States New York, et al. In Support of Defendants filed by State of Arizona (Attachments: # 1 (p.74) Proposed Order Granting Motion to Join Amicus Brief of Amici States New York, et al. In Support of Defendants) (Bendor, Joshua) (Entered: 02/21/2023) |
| 02/21/2023 | 117 (p.4192) | ORDER: On February 3, 2023, the Court ordered parties to submit separate briefs on whether the Court should consolidate the injunction hearing and the trial on the merits under Federal Rule of Civil Procedure 65(a)(2). Having considered the briefing and relevant law, the Court determines that consolidation would not be appropriate in this case. (Ordered by Judge Matthew J. Kacsmaryk on 2/21/2023) (nht) (Entered: 02/21/2023) |
| 02/21/2023 | 118 (p.4193) | ORDER granting 107 (p.3962) Application for Admission Pro Hac Vice of Megan McGuigan. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/21/2023) (nht) (Entered: 02/21/2023) |
| 02/21/2023 | 119 (p.4194) | ORDER granting 111 (p.4153) Application for Admission Pro Hac Vice of Gene C. Schaerr. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 2/21/2023) (nht) (Entered: 02/21/2023) |
| 02/24/2023 | 120 (p.4195) | REPLY filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re: 6 (p.1027) MOTION for Injunction (Baptist, Erik) (Entered: 02/24/2023) |
| 02/24/2023 | 121 (p.4228) | Appendix in Support filed by Alliance for Hippocratic Medicine, American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, Christian Medical & Dental Associations, George Delgado, MD, Regina Frost-Clark, MD, Shaun Jester, DO, Tyler Johnson, DO re 120 (p.4195) Reply, *in Support of Motion for Preliminary Injunction* (Baptist, Erik) (Entered: 02/24/2023) |
| 02/28/2023 | 122 (p.4295) | ORDER granting 112 (p.4159) Motion Join the Brief of Amici Curiae, Susan B. Anthony Pro-Life America, et. al. (Ordered by Judge Matthew J. Kacsmaryk on 2/28/2023) (awc) (Entered: 02/28/2023) |
| 02/28/2023 | | |

| | 123 (p.4296) | ORDER granting 113 (p.4162) Application for Admission Pro Hac Vice of Joshua D. Bendor. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g).; granting 116 (p.4188) Motion for Leave to File. (Ordered by Judge Matthew J. Kacsmaryk on 2/28/2023) (nht) (Entered: 03/01/2023) |
|---|---|---|
| 03/10/2023 | 125 (p.4297) | NOTICE of Attorney Appearance by Julie Straus Harris on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Straus Harris, Julie) (Entered: 03/10/2023) |
| 03/10/2023 | 128 | ELECTRONIC Minute Entry for proceedings held before Judge Matthew J. Kacsmaryk: Telephone Conference held on 3/10/2023. Written Order to follow. Attorney Appearances: Plaintiff - Erik Baptist/Erin Hawley; Defense - Noah Katzen/Julie Straus Harris/Kate Talmor Intervenor - Jessica Ellsworth/Catherine Stetson/Ryan Patrick Brown/Kaitlyn Golden. (Court Reporter: Todd Anderson) (No exhibits) Time in Court - :31. (vls) (Entered: 03/10/2023) |
| 03/13/2023 | 126 (p.4298) | NOTICE of Attorney Appearance by Peter Blackmer Steffensen on behalf of News Media Coalition. (Filer confirms contact info in ECF is current.). Party News Media Coalition added. (Steffensen, Peter) (Entered: 03/13/2023) |
| 03/13/2023 | 127 (p.4299) | NOTICE of *Objection* filed by News Media Coalition (Steffensen, Peter) (Entered: 03/13/2023) |
| 03/13/2023 | 129 (p.4301) | ORDER: Motion Hearing set for 3/15/2023 09:00 AM in US Courthouse, Courtroom 1st Floor, 205 S. E. 5th Ave., Amarillo, TX 79101-1559 before Judge Matthew J. Kacsmaryk. (Ordered by Judge Matthew J. Kacsmaryk on 3/13/2023) (nht) (Entered: 03/13/2023) |
| 03/13/2023 | 130 (p.4303) | NOTICE of Attorney Appearance by Daniel Schwei on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Schwei, Daniel) (Entered: 03/13/2023) |
| 03/13/2023 | 131 (p.4304) | NOTICE of Attorney Appearance by Christopher A. Eiswerth on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Eiswerth, Christopher) (Entered: 03/13/2023) |
| 03/13/2023 | 132 (p.4306) | NOTICE of Attorney Appearance by Emily Brooke Nestler on behalf of Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. (Filer confirms contact info in ECF is current.) (Nestler, Emily) (Entered: 03/13/2023) |
| 03/14/2023 | 133 (p.4423) | Notice of Filing of Official Electronic Transcript of Status Conference Proceedings held on 3-10-23 before Judge Kacsmaryk. Court Reporter/Transcriber Todd Anderson, Telephone number 214-753-2170. Parties are notified of their duty to review the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office. If the transcript contains personal identifiers that must be redacted under MO 61, Fed.R.Civ.P. 5.2 or Fed.R.Crim.P. 49.1, or if the transcript contains the name of a minor child victim or a minor child witness that must be redacted |

| | | |
|---|---|---|
| | | under 18 U.S.C. § 3509, file a <u>Redaction Request - Transcript</u> within 21 days. If no action is taken, the entire transcript will be made available through PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. (21 pages) Redaction Request due 4/4/2023. Redacted Transcript Deadline set for 4/14/2023. Release of Transcript Restriction set for 6/12/2023. (jta) (Entered: 03/14/2023) |
| 03/14/2023 | 134 | NOTICE OF AUDIO STREAM AVAILABILITY: The audio broadcast for the hearing on Plaintiffs' Motion for Preliminary Injunction set for Wednesday, March 15, 2023 at 9:00 AM will be live-streamed in the Dallas Division of the Northern District of Texas, located at 1100 Commerce Street, Courtroom 1351, Dallas, TX 75242. No electronic devices will be permitted in the courtroom. No recording devices will be permitted in the courtroom. It is impermissible under Judicial Conference Policy and local rules of the court (see LCR 83.18 and Miscellaneous Order No. 63) to record or rebroadcast court proceedings. Violators will be subject to sanctions. (ctf) (Entered: 03/14/2023) |
| 03/15/2023 | 135 | ELECTRONIC Minute Entry for proceedings held before Judge Matthew J. Kacsmaryk: Motion Hearing held on 3/15/2023 re 6 (p.1027) Motion for Injunction. Written Order to follow. Attorney Appearances: Plaintiff - Erik Baptist/Erin Hawley; Defense - Julie Straus Harris/Daniel Schwei Intervenor - Jessica Ellsworth. (Court Reporter: Mechelle Daniel) (No exhibits) Time in Court - 4:15. (vls) (Entered: 03/15/2023) |
| 03/17/2023 | 136 (p.4445) | Notice of Filing of Official Electronic Transcript of Hearing on Motion for Preliminary Injunction held on 03/15/2023 before Judge Matthew J. Kacsmaryk. Court Reporter/Transcriber Mechelle Daniel, Telephone number 806.744.7667. Parties are notified of their <u>duty to review</u> the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office. If the transcript contains personal identifiers that must be redacted under MO 61, Fed.R.Civ.P. 5.2 or Fed.R.Crim.P. 49.1, or if the transcript contains the name of a minor child victim or a minor child witness that must be redacted under 18 U.S.C. § 3509, file a <u>Redaction Request - Transcript</u> within 21 days. If no action is taken, the entire transcript will be made available through PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. (155 pages) Redaction Request due 4/7/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/15/2023. (kmd) (Entered: 03/17/2023) |
| 04/07/2023 | 137 (p.4307) | Memorandum Opinion and Order (Ordered by Judge Matthew J. Kacsmaryk on 4/7/2023) (vls) (Entered: 04/07/2023) |
| 04/07/2023 | 138 (p.4374) | NOTICE OF INTERLOCUTORY APPEAL as to 137 (p.4307) Memorandum Opinion and Order to the Fifth Circuit by Xavier Becerra, Robert M. Califf, MD, Patrizia Cavazzoni, MD, U.S. Department of Health and Human Services, US Food and Drug Administration, Janet Woodcock, MD. T.O. form to appellant electronically at <u>Transcript Order Form</u> or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions <u>here</u>. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Schwei, Daniel) |

| | | |
|---|---|---|
| | | (Entered: 04/07/2023) |
| 04/07/2023 | 139 (p.4376) | NOTICE OF INTERLOCUTORY APPEAL as to 137 (p.4307) Memorandum Opinion and Order to the Fifth Circuit by Danco Laboratories LLC. Filing fee $505, receipt number ATXNDC-13649338. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Ellsworth, Jessica) (Entered: 04/07/2023) |
| 04/10/2023 | 140 | USCA Case Number 23-10362 in USCA5 for 138 (p.4374) Notice of Appeal, filed by Robert M. Califf, M.D., Xavier Becerra, Patrizia Cavazzoni, M.D., Janet Woodcock, M.D., U.S. Department of Health and Human Services, US Food and Drug Administration, 139 (p.4376) Notice of Appeal, filed by Danco Laboratories LLC. (nht) (Entered: 04/10/2023) |
| 04/12/2023 | 141 (p.4378) | UNPUBLISHED ORDER of USCA5 as to 138 (p.4374) Notice of Appeal, filed by Robert M. Califf, M.D., Xavier Becerra, Patrizia Cavazzoni, M.D., Janet Woodcock, M.D., U.S. Department of Health and Human Services, US Food and Drug Administration, 139 (p.4376) Notice of Appeal, filed by Danco Laboratories LLC. (Attachments: # 1 (p.74) USCA5 Letter) (nht) (Entered: 04/13/2023) |

**2.   Notice of Interlocutory Appeal filed by FDA**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| Alliance for Hippocratic Medicine, *et al.*, | |
| Plaintiffs, | |
| *v.* | Case No. 2:22-cv-00223-Z |
| U.S. Food and Drug Administration, *et al.*, | |
| Defendants. | |

### Defendants' Notice of Appeal

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the Fifth Circuit from this Court's Memorandum Opinion and Order, entered at ECF No. 137 and dated April 7, 2023.

April 7, 2023                        Respectfully submitted,

OF COUNSEL:                          BRIAN M. BOYNTON
                                     Principal Deputy Assistant Attorney General
SAMUEL R. BAGENSTOS
General Counsel                      ERIC B. BECKENHAUER
                                     Assistant Director
MARK RAZA
Associate General Counsel            */s/ Daniel Schwei*
U.S. Department of Health            DANIEL SCHWEI
  and Human Services                 Special Counsel
Chief Counsel                        JULIE STRAUS HARRIS
Food and Drug Administration         Senior Trial Counsel
                                     CHRISTOPHER A. EISWERTH
                                     EMILY NESTLER
                                     KATE TALMOR
                                     Trial Attorneys
                                     Federal Programs Branch
                                     Civil Division
                                     U.S. Department of Justice
                                     1100 L St., NW

Washington, DC 20005
202-305-8693
daniel.s.schwei@usdoj.gov


ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Acting Director

HILARY K. PERKINS
Assistant Director

NOAH T. KATZEN
Trial Attorney
Consumer Protection Branch

**3.   Notice of Interlocutory Appeal filed by Danco Laboratories LLC**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| ALLIANCE FOR HIPPOCRATIC MEDICINE, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 2:22-cv-00223-Z |
| U.S. FOOD AND DRUG ADMINISTRATION, *et al.*, | § § § | |
| | § | |
| Defendants, | § § | |
| DANCO LABORATORIES, LLC, | § § | |
| Intervenor-Defendant. | § § | |
| | § | |

## DANCO LABORATORIES, LLC'S NOTICE OF APPEAL

Notice is given that Intervenor-Defendant Danco Laboratories, LLC hereby appeals to the United States Court of Appeals for the Fifth Circuit from this Court's Memorandum Opinion and Order, entered into on April 7, 2023 at ECF No. 137.

Dated: April 7, 2023

Respectfully submitted,

*/s/ Jessica L. Ellsworth*

Ryan Brown
RYAN BROWN ATTORNEY AT LAW
Texas Bar No. 24073967
ryan@ryanbrownattorneyatlaw.com
1222 S. Fillmore Street
Amarillo, Texas 79101
Tel: (806) 372-5711

Jessica L. Ellsworth*
Catherine E. Stetson*
Philip Katz*
Lynn W. Mehler*
Kaitlyn A. Golden*

1

Marlan Golden*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Tel:  (202) 637-5600
jessica.ellsworth@hoganlovells.com

*admitted *pro hac vice*

*Counsel for Danco Laboratories, LLC*


## CERTIFICATE OF SERVICE

I certify that on April 7, 2023, I electronically filed the foregoing Notice of Appeal using the CM/ECF system.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties of record.

/s/ *Jessica L. Ellsworth*

23-10362.4377

**4.    Memorandum Opinion and Order**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

ALLIANCE FOR HIPPOCRATIC
MEDICINE, *et al.*,

        Plaintiffs,

v.

                                         2:22-CV-223-Z

U.S. FOOD AND DRUG
ADMINISTRATION, *et al.*,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs' Motion for Preliminary Injunction ("Motion") (ECF No. 6), filed on November 18, 2022. The Court **GRANTS** the Motion **IN PART**.

**BACKGROUND**

Over twenty years ago, the United States Food and Drug Administration ("FDA") approved chemical abortion ("2000 Approval"). The legality of the 2000 Approval is now before this Court. Why did it take *two decades* for judicial review in federal court? After all, Plaintiffs' petitions challenging the 2000 Approval date back to the year 2002, right?

Simply put, FDA stonewalled judicial review — until now. Before Plaintiffs filed this case, FDA ignored their petitions for over sixteen years, even though the law requires an agency response within "180 days of receipt of the petition." 21 C.F.R. § 10.30(e)(2)). But FDA waited 4,971 days to adjudicate Plaintiffs' first petition and 994 days to adjudicate the second. *See* ECF Nos. 1-14, 1-28, 1-36, 1-44 ("2002 Petition," "2019 Petition," respectively). Had FDA responded to Plaintiffs' petitions within the 360 total days allotted, this case would have been in federal court *decades* earlier. Instead, FDA postponed and procrastinated for nearly **6,000 days**.

Plaintiffs are doctors and national medical associations that provide healthcare for pregnant and post-abortive women and girls. Plaintiffs sued Defendants to challenge multiple administrative actions culminating in the 2000 Approval of the chemical abortion regimen for mifepristone. ECF No. 1 at 2. Mifepristone — also known as RU-486 or Mifeprex — is a synthetic steroid that blocks the hormone progesterone, halts nutrition, and ultimately starves the unborn human until death. ECF No. 7 at 7–8.[1] Because mifepristone alone will not always complete the abortion, FDA mandates a two-step drug regimen: mifepristone to kill the unborn human, followed by misoprostol to induce cramping and contractions to expel the unborn human from the mother's womb. *Id.* at 8.

In 1996, the Population Council[2] filed a new drug application ("NDA") with FDA for mifepristone. ECF No. 1 at 35. Shortly thereafter, FDA reset the NDA from "standard" to "priority review." *Id.* In February 2000, FDA wrote a letter to the Population Council stating that "adequate information ha[d] *not* been presented to demonstrate that the drug, when marketed in accordance with the terms of distribution proposed, is safe and effective for use as recommended." ECF No. 1-24 at 6 (emphasis added). FDA also noted the "restrictions on distribution will need to be amended." *Id.*

---

[1] Jurists often use the word "fetus" to inaccurately identify unborn humans in *un*scientific ways. The word "fetus" refers to a specific gestational stage of development, as opposed to the zygote, blastocyst, or embryo stages. *See* ROBERT P. GEORGE & CHRISTOPHER TOLLEFSEN, EMBRYO 27–56 (2008) (explaining the gestational stages of an unborn human). Because other jurists use the terms "unborn human" or "unborn child" interchangeably, and because both terms are inclusive of the multiple gestational stages relevant to the FDA Approval, 2016 Changes, and 2021 Changes, this Court uses "unborn human" or "unborn child" terminology throughout this Order, as appropriate.

[2] The Population Council was founded by John D. Rockefeller in 1952 after he convened a conference with "population activists" such as Planned Parenthood's director and several well-known eugenicists. MATTHEW CONNELLY, FATAL MISCONCEPTION: THE STRUGGLE TO CONTROL WORLD POPULATION 156 (2008). The conference attendees discussed "the problem of 'quality.'" John D. Rockefeller, *On the Origins of the Population Council*, 3 POPULATION AND DEV. REV. 493, 496 (1977). They concluded that "[m]odern civilization had reduced the operation of natural selection by saving more 'weak' lives and enabling them to reproduce," thereby resulting in "a downward trend in . . . genetic quality." *Id.*

2

23-10362.4308

Mere months later, FDA approved the chemical abortion regimen under Subpart H, commonly known as "accelerated approval" and originally designed to expedite investigational HIV medications during the AIDS epidemic.[3] Subpart H accelerates approval of drugs "that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (*e.g.*, ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy)." 21 C.F.R. § 314.500.

FDA then imposed post-approval restrictions "to assure safe use." *See* 21 C.F.R. § 314.520. These restrictions were later adopted when Subpart H was codified as a Risk Evaluation and Mitigation Strategy ("REMS") "to ensure that the benefits of the drug outweigh the risks." 21 U.S.C. § 355-1(a)(1)–(2). The drugs were limited to women and girls with unborn children aged seven-weeks gestation or younger. ECF No. 7 at 9. FDA also required three (3) in-person office visits: the first to administer mifepristone, the second to administer misoprostol, and the third to assess any complications and ensure there were no fetal remains in the womb. *Id.* Additionally, abortionists were required to be properly trained to administer the regimen and to report *all* adverse events from the drugs. *Id.*

Plaintiffs American Association of Pro-Life Obstetricians & Gynecologists ("AAPLOG") and Christian Medical & Dental Associations filed the 2002 Petition with FDA challenging the 2000 Approval. *Id.* In 2006, the U.S. House Subcommittee on Criminal Justice, Drug Policy, and Human Resources expressed the same concerns and held a hearing to investigate FDA's handling

---

[3] *See, e.g.*, Jessica Holden Kloda & Shahza Somerville, *FDA's Expedited Review Process: The Need for Speed*, 35 APPLIED CLINICAL TRIALS 17, 17–18 (2015) ("In 1992, in response to a push by AIDS advocates to make the investigational anti-AIDS drug azidothymidine (AZT) accessible, the FDA enacted 'Subpart H' commonly referred to as accelerated approval; giving rise to expedited review of drugs by the FDA.").

of mifepristone and its subsequent monitoring of the drug.[4] Then-Chairman Souder remarked that mifepristone was "associated with the deaths of at least 8 women, 9 life-threatening incidents, 232 hospitalizations, 116 blood transfusions, and 88 cases of infection."[5] Additionally, Chairman Souder noted "more than 950 adverse event cases" associated with mifepristone "out of only 575,000 prescriptions, at most."[6] The subsequent Staff Report concluded that FDA's approval and monitoring of mifepristone was "substandard and necessitates the withdrawal of this dangerous and fatal product before more women suffer the known and anticipated consequences or fatalities."[7] The report stated the "unusual approval" demonstrated a lower standard of care for women, "and [mifepristone's] withdrawal from the market is justified and necessary to protect the public's health."[8]

FDA rejected the 2002 Petition on March 29, 2016 — nearly *fourteen* years after it was filed. ECF No. 7 at 9. That same day, FDA approved several changes to the chemical abortion drug regimen, including the removal of post-approval safety restrictions for pregnant women and girls. *Id.* at 10. FDA increased the maximum gestational age from seven-weeks gestation to ten-weeks gestation. *Id.* And FDA also: (1) changed the dosage for chemical abortion; (2) reduced the number of required in-person office visits from three to one; (3) allowed non-doctors to prescribe and administer chemical abortions; and (4) eliminated the requirement for prescribers to report non-fatal adverse events from chemical abortion. *Id.*

---

[4] *See The FDA and RU-486: Lowering the Standard for Women's Health: Hearing Before the Subcomm. on Crim. Just., Drug Pol'y, & Hum. Res. of the H. Comm. on Gov't Reform*, 109th Cong. 3 (2006) ("Subcommittee Report").

[5] The transcript of the hearing before the House Subcommittee is available at https://www.govinfo.gov/content/pkg/CHRG-109hhrg31397/html/CHRG-109hhrg31397.htm.

[6] *Id.*

[7] Subcommittee Report at 40.

[8] *Id.*

4

In March 2019, Plaintiffs AAPLOG and American College of Pediatricians filed the 2019 Petition challenging FDA's 2016 removal of safety restrictions. *Id.* On April 11, 2019, FDA approved GenBioPro, Inc.'s abbreviated new drug application ("ANDA") for a generic version of mifepristone without requiring or reviewing *new* peer-reviewed science ("2019 Generic Approval"). *Id.* Two years later, on April 12, 2021, FDA announced it would "exercise enforcement discretion" to allow "dispensing of mifepristone through the mail . . . or through a mail-order pharmacy" during the COVID pandemic — notwithstanding the nearly 150-year-old Comstock Act banning the *mailing* of "[e]very article, instrument, substance, drug, medicine or thing" that produces "abortion." *Id.* Finally, on December 16, 2021, FDA denied most of Plaintiff's 2019 Petition. *Id.* at 11. Specifically, FDA expressly rejected the 2019 Petition's request to keep the in-person dispensing requirements and announced that the agency would *permanently* allow chemical abortion by mail. *Id.*

After Plaintiffs filed suit, Danco Laboratories, LLC ("Danco") — the holder of the NDA for mifepristone — moved to intervene as a defendant. ECF No. 19. On February 6, 2023, this Court granted Danco's motion. ECF No. 33. Plaintiffs now seek a preliminary injunction ordering Defendants to withdraw or suspend: (1) FDA's 2000 Approval and 2019 Approval of mifepristone tablets, 200 mg, thereby removing both from the list of Approved Drugs; (2) FDA's 2016 Changes and 2019 Generic Approval; and (3) FDA's April 12, 2021, Letter and December 16, 2021, Response to the 2019 Petition concerning the in-person dispensing requirement for mifepristone. ECF No. 7 at 12. Additionally, Plaintiffs seek to enjoin Defendants from taking actions inconsistent with these orders. *Id.*

LEGAL STANDARD

A court may issue a preliminary injunction when a movant satisfies the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) the threatened injury outweighs any harm that will result if the injunction is granted; and (4) the grant of an injunction is in the public interest. *See Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). The same standards apply "to prevent irreparable injury" under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 705; *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021).

ANALYSIS

**A.  Plaintiffs Have Standing**

The judicial power of federal courts is limited to certain "Cases" and "Controversies." U.S. CONST. art. III, § 2. The case-or-controversy requirement requires a plaintiff to establish he has standing to sue. *See Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). To have standing, the party invoking federal jurisdiction must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Courts should assess whether the alleged injury to the plaintiff has a "close relationship" to harm "traditionally" recognized as providing a basis for a lawsuit in American courts. *Id.* at 2204. "[S]tanding is not dispensed in

gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 2208.

### 1. *Plaintiff Medical Associations have Associational Standing*

"An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'" *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Under a theory of "associational standing," an association "has standing to bring a suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

Here, the associations' members have standing because they allege adverse events from chemical abortion drugs can overwhelm the medical system and place "enormous pressure and stress" on doctors during emergencies and complications.[9] ECF No. 7 at 14. These emergencies "consume crucial limited resources, including blood for transfusions, physician time and attention, space in hospital and medical centers, and other equipment and medicines." ECF No. 1-5 at 9. This is especially true in maternity-care "deserts" — geographical areas with limited physician availability. *Id.* These emergencies force doctors into situations "in which they feel complicit in the elective chemical abortion by needing to remove a baby with a beating heart or pregnancy

---

[9] *See* James Studnicki et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999-2015*, 8 HEALTH SERV. RSCH. MGMT. EPIDEMIOLOGY 8 (2021) ("ER visits following mifepristone abortion grew from 3.6% of all postabortion visits in 2002 to 33.9% of all postabortion visits in 2015. The trend toward increasing use of mifepristone abortion requires all concerned with health care utilization to carefully follow the ramifications of ER utilization.").

tissue as the only means to save the life of the woman or girl." ECF No. 1 at 85. Members of
Plaintiff medical associations "oppose being forced to end the life of a human being in the womb
for no medical reason, including by having to complete an incomplete elective chemical abortion."
*Id.* at 86; *see also Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 3639525, at *12 (N.D. Tex.
Aug. 23, 2022) (unwanted participation in elective abortions is cognizable under Article III).

Plaintiffs also argue the challenged actions "prevent Plaintiff doctors from practicing
evidence-based medicine" and have caused Plaintiffs to face increased exposure to allegations of
malpractice and potential liability, along with higher insurance costs. ECF No. 7 at 15. The lack
of information on adverse events "harms the doctor-patient relationship" because women and girls
are prevented from giving informed consent to providers. *Id.*; *see also* American Medical
Association Code of Medical Ethics, *Opinion 2.1.1: Informed Consent* (informed consent is
"fundamental in both ethics and law"). To obtain informed consent, physicians must "[a]ssess the
patient's ability to understand relevant medical information" and present to their patient "relevant
information accurately and sensitively," including the burdens and risks of the procedure. *Id.*

Women also perceive the harm to the informed-consent aspect of the physician-patient
relationship. In one study, fourteen percent of women and girls reported having received
insufficient information about (1) side effects, (2) the intensity of the cramping and bleeding,
(3) the next steps after expelling the aborted human, and (4) potential negative emotional reactions
like fear, uncertainty, sadness, regret, and pain. *See* Katherine A. Rafferty & Tessa Longbons,
*#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's
Medication Abortion Narratives*, 36 HEALTH COMMC'N. 1485, 1485–94
(2021). Plaintiff physicians' lack of pertinent information on chemical abortion harms their
physician-patient relationships because they *cannot* receive informed consent from the women and

girls they treat in their clinics. Plaintiffs allege these actions have "radically altered the standard of care." ECF No. 1-6 at 7.

Additionally, Plaintiff medical associations have associational standing via their members' third-party standing to sue on behalf of their patients. *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988) ("It does not matter what specific analysis is necessary to determine that the members could bring the same suit."); *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 293 (3d Cir. 2002) ("So long as the association's members have or will suffer sufficient injury to merit standing and their members possess standing to represent the interests of third-parties, then associations can advance the third-party claims of their members without suffering injuries themselves."); *Ohio Ass'n of Indep. Schs. v. Goff*, 92 F.3d 419, 422 (6th Cir. 1996) (associational standing via member schools' third-party standing to assert constitutional rights of parents to direct their children's education); 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.9.3 (3d ed. 2022) ("Doctors regularly achieve standing to protect the rights of patients and their own related professional rights.").

The requirements for third-party standing are met here because: (1) the patients have "endure[d] many intense side effects and suffer[ed] significant complications requiring medical attention" and "suffer distress and regret";[10] (2) the patients have a "close relation" to the physician members of the Plaintiff medical associations; and (3) "some hindrance" exists to the patients' ability to protect their interests. *See* ECF No. 7 at 13; *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (women seeking abortions may be chilled "by a desire to protect the very privacy of [their] decision from the publicity of a court suit");

---

[10] *Cf. TransUnion*, 141 S. Ct. at 2211 ("Nor did those plaintiffs present evidence that . . . they suffered some other injury (such as an emotional injury)"); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006).

*Pa. Psychiatric*, 280 F.3d at 290 ("[A] party need not face insurmountable hurdles to warrant third-party standing."). The injuries suffered by patients of the Plaintiff medical associations' members are sufficient to confer associational standing.

Here, the physician-patient dynamic favors third-party standing. Unlike abortionists suing on behalf of women seeking abortions, here there are no potential conflicts of interest between the Plaintiff physicians and their patients. *See June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2167 (2020) (Alito, J., dissenting), *abrogated by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (abortionists have a "financial interest in avoiding burdensome regulations," while women seeking abortions "have an interest in the preservation of regulations that protect their health"). And the case for a close physician-patient relationship is even stronger here than in the abortion context. *See id.* at 2168 ("[A] woman who obtains an abortion typically does not develop a close relationship with the doctor who performs the procedure. On the contrary, their relationship is generally brief and very limited."); *see also* ECF No. 1-9 at 7 ("[I]n many cases there is no doctor-patient relationship [between a woman and an abortionist], so [women] often present to overwhelmed emergency rooms in their distress, where they are usually cared for by physicians other than the abortion prescriber."); ECF No. 1-11 at 4 (because there "is no follow-up or additional care provided to patients" by abortionists, there is "no established relationship with a physician" and "patients are simply left to report to the emergency room"). Plaintiff physicians often spend several hours treating post-abortive women, even hospitalizing them overnight or providing treatment throughout several visits. *See* ECF No. 1-8 at 5–6. Given the Supreme Court's jurisprudence on the close relationship between abortionists and women, the facts of this case indicate that Plaintiffs' relationships with their patients are at least as close — if not closer — for purposes of third-party standing.

Finally, women who have *already* obtained an abortion may be *more* hindered than women who challenge restrictions on abortion. Women who have aborted a child — especially through chemical abortion drugs that necessitate the woman seeing her aborted child once it passes — often experience shame, regret, anxiety, depression, drug abuse, and suicidal thoughts because of the abortion. *See* ECF No. 96 at 25; David C. Reardon et al., *Deaths Associated with Pregnancy Outcome: A Record Linkage Study of Low Income Women*, 95 S. MED. J. 834, 834–41 (2002) (women who receive abortions have a 154% higher risk of death from suicide than if they gave birth, with persistent tendencies over time and across socioeconomic boundaries, indicating "self-destructive tendencies, depression, and other unhealthy behavior aggravated by the abortion experience"); Priscilla K. Coleman, *Abortion and Mental Health: Quantitative Synthesis and Analysis of Research Published 1995–2009*, 199 BRITISH J. PSYCHIATRY 180, 180–86 (2011) (same). Subsequently, *in addition to* the typical privacy concerns present in third-party standing in abortion cases, adverse abortion experiences that are often deeply traumatizing pose a hindrance to a woman's ability to bring suit. In short, Plaintiffs — rather than their patients — are most likely the "least awkward challenger[s]" to Defendants' actions. *Craig v. Boren*, 429 U.S. 190, 197 (1976).

### 2. *Plaintiff Medical Associations have Organizational Standing*

"'[O]rganizational standing' does not depend on the standing of the organization's members." *OCA*, 867 F.3d at 610. The organization can establish standing in its own name if it "meets the same standing test that applies to individuals." *Id.* (internal marks omitted). An organization can have standing if it has "proven a drain on its resources resulting from counteracting the effects of the defendant's actions." *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000); *see also Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir.

2018) (changing one's "plans or strategies in response to an allegedly injurious law can itself be a sufficient injury to confer standing"). "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (internal marks omitted).

One way an organization can establish standing is by "identifying specific projects that [it] had to put on hold or otherwise curtail in order to respond to the [challenged action]." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022) (internal marks omitted). This is "not a heightening of the *Lujan* standard,[11] but an example of how to satisfy it by pointing to a non-litigation-related expense." *OCA*, 867 F.3d at 612. Plaintiffs "need not identify specific projects that they have placed on hold or otherwise curtailed."[12] *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 3052489, at *31 (W.D. Tex. Aug. 2, 2022). Rather, this is simply the "most secure foundation" to establish organizational standing. 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.9.5 (3d ed. 2022). Furthermore, "'[a]t the pleading stage,' we 'liberally' construe allegations of injury." *Bezet v. United States*, 714 Fed. Appx. 336, 339 (5th Cir. 2017) (quoting *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009)).

Here, Plaintiff medical associations have standing via diversionary injury. Because of FDA's failure to require reporting of all adverse events, Plaintiffs allege FDA's actions have frustrated their ability to educate and inform their member physicians, their patients, and the public on the dangers of chemical abortion drugs. ECF No. 7 at 12. As a result, Plaintiffs attest they have

---

[11] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

[12] At the hearing, Danco argued *Elfant* held there was no standing where organizations failed to identify specific projects put on hold. ECF No. 136 at 125. This is incorrect. The Fifth Circuit in *Elfant* assumed without deciding the plaintiffs pled an injury-in-fact but held they did not have standing because the causation and redressability elements were not met. *See* 52 F.4th at 255.

diverted valuable resources away from advocacy and educational efforts to compensate for the lack of information. *See* ECF No. 1 at 91. Such diversions expend considerable time, energy, and resources, to the detriment of other priorities and functions and impair Plaintiffs' ability to carry out their educational purpose. *Id.* at 92; *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010).[13] Similarly, Plaintiffs allege their efforts to respond to FDA's actions have "tak[en] them away from other priorities such as fundraising and membership recruitment and retention." ECF Nos. 1-4 at 6, 1-5 at 11. Consequently, Plaintiffs have re-calibrated their outreach efforts to spend extra time and money educating their members about the dangers of chemical abortion drugs. Combined, these facts are sufficient to confer organizational standing. *See OCA*, 867 F.3d at 612 (finding organizational standing even where the injury "was not large"); *Fowler*, 178 F.3d at 356 (injuries in fact "need not measure more than an 'identifiable trifle'") (internal marks omitted).

### 3. *Plaintiffs' alleged Injuries are Concrete and Redressable*

Defendants contend that Plaintiffs' theories of standing "depend upon layer after layer of speculation." ECF No. 28 at 20. But Plaintiffs allege FDA's chemical abortion regimen "caused" intense side effects and significant complications for their patients requiring medical intervention and attention. ECF No. 7 at 13; *see id.* ("The harms that the FDA has wreaked on women and girls have also injured, and will continue to injure, Plaintiff doctors and their medical practices."); *id.* at 14 ("The FDA's actions have placed enormous pressure and stress on Plaintiff doctors during these

---

[13] It is true that Plaintiffs must allege their activities in response to the challenged actions differ from their "routine" activities. *See, e.g.*, *City of Kyle*, 626 F.3d at 238. But Plaintiffs have done so. For example, Plaintiffs argue they conducted independent studies and analyses of available data to the detriment of their advocacy, educational, and recruitment efforts. ECF No. 1-8 at 8. The Fifth Circuit has found diversionary injuries to constitute injuries-in-fact even where it was less clear the plaintiffs diverted from routine activities. *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999) (injury-in-fact where organization regularly conducted voter registration drives and "expended resources registering voters in low registration areas who would have already been registered" if not for the challenged actions).

emergency situations."); *id.* at 15 ("The FDA has caused Plaintiff doctors to face increased exposure to allegations of malpractice and potential liability, along with higher insurance costs."). In fact, Plaintiffs' declarations list specific events where Plaintiff physicians provided emergency care to women suffering from chemical abortion. *See* ECF Nos. 1-8 at 5–6, 1-9 at 4–9, 1-10 at 6–7, 1-11 at 5–6. And Defendants even concede the existence of adverse events related to chemical abortion drugs. *See* ECF No. 28 at 21. Consequently, Defendants misconstrue Plaintiffs' pleadings and mischaracterize Plaintiffs' evidence as "speculative." It is not.

Past injuries thus distinguish this case from *Clapper v. Amnesty Int'l USA*, where the Supreme Court held a "threatened injury must be certainly impending to constitute injury in fact." 568 U.S. 398, 410 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 157–58 (1990)). Were there no past injuries in this case, the alleged future harms are still less attenuated than those in *Clapper. See id.* (finding "a highly attenuated chain of" *five* separate possibilities needed to align for the alleged harm to occur); *McCardell v. U.S. Dep't of Hous. & Urb. Dev.*, 794 F.3d 510, 520 (5th Cir. 2015) ("[U]nlike in *Clapper,* where the alleged injury depended on a long and tenuous chain of contingent events, the chain-of-events framework in this case involves fewer steps and no unfounded assumptions.") (internal marks omitted). *See also* ECF No. 1-31 at 10 (roughly eight percent of women who use abortion pills will require surgical abortion); ECF No. 1-14 at 23 (discussing a study in which 18.3 percent of women required surgical intervention after chemical abortion). And as post-*Whitmore* cases have demonstrated, the "certainly impending" standard for an "imminent" injury is not as demanding as it sounds. *See TransUnion*, 141 S. Ct. at 2197 (material risk of future harm can suffice "so long as the risk of harm is sufficiently imminent and substantial"); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or* there is a 'substantial

risk' that the harm will occur.") (emphasis added); *Clapper*, 568 U.S. at 414 n.5; *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 n.23 (2007) ("Even a small probability of injury is sufficient . . . provided of course that the relief sought would, if granted, reduce the probability."); *Deanda v. Becerra*, No. 2:20-CV-092-Z, 2022 WL 17572093, at *2 (N.D. Tex. Dec. 8, 2022) (collecting cases).[14]

For similar reasons, Defendants' reliance on *City of Los Angeles v. Lyons* also fails. 461 U.S. 95 (1983). There, the Supreme Court held Lyons did not have standing to seek injunctive relief because "[t]here was no finding that Lyons faced a real and immediate threat of again being illegally choked" by Los Angeles police. *Id.* at 110. The *Lyons* holding "is based on the obvious proposition that a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past." *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992). "No such reluctance, however, is warranted here." *Hernandez v. Cremer*, 913 F.2d 230, 234 (5th Cir. 1990). Considering FDA's 2021 decision to permit "mail-in" chemical abortion, many women and girls will consume mifepristone without physician supervision. And in maternity-care "deserts," women may not have ready access to emergency care. In sum, there are fewer safety restrictions for women and girls today than ever before. Plaintiffs have good reasons to believe their alleged injuries will continue in the future, and possibly with greater frequency than in the past.

---

[14] Defendants' reliance on *Spokeo, Inc. v. Robins* is also unavailing. 578 U.S. 330 (2016). Courts should indeed assess whether the alleged injury to the plaintiff has a "close relationship" to harm "traditionally" recognized as the basis for a lawsuit in American courts. *See TransUnion*, 141 S. Ct. at 2204. But "a plaintiff doesn't need to demonstrate that the level of harm he has suffered would be actionable under a similar, common-law cause of action." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022). Rather, Plaintiffs only need to show the *type* of harm allegedly suffered "is similar in kind to a type of harm that the common law has recognized as actionable." *Id.*; *see also Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 940 (5th Cir. 2022) (Ho, J, concurring) (evidence of injury required by *TransUnion* is not burdensome). Harm resulting from unsafe drugs is similar to harm actionable under the common law.

23-10362.4321

Defendants next argue Plaintiffs' theories depend on "unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." ECF No. 28 at 20 (quoting *Lujan*, 504 U.S. at 562). "[A] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976) ("In other words, the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.").

In this case, a favorable decision would likely relieve Plaintiffs of at least some of the injuries allegedly caused by FDA. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[Plaintiffs] need not show that a favorable decision will relieve [their] *every* injury."); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978) (a "substantial likelihood" of the requested relief redressing the alleged injury is enough); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (a plaintiff "need only show that a favorable ruling could potentially lessen its injury"); *Texas v. Becerra*, 577 F. Supp. 3d 527, 560 (N.D. Tex. 2021) ("That the plaintiffs have brought forth specific evidence and examples of how they *will* be harmed . . . distinguishes this case from others where a third party's actions *might* have hurt the plaintiff."). And redressability is satisfied even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g., Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019) ("[T]hird parties will likely react in

23-10362.4322

predictable ways."); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (defendants' actions need not be "the very last step in the chain of causation"); *Larson*, 456 U.S. at 242–44; *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015). Therefore, Plaintiffs' alleged injuries are fairly traceable to Defendants and redressable by a favorable decision.

### 4. *Plaintiffs are within the "Zone of Interests"*

Plaintiffs are also within the zone of interests of the Federal Food, Drug, and Cosmetic Act ("FFDCA") and the Comstock Act. Plaintiffs suing under the APA must assert an interest that is "arguably within the zone of interests to be protected or regulated by the statute that they say was violated." *Texas v. United States*, 809 F.3d 134, 162 (5th Cir. 2015) (internal marks omitted). The zone-of-interests test "is not meant to be especially demanding" and is applied "in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Id.* (internal marks omitted). The zone-of-interests test "looks to the law's substantive provisions to determine what interests (and hence which plaintiffs) are protected." *Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 669 (5th Cir. 2020). "That interest, at times, may reflect aesthetic, conservational, and recreational as well as economic values." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).

A federal court's obligation to hear and decide cases within its jurisdiction is "virtually unflagging." *Lexmark*, 572 U.S. at 126 (internal marks omitted). And "the trend is toward enlargement of the class of people who may protest administrative action." *Camp*, 397 U.S. at 154. No "explicit statutory provision" is necessary to confer standing. *Id.* at 155. "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Texas v. United States*, 809 F.3d at 162 (internal marks omitted). In other words, "[t]here is

no presumption against judicial review and in favor of administrative absolutism unless that purpose is fairly discernible in the statutory scheme." *Camp*, 397 U.S. at 157 (internal marks omitted); *see also Barlow v. Collins*, 397 U.S. 159, 165 (1970) (courts "must decide if Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion").

Defendants argue that Plaintiffs identify no particular provision of the FFDCA protecting their interests. ECF No. 28 at 26. But Plaintiffs' interests are *not* "marginally related" to the purposes implicit in the FFDCA. The statute's substantive provisions protect the safety of physicians' patients and the integrity of the physician-patient relationship. *See generally* 21 U.S.C. § 355. Furthermore, this Court finds Plaintiffs have third-party standing on behalf of their patients. Plaintiffs' patients are within the zone of interest of the FFDCA because patients seek safe and effective medical procedures.

Likewise, Plaintiffs are within the zone of interests of the Comstock Act. This statute "indicates a national policy of discountenancing abortion as inimical to the national life." *Bours v. United States*, 229 F. 960, 964 (7th Cir. 1915); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.19 (1983) (the "thrust" of the Comstock Act was "to prevent the mails from being used to corrupt the public morals"). There is no evidence that Congress "sought to preclude judicial review of administrative rulings" by FDA "as to the legitimate scope of activities" available concerning chemical abortion drugs under these statutes. *Camp*, 397 U.S. at 157. For all the aforementioned reasons, Plaintiffs have standing.

**B. Plaintiffs' Claims Are Reviewable**

Defendants aver that "[a]ll of Plaintiffs' claims are untimely or unexhausted except their challenge to FDA's December 16, 2021, response to the 2019 citizen petition." ECF No. 28 at 26.

This includes Plaintiffs' challenges to: (1) the 2000 Approval and FDA's 2016 Response to the 2002 Petition challenging that approval; (2) the 2019 Generic Approval; and (3), the April 2021 letter. As for FDA's December 2021 Response to the 2019 Petition, Defendants maintain review is limited to the narrow issues presented in the 2019 Petition — which did not include arguments concerning the Comstock Act. *Id.* at 27–28.[15] The Court disagrees with each of these arguments.

### 1. FDA "Reopened" its Decision in 2016 and 2021

FDA's final decision on a citizen petition constitutes "final agency action" under the APA. 21 C.F.R. § 10.45(c). Challenges to agency actions have a six-year statute of limitations period. *See* 28 U.S.C. § 2401(a). Therefore, the statute of limitations for challenging the 2000 Approval began running on March 29, 2016 — the date of FDA's denial of the 2002 Petition. Because the 2016 Denial of the 2002 Petition occurred more than six years before Plaintiffs filed this suit, Defendants argue the challenge is untimely. ECF No. 28 at 26. But if "the agency opened the issue up anew, and then reexamined and reaffirmed its prior decision," the agency's second action — rather than the original decision — starts the limitations period. *See Texas v. Biden*, 20 F.4th 928, 951 (5th Cir. 2021), *rev'd in part on other grounds*, 142 S. Ct. 2528 (2022).

The reopening doctrine arises "where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision."[16] *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 345 (D.C. Cir. 2018); *see also Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017 (D.C. Cir. 2016) ("The reopener doctrine allows an otherwise untimely challenge

---

[15] The Court refers to the 2000 Approval, the 2016 Changes and denial of the 2002 Petition, and the 2019 Generic Approval collectively as FDA's "Pre-2021 Actions." Similarly, the Court refers to FDA's April 2021 letter and December 2021 Response as FDA's "2021 Actions."

[16] Courts have even applied the doctrine where agencies decide *not* to engage in rulemaking and then revisit and reaffirm that decision. *See Pub. Citizen v. Nuclear Regul. Comm'n*, 901 F.2d 147, 152 (D.C. Cir. 1990).

to proceed where an agency has — either explicitly or implicitly — undertaken to reexamine its former choice.") (internal marks omitted); *CTIA-Wireless Ass'n v. F.C.C.*, 466 F.3d 105, 112 (D.C. Cir. 2006) (agency "reconsidered" policy by reaffirming policy and offering "two new justifications" not found in prior orders).

In the rulemaking context, courts have identified four non-exhaustive factors to apply the doctrine where the agency: (1) proposed to make some change in the rules or policies; (2) called for comment on new or changed provisions, but at the same time; (3) explained the unchanged, republished portions; and (4) responded to at least one comment aimed at the previously decided issue. *Tripoli Rocketry Ass'n, Inc. v. U.S. Bureau of Alcohol, Tobacco & Firearms*, No. 00CV0273(RBW), 2002 WL 33253171, at *6 (D.D.C. June 24, 2002) (internal marks omitted). But a court "cannot stop there" — it "must look to the entire context of the rulemaking including all relevant proposals and reactions of the agency to determine whether an issue was in fact reopened." *Pub. Citizen*, 901 F.2d at 150. For example, an agency can reopen a prior action if it removes restrictions or safeguards related to the first action or affects a "sea change" in the regulatory scheme. *See Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008); *Nat'l Biodiesel*, 843 F.3d at 1017 (declining to apply doctrine when "the basic regulatory scheme remain[ed] unchanged"); *Pub. Citizen*, 901 F.2d at 152 (agency reopens decision when it reiterates a policy in such a way as to render the policy "subject to renewed challenge on any substantive grounds").

In the adjudication context, an agency need not solicit or respond to comments to reopen a decision because adjudication does not require notice and comment procedures. *See* 5 U.S.C. §§ 553(c), 554. The reopening doctrine has been applied in the adjudication context where an agency undertakes a "serious, substantive reconsideration" of "a prior administrative decision." *Chenault v. McHugh*, 968 F. Supp. 2d 268, 275 (D.D.C. 2013); *see also Battle v. Sec'y U.S. Dep't*

20

*of Navy*, 757 Fed. Appx. 172, 175 (3d Cir. 2018) (a petition for reconsideration can restart Section

2401(a)'s limitation period if the agency reopens the action based on a finding of "new evidence"

or that the petition reflects some "changed circumstances"); *Peavey v. United States*, 128 F. Supp.

3d 85, 100 (D.D.C. 2015), *aff'd*, No. 15-5290, 2016 WL 4098768 (D.C. Cir. 2016) (reopening in

2011 occurred where agency "elected to conduct a substantive review" of servicemember's 1968

application to correct military records). For formal agency adjudications, even an order stating

"only that it is denying reconsideration" is not conclusive if the agency has "altered its original

decision." *Sendra Corp. v. Magaw*, 111 F.3d 162, 167 (D.C. Cir. 1997).

The standard for reopening is satisfied here. FDA's requirements for distribution in its 2000

Approval originally included:

- In-person dispensing from the doctor to the patient;

- Secure shipping procedures;

- Tracking system ability;

- Use of authorized distributors and agents; and

- Provision of the drug through direct, confidential physician distribution systems that ensures only qualified physicians will receive the drug for patient dispensing.

*See* ECF No. 1 at 40. FDA's 2016 Changes to this regulatory scheme included the following

alterations:

- Extending the maximum gestational age at which a woman or girl can abort her unborn child from 49 days to 70 days;

- Altering the mifepristone dosage from 600 mg to 200 mg, the misoprostol dosage from 400 mcg to 800 mcg, and misoprostol administration from oral to buccal;

- Eliminating the requirement that administration of misoprostol occur in-clinic;

- Broadening the window for misoprostol administration to include a range of 24–48 hours after taking mifepristone, instead of 48 hours afterward;

- ▪ Adding a repeat 800 mcg buccal dose of misoprostol in the event of incomplete chemical abortion;

- ▪ Removing the requirement for an in-person follow-up examination after an abortion;

- ▪ Allowing "healthcare providers" other than physicians to dispense and administer the chemical abortion drugs; and

- ▪ Eliminating the requirement for prescribers to report all non-fatal serious adverse events from chemical abortion drugs.

*Id.* at 53–54. And in 2021, FDA removed the "in-person dispensing requirement" and signaled that it will soon allow pharmacies to dispense chemical abortion drugs. *Id.* at 68. Plaintiffs warn that without this requirement, "there is a dramatically reduced chance that the prescriber can confirm pregnancy and gestational age, discover ectopic pregnancies, and identify a victim of abuse or human trafficking being coerced into having a chemical abortion." ECF No. 120 at 19.

FDA's 2016 and 2021 Changes thus significantly departed from the agency's original approval of the abortion regimen. FDA repeatedly altered its original decision by removing safeguards and changing the regulatory scheme for chemical abortion drugs. *Sierra Club*, 551 F.3d at 1025; *Nat'l Biodiesel*, 843 F.3d at 1017. Additionally, FDA's response to the 2019 Petition *explicitly* states FDA "undertook a *full review* of the Mifepristone REMS Program" in 2021. ECF No. 1-44 at 7 (emphasis added);[17] *see also Peavey*, 128 F. Supp. 3d at 100–02 (agency reopened decision by conducting "thorough review" of the merits, even where the order did not state it was a "reconsideration" and did not reference prior decision). And FDA even granted the 2019 Petition in part. ECF No. 1-44 at 3. A "full review" of a REMS for a drug with known serious risks necessarily considers the possibility that a drug is too dangerous to be on the market, any mitigation

---

[17] *See also Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, FDA (Jan. 4, 2023), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation (describing the 2021 review as "comprehensive").

23-10362.4328

strategy notwithstanding. FDA has the authority to withdraw an approved drug application on this basis. *See* 21 U.S.C. § 355(e). Because the agency reaffirmed its prior actions after undertaking a substantive reconsideration of those actions, the limitations period for those actions starts in 2021. *See Pub. Citizen*, 901 F.2d at 152 (an agency reconsidering and reaffirming original policy "necessarily raises the lawfulness of the original policy, for agencies have an everpresent duty to insure that their actions are lawful").[18]

Alternatively, the Court finds Plaintiffs' claims are not time-barred under the equitable tolling doctrine. *See United States v. Patterson*, 211 F.3d 927, 931 (5th Cir. 2000) (courts "must be cautious not to apply the statute of limitations too harshly"); *P & V Enters. v. U.S. Army Corps of Engr's*, 466 F. Supp. 2d 134, 149 (D.D.C. 2006), *aff'd,* 516 F.3d 1021 (D.C. Cir. 2008) (a "rebuttable presumption of equitable tolling" applies to lawsuits governed by the six-year limitations period of Section 2401(a)); *Bornholdt v. Brady*, 869 F.2d 57, 64 (2d Cir. 1989) ("The existence of § 2401 as a catchall provision . . . does not necessarily mean that Congress intended the six-year period to be applied whenever a substantive statute does not specify a limitations period."). "[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (internal marks omitted); *see also Holland v. Florida*, 560 U.S. 631, 650 (2010) ("The flexibility inherent in equitable procedure enables courts

---

[18] To date, it is unclear whether the reopening doctrine has been applied in the precise context of FDA's approval of an NDA. However, much of the rationale courts have applied in both the rulemaking and adjudication context applies here. And the Court is unaware of any legal principle that would preclude the doctrine from being applied to these facts. Assuming *arguendo* Plaintiffs' allegations are true, a contrary holding would mean there is *no* judicial remedy to FDA's insistence on keeping an unsafe drug on the market, so long as enough time has passed.

to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct particular injustices.") (cleaned up).

Equitable tolling is appropriate here in large part because of FDA's unreasonable delay in responding to Plaintiff's 2002 and 2019 Petitions. *See WildEarth Guardians v. U.S. Dep't of Just.*, 181 F. Supp. 3d 651, 670 (D. Ariz. 2015) (it is "grossly inappropriate" to apply a statute of limitations where the agency unreasonably delayed a claim because the agency "could immunize its allegedly unreasonable delay from judicial review simply by extending that delay for six years") (internal marks omitted). It took FDA 13 years, 7 months, and 9 days to respond to the 2002 Petition. FDA then moved the goalposts by substantially changing the regulatory scheme on the *same day* it issued its Response. And it took FDA 2 years, 8 months, and 17 days to respond to the 2019 Petition which challenged those changes. Thus, in the 20 years between the 2002 Petition and the filing of this suit, Plaintiffs were waiting on FDA for over 16 of those years. *See Hill Dermaceuticals, Inc. v. U.S. Food & Drug Admin.*, 524 F. Supp. 2d 5, 9 (D.D.C. 2007) ("Once citizen petitions are submitted, the FDA Commissioner is required to respond in one of three manners 'within 180 days of receipt of the petition.'") (quoting 21 C.F.R. § 10.30(e)(2)). [19]

Additionally, statutes of limitations "are primarily designed to assure fairness to defendants," and "to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence is lost, memories have faded, and witnesses have disappeared." *Clymore v. United States*, 217 F.3d 370, 376 (5th Cir. 2000), *as corrected on reh'g* (Aug. 24, 2000) (internal marks omitted). But it "has not been argued, and cannot seriously be, that the government was unfairly surprised" when Plaintiffs filed this suit. *Id.* Plaintiffs have been

---

[19] Incidentally, the delayed FDA Response is extreme but not unprecedented. *See, e.g.*, *Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, 942 F. Supp. 2d 17, 22 (D.D.C. 2013) (FDA had yet to respond to a 2006 petition when it approved a related ANDA in 2013).

reasonably diligent in pursuing their claims. *See, e.g.*, ECF No. 1-4 at 6 (after years of waiting for FDA to respond to the Petition, Plaintiff "called upon" FDA to issue a response in 2005 and again in 2015). And the public interest in this case militates toward resolving Plaintiffs' claims on the merits. Accordingly, Plaintiffs' challenges to FDA's Pre-2021 Actions concerning chemical abortion drugs are not time-barred.

### 2. *FDA's April 2021 Decision on In-Person Dispensing Requirements is not "Committed to Agency Discretion by Law"*

Defendants also argue any challenge to FDA's decision regarding the in-person dispensing requirement is foreclosed under *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). ECF No. 28 at 30. In *Heckler*, the Supreme Court held that FDA's decision not to recommend civil or criminal enforcement action to prevent violations of the FFDCA was "committed to agency discretion by law." 470 U.S. at 837–38; *see also Texas v. Biden*, 20 F.4th at 982 ("In other words, a litigant may not waltz into court, point his finger, and demand an agency investigate (or sue, or otherwise enforce against) 'that person over there.'"). "[T]he Supreme Court and the Fifth Circuit have consistently read *Heckler* as sheltering one-off nonenforcement decisions rather than decisions to suspend entire statutes." *Texas v. Biden*, 20 F.4th at 983. The "committed to agency discretion by law" exception to judicial review is a "very narrow exception" that applies *only* where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

That is not the case here. The Secretary has the authority to determine that drugs with "known serious risks" may be dispensed "only in certain health care settings, such as hospitals." *See* 21 U.S.C. § 355-1(f)(3)(C); *Gomperts v. Azar*, No. 1:19-CV-00345-DCN, 2020 WL 3963864, at *1 (D. Idaho July 13, 2020) ("[T]hese restrictions mandate that Mifeprex be dispensed only in

certain healthcare settings").[20] The statute also provides other "elements to assure safe use" of dangerous drugs. 21 U.S.C. § 355-1(f)(1), (3). The Secretary must publicly explain "how such elements will mitigate the observed safety risk." 21 U.S.C. § 355-1(f)(2). The Secretary must also consider whether the elements would "be unduly burdensome on patient access to the drug" and must "minimize the burden on the health care delivery system." *Id.* Additionally, the elements "shall include [one] or more goals to mitigate a specific serious risk listed in the labeling of the drug." 21 U.S.C. § 355-1(f)(3). And as the Court will later explain, federal law prohibits the mailing of chemical abortion drugs. Thus, unlike in *Heckler*, there *is* "law to apply" to FDA's decision. *See Texas v. Biden*, 20 F.4th at 982 ("[T]he executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand."). And even if Defendants have significant discretion in how they administer Section 355-1, that does not mean *all* related actions are immune to judicial review under Section 701(a)(2) of the APA.

In sum, Defendants cannot shield their decisions from judicial review merely by characterizing the challenged action as exercising "enforcement discretion." ECF No. 28 at 15; *see also Texas v. Biden*, 20 F.4th at 987 ("The Government is still engaged in enforcement — even if it chooses to do so in a way that ignores the statute. That's obviously not nonenforcement."); *id.* at 985 ("*Heckler* cannot apply to agency actions that qualify as rules under 5 U.S.C. § 551(4)."); *Heckler*, 470 U.S. at 833 n.4 (a decision to consciously and expressly adopt a general policy that is "so extreme as to amount to *abdication* of its statutory responsibilities" is not "committed to agency discretion") (emphasis added). Furthermore, the suggestion that FDA has full discretion

---

[20] *See also Frequently Asked Questions (FAQS) about REMS*, FDA (Jan. 26, 2018), https://www.fda.gov/drugs/risk-evaluation-and-mitigation-strategies-rems/frequently-asked-questions-faqs-about-rems ("A REMS is required to ensure the drug is administered only in a health care facility with personnel trained to manage severe allergic reactions and immediate access to necessary treatments and equipment to managing such events.").

under Section 355-1 to not require *any* REMS for dangerous drugs would likely present nondelegation problems even under a modest view of that doctrine. *See, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). So too the notion that FDA could exercise its non-enforcement discretion in violation of other federal laws. Therefore, FDA's decision to not enforce the in-person dispensing requirement is reviewable because the decision is not committed to agency discretion by law.

### 3. *Plaintiffs' Failure to Exhaust Certain Claims is Excusable*

Plaintiffs allege FDA's 2021 Decision to dispense mifepristone through the mail did not acknowledge or address federal criminal laws that "expressly prohibit[] such downstream distribution." ECF No. 7 at 26. Defendants maintain Plaintiffs' argument is unexhausted because they failed to present it at any stage of any administrative proceeding. ECF No. 28 at 38. Similarly, Plaintiffs have not exhausted their challenge to FDA's approval of the supplemental NDA for generic mifepristone. *Id*. at 26. These failures to exhaust claims do not preclude judicial review.

"The general rule of nonreviewability is not absolute." *Myron v. Martin*, 670 F.2d 49, 52 (5th Cir. 1982). To begin, exhaustion is not required where the agency action is "in excess of" the agency's authority. *Id.* And a court will review for the first time "a particular challenge to an agency's decision which was not raised during the agency proceedings" where the agency action is "likely to result in individual injustice" or is "contrary to an important public policy extending beyond the rights of the individual litigants." *Id.*; *see also Mathews v. Eldridge*, 424 U.S. 319, 330 (1976) ("[C]ases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate."); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967) (injunctive remedies applied to administrative determinations should evaluate "both the fitness of the issues for judicial decision and the hardship

27

to the parties of withholding court consideration"); *Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 606 (5th Cir. 2007) (exhaustion may be excused when "irreparable injury will result absent immediate judicial review"); *Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068, 1072 (5th Cir. 1969) (exceptional circumstances include "where injustice might otherwise result").

Courts have also excused a claimant's failure to exhaust administrative remedies where exhaustion "would be futile because the administrative agency will clearly reject the claim." *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 176 (5th Cir. 2012) (internal marks omitted); *see also Oregon Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1159 (D. Or. 2011) (exceptional circumstances include evidence of administrative bias). Additionally, courts will consider any issue that was "raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, whether the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." *Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 942 (9th Cir. 2020). In short, "there is no bright-line standard as to when this requirement has been met." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010). Finally, "[a]dministrative remedies that are inadequate need not be exhausted." *Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 587 (1989) (a lack of reasonable time limits in the claims procedure renders the procedure inadequate).

### a. Contrary to Public Policy

Judicial review of Plaintiffs' unexhausted claims is appropriate for several reasons. First, Defendants' alleged violation of the Comstock Act would be "contrary to an important public policy." *Myron*, 670 F.2d at 52. As a case Defendants rely upon explains, the word "abortion" in the statute "indicates a national policy of discountenancing abortion as inimical to the national

28

life." *See Bours*, 229 F. at 964; ECF No. 28-1 at 206. And twenty-two states filed an amicus brief arguing FDA's decision to permit mail-in chemical abortion harms the public interest by undermining states' ability to enforce laws regulating abortion.[21] ECF No. 100 at 17.

### b. *Individual Injustice and Irreparable Injury*

Second, the agency's actions are "likely to result in individual injustice" or cause "irreparable injury." *Myron*, 670 F.2d at 52; *Dawson*, 504 F.3d at 606. Plaintiffs allege "many intense side effects" and "significant complications requiring medical attention" resulting from Defendants' actions.[22] ECF No. 7 at 13. Many women also experience intense psychological trauma and post-traumatic stress from excessive bleeding and from seeing the remains of their aborted children. *See* ECF No. 96 at 25–29; Pauline Slade et al., *Termination of pregnancy: Patient's perception of care*, J. OF FAMILY PLANNING & REPRODUCTIVE HEALTH CARE Vol. 27, No. 2, 72–77 (2001) ("Seeing the foetus, in general, appears to be a difficult aspect of the medical termination process which can be distressing, bring home the reality of the event and may influence later emotional adaptation."). Parenthetically, said "individual justice" and "irreparable injury" analysis also arguably applies to the unborn humans extinguished by mifepristone — especially in

---

[21] *See* David S. Cohen et al., *Abortion Pills*, 76 STAN. L. REV. 1, 9 (forthcoming 2024) ("Despite state laws, mailed medication abortion can cross borders in ways that undermine state laws . . . A new organization, Mayday Health, for example, focuses on those who live in states with abortion bans, giving users step-by-step instructions on how to set up temporary addresses in an abortion permissive state and forward the mail into the banned state.") (internal marks omitted).

[22] At least 4,213 adverse events from chemical abortion drugs have been reported. *See* ECF No. 96 at 12 n.16. But the actual number is likely far higher because non-fatal adverse events are no longer required to be reported, and because more than 60 percent of women and girls' emergency room visits after chemical abortions are miscoded as miscarriages. *See* James Studnicki et al., *A Post Hoc Exploratory Analysis: Induced Complications Mistaken for Miscarriage in the Emergency Room are a Risk Factor for Hospitalization*, 9 HEALTH SERV. RSCH. MGMT. EPIDEMIOLOGY 1, 1 (2022); *see also* ECF No. 1-8 at 7 (describing Plaintiffs' difficulty in submitting adverse event reports to mifepristone manufacturer Danco). Other data sources such as the Center for Disease Control and Prevention Abortion Surveillance Reports are "profoundly flawed" because state reporting "is voluntary, with many states reporting intermittently and some not at all." Studnicki et al., *supra* note 9, at 2. One Plaintiff physician alleges that when she reported an adverse event to her state's health department, the "report was rejected because the State said it was not a 'true' adverse event because the patient ultimately recovered." ECF No. 1-10 at 7.

the post-*Dobbs* era. *See Dobbs*, 142 S. Ct. at 2261 ("Nothing in the Constitution or in our Nation's legal traditions authorizes the Court to adopt [the] theory of life" that States are *required* "to regard a fetus as lacking even the most basic human right — to live — at least until an arbitrary point in a pregnancy has passed.") (internal marks omitted); Brief of *Amici Curiae* Scholars of Jurisprudence John M. Finnis and Robert P. George in Support of Petitioners, *Dobbs*, 142 S. Ct. 2228 (2022) (arguing unborn humans are constitutional "persons" entitled to equal protection).

### c. Administrative Procedures are Inadequate

Third, FDA's combined response time of over sixteen years to Plaintiffs' two petitions shows their procedures have been inadequate. *See Coit*, 489 U.S. at 587; *Bowen v. City of New York*, 476 U.S. 467, 476 (1986) ("[T]he harm imposed by exhaustion would be irreparable."). FDA slow-walked — or rather, *snail*-walked — its response to the 2002 Petition by waiting nearly *fourteen years* to deny the petition. ECF No. 7 at 9. Requiring Plaintiffs to exhaust their administrative remedies may equate to another decade-plus of waiting for the agency to give them the time of day.

### d. Exhaustion would be Futile

Alternatively, any attempt by Plaintiffs to challenge Defendants' actions would likely be futile. Even if Plaintiffs did not endure sixteen years of delay, dawdle, and dithering, their efforts would surely "be futile because the administrative agency will clearly reject the claim." *Gulf Restoration Network*, 683 F.3d at 176. "President Biden has emphasized the need to protect access to mifepristone" since the day of the Supreme Court's decision in *Dobbs*.[23] President Biden stated that "protecting reproductive rights is essential to our Nation's health, safety, and

---

[23] *See FACT SHEET: President Biden to Sign Memorandum on Ensuring Safe Access to Medication Abortion*, THE WHITE HOUSE (Jan. 22, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/01/22/fact-sheet-president-biden-to-sign-presidential-memorandum-on-ensuring-safe-access-to-medication-abortion/.

progress."[24] He also criticized States' efforts to impose restrictions on mifepristone because such efforts "have stoked confusion, sowed fear, and may prevent patients from accessing safe and effective FDA-approved medication."[25] Thus, it is unlikely FDA would reverse course on its "mail-order" abortion regimen. ECF No. 7 at 7. Defendants' position on the Comstock Act in this litigation only confirms that fact. *See* ECF No. 28 at 38 ("Plaintiffs misconstrue the Comstock Act.").[26]

### e. The Comstock Act was raised with Sufficient Clarity

Finally, the Comstock Act issue was "raised with sufficient clarity." *Ross*, 976 F.3d at 942. This is because: (1) the 2019 Petition requested FDA to retain the in-person requirement for dispensing of chemical abortion drugs; and (2) the Comstock Act issue was also raised by the United States Postal Service and the Department of Health & Human Services on July 1, 2022, "[i]n the wake of" *Dobbs*.[27] The Office of Legal Counsel specifically mentioned FDA's regimen for chemical abortion drugs when concluding "the mere mailing of such drugs to a particular jurisdiction is an insufficient basis for concluding that the sender intends them to be used unlawfully." OLC Memo at *1. This shows not only that the issue was raised with sufficient clarity, but also the *futility* of raising the issue before the agency. Therefore, Plaintiffs' failure to exhaust their claims does not preclude judicial review.

---

[24] *Memorandum on Further Efforts to Protect Access to Reproductive Healthcare Services*, THE WHITE HOUSE (Jan. 22, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/01/22/memorandum-on-further-efforts-to-protect-access-to-reproductive-healthcare-services/.

[25] *Id.*

[26] The D.C. Circuit has hinted that the futility doctrine is ordinarily predicated on the "worthlessness of an argument before an agency that *has rejected it* in the *past*" rather than the likelihood that "the agency *would reject it* in the *future*." *Tesoro Refin. & Mktg. Co. v. FERC*, 552 F.3d 868, 874 (D.C. Cir. 2009). But in this case, there is no principled distinction between the two scenarios. Defendants do not even pretend the agency might have accepted Plaintiffs' arguments. Other cases may involve uncertainty about *future* agency rejection, but it is not this case.

[27] *See Application of the Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions*, 2022 WL 18273906 (O.L.C. Dec. 23, 2022) ("OLC Memo").

23-10362.4337

### C. Plaintiffs' Challenges to FDA's 2021 Actions Have a Substantial Likelihood of Success on the Merits

"To satisfy the first element of likelihood of success on the merits," Plaintiffs "must present a prima facie case but need not show that [they are] certain to win." *Janvey v. Alguire*ˌ 647 F.3d 585, 595–96 (5th Cir. 2011) (internal marks omitted). Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) & (C).

The Court will first address FDA's 2021 Actions that eliminated the in-person dispensing requirement and announced that FDA would allow abortionists to dispense chemical abortion drugs by mail or mail-order pharmacy. Plaintiffs have a substantial likelihood of success on their claims that these actions violate federal law.

#### 1. *The Comstock Act prohibits the Mailing of Chemical Abortion Drugs*

The Comstock Act declares "[e]very obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance" to be "nonmailable matter" that "shall not be conveyed in the mails or delivered from any post office or by any letter carrier." 18 U.S.C. § 1461. The next clauses declare nonmailable "[e]very article or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; and [e]very article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose." *Id.* Similarly, Section 1462 forbids the use of "any express company or other common carrier" to transport chemical abortion drugs "in interstate or foreign commerce."

Defendants' argument that the Comstock Act does not prohibit the mailing of chemical abortion drugs relies on the "reenactment canon." That is, courts may distill a statute's meaning

32

when "federal courts of appeals settled upon a consensus view" and "Congress never modified the relevant statutory text to reject or displace this settled construction." ECF No. 28 at 39. This purported "consensus view" is that the Comstock Act does not prohibit the mailing of items designed to produce abortions "where the sender does not intend them to be used unlawfully." *Id.* This argument is unpersuasive for several reasons.

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). But "[t]here is an obvious trump to the reenactment argument": "'[w]here the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction.'" *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (quoting *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 576 (2011) ("[W]e have no warrant to ignore clear statutory language on the ground that other courts have done so."). Additionally, the presumption only applies when the judicial or administrative gloss "represented settled law when Congress reenacted the [language in question]." *Keene Corp. v. United States*, 508 U.S. 200, 212 (1993); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 349 (2005) (presumption applies only when the supposed judicial consensus at the time of reenactment was "so broad and unquestioned that we must presume Congress knew of and endorsed it"); *Davis v. United States*, 495 U.S. 472, 482 (1990); *Fed. Deposit Ins. Corp. v. Phila. Gear Corp.*, 476 U.S. 426, 437 (1986); *United States v. Powell*, 379 U.S. 48, 55 n.13 (1964).[28]

---

[28] *See also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 325 (2012) ("But how numerous must the lower-court opinions be, or how prominent and long-standing the administrative interpretation, to justify the level of lawyerly reliance that justifies the canon? What about two intermediate-court decisions? (We doubt it — though some cases have relied on just a single intermediate-court decision.) Or seven courts of first instance? (Perhaps.)").

The canon is easily overcome for one simple reason: it is a dubious means of ascertaining congressional intent. "There are plenty of reasons to reenact a statute that have nothing to do with codifying the glosses that courts have already put on the statute." CALEB NELSON, STATUTORY INTERPRETATION 481 (2011). For example, perhaps the original statute contained a "sunset" provision. Maybe Congress wanted to change the statute in some other respects but found it easier to communicate those changes by reenacting a modified version of the complete statute "than by casting each discrete change as an amendment to the existing language." *Id.* at n.14. Or Congress was perhaps conducting "a more general codification or reorganization of the statutes in a particular field, for the sake of making the structure of its statutes easier to follow." *Id.* "Or maybe Congress simply wanted to enact the relevant title of the United States Code into positive law." *Id.* "To the extent that Congress reenacts statutory language for one of those other reasons, members of Congress may well not mean to be expressing any view at all about the glosses that have piled up in the meantime." *Id.*; *see also* HENRY M. HART, JR., & ALBERT M. SACKS, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1367 (William N. Eskridge, Jr., & Philip P. Frickey eds., 1994) (tent. ed. 1958) (criticizing the canon for adding to the costs of the legislative process in counterproductive ways).

Here, the plain text of the Comstock Act controls. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1749 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *Lawson v. FMR LLC*, 571 U.S. 429, 441 (2014) ("Absent any textual qualification, we presume the operative language means what it appears to mean."). The Comstock Act declares "nonmailable" every "article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use it or apply it for producing *abortion*." 18 U.S.C. § 1461 (emphasis added). It is indisputable that chemical abortion drugs are both

"drug[s]" and are "for producing abortion." Therefore, federal criminal law declares they are "nonmailable." *See Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 3639525, at *26 n.21 (N.D. Tex. Aug. 23, 2022) ("[F]ederal law bar[s] the importation or delivery of any device or medicine designed to produce an abortion.").

The statute plainly does *not* require intent on the part of the seller that the drugs be used "unlawfully." To be sure, the statute does contain a catch-all provision that prohibits the mailing of such things "for producing abortion, *or for any indecent or immoral purpose*." 18 U.S.C. § 1461 (emphasis added). But "or" is "almost always disjunctive." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018) (internal marks omitted). Additionally, the "or" in Section 1461 is preceded by a comma, further disjoining the list of nonmailable matter. Thus, the Court does not read the "or" as an "and." Similarly, the Act requires that the defendant "knowingly uses the mails for the mailing" of anything declared by the Act "to be nonmailable." 18 U.S.C. § 1461. A defendant could satisfy this *mens rea* requirement by mailing mifepristone and knowing it is for producing abortion. The statute does not require anything more. *See, e.g.*, *United States v. Lamott*, 831 F.3d 1153, 1157 (9th Cir. 2016) (where Congress "intends to legislate a specific intent crime," the statute typically uses the phrase "with the intent to") (internal marks omitted).

Even if the statute were ambiguous, the legislative history also supports this interpretation.[29] *See* H.R. Rep. No. 91-1105, at 2 (1970) ("Existing statutes completely prohibit the importation, interstate transportation, and mailing of contraceptive materials, or the mailing of advertisement or information concerning how or where such contraceptives may be obtained or how conception may be prevented."). Congress unsuccessfully tried to modify Section 1461 to

---

[29] This Court reviews the legislative history as mere evidence of the ordinary public meaning of the current statutory language. *See* ANTONIN SCALIA, A MATTER OF INTERPRETATION 17 (1997) ("It is the *law* that governs, not the intent of the lawgiver . . . Men may intend what they will; but it is only the laws that they enact which bind us.").

prohibit mailing drugs "intended by the offender . . . to be used to produce an *illegal* abortion." *See* REP. OF THE SUBCOMM. ON CRIM. JUST., 95TH CONG., REP. ON RECODIFICATION OF FED. CRIM. LAW 40 (Comm. Print 1978) (emphasis added); *Bostock*, 140 S. Ct. at 1824 (Kavanaugh, J., dissenting) ("In the face of the unsuccessful legislative efforts . . . judges may not rewrite the law simply because of their own policy views.").[30] In fact, the House Subcommittee Report on the proposed amendment acknowledged the plain meaning of the statute: "[U]nder current law, the offender commits an offense whenever he 'knowingly' mails any of the designated abortion materials," and the proposed amendment would "require proof that the offender *specifically intended* that the mailed materials be used to produce an illegal abortion."[31] If Congress believed the statute *already* contained the "intentionality" requirement gloss in prior reenactments, there is little reason why Congress would amend the provision to *include* that requirement.

Defendants aver Plaintiffs' interpretation of the Comstock Act is foreclosed by the Food and Drug Administration Amendments Act of 2007 ("FDAAA") for one reason: "Congress was well aware that it was directing mifepristone's preexisting distribution scheme to continue" in enacting the FDAAA. ECF No. 28 at 40. But neither "critics [of FDA's 2000 Approval of mifepristone] nor anyone else in the congressional debate mentioned the Comstock Act." OLC Memo at *7 n.18; *see also In re Lively*, 717 F.3d 406, 410 (5th Cir. 2013) ("Repeals by implication are disfavored and will not be presumed unless the legislature's intent is 'clear and manifest.'") (internal marks omitted). Because the Comstock Act is not even implicitly mentioned

---

[30] *Bostock*'s majority opinion warns that "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." 140 S. Ct. at 1747. But the opinion does not suggest judges can "rewrite the law." Instead, *Bostock*'s stated rationale was that the disputed term was implicit in the statutory text all along. No such "textualist" analysis could plausibly justify Defendants' interpretation of the Comstock Act, and Defendants offer none.

[31] REP. OF THE SUBCOMM. ON CRIM. JUST., 95TH CONG., REP. ON RECODIFICATION OF FED. CRIM. LAW 40 (Comm. Print 1978) (emphasis added).

in the FDAAA's enactment, there is no repeal by implication. And in any case, Defendants' arguments based on legislative history cannot overcome clear statutory text.

Consequently, reenactment of the Comstock Act does not constitute an adoption of prior constructions because "the law is plain." *Brown*, 513 U.S. at 121 (1994). Even if that were not the case, the reenactment canon does not apply here because the relevant judicial glosses do not represent a "broad and unquestioned" consensus. *Jama*, 543 U.S. at 349. Defendants rely heavily on the OLC Memo that purports to establish this "consensus." But none of the cases cited in the OLC Memo support the view that the Comstock Act bars the mailing of abortion drugs only when the sender has the specific intent that the drugs be used unlawfully.

On the contrary, the Seventh Circuit reasoned that the word "abortion" in the context of the Act indicates "a national policy of discountenancing abortion as inimical to the national life." *Bours*, 229 F. at 964. *Bours* further declared "it is immaterial what the local statutory definition of abortion is, what acts of abortion are included, or what excluded." *Id.* Similarly, the Sixth Circuit's decision in *Davis v. United States* only suggests that legitimate uses of drugs should not fall within the scope of the statute "merely because they are capable of illegal uses." 62 F.2d 473, 474 (6th Cir. 1933). In other words, the *Davis* holding reflects the position that *legitimate* uses — uses beyond the purposes the statute condemns — should be excluded from the scope of the statute, *not* that whatever uses are *lawful under state law* should be. ECF No. 114 at 10. Likewise, the Second Circuit interpreted the statute to embrace articles the 1873 Congress "would have denounced as immoral if it had understood all the conditions under which they were to be used." *United States v. One Package*, 86 F.2d 737, 739 (2d Cir. 1936). The court further observed that "[t]he word 'unlawful' would make this clear as to articles for producing abortion." *Id.*; *see also* James S. Witherspoon, *Reexamining Roe: Nineteenth-Century Abortion Statutes and the Fourteenth*

*Amendment*, 17 ST. MARY'S L.J. 29, 33 (1985) (explaining that thirty of thirty-seven states had statutory abortion prohibitions in 1868 — just five years before Congress enacted the Comstock Act).

Defendants maintain "the legality of the agency actions needs to be judged at the time of the decision, all of which occurred when *Roe* and *Casey* were still good law." ECF No. 136 at 109. Even assuming that is true in all cases, *Roe* did not prohibit *all* restrictions on abortions. And it is not obvious that enforcement of the Comstock Act post-*Casey* would have necessarily run afoul of *Casey*'s "arbitrary 'undue burden' test." *Dobbs*, 142 S. Ct. at 2266. Therefore, there is no reason why the Act should not have at least been considered. In any case, the Comstock Act plainly forecloses mail-order abortion in the present, and Defendants have stated no present or future intention of complying with the law. Defendants cannot immunize the illegality of their actions by pointing to a small window in the past where those actions might have been legal.

In sum, the reenactment canon is inapplicable here because the law is plain. Even if that were not true, the cases relied on in the OLC Memo do not support Defendants' interpretation. And even if they did, a small handful of cases cannot constitute the "broad and unquestioned" consensus required under the reenactment canon. Therefore, Plaintiffs have a substantial likelihood of prevailing on their claim that Defendants' decision to allow the dispensing of chemical abortion drugs through mail violates unambiguous federal criminal law.

### 2. *FDA's 2021 Actions violate the Administrative Procedure Act*

Because FDA's 2021 Actions violate the Comstock Act, they are "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Additionally, the actions were likely "arbitrary and capricious." *Id.* FDA relied on FDA Adverse Event Reporting System data despite the agency's 2016 decision to eliminate the requirement for abortionists to report non-fatal "adverse events."

ECF No. 7 at 25. Defendants maintain that "Plaintiffs offer no explanation for why it was impermissible to rely on the reported data." ECF No. 28 at 33. The explanation should be obvious — it is circular and self-serving to practically eliminate an "adverse event" reporting requirement and then point to a low number of "adverse events" as a justification for removing even *more* restrictions than were already omitted in 2000 and 2016. In other words, it is a predetermined conclusion in search of non-data — a database designed to produce a null set. But even if FDA's explanation were well-reasoned, the actions would still run afoul of the Comstock Act and therefore violate the APA.

### D. Plaintiffs' Challenges to FDA's Pre-2021 Actions Have a Substantial Likelihood of Success on the Merits

#### 1. *FDA's 2000 Approval violated Subpart H*

In 1992, FDA issued regulations "needed to assure safe use" of *new* drugs designed to treat life-threatening diseases like HIV and cancer. *See* 57 Fed. Reg. 58,942, 58,958 (Dec. 11, 1992) (codified at 21 C.F.R. § 314.520). Subpart H — titled "Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses" — applies to drugs that satisfy two requirements. First, the drug must have been "studied for [its] safety and effectiveness in treating serious or life-threatening illnesses." 21 C.F.R. § 314.500. And second, the drug must "provide [a] meaningful therapeutic benefit to patients over existing treatments." *Id.* "These rules were promulgated by FDA . . . as part of an attempt to correct perceived deficiencies in FDA's approval process made apparent by the need to quickly develop drugs for HIV/AIDS patients." ECF No. 1-13 at 20.

"When FDA originally approved Mifeprex, the agency relied upon Subpart H to place certain restrictions on the manufacturer's distribution of the drug product to assure its safe use." ECF No. 28 at 14; *see also* ECF No. 1-13 at 9 (the American Medical Association explained that "[Mifepristone] poses a severe risk to patients unless the drug is administered as part of a complete

treatment plan under the supervision of a physician"). Thus, to satisfy Subpart H, FDA deemed pregnancy a "serious or life-threatening illness[]" and concluded that mifepristone "provide[d] [a] meaningful therapeutic benefit to patients over existing treatments." *See* 21 C.F.R. §§ 314.500; 314.560. FDA was wrong on both counts.

### a. Pregnancy is not an "Illness"

Pregnancy is a normal physiological state most women experience one or more times during their childbearing years — a natural process essential to perpetuating human life. Defendants even admit pregnancy is not an "illness." FDA claims the Final Rule explained Subpart H was available for serious or life-threatening "conditions," whether or not they were understood colloquially to be "illnesses." ECF No. 28 at 36. But the Final Rule says no such thing. "One comment asserted that neither depression nor psychosis is a disease, nor is either one serious or life-threatening." 57 Fed. Reg. 58,946. FDA responded to the comment that "signs of these diseases are readily studied" and that its reference to depression and psychosis "was intended to give examples of conditions or diseases that can be serious for certain populations or in some or all of their phases." *Id.* In other words, FDA's response to this comment was *not* that depression and psychosis qualify because they are "conditions" even though they are not colloquially understood as "illnesses." Rather, FDA simply disagreed with the comment's characterization of these conditions and explained that they *were* examples of "diseases" that can be "serious." Nothing in the Final Rule supports the interpretation that pregnancy is a serious or life-threatening illness.

FDA's 2016 Denial of the 2002 Petition is similarly unpersuasive. For example, FDA noted that approximately fifty percent of pregnancies in the United States are unintended and that unintended pregnancies may cause depression and anxiety. ECF No. 1-28 at 5. But categorizing

complications or negative psychological experiences arising *from* pregnancy as "illnesses" is materially different than classifying pregnancy *itself* as a serious or life-threatening illness *per se*. Tellingly, FDA never explains how or why a "condition" would *not* qualify as a "serious or life-threatening illness." Suppose that a woman experiences depression because of lower back pain that inhibits her mobility. Under FDA's reading, a new drug used to treat lower back pain — which can cause depression, just like unplanned pregnancy — could obtain accelerated approval under Subpart H.

Defendants cite zero cases reading Subpart H like FDA reads Subpart H. On the contrary, courts have read "serious or life-threatening illnesses" to mean what it says. *See, e.g.*, *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 182 (E.D.N.Y. 2013) ("Whether an illness is 'serious or life-threatening' 'is based on its impact on such factors as survival, day-to-day functioning, or the likelihood that the disease, if left untreated, will progress from a less severe condition to a more serious one.'") (quoting 57 Fed. Reg. at 13235). The preamble to the final rule also clarified the terms "would be used as FDA has defined them in the past." 57 Fed. Reg. at 13235.

Likewise, the Final Rule expressly stated this nomenclature "is the same as FDA defined and used the terms" in two rulemakings: the first in 1987; the second in 1988. 57 Fed. Reg. at 58,945. In the 1988 rulemaking, FDA defined "life-threatening" to include *diseases or conditions* "where the likelihood of death is high unless the course of the disease is interrupted (*e.g.*, AIDS and cancer), as well as diseases or conditions with potentially fatal outcomes where the end point of clinical trial analysis is survival (*e.g.*, increased survival in persons who have had a stroke or heart attack)." *See* 53 Fed. Reg. at 41517; *id.* at 41516 (referencing "AIDS, cancer, Parkinson's disease, and other serious conditions"); *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 294 (2011) (the canon of *ejusdem generis* "limits general terms that follow specific ones to matters

similar to those specified") (internal marks omitted). Therefore, "diseases" and "conditions" are used interchangeably, and even "conditions" must be "serious" or "life-threatening" as defined.

Food and Drug scholars have understood Subpart H's scope the same way. *See, e.g.*, Charles Steenburg, *The Food and Drug Administration's Use of Postmarketing (Phase IV) Study Requirements: Exception to the Rule?*, 61 FOOD & DRUG L.J. 295, 323 (2006) (Subpart H "extend[s] only to drugs and biological products that target[] 'serious or life-threatening illnesses' and offer[] a 'meaningful' benefit over existing treatments"). Even the Population Council argued to FDA that "the imposition of Subpart H is unlawful" because "[t]he plain meaning of these terms does not comprehend normal, everyday occurrences such as pregnancy and unwanted pregnancy." ECF No. 1-14 at 21. This reading is also consistent with the fact that aside from mifepristone, FDA had approved fewer than forty NDAs under Subpart H by early 2002. *See id.* at 20. And of those *other* approvals, twenty were for the treatment of HIV and HIV-related diseases, nine were for the treatment of various cancers and their symptoms, four were for severe bacterial infections, one was for chronic hypertension, and one was for leprosy. *Id.* "One of these things is not like the others, one of these things just doesn't belong." *See Sesame Street*.

### b. *Defendants are not entitled to* Auer *Deference*

Courts sometimes extend *Auer* deference "to agencies' reasonable readings of genuinely ambiguous regulations." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019). *Auer* deference is rooted in an "always rebuttable" presumption "that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities." *Id.* at 2412. "*Auer* deference is sometimes appropriate and sometimes not." *Id.* at 2408. "First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* at 2415. "And before concluding that a rule is genuinely ambiguous, a court must exhaust all the traditional tools of construction." *Id.*

(internal marks omitted). "That means a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read." *Id.* If genuine ambiguity remains, the agency's reading must still be "reasonable." *Id.* And even if the regulation is genuinely ambiguous, the agency's interpretation "must in some way implicate its substantive expertise." *Id.* at 2417. Finally, an agency's reading of a rule must reflect "fair and considered judgment" to receive *Auer* deference. *Id.* (internal marks omitted).

Here, *Auer* deference is not appropriate because "the language of [the] regulation is plain and unambiguous." *McCann v. Unum Provident*, 907 F.3d 130, 144 (3d Cir. 2018). As explained, FDA's definitions in prior rulemakings foreclose its interpretation of Subpart H. If there is any ambiguity in "serious or life-threatening illnesses," the ordinary meaning principle resolves that ambiguity. *See Bostock*, 140 S. Ct. at 1825 (Kavanaugh, J, dissenting) ("The ordinary meaning principle is longstanding and well settled."). "[C]ommon parlance matters in assessing the ordinary meaning" of a statute or regulation "because courts heed how most people would have understood the text." *Id.* at 1828 (internal marks omitted). The word "illness" refers to "poor health; sickness," or "a specific sickness or disease, or an instance of such."[32] Merriam-Webster invokes the definition for "sickness" — "an unhealthy condition of body or mind."[33] Likewise, a Wikipedia search for "illness" re-directs to the entry for "Disease," which is defined as "a particular *abnormal* condition that negatively affects the structure or function of all or part of an organism, and that is not immediately due to any external injury."[34] Pregnancy, on the other

---

[32] *Illness*, Dictionary.com, https://www.dictionary.com/browse/illness (last visited Mar. 22, 2023); *see also Bostock*,140 S. Ct. at 1766 (Alito, J, dissenting) ("Dictionary definitions are valuable because they are evidence of what people at the time of a statute's enactment would have understood its words to mean.").

[33] *Illness*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/illness (last visited Mar. 22, 2023).

[34] *Disease*, Wikipedia, https://en.wikipedia.org/wiki/Disease (emphasis added) (last visited Mar. 22, 2023).

hand, is defined as "the time during which one or more offspring develops (gestates) inside a woman's uterus (womb)."[35]

Most readers would not define pregnancy to be a serious or life-threatening illness. Even FDA does not earnestly defend that position. True, complications can arise during pregnancy, and said complications *can* be serious or life-threatening. But that does not make pregnancy *itself* an illness. *See* ECF No 1-13 at 21. And even if the regulation were genuinely ambiguous after exhausting all traditional tools of statutory construction, Defendants' interpretation: (1) is *not* reasonable; (2) does not implicate their substantive expertise; and (3) does not reflect fair and considered judgment. Accordingly, Defendants are not entitled to *Auer* deference on their interpretations of "serious or life-threatening illnesses." By interpreting Subpart H's scope as reaching any state or side effect that can be considered an undefined "condition," Defendants broaden the regulation on accelerated approval of new drugs farther than the text of the regulation would ever suggest. Therefore, FDA's approval of chemical abortion drugs under Subpart H exceeded its authority under the regulation's first requirement.

### c. Chemical Abortion Drugs do not provide a "Meaningful Therapeutic Benefit"

FDA also exceeded its authority under the second requirement of Subpart H. In addition to treating a serious or life-threatening illness, chemical abortion drugs must also provide a "meaningful therapeutic benefit" to patients over surgical abortion. 21 C.F.R. § 314.500. As explained, this cannot be the case because chemical abortion drugs do not treat "serious or life-threatening illnesses" — a prerequisite to reaching the second requirement. *Id.* Similarly, chemical abortion drugs cannot be "therapeutic" because the word relates to the treatment or curing of disease.[36] But even putting that aside, chemical abortion drugs do not provide a meaningful

---

[35] *Pregnancy*, Wikipedia, https://en.wikipedia.org/wiki/Pregnancy (last visited Mar. 22, 2023).
[36] *Therapeutic*, Dictionary.com, https://www.dictionary.com/browse/illness (last visited Mar. 28, 2023).

therapeutic benefit over surgical abortion. *See* 21 C.F.R. § 314.500 (examples include where the benefit is the "ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy"). To the extent surgical abortion can be considered a "therapy," the clinical trials did not compare chemical abortion with surgical abortion to find such a benefit. ECF No. 1 at 44.

Defendants argue just one "meaningful therapeutic benefit": chemical abortion drugs avoided "an invasive surgical procedure and anesthesia in 92 percent of" patients in the trial. ECF No. 28 at 37. But "[b]y defining the 'therapeutic benefit' solely as the avoidance of the current standard of care's delivery mechanism, FDA effectively guarantees that a drug will satisfy this second prong of Subpart H as long as it represents a different method of therapy." ECF No. 1-14 at 22. And even if that *were* a benefit, chemical abortions are over fifty percent more likely than surgical abortion to result in an emergency room visit within thirty days. ECF No. 7 at 21.[37] Consequently, the number of chemical abortion-related emergency room visits increased by over *five hundred percent* between 2002 and 2015. ECF No. 1 at 19.

One study revealed the overall incidence of adverse events is "fourfold higher" in chemical abortions when compared to surgical abortions.[38] Women who underwent chemical abortions also experienced far higher rates of hemorrhaging, incomplete abortion, and unplanned surgical evacuation.[39] Chemical abortion patients "reported significantly higher levels of pain, nausea,

---

[37] Some studies report that the exact number is *fifty-three* percent. *See* Studnicki et al., *supra* note 22.

[38] *See* Maarit Niinimäki et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 OBSTETRICS & GYNECOLOGY 795 (2009). FDA agrees with this study but finds it "not surprising" given that chemical abortion "is associated with longer uterine bleeding." ECF No. 1-44 at 38. *See also* ECF No 1-13 at 15, n.68–72 (collecting studies demonstrating the far higher rates of adverse events in chemical abortion over surgical abortion).

[39] *Id.*

vomiting and diarrhea during the actual abortion than did surgical patients . . . Post-abortion pain occurred in 77.1% of mifepristone patients compared with only 10.5% of surgical patients." ECF No 1-13 at 24. And before the approval, an FDA medical officer recognized the "medical regimen had *more* adverse events, particularly bleeding, than did surgical abortion. Failure rates exceeded those for surgical abortion . . . This is a serious potential disadvantage of the medical method." *Id.* at 23 (emphasis added).

Other studies show eighty-three percent of women report that chemical abortion "changed" them — and seventy-seven percent of those women reported a *negative* change.[40] Thirty-eight percent of women reported issues with anxiety, depression, drug abuse, and suicidal thoughts because of the chemical abortion.[41] Bleeding from a chemical abortion, unlike surgical abortion, can last up to several weeks.[42] And the mother seeing the aborted human "appears to be a difficult aspect of the medical termination process which can be distressing, bring home the reality of the event and may influence later emotional adaptation."[43] "For example, one woman was surprised and saddened to see that her aborted baby 'had a head, hands, and legs' with '[d]efined fingers and toes.'" ECF No. 1 at 21. The entire abortion process takes place within the mother's home, without physician oversight, potentially leading to undetected ectopic pregnancies, failure of rH factor incompatibility detection, and misdiagnosis of gestational age — all leading to severe or even fatal

---

[40] *See* Katherine A. Rafferty & Tessa Longbons, *#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives*, 36 HEALTH COMM. 1485, 1485–94 (2021), https://www.tandfonline.com/doi/full/10.1080/10410236.2020.1770507.

[41] *Id.*

[42] *After Mifepristone: When bleeding will start and how long will it last?*, WOMEN ON WEB, https://www.womenonweb.org/en/page/484/when-will-you-start-bleeding-and-howlong-will-it-last. *See also* ECF No. 1-28 at 25 ("Up to 8% of all subjects may experience some type of bleeding for 30 days or more.").

[43] Pauline Slade et al., *Termination of Pregnancy: Patient's Perception of Care*, 27 J. OF FAMILY PLANNING & REPRODUCTIVE HEALTH CARE 72, 76 (2001).

consequences. *See* ECF No. 96 at 15–17. Contrary to popular belief and talking points, the evidence shows chemical abortion is *not* "as easy as taking Advil." *Id.* at 20.

Compelling evidence suggests the statistics provided by FDA on the adverse effects of chemical abortion *understate* the negative impact the chemical abortion regimen has on women and girls. When women seek emergency care after receiving the chemical abortion pills, the abortionist that prescribed the drugs is usually *not* the provider to manage the mother's complications.[44] Consequently, the treating physician may not know the adverse event is due to mifepristone. *Id.* at 13. Studies support this conclusion by finding *over sixty percent* of women and girls' emergency room visits after chemical abortions are miscoded as "miscarriages" rather than adverse effects to mifepristone.[45] Simply put, FDA's data are incomplete and potentially misleading, as are the statistics touted by mifepristone advocates.

Lastly, chemical abortion does not "treat patients unresponsive to, or intolerant of, available therapy." *See* 21 C.F.R. § 314.500. "To the contrary, because 'medical abortion failures should be managed with surgical termination' the option for surgical abortion must be available for any Mifeprex patient." ECF No. 1-14 at 23 (quoting the Mifeprex "Warnings" label). One study showed that 18.3 percent of women required surgical intervention after the chemical abortion regimen failed. *Id.* Hence, "any patient who would be intolerant of surgical abortion, if such a class of patients exists, cannot use the Mifeprex Regimen." *Id.* at 24. On balance, the data reflect little to no benefit over surgical abortion — much less a "meaningful therapeutic" benefit.

---

[44] Kathi Aultman et al., *Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 36 ISSUES IN LAW & MED., 3–26 (2021).

[45] Studnicki et al., *supra* note 9.

### d. Defendants' Misapplication of Subpart H has not been Cured by Congress

Defendants contend "Plaintiffs' arguments about Subpart H have been overtaken by congressional action." ECF No. 28 at 35. In the FDAAA, "Congress specifically directed" that drugs with elements to assure safe use "in effect on the effective date on this Act" would be "deemed to have in effect an approved" REMS. *Id.* (citing Pub. L. No. 110-85, § 909(b)(1)). But the sponsors of such drugs were also required to submit a proposed REMS within 180 days. *See* Pub. L. No. 110-85, § 909(b)(3). Hence, Congress "deemed" preexisting safety requirements to be a sufficient REMS until a *new* REMS was approved. The FDAAA did not affect, however, whether an NDA was properly approved or authorized under Subpart H in the first place. Rather, the FDAAA required that such drugs needed continued restrictions in place to mitigate risks. Implementation of a REMS under the FDAAA does not somehow repeal or supplant the approval process under Subpart H or 21 U.S.C. § 355(d). The FDAAA only eased the regulatory transition from Subpart H to the REMS provision. Simply stated, Congress's *general* reiteration that dangerous drugs should carry a REMS did not codify FDA's *specific* approval of the mifepristone NDA. It did not consider the chemical abortion approval at all.

In sum, Subpart H doubly forecloses FDA's approval of mifepristone. *At most*, FDA might have lawfully approved mifepristone under Subpart H for cases where a pregnant woman's life or health is in danger. But even a limited approval of this sort would still not render pregnancy an "illness." And surgical abortion — a statistically far safer procedure — would still be available to her. But in any case, that is not what FDA did. Instead, FDA manipulated and misconstrued the text of Subpart H to greenlight elective chemical abortions on a wide scale. Therefore, Plaintiffs have a substantial likelihood of prevailing on their claim that Defendants violated Subpart H.

23-10362.4354

## 2. *FDA's Pre-2021 Actions were Arbitrary and Capricious*

Under the FFDCA, a pharmaceutical company seeking to market a new drug must first obtain FDA approval via an NDA. *See* 21 U.S.C. § 355(a), (b). The NDA must include "adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d). The trials must "provide an adequate basis for physician labeling." 21 C.F.R. § 312.21(c). In those trials, "the drug is used *the way it would be administered when marketed*."[46] The Secretary must deny the NDA if "he has insufficient information to determine whether such drug is safe for use under such conditions." 21 U.S.C. § 355(d)(4).

Here, the U.S. trials FDA relied upon when approving mifepristone required that: (1) each woman receive an ultrasound to confirm gestational age and exclude an ectopic pregnancy;[47] (2) physicians have experience in performing surgical abortions and admitting privileges at medical facilities that provide emergency care; (3) all patients be within one hour of emergency facilities or the facilities of the principal investigator; and (4) women be monitored for four hours to check for adverse events after taking misoprostol. ECF No. 7 at 23. However, FDA included *none* of these requirements — which were explicitly stated in the clinical trial FDA relied on most — in the 2000 Approval. *Id.* Likewise, FDA's 2016 Changes omitted the requirements of the underlying tests: (1) gestational age confirmed by ultrasounds; (2) participants required to return for clinical assessment; and (3) surgical intervention if necessary. *Id.* at 24.

---

[46] *Glossary*, WEILL CORNELL MEDICINE, https://research.weill.cornell.edu/compliance/human-subjects-research /institutional-review-board/glossary-faqs-medical-terms-lay-3 (last visited Mar. 22, 2023) (emphasis added).

[47] The 2016 Denial of the 2002 Petition briefly notes the two French clinical trials did not *require* an ultrasound but instead left the decision to the investigator's discretion. ECF No. 1-28 at 19 n.47. Defendants do not explain how many investigators chose to perform an ultrasound. The higher that number is, the more it supports Plaintiffs' argument. But in any case, the U.S. trial was larger than the two French trials combined and is therefore the more reliable study. *Id.* at 9.

Defendants maintain "there is no legal basis for Plaintiffs' contention that the approved conditions of use of a drug must duplicate the protocol requirements for the clinical trials supporting its approval." ECF No. 28 at 35. But FDA's actions must not be arbitrary and capricious.[48] *See* 5 U.S.C. § 706(2)(A); *United States v. An Article of Device . . . Diapulse*, 768 F.2d 826, 832–33 (7th Cir. 1985) (concluding FDA's denial was not arbitrary and capricious because the proposed labeling did not "specify conditions of use that are similar to those followed in the studies"). "The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal marks omitted). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal marks omitted); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (judicial review of agency action "is not toothless"). Courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal marks omitted). An agency's action is "arbitrary and capricious" if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Defendants fail this test.

---

[48] Plaintiffs also frame what the Court characterized as the "study-match problem" as a statutory violation of the FFDCA. *See* ECF No. 7 at 22. The Court does not read 21 U.S.C. § 355(d) as necessarily *requiring* an exact "match" between trial conditions and the conditions on the approved labeling of a new drug. But Section 355(d) does mandate the Secretary "issue an order refusing to approve the application" if he finds the investigations do not show the drug is safe for use under the suggested conditions in the proposed labeling. FDA made such a finding yet did not deny the Application. *See* ECF No. 1-24 at 6 ("We have concluded that adequate information has not been presented to demonstrate that the drug, when marketed in accordance with the terms of distribution proposed, is safe and effective for use as recommended."). Thus, even if Defendants could survive "arbitrary and capricious" analysis of the "study-match problem," Defendants still violated Section 355(d) on their own terms.

### a. The 2000 Approval

To begin, FDA "entirely failed to consider an important aspect of the problem" by omitting any evaluation of the psychological effects of the drug or an evaluation of the long-term medical consequences of the drug. *State Farm*, 463 U.S. at 43; ECF No. 84 at 12. Considering the intense psychological trauma and post-traumatic stress women often experience from chemical abortion, this failure should not be overlooked or understated. Nor was the drug tested for under-18 girls undergoing reproductive development.[49] But that is not all. Clinical trial protocols in the United States for the 2000 Approval required a transvaginal ultrasound for each patient to accurately date pregnancies and identify ectopic pregnancies. ECF No. 1-28 at 19. But FDA ultimately concluded that "a provider can accurately make such a determination by performing a pelvic examination and obtaining a careful history." *Id.* Thus, FDA determined it was inappropriate "to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy." ECF No. 1-28 at 19. FDA believed "it is reasonable to expect that the women's providers would not have prescribed Mifeprex if a pelvic ultrasound examination had clearly identified an ectopic pregnancy." *Id.* at 20.

FDA thus assumes physicians will ascertain gestational age. But put another way, there is simply *no requirement* that *any* procedure is done to rule out an ectopic pregnancy — which *is* a serious and life-threatening situation. This is arbitrary and capricious. The mere fact that other clinical methods can be used to date pregnancies does not support the view that it should be the

---

[49] In 1998, FDA issued the "Pediatric Rule," which "mandated that drug manufacturers evaluate the safety and effectiveness of their products on pediatric patients, absent an applicable exception." *Ass'n of Am. Physicians & Surgeons, Inc. v. U.S. Food & Drug Admin.*, 391 F. Supp. 2d 171, 173–74 (D.D.C. 2005). Two years after approving mifepristone, FDA was enjoined from enforcing the Pediatric Rule because it lacked statutory authority in issuing the rule. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 226 F. Supp. 2d 204, 222 (D.D.C. 2002). In response, Congress enacted the Pediatric Research Equity Act of 2003 to codify the Pediatric Rule. *See* 21 U.S.C. § 355c. In the 2000 Approval, FDA clarified that the Mifeprex NDA was covered by the Pediatric Rule. *See* ECF No. 1-26 at 4. However, FDA fully waived the rule's requirements without explanation. ECF No. 1-28 at 30.

provider's decision to decide which method — if any — is used to make this determination. FDA has never denied that an ultrasound is the *most accurate* method to determine gestational age and identify ectopic pregnancies. *See* ECF No. 1-14 at 62. And the fact that other clinical methods can be used does not mean that all such methods are equal in their accuracy and reliability.[50] FDA did rely on a study showing that clinicians rarely underestimate gestational age. ECF No. 1-28 at 19 n.49. But this study does nothing to support FDA's view that a transvaginal ultrasound is not necessary to diagnose ectopic pregnancies. To this point, FDA merely argues that even transvaginal ultrasounds do not *guarantee* an existing ectopic pregnancy will be identified. *Id.* at 19. If that is the case, it does not follow that it should be left to the provider's discretion to employ less reliable methods — or no methods at all.

Correct diagnosis of gestational age and ectopic pregnancies is vital. The error in FDA's judgment is borne out by myriad stories and studies brought to the Court's attention. One woman alleged she did not receive an ultrasound or any other physical examination before receiving chemical abortion drugs from Planned Parenthood. ECF No. 1 at 22. "The abortionist misdated the baby's gestational age as six weeks, resulting in the at-home delivery of a 'lifeless, fully-formed baby in the toilet,' later determined to be around *30-36 weeks old*." *Id.*; *see also Patel v. State*, 60 N.E.3d 1041, 1043 (Ind. Ct. App. 2016) (woman who used chemical abortion drugs "delivered a live baby of approximately twenty-five to thirty weeks gestation who died shortly after birth"). Another woman was given chemical abortion drugs during an ectopic pregnancy because her ultrasound "was not even that of a uterus but was of a bladder."[51] ECF No. 31 at 5.

---

[50] Studies reflect that women recurrently miscalculate their unborn child's gestational age. *See* P. Taipale & V. Hiilesmaa, *Predicting delivery date by ultrasound and last menstrual period in early gestation*, 97 OBSTETRICS GYN. 189 (2001); David A. Savitz et al., *Comparison of pregnancy dating by last menstrual period, ultrasound scanning, and their combination*, 187 AM. J. OBSTETRICS GYN. 1660 (2002).

[51] This incident also demonstrates that even where ultrasounds are used, only a qualified provider can assure they are done properly.

The resulting rupture "led to massive infection and a collapse of her vital systems." *Id.* Amicus Human Coalition identified four of their clients who were unknowingly ectopic when they arrived at their clinic "with abortion pills in hand." ECF No. 96 at 20. And at least two women died from chemical abortion drugs last year. *See* ECF No. 120 at 30 n.5. One of those women was an estimated twenty-one weeks pregnant. *See id.* Presumably, the fact that the woman obtained chemical abortion drugs more than two months past FDA's gestational age cutoff suggests that no adequate procedures confirmed the gestational age in her case.

FDA has also reported at least ninety-seven cases where women with ectopic pregnancies took mifepristone.[52] But these data are likely incomplete because FDA now only requires reporting on deaths. *See* ECF No. 1 at 4. And as noted above, hospitals often miscode complications from chemical abortions as miscarriages. Studies show that women are thirty percent more likely to die from a ruptured ectopic pregnancy while seeking abortions if the condition remains undiagnosed.[53] A woman may interpret the warning signs of an ectopic pregnancy — cramping and severe bleeding — as side effects of mifepristone. In reality, the symptoms indicate her life is in danger.[54] Another study revealed that of 5,619 chemical abortion visits, 452 patients had a pregnancy of "unknown location" and 31 were treated for ectopic pregnancy — including 4 that were ruptured.[55] Yet another study examined 3,197 unique, U.S.-only adverse event reports dated September 2000

---

[52] FDA, *Mifepristone US. Post-Marketing Adverse Events Summary Through 6/30/2022,* http://www.fda.gov/media/164331/download.

[53] H.K. Atrash et al., *Ectopic pregnancy concurrent with induced abortion: incidence and mortality*, 162 AM. J. OBSTETRICS GYN. 726 (1990).

[54] *Id.*

[55] Alisa B. Goldberg et al., *Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location*, 139 OBSTETRICS GYN. 771, 775 (2022).

to February 2019.[56] That study noted 20 deaths, 529 life-threatening events, and 1,957 *severe* adverse events before concluding that a pre-abortion ultrasound "should be required to rule out ectopic pregnancy and confirm gestational age."[57]

The record confirms FDA once shared these concerns. After all, many tragedies could be avoided by auditing physician qualifications and requiring ultrasounds. In 1996, the FDA Advisory Committee expressed to the Population Council "serious reservations" on how the drugs were described "in terms of assuring safe and adequate credentialing of providers." ECF No. 1-14 at 51. Population Council initially committed to conducting post-approval studies in 1996, and FDA reiterated these requirements mere months before the September 2000 approval. *See* ECF No. 1-24 at 6 ("We remind you of your commitments dated September 16, 1996, to perform the . . . Phase 4 studies."). Those protocols would have required, *inter alia*, that the Population Council: (1) assess the long-term effects of multiple uses of mifepristone; (2) ascertain the frequency with which women follow the regimen and outcomes of those that do not; (3) study the safety and efficacy of chemical abortion in girls under the age of eighteen; and (4) ascertain the regimen's effects on children born after treatment failure.[58] ECF No. 1-28 at 32.

---

[56] Aultman et al., *supra* note 44.

[57] *Id.*

[58] *See* 153 Cong. Rec. S5765 (daily ed. May 9, 2007) (statement of Sen. Coburn) ("I recently learned of a woman who was given RU-486 after she had a seizure. Her physicians assumed that the seizure was life-threatening to the baby she was carrying and gave her RU-486 for a therapeutic abortion. RU–486 was not effective in her case and the woman carried the baby to term. When the baby was born at a low birth weight, it also suffered from failure to thrive. That baby has had three subsequent brain surgeries due to hydrocephalus. The baby also suffers from [idiopathic lymphocytic colitis] — an inflammatory disease of the colon, which is extremely rare in children. It is clear that RU-486 not only is unsafe in women, but it is also not completely effective. And when it is not effective, the results are devastating.").

Similarly, on February 18, 2000 — months before chemical abortion approval — FDA informed the Population Council that "adequate information ha[d] *not* been presented to demonstrate that the drug, when marketed in accordance with the terms of distribution proposed, is safe and effective for use as recommended." ECF No. 1-24 at 6 (emphasis added). FDA then stated the "restrictions on distribution will need to be amended." *Id.* Accordingly, FDA informed the Population Council that it would proceed under Subpart H — the *only* provision that could implement the requisite restrictions on distribution. *Id.* But as explained above, that was the improper regulation for the approval of chemical abortion. Regardless, the restrictions were insufficient to ensure safe use.

On June 1, 2000, FDA privately delivered to the Population Council a set of proposed restrictions to rectify the safety issues. Said proposal required physicians who were: (1) "trained and authorized by law" to perform surgical abortions; (2) trained in administering mifepristone and treating adverse events; and (3) allowed "continuing access (*e.g.*, admitting privileges) to a medical facility equipped for instrumental pregnancy termination, resuscitation procedures, and blood transfusion at the facility or [one hour's] drive from the treatment facility." *See* ECF No. 1-14 at 53–54. When FDA's proposal was leaked to the press, a political and editorial backlash ensued.[59] In response, the Population Council rejected the proposal and repudiated the restrictions the sponsor *itself* proposed in 1996 — what FDA deemed a "very significant change" in the sponsor's position. *Id.* at 50. Because "[t]he whole idea of mifepristone was to increase access," abortion advocates argued that restrictions on mifepristone "would effectively eliminate" the drug's "main advantage" and would "kill[] the drug."[60]

---

[59] Sheryl Gay Stolberg, *FDA Adds Hurdles in Approval of Abortion Pill*, THE NEW YORK TIMES (June 8, 2000), https://www.nytimes.com/2000/06/08/us/fda-adds-hurdles-in-approval-of-abortion-pill.html.

[60] *Id.*

23-10362.4361

In September 2000, FDA abandoned its safety proposals and acquiesced to the objections of the Population Council and Danco. Despite its "serious reservations" about mifepristone's safety, FDA approved a regimen that relied on a self-certification that a prescribing physician has the *ability* to diagnose ectopic pregnancies. *Id.* at 51, 62; *see also* ECF No. 1-28 at 21 ("[W]e concluded that there was no need for special certification programs or additional restrictions."). FDA later released the applicant *entirely* from its Phase 4 duties — *twelve years* after the 1996 commitment. ECF Nos. 1-24 at 6, 1-28 at 32; *see also* 21 C.F.R. § 314.510 ("Approval under this section will be subject to the requirement that the applicant study the drug further, to verify and describe its clinical benefit, where there is uncertainty . . . of the observed clinical benefit to ultimate outcome. Postmarketing studies would usually be studies *already underway*.") (emphasis added).

FDA *must* refuse to approve a drug if the agency determines there is "insufficient information to determine whether such drug is safe for use" or a "lack of substantial evidence that the drug will have the effect it purports or is represented to have" under the conditions of use in the proposed label. 21 U.S.C. § 355(d)(4)–(5); *see also* 21 C.F.R. § 314.125(b). FDA is therefore required to deny an NDA if it makes the exact findings FDA made in its 2000 review. "[A]n agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009). The agency must ordinarily "display awareness that it *is* changing position," and "must show that there are good reasons for the new policy." *Id.* at 515. And "if the agency's decision was in any material way influenced by political concerns it should not be upheld." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 768 (9th Cir. 2007). FDA's only acknowledgments of its prior proposals were that "FDA and the applicant were not always in

full agreement about the distribution restrictions" and that fulfilling the Phase 4 commitments "would not be feasible." ECF No. 1-28 at 18, 32–33.

The Court does not second-guess FDA's decision-making lightly. But here, FDA acquiesced on its legitimate safety concerns — in violation of its statutory duty — based on plainly unsound reasoning and studies that did not support its conclusions. There is also evidence indicating FDA faced significant political pressure to forego its proposed safety precautions to better advance the *political* objective of increased "access" to chemical abortion — which was the "whole idea of mifepristone."[61] As President Clinton's Secretary for Health & Human Services ("HHS") explained to the White House, it was *FDA* that arranged the meeting between the French pharmaceutical firm — who owned the mifepristone patent rights — and the eventual drug sponsor Population Council. The purpose of the FDA-organized meeting was "to facilitate an agreement between those parties to work together to test [mifepristone] and file a new drug application." ECF No. 95 at 14. HHS also "initiated" another meeting "to assess how the United States Government" — *i.e.*, the Clinton Administration — "might facilitate successful completion of the negotiations" between the French firm and the American drug sponsor to secure patent rights and eventual FDA approval. *Id.* at 16. In fact, for their "negotiations [to be] successfully concluded," the HHS Secretary believed American pressure on the French firm was necessary.[62] *Id.*

Whether FDA abandoned its proposed restrictions because of political pressure or not, one thing is clear: the lack of restrictions resulted in many deaths and many more severe or life-

---

[61] Stolberg, *supra* note 59.

[62] *See also* Lars Noah, *A Miscarriage in the Drug Approval Process?: Mifepristone Embroils the FDA in Abortion Politics*, 36 WAKE FOREST L. REV. 571, 576 (2001) ("The Clinton administration went to great lengths to bring mifepristone into the United States. From pressuring the hesitant manufacturer to apply for approval, and utilizing a specialized review procedure normally reserved for life-saving drugs, to imposing unusual restrictions on distribution, and promising to keep the identity of the manufacturer a secret, the FDA's approval process deviated from the norm in several respects.").

threatening adverse reactions. Due to FDA's lax reporting requirements, the exact number is not ascertainable. But it is likely far higher than its data indicate for reasons previously mentioned. Whatever the numbers are, they likely would be considerably lower had FDA not acquiesced to the pressure to increase access to chemical abortion at the expense of women's safety. FDA's failure to *insist* on the inclusion of its proposed safety restrictions was not "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52. To hold otherwise would be "tantamount to abdicating the judiciary's responsibility under the [APA] to set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995) (quoting 5 U.S.C. § 706(2)(A)). Finally, the 2000 Approval was also arbitrary and capricious because it violated Subpart H.[63]

### b. The 2016 Changes

FDA made numerous substantial changes to the chemical abortion regimen in 2016. These changes include but are not limited to: (1) eliminating the requirement for prescribers to report *all* nonfatal serious adverse events; (2) extending the maximum gestational age from 49 days to 70 days; (3) eliminating the requirement that administration of misoprostol occurs in-clinic; (4) removing the requirement for an in-person follow-up exam; and (5) allowing "healthcare providers" other than physicians to dispense chemical abortion drugs. ECF No. 1 at 53–54. Plaintiffs allege the 2016 Changes were also arbitrary and capricious "because *none* of the studies on which FDA relied were designed to evaluate the safety and effectiveness of chemical abortion

---

[63] As one scholar noted, "the agency took this route so that it could better justify imposing otherwise unauthorized restrictions on the use and distribution of the drug." *See* Noah, *supra* note 62, at 582. And "while agency action may generally be 'entitled to a presumption of regularity,' here FDA itself acknowledges that its action has not been regular: it failed to respond to the Citizen Petition for years." *Bayer*, 942 F. Supp. 2d at 25 (internal marks omitted). At the hearing, Defendants' leading argument for Subpart H was that "none of it really matters" because of the FDAAA. *See* ECF No. 136 at 100. "This is not the argument of an agency that is confident in the legality of its actions." ECF No. 100 at 15.

drugs for use under the conditions prescribed, recommended, or suggested in the proposed labeling." ECF No. 7 at 24.

For similar reasons as the 2000 Approval, the Court agrees. Unlike the crucial studies FDA relied upon to extend the maximum gestational age, change the dosing regimen, and authorize a repeat dose of misoprostol, the labeling approved by FDA in 2016 did *not* require: (1) an ultrasound; (2) an in-person follow-up exam; or (3) the ability of abortionists to personally perform a surgical abortion if necessary. *Id.* Simply put, FDA built on its already-suspect 2000 Approval by removing *even more* restrictions related to chemical abortion drugs that were present during the final phase of the investigation. And it did so by relying on studies that included the very conditions FDA refused to adopt.[64] None of the studies compared the safety of the changes against the then-current regimen, nor under the labeled conditions of use. Moreover, FDA shirked any responsibility for the consequences of its actions by eliminating any requirement that non-fatal adverse events be reported. Thus, FDA took its chemical abortion regimen — which had already culminated in *thousands* of adverse events suffered by women and girls — and removed what little restrictions protected these women and girls, systematically ensuring that almost all new adverse events would go unreported or underreported.

Defendants aver that "Plaintiffs point to no statutory provision requiring the conditions of use in a drug's approved labeling to duplicate the protocol requirements used in the studies supporting its approval." ECF No. 28 at 32. "The [FFDCA] thus requires FDA to apply its scientific expertise in determining whether a drug has been shown to be safe and effective under particular conditions of use, and the application of that expertise is owed substantial deference." *Id.* But FDA does not have unfettered discretion to approve dangerous drugs under substantially

---

[64] *See* ECF No. 1-35.

different conditions than the tests, trials, and studies cited. To be clear, the Court does not hold that *any* difference between approval conditions and testing conditions — no matter how well-justified — means the approval fails as a matter of law. But the agency "must cogently explain why it has exercised its discretion in a given manner," and that explanation must be "sufficient to enable [the Court] to conclude that the [agency's action] was the product of reasoned decisionmaking." *A.L. Pharma*, 62 F.3d at 1491 (quoting *State Farm*, 463 U.S. at 52). Defendants have not done so here. FDA's 2016 Actions were not the product of reasoned decision-making.

### c.  The 2019 Generic Approval

The FFDCA allows a generic drug manufacturer to submit an ANDA for premarket review and approval. 21 U.S.C. § 355(j); 21 C.F.R. § 314.94. The generic sponsor must show that: (1) the conditions of use prescribed, recommended, or suggested in the labeling have been previously approved; and (2) the drug product is chemically the same as the already approved drug — allowing it to rely on FDA's previous finding of safety and effectiveness for the approved drug. *Id.* On April 11, 2019, FDA approved GenBioPro, Inc.'s ANDA for a generic version of mifepristone. ECF No. 7 at 10. In doing so, FDA relied on Mifeprex's safety data. *Id.*

Plaintiffs argue the 2019 Approval was unlawful because FDA relied on the unlawful 2000 Approval and its unlawful 2016 Changes when approving generic mifepristone. ECF No. 7 at 27. If FDA withdraws the listed drug on which the ANDA-approved generic drug is based, the agency is generally required to withdraw the generic drug as well. 21 U.S.C. § 355(j)(6); 21 C.F.R. § 314.151. Because the Court agrees that Plaintiffs have a substantial likelihood of success in their challenges to the 2000 and 2016 Actions, the Court is inclined to agree with Plaintiffs on this claim as well.

**E.  There Is a Substantial Threat of Irreparable Harm**

To satisfy the second element of the preliminary injunction standard, Plaintiffs "must demonstrate that if the district court denied the grant of a preliminary injunction, irreparable harm would result." *Janvey*, 647 F.3d at 600 (internal marks omitted). "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Id.* (internal marks omitted). "When determining whether injury is irreparable, it is not so much the magnitude but the irreparability that counts." *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 433–34 (5th Cir. 2016) (internal marks omitted). Where "the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for preliminary injunction." *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997), *aff'd,* 140 F.3d 1060 (D.C. Cir. 1998) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C.Cir. 1985) (per curiam)). Plaintiffs' Motion satisfies this standard.

For reasons already stated, Plaintiffs are likely to suffer irreparable harm if the Motion is not granted. At least two women died from chemical abortion drugs just last year. *See* ECF No. 120 at 30 n.5;[65] *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (finding irreparable harm to third-party pregnant women). "The physical and emotional trauma that chemical abortion inflicts on women and girls cannot be reversed or erased." ECF No. 7 at 28; *see also E.E.O.C. v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984) (affirming irreparable harm for plaintiffs' "emotional distress"). "The crucial time that doctors need to treat these injured women and girls cannot be replaced." *Id.* "The mental and monetary costs to these doctors cannot be repaid." *Id.* "And the time, energy and resources that Plaintiff medical associations expend in

---

[65] One of those women was reportedly twenty-one weeks pregnant, which is well past the cutoff for gestational age even after the 2016 Changes. *See id.* The other maternal death occurred while the woman was seven weeks pregnant, which falls within FDA's current restrictions. *Id.*

response to FDA's actions on chemical abortion drugs cannot be recovered." *Id.*; *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (obstacles that make it more difficult for an organization to accomplish its mission provide injury for both standing *and* irreparable harm).

Defendants' respond that the drugs at issue have been on the market for more than twenty years. ECF No. 28 at 41. This argument ignores that many restrictions and safeguards — which no longer exist — were in place for most of that time. Defendants also argue "Plaintiffs' extreme delay" in filing suit shows they face no irreparable harm. *Id.* at 42. But the time between the allegedly unlawful actions and the filing of a suit "is not determinative" of whether relief should be granted. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975). Here, eleven months does not constitute an "extreme" delay. *See, e.g.*, *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 720 (E.D. Tex. 2020) (eleven-month delay did not militate against equitable relief because "the Court can presume that Plaintiff needed ample time to evaluate its claims").[66] "[T]emporary injunctive relief may still be of great value to protect against ongoing harms, even if the initial harm is in the distant past." *N.L.R.B. v. Hartman & Tyner, Inc.*, 714 F.3d 1244, 1252 (11th Cir. 2013).

The Court also disagrees that Plaintiffs' theories of injury "are too speculative to even show standing." ECF No. 28 at 42. Plaintiffs have credibly alleged past and future harm resulting from the removal of restrictions for chemical abortion drugs. "Although a court's analysis of likelihood of success in the context of an injunctive relief request is governed by the deferential APA's arbitrary and capricious standard, a court does not always owe deference to federal agencies' positions concerning irreparable harm, balance of hardships, or public interest." *San Luis & Delta-*

---

[66] To clarify, the eleven months referenced here is the approximate time between FDA's "final agency action" in the December 2021 Denial of the 2019 Petition and the commencement of this case.

*Mendota Water Auth. v. Jewell*, 969 F. Supp. 2d 1211, 1215 (E.D. Cal. 2013); *see also R.J. Reynolds Vapor Co. v. FDA*, No. 23-60037 (5th Cir. Mar. 23, 2023)[67] (noting FDA's public interest argument was "obviously colored by the FDA's view of the merits"); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011) ("If the federal government's experts were always entitled to deference concerning the equities of an injunction, substantive relief against federal government policies would be nearly unattainable, as government experts will likely attest that the public interest favors the federal government's preferred policy.").

### F.  Preliminary Injunction Would Serve the Public Interest

The third and fourth factors — assessing the harm to the opposing party and weighing the public interest — "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he public interest weighs strongly in favor of preventing unsafe drugs from entering the market." *Hill Dermaceuticals*, 524 F. Supp. 2d at 12. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (internal marks omitted). And "there is a strong public interest in meticulous compliance with the law by public officials." *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993); *see also State v. Biden*, 10 F.4th at 559. "Indeed, the Constitution itself declares a prime public interest that the President and, by necessary inference, his appointees in the Executive Branch 'take Care that the Laws be faithfully executed.'" *Id.* (internal marks omitted). Additionally, Defendants' actions harm States' efforts to regulate chemical abortion "in the interests of life, health, and liberty." ECF No. 100 at 21. "The Court appreciates FDA's institutional interest but, given its long-standing disregard of [Plaintiffs'] Citizen Petition[s], its argument has a hollow center." *Bayer HealthCare*, 942 F. Supp. 2d at 26. To the extent Defendants

---

[67] https://www.ca5.uscourts.gov/opinions/pub/23/23-60037-CV0.pdf.

and third parties would be harmed by an injunction, the Court still balances these factors in favor of ensuring that women and girls are protected from unnecessary harm and that Defendants do not disregard federal law.

For these reasons, a preliminary injunction would serve the public interest. Defendants maintain that *unaborted* children of the women "who seek but are unable to obtain an abortion" are "expected to do worse in school," "to have more behavioral and social issues, and ultimately to attain lower levels of completed education." ECF No. 28-2 at 7. "They are also expected to have lower earnings as adults, poorer health, and an increased likelihood of criminal involvement." *Id.* But "[u]sing abortion to promote eugenic goals is morally and prudentially debatable." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting); *see also Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1790 (2019) (Thomas, J., concurring) ("[A]bortion has proved to be a disturbingly effective tool for implementing the discriminatory preferences that undergird eugenics."). Though eugenics were once fashionable in the Commanding Heights and High Court, they hold less purchase after the conflict, carnage, and casualties of the *last* century revealed the bloody consequences of Social Darwinism practiced by would-be Übermenschen. *Cf. Buck v. Bell*, 274 U.S. 200, 207 (1927) ("It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes.").

Defendants are correct that one purpose of injunctive relief is to preserve the status quo. *See, e.g.*, *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). But the "status quo" to be restored is "the last peaceable uncontested status existing between the parties before the

23-10362.4370

dispute developed." *Texas v. Biden*, No. 2:21-CV-067-Z, 2022 WL 17718634, at *9 (N.D. Tex.

Dec. 15, 2022) (internal marks omitted); *see also Texas v. United States*, 40 F.4th 205, 220 (5th

Cir. 2022) (the relevant status quo is the one "absent the unlawful agency action"); *Wages & White

Lion*, 16 F.4th at 1144 ("In other words, 'the relief sought here would simply suspend

*administrative* alteration of the *status quo*.'") (quoting *Nken*, 556 U.S. at 430 n.1); *Callaway*, 489

F.2d at 576 ("If the currently existing status quo itself is causing one of the parties irreparable

injury, it is necessary to alter the situation so as to prevent the injury."). "[P]arties could otherwise

have no real opportunity to seek judicial review except at their peril." Mila Sohoni, *The Power to

Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1157–58 (2020). Chemical abortion is only the status

quo insofar as Defendants' unlawful actions and their delay in responding to Plaintiffs' petitions

have made it so. The fact that injunctive relief could upset this "status quo" is therefore an

insufficient basis to deny injunctive relief.

### G. A Stay Under Section 705 of the APA Is More Appropriate Than Ordering Withdrawal or Suspension of FDA's Approval

The Motion asks for injunctive relief but goes as far as requesting the Court to order

Defendants to "withdraw or suspend the approvals of chemical abortion drugs, and remove them

from the list of approved drugs." ECF No. 7 at 7. Singular equitable relief is "commonplace" in

APA cases and is often "necessary to provide the plaintiffs" with "complete redress." *E. Bay

Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (internal marks omitted).

Although the Court finds Plaintiffs have a substantial likelihood of prevailing on the merits, the

Court instead exercises its authority under the APA to order less drastic relief. Section 705 of the

APA provides:

> When an agency finds that justice so requires, it may postpone the effective date of
> action taken by it, pending judicial review. On such conditions as may be required
> and to the extent necessary to prevent irreparable injury, the reviewing court,
> including the court to which a case may be taken on appeal from or on application
> for certiorari or other writ to a reviewing court, *may issue all necessary and
> appropriate process to postpone the effective date of an agency action* or to
> preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705 (emphasis added).

The Fifth Circuit has acknowledged "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *Texas v. Biden*, 2022 WL 17718634 at *7 (quoting *Texas v. United States*, 40 F.4th at 219). Whereas an injunction "tells someone what to do or not to do," a vacatur only reinstates "the status quo absent the unlawful agency action and neither compels nor restrains further agency decision-making." *Id.* (internal marks omitted). A Section 705 stay can "be seen as an interim or lesser form of vacatur under Section 706." *Id.* "Just as a preliminary injunction is often a precursor to a permanent injunction, a stay under Section 705 can be viewed as a precursor to vacatur under Section 706." *Id.*; *see also Nken*, 556 U.S. at 428–29 (a stay "temporarily suspend[s] the source of authority to act — the order or judgment in question — not by directing an actor's conduct"). "Motions to stay agency action pursuant to [Section 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* at *10 (citing *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010)); *see also Nken*, 556 U.S. at 434; *Texas v. U.S. Env't Prot. Agency*, 829 F.3d at 435. Because the Court finds injunctive relief is generally appropriate, Section 705 plainly authorizes the lesser remedy of issuing "all necessary and appropriate process" to postpone the effective date of the challenged actions. "Courts — including the Supreme Court — routinely stay *already-effective* agency action under Section 705." *Id.* at *8 (emphasis added) (collecting cases).

Accordingly, the Court hereby **STAYS** the effective date of FDA's September 28, 2000, Approval of mifepristone and all subsequent challenged actions related to that approval — *i.e.*, the 2016 Changes, the 2019 Generic Approval, and the 2021 Actions. This Court acknowledges that its decision in *Texas v. Biden* has been appealed to the Fifth Circuit. *See* 2:21-CV-067-Z, ECF No. 184 (Feb. 13, 2023). If the Fifth Circuit reverses this Court's Section 705 analysis, the Court clarifies that it alternatively would have ordered Defendants to suspend the chemical abortion approval and all subsequent challenged actions related to that approval until the Court can render a decision on the merits.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion **IN PART**. FDA's approval of mifepristone is hereby **STAYED**. The Court **STAYS** the applicability of this opinion and order for seven (7) days to allow the federal government time to seek emergency relief from the United States Court of Appeals for the Fifth Circuit.

**SO ORDERED**.

April 7, 2023

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

67

**5. Complaint Exhibit 24 – 2000 FDA Approval Memorandum re: NDA 20-687 Mifeprex (mifepristone) (Sept. 28, 2000) (excerpt)**

**M E M O R A N D U M**                    DEPARTMENT OF HEALTH AND HUMAN SERVICES
                                                       PUBLIC HEALTH SERVICE
                                                    FOOD AND DRUG ADMINISTRATION
                                            CENTER FOR DRUG EVALUATION AND RESEARCH

DATE:        September 28, 2000

FROM:                                               /S/

SUBJECT:

TO:             NDA 20-687 MIFEPREX (mifepristone) Population Council

This memo documents the approval action concerning the Population Council's NDA for mifepristone for the medical termination of intrauterine pregnancy through 49 days' pregnancy. The application was initially submitted to the Food and Drug Administration (FDA) on March 14, 1996. The Reproductive Health Drugs Advisory Committee met on July 19, 1996 and voted that benefits exceeded risk for this drug product with 6-yes, 0-no, and 2 abstentions. An approvable action letter was issued September 18, 1996 citing deficiencies in areas of Clinical (distribution system), Chemistry/Manufacturing and Controls, Biopharmaceutics, and Labeling. A complete response was received August 18, 1999. The last action by the Office was on February 18, 2000. That approvable action letter listed application deficiencies consisting of Chemistry/Manufacturing and Controls, Labeling, and the Distribution System issues. The Population Council submitted a complete response on March 30, 2000. After a brief summary of effectiveness and safety, this memo addresses those outstanding issues listed in the last action letter, Phase 4 commitments, and other issues.

Summary of Effectiveness and Safety
Effectiveness and safety data were derived from one U.S. clinical trial and two French trials. Effectiveness was defined as the complete expulsion of products of conception without the need for surgical intervention.

The U.S. trial consisted of 859 women providing safety data and 827 women providing effectiveness data for gestations of 49 days or less, dated from the last menstrual period. Demographic data showed racial composition of the U.S. trial was similar to the overall U.S. general population. Medical abortion was complete in 92.1% of 827 subjects. Surgical intervention was performed in 7.9% of subjects: 1.6% had medically indicated interventions (1.2% for heavy bleeding), 4.7% had incomplete abortions, 1.0% had ongoing pregnancies, and 0.6% had intervention at the patient's request. One of the 859 patients received a blood transfusion.

The two French trials enrolled a total of 1,681 women providing effectiveness outcomes and 1,800 women providing safety information. Medical abortion was complete in 95.5% of the 1681 subjects. Surgical intervention was performed in 4.5% of subjects: 0.3% for bleeding, 2.9% for incomplete abortions, and 1.3% for ongoing pregnancies. Of the 1,800 women, 2 patients received blood transfusions.

The Advisory Committee reviewed the French data in 1996 and voted 6-yes and 2-no for data supporting efficacy, 7-yes and 1-abstention for data supporting safety. As stated above, the overall vote for benefits exceeding risk was 6-yes, 0-no, and 2-abstentions. During the second review cycle in 1999, the committee received a copy of the U.S. study report, as they requested, to provide FDA with comments. None were received. The U.S. trial data confirms the effectiveness and safety of the product.

**6.   Complaint Exhibit 27 – 2016 Petition Denial (Mar. 29, 2016) (excerpts)**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

MAR 2 9 2016

Food and Drug Administration
10903 New Hampshire Avenue
Building #51
Silver Spring, MD 20993

Donna Harrison, M.D.
Executive Director
American Association of Pro Life Obstetricians and Gynecologists
P.O. Box 395
Eau Claire, MI 49111

Gene Rudd, M.D.
Senior Vice President
Christian Medical and Dental Associations
P.O. Box 7500
Bristol, TN 37621

Penny Young Nance
CEO and President
Concerned Women for America
1015 Fifteenth St., NW
Suite 1100
Washington, DC 20005

Re: Docket No. FDA-2002-P-0364

Dear Drs. Harrison and Rudd and Ms. Nance:

This letter responds to your citizen petition submitted on August 20, 2002, to the Food and Drug
Administration (FDA or Agency) on behalf of the American Association of Pro Life Obstetricians
and Gynecologists (AAPLOG), the Christian Medical Association (CMA) (n/k/a the Christian
Medical and Dental Associations), and Concerned Women for America (CWA) (Petition).[1] Your
Petition requests that the Agency stay FDA's approval of Mifeprex (mifepristone, also known as
RU-486), thereby halting the distribution and marketing of the drug pending final action on the
Petition. The Petition also requests that the Agency revoke FDA's approval of Mifeprex and
requests a full audit of the French and U.S. clinical trials submitted in support of the new drug
application (NDA) for Mifeprex.

We have carefully considered the information submitted in your Petition, comments on your
Petition submitted to the docket, other submissions to the docket, and other relevant data available
to the Agency. Based on our review of these materials and for the reasons described below, your
Petition is denied.

---

[1] The citizen petition was originally assigned docket number 2002P-0377/CP1. The number was changed to
FDA-2002-P-0364 as a result of FDA's transition to its new docketing system (Regulations.gov) in January
2008. This citizen petition was submitted by AAPLOG, CMA, and Sandy Rios, the then-President of CWA.
We have addressed this response to CWA's current CEO and President, Penny Young Nance.

Docket No. FDA-2002-P-0364

Furthermore, we approved a risk evaluation and mitigation strategy (REMS) for Mifeprex in June 2011, consisting of a Medication Guide, elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS. Mifeprex was identified as one of the products that was deemed to have in effect an approved REMS under the Food and Drug Administration Amendments Act of 2007 (FDAAA) because on the effective date of Title IX, subtitle A of FDAAA (March 28, 2008), Mifeprex had in effect elements to assure safe use.[17] The 2011 REMS for Mifeprex incorporated the restrictions under which the drug was approved. Indeed, there is substantial overlap between the requirements of subpart H and the statutory criteria for REMS set out in Title IX.

Given all of the above, the Mifeprex NDA was appropriately approved in 2000.

**B.    The French and U.S. Clinical Trials of Mifeprex Provided Substantial Evidence to Support Approval**

You contend that the studies on which the Population Council relied in support of its NDA for Mifeprex do not meet the statutory and regulatory requirements for the quality and quantity of scientific evidence needed to support a finding that a new drug is safe and effective (Petition at 24).

Our review of Mifeprex was thorough and consistent with the FD&C Act and FDA regulations, including the requirements under section 505(d) of the FD&C Act that: (1) there be adequate tests to show that the drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling (section 505(d)(1)) and (2) there be substantial evidence that the drug will have the effect it purports or is recommended to have under the conditions of use prescribed, recommended, or suggested in the labeling (section 505(d)(5)). The Mifeprex NDA was thoroughly reviewed, and the drug product was found to be safe and effective for its approved indication. In addition, as noted in the Mifeprex Approval Memorandum (at 1), FDA's Reproductive Health Drugs Advisory Committee (Advisory Committee) voted 6 to 0 (with 2 abstentions) on July 19, 1996, that the benefits of Mifeprex exceeded the risks. As set forth below, we disagree with your claims concerning the clinical trials that form the basis for the approval of Mifeprex.

1.    The Clinical Trials Used to Support the Mifeprex NDA Were in Accordance With the FD&C Act and Applicable Regulations

You argue that because neither the French clinical trials nor the U.S. clinical trial of mifepristone were blinded, randomized, or concurrently controlled, these trials were inadequate to establish the safety and effectiveness of Mifeprex (Petition at 24-25 and 32-34). In addition, you assert in the response you submitted on October 10, 2003, to the comments in opposition to the Petition submitted by the Population Council and Danco (Response to Opposition) that the clinical trials of Mifeprex were not historically controlled but instead were uncontrolled.[18] You state that the

---

[17] 73 FR 16313 (Mar. 27, 2008).

[18] Response to Opposition at 5. You also state that because the Mifeprex regimen was the first drug regimen that FDA approved to induce abortions, the applicant should have compared the new drug regimen to surgical abortions performed during the first 49 days after a woman's last menstrual period (Response to Opposition at

EX. 27 pg. 07
**23-10362.641**

applicant did not describe any historical control group in the French clinical trials, and did not indicate that any of the scientific guidelines for selecting a proper control group before beginning a historically controlled study were used for these trials (id. at 5-6). You also reject the applicant's claim that the available information on surgical abortion constitutes historically controlled data (id. at 6).

We disagree with your conclusion that the French and U.S. clinical trials of mifepristone were not clinically and legally adequate to support the approval of Mifeprex. The data from these three clinical trials (a large U.S. trial and two French trials) constitute substantial evidence that Mifeprex is safe and effective for its approved indication in accordance with section 505(d) of the FD&C Act. The labeling approved in 2000 for Mifeprex was based on data from these three clinical trials and from safety data from a postmarketing database of over 620,000 women in Europe who had had a medical termination of pregnancy (approximately 415,000 of whom had received mifepristone together with misoprostol).[19]

The U.S. trial of Mifeprex involved 2,121 subjects enrolled at 17 sites. Of these, 827 had an EGA of ≤ 49 days and were included in the efficacy evaluation.[20] Medical termination of pregnancy was complete (without the need for surgical intervention) in 762 of these subjects (92 percent).[21] Sixty-five of the subjects in the U.S. trial who were evaluable for efficacy were classified as having had a "treatment failure." The reasons for treatment failure (and number of subjects experiencing each) were: incomplete pregnancy termination (n = 39), still pregnant (n = 8), subject request for surgical intervention (n = 5), and medical indication (bleeding, n = 13).[22] The two French trials enrolled a total of 1,681 subjects providing effectiveness outcomes. Among the French subjects, the success rate for medical termination of pregnancy was 95.5 percent.[23]

In the U.S. trial, 859 subjects with an EGA of ≤ 49 days were evaluated for safety. Among these subjects, there were no deaths, one transfusion, and nine instances in which subjects received intravenous fluids.[24] The safety profile of the patient group in the French trials with an EGA of ≤ 49 days did not differ significantly from the safety profile of the same patient group in the U.S.

---

5, note 20). The fact that a drug might be the first one approved for a particular indication is not a factor in determining what type of control is adequate for a clinical trial of that drug for that indication. As discussed above, FDA's regulations provide for a variety of different types of controls (see 21 CFR 314.126(b)), and do not require comparison of a proposed drug product to an active control group to establish the safety and effectiveness of the drug. Therefore, the clinical trials to support the approval of Mifeprex were not required to have a surgical comparator arm.

[19] Mifeprex labeling, Sept. 28, 2000, PRECAUTIONS, Teratogenic Effects: Human Data, *Pregnancy,* available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.pdf.

[20] Mifeprex Approval Memorandum, supra note 16, at 1; Medical Officer's Review, supra note 12, at 10.

[21] Medical Officer's Review, supra note 12, at 11 (Table 1) and 16.

[22] Id. at 11 (Table 1).

[23] Mifeprex Approval Memorandum, supra note 16, at 1.

[24] Medical Officer's Review, supra note 12, at 12-13.

EX. 27 pg. 08
23-10362.642

Docket No. FDA-2002-P-0364

trial, and the percentage of patients in the French and U.S. trials requiring hospitalization and blood transfusion and experiencing heavy bleeding was comparable.[25] There were no deaths in the French trials.[26]

Section 505(d) of the FD&C Act states, in part, that FDA must refuse to approve an application if the Agency finds that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the drug's proposed labeling. Section 505(d) defines "substantial evidence" as "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved."

As stated in 21 CFR 314.126(a), the purpose of conducting clinical investigations of a drug is to distinguish the effect of the drug from other influences, such as a spontaneous change in the course of the disease or condition, placebo effects, or biased observation. Reports of adequate and well-controlled investigations serve as the main basis for determining whether there is substantial evidence to support the claims of effectiveness for a drug.

We agree that randomization and the use of concurrent controls are two principal means of ensuring that clinical trial data are reliable and robust. However, that does not mean that in order to be adequate and well-controlled, a clinical trial must use a randomized concurrent control design. Section 314.126(b) lists the characteristics of an adequate and well-controlled study. Contrary to your assertion (Petition at 24), FDA regulations do not require that a study be blinded, randomized, and/or concurrently controlled. Among the characteristics of an adequate and well-controlled study is that it uses a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect (§ 314.126(b)(2)). A historical control is one of the recognized types of control (§ 314.126(b)(2)(v)), and one in which the results of treatment with the test drug are compared with experience historically derived from the adequately documented natural history of the disease or condition, or from the results of active treatment in comparable patients or populations (id.). Unlike some other types of control (e.g., placebo concurrent control (§ 314.126(b)(2)(i)) or dose-comparison concurrent control (§ 314.126(b)(2)(ii))), use of a historical control does not include randomization or blinding. Because historical control populations usually cannot be as well assessed with respect to pertinent variables as can concurrent control populations, historical control designs are usually reserved for special circumstances, including studies in which the effect of the drug is self-evident.[27] Thus, in the proper setting,

---

[25] Id. at 18.

[26] FDA, May 21, 1996, Statistical Review and Evaluation (May 21, 1996, Statistical Review), at 4 and 7, available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_statr.pdf.

[27] 21 CFR 314.126(b)(2)(v). We note your contention that the effects of the regimen approved in 2000 are not self-evident because "[t]he Sponsor's focus on this dyadic set of possibilities (failure (0) or success (1)) obscures a whole range of less easily measurable, but critically important, outcomes," including "tissue retention, life-threatening hemorrhaging, persistent bleeding, infection, teratogenicity, pain, continued fertility, and psychological effects" (Response to Opposition at 8). We disagree with your argument. From a clinical perspective, there are two outcomes associated with the use of Mifeprex for medical abortion: either there is a complete abortion (without the need for surgical intervention) or there is not. The "outcomes" you

9

Docket No. FDA-2002-P-0364

historically controlled trials can be considered adequate and well-controlled, and there is no need for the other types of control listed in § 314.126(b)(2).[28]

The use of historical controls in the Mifeprex clinical trials was appropriate for two reasons. First, the natural history of a viable pregnancy is adequately documented (a pregnancy continues on average for 40 weeks' gestation).[29] Second, the effect of Mifeprex is dramatic, occurs rapidly following treatment, and has a low probability of having occurred spontaneously.[30] Furthermore, contrary to your assertion (Petition at 32-34), the use of a historical control in these circumstances is consistent with ICH's guidance for industry, *E10 Choice of Control Group and Related Issues in Clinical Trials* (E10 Guidance).[31] The E10 Guidance addresses external controls (including historical controls) that are used in externally controlled trials to compare a group of subjects receiving the test treatment with a group of patients external to the study, rather than with an internal control group consisting of patients from the same population assigned to a different treatment.[32] The guidance states that the "external control may be defined (a specific group of patients) or non-defined (a comparator group based on general medical knowledge of outcome)."[33]

---

cite are complications that can be associated with all abortions (including surgical abortion, missed abortion (non-viable pregnancy that has not been expelled from the uterus), and spontaneous abortion).

[28] You cite to a statement in the May 21, 1996, Statistical Review regarding the two French trials that "[i]n the absence of a concurrent control group in each of these studies, it is a matter of clinical judgement whether or not the sponsor's proposed therapeutic regimen is a viable alternative to uterine aspiration for the termination of pregnancy" (Petition at 27). FDA's finding that Mifeprex was safe and effective for its labeled indication was based on data from three trials, one in the U.S. and two in France, as well as from safety data from a database of over 620,000 women in Europe who had had a medical termination of pregnancy (and approximately 415,000 of whom had received the combination of mifepristone and misoprostol). The Medical Officer's Review, supra note 12, also states that the "U.S. clinical trials confirm the safety and efficacy of mifepristone and misoprostol found in the pivotal French studies for women seeking medical abortions with gestations of 49 days duration or less" (Id. at 18-19). As stated previously, it is up to the physician and his/her patient to decide whether a medical or surgical abortion is preferable and safer in the patient's particular situation.

[29] MacDonald, PC, NF Gant, et al., 1996, Williams Obstetrics (20th ed.), Appleton and Lange, at 151.

[30] Although sources and studies differ somewhat, the 92% success rate following mifepristone/misoprostol use far exceeds the rate of spontaneous abortion (spontaneous miscarriage). One source states: "No less than 30% and as much as 60% of all conceptions abort within the first 12 weeks of gestation, and at least half of all losses go unnoticed. Most recognized pregnancy losses occur before 8 weeks' gestation, and relatively few occur after 12 weeks" (Fritz, M and L Speroff, 2011, Clinical Gynecologic Endocrinology and Infertility (8th ed.), Lippincott Williams & Wilkins, Philadelphia, at 1193). Other sources indicate that 15% of all pregnancies between 4-20 weeks of gestation spontaneously abort (See Speroff, L, et al., 1989, Clinical Gynecologic Endocrinology and Infertility (4th ed.), Williams and Wilkins, Baltimore, at 535; see also Stenchever, MA, 2001, Comprehensive Gynecology (4th ed.), Mosby, at 414). According to the National Library of Medicine, "[a]mong women who know they are pregnant, the miscarriage rate is about 15-20%. Most miscarriages occur during the first 7 weeks of pregnancy." (Miscarriage, available on the MedlinePlus Web site at http://www.nlm.nih.gov/medlineplus/ency/article/001488.htm.

[31]   E10 Guidance, available on the FDA Drugs Web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm, at 6.

[32] Id.

[33] Id.

EX. 27 pg. 010
23-10362.644

Moreover, the E10 Guidance clearly states that, notwithstanding certain limitations of external controls, including the possibility of bias, external controls can be appropriate under circumstances where the effect of the treatment is dramatic and the usual course of the disease or condition is highly predictable.[34]  In other words, historical controls can be appropriate in circumstances such as medical termination of early pregnancy.  The use of the expected rate of spontaneous abortion during early pregnancy as the control in the Mifeprex clinical trials was appropriate and fully consistent with FDA regulations and guidance.  The applicant could rely on the data from the three trials to support approval because they were adequate and well-controlled, using a historical control.[35]

It is not uncommon for the drug product review divisions in FDA's Center for Drug Evaluation and Research (CDER) to accept for filing and approve applications that rely on clinical trials employing historical controls to support approval for drug products in which the outcome of the condition is well known and the effect of the drug is anticipated to be markedly different from that of a placebo.  Examples include FDA's approval of numerous oncology drug products, including, for example, Xalkori (crizotinib) for the treatment of patients with locally advanced or metastatic non-small cell lung cancer (NSCLC) that is anaplastic lymphoma kinase (ALK)-positive as detected by an FDA-approved test, and Adcetris (brentuximab vedotin) for the treatment of patients with Hodgkin lymphoma and a rare lymphoma known as systemic anaplastic large cell lymphoma.  Other examples include iPlex (mecasermin rinfabate [rDNA origin] injection) for treatment of growth failure in children with severe primary IGF-1 deficiency (Primary IGFD) or with growth hormone (GH) gene deletion who have developed neutralizing antibodies to GH; Myozyme (alglucosidase ALFA) for use in patients with Pompe disease (GAA deficiency); Ferriprox (deferiprone) for the treatment of patients with transfusional iron overload due to thalassemia syndromes when current chelation therapy is inadequate; Voraxaze (glucarpidase) for treatment of toxic (>1 micromole per liter) plasma methotrexate concentrations in patients with delayed methotrexate clearance due to impaired renal function; and Elelyso (taliglucerase alfa) for injection for use as a long-term enzyme replacement therapy in patients with Type 1 Gaucher disease.  Similarly, it is not unusual for the CDER review divisions to accept for filing applications relying on historically controlled clinical trials.  Examples of reproductive drug products for which a historical control is often relied on in the drug approval process include contraceptive drug products (e.g., most birth control pills, Mirena intrauterine device, NuvaRing (an intravaginal hormonal contraceptive), and Implanon (an implanted hormonal contraceptive)) and menopausal hormonal therapy products with the addition of a progestin to prevent endometrial cancer secondary to unopposed estrogen stimulation.

---

[34] Id. at 27.

[35] We disagree with your statement that the sponsor's failure to identify precisely a historical control group is fatal to its claim that the trials supporting the approval of Mifeprex were historically controlled (Response to Opposition at 5-6).  In situations where an investigational product is anticipated to have an effect that is readily discernible and greatly exceeds that which would be expected otherwise, the historical control may be relied upon without explicitly describing it as such.  Examples of situations where this arises include, as here, the use of a drug for early medical abortion, given that the majority of pregnancies continue to term, and the use of a drug as a contraceptive, given that the pregnancy rate in sexually active women between 18 and 35 years old in the absence of contraception for one year is well documented at approximately 85% ( Hatcher, RA, et al., 2012, Contraception Technology (20th ed.), Ardent Media, Inc., at 780.

EX. 27 pg. 011
23-10362.645

Docket No. FDA-2002-P-0364

You state that FDA did not conduct a statistical review of the results of the U.S. clinical trial (Petition at 29). The Agency, however, concluded that the clinical results of the supporting U.S. clinical trial were "similar enough to the results of the European studies" (the studies used to support the original approval of Mifeprex in Europe) that a statistical evaluation of the results of the U.S. trial was not required.[36]

You maintain that the Mifeprex approval is not in accordance with Agency guidance[37] on when only one effectiveness trial may be necessary for approval because: (1) mifepristone had not been approved for any use in any population in the United States and (2) no one had ever presented to FDA any evidence from adequate and well-controlled trials regarding any use for mifepristone.[38] As stated above, our approval of Mifeprex was based on not one but three studies that met the requirements of § 314.126. Therefore, Agency guidance concerning reliance on only one effectiveness trial is not relevant to the approval of Mifeprex.

You argue that FDA's acceptance of the French and U.S. clinical trial data violated § 314.126(e), which states that uncontrolled studies or partially controlled studies are not acceptable as the sole basis for approval of claims of effectiveness (Petition at 34-36). As explained above, the Mifeprex clinical trials were neither uncontrolled nor partially controlled. They were historically controlled, and the use of an historical control was appropriate under § 314.126(b)(2)(v). Consequently, § 314.126(e) is inapplicable.

Citing § 314.500, you contend that the approval of Mifeprex under subpart H was improper because FDA did not require the concurrent testing of mifepristone with surgical abortion to test the proposition that mifepristone provides a meaningful therapeutic benefit over the standard method for terminating pregnancies (Petition at 37-40). You maintain that Mifeprex is the only drug that we have approved under § 314.520 (approval with restrictions to assure safe use) without requiring "that safety and efficacy be scientifically demonstrated through blinded, comparator-controlled, and randomized clinical trials" (Petition at 37).

Nothing in subpart H requires that an applicant conduct comparative clinical trials in order to demonstrate that a drug product provides meaningful therapeutic benefit to patients over existing treatments. Furthermore, nothing in the concept of "meaningful therapeutic benefit" requires concurrent testing of a proposed drug with an existing treatment.[39] We have approved other drugs

---

[36] FDA Memorandum to NDA 20-687 re: Statistical comments on Amendment 024, Feb. 14, 2000, available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_statr.pdf.

[37] FDA guidance for industry, *Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (Effectiveness Guidance), available on the FDA Drugs Web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

[38] Petition at 31-32 (citing Effectiveness Guidance at 5-17).

[39] You state that "[c]onducting a concurrently-controlled randomized trial comparing surgical abortion with the mifepristone-misoprostol regimen is readily achievable" (Petition at 32, note 145). You add that "[t]here are study designs that would have also allowed for blinding" (Id.). Assuming, arguendo, that it may have been feasible to design a randomized, concurrently-controlled study, such study was not required under our regulations; as described previously in this response, the clinical trials supporting the approval of Mifeprex

EX. 27 pg. 012
23-10362.646

under subpart H based on clinical trials that do not directly compare the drug to an existing therapy, including Gleevec (imatinib mesylate), Tracleer (bosentan), and Xyrem (sodium oxybate). We also note that the latter two referenced drug products, Tracleer (bosentan) and Xyrem (sodium oxybate), were approved under the restricted distribution provisions at 21 CFR 314.520. As previously explained in this response, Mifeprex was deemed to have in effect an approved REMS under Title IX of FDAAA. The Mifeprex REMS, which was approved in June 2011 and is still in effect, incorporated the subpart H restrictions under which the drug was approved.

As evidenced by the foregoing, the studies supporting the 2000 approval of Mifeprex were consistent with the FD&C Act and FDA regulations, including § 314.126 and subpart H.

      2.      There Is No Need for an Audit of the French Clinical Data

You assert that FDA allowed "tainted data" to support the Mifeprex NDA by failing to require a comprehensive audit of the French clinical trial data after discovering violations of good clinical practices (Petition at 40-41). You maintain that we should therefore conduct a complete audit of all of the French clinical trial data to determine whether other trials must be conducted (Petition at 41 and 89).

We disagree with your characterization of both the French data and FDA's reliance on that data. You reference the Form FDA 483 issued on June 28, 2006, to Dr. Elisabeth Aubeny, as well as the Summary of Findings related to that Form FDA 483. It is not uncommon to have trial sites receive a Form FDA 483, listing the FDA investigator's observations regarding non-compliance with good clinical practice, at the conclusion of an inspection. The investigator will draft an Establishment Inspection Report (EIR) that reviews the violations noted and will recommend an action, taking into consideration the nature of the inspectional findings, any actions that occurred following the findings, and Agency policy. For products regulated by CDER, compliance reviewers in the Division of Clinical Compliance Evaluation in the Office of Scientific Investigations (previously, the Division of Scientific Investigations) review the EIR, the Form FDA 483, and the evidence collected during the inspection, as well as any written response submitted timely by the inspected party, to determine whether the recommended action is appropriate and is supported by adequate evidence. This review evaluates each violation's effect on the timeliness, accuracy, and/or completeness of the data collected from the site to ascertain if the data are reliable. In this particular case, although there were violations cited on the Form FDA 483 and discussed in the EIR, the violations were determined not to affect the reliability of the data provided by that site. The statement you quote from the Summary of Findings reflects this conclusion. We note that, although the French studies were not performed under a U.S. investigational new drug application (IND), this is typical of many approved drugs that originally were developed or studied outside the United States, and is fully permissible under 21 CFR 312.120 (Foreign clinical studies not conducted under an IND) (including the version of the provision in effect at the time of the 2000

were historically controlled, which was appropriate under § 314.126(b)(2)(v). Furthermore, your suggestion that there are study designs that would have allowed for blinding raises ethical issues that go beyond the scope of your Petition and this response.

EX. 27 pg. 013
23-10362.647

**7.   Complaint Exhibit 43 – 2021 FDA Response to 2019 Citizen Petition (Dec. 16, 2021) (excerpts)**



Donna J. Harrison, M.D.
Executive Director
American Association of Pro-Life Obstetricians and Gynecologists
P.O. Box 395
Eau Claire, MI 49111-0395

Quentin L. Van Meter, M.D., FCP
President
American College of Pediatricians
P.O. Box 357190
Gainesville, FL 32635-7190

December 16, 2021

Re: Docket No. FDA-2019-P-1534

Dear Drs. Harrison and Van Meter:

This letter responds to your citizen petition submitted to the Food and Drug Administration (FDA
or Agency) on March 29, 2019, on behalf of the American Association of Pro-Life Obstetricians
and Gynecologists and the American College of Pediatricians (Petition). In the Petition, you
request that FDA: (1) restore and strengthen elements of the Mifeprex regimen and prescriber
requirements approved in 2000, and (2) retain the Mifeprex Risk Evaluation and Mitigation
Strategy (REMS) and continue limiting the dispensing of Mifeprex to patients in clinics, medical
offices, and hospitals, by or under the supervision of a certified prescriber.

Specifically, in your Petition you request that the Agency:

(1) Restore and strengthen elements of the Mifeprex regimen and prescriber requirements
    approved in 2000, to include the following:

  - Indications and Usage - Mifeprex, in a regimen with misoprostol, for the termination of
    intrauterine pregnancy, should be limited to 49 days gestation.

  - Dosage and Administration:
    o Mifeprex should be administered by or under the supervision of a physically present
      and certified physician who has ruled out ectopic pregnancy.

    o The use of Mifeprex and misoprostol for the termination of pregnancy should
      require three office visits by the patient.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

Docket No. FDA-2019-P-1534

### c. ETASU C – In-Person Dispensing

ETASU C under the Mifepristone REMS Program currently requires mifepristone to be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.  This creates what we refer to in this response as an in-person dispensing requirement under the REMS; i.e., the patient must be present in person in the clinic, medical office, or hospital when the drug is dispensed.  The mifepristone REMS document currently states that mifepristone may not be distributed to or dispensed through retail pharmacies or settings other than a clinic, medical office, or hospital.  As explained below, based on a recent review of the REMS, we believe that the Mifepristone REMS Program must be modified to remove the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, because this requirement is no longer necessary to ensure that the benefits of the drug outweigh the risks.  This conclusion is based on our review of information from the Mifepristone REMS Program one-year (1st) REMS[77] assessment data and postmarketing safety information, and supported by our review of the published literature.

#### i.    Assessment Data

As part of our review of the REMS, we evaluated information included in the 1st REMS assessment report for the Mifepristone REMS Program, which included healthcare provider certification data, program utilization data, and non-compliance data.  This 1st REMS assessment report covers a reporting period between April 11, 2019 through February 29, 2020.  During this reporting period, a small number of non-compliance events were reported.

As described in section I.C. of this response, during the timeframe from January 27, 2020 through September 30, 2021, there were periods when the in-person dispensing requirement was not enforced.  To better understand whether there was any impact on safety or non-compliance during the periods when the in-person dispensing requirement was not enforced, we requested additional information from the Applicants to provide for more comprehensive assessment of the REMS for the time period from January 27, 2020 (the effective date of the COVID-19 PHE) to September 30, 2021.  We requested the Applicants provide a summary and analysis of any program deviation or non-compliance events from the REMS requirements and any adverse events that occurred during this time period that had not already been submitted to FDA.  The NDA and the ANDA Applicants reported a total of eight cases reporting adverse events between January 27, 2020 and September 30, 2021.  These eight cases were also identified in the FAERS database and are described below.

The number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use for medical termination of pregnancy is small, and the data provide no

---

[77] This REMS assessment report was the first submitted following the approval of the single, shared system REMS for mifepristone.

EX. 43 pg. 025
23-10362.827

Docket No. FDA-2019-P-1534

indication that any program deviation or noncompliance with the Mifepristone REMS
Program contributed to these reported adverse events.


## ii. FAERS/Postmarketing Safety Data

FDA routinely monitors postmarketing safety data for approved drugs through adverse
events reported to our FAERS database,[78] through our review of published medical
literature, and when appropriate, by requesting applicants submit summarized
postmarketing data.  For our recent review of the REMS, we searched our FAERS
database, reviewed the published medical literature for postmarketing adverse event reports
for mifepristone for medical termination of pregnancy, and requested that the Applicants
submit a summary and analysis of certain adverse events.  Our review of this postmarketing
data indicates there have not been any new safety concerns with the use of mifepristone for
medical termination of pregnancy through 70 days gestation, including during the time
when in-person dispensing was not enforced.

In order to evaluate the periods when in-person dispensing was and was not enforced, we
conducted a search of the FAERS database and the published medical literature to identify
U.S. postmarketing adverse events that reportedly occurred from January 27, 2020 through
September 30, 2021 with mifepristone use for medical termination of pregnancy.  The data
for this time period were then further divided into the date ranges when in-person
dispensing was enforced per the REMS (January 27, 2020 - July 12, 2020 and January 13,
2021 - April 12, 2021) versus when in-person dispensing was not enforced: July 13, 2020 -
January 12, 2021 (in-person dispensing enforcement was temporarily enjoined) and April
13, 2021 - September 30, 2021 (enforcement discretion for in-person dispensing because of
the COVID-19 PHE).

Based on the above search, a total of eight cases were identified in FAERS and no
additional case reports were identified in the medical literature.  Two of the eight cases
reported adverse events that occurred when in-person dispensing was being enforced (i.e.,
January 27, 2020-July 12, 2020 and January 13, 2021-April 12, 2021).  These two cases
reported the occurrence of uterine/vaginal bleeding (case 1) and uterine/vaginal bleeding
and sepsis (case 2).  Of note, uterine/vaginal bleeding and sepsis are labeled adverse events.
Five of the eight cases reported adverse events that occurred when in-person dispensing
was not enforced (i.e., July 13, 2020-January 12, 2021 and April 13, 2021-September 30,
2021); however, the narratives provided in the FAERS reports for three of the five cases
explicitly stated that mifepristone was dispensed in-person.  These five cases reported the
occurrence of ongoing pregnancy (case 3), drug intoxication and death approximately 5
months after ingestion of mifepristone (case 4), death [cause of death is currently unknown]
(case 5), sepsis and death (case 6), and pulmonary embolism (case 7).  Of note, ongoing
pregnancy and sepsis, including the possibility of fatal septic shock, are labeled adverse
events.  The remaining case reported the occurrence of oral pain/soreness (case 8) in July

---

[78] FAERS is a database that contains adverse event reports, medication error reports and product quality
complaints resulting in adverse events that were submitted to FDA. The database is designed to support
FDA's post-marketing safety surveillance program for drug and therapeutic biologic products.

EX. 43 pg. 026
23-10362.828

Docket No. FDA-2019-P-1534

2021, but did not provide sufficient information to determine the exact date of the adverse event.

As discussed in section II.A.2.d., the Applicants report adverse events, including serious adverse events, to FDA in accordance with applicable regulations.[79]  To enable additional review of adverse events, Applicants were requested to provide a summary and analysis for adverse events reported with incomplete medical abortion requiring surgical intervention to complete abortion, blood transfusion following heavy bleeding or hemorrhage, ectopic pregnancies, sepsis, infection without sepsis, hospitalization related to medical abortion, and emergency department/urgent care encounter related to medical abortion.  The Applicant for Mifeprex provided the requested summary of postmarketing safety information from March 29, 2016, when S-020 was approved, through September 30, 2021.  The Applicant for the generic provided the requested summary of postmarketing safety information from April 11, 2019 (date of initial approval) through September 30, 2021.  The information provided by the Applicants included the same cases identified in FAERS, as discussed above.

We analyzed the FAERS data referenced above to determine if there was a difference in adverse events when in-person dispensing was and was not enforced.  Based on FDA's review of this data, we concluded that there does not appear to be a difference in adverse events when in-person dispensing was and was not enforced and that mifepristone may be safely used without in-person dispensing.  FDA's review of the summary and analysis data submitted by the Applicants (which, as noted above, included the same cases identified from FAERS) did not change this conclusion.

### iii.  Published Literature

As noted above, we also conducted an extensive review of the published literature since March 29, 2016 (the date the S-020 efficacy supplement for Mifeprex was approved) through September 30, 2021.[80]  Published studies have described alternatives in location and method for dispensing mifepristone by a certified prescriber (or equivalent healthcare provider in countries other than the United States).  Some studies have examined replacing in-person dispensing in certain healthcare settings with dispensing at retail pharmacies[81]

---

[79] See 21 CFR 314.98, 21 CFR 314.80, and 21 CFR 314.81.

[80] In support of your request that we retain the REMS and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals by or under the supervision of a certified prescriber, you reference two studies that you assert do not comply with the REMS (Petition at 19-22).  Outcomes from both of the studies you reference have been reported in the published literature and are addressed in the discussion that follows. We note that as a general matter, a clinical investigation of an approved drug that is subject to a REMS can take place in healthcare settings outside those provided for in the REMS.  When an approved drug that is subject to a REMS is studied in a clinical trial, the REMS does not apply to the use of the drug in that clinical trial.  However, FDA reviews the protocol to ensure that it will be conducted in a manner that adequately addresses the risks that the REMS is intended to mitigate, such that the trial participants will not be exposed to an unreasonable and significant risk of illness or injury.  See 21 CFR 312.42(b)(1)(i) and (b)(2)(i).

[81] Grossman D, Baba CF, Kaller S, et al. Medication Abortion With Pharmacist Dispensing of Mifepristone. Obstet Gynecol 2021;137:613–22; Rocca CH, Puri M, et al. Effectiveness and safety of early medication

EX. 43 pg. 027
23-10362.829

Docket No. FDA-2019-P-1534

7-14 days after administration of mifepristone is more appropriate to evaluate safety and efficacy.  This study used a model with numerous deviations from standard provision of medical abortion in the United States, such as no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history.  These deviations, limited follow-up information, and small sample size limit the usefulness of this study.

Hyland[98] describes findings from a cohort study in Australia evaluating medical abortion outcomes utilizing telemedicine and a central mail order pharmacy.  Complete abortions without additional procedures occurred in 96 percent of participants with documented outcomes and is consistent with labeled efficacy.  Of the participants included in the analysis, 95 percent had no face-to-face clinical encounters after medications were mailed while 3 percent were admitted to the hospital and 2 percent had an outpatient encounter.  One participant who was hospitalized and underwent a surgical uterine evacuation received a transfusion.  Not included in the findings are 7 hospitalizations occurring in 7 participants who did not have "full follow up."  The authors do not report any other adverse events and conclude use of the telemedicine medical abortion service is safe.  However, the reasons for hospitalization are not discussed by the authors; therefore, it is unknown why the patients were hospitalized.  Although the reported frequency of hospitalizations (3 percent) is higher than the less than 1 percent in the FDA-approved mifepristone labeling, conclusions on the safety findings cannot be made in the absence of information about the reasons for hospitalization. Other limitations of this study include incomplete information about outcomes with face-to-face encounters.

Overall, the three studies evaluating mail order pharmacy dispensing suggest that efficacy of medical abortion is maintained with mail order pharmacy dispensing.  With respect to safety, in the Grossman study[99] the interim analysis, although small, does not raise serious safety concerns.  Safety findings from the Hyland[100] study are difficult to interpret.  Although only one transfusion is reported and the authors state the findings demonstrate safety, a higher hospitalization rate and lack of information on the reasons for hospitalization preclude reaching any conclusions about the safety findings.  Lastly, the Upadhyay[101] study had no reported adverse events, but the findings are less useful because of the limited follow-up, and because medical abortions were provided using a model with numerous deviations from standard provision of medical abortion in the United States.

(c)  Clinic dispensing by mail

A total of five studies evaluated clinic dispensing by mail.  Gynuity Health Projects conducted a prospective cohort study (the "TelAbortion" study) evaluating use of telemedicine for remote visits and mifepristone being dispensed from clinics via overnight or regular tracked mail.  Three publications reviewed have reported outcomes for the Gynuity population exclusively: Raymond (outcomes from May 2016 to December

---

[98] Hyland et al., supra n. 82.
[99] Grossman et al., supra n. 82.
[100] Upadhyay et al., supra n. 82.
[101] Hyland et al., supra n. 82.

EX. 43 pg. 031
23-10362.833

Docket No. FDA-2019-P-1534

2018),[102] Chong (outcomes from May 2016 to September 2020)[103] and Anger (outcomes from March 2020 to September 2020).[104]  A fourth study, Kerestes,[105] reports outcomes of medical abortion at the University of Hawai'i from April 2020 to November 2020 and a fifth study, Aiken (2021)[106] reports outcomes of medical abortion up to 70 days gestational age in the United Kingdom before and during the COVID-19 PHE in a retrospective cohort study.

In Raymond,[107] complete abortion without additional procedures occurred in 93 percent of participants with known outcomes.  There were two hospitalizations (one participant received a transfusion for severe anemia despite having had a complete abortion) and 7 percent of participants had clinical encounters in ED/urgent care centers.  The reported outcomes are similar to outcomes described in approved labeling except the combined ED/urgent care center encounters (7 percent) exceeded the ED visits in approved labeling (2.9-4.6 percent).[108]  Of note, the authors state that half of the ED/urgent care visits did not entail any medical treatment.  In Chong,[109] approximately 50 percent of the medical abortions occurred during the period of the COVID-19 PHE.  Complete abortion without an additional procedure occurred in 95 percent of those with known outcomes.  Transfusions were 0.4 percent and hospitalizations were 0.7 percent; 6 percent of participants had unplanned clinical encounters in ED/urgent care.  Surgical interventions were required in 4.1 percent to complete abortion.  The reported outcomes in Chong (which updated the findings described in Raymond) are similar to outcomes described in approved labeling except that (as with the Raymond study it updated) the combined ED/urgent care center encounters (6 percent) exceeded the ED visits in approved labeling (2.9-4.6 percent).

Anger,[110] which compared outcomes among participants enrolled in the Gynuity study who did ("test medical abortion cohort") versus did not ("no-test medical abortion cohort")[111]

---

[102] Raymond et al., supra n. 83.

[103] Chong E, Shochet T, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-48.

[104] Anger et al., supra n. 83.

[105] Kerestes C, Murayama S, et al. Provision of medication abortion in Hawai'i during COVID-19: Practical experience with multiple care delivery models. Contraception 2021 Jul;104(1):49-53. doi:10.1016/j.contraception.2021.03.025. Epub 2021 Mar 28.

[106] Aiken ARA, Lohr PA, et al. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464–1474.

[107] Raymond, supra n. 83.

[108] The authors reported the combined frequency of emergency department/urgent care visits, whereas the approved labeling includes the frequency for emergency department (emergency room) visits. Therefore it is unknown whether the frequency of emergency department visits in the trial, as distinct from the combined frequency of emergency department/urgent care visits, is comparable to the frequency of emergency department visits reflected in approved labeling.

[109] Chong et al., supra n. 103.

[110] Anger et al., supra n. 83.

[111] "No-test medication abortion" refers to medical abortion provided without a pretreatment ultrasound, pelvic examination or laboratory tests when, in the judgment of the provider, doing so is medically appropriate (appropriateness based on history and symptoms); "no-test medication abortion"  does include post-abortion follow up. A sample protocol is described by Raymond et al." (Raymond EG, Grossman D, Mark A, et.al. Commentary: No-test medication abortion: A sample protocol for increasing access during a pandemic and beyond. Contraception 2020;101:361-366)

EX. 43 pg. 032
23-10362.834

Docket No. FDA-2019-P-1534

have confirmation of gestational age/intrauterine location with an examination or ultrasound, found that those without an examination or ultrasound prior to medical abortion were more likely to require procedural interventions and had more unplanned clinical encounters.[112]  There were no reported ectopic pregnancies in either group.  The number of ED/urgent care visits and the proportion of unplanned clinical encounters that led to medical treatment were not reported.  In the "test" group, complete medical abortion was confirmed in 98 percent of participants with known outcomes; one participant was "hospitalized and/or blood transfusion" and 8 percent had an unplanned clinic encounter (participant sought in-person medical care related to abortion and the visit was not planned prior to abortion).  In the "no-test" group, complete medical abortion was confirmed in 94 percent of participants with known outcomes; two participants were "hospitalized and/or blood transfusion" and 12.5 percent had an unplanned clinical encounter.

Kerestes[113] included three different delivery models: traditional in-person visits, telemedicine consultation with in-person pick-up of medications, and telemedicine consultation with delivery of medications by mail (most of the latter were enrolled through Gynuity's TelAbortion study).  Among participants with follow-up data, the rates of successful medical abortion without surgery were consistent with outcomes in approved labeling. Blood transfusion was given to two participants (both in the telemedicine plus in-person pickup group).  Although ED visits occurred the most frequently in the telemedicine plus mail group (four participants or 5.8 percent) and the least in the in-person group (two participants or 2.1 percent), the study reported no increases in other serious adverse events. Aiken (2021)[114] reported outcomes before and during the pandemic in a retrospective cohort study in the United Kingdom.  The study compared the two cohorts: one before the pandemic with in-person visits and dispensing (traditional model) and one during the pandemic with either an in-person visit and in-person dispensing or a telemedicine visit and dispensing by mail or picked up from the clinic (hybrid model).  Complete abortion occurred in greater than 98 percent in both cohorts; the rate was slightly higher in the telemedicine group than in the in-person group.  There were no significant differences in the rates of reported serious adverse events.  The investigators' analysis determined that the efficacy and safety were comparable between both cohorts and concluded the hybrid model for medical abortion is effective and safe.

Taken together, data from the three Gynuity study reports (Raymond, Chong, and Anger), Kerestes, and Aiken (2021) support that efficacy of medical abortion was maintained when mifepristone was dispensed by mail from the clinic.  Study reports of Raymond, Chong, and Kerestes all suggest there may be an increase in ED/urgent care visits with telemedicine visits and dispensing by mail from the clinic, but without increases in other serious adverse events.  Anger's comparative analysis suggests a pre-abortion examination may decrease the occurrence of procedural intervention and decrease the number of unplanned visits for postabortion care.  The Aiken (2021) study appears to be of sufficient

---

[112] We note that the two cohorts were not randomized in the Anger study; they had different baseline characteristics. Consequently, findings based on the comparisons between the two cohorts should be interpreted carefully.
[113] Kerestes et al., supra n. 105.
[114] Aiken et al., supra n. 106.

EX. 43 pg. 033
23-10362.835

Docket No. FDA-2019-P-1534

sample size to determine whether safety outcomes with mail dispensing differ from in-person dispensing; however, significant limitations include that the analysis was based on deidentified information and the investigators were unable to verify the outcomes extracted. Further, the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings.

Notwithstanding the limitations discussed above, these studies overall support that dispensing by mail from the clinic is safe and effective. Although the literature suggests there may be more frequent ED/urgent care visits related to the use of mifepristone when dispensed by mail from the clinic, there are no apparent increases in other serious adverse events related to mifepristone use.

(d) Clinic dispensing by courier

Reynolds-Wright[115] reported findings from a prospective cohort study of participants at less than 12 weeks gestational age in Scotland undergoing medical abortion at home that provided mifepristone for pick up at the service or by couriered delivery to woman's home. The outcomes from this study in Scotland are consistent with the outcomes in the approved mifepristone labeling. However, the number of couriered deliveries was not reported. Thus this study does not provide abortion outcomes separately for couriered delivery of mifepristone and misoprostol. The study shares the same limitations as the Aiken (2021) study; the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings.

(e) Partner organization dispensing by mail

Women on Web (WoW), an internet group, connects patients and providers outside of the US and provides medical abortion globally, dispensing mifepristone through "a partner organization" by mail. WoW uses a model with numerous deviations from the standard provision of medical abortion in the United States. For example, this model has no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history or confirmed pregnancy testing. Three studies (Endler, Norten, and Aiken (2017))[116] reported outcomes based on dispensing through this model. Endler and Norten reported outcomes from WoW cohorts but do not provide relevant information on mifepristone dispensing by mail because neither provide meaningful outcomes data for consideration. Although Aiken (2017) is a large cohort study, the outcomes are self-reported and an unusually high rate of outcomes are unaccounted for; these limitations result in the data being insufficient to determine the safety of dispensing mifepristone by mail though a partner organization.

In sum, there are insufficient data from the literature we have reviewed to determine the safety and efficacy of dispensing from a retail pharmacy, by courier, or by a partner organization. With respect to dispensing mifepristone by mail, our review of the literature indicates that dispensing mifepristone by mail from the clinic or from a mail order

---

[115] Reynolds-Wright JJ, et al. BMJ Sex Reprod Health 2021;0:1–6. doi:10.1136/bmjsrh-2020-200976.
[116] Endler et al., Norten et al., and Aiken et al., supra n. 85.

EX. 43 pg. 034
23-10362.836

**8.   Katzen Declaration Exhibit 1A – CDER,
Clinical Review (Mar. 29, 2016) (excerpts)**

Clinical Review:

(b) (6) and (b) (6)

NDA 020687/S-020- Mifeprex

# CLINICAL REVIEW

| | |
|---|---|
| Application Type | SE-2 Efficacy Supplement |
| Application Number(s) | NDA 020687/S-020 |
| Priority or Standard | Standard |
| | |
| Submit Date(s) | May 28, 2015 |
| Received Date(s) | May 29, 2015 |
| PDUFA Goal Date | March 29, 2016 |
| Division / Office | (b) (6) |
| | |
| Reviewer Name(s) | (b) (6) and (b) (6) |
| Review Completion Date | March 29, 2016 |
| | |
| Established Name | Mifepristone |
| (Proposed) Trade Name | Mifeprex |
| Therapeutic Class | Progestin antagonist |
| Applicant | Danco Laboratories, LLC |
| | |
| Formulation(s) | Oral Tablet |
| Dosing Regimen | For pregnancies through 70 days gestation: Mifeprex 200 mg tablet orally followed in 24-48 hours by 800 mcg buccal misoprostol. |
| Indication(s) | Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. |
| Intended Population(s) | Pregnant women who desire a medical termination through 70 days gestation. |

1

(b) (6)  and  (b) (6)

NDA 020687/S-020-  Mifeprex

safely used depending on gestational age, and these combinations result in a complete termination in more than 95% of cases.

Similar guidelines using either vaginal, buccal, or sublingual misoprostol are endorsed by the World Health Organization (WHO), the United Kingdom Royal College of Obstetricians and Gynecologists[34], and a recent Cochrane Review (2011, Issue11).[35]

**Reviewer's Comment:**

**From the above discussion, it is clear that the standard of care in the US for early MAB has deviated from the FDA-approved dosing regimen.  PPFA provides the largest number of medical abortions each year in the US and as early as 2001, was already using the regimen of 200 mg oral mifepristone followed 24-48 hours later by 800 mcg vaginal misoprostol.**

There are a large number of studies and reviews that support the efficacy of the proposed new dose regimen through 63-70 days gestation.  Efficacy was defined in these studies as a complete expulsion of the pregnancy without need for surgical intervention for any reason during the follow up period.  The 2015 review by Chen and Creinin summarized clinical outcomes and adverse effects from 20 MAB studies including a total of 33,846 women using regimens consisting of 200 mg oral mifepristone followed by buccal misoprostol through 70 days gestation.  All studies except two used 800 mcg misoprostol. Two studies (827 women) used 400 mcg buccal misoprostol.  Six studies used a 24-hour time interval between mifepristone and buccal misoprostol administration and 14 used a 24-48 hour window for the dosing interval. The table below lists the 15 studies using the proposed doses (200 mg plus 800 mcg) with a 24-48 hour dosing interval.

---

[34] Royal College of Obstetricians and Gynaecologists. The care of women requesting induced abortion: evidence-based clinical guideline Number 7. 3rd ed. London (UK):RCOG Press 2011.

[35] Kulier R, Kapp N, et al. Medical methods for first trimester abortion (Review). The Cochrane Library 2011, Issue 11:1-126.

28

23-10362.2170

Clinical Review

(b) (6)       and                                        (b) (6)
NDA 020687/S-020-  Mifeprex

**Table 3: Efficacy- Mifepristone 200 mg with Buccal Misoprostol 800 mcg 24-48 Hours Later - US Studies**

| Study &Year | Design, Location | Gestation (maximum days) | M-M Interval (hrs) | Evaluable Subjects (N) | Success - no intervention (%) |
|---|---|---|---|---|---|
| **Middleton 2005**[24] **US** | **Prospective** | 56 | 24-48 | 216 | 94.9 |
| **Winikoff 2008**[23] **US** | **Prospective** | 63 | 24-36 | 421 | 96.2 |
| **Fjerstad 2009**[27] **US** | **Retrospective** | 59 | 24-48 | 1,349 | 98.3 |
| **Grossman 2011**[36] **US -  Clinic Mife v. Tele-med** | **Prospective** | 63 | 24-48 | 449 | Clinic: 96.9%<br>Telemed: 98.7% |
| **Winikoff 2012**[19]      **US** | **Prospective** | 57-70 | 24-48 | 629 | 93.2 |
| **Gatter 2015**[13] **US** | **Retrospective** | 63 | 24-48 | 13,373 | 97.7 |
| **Chong 2015**[17]      **US** | **Prospective** | 63 | 24-48 | 357 | 96.7 |
| **TOTALS** | **7 Studies** | **56-70 days** | **24-48 hr** | **16,794** | **97.4** |

**Source: Modified from Table 3, page 14-15, Chen-Creinin 2015 Review and submitted articles.  All subjects had 200 mg oral mifepristone followed by 800 mcg buccal misoprostol.**

**Success percentages calculated by clinical reviewer.**

---

[36] Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.

29

Clinical Review

(b) (6)   and                                        (b) (6)
NDA 020687/S-020-  Mifeprex

**Table 4: Efficacy- Mifepristone 200 mg with Buccal Misoprostol 800 mcg 24-48 Hours Later- Non- US Studies**

| Study &Year/Country | Design, Location | Gestation (maximum) | M-M Interval (hrs) | Evaluable Subjects (N) | Success - no intervention (%) |
|---|---|---|---|---|---|
| Alam 2013[37] Bangladesh | Prospective | 63 | 24 | 629 | 92.7 |
| Blum 2012[70] | Prospective | 63 | 24 | 210 | 92.9 |
| Boersma 2011[22] Curacao | Prospective | 70 | 24-48 | 307 | 97.7 |
| Chai 2013[38] Hong Kong | Prospective | 63 | 48 | 45 | 95.6 |
| Dahiya 2012[39] India | Prospective | 50 | 24 | 50 | 92 |
| Chong 2012[40] Georgia, Vietnam | Prospective | 63 | 36-48 | 560 | 96.4 |
| Giri 2011[41]       Nepal | Prospective | 63 | 24 | 95 | 93.6 |
| Goldstone 2012[20] Australia | Retrospective | 63 | 24-48 | 11,155 | 96.5 |
| Louie 2014[14] Azerbaijan | Prospective | 63 | 24-48 | 863 | 97.3 |
| Ngo 2012[42]       China | Retrospective | 63 | 36-48 | 167 | 91.0 |
| Ngoc 2011[43]     Vietnam | Prospective | 63 | 24 | 201 | 96.5 |
| Ngoc 2014[16]     Vietnam | Prospective | 63 | 24-48 | 1,371 | 94.7 |
| Olavarietta 2015[85] Mexico | Prospective | 70 | 24 | 884 | 98.2 |
| Pena 2014[44]     Mexico | Prospective | 70 | 24-48 | 971 | 97.3 |

---

[37] Alam A, Bracken H et al. Acceptability and Feasibility of Mifepristone-Misoprostol for Menstrual Regulation in Bangladesh. Intnational Persp on Sexual and Reprod Health 2013;39(2):79-87.

[38] Chai J, Wong CY, Ho PC. A randomized clinical trial comparing the short-term side effects of sublingual and buccal routes of misoprostol administration for medical abortions up to 63 days' gestation. Contraception 2013;87:480-5.

[39] Dahiya K, Ahuja K, Dhingra A et al.  Efficacy and safety of mifepristone and buccal misoprostol versus buccal misoprostol alone for medical abortion.  Arch Gynecol Obstet 2012; 285: 1055-8

[40] Chong E, Tsereteli T, Nguyen NN, Winikoff B. A randomized controlled trial of different buccal misoprostol doses in mifepristone medical abortion. Contraception 2012;86:251-6.

[41] Giri A, Tuladhar H et al. Prospective study of medical abortion in Nepal Medical College- a one year experience. Nepal Medical Coll J 2011;13(3):213-15.

[42] Ngo TD, Park MH, Xiao Y. Comparing the WHO versus China recommended protocol for first trimester medical abortion: a retrospective analysis. Int J Womens Health 2012;4:123-7.

[43] Ngoc NTN, et al. Comparing two early medical abortion regimens: mifepristone+misoprostol  vs. misoprostol alone. Contraception 2011;83:410-17.

[44] Pena M, Dzuba IG, Smith PS, et al. Efficacy and acceptability of a mifepristone-misoprostol combined

30

(b) (6)   and                              (b) (6)
NDA 020687/S-020- Mifeprex

| Sanhueza 2015[48] Mexico | Prospective | 70 | 24-48 | 896 | 93.3 |
|---|---|---|---|---|---|
| TOTALS | 15 Studies | 56-70 days | 24-48 hrs | 18,425 | 96.1% |

Source: Modified from Table 3, page 14-15, Chen-Creinin 2015 Review and submitted articles.  All subjects had 200 mg oral mifepristone followed by 800 mcg buccal misoprostol.
Success percentages calculated by clinical reviewer.

**Reviewer's comments:**

**The data above in Table 3 and Table 4 from ~16,800 US women and ~18,400 non-US women in clinical studies of MAB through 70 days gestation with success rates of 97.4% (US) and 96.1% (non-US) strongly support the proposed new dosing regimen and the extension of the acceptable gestational age.  The number of US and non-US studies, the number of evaluable women, and the overall complete abortion rates (termination with no surgical intervention) will be described in the efficacy table in Section 14 CLINICAL STUDIES in the new approved label.  Additional discussion on increasing the gestational age through 70 days follows in the next major section.**

Precise timing of the administration of misoprostol has not been shown to result in a higher success rate which is why the majority of the above studies allowed a range of hours between the mifepristone dose and misoprostol dose rather than one set time between the two drugs.  The 2013 Raymond systematic review[18] of 87 studies that exclusively used a mifepristone 200 mg oral dose in over 45,000 women, followed by varying doses and routes of administration of misoprostol, concluded that if the mifepristone-misoprostol interval is < 24 hours, the procedure is less effective compared to an interval of 24-48 hours.

Another study[45] also looked at the question of the mifepristone-misoprostol interval. The authors conducted a systematic review of randomized controlled trials published from 1999 to 2008 to assess the evidence for a shorter mifepristone and misoprostol administration interval for first trimester medical termination.  Searching strategy included MEDLINE, EMBASE, CLINAHL and Cochrane Library.  The primary outcome measure was complete abortion without the need for a surgical procedure.  "Five randomized controlled trials (RCTs) compared the efficacy of mifepristone-misoprostol administration intervals between 0 and 72 hours in 5,139 participants.  The complete abortion rates varied between 90% and 98%.  Although the meta-analysis of pooled data of all five RCTs showed no statistically significant difference in efficacy between

---

regimen for early induced abortion among women in Mexico City. Int J Gynaecol Obstet 2014;127:82-5.

[45] Wedisinghe L and Elsandabesee D. Flexible mifepristone and misoprostol administration interval for first-trimester medical termination. Contraception 2010;81(4):269-74. doi: 10.1016/ j.contraception.2009.09.007. Epub Oct 29, 2009.

31

Clinical Review

(b) (6)  and  (b) (6)

NDA 020687/S-020-  Mifeprex

the shorter and longer dosing intervals, there was a trend toward slightly <u>lower</u> success rates with administration intervals < 8 hours." This study supports the finding that the proposed regimen is effective with the 24-48 hour flexible interval.  Labeling will indicate that the regimen may not work as well if the misoprostol is taken earlier than 24 hours after Mifeprex.

<u>**Reviewer's Final Recommendation**</u>**:**
**The new proposed regimen of 200 mg oral mifepristone followed in 24-48 hours with 800 mcg buccal misoprostol should be approved; there are sufficient data from the medical literature with over 35,000 women supporting the regimen's efficacy (termination without any additional surgical intervention) as being in the 91-98% range.**

## 6.1.7  Increase in gestational age from 49 days to 70 days

**Original NDA review:**

The US clinical trial[31] was conducted from September 1994 to September 1995 and treated 2,121 women.  A total of 2,015 women (95%) returned at the 14-day follow-up visit.  The trial categorized women into three groups based on gestational age at the time of procedure, and evaluated the rates of "Success" (a complete pregnancy termination without use of any additional doses of misoprostol or surgical intervention), and the rates of "Failure" (with four sub-categories of incomplete abortion, ongoing pregnancy, intervention for medical reason, and intervention solely because of patient request).  The success and failure data are shown in Table 5.

**Table 5: Original NDA Efficacy Results**

| OUTCOME | ≤ 49 Days N= 827 (%) | 50-56 Days N= 678 (%) | 57-63 Days N= 510 (%) |
|---|---|---|---|
| **Success (mifepristone + misoprostol** | **762  (92)** | **563  (83)** | **395  (77)*†** |
| **Failure (any surgical intervention for any reason)  N (%)** | | | |
| **Total failures** | **8%** | **17%** | **23%*†** |
| Incomplete abortion | 39 (5) | 51 (8)‡ | 36 (7) |
| Ongoing pregnancy | 8 (1) | 25 (4)* | 46 (9)* § |
| Medical indication  for intervention | 13 (2) | 26 (4)‡ | 21 (4)‡ |
| Patient's request  for intervention | 5 (0.6) | 13 (2) | 12 (2)‡ |

**\*P<0.001 for the comparison with the ≤ 49-days group.**
**†P= 0.02 for the comparison with the 50 to 56-days group.**
**‡ 0.001 ≤ P<0.03 for the comparison with the ≤ 49-days group.**
**§ P<0.001 for the comparison with the 50 to 56-days group.**
**Source: Modified from Table 1, pg 1243 in the Spitz NEJM article (1998).**

32

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

**Table 7: MAB Efficacy Outcome 64-70 Days Gestation**

| Study | Enrolled N | Followed N | Success N (%) | Ongoing Pregnancy N (%) | Lost to Follow up % | Comment |
|---|---|---|---|---|---|---|
| Winikoff[19] 2012 | 350 | 304 | 282 (92.8) | 9 (3.0) | 13.1 | *Proposed dosing |
| Sanhueza[48] 2015 | 150 | 147 | 134 (91.2) | 5 (3.4) | 2.0 | * Proposed dosing |
| Boersma[22] 2011† | 26 | 26 | 25 (96.2) | 1 (3.8) | 0 | Proposed dosing @ 24-36 hr @ home |
| Pena[44] 2014 | 2 | 2 | 2 (100) | 0 (0) | 0 | * Proposed dosing |
| Chong[40] 2012 RCT | 1 | 1 | 1 (100) | 0 (0) | 0 | * Proposed dosing @ 36-48 hr |
| | 6 | 6 | 6 (100) | 0 (0) | 0 | 400 mcg buccal |
| [Y]Gouk[47] 1999 UK-misoprostol in hospital | 127 | 127 | 120 (94.5) | 7 (5.5) | 0 | 800 mcg vaginal @ 36-48 hr |
| Bracken[49] 2014 | 325 | 321 | 295 (91.9) | 7 (2.2) | 1.2 | 400 mcg sublingual @ 24-48 hr |
| TOTAL | 987 | 934 | 865 (92.6) | 29/934 (3.1) | 53/987 (5.4) | |

*Mifepristone oral 200 mg followed in 24-48 hour range with misoprostol buccal 800 mcg.

[Y]The Gouk study in 1996-97 included 253 women at 63-83 days gestation (Weeks 10-12).

Source: Table modified with data from published studies.  See Abbas D et al. Contraception [MAB through 70 days gestation] 92 (2015):197-199.

**Reviewer comments:**

Use of the Chong and Bracken data is discussed above.  Although the Gouk regimen used a different route of administration for misoprostol, the effectiveness of the vaginal route appears to be similar to that of the buccal route; therefore, these data are considered relevant.  Data on sublingual administration of misoprostol may be less generalizable due to the different pharmacokinetic (PK) profile and higher AE frequency compared to buccal

37

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

administration.  Also, see Section 4.4.3 Pharmacokinetics and the Cross Discipline Team Leader review.

The abortion success rates shown above from seven studies are comparable to (and in several studies, greater than) the success rates for medical abortion in the initial 2000 decision for Mifeprex up to 49 days gestation.  The proportion of subjects with complete success without any medical or surgical intervention in the US pivotal trial that supported the original approval was 92.1%, as shown in Table 5, in 827 women encompassing all gestational weeks up to 49 days.  The data in the above two tables include 3,072 women treated at 57-63 days gestation and 987 women at 64-70 days gestation.  We believe that this comprises a sufficient number of women in each gestational week upon which to make a clinical decision, and that the overall 94.7% and 92.6% success rates are acceptable for approval.

The data here clearly establish the efficacy of medical abortion with mifepristone and misoprostol through 70 days gestation.  At least two Gynuity Health studies of outpatient medical abortion through 70 days are ongoing, so more information from clinical studies will be available in the future.

It is also worth noting that in November 2015, the National Medical Committee of PPFA approved medical abortion through 70 days, so this is currently their standard of care.

Reviewer's Final Recommendation:
The new proposed regimen of 200 mg oral mifepristone followed in 24-48 hours with 800 mcg buccal misoprostol should be approved for use through 70 days gestation (10 weeks from the first day of the LMP).


## 6.1.8  At-home Administration of Misoprostol

For the majority of women, the most significant cramping and bleeding will occur within 2-24 hours after taking misoprostol.  Requiring women to take misoprostol in the office necessitates another visit and can interfere with the woman's ability to make reasonable plans for the expected bleeding and cramping.  With the option to take misoprostol at home the woman can:

- **Plan to experience cramping and bleeding at a safe and convenient time when support is available**
- **Minimize loss of income (for childcare or missed days of work)**
- **Experience improved comfort, satisfaction and privacy**

Data (graph below) from Winikoff (2012)[19] shows the time in hours to complete expulsion of the pregnancy after misoprostol administration for gestations at 57-63 and 64-70 days.  Within about 5 hours after misoprostol dosing, 50-60% of the MABs are complete.

38

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020- Mifeprex

**Table 8: Misoprostol Self-administration at Home**

| Study | Evaluable N | Misoprostol at home | Success | Comment |
|---|---|---|---|---|
| **US Studies** | | | | |
| Gatter 2015[13] US | **13,373** | **All subjects** at 24-48 hr | 97.7% | Through 63 days; buccal miso 800 mcg |
| Winikoff 2008[23] US | 421 | **All subjects** at 24-36 hr | 96.2% | Through 63 days; buccal miso 800 mcg |
| Winikoff 2012[19] US | 629 | **All subjects** at 24-48 hr | 93.5% (Wk 9) 92.8% (Wk 10) | **Week 9 v Week 10;** buccal miso 800 mcg |
| Swica 2013[50] US | 301 | **All subjects** at 6-48 hr | 96.7 %- home mife 95.6%- clinic mife | Through 63 days; 800 mcg miso |
| **Foreign Studies** | | | | |
| Louie 2014[14] Azerbaijan | 863 | 794 (92%) at home at 24-48 hr | 97% | Through 63 days; buccal miso 800 mcg |
| Pena 2014[44] Mexico | **1,000** | **All subjects** at 24-48 hr | 97.3% | Through 63 days; buccal miso 800 mcg |
| Bracken 2014[49] 4 countries | 703 (382 v 321) | 543 (**77%**) took miso at 24-48 hr | 94.8% (Wk 9) v 91.9% (Wk 10) | **Week* 9 v Week 10** 400 mcg sublingual miso used |
| Boersma 2011[22] Curacao | 307 | **All subjects** at 24-36 hr | 97.7% | Through **70 days (Wk 10); GP care**; buccal miso 800 mcg; |
| Chong 2012[40] 400 v 800 buccal | 1115 (559 v 563 were enrolled) | 851 (**76%**) at 36-48 hr | 96.8% with home miso; 95.1% with clinic miso | Through 63 days; *DB, RCT in Vietnam and Georgia |
| Goldstone 2012[20] Australia: | **11,155** | **All subjects** at 24-48 hr | 96.5% | Through 63 days; **buccal miso 800 mcg** |
| Sanhueza 2015[48] | **896** | **All subjects** at 24-48 hr | 93.3 | **Through 70 days (Wk 10)** |
| **TOTAL** | 30,763 | 30,210 (**98.2%**) | 92%-97.7% | **Different gestations, and regimens** |

**\*DB, RCT: double-blind, randomized clinical trial.**

**Source: FDA clinical reviewer table.**

**Reviewer comments:**

**The above table with data for home administration of misoprostol for 30,763 women in the US and other countries shows a success rate ranging from 91.9 to**

40

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

97.7%.  The two largest studies (Gatter and Goldstone) pooled showed 97%
success using the new proposed dosing regimen with home use of buccal
misoprostol.  The lowest success rate above of 91.9% in the Bracken study is still
supportive for approval and does not differ significantly from results with
misoprostol taken in the clinic/office.

Of note is that 4 of the above studies provided data on home use of misoprostol
through 70 days gestation.

Home use of misoprostol has been evaluated as part of the proposed protocol in
studies including well over 30,000 patients, as well as in studies of home use of
both mifepristone and misoprostol.  The Raymond (2013) review[18] of early MAB
with mifepristone 200 mg and misoprostol (different doses and routes of
administration), analyzed 87 trials with 47,283 treated women up to 63 days
gestation.  The article concludes: "We found no evidence that allowing women to
take the misoprostol at home increased the rate of abortion failure or serious
complications."  It is also notable that the NAF and ACOG guidances encourage
home administration of misoprostol and it has been standard protocol for most
PPFA clinics for since 2005.

While we do not have age-specific efficacy data for adolescents who took
misoprostol at home, it is evident that many adolescents did take buccal
misoprostol at home.  In the Goldstone 2012 study, there were eight 14 year olds
and 931 women ages 15-19 who took misoprostol at home.  In the Gatter 2015
study, there were 24 adolescents age 11-14, 82 age 15, 216 age 16, and 435 age 17
who took misoprostol at home.  The overall efficacy in these two large studies
was excellent, as previously noted.

<u>Reviewer's Final Recommendation</u>:
There is no medical rationale against permitting the woman to be given the
misoprostol on the day of the initial clinic/office visit and self-administer it at a
convenient time in the next 24-48 hours at home.  This would avoid another visit
and the time, transportation, loss of work, inconvenience, etc. that such a visit
would involve.  Furthermore, given the fact that 22-38% of women abort within 3
hours and 50-60% within 5 hours of buccal misoprostol[19], it is preferable for the
woman to be in a convenient, safe place (home or at a support person's location)
for the expected uterine cramping and vaginal bleeding to occur.  The new
proposed regimen of 200 mg oral mifepristone followed in 24-48 hours with 800
mcg buccal misoprostol shows acceptable efficacy when misoprostol is self-
administered at home.

## 6.1.9  Use of a Repeat Dose of Misoprostol if Needed

Several studies using buccal misoprostol allowed the option of repeat misoprostol at
follow-up one week after mifepristone for persistent gestational sac; however, only a few

41

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Reviewer's comment:**
**The completion success rates shown above are high.  While only 3.4% of the women took a second misoprostol dose, 90% of these women  avoided a surgical procedure to complete their termination.  We believe the option of a repeat dose of misoprostol is acceptable and safe in the case that complete expulsion has not occurred after initial dosing (provided that the pregnancy is not still ongoing): it offers a choice for the healthcare provider and the patient on how to manage an incomplete expulsion (retained products of conception) following the initial treatment.  As noted above, the other options are expectant management, suction aspiration in the office, or a surgical D&C in the operating room.  It is also of note that it is standard protocol in many US clinics to offer the choice of a repeat misoprostol dose, especially for women with an incomplete termination (retained tissue/clots or a documented non-viable pregnancy).  A second dose of misoprostol is generally not offered in the case of a documented ongoing pregnancy following use of mifepristone and misoprostol.**

**Reviewer's Final Recommendation:**
**Use of a repeat dose of misoprostol may be offered when using the new dosing regimen if the pregnancy has ended, but the expulsion is incomplete.**

## 6.1.10  Physician v Other Healthcare Provider Treatment

The Applicant provided data on the efficacy of medical abortion provided by non-physician healthcare providers, including four studies with 3,200 women in randomized controlled clinical trials and 596 women in prospective cohorts. These studies took place in varying settings (urban, rural, international, low resource).  The efficacy results are as follows:

- Olavarietta[85] demonstrated efficacy of 97.9% when the MAB was provided by nurses as compared with 98.4% with physicians
- Kopp Kallner[84] showed efficacy of 99% with certified nurse midwives versus 97.4% with physicians
- Warriner[52] demonstrated efficacy of 97.4% with nurses versus 96.3% with physicians
- Puri[83] showed efficacy of 96.8% compared with 97.4% in the "standard care" group

**Reviewer comment:**
**The above findings for MAB efficacy from 5 studies clearly demonstrates that efficacy is the same with non-physician providers compared to physicians or the**

---

[52] Warriner IK, Wang D, Huong NTM, Thapa K, Tamang A, Shah I et al.  Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors?  A randomized controlled equivalence trial in Nepal.  Lancet 2011; 377: 1155-61.

43

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

"standard care" treatment.


## 6.1.11  Follow-up Timing and Method

Concerning follow-up timing and method, follow-up within the 7-14 day interval after mifepristone administration is universally recommended; however, follow-up does not necessarily need to be done as currently labeled "in the clinic or healthcare provider's office 14 days after Mifeprex administration."

One strong argument for flexibility in follow-up timing, location and method after the administration of Mifeprex and misoprostol is to avoid placing an undue burden on either the provider or the patient, while maintaining the ability to identify incomplete terminations.  The currently approved labeling specifies three visits (two for dosing, one for follow-up) at fairly rigid times that are often not practical, convenient or necessary.

Several articles were submitted by the Applicant to support flexible follow-up.  The most noteworthy article is the 2013 Raymond review[18] of over 45,000 MABs using 200 mg oral mifepristone that concluded: "we observed no significant association between abortion failure rates and the timing of the follow-up evaluation."  This topic is discussed thoroughly in the Section Submission-Specific Primary Safety Concerns.

**Reviewer comment:**

**Follow-up during the 7-14 day window after the administration of mifepristone is necessary to determine that the termination was successful and the woman is in good health.  If for some reason the follow-up contact is not made (the woman is "lost to follow-up"), the clinical guidelines of NAF state that "all attempts to contact the patient (phone calls and letters) must be documented in the patient's medical record."  This guideline emphasizes the importance of follow-up but accepts the fact that women are sometimes lost to follow-up and there is no mechanism that can guarantee 100% follow-up in the normal clinical setting.**

**Reviewer's Final Recommendation:**

**Follow-up after taking Mifeprex and misoprostol is necessary.  The exact timing and method should be flexible and determined jointly by the healthcare provider and the individual woman being treated, and should follow the standard guidelines for the office/clinic where the Mifeprex is being dispensed. Fortunately, there are several choices/methods of follow-up that can be used and it appears that no single option is superior to the others.  The woman should always have the option to be seen at the office/clinic.**


## 6.1.12  Subpopulations

### Parity

The Raymond (2013) review article[18] had 74 trials with parity data for ~ 32,000 women. In 34 trials whose study populations comprised > 50% nulliparous women, the MAB success rate was 96.4%; in 40 trials with ≤ 50% nulliparous women, the success rate was 94.9%.  This suggests that women who have not had a previous term pregnancy

44

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

## 6.1.14  Discussion of Persistence of Efficacy and/or Tolerance Effects

There is no evidence that repeated medical or surgical abortion is unsafe or that there is a tolerance effect.  Return to fertility is well-documented: in the Patient Counseling Information section, the labeling states "inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses" and "inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before she resumes sexual intercourse."

## 6.1.15  Additional Efficacy Issues/Analyses

The Applicant has requested that revised labeling provide only for the new proposed regimen and that the original approved regimen be deleted.

**Reviewer Final Recommendation:**
**While there are no safety or efficacy reasons that would lead us to withdraw approval of the currently labeled dosing regimen, we concur that it may be deleted from labeling because very few providers currently use it, and inclusion of two options for dosing could be confusing.  Of note, PPFA and NAF guidelines have used mifepristone 200 mg oral and misoprostol 800 mcg (initially given vaginally and now buccally) since 2001.**

# 7  Review of Safety

## *Safety Summary*

- Medical abortion with the new proposed regimen of Mifeprex 200 mg followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation is safe. Major adverse events including death, hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy with the proposed regimen are reported rarely in the literature on over 30,000 patients.  The rates, when noted, are exceedingly rare, generally far below 0.1% for any individual adverse event. The number of postmarketing deaths associated with Mifeprex pharmacovigilance is very low.  Non-vaginal routes of administration of misoprostol have increased and since  the *C. sordellii* deaths associated with vaginal misoprostol, there have been no *C. sordellii* deaths. Given that the numbers of these adverse events appear to be stable or decreased over time, it is likely that these serious adverse events will remain acceptably low.

- Common adverse events associated with medical abortion occur at varying but acceptable rates.

- There are scarce cases of uterine rupture associated with early medical abortion. Medical abortion using mifepristone with or without misoprostol in the first trimester is safe from this perspective.

47

(b) (6)  and                                                    (b) (6)

NDA 020687/S-020-  Mifeprex

medical or surgical abortion at ≤ 63 days gestation at Planned Parenthood clinics in Los Angeles between November 1, 2010 and August 31, 2013. The authors reported that 29 women of 13,221 (0.1%) undergoing medical abortion experienced a major complication, which was defined as including: emergency department presentation, hospitalization, infection, perforation and hemorrhage requiring transfusion. The article did not specify the rate of each event.  No deaths or ectopic pregnancies were reported in this study.  In 2011, Grossman[36] reported on a study of medical abortion provided through telemedicine, in which 578 women seeking abortion services at Planned Parenthood of the Heartland clinics in Iowa were offered in-person services or telemedicine services. The serious adverse event outcomes are reported in Table 12, Table 13 and Table 14 above, but in addition, he reported on adverse events among all medical abortion patients from July 1, 2008 through October 31, 2009 (a wider time frame than the study itself). Four of 1,172 telemedicine patients (0.3%) required a blood transfusion compared to 0.1% of 2,384 in-person patients. These figures were reported in the paper to support study findings of low rates of serious adverse events, including transfusion.  Pena (2014)[44] reported on 1,000 women in Mexico who had a medical abortion up to 63 days gestation. Their paper reported that "there were no serious complications as defined by any occurrence that was unexpected, serious, and related to the induced abortion."  Upadhyay et al[55] used 2009 through 2010 patient-level billing data from Medi-Cal, California's state Medicaid program, to evaluate the incidence of complications after abortion, including medical abortion.  Major complications were defined as those which required hospitalization, surgery or blood transfusion. There were 11,319 medical abortions, with 35 women (0.31%) having a major complication.

Winikoff (2012)[19] provides data on other serious adverse events through 70 days. Regarding hospitalization, there were zero hospitalizations among 350 women receiving medical abortion at 64-70 days compared with 2/379 women at 57-63 days (0.5% rate). There were no serious infections in the 64-70 day group, compared with 1/379 (0.3% rate) in the 57-63 day group. There was one transfusion (1/350=0.3% rate) in the 64-70 day group, compared with 2/379 (0.5% rate) in the 57-63 day group.

**Reviewer comments:**

(b) (4)

**. Serious adverse events including death, hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy with the proposed regimen are rarely reported in the literature. The rates, when noted are exceedingly rare, with rates generally far below 1.0% for any individual adverse event. This indicates that medical abortion with the proposed regimen up through 63 days is safe.**

---

[55] Upadhyay UD, Desai S, Lidar V, Waits TA, Grossman D, Anderson P, Taylor D. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-183.

56

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

**Serious fatal or nonfatal adverse events in the 64-70 days gestation group, were evaluated in one US study (Winikoff 2012)[19].  This study with 379 women in the 64-70 day range is reassuring in that the rates of hospitalization, serious infection and transfusion are no higher than in the lower gestational age ranges.  Based on the available safety data on medical abortion in totality, it appears that serious fatal or nonfatal adverse events are very rare through 70 days as well.  This regimen should be approved for use through 70 days gestation.**

**Reviewer's Final Recommendation:**
**The regimen of mifepristone 200 mg followed by misoprostol 800 mcg buccally in 24-48 hours is safe to approve for use through 70 days gestation.**

## 7.3.3  Dropouts and/or Discontinuations

The studies included in this safety review revealed a wide range of loss to follow-up, from 0.6% loss to follow-up in the study with telephone follow-up (Ngoc 2014[16]) to 22% in the Grossman[36] study using telemedicine to deliver medical abortion services. One study noted no differences in demographics between the subjects on whom follow-up was available, compared with those on whom no follow-up information was available. Only two studies evaluated other subgroups of  women lost to follow-up. Gatter et al 2015[13] found a higher odds of loss to follow-up with age <18 and with income at or below the federal poverty level.  Additionally they noted increased odds of loss to follow-up with increasing gestational age.  As compared with women 43-49 days gestation, the Odds Ratio (OR) for loss to follow-up at 50-56 days was 1.17 (95% CI 1.05-1.31) and at 57-63 days was 1.28 (95% CI 1.10-1.48). The Boersma study[22] had a 7% loss to follow-up rate. The rate of loss to follow-up was 6.5% at ≤ 49 days, 7.6% at 50-63 days and 7.7% at 64-70 days. No tests for significance were applied to these numbers.  Only one study reported on withdrawals: Winikoff 2012[19] reported that 0.27% of patients withdrew and noted this was similar to rates previously reported in the literature.

**Reviewer comment:**
**There is a wide range of loss to follow-up in the studies submitted with the efficacy supplement. The loss to follow-up rate cannot be reliably linked to method of follow-up, though it is notable that the lowest rate of loss-to-follow-up occurred in the Ngoc trial with telephone follow-up (0.6%) and the highest with abortion services provided via telemedicine (22%). The range of loss to follow-up is well-within the range documented in literature covering real-world abortion practice.[1]**

## 7.4  Significant Adverse Events

The label for misoprostol currently includes a boxed warning against the use past 8 weeks gestation, due to the risk of uterine rupture. The (b) (6) safety reviewer and

57

Clinical Review

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Table 15: Uterine Rupture with Misoprostol Case Reports**

| Study | GA (weeks) | Mifepristone used? | Dose of Misoprostol | Number of doses of misoprostol | Risk Factor for Rupture |
|-------|-----------|--------------------|--------------------|-------------------------------|------------------------|
| Khan[58] | 8 | Yes; dose not specified | 600 mcg | 1 | 1 prior C-section, 1 prior uterine rupture at 32 weeks |
| Kim[59] | 8 | No | 400 mcg | 1 | 1 prior C-section |
| Jwarah[60] | 8 2/7 | No | 800 mcg | 1 | 1 prior C-section |
| Bika[61] | 10 2/7 | Yes; 200 mg | 800 mcg x 2 doses then 400 mcg x 2 doses | 4 | 2 prior C-sections |
| Willmott[62] | 12 3/7 | Yes; 200 mg | 400 mcg | 5 | none |

Source: NDA clinical reviewer table.

(b) (6) also conducted a review of FAERS cases from January 1,1965 through October 15, 2015 for reports of uterine rupture with mifepristone alone, misoprostol alone, or a combined regimen, with special interest in cases occurring in women ≤ 10 weeks pregnant (≤ 70 days). The FAERS search retrieved 80 cases of uterine rupture, with 77 citing misoprostol use alone and 3 citing both mifepristone and misoprostol use. No cases of uterine rupture were reported with mifepristone use alone. Vaginal administration of misoprostol was documented in the majority of the cases. The majority of the FAERS cases either occurred in the 3rd trimester of pregnancy, or did not report gestational age. In the cases where the gestational age was not reported, it is likely that most of these cases occurred during the 2nd or 3rd trimester, as many noted the induction of labor as the reason for misoprostol use. The majority of cases also noted at least one additional potential risk factor, with a history of at least one previous c-section, or the use of additional uterotonic drugs (e.g., oxytocin or dinoprostone) being the most commonly reported. The use of misoprostol during the 3rd trimester for the induction of labor, cervical ripening, or both, in women that had at least one previous c-section, was also documented in many cases.

There were only two cases (2.5% of all reports) that reported uterine rupture within the first 10 weeks of pregnancy.  In both cases, misoprostol alone was utilized for termination of pregnancy.  The first case provided minimal information other than documentation of a 5 week gestation, and an ultrasound noting "an important uterine separation" during an unspecified time after misoprostol (route not specified) administration.  The remaining case was also a published case report in which uterine rupture was documented as occurring approximately 2.5 hours after 800 mcg of misoprostol was administered vaginally for cervical preparation prior to surgical termination of pregnancy.  The patient was 8 weeks and 2 days pregnant, had a history of a prior c-section, and was of advanced maternal age.   (b) (6) concluded that uterine

59

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

rupture associated with the use of mifepristone alone, misoprostol alone, or both, is likely a rare event in the 1st trimester.

**Reviewer comment:**

**Based on the scarcity of reported cases in the first trimester of pregnancy, uterine rupture associated with early medical abortion using mifepristone with or without misoprostol is likely rare.  There are a three reports of uterine rupture with mifepristone and misoprostol in the first trimester, most of which occurred in women with prior uterine surgery (e.g., a cesarean section).**

## 7.4.1 Submission-Specific Primary Safety Concerns

**Summary of requested dosing changes in the NDA Supplement that could affect safety:**

1. **Proposing a new dosing regimen that uses mifepristone 200 mg oral and the buccal administration of 800 mcg misoprostol at 24-48 hours after Mifeprex and increasing the gestational age from 49 days to 70 days**

   The Applicant submitted several articles in support of the proposed dosing regimen as well as increasing the gestational age through 70 days using the proposed regimen, including the 24-48 hour interval.  See Section 7.3 Major Safety Results for fatal and nonfatal serious adverse events reported with the proposed regimen and gestational age. The data submitted show these events to be exceedingly rare, indicating that the new dosing regimen and increasing the gestational age to 70 days is safe.  Please see Section 7.3 Major Safety Results on Nonfatal Serious Adverse Events for a review of this information.

   In further support of changing the dosing interval for misoprostol to 24-48 hours after mifepristone is taken, the Applicant also provided a systematic review by Shaw et al.[63]  In this study the authors searched Medline, ClinicalTrials.gov, Popline and the Cochrane Controlled Trials Register and included 20 randomized controlled trials and 9 observational studies.  The majority of the studies used the proposed 200 mg dose of mifepristone, but three RCTs and two observational studies used 600 mg of mifepristone.  The doses and route of misoprostol administration varied, including doses of 400 mcg, 600 mcg, and 800 mcg, some with repeat doses, and included vaginal, buccal, oral and sublingual routes.  There was wide variation in time to administration of the misoprostol, ranging from <24 hours, 24-48 hours, 36-48 hours.  Adverse events were not reported consistently.  There was no statistically significant difference in nausea, vomiting or diarrhea.

---

[63] Shaw KA, Topp NJ, Shaw JG, Blumenthal PB. Mifepristone-misoprostol dosing interval and effect on induction abortion times. Obstet Gynecol 2013;121(6):1335-1347.

60

23-10362.2202

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

**Reviewer comment:**

**Unlike the efficacy data, which is based on studies that look specifically at individual changes proposed by the Applicant, the adverse event data typically come from studies or reviews that include multiple changes (e.g., dose of each drug, dosing interval, gestational age) simultaneously.  Therefore, it is not possible to provide safety data specific to each individual change.**

**The changing of the dosing interval to 24-48 hours does not appear to increase the risk of serious fatal or nonfatal adverse events or to increase the risk of common adverse events associated with medical abortion.**

**Reviewer's Final Recommendation:**

**Based on the available evidence, changing the dosing interval between mifepristone and misoprostol to 24-48 hours is safe to approve, including for use in gestations up through 70 days.**

2. **Home administration of misoprostol**

Currently, the Dosage and Administration section of labeling for Mifeprex requires that patients return to the healthcare provider on Day 3 (two days after ingesting Mifeprex) for misoprostol. The Applicant proposes that the label be changed to allow for home administration of the misoprostol. The Applicant reasons that all published US trials after the initial trial by Spitz et al[26], as well as numerous international trials, included distribution of misoprostol for self-administration at home with evidence of safe and effective medical abortion. The Applicant also emphasizes that women usually start having bleeding within two hours of administration of the misoprostol and home administration gives the opportunity for more privacy in the process.

The Applicant submitted many articles to support this change.  See Table 8 for US and foreign studies that enrolled over 30,000 women who administered misoprostol at home.  None of the studies directly compare home versus clinic/office administration of misoprostol.  Most of the studies include protocols where all of the subjects take misoprostol at home. Gatter[13] and Ireland[15] reported separately on large numbers of clients of Planned Parenthood Los Angeles (13,373 and 13,221 clients respectively, though likely with some overlap, in 2010-2011), while Winikoff (2012[19] and 2008[23]), Grossman[36], Creinin[25] and Middleton[24] reported on smaller numbers of US subjects. Internationally, Goldstone[20] reported on 13,345 medical abortions, while Kopp Kallner[64], Løkeland[65], Chong (2012)[40], Bracken[49], Pena[44],

---

[64] Kopp Kallner H, Fiala C, Stephansson O, Gemzell-Danielsson K. Home self-administration of vaginal misoprostol for medical abortion at 50-63 days compared with gestation of below 50 days. Human Reprod 2010;25(5):1153-1157.

[65] Løkeland M, Iversen OE, Engeland A, Økland I. Medical abortion with mifepristone and home administration of misoprostol up to 63 days' gestation. Acta Obstet Gynecol Scand 2014;93:647-653.

61

(b) (6) and                                              (b) (6)
NDA 020687/S-020-  Mifeprex

Ngoc[16], Louie[14],  Sanhueza Smith[48], Boersma[22] and Lynd[66] report on smaller numbers of subjects.  All of these studies have been reviewed above in Sections Deaths, Nonfatal Serious Adverse Events and Common Adverse Events. This information shows that home administration of misoprostol, as part of the proposed regimen, is associated with exceedingly low rates of serious adverse events, and with rates of common adverse events comparable to those in the original studies of clinic administration of misoprostol.

Swica et al[50] similarly conducted a non-randomized trial with 301 US women, 139 of whom chose home use of mifepristone and misoprostol and 162 of whom chose clinic administration of mifepristone followed by home use of misoprostol.  The majority of women (74%) who chose home use took the mifepristone at the appointed 6-48 hour window; for those who took it at a different time than that planned with their provider, the median interval was 25 hours. Over 90% of women in both groups took the misoprostol at the scheduled time, and none waited past 72 hours to take the misoprostol.  There were no significant differences in the mean number of days of work or school missed or dependent care needed.  Most women made no additional calls (85% for home use group and 90% for office use group) or unscheduled visits to the doctor's office (96% for home use group and 99% for office use group).

The Applicant also submitted a commentary by Gold and Chong[67], in which they discuss benefits of home administration of Mifeprex and misoprostol.  They cite the convenience of scheduling for women, the possibility of greater autonomy and privacy, the lack of burden on staff, and the safety.

**Reviewer comment:**
**Home use of misoprostol has been evaluated as part of the proposed protocol in studies including well over 30,000 patients, as well as in dedicated studies of home use of mifepristone and misoprostol. The studies demonstrate that women take the misoprostol at the recommended time. The safety profile is acceptable, with rates of adverse events equal to or lower than those with the approved regimen requiring in-office dispensing of misoprostol. The studies, including those of home use of mifepristone and misoprostol, show increased convenience, autonomy and privacy for the woman, a smaller impact on their lifestyles, and no increased burden on the healthcare system. The safety data on the home use of misoprostol are adequate to support revision of labeling.**

---

[66] Lynd K, Blum J, Ngoc NTN, Shochet T, Blumenthal PD, Winikoff B. Simplified medical abortion using a semi-quantitative pregnancy test for home-based follow-up. Int J Gynecol Obstet 2013;121:144-148.

[67] Gold M, Chong E. If we can do it for misoprostol, why not for mifepristone? The case for taking mifepristone out of the office in medical abortion. Contraception 2015;92:194-196.

Clinical Review
[(b) (6)] and [(b) (6)]
NDA 020687/S-020-  Mifeprex

- the mention of misoprostol enhances the goal of labeling, which is to give healthcare providers information necessary for safe and effective use of Mifeprex.

Subsequently on February 25, 2016, the Applicant proposed [(b) (4)] [(b) (4)] gestational age through 70 days, based on the literature already submitted.

**Reviewer comment:**

**We recommend that the Indication Statement read:**

> **"Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation."**

**The rationale for this is that:**

- **All supporting data are based on the combined regimen**
- **Inclusion of misoprostol in the Indication Statement would be consistent with the rest of Mifeprex labeling and with current medical practice**
- **It would be consistent with current FDA thinking (e.g., the internal Label Review Tool) which states that the indication and use statement should include "Information if drug is to be used only in conjunction with another therapy."**

**Reviewer's Final Recommendation:**

**Misoprostol should be included in the Indication Statement for Mifeprex.**

# 8  Postmarket Experience

A comprehensive review of the adverse events associated with Mifeprex from September 28, 2000 through November 17, 2015, performed by [(b) (6)] [(b) (6)], yielded the following information on reported deaths. Regarding the US cases, there were 17 reported deaths. Deaths were associated with sepsis in eight of the 17 (seven cases tested positive for *Clostridium sordellii,* one case tested positive for *Clostridium perfringens).* Seven of the eight fatal sepsis cases reported vaginal misoprostol use; one case reported buccal misoprostol use. Seven of the nine remaining U.S. deaths involved two cases of ruptured ectopic pregnancy and one case each of the following: substance abuse/drug overdose; methadone overdose; suspected homicide; suicide; and a case of delayed onset toxic shock-like syndrome. In the eighth case, the cause of death could not be established despite performance of an autopsy; tissue samples were negative for *C. sordellii.* The autopsy report on the ninth death became available to the Agency and was reviewed on December 2, 2015.  It showed the woman died of pulmonary emphysema.

There were 11 additional deaths in women in foreign countries who used mifepristone for medical termination of pregnancy. These fatal cases were associated with the

Clinical Review
(b) (6)     and                              (b) (6)
NDA 020687/S-020-  Mifeprex

following: sepsis (*Clostridium sordellii* identified in tissue samples) in a foreign clinical trial; sepsis (Group A *Streptococcus pyogenes*); a ruptured gastric ulcer; severe hemorrhage; severe hemorrhage and possible sepsis; "multivisceral failure;" thrombotic thrombocytopenic purpura leading to intracranial hemorrhage; toxic shock syndrome (*Clostridium sordellii* was identified through uterine biopsy cultures); asthma attack with cardiac arrest; respiratory decompensation with secondary pulmonary infection 30 days after mifepristone in a patient on the lung transplant list with diabetes, a jejunostomy feeding tube, and severe cystic fibrosis; and a case of *Clostridium sordellii* sepsis (from a published literature report).

**Reviewer Comments:**

**While an exact rate of death with use of mifepristone cannot be calculated from this information, given that there have been over 2.5 million uses of Mifeprex by US women since its marketing in 2000, the number of deaths is very low. Moreover, half of the deaths were associated with *C. sordellii* sepsis. Seven out of 8 of these cases occurred in women who used misoprostol via the vaginal route while one used buccal misoprostol. Since at least 2006, PPFA (comprising the majority of US medical abortion providers) switched its national guidelines to avoid vaginal administration of misoprostol (even though the data did not find a causal relationship).[23] Although the possibility that Mifeprex might increase the likelihood of infection by adversely affecting immune system function has been raised, the overall event rate of serious infections does not support this.**

**Since 2009, there have been no *C. sordellii* deaths associated with medical abortion in the US. This reviewer finds that the postmarketing data on deaths associated with medical abortion demonstrate low numbers and an improved safety profile with the buccal route of misoprostol administration as compared with the vaginal route.**

**The review by** (b) (6)   (b) (6) **also yielded the following**
Table 21 summarizing hospitalizations, blood loss requiring transfusions, and severe infections.

**Table 21: US Postmarketing AEs- Mifepristone for Medical Abortion**

| Date ranges of reports received | 09/28/00[†] -10/31/12 | 11/1/12 - 04/30/14[‡] |
|---|---|---|
| Cases with any adverse event | 2740 | 504 |
| Hospitalized, excluding deaths | 768 | 110 |
| *Experienced blood loss requiring transfusions[§] | 416 | 66 |
| Infections[∥] (*Severe infections[¶]) | 308 (57) | 37 (5) |

83

Clinical Review
[b) (6)] and [b) (6)]
NDA 020687/S-020-  Mifeprex

---

† U.S. approval date.
‡ FDA implemented FAERS on September 10, 2012, and migrated all of the data from the previous reporting system (AERS) to FAERS.  Differences may exist when comparing case counts in AERS and FAERS.  FDA validated and recoded product information as the AERS reports were migrated to FAERS.  As a result of this change, it is not recommended to calculate a cumulative number when reviewing the data provided in Table 5.
* The majority of these women are included in the hospitalized category in Table 5.
§ As stated in the approved Mifeprex (mifepristone) labeling, bleeding or spotting can be expected for an average of 9-16 days, and may last for up to 30 days.  Excessive vaginal bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, curettage, administration of saline infusions, and/or blood transfusions.
‖ This category includes endometritis (inflammation resulting from an infection involving the lining of the womb), pelvic inflammatory disease (involving the nearby reproductive organs such as the fallopian tubes or ovaries), and pelvic infections with sepsis (a serious systemic infection that has spread beyond the reproductive organs).  Not included are women with reported sexually transmitted infections such as chlamydia and gonorrhea, cystitis, and toxic shock syndrome not associated with a pelvic infection.
¶ This subset of infections includes cases that were determined to be severe based on medical review of the available case details.  Severe infections generally result in death or hospitalization for at least 2-3 days, require intravenous antibiotics for at least 24 hours and total antibiotic usage for at least 3 days, or have other physical or clinical findings, laboratory data, or surgery that suggest a severe infection.

**Source: Review by** [b) (6)] [b) (6)] **dated 08/27/2015.**

The [b) (6)] review also describes ectopic pregnancies:

### Table 22: US Postmarketing Ectopic Cases- Mifepristone for Medical Abortion

| Date Range of Cumulative Reports | 9/28/2000-10/31/14* | 11/1/14-4/30/2015 |
|---|---|---|
| Ectopic Pregnancies† | 79 | 10 |

* U.S. approval date

† Administration of mifepristone and misoprostol is contraindicated in patients with confirmed or suspected ectopic pregnancy (a pregnancy outside the uterus).

**Source:** [b) (6)] [b) (6)] **Mifepristone U.S. Post-marketing Adverse Events 6 month Update Summary through 04/30/2015, dated 08/20/2015.**

**Reviewer comment:**

**While exact rates cannot be calculated, as these reports are spontaneously generated, a few conclusions can be drawn from the information provided:**

- **Given that there have been over 2.5 million uses of Mifeprex by US women since its marketing in 2000, including the use of the proposed dosing regimen and extended gestational age at many clinic/office sites, the numbers of hospitalizations, severe infections,  blood loss requiring transfusion and ectopic pregnancy will likely remain acceptably low.**
- **The numbers of each of these adverse events appears to have remained steady over time, with a possible decrease in severe infections.**

A discussion of a [b) (6)] review of uterine rupture is found in the Section Significant Adverse Events.

84

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

(b) (6) identified another safety signal in a review dated January 27, 2016. A FAERS search retrieved one case of anaphylaxis and six cases of angioedema with mifepristone administration.  A literature search did not reveal any case reports of either adverse event with mifepristone.  Six of the seven cases were seen in women using mifepristone for termination of pregnancy.  Six of the seven cases noted some type of medical intervention, such as treatment with an antihistamine, a histamine H2 antagonist, a corticosteroid, or a combination of the various medications. Hospitalization was noted in three of the seven total cases; all three hospitalization cases occurred in patients who experienced angioedema.

In the case of anaphylaxis, it was reported that the patient experienced an anaphylactic reaction three hours after mifepristone administration; however, co-administration of doxycycline was also documented.  Because both mifepristone and doxycycline were discontinued simultaneously, the exact cause of the anaphylactic reaction cannot be determined.

Regarding angioedema, five of the six cases noted a time-to-onset within 24 hours of mifepristone administration for the termination of pregnancy, with no additional suspect medications reported.  The remaining case of angioedema with mifepristone reported a time-to-onset of approximately one week in a Cushing's syndrome patient with a complex medical history and multiple concomitant medications; however, this case noted both a positive dechallenge and rechallenge upon sole re-introduction of mifepristone therapy.  Evaluation of these FAERS cases provides supportive evidence of a drug-event association between angioedema and mifepristone. The (b) (6) reviewer recommends the inclusion of anaphylaxis and angioedema within the Mifeprex labeling, specifically to the Contraindications and Adverse Reactions Postmarketing Experience sections.

**Reviewer Comment**:
**There does appear to be an association with angioedema and mifepristone administration.  The reviewers agree with inclusion of anaphylaxis and angioedema in the labeling for Mifeprex and with continued pharmacovigilance for anaphylaxis.**

# 9 Appendices

## 9.1 Literature Review/References

This NDA review obviously involved an extensive review of resources and the peer-reviewed medical literature that was pertinent to the requested changes of the Applicant.  Such sources are noted throughout the review in footnotes.  A detailed Reference List is found in Appendix 9.6.

85

23-10362.2227

## CERTIFICATE OF SERVICE

I hereby certify that, on April 26, 2023, I electronically filed the foregoing with the Clerk of Court by using the appellate CM/ECF system. I further certify that the participants in the case are CM/ECF users and that service will be accomplished by using the appellate CM/ECF system.

<u>/s/ Jessica L. Ellsworth</u>
Jessica L. Ellsworth

*Counsel for Intervenor-Appellant*