IN THE

# United States Court of Appeals

FOR THE FIFTH CIRCUIT

Case No. 23-10362

ALLIANCE FOR HIPPOCRATIC MEDICINE, et al.,
*Plaintiffs-Appellees,*

– v. –

FOOD & DRUG ADMINISTRATION, et al.,
*Defendants-Appellants,*

– v. –

DANCO LABORATORIES, L.L.C.,
*Intervenor-Appellant.*

On Appeal from the United States District Court for the
Northern District of Texas, Amarillo Division
Civil Action No. 2:22-CV-223-Z

## BRIEF OF *AMICI CURIAE* ADVOCATES FOR SURVIVORS OF INTIMATE PARTNER VIOLENCE IN SUPPORT OF DEFENDANTS-APPELLANTS AND URGING REVERSAL OF THE DISTRICT COURT'S ORDER

AMANDA BEANE
  *Counsel of Record*
Perkins Coie LLP
1201 3rd Ave Suite 4900
Seattle, WA 98101
(206) 359-3965
abeane@perkinscoie.com

ELIZABETH GARDNER
Perkins Coie LLP
500 N Akard St Suite 3300
Dallas, TX 75201
(214) 259-4919
egardner@perkinscoie.com

JULIA MARKS
ALIZEH BHOJANI
WENDY HEIPT
RIDDHI MUKHOPADHYAY
Legal Voice
907 Pine Street Suite 500
Seattle, WA 98101
(206) 682-9552
jmarks@legalvoice.org

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fed. R. App. R. 26.1, *amici curiae* certify that they have no outstanding shares or debt securities in the hands of the public, and they have no parent companies. No publicly held company has a 10% or greater ownership interest in any of the *amici curiae*.

The undersigned counsel of record certifies pursuant to 5th Cir. R. 28.2.1 that—in addition to the persons and entities listed in defendants-appellants', intervenor-appellant's, and other amici's Certificates of Interested Persons—the following listed persons and entities have an interest in the outcome of this case.

### *Amici Curiae*

Legal Voice

Sexual Violence Law Center

Washington State Coalition Against Domestic Violence

Idaho Coalition Against Domestic Violence

National Domestic Violence Hotline

Family Violence Appellate Project

Sanctuary for Families

***Attorneys for Amicus Curiae Legal Voice***

Amanda Beane and Elizabeth Gardner, Perkins Coie LLP

Julia Marks, Alizeh Bhojani, Wendy Heipt, and Riddhi Mukhopadhyay, Legal Voice

Dated:  May 1, 2023

/s/                 
AMANDA BEANE

*Counsel for Amicus Curiae*
*Legal Voice*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS........ i

INTEREST OF AMICI AND SUMMARY OF ARGUMENT................... 1

ARGUMENT ......................................................................................... 4

    I. Survivors of intimate partner violence are at greater risk of unintended pregnancy, which creates significant risks for survivors' health and safety............................................................ 4

      A. Many people in the United States experience intimate partner violence........................................................................................ 4

      B. Abusers use "coercive control" to create the conditions for unwanted pregnancy, and systemic inequities exacerbate those conditions.................................................................................... 5

      C. Abusers coerce and force victims into unwanted pregnancies, putting those survivors at risk................................................. 10

    II. Intimate partner violence survivors need meaningful access to abortion care. ................................................................................ 12

    III.    Removing or reducing access to mifepristone will have grave consequences for the lives and health of intimate partner violence survivors.................................................................................... 18

CONCLUSION.................................................................................. 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

CASES

*City of Dallas v. Delta Air Lines, Inc.,*
   847 F.3d 279 (5th Cir. 2017) ............................................................18

*Robinson v. Att'y Gen.,*
   957 F.3d 1171 (11th Cir. 2020)........................................................26

RULES

Fed. R. App. P. 29(a)(4)(E).........................................................................1

OTHER AUTHORITIES

*1 in 4 Callers to the National Domestic Violence Hotline*
   *Report Birth Control Sabotage and Pregnancy Coercion,*
   Nat'l Domestic Violence Hotline (Feb. 15, 2011),
   https://www.thehotline.org/news/1-in-4-callers-to-the-
   national-domestic-violence-hotline-report-birth-control-
   sabotage-and-pregnancy-coercion/ ....................................................11

2015 Washington State Civil Legal Needs Study Update,
   Civil Legal Needs Study Update Committee, Washington
   State Supreme Court 15 (Oct. 2015),
   https://ocla.wa.gov/wp-
   content/uploads/2015/10/CivilLegalNeedsStudy_October2
   015_V21_Final10_14_15.pdf ............................................................17

*ACOG Committee Opinion No. 554: Reproductive and Sexual*
   *Coercion,* 121 Obstetrics & Gynecology 411, 411-15 (2013
   *reaffirmed* 2022), https://www.acog.org/-
   /media/project/acog/acogorg/clinical/files/committee-
   opinion/articles/2013/02/reproductive-and-sexual-
   coercion.pdf........................................................................................11

ACOG Committee Opinion No. 825, Caring for Patients Who
   Have Experienced Trauma (Apr. 2021) ............................................20

ACOG Practice Bulletin No. 200, *Early Pregnancy Loss* (Nov. 2018) ............................................................................21

ACOG Practice Bulletin No. 225, *Medication Abortion Up to 70 Days of Gestation* (Oct. 2020)..........................................19

Alexandra Thompson et al., *The Disproportionate Burdens of the Mifepristone REMS*, 104 Contraception 16 (2021)......................22

Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980-2008, Annual Rates for 2009 and 2010* (2011), U.S. Dep't Just., Bureau of Just. Stats., http://bjs.gov/content/pub/pdf/htus8008.pdf......................................16

Am. Bar Ass'n Comm'n on Domestic Violence, *10 Custody Myths and How to Counter Them*, 4 ABA Comm'n on Domestic Violence Quarterly E-Newsletter (July 2006), https://xyonline.net/sites/xyonline.net/files/ABACustodymyths.pdf..............................................................................18

Amaranta D. Craig et al., *Exploring Young Adults' Contraceptive Knowledge and Attitudes: Disparities by Race/Ethnicity and Age* Women's Health Issues e281 (2014)....................................................................................12

Ann L. Coker, *Does Physical Intimate Partner Violence Affect Sexual Health? A Systematic Review*, 8 Trauma, Violence, & Abuse 149 (2007) ...........................................................11

Anne M. Moore et al., *Male Reproductive Control of Women Who Have Experienced Intimate Partner Violence in the United States* Soc. Sci. & Med. 1737 (2010)......................................11

Beth A. Bailey, *Partner Violence During Pregnancy: Prevalence, Effects, Screening, and Management* Int'l J. Women's Health 183 (2010) .............................................................16

Bianca Wilson et al., *LGBT Poverty in the United States: Trends at the Onset of COVID-19*, UCLA School of Law Williams Institute (Feb. 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Poverty-COVID-Feb-2023.pdf ........................8

Bushra Sabri et al., *Effect of COVID-19 Pandemic on Women's Health and Safety: A Study of Immigrant Survivors of Intimate Partner Violence*, Health Care Women Int. (2020) ...................................................................8

Caitlin Myers et al., *What If Medication Abortion Were Banned?* (Apr. 7, 2023), https://storymaps.arcgis.com/stories/5c7256ea935e4b3f89b e2e5f2ce499bd ....................................................................21

*Car Access: Everyone Needs Reliable Transportation Access and In Most American Communities that Means a Car*, National Equity Atlas, https://nationalequityatlas.org/indicators/Car_access (last visited Apr. 28, 2023) .........................................................22

Carmela DeCandia et al., *Closing the Gap: Integrating Services for Survivors of Domestic Violence Experiencing Homelessness*, The National Center on Family Homelessness 4 (2013), https://www.air.org/sites/default/files/2021-06/Closing%20the%20Gap_Homelessness%20and%20Dom estic%20Violence%20toolkit.pdf.....................................13, 14

Carmody and Assocs., *The Justice Gap in Montana: As Vast as Big Sky Country* 24 (2014), https://courts.mt.gov/External/supreme/boards/a2j/docs/ju sticegap-mt.pdf...............................................................17

Claudia Garcia-Moreno et al., *Understanding and Addressing Violence Against Women: Intimate Partner Violence* 1 (2012), World Health Org., http://apps.who.int/iris/bitstream/10665/77432/1/WHO_RH R_12.36_eng.pdf.................................................................4

Corinne Peek-Asa et al., *Rural Disparity in Domestic Violence Prevalence and Access to Resources* J. Women's Health 1743 (Nov. 2011).......................................................9

Cynthia Prather et al., *Racism, African American Women, and Their Sexual and Reproductive Health: A Review of Historical and Contemporary Evidence and Implications for Health Equity*, 2 Health Equity 249 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6167003/pdf/heq.2017.0045.pdf .........................................................15

Danielle M. Davidov et al., *Comparison of Intimate Partner Violence and Correlates at Urgent Care Clinics and an Emergency Department in a Rural Population*, Int'l J. Env't Res. & Pub. Health 1 (2023) ......................................................9

Dominque Bourassa & Jocelyn Berube, *The Prevalence of Intimate Partner Violence among Women and Teenagers Seeking Abortion Compared with Those Continuing Pregnancy* J. Obstetrics & Gynaecology Can. 415 (2007)..................12

Elena Ruiz et al., *Measuring the Economic Impact of COVID-19 on Survivors of Color*, Me Too & Free From 1 (2020), https://metoomvmt.org/wp-content/uploads/2020/11/MeTooFreeFrom_CovidImpactReport2020.pdf ........................................................8

Elizabeth Miller et al., *Pregnancy Coercion, Intimate Partner Violence, and Unintended Pregnancy* Contraception 316 (2010)...............................................................11

Elizabeth Miller et al., *Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy* Contraception 457 (2010) .................................11

Ellen Gutowski & Lisa Goodman, *Coercive Control in the Courtroom: the Legal Abuse Scale (LAS)*, 28 J. of Family Violence 527 (2023) ..........................................17

Ellen Ridley et al., *Domestic Violence Survivors at Work: How Perpetrators Impact Employment*, Me. Dep't Lab. & Fam. Crisis Services 1 (Oct. 2005), https://www1.maine.gov/labor/labor_stats/publications/dvr eports/survivorstudy.pdf ....................................................................7

Emiko Petrosky et al., *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence - United States, 2003-2014*, 66 Morbidity and Mortality Weekly Rep. 741 (July 21, 2017)................................17

Erika Sussman & Sara Wee, *Accounting for Survivors' Economic Security: An Atlas for Direct Service Providers, Mapbook 1*, Ctr. for Survivor Agency & Just. 1 (2016), https://csaj.org/wp-content/uploads/2021/10/Accounting-for-Survivors-Economic-Security-Atlas-Mapping-the-Terrain-.pdf ...............................................................................7, 22

*Fact Sheet: Gender and Racial Wage Gaps Persist as the Economy Recovers*, Institute for Women's Policy Research 2 (Sept. 2022), https://iwpr.org/wp-content/uploads/2022/10/Annual-Gender-Wage-Gap-by-Race-and-Ethnicity-2022.pdf.............................................................23

Gunnar Karakurt et al., *Mining Electronic Health Records Data: Domestic Violence and Adverse Health Effects*, 3 J. of Fam. Violence 79 (2017) ..............................................14

Heike Thiel de Bocanegra et al., *Birth Control Sabotage and Forced Sex: Experiences Reported by Women in Domestic Violence Shelters* Violence Against Women 601 (2010) ....................11

*Intimate Partner Violence Screening Fact Sheet and Resources*, National Center for Excellence in Primary Care Research, Agency for Healthcare Research and Quality, https://www.ahrq.gov/ncepcr/tools/healthier-pregnancy/fact-sheets/partner-violence.html....................................16

Issue Brief: Improving Access to Maternal Health Care in
    Rural Communities, Center for Medicare & Medicaid
    Services 3 (2019), https://www.cms.gov/About-
    CMS/Agency-Information/OMH/equity-initiatives/rural-
    health/09032019-Maternal-Health-Care-in-Rural-
    Communities.pdf .............................................................................25

Jamila K. Stockman et al., *Intimate Partner Violence and Its
    Health Impact on Disproportionately Affected Populations,
    Including Minorities and Impoverished Groups* J.
    Women's Health 62 (2015) ..................................................................5

Jeanne Alhusen, *Intimate Partner Violence During
    Pregnancy: Maternal and Neonatal Outcomes* J. Womens
    Health (Larchmt) 100 (2015)...........................................................15

Joan S. Meier, *Domestic Violence, Child Custody, and Child
    Protection: Understanding Judicial Resistance and
    Imagining the Solutions*, 11 Am. U. J. Gender Soc. Pol'y &
    L. 657 (2003)....................................................................................13

John Creamer et al., *Poverty in the United States: 2021*, U.S.
    Census Bureau Population Reports 29-30 (Sept. 2022),
    https://www.census.gov/content/dam/Census/library/publi
    cations/2022/demo/p60-277.pdf ..........................................................7

Judith McFarlane, *Pregnancy Following Partner Rape: What
    We Know and What We Need to Know* Trauma, Violence,
    & Abuse 127 (2007) ..........................................................................14

Julie A. Gazmararian et al., *Prevalence of Violence Against
    Pregnant Women*, 275 JAMA 1915 (1996) .......................................16

Julie Goldscheid, *Gender Violence and Work: Reckoning with
    the Boundaries of Sex Discrimination Law*, 18 Colum. J.
    Gender & L. 61 (2008).........................................................................6

Karla Fischer et al., *The Culture of Battering and the Role of
    Mediation in Domestic Violence Cases*, 46 SMU L. Rev.
    2117 (1993) .....................................................................................5, 6

Karuna S. Chibber et al., *The Role of Intimate Partners in Women's Reasons for Seeking Abortion* Women's Health Issues e131 (2014) ...............................................................13

Katie Edwards et al., *Intimate Partner Violence and the Rural-Urban-Suburban Divide: Myth or Reality? A Critical Review of the Literature* Trauma, Violence, & Abuse 359 (2015) ......................................................25

Latoya Hill et al., *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them*, Kaiser Family Foundation (2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/racial-disparities-in-maternal-and-infant-health-current-status-and-efforts-to-address-them/ ....................................15

Lauren Maxwell et al., *Estimating the Effect of Intimate Partner Violence on Women's Use of Contraception: A Systematic Review and Meta-Analysis* PLoS One 1 (2015)...............11

Leigh Goodmark, *A Troubled Marriage: Domestic Violence and the Legal System* 42 (2012) ..........................................................6

Maeve Wallace et al., *Homicide During Pregnancy and the Postpartum Period in the United States, 2018-2019* Obstetrics & Gynecology 762 (2021) ...........................................16, 17

Marcela Howell et al., *Contraceptive Equity for Black Women*, In Our Own Voice: Nat'l Black Women's Reprod. Just. Agenda 1 (2020), http://blackrj.org/wp-content/uploads/2020/04/6217-IOOV_ContraceptiveEquity.pdf..........................................12

Maryam Siddiqui et al., *Increased Perinatal Morbidity and Mortality Among Asian American and Pacific Islander Women in the United States* Anesth Analg. 879 (2017) .....................16

Megan Hall et al., *Associations between Intimate Partner Violence and Termination of Pregnancy: A Systemic Review and Meta-Analysis* PLoS Med. 1 (2014)............... 11, 12, 13, 21

Melisa M. Holmes et al., *Rape-Related Pregnancy: Estimates and Descriptive Characteristics from a National Sample of Women* Am. J. Obstetrics & Gynecology 320 (1996)..........................13

Minna Lyons & Gayle Brewer, *Experiences of Intimate Partner Violence during Lockdown and the COVID-19 Pandemic* J. of Fam. Violence 969 (Feb. 2021) ....................................8

Munira Z. Gunja et al., *The U.S. Maternal Mortality Crisis Continues to Worsen: An International Comparison,* The Commonwealth Fund (Dec. 1, 2022), https://www.commonwealthfund.org/blog/2022/us-maternal-mortality-crisis-continues-worsen-international-comparison ........................................................................15

Na'amah Razon et al., *Exploring the Impact of Mifepristone's Risk Evaluation and Mitigation Strategy (REMS) on the Integration of Medication Abortion into US Family Medicine Primary Care Clinics*, 109 Contraception 19 (2022)....................................................................................26

Naomi R. Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions*, 44 Vand. L. Rev. 1041 (1991) .............................................17

Nat Stern et al., *Unheard Voices of Domestic Violence Victims: A Call to Remedy Physician Neglect*, 15 Geo. J. Gender & L. 613 (2014)......................................................14

Natalie J. Sokoloff & Ida Dupont, *Domestic Violence at the Intersections of Race, Class, and Gender: Challenges and Contributions to Understanding Violence Against Marginalized Women in Diverse Communities* Violence Against Women 38 (2005) ....................................7

*Public Health Impact: Unintended Pregnancy*, America's Health Rankings: United Health Foundation, <https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/unintended_pregnancy/state/U.S..........................14

Rachel Perry et al., *Prevalence of Rape-related Pregnancy as an Indication for Abortion at Two Urban Family Planning Clinics* Contraception 393 (2015) ......................................................20

Ruth Leemis et al., *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence* 1 (2022), Ctrs. for Disease Control & Prevention, https://www.cdc.gov/violenceprevention/pdf/nisvs/NISVSR eportonIPV_2022.pdf.....................................................................5, 20

Samantha Artiga et al., *Health Coverage by Race and Ethnicity 2010-2021*, Kaiser Family Foundation (Dec. 20, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-coverage-by-race-and-ethnicity/ ...........12, 23

Sanctuary for Families, *Access to Abortion - A Lifeline for Survivors of Domestic Violence* (June 24, 2022), https://sanctuaryforfamilies.org/abortion-domestic-violence/................................................................................................11

Sarah CM Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 1 (2014), https://bmcmedicine.biomedcentral.com/articles/10.1186/s 12916-014-0144-z ..............................................................................13

Sheela Maru et al., *Utilization of Maternal Health Care Among Immigrant Mothers in New York City, 2016-2018* J. Urban Health 711 (2021)...............................................................16

Sobel et al., *Pregnancy and Childbirth After Sexual Trauma: Patient Perspectives and Care Preferences* Obstet. Gynecol. 1461 (2018) ..........................................................20

Theresa Y. Kim et al., *Racial/Ethnic Differences in Unintended Pregnancy: Evidence from a National Sample of U.S. Women* Am. J. Preventative Med. 427 (2016) ........................12

Usha Ranji et al., *Beyond the Numbers: Access to Reproductive Health Care for Low-Income Women in Five Communities*, Kaiser Family Foundation (2019), https://www.kff.org/report-section/beyond-the-numbers-access-to-reproductive-health-care-for-low-income-women-in-five-communities-executive-summary/ ..........................................12

Victoria Tran, *Asian Americans are Falling Through the Cracks in Data Representation and Social Services*, Urban Institute (June 19, 2018), https://www.urban.org/urban-wire/asian-americans-are-falling-through-cracks-data-representation-and-social-services ........................................................7

*Violence Against Women*, World Health Organization (March 9, 2021), https://www.who.int/news-room/fact-sheets/detail/violence-against-women ..................................................4

*Where We Stand: Racism and Rape*, National Alliance to End Sexual Violence, https://endsexualviolence.org/where_we_stand/racism-and-rape/ ...........................................................................20

Yvonne Lindgren, *The Doctor Requirement: Griswold, Privacy, and at-Home Reproductive Care*, 32 Const. Comment. 341 (2017) .........................................................24

**INTEREST OF AMICI AND SUMMARY OF ARGUMENT**[1]

*Amici* Legal Voice, Sexual Violence Law Center, Washington State Coalition Against Domestic Violence, the Idaho Coalition Against Domestic Violence, the National Domestic Violence Hotline, Family Violence Appellate Project, and Sanctuary for Families are non-profit, non-partisan public interest organizations that advocate for and serve survivors of intimate partner violence ("IPV"). *Amici* serve IPV survivors through a variety of avenues, including legal services, community education, coalition-building, and legal and policy advocacy. These organizations are familiar with the challenges that IPV survivors face in exercising their autonomy and understand the specific barriers that make it especially difficult for IPV survivors to access reproductive health care, including abortion care. *Amici* are also knowledgeable about how access to medication abortion can be essential to IPV survivors' health, well-being, and safety. As advocates for survivors of IPV, *amici*

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amici curiae state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than the amici curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

have a strong interest in ensuring that survivors can access medication abortion.

The district court's order endangers survivors of IPV by depriving them of access to essential medical care. The district court took the drastic step of "staying" the Food and Drug Administration's ("FDA") decades-old decision to approve mifepristone despite plaintiffs' lack of standing, a complete absence of factual or scientific support for plaintiffs' claims, and contrary law. *See* Memorandum Opinion and Order, ROA.4307-4373 [hereinafter Order]. Staying approval of mifepristone is unprecedented and attempts to remove a safe and effective medication from the market, immediately putting pregnant IPV survivors at risk. The district court also severely endangered access to mifepristone by ordering a stay of the FDA's subsequent actions modifying its restrictions on mifepristone, specifically the agency's 2016 modifications to mifepristone labeling and REMS, 2019 approval of generic mifepristone, and 2021 actions lifting the medically unnecessary in-person dispensing requirement. ROA.4307. The Order jeopardizes established and evidence-based processes for drug approval and regulation, causing

upheaval to pharmaceutical manufacturers, physicians and providers, and patients across the United States.

Removing or restricting access to mifepristone will cause irreparable harm to the many Americans who face IPV and need abortions to protect their own health and safety. One way abusive partners exert control over survivors of IPV and maintain power within the relationship is by undermining survivors' autonomy to make reproductive decisions, limiting access to health care, and forcing pregnancy. Being forced to carry an unintended pregnancy to term for lack of access to abortion care exposes survivors of IPV to a higher likelihood of further violence, including homicide, poses significant health risks, and increases their risk of being trapped in violent relationships. The consequences of such entrapment range from heightened abuse during pregnancy to death. As difficult as it is for all survivors of IPV to escape abusive relationships and exercise their reproductive autonomy, IPV survivors of color—who already experience disproportionately high rates of unintended pregnancy and increased health risks—face systemic inequities that make doing so all the more difficult.

The district court's radical decision to alter the status quo and undermine the FDA's scientific decision-making jeopardizes the health and safety of IPV survivors. The significant deficiencies and errors in the district court's reasoning and the serious risk of harm to the public warrant reversal of the Order in full.

## ARGUMENT

I. **Survivors of intimate partner violence are at greater risk of unintended pregnancy, which creates significant risks for survivors' health and safety.**

### A. **Many people in the United States experience intimate partner violence.**

Nearly half of the women in the United States have been affected by IPV, which the World Health Organization defines as "behaviour by an intimate partner or ex-partner that causes physical, sexual or psychological harm, including acts of physical aggression, sexual coercion, psychological abuse and controlling behaviors."[2] Almost *60 million* American women[3] report that they have experienced sexual

---

[2] *Violence Against Women*, World Health Organization (March 9, 2021), https://www.who.int/news-room/fact-sheets/detail/violence-against-women; *see also* Claudia Garcia-Moreno et al., *Understanding and Addressing Violence Against Women: Intimate Partner Violence* 1 (2012), World Health Org., http://apps.who.int/iris/bitstream/10665/77432/1/WHO_RHR_12.36_eng.pdf.

[3] People of many gender identities can become pregnant and people of many gender identities experience IPV. This brief specifically references "women" where the underlying research or quoted material focuses on women.

violence, physical violence, and/or stalking by an intimate partner during their lifetimes.[4] The numbers are even starker for women of color: More than half of all multi-racial, Native, and Black people in the United States reported experiencing IPV in their lifetimes.[5] Rates of IPV are also disproportionately high for Asian and Latina immigrant women who face additional structural barriers including language difficulties, immigration status, and lack of faith in or resources to utilize the legal system, all layered on top of the overall stress of assimilation.[6]

### B.   Abusers use "coercive control" to create the conditions for unwanted pregnancy, and systemic inequities exacerbate those conditions.

Physical abuse is only one aspect of IPV. Abusers also exert control by isolating survivors from family and friends and monitoring their whereabouts and relationships,[7] limiting their financial resources,

---

[4] Ruth Leemis et al., *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence* 1, 14 (2022), Ctrs. for Disease Control & Prevention, https://www.cdc.gov/violenceprevention/pdf/nisvs/NISVSReportonIPV_2022.pdf.

[5] *Id.*; *see also* Jamila K. Stockman et al., *Intimate Partner Violence and Its Health Impact on Disproportionately Affected Populations, Including Minorities and Impoverished Groups*, 24 J. Women's Health 62 (2015).

[6] Stockman, *supra* note 5.

[7] Karla Fischer et al., *The Culture of Battering and the Role of Mediation in Domestic Violence Cases*, 46 SMU L. Rev. 2117, 2126–27 (1993).

tracking their use of transportation and time away from home,[8] and threatening to harm or kidnap children, among other tactics.[9] This "coercive control" limits survivors' access to the resources necessary to escape the abusive relationship. Economic coercive control may include sabotaging employment or restricting access to money.[10] Together, these actions position the abuser to use violence with relative impunity because the survivor's support system, economic security, and resources to seek safety from abuse are compromised.

Poverty and lack of access to resources make it even more difficult for survivors to escape IPV. It takes money to flee an abusive relationship—for hotel rooms, gas, food, and childcare, among other things. Longer term costs include mental and physical health care needs, stable housing, legal representation, and finding flexible employers who will accommodate time off requests for court appearances and safety-related needs. Yet many IPV survivors do not have those resources. Indeed, women living in poverty are nearly twice as likely to experience

---

[8] *Id.* at 2121–22, 2131–32; *see also* Leigh Goodmark, *A Troubled Marriage: Domestic Violence and the Legal System* 42 (2012).

[9] Fischer et al., *supra* note 7, at 2122–23.

[10] Julie Goldscheid, *Gender Violence and Work: Reckoning with the Boundaries of Sex Discrimination Law*, 18 Colum. J. Gender & L. 61, 75–77 (2008).

domestic violence.[11] And making matters worse, many IPV survivors lose their jobs as a direct consequence of the abuse they experienced.[12]

Survivors from marginalized communities face systemic inequities that exacerbate the conditions for coercive control.[13] One in four Native Americans, nearly one in five Black Americans, more than one in six Latinx Americans, and more than one in six Asian Americans from certain ethnic groups, including Thai and Vietnamese, live in poverty.[14] People of color are even more likely to live in poverty if they also are

---

[11] Erika Sussman & Sara Wee, *Accounting for Survivors' Economic Security: An Atlas for Direct Service Providers, Mapbook 1*, Ctr. for Survivor Agency & Just. 1 (2016), https://csaj.org/wp-content/uploads/2021/10/Accounting-for-Survivors-Economic-Security-Atlas-Mapping-the-Terrain-.pdf.

[12] Ellen Ridley et al., *Domestic Violence Survivors at Work: How Perpetrators Impact Employment*, Me. Dep't Lab. & Fam. Crisis Services 1, 4 (Oct. 2005), https://www1.maine.gov/labor/labor_stats/publications/dvreports/survivorstudy.pdf.

[13] *See generally* Natalie J. Sokoloff & Ida Dupont, *Domestic Violence at the Intersections of Race, Class, and Gender: Challenges and Contributions to Understanding Violence Against Marginalized Women in Diverse Communities*, 11 Violence Against Women 38 (2005).

[14] John Creamer et al., *Poverty in the United States: 2021*, U.S. Census Bureau Population Reports 29–30 (Sept. 2022), https://www.census.gov/content/dam/Census/library/publications/2022/demo/p60-277.pdf; Victoria Tran, *Asian Americans are Falling Through the Cracks in Data Representation and Social Services*, Urban Institute (June 19, 2018), https://www.urban.org/urban-wire/asian-americans-are-falling-through-cracks-data-representation-and-social-services.

LGTBQ+, disabled, or non-citizens.[15] And women from these communities are more likely to experience IPV.[16]

The COVID-19 pandemic only exacerbated existing economic inequities and coercive control experienced by IPV survivors. The effects were particularly pernicious on Black and Latinx survivors of IPV: A recent report found that they had barely one-sixth the savings of White women.[17] COVID-related economic hardship was particularly difficult for undocumented survivors, who were not eligible for most federal cash relief packages and who faced existing barriers to accessing health care and employment.[18] Abusers further limited survivors' access to resources by using lockdown policies to justify increased surveillance and coercive control of their partners.[19]

---

[15] Bianca Wilson et al., *LGBT Poverty in the United States: Trends at the Onset of COVID-19*, UCLA School of Law Williams Institute 3–4 (Feb. 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Poverty-COVID-Feb-2023.pdf.

[16] *See supra* § I.A.

[17] Elena Ruiz et al., *Measuring the Economic Impact of COVID-19 on Survivors of Color*, Me Too & Free From 1, 9 (2020), https://metoomvmt.org/wp-content/uploads/2020/11/MeTooFreeFrom_CovidImpactReport2020.pdf.

[18] Bushra Sabri et al., *Effect of COVID-19 Pandemic on Women's Health and Safety: A Study of Immigrant Survivors of Intimate Partner Violence*, Health Care Women Int. (2020).

[19] Minna Lyons & Gayle Brewer, *Experiences of Intimate Partner Violence during Lockdown and the COVID-19 Pandemic*, 37 J. of Fam. Violence 969 (Feb. 2021).

Women living in rural areas, who face more frequent and severe rates of IPV than women in urban areas, face additional challenges.[20] They have to drive, on average, more than 25 miles to access domestic violence intervention programs.[21] And access to health care providers and hospitals is scarcer outside urban areas, often making it more difficult for rural survivors to receive needed care. Additionally, rural emergency departments have fewer resources in place to address IPV— meaning that even someone who has managed to find care may still be without the support needed to address the underlying problem.[22] These barriers further isolate a survivor from necessary resources and underline the importance of access to telehealth and medication abortion services.

---

[20] Corinne Peek-Asa et al., *Rural Disparity in Domestic Violence Prevalence and Access to Resources*, 20 J. Women's Health 1743, 1747 (Nov. 2011).

[21] *Id.* at 1748.

[22] Danielle M. Davidov et al., *Comparison of Intimate Partner Violence and Correlates at Urgent Care Clinics and an Emergency Department in a Rural Population*, Int'l J. Env't Res. & Pub. Health 1, 2 (2023).

**C.    Abusers coerce and force victims into unwanted pregnancies, putting those survivors at risk.**

Along with other forms of coercive control, abusers frequently use "reproductive coercion" and rape to force victims into unwanted pregnancies to increase dependency and make it harder for the survivor to escape.[23] "Reproductive coercion" describes a spectrum of conduct used primarily to force pregnancy, ranging from rape to threats of physical harm to sabotaging a partner's birth control.[24] Abusers interfere with their partners' contraceptive use by discarding or damaging contraceptives, removing prophylactics during sex without consent, forcibly removing internal-use contraceptives, or retaliating against their partners or threatening harm for contraceptive use.[25] When the National Domestic Violence Hotline surveyed over 3,000 women seeking help, more than 25 percent reported that their abusive partner sabotaged birth control and tried to coerce pregnancy.[26] Survivors of IPV "face compromised decision-making regarding, or limited ability to enact, contraceptive use and family planning . . . ."[27] As a result, survivors of IPV are significantly less likely to be able to use contraceptives than their non-victimized counterparts.[28]

It is hardly surprising, therefore, that reproductive coercion in abusive relationships dramatically increases the risk of unintended pregnancy.[29] Again, systemic inequities further compound the risks associated with reproductive coercion. Marginalized communities already experience disproportionately high rates of unintended

[23] Elizabeth Miller et al., *Pregnancy Coercion, Intimate Partner Violence, and Unintended Pregnancy*, 81 Contraception 316 (2010); *see also* Anne M. Moore et al., *Male Reproductive Control of Women Who Have Experienced Intimate Partner Violence in the United States*, 70 Soc. Sci. & Med. 1737 (2010); Sanctuary for Families, *Access to Abortion – A Lifeline for Survivors of Domestic Violence* (June 24, 2022), https://sanctuaryforfamilies.org/abortion-domestic-violence/.

[24] Miller et al., *supra* note 23, at 316–17; Moore et al., *supra* note 23, at 1738; *see also ACOG Committee Opinion No. 554: Reproductive and Sexual Coercion*, 121 Obstetrics & Gynecology 411, 411–15 (2013 *reaffirmed* 2022), https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2013/02/reproductive-and-sexual-coercion.pdf.

[25] Ann L. Coker, *Does Physical Intimate Partner Violence Affect Sexual Health? A Systematic Review*, 8 Trauma, Violence, & Abuse 149, 151–53 (2007); *see also* Miller et al., *supra* note 23, at 319; Lauren Maxwell et al., *Estimating the Effect of Intimate Partner Violence on Women's Use of Contraception: A Systematic Review and Meta-Analysis*, 10 PLoS One 1 (2015).

[26] *1 in 4 Callers to the National Domestic Violence Hotline Report Birth Control Sabotage and Pregnancy Coercion*, Nat'l Domestic Violence Hotline (Feb. 15, 2011), https://www.thehotline.org/news/1-in-4-callers-to-the-national-domestic-violence-hotline-report-birth-control-sabotage-and-pregnancy-coercion/; *see also* Heike Thiel de Bocanegra et al., *Birth Control Sabotage and Forced Sex: Experiences Reported by Women in Domestic Violence Shelters*, 16 Violence Against Women 601 (2010).

[27] Miller et al., *supra* note 23, at 316–17; *see also* Coker, *supra* note 25, at 151–53.

[28] Megan Hall et al., *Associations between Intimate Partner Violence and Termination of Pregnancy: A Systemic Review and Meta-Analysis*, 11 PLoS Med. 1, 2 (2014); *see also* Maxwell et al., *supra* note 25.

[29] Elizabeth Miller et al., *Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy*, 81 Contraception 457, 457 (2010).

pregnancy,[30] largely due to a lack of access to sexual health information,[31] health insurance,[32] and affordable contraceptives,[33] as well as a history of coercion by and mistrust of state and medical institutions.[34]

## II. Intimate partner violence survivors need meaningful access to abortion care.

Meaningful access to abortion care, while important to all women, is particularly critical for IPV survivors, and especially those whose unintended pregnancies resulted from reproductive coercion. Dozens of studies have found a strong association between IPV and the decision to terminate a pregnancy.[35] A survivor may choose to terminate a

---

[30] Theresa Y. Kim et al., *Racial/Ethnic Differences in Unintended Pregnancy: Evidence from a National Sample of U.S. Women*, 50 Am. J. Preventative Med. 427, 427 (2016).

[31] Amaranta D. Craig et al., *Exploring Young Adults' Contraceptive Knowledge and Attitudes: Disparities by Race/Ethnicity and Age*, 24 Women's Health Issues e281, e287 (2014).

[32] Samantha Artiga et al., *Health Coverage by Race and Ethnicity 2010-2021*, Kaiser Family Foundation (Dec. 20, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-coverage-by-race-and-ethnicity/.

[33] Usha Ranji et al., *Beyond the Numbers: Access to Reproductive Health Care for Low-Income Women in Five Communities*, Kaiser Family Foundation (2019), https://www.kff.org/report-section/beyond-the-numbers-access-to-reproductive-health-care-for-low-income-women-in-five-communities-executive-summary/.

[34] Marcela Howell et al., *Contraceptive Equity for Black Women*, In Our Own Voice: Nat'l Black Women's Reprod. Just. Agenda 1, 2–3 (2020), http://blackrj.org/wp-content/uploads/2020/04/6217-IOOV_ContraceptiveEquity.pdf.

[35] *See* Hall et al., *supra* note 28 (identifying 74 studies from the United States and around the world that demonstrated a correlation between IPV and abortion); *see also* Dominque Bourassa & Jocelyn Berube, *The Prevalence of Intimate Partner Violence among Women and Teenagers Seeking Abortion Compared with Those Continuing Pregnancy*, 29 J. Obstetrics & Gynaecology Can. 415 (2007).

pregnancy that results from reproductive coercion,[36] that results from rape,[37] or out of fear of increased violence and/or being trapped in the relationship if the pregnancy continues.[38] A survivor of IPV also may terminate a pregnancy to avoid exposing a child to violence.[39] And many survivors have children whom they already struggle to protect.[40] Having a child, or another child, with an abusive partner can exacerbate challenges survivors face in finding housing upon leaving the abuser, increasing the risk of homelessness.[41] Notably, pregnancy termination can improve survivors' circumstances: While research shows that having a baby with the abuser is likely to result in increased violence, "having

---

[36] Hall et al., *supra* note 28 at 6–7.

[37] Melisa M. Holmes et al., *Rape-Related Pregnancy: Estimates and Descriptive Characteristics from a National Sample of Women*, 175 Am. J. Obstetrics & Gynecology 320, 322 (1996) (50 percent of women pregnant through rape had abortions).

[38] Sarah CM Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion*, 12 BMC Med. 1, 5 (2014), https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-014-0144-z.

[39] Karuna S. Chibber et al., *The Role of Intimate Partners in Women's Reasons for Seeking Abortion*, 24 Women's Health Issues e131, e134 (2014).

[40] *See, e.g.*, Joan S. Meier, *Domestic Violence, Child Custody, and Child Protection: Understanding Judicial Resistance and Imagining the Solutions*, 11 Am. U. J. Gender Soc. Pol'y & L. 657 (2003) (discussing difficulties parent survivors face in protecting children from physical harm and navigating courts for custody and protective orders).

[41] *See* Carmela DeCandia et al., *Closing the Gap: Integrating Services for Survivors of Domestic Violence Experiencing Homelessness*, The National Center on Family Homelessness 4 (2013), https://www.air.org/sites/default/files/2021-06/Closing%20the%20Gap_Homelessness%20and%20Domestic%20Violence%20toolkit.pdf.

an abortion was associated in a reduction over time in physical violence .
. . ."[42]

Indeed, abortion care is lifesaving medical care for many survivors. Every pregnancy carries some level of risk. But unintended pregnancies have significantly greater risks of pregnancy complications and poor birth outcomes,[43] including miscarriage or stillbirth.[44] These problems are compounded for survivors of IPV. It is common for abusers to prevent survivors from making or keeping medical appointments or from having private conversations with health care providers.[45] As a result, IPV survivors are less likely to receive prenatal care and more likely to miss doctors' appointments than pregnant people in non-violent relationships, all of which increases the risks of further harm to them.[46] Pregnant people experiencing IPV are also at high risk of depression and post-

---

[42] *Id.* at 5.

[43] Judith McFarlane, *Pregnancy Following Partner Rape: What We Know and What We Need to Know*, 8 Trauma, Violence, & Abuse 127, 130 (2007); *see also Public Health Impact: Unintended Pregnancy*, America's Health Rankings: United Health Foundation, https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/unintended_pregnancy/state/U.S.

[44] McFarlane, *supra* note 43, at 130.

[45] Nat Stern et al., *Unheard Voices of Domestic Violence Victims: A Call to Remedy Physician Neglect*, 15 Geo. J. Gender & L. 613, 633 (2014).

[46] Gunnar Karakurt et al., *Mining Electronic Health Records Data: Domestic Violence and Adverse Health Effects*, 3 J. of Fam. Violence 79, 79–87 (2017).

traumatic stress disorder and at increased risk of having babies preterm and babies with low birth weight.[47]

Survivors of color are further burdened by the effects of transgenerational racism and poverty on their health, making them especially vulnerable to pregnancy-related complications.[48] While the United States as a whole has a maternal mortality rate over three times that of other developed nations,[49] the rates for women of color are strikingly higher: Black women die three times as often as White women, and American Indian and Alaskan Native women die twice as often.[50] Moreover, Black, American Indian, Alaskan Native, Native Hawaiian, and Pacific Islander women are more likely to have preterm births and babies with low birthweights.[51] Asian American and Pacific Islander

---

[47] Jeanne Alhusen, *Intimate Partner Violence During Pregnancy: Maternal and Neonatal Outcomes*, 24 J. Womens Health (Larchmt) 100, 100–06 (2015).

[48] Cynthia Prather et al., *Racism, African American Women, and Their Sexual and Reproductive Health: A Review of Historical and Contemporary Evidence and Implications for Health Equity*, 2 Health Equity 249, 253 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6167003/pdf/heq.2017.0045.pdf.

[49] Munira Z. Gunja et al., *The U.S. Maternal Mortality Crisis Continues to Worsen: An International Comparison,* The Commonwealth Fund (Dec. 1, 2022), https://www.commonwealthfund.org/blog/2022/us-maternal-mortality-crisis-continues-worsen-international-comparison.

[50] Latoya Hill et al., *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them*, Kaiser Family Foundation (2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/racial-disparities-in-maternal-and-infant-health-current-status-and-efforts-to-address-them/.

[51] *Id.*

women are at greater risk of severe maternal morbidities and maternal mortality compared to White women.[52] Immigrant women are at higher risk because they tend to receive less prenatal care than non-immigrant women, in part due to exclusionary health insurance laws and policies.[53]

Not only do pregnant people in abusive relationships face increased health risks associated with pregnancy, they are likely to suffer more, and more intense, violence during pregnancy.[54] IPV is common in pregnancy: "Nearly one in six pregnant women in the United States [has] been abused by a partner."[55] And IPV can and does escalate to homicide.[56] In fact, homicide is the leading cause of maternal death in the United States.[57] Risks are even greater for people of color and young women:

---

[52] Maryam Siddiqui et al., *Increased Perinatal Morbidity and Mortality Among Asian American and Pacific Islander Women in the United States*, 124 Anesth Analg. 879 (2017).

[53] Sheela Maru et al., *Utilization of Maternal Health Care Among Immigrant Mothers in New York City, 2016–2018*, 98 J. Urban Health 711, 711–26 (2021).

[54] Beth A. Bailey, *Partner Violence During Pregnancy: Prevalence, Effects, Screening, and Management*, 2 Int'l J. Women's Health 183 (2010); *see also* Julie A. Gazmararian et al., *Prevalence of Violence Against Pregnant Women*, 275 JAMA 1915, 1918 (1996).

[55] *Intimate Partner Violence Screening Fact Sheet and Resources*, National Center for Excellence in Primary Care Research, Agency for Healthcare Research and Quality, https://www.ahrq.gov/ncepcr/tools/healthier-pregnancy/fact-sheets/partner-violence.html.

[56] Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008, Annual Rates for 2009 and 2010* at 10 (2011), U.S. Dep't Just., Bureau of Just. Stats., http://bjs.gov/content/pub/pdf/htus8008.pdf (between 1980 and 2008 40% of homicides of women were committed by intimate partners).

[57] Maeve Wallace et al., *Homicide During Pregnancy and the Postpartum Period in the United States, 2018–2019*, 138 Obstetrics & Gynecology 762, 763 (2021).

Pregnancy-associated homicide is highest among Black women and women under 25 years of age.[58]

Meaningful access to abortion care is critical to IPV survivors' ability to escape abusive relationships. If a survivor who is coerced into pregnancy goes on to have a child with the abuser, it becomes even more difficult for the survivor to sever that abusive relationship.[59] The survivor must navigate the legal system to obtain custody and ensure protective parenting arrangements, commonly without legal advice or representation.[60] Violent partners have learned to use this system to their advantage to continue the abuse.[61] Nationwide, abusive fathers are more likely to seek child custody than non-abusive fathers, and they

---

[58] *Id.*; Emiko Petrosky et al., *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence — United States, 2003–2014*, 66 Morbidity and Mortality Weekly Rep. 741 (July 21, 2017).

[59] *See, e.g.*, Naomi R. Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions*, 44 Vand. L. Rev. 1041, 1051 (1991).

[60] *See, e.g.*, 2015 Washington State Civil Legal Needs Study Update, Civil Legal Needs Study Update Committee, Washington State Supreme Court 15 (Oct. 2015), https://ocla.wa.gov/wp-content/uploads/2015/10/CivilLegalNeedsStudy_October2015_V21_Final10_14_15.pdf; Carmody and Assocs., *The Justice Gap in Montana: As Vast as Big Sky Country* 24 (2014), https://courts.mt.gov/External/supreme/boards/a2j/docs/justicegap-mt.pdf.

[61] Ellen Gutowski & Lisa Goodman, *Coercive Control in the Courtroom: the Legal Abuse Scale (LAS)*, 28 J. of Family Violence 527 (2023).

succeed more than 70 percent of the time.[62] When the legal system forces an ongoing relationship with an abuser, IPV survivors have less trust in systems and may become more isolated from support.

## III. Removing or reducing access to mifepristone will have grave consequences for the lives and health of intimate partner violence survivors.

Preliminary relief should preserve the status quo and prevent irreparable harm. *See City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). The Order does the opposite, taking away pregnant IPV survivors' ability to protect their own health and safety. The Order's unprecedented "stay" of FDA approval and changes to mifepristone requirements will make it more difficult for IPV survivors to access abortion. The serious harm that the Order causes to IPV survivors is particularly egregious considering the significant legal and factual deficiencies in the district court's analysis of the merits of the case. Being forced to carry an unintended pregnancy to term exposes survivors of IPV to a higher likelihood of further violence, including homicide, and poses

---

[62] Am. Bar Ass'n Comm'n on Domestic Violence, *10 Custody Myths and How to Counter Them*, 4 ABA Comm'n on Domestic Violence Quarterly E-Newsletter 3 (July 2006), https://xyonline.net/sites/xyonline.net/files/ABACustodymyths.pdf.

significant health risks. Indeed, it could cost some pregnant people their lives.

Removing mifepristone from the market will limit abortion options in a way that is particularly difficult for IPV survivors. People seeking abortions will not be able to use mifepristone, which, combined with misoprostol, is the standard protocol for medication abortion. Medication abortion makes up more than half of abortions in the United States. Instead, patients will have to undergo procedural abortions or use a misoprostol-only protocol. While safe and effective, the misoprostol-only regimen can have greater side effects and can be less effective than the mifepristone-misoprostol regimen.[63] These options will not work for all survivors of IPV who need an abortion, due to medical conditions, cost and travel limitations, the need to hide the abortion from an abuser, or trauma from sexual assault.

Some IPV survivors will forgo a desired abortion altogether because a procedural abortion feels unsafe due to trauma from sexual violence. Many patients are affected by sexual violence: Nearly twenty percent of

---

[63] ACOG Practice Bulletin No. 225, Medication Abortion Up to 70 Days of Gestation, 1, 4 (Oct. 2020).

women in the United States will experience rape, sexual coercion, and/or unwanted sexual contact by an intimate partner in their lifetime.[64] Having access to a medication option is particularly important for communities of color who experience rape at high rates, including American Indian and Alaskan Native, Black, and multiracial women,[65] and who may seek to terminate a rape-related pregnancy.[66] Past physical injuries from a sexual assault can interfere with future medical care. For example, *Amici* have worked with survivors who experienced significant internal scarring and medical complications due to a rape, which limited surgical interventions for medical needs, including abortion. Obstetric and gynecological care, medical procedures that require instruments, and the use of anesthetic can be psychologically and emotionally difficult due to trauma from past sexual assault.[67] Meeting the reproductive health

---

[64] Leemis et al., *supra* note 4, at 3.

[65] See *Where We Stand: Racism and Rape*, National Alliance to End Sexual Violence, https://endsexualviolence.org/where_we_stand/racism-and-rape/,

[66] Rachel Perry et al., *Prevalence of Rape-related Pregnancy as an Indication for Abortion at Two Urban Family Planning Clinics*, 91 Contraception 393 (2015) (among women seeking abortions, rape-related pregnancy was more prevalent among Black and Indigenous women).

[67] *See, e.g.*, ACOG Committee Opinion No. 825, Caring for Patients Who Have Experienced Trauma, 3 (Apr. 2021); Sobel et al., *Pregnancy and Childbirth After Sexual Trauma: Patient Perspectives and Care Preferences*, 132 Obstet. Gynecol. 1461 (2018).

needs of rape and sexual assault survivors requires specialized and trauma-informed medical options, including medication abortion.

For similar reasons, IPV survivors who experience miscarriage may also strongly prefer to treat their miscarriage with medication rather than having a procedure performed to evacuate the contents of the uterus. Mifepristone is commonly used as part of a safe and effective regimen for miscarriage management.[68] In this way, too, the district court's Order jeopardizes the safety and emotional well-being of IPV survivors.

Removing or reducing access to mifepristone will increase travel burdens for survivors of IPV. Many people will need to travel farther to reach a clinic that offers procedural abortions and that has available appointments.[69] Survivors who must travel longer distances for abortion care will face greater difficulty hiding their abortion from an abusive partner. Compared to people in non-violent relationships, IPV survivors are three times as likely to conceal their abortion from their partner.[70]

---

[68] ACOG Practice Bulletin No. 200, Early Pregnancy Loss (Nov. 2018).
[69] *See* Caitlin Myers et al., *What If Medication Abortion Were Banned?* (Apr. 7, 2023), https://storymaps.arcgis.com/stories/5c7256ea935e4b3f89be2e5f2ce499bd.
[70] Hall et al., *supra* note 28, at 25.

For the many survivors who are subject to reproductive coercion by their partners, traveling for a procedural abortion may not be an option.

Travel is costly, both financially—such as hotel costs, gas, or flights—and in time spent away from work and care-giving responsibilities.[71] Many IPV survivors have children and need to arrange childcare to go to medical appointments. Childcare options are limited for people who lack funds, want to keep their need for an abortion private, or are isolated from friends and family. These costs will be prohibitive for many survivors of IPV, who disproportionately face economic hardship and financial control by their partners.[72]

For survivors of color and immigrant survivors, discrimination and structural oppression exacerbate the barriers to abortion when mifepristone is unavailable. Transportation is a major barrier—female-led, Black, Native American, and immigrant households are all less likely to have access to a car compared to White and non-immigrant households.[73] Missing work and traveling are costly, and Black and

---

[71] Alexandra Thompson et al., *The Disproportionate Burdens of the Mifepristone REMS*, 104 Contraception 16, 17 (2021).

[72] Sussman et al., *supra* note 11, at 1, 4.

[73] *Car Access: Everyone Needs Reliable Transportation Access and In Most American Communities that Means a Car*, National Equity Atlas, https://nationalequityatlas.org/indicators/Car_access (last visited Apr. 28, 2023).

Latinx women tend to have significantly lower wages than White women and men.[74] Lack of health insurance can also limit access to abortion care. American Indian, Alaskan Native, and Latinx people are the most likely to be uninsured, followed by Black, Native Hawaiian, and Pacific Islander people.[75] Between the drastic reduction in abortion access if mifepristone is not available, and the many barriers to access to care that survivors of IPV already face, some simply will not be able to access abortion care at all.

Even if the Order's stay of the FDA's approval is reversed, the district court's undoing of the 2016 Risk Evaluation and Mitigation Strategy (REMS) modifications, the 2019 generic approval, and the elimination of the REMS in-person dispensing requirement will make medication abortion extremely difficult to access for many survivors of IPV, with grave consequences for their health and well-being. The Order's sweeping invalidation of the FDA's recent, evidence-based decisions regarding mifepristone will have the immediate effect of

---

[74] *Fact Sheet: Gender and Racial Wage Gaps Persist as the Economy Recovers*, Institute for Women's Policy Research 2 (Sept. 2022), https://iwpr.org/wp-content/uploads/2022/10/Annual-Gender-Wage-Gap-by-Race-and-Ethnicity-2022.pdf.

[75] Artiga et al., *supra* note 32.

limiting the availability of mifepristone across the country. The distribution of branded mifepristone will be severely limited and generic mifepristone could be taken off the market altogether. *See* U.S. Food and Drug Administration's Application to Stay the Order, No. 22A902 (U.S. Apr. 14, 2023).

The Order's stay of the FDA decision removing the in-person dispensing requirement may effectively prohibit telehealth services for mifepristone, removing a critical option for IPV survivors. The availability of telehealth, the ability to fill prescriptions at local pharmacies, and the ability to receive medication by mail are essential to survivors of IPV because these options reduce travel and cost barriers and protect survivors from coercion and violence by their abuser. Indeed, in-home medication abortion is often a survivor's only option for abortion care because the survivor must obtain care without the abuser finding out.[76] Having a variety of options for accessing that care—in one's home via telehealth or from a local provider—helps survivors maintain safety and privacy.

---

[76] Yvonne Lindgren, *The Doctor Requirement: Griswold, Privacy, and at-Home Reproductive Care*, 32 Const. Comment. 341, 373 (2017).

The need for telehealth-based abortion care is especially acute for survivors who live in rural areas. Survivors in rural America need access to abortion: They are more likely to face chronic and severe IPV and have worse psychosocial and physical health outcomes.[77] But rural areas have significantly fewer primary care physicians and fewer hospitals with obstetric care.[78] If rural survivors of IPV cannot access mifepristone by mail, many will have to travel long distances to get an abortion, increasing the risk that their abuser will find out.

Requiring in-person dispensing of mifepristone by providers, rather than through pharmacies or telehealth, will also reduce the number of providers that IPV survivors can turn to for medication abortion. Family physicians who might otherwise provide mifepristone-based abortions as one of their services have described the in-person dispensing requirement as a barrier to providing medication abortion because it necessitated that the provider stock, dispense, and bill for the medication onsite at their

---

[77] Katie Edwards et al., *Intimate Partner Violence and the Rural-Urban-Suburban Divide: Myth or Reality? A Critical Review of the Literature*, 16 Trauma, Violence, & Abuse 359 (2015).

[78] Issue Brief: Improving Access to Maternal Health Care in Rural Communities, Center for Medicare & Medicaid Services 3, 8, 10 (2019), https://www.cms.gov/About-CMS/Agency-Information/OMH/equity-initiatives/rural-health/09032019-Maternal-Health-Care-in-Rural-Communities.pdf.

facility, requiring extra administrative steps and involvement of clinic administration.[79] When there are fewer providers available and telehealth is not an option, people who want a medication abortion will be forced to travel long distances to get the care they need.

Federal courts have recognized the importance of access to abortion care for survivors of IPV. *See, e.g.*, *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1180–81 (11th Cir. 2020) (summarizing the unchallenged district court factual finding of undue burden based, in part, on expert testimony about abortion delays leading to increased IPV and mental toll on patients). This Court should likewise recognize that for many survivors of IPV, accessing abortion care is critical to their health and safety because being forced to carry an unintended pregnancy to term increases survivors' risks of suffering further violence, including homicide, and poses significant health risks. The district court Order upends the status quo and causes serious harm to the public.

## CONCLUSION

The Court should reverse the district court's Order.

---

[79] Na'amah Razon et al., *Exploring the Impact of Mifepristone's Risk Evaluation and Mitigation Strategy (REMS) on the Integration of Medication Abortion into US Family Medicine Primary Care Clinics*, 109 Contraception 19, 20–21 (2022).

Dated: May 1, 2023

Respectfully submitted,

*/s/ Amanda Beane*
AMANDA BEANE
  *\*Counsel of Record*
Perkins Coie LLP
1201 3rd Ave Suite 4900
Seattle, WA 98101
(206) 359-3965
abeane@perksincoie.com

ELIZABETH GARDNER
Perkins Coie LLP
500 N Akard St Suite 3300
Dallas, TX 75201
(214) 259-4919
egardner@perkinscoie.com

JULIA MARKS
ALIZEH BHOJANI
WENDY HEIPT
RIDDHI MUKHOPADHYAY
Legal Voice
907 Pine Street Suite 500
Seattle, WA 98101
(206) 682-9552
jmarks@legalvoice.org

*Attorneys for Legal Voice, Sexual Violence Law Center, Washington State Coalition Against Domestic Violence, the Idaho Coalition Against Domestic Violence, the National Domestic Violence Hotline, Family Violence Appellate Project, and Sanctuary for Families*

27

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(5) because it contains 5,601 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

Dated: May 1, 2023

/s/ Amanda Beane
AMANDA BEANE

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated:  May 1, 2023

*/s/ Amanda Beane*
AMANDA BEANE