No. 23-10362

# In the United States Court of Appeals for the Fifth Circuit

ALLIANCE FOR HIPPOCRATIC MEDICINE; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; AMERICAN COLLEGE OF PEDIATRICIANS; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; SHAUN JESTER, D.O.; REGINA FROST-CLARK, M.D.; TYLER JOHNSON, D.O.; GEORGE DELGADO, M.D.,

*Plaintiffs-Appellees*

v.

U.S. FOOD & DRUG ADMINISTRATION; ROBERT M. CALIFF, Commissioner of Food and Drugs; JANET WOODCOCK, M.D., in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration; PATRIZIA CAVAZZONI, M.D., in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, Secretary, U.S. Department of Health and Human Services,

*Defendants-Appellants*

v.

DANCO LABORATORIES, L.L.C.,

*Intervenor-Appellant*

On Appeal from the United States District Court for the Northern District of Texas, Amarillo Division, Case No. 2:22-cv-00223-Z, Judge Matthew J. Kacsmaryk

## REPLY BRIEF FOR INTERVENOR-APPELLANT DANCO LABORATORIES, LLC

PHILIP KATZ
LYNN W. MEHLER
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

EVA M. SCHIFINI
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067

JESSICA L. ELLSWORTH
CATHERINE E. STETSON
KAITLYN A. GOLDEN
DANIELLE DESAULNIERS STEMPEL
MARLAN GOLDEN
DELIA SCOVILLE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Intervenor-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ........................................................................... 1

ARGUMENT .................................................................................. 3

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ....................... 3

    A.    Plaintiffs' Lack Standing ................................................ 3

        *1.    Plaintiffs lack individual injury traceable to FDA's challenged actions and redressable by this suit* ........................................................... 4

        *2.    Plaintiffs lack third-party standing* ..................... 15

        *3.    Plaintiffs lack organizational standing* ............... 16

    B.    Plaintiffs' Challenge To The 2000 NDA Is Time-Barred ...................................................................... 17

    C.    Plaintiffs' Failure To Exhaust Is Inexcusable ............... 20

    D.    Plaintiffs' Claims Fail On The Merits ......................... 22

        *1.    FDA's actions were explained and supported by substantial evidence* ...................................... 22

        *2.    FDA's reliance on Subpart H is irrelevant today and was correct in 2000* ............................ 31

        *3.    Plaintiffs' Comstock argument is unreviewable and wrong* .................................................... 34

II.   THE EQUITIES OVERWHELMINGLY FAVOR DEFENDANTS ......................... 36

    A.    Danco Faces Certain, Significant Harm ...................... 36

    B.    The Public Interest Weighs Against An Injunction ...... 37

## TABLE OF CONTENTS—Continued

C.    Plaintiffs Face No Irreparable Harm Absent An
Injunction ........................................................................42

CONCLUSION ........................................................................43

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*A.L. Pharma, Inc. v. Shalala,*
  62 F.3d 1484 (D.C. Cir. 1995).............................................................33

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
  429 F.3d 1136 (D.C. Cir. 2005).........................................................41

*Attala Cnty., Miss. Branch of NAACP v. Evans,*
  37 F.4th 1038 (5th Cir. 2022) ..............................................................7

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,*
  875 F.2d 1174 (5th Cir. 1989) ...........................................................37

*Clapper v. Amnesty Int'l, USA,*
  568 U.S. 398 (2013).........................................................................4, 7

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau,*
  51 F.4th 616 (5th Cir. 2022) .........................................................22, 25

*Consumers Union of U.S. v. Walker,*
  145 F.2d 33 (D.C. Cir. 1944)..............................................................35

*Ctr. for Biological Diversity v. EPA,*
  937 F.3d 533 (5th Cir. 2019) .............................................................14

*Daves v. Dallas Cnty.,*
  22 F.4th 522 (5th Cir. 2022) ..........................................................7, 15

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
  661 F.2d 328 (5th Cir. 1981) .............................................................38

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019)..................................................................13, 22

*E.T. v. Paxton,*
  41 F.4th 709 (5th Cir. 2022) .......................................................*passim*

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*FCC v. NextWave Personal Communications, Inc.*,
   537 U.S. 293 (2003).............................................................................34, 35

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021)...........................................................................22, 28

*GenBioPro, Inc. v. Sorsaia*,
   No. CV 3:23-0058, 2023 WL 3211847 (S.D.W. Va. May 2, 2023) .................35

*Google, Inc. v. Hood, III*,
   822 F.3d 212 (5th Cir. 2016) ...............................................................42

*Growth Energy v. EPA*,
   5 F.4th 1 (D.C. Cir. 2021)...................................................................18

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)...........................................................................16

*Heartland Reg'l Med. Ctr. v. Sebelius*,
   566 F.3d 193 (D.C. Cir. 2009).............................................................42

*Hisp. Affs. Project v. Acosta*,
   901 F.3d 378 (D.C. Cir. 2018).............................................................21

*Hormel v. Helvering*,
   312 U.S. 552 (1941)...........................................................................21

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) .................................................................22

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)........................................................................32

*Manual Enters., Inc. v. Day*,
   370 U.S. 478 (1962)...........................................................................35

*Mi Familia Vota v. Abbott*,
   977 F.3d 461 (5th Cir. 2020) ..............................................................40

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ..............................................................37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................23, 25

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ..............................................................16

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*,
    158 F.3d 135 (D.C. Cir. 1998) ............................................................18

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) .........................................................16, 17

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.*,
    280 F.3d 278 (3d Cir. 2002) ...............................................................15

*Powers v. Ohio*,
    499 U.S. 400 (1991) ...........................................................................15

*Sendra Corp. v. Magaw*,
    111 F.3d 162 (D.C. Cir. 1997) ............................................................18

*Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008) ..........................................................19

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) .............................................................................6

*Soc'y of Separationists, Inc. v. Herman*,
    959 F.2d 1283 (5th Cir. 1992) ..............................................................9

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..........................................................................7, 9

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .............................................................................5

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Texas State LULAC v. Elfant*,
   52 F.4th 248 (5th Cir. 2022) ............................................................17

*Texas v. Becerra*,
   No. 5:22-CV-185-H, 2022 WL 3639525 (N.D. Tex. Aug. 23,
   2022) ......................................................................................................6

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ........................................................................6

*United States v. 12 200-Ft. Reels of Super 8mm. Film*,
   413 U.S. 123 (1973) ...........................................................................35

*United States v. Green*,
   508 F.3d 195 (5th Cir. 2007) .............................................................34

*Woodford v. Ngo*,
   548 U.S. 81 (2006) .............................................................................21

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) .........................................................42

**STATUTES:**

18 U.S.C. § 1461 .......................................................................................35

19 U.S.C. § 1305(a) ..................................................................................35

21 U.S.C. § 355(b)(1)(A)(d) .....................................................................34

21 U.S.C. § 355(b)(1)(A)(i) ......................................................................34

21 U.S.C. § 355(d) ..............................................................................24, 26

21 U.S.C. § 355(e) ....................................................................................24

21 U.S.C. § 355-1 .....................................................................................26

21 U.S.C. § 355-1(c) ................................................................................34

21 U.S.C. § 355-1(e) ................................................................................34

## TABLE OF AUTHORITIES—Continued

**Page(s)**

21 U.S.C. § 355-1(f) ........................................................................34

21 U.S.C. § 355-1(f)(1) ...................................................................33

21 U.S.C. § 355-1(f)(2) ...................................................................30

21 U.S.C. § 355-1(g)(4)(A) ........................................................27, 30

21 U.S.C. § 355-1(g)(4)(B) ...............................................................27

42 U.S.C. § 238n ...............................................................................5

42 U.S.C. § 300a-7(c) ........................................................................5

42 U.S.C. § 300a-7(d) ........................................................................5

Act of Mar. 3, 1873, ch. 258, § 1, 17 Stat. 598, 598-599 .........................35

Consolidated Appropriations Act 2022, Pub. L. No. 117-103, tit. V, 136 Stat. 49
   § 506 ......................................................................................5
   § 507 ......................................................................................5

Ga. Code § 31-9A-3 (2020) ................................................................9

Ga. Code § 31-9B-2 (2020) ................................................................9

Ind. Code Ann. § 16-34-1-4 (2021) ......................................................5

Ind. Code Ann. § 16-34-2-1.1(a)(5) (2022) ...........................................9

Ind. Code Ann. § 25-1-9.5-0.5 (2021) ..................................................9

Rev. Stat. § 2491 (1st ed. 1875), 18 Stat. pt. 1 ......................................35

Tex. Health & Safety Code § 170A.002 (2022) .......................................9

Tex. Health & Safety Code § 171.063(a) (2021) ......................................9

Tex. Health & Safety Code § 171.063(b-1) (2021) ...................................9

Tex. Health & Safety Code § 171.063(c) (2021) ......................................9

# TABLE OF AUTHORITIES—Continued

**Page(s)**

Tex. Occ. Code Ann. § 103.001 (1999)....................................................5

**REGULATIONS:**

21 C.F.R. § 314.500 ..............................................................................32

New Drug, Antibiotic, and Biological Drug Product Regulations,
57 Fed. Reg. 58,942 (Dec. 11, 1992)........................................32, 33

**LEGISLATIVE MATERIAL:**

H.R. Rep. No. 71-7 (1929)....................................................................35

**OTHER AUTHORITIES:**

Jonathan Adler, *AHM v. FDA: A Contrary View and a Rejoinder*,
reason.com (Mar. 28, 2023),
https://reason.com/volokh/2023/03/28/ahm-v-fda-a-contrary-view-
and-a-rejoinder/......................................................................................1

*Alliance for Hippocratic Medicine – Franchise Tax Details*, Tex.
Comptroller (registration effective August 2022), *available at*
https://mycpa.cpa.state.tx.us/coa/search.do (last visited May 12,
2023) ........................................................................................................42

CDC, *End of the Federal COVID-19 Public Health Emergency (PHE)
Declaration* (May 5, 2023),
https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-
phe.html ...............................................................................................34

Ctrs. for Medicare & Medicaid Servs., *Reinforcement of EMTALA
Obligations specific to Patients who are Pregnant or are
Experiencing Pregnancy Loss* (July 11, 2022),
https://www.cms.gov/files/document/qso-22-22-hospitals.pdf..........5

FDA, *Approved Risk Evaluation and Mitigation Strategies (REMS)*,
https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm (last
visited May 12, 2023) ..........................................................................29

**TABLE OF AUTHORITIES—Continued**

<u>**Page(s)**</u>

FDA, *Benefit-Risk Assessment for New Drug and Biological Products,*
　　*Guidance for Industry, Draft Guidance* (Sept. 2021),
　　https://www.fda.gov/media/152544/download ..................................................25

FDA, *Guidance for Industry, Expedited Programs for Serious*
　　*Conditions—Drugs and Biologics* (May 2014),
　　https://www.fda.gov/media/86377/download ...................................................32

FDA, *MedWatch Forms for FDA Safety Reporting* (Sept. 15, 2022),
　　https://www.fda.gov/safety/medical-product-safety-
　　information/medwatch-forms-fda-safety-reporting...........................................13

GAO, GAO-18-292, *FDA: Information on Mifeprex Labeling*
　　*Changes and Ongoing Monitoring Efforts* (Mar. 2018),
　　https://www.gao.gov/assets/gao-18-292.pdf; ...................................................30

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation*
　　*of Legal Texts* (2012) ..........................................................................................32

# INTRODUCTION

No court has ever ordered a drug that FDA repeatedly evaluated as safe and effective be pulled from the market, let alone without the full administrative record, in a case that would "blow apart existing limits on Article III standing,"[1] where the court admitted "second-guessing" FDA's scientific evaluation after relying on studies never presented to FDA, including of anonymous blog posts.

Plaintiffs' standing theory is "equal parts sweeping and unprecedented":  It asserts "probabilistic" injuries in which "'the odds' of any particular plaintiff" being injured are "'speculative,' and 'the time (if ever) when any such [injury] would occur is entirely uncertain."  *E.T. v. Paxton*, 41 F.4th 709, 722, 715-716 (5th Cir. 2022) (quotation omitted).  Plaintiffs' challenge to the 2000 approval is time-barred, as the stay panel found.  And no precedent excuses Plaintiffs' failure to exhaust their challenge to the 2000 approval in their 2019 citizen petition.

Plaintiffs' merits arguments are a naked plea to second-guess FDA's scientific analysis.  Even the current truncated record shows FDA fully considered mifepristone's safety and efficacy, carefully analyzed data from dozens of clinical trials, reviewed medical literature, and evaluated decades of real-world experience

---

[1] Jonathan Adler, *AHM v. FDA: A Contrary View and a Rejoinder*, reason.com (Mar. 28, 2023), https://reason.com/volokh/2023/03/28/ahm-v-fda-a-contrary-view-and-a-rejoinder/.

with the drug.  The agency spelled out its reasoning at every turn, which is what the APA requires.

That Plaintiffs disagree with FDA's conclusions does not make them arbitrary and capricious.  FDA's safety and efficacy determinations are the gold standard globally for drug approvals.  The amicus briefs from the pharmaceutical industry, former FDA commissioners, food and drug law scholars, and advocacy organizations, like the American Cancer Society, make clear that affirming the District Court's decision would upend drug approvals as we know them and unsettle incentives for innovation by endorsing non-expert judges imposing their views in lieu of FDA's.

Plaintiffs' remaining merits arguments are purely academic.  Plaintiffs do not refute that, since at least 2011, the mifepristone use restrictions have been approved under 21 U.S.C. § 355-1—not Subpart H.  Plaintiffs' Comstock argument is unexhausted and moot twice over; the challenged action is no longer in effect and was separately superseded.  And the Comstock Act is irrelevant too; FDA's statutory directive is to assess safety and efficacy, not other federal-law restrictions that FDA does not administer.

Nor do the equities support the mandatory injunction that the District Court called a "stay" of a 23-year-old approval.  The District Court ignored the certain

harm Danco[2] faces if it is unable to market and distribute its sole product. It disregarded that women relying on mifepristone for medication abortion and other health purposes, the pharmaceutical industry's ability to bring new drugs to market, and the healthcare sector will all suffer substantially, too. In fact, the only group that will not be harmed is Plaintiffs, who delayed filing suit before seeking "emergency" relief.

## ARGUMENT

### I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

#### A.    Plaintiffs Lack Standing.

Plaintiffs agree they need to show a certainly impending injury, personal to an individual doctor, from each challenged FDA action, traceable to that action, and redressable by enjoining it. They cannot make this showing. Instead, Plaintiffs selectively quote and misquote their standing declarations, characterizing third-party anecdotes and rank speculation as actual personal experience. Plaintiffs pretend away the decision in *E.T.*, which reaffirmed this Circuit's precedent: Theories of "probabilistic standing" based on non-particularized increased risk of future events are insufficient, and even a *particularized* increased risk is not evidence of a certainly impending or substantial risk of harm. 41 F.4th at 715 (quotation omitted). And they ignore the heightened scrutiny that attaches when a plaintiff challenges

---

[2] Danco is an LLC organized in Delaware.

government conduct that does not regulate them. *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 412 (2013).

> 1. *Plaintiffs lack individual injury traceable to FDA's challenged actions and redressable by this suit.*

***No personally cognizable injury***. Plaintiffs' proposed physician standing super-doctrine "would drain the 'actual or imminent' requirement of meaning." *E.T.*, 41 F.4th at 722 (quotation omitted). They do not cite *one case* "[o]pening the courthouse door to the[] kinds of increased-risk claims" asserted here. *Id.* (quotation omitted).

*Conscience rights.* Plaintiffs first claim a conscience injury, citing three declarants and the Complaint. Response Br. 15-18. None describe any personal, actual or imminent conscience injury:

- ROA.269: declarant describes emergency D&C that "*my partner*" performed and anticipates "more physicians" will have to do so in the future;

- ROA.256: declarant expresses "*concern[]* that the FDA's actions will force CDMA members to complete an unfinished elective abortion in an emergency situation";

- ROA.282-283: declarant expresses concern that FDA's actions "*may*" or "*could* force me to have to surgically finish an incomplete elective chemical abortion";

- ROA.159: Complaint alleges that "members of Plaintiff medical associations" oppose abortions.

(All emphases added).

No declarant states that he or she is unprotected by conscience laws. *See, e.g.*, 42 U.S.C. §§ 238n, 300a-7(c) & (d) (federal protections); Consolidated Appropriations Act 2022, Pub. L. No. 117-103, tit. V, §§ 506-507, 136 Stat. 49 (similar); Tex. Occ. Code Ann. § 103.001 (1999); Ind. Code Ann. § 16-34-1-4 (2021). That undercuts any conscience injury and renders inapposite any analogy to *SBA List*. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-164 (2014) ("threatened enforcement … creates an Article III injury" where plaintiff alleges intention to engage in arguably unlawful conduct and "threat of future enforcement … is substantial").

Plaintiffs suggest these laws will not prevent a conscience injury because the Biden administration purportedly "issued a mandate … to force emergency room doctors to complete chemical abortions." Response Br. 17. Wrong. That memorandum mentions incomplete medication abortions once, stating hospitals cannot retaliate against physicians for refusing to transfer patients with unstabilized emergency medical conditions, such as "an incomplete medical abortion." Ctrs. for Medicare & Medicaid Servs., *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* 6 (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf (CMS Memorandum). This sentence speaks to physicians who *want* to provide care for an incomplete medical abortion—the opposite of declarants' position.

Besides, two Plaintiffs-Associations here successfully moved to enjoin the CMS Memorandum, *see Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 3639525, at *1 (N.D. Tex. Aug. 23, 2022), which now reflects it is unenforceable against their members and does not preempt Texas abortion laws, CMS Mem., *supra*, at 1.

*Stress and pressure.* The declarants' assert that medication abortion is "heartbreaking," ROA.282, that patients' regret is "emotionally taxing," ROA.953, and that "the potential" for women to present in an emergency room after another provider's insufficient supervision places "stress and pressure" on hospital doctors, ROA.288. None of this amounts to Article III injury; nor are these statements linked to any challenged FDA action. Neither case cited by Plaintiffs supports them. *Sierra Club v. Morton*, 405 U.S. 727, 735, 738, 740 (1972), *rejected* a standing theory that would open the floodgates to suits by organizations and individuals who "seek to do no more than vindicate their own value preferences through the judicial process." And *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208-09 (2021), concluded only that emotional harm "with a 'close relationship' to the … tort of defamation" can establish standing.

*Consuming resources.* Plaintiffs cite no case finding doctors suffer Article III injury when a hospital gives patients a blood transfusion or provides a bed. Such care is the business of emergency rooms. And Plaintiffs' citation (at 19) to the declaration at ROA.267-268 is disingenuous: That declarant describes treating a

patient who required care after taking *non-FDA-approved medication abortion drugs from India*. ROA.267-268. This does not demonstrate injury from any challenged FDA action.

*Increased liability.* That leaves Plaintiffs' claim of Article III standing from potentially increased liability. Response Br. 20. If potential liability gave doctors Article III standing, doctors could sue over virtually anything. No declarant identifies any prior or certainly impending liability claim to support this boundless theory.

**No certainly impending future harm from any challenged FDA action.** Even if Plaintiffs could show cognizable *past* harm, they cannot show the "certainly impending" or "substantial risk" of *future* injury to a specific person required to seek injunctive relief—which requires more than an "objectively reasonable likelihood." *Clapper*, 568 U.S. at 401; *Summers v. Earth Island Inst.*, 555 U.S. 488, 495, 497 (2009); *see also Attala Cnty., Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1042-43 (5th Cir. 2022). That burden intensifies where, as here, plaintiffs challenge government action that does not regulate their own conduct. *Daves v. Dallas Cnty.*, 22 F.4th 522, 542 (5th Cir. 2022). Plaintiffs ignore this heavier burden.

Plaintiffs say it suffices for certainly impending injury that some declarants (or their colleagues) have cared for some women after an incomplete medication abortion, because FDA's challenged actions make it likely some other women will

obtain medication abortions from abortion providers, require follow-up care, and come to an emergency room where some doctor connected to some Plaintiff-Association practices; apparently that unidentified doctor will be unable to assert a conscience objection or ask a colleague to provide the care.

They point to three physicians who, over a collective forty-plus years of practice, say they have personally treated a handful of women who needed emergency care after a medication abortion. Response Br. 30. They rely most heavily on Dr. Skop, pointing to her statements that she has cared for women "unprepared" for the pain and bleeding that the FDA-approved label and Medication Guide expressly state will occur and that she has "treated at least a dozen women who have required surgery," though Dr. Skop never specifies whether *she* performed these surgeries. ROA.278.[3] She and other declarants also augment their personal experiences with anecdotes about others' experiences several times. *E.g.*, ROA.268-269 (declarant's "partner" provided "critical care"); ROA.278-279 (declarant's "group practice admitted three women").

But even crediting those examples, these doctors have seen, at most, one to two patients a year who present with any sort of mifepristone-related complaint. And that was *before* the states in which many declarants practice significantly

---

[3] *See, e.g.*, Reproductive Orgs. Br. 10, ECF No. 348 (collecting cases cataloging Dr. Skop's admitted errors in prior anti-abortion testimony).

restricted medication abortion post-*Dobbs*—further shrinking the fraction of hypothetical women any declarant could potentially encounter.[4] These "inherently contextual and episodic" past occurrences cannot provide standing to "obtain prospective relief" for any challenged FDA action. *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1286-87 (5th Cir. 1992); *accord, e.g.*, *Summers*, 555 U.S. at 495.

*2000 approval.* Plaintiffs repeat the stay panel's contention that the Patient Agreement Form establishes that serious complications from mifepristone are certainly impending. Response Br. 22-23. But the question is *whether any declarant has established that he or she has a certainly impending injury* from treating a patient with serious complications. None has. In any event, the form states only that in 2-7% of cases, the treatment "will not work"; in such a case, the prescribing provider could recommend an additional dose of misoprostol, which is 90% effective at completing termination, ROA.2185; expectant management (wait-and-see), *or* a surgical abortion, *see* ROA.2175. For women with continued pregnancy after

---

[4] *See, e.g.*, Tex. Health & Safety Code §§ 171.063(a), (b-1), (c) (2021) (only physicians may provide abortions; restricts medication abortion to 49 days' gestation; requires in-person dispensing; prohibits mailing medication abortion drugs); 170A.002 (2022) (no abortion except under narrow circumstances); Ind. Code Ann. §§ 25-1-9.5-0.5 (2021); 16-34-2-1.1(a)(5) (2022) (prohibits telehealth abortion care; requires ultrasound); Ga. Code § 31-9A-3 (2020) (only physicians may prescribe mifepristone), § 31-9B-2 (2020) (no abortion following detection of heartbeat).

treatment, the form directs them to "talk with [their] provider about a surgical procedure" and tells them that *their provider* will perform that procedure or refer them to another healthcare provider. ROA.4389.

The Patient Agreement Form *does not* say that hundreds of thousands of patients have sought emergency room care in the past, let alone from a Plaintiff-physician or Plaintiff-Association member. Response Br. 23. And Plaintiffs are flat wrong in their blanket assertion that "non-physician providers are incapable of performing follow-up surgeries." *Id.*; *see* ROA.2220; National Association of Nurse Practitioners et al. Br. 12-14, ECF No. 350 (explaining care that advanced practice clinicians and clinics provide). Even if Plaintiffs were not wrong on the facts, the 2000 approval required physician-prescribing and in-person follow-up visits, so their argument would not show a substantial risk of future harm from *that* approval. ROA.593-594.

*2016 REMS changes.* Plaintiffs cannot show certainly impending harm from the 2016 changes. First, Plaintiffs' arguments about increased risk of complication or incomplete treatment with gestational age leave out key details: While they cite the statistics from the *original* 1990s clinical trials under the *original* drug regimen, but the 2016 "dosing regimen is considerably more effective for all gestations through 70 days." ROA.2175; *see also* ROA.2178 (complete treatment for 57-63 days is "better (94.7% compared to 92.1%) than the rate in the data on which the

2000 Mifeprex approval was based"); ROA.2179-2180 (same for 64-70 days); ROA.2189-2191, 2266.

Second, Plaintiffs get the facts wrong again in saying (at 25) that FDA "remov[ed]" all follow-up care in the 2016 changes. FDA allowed flexibility in *how* follow-up care occurs; it did not eliminate it. *E.g.*, ROA.2186 (follow up within 7-14 days "universally recommended" and "necessary"; women "should always have the option to be seen at the office/clinic"); ROA.2268 ("variety of follow-up modalities" can identify need for additional intervention); ROA.2208-09, 2266 (similar); ROA.2378 (Medication Guide section titled "Follow-Up Assessment at Day 7 to 14," stressing follow-up is "very important" and "must" occur "to be sure you are well").

Third, Plaintiffs repeat their incorrect premise that non-physician providers can never provide follow-up.

With the facts straightened out, it is impossible to conclude that Plaintiffs have personally demonstrated any harm traceable to any *actual* change made by the 2016 REMS.

*2021 FDA action.* Here again, the declarations do not say what Plaintiffs, or the stay panel, claimed. No declarant describes having treated any patient who received FDA-regulated mifepristone by mail from a U.S. pharmacy and (a) had complications resulting in emergency care; (b) had an undiagnosed ectopic

pregnancy; or (c) underestimated the gestational age leading to complications. *Cf.* Response Br. 26-28. Three of the four cited statements offer only general assertions with no reference to personal experience, ROA.1264, 1275, 1285, and the fourth says nothing about the 2021 changes, ROA.1936. Vague references to "deregulation" writ large—again, without a basis in personal experience—cannot establish certainly impending injury linked to the 2021 REMS. *See* ROA.280-282.

Again, the question is whether *any Plaintiff* faces a certainly impending injury from having to treat one of these rare women in the future. They do not.

*Remaining arguments.* Lacking any facts substantiating a certainly impending injury for any particular physician resulting from any specific challenged FDA action, Plaintiffs resort to a mishmash of meritless broadside attacks.

First, Plaintiffs suggest the real-world data showing that only a fraction of the 5.6 million U.S. women who have taken mifepristone over 23 years have suffered a serious adverse event is "unreliable," because FDA "eliminated the prescriber adverse-event reporting requirement" in *2016*. Response Br. 28; *see* ROA.2225-2226. Wrong again. Mifepristone is subject to the same adverse event reporting regime as other drugs, and is one of only five REMS programs with additional mandatory provider-reporting of fatalities. Danco Br. 47.

Declarants complain that reporting adverse events is difficult. *See* Response Br. 28-29. Wrong, *again*. The drug label states in bold:

12

**To report SUSPECTED ADVERSE REACTIONS, contact Danco Laboratories, LLC at 1-877-432-7596 or medicaldirector@earlyoptionpill.com or www.earlyoptionpill.com or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

And a simple Google search for "FDA adverse event report form" immediately locates the FAERS forms. *See* FDA, *MedWatch Forms for FDA Safety Reporting*, (Sept. 15, 2022), https://www.fda.gov/safety/medical-product-safety-information/medwatch-forms-fda-safety-reporting.

Second, Plaintiffs' claims of future injury depend almost entirely on independent, unpredictable third-party actions, leaving them with only speculative "odds" and an "entirely uncertain" "time (if ever)" that the asserted injuries will occur. *E.T.*, 41 F.4th at 716 (quotations omitted). Plaintiffs' invocation of *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), does not help them. There, the Supreme Court found states had standing to challenge a citizenship-based census question even though the states' injuries depended on whether people would not respond if the census included the question. After reviewing the multi-thousand page administrative record, the court found the challenged question historically resulted in significant undercounting and would continue to do so at a predictable rate. *Id.* at 2564-65. Plaintiffs here do not use historical data to predict a specific rate of hospital emergency room visits for a declarant's hospital. They offer no facts demonstrating that the rate of emergency room visits to that hospital will necessarily

13

affect any declarant, or require that declarant to provide any specific care. They likewise cannot accurately predict how third-party patients or doctors would act in the future.

In fact, the opposite is true: Plaintiffs' limited specific examples involve non-standard behavior. One patient sought a medication abortion after being advised against it for other medical reasons, ROA.289-290; another obtained non-FDA-approved medication abortion drugs *from India*. ROA.267-268. And unlike the plaintiff-states in *Department of Commerce*, where a 2% census undercounting would directly cause a loss of federal funds, Plaintiffs have not provided any data or studies demonstrating a rate of adverse events that would necessarily injure them.

Plaintiffs' mix-and-match approach to the facts "do[es] not provide nearly enough information to infer, with any degree of certainty, that any [harms] will … overlap"—or otherwise adversely affect—"their interests." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 539 (5th Cir. 2019). That some Plaintiff doctors have "ongoing plans to continue providing obstetric care" is not enough. Response Br. 31. It stretches the concept of imminence "beyond the breaking point where, as here, the plaintiff alleges only an injury at some indefinite future time." *E.T.*, 41 F.4th at 716 (quotation omitted).

***No causation or redressability***. These same shortcomings doom causation and redressability. *See id.* at 719 (recognizing it is "'ordinarily substantially more

difficult' to establish the needed causal connection" to challenge government action regulating "someone *other* than plaintiffs themselves"). As is especially obvious for the 2016 and 2021 actions, no declarant offers any facts linking even past care to these actions—let alone establishing a certainly impending future injury caused by those actions.

Plaintiffs' "one size fits all" redressability approach fails to explain how undoing each discrete FDA action would redress that future injury. *See Daves*, 22 F.4th at 542. Plaintiffs have not and cannot specifically identify the doctors, patients, hospitals, times, or circumstances that would lead a Plaintiff-physician to treat a patient for harm resulting from the 2000 approval as opposed to the 2016 or 2021 REMS modifications.

### 2. *Plaintiffs lack third-party standing.*

The stay panel rightly declined to endorse the District Court's embrace of third-party standing. ROA.4387-4388 & n.4. Third-party standing requires an individual physician with standing, and no declarant has established individual standing. *See Powers v. Ohio*, 499 U.S. 400, 410-411 (1991).

Plaintiffs also flunk both additional third-party standing requirements. Doctors with (1) a close relationship (2) to patients who are hindered from filing suit can sometimes establish third-party standing. *E.g.*, *Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 289 (3d Cir. 2002). But no case has found third-

party physician standing where a doctor and a patient *have diametrically opposed positions* on whether care the patient wants should be available. The court below was the first to ever find that trying to *block* medical care to a patient can create a "close relationship" with them, and it defies logic to assert that women who *want* abortions in the future would be hindered from filing suit to *enjoin* FDA's approval of mifepristone.

### 3. *Plaintiffs lack organizational standing.*

Relying on an unsupportable reading of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), Plaintiffs say organizational standing attaches because they (1) spent time and money studying, analyzing, and educating their members and the public about their view of whether FDA correctly assessed "the dangers of mifepristone," and (2) filed two citizen petitions. Response Br. 35. The former is entirely distinct from *Havens*, where housing discrimination made it more difficult and costly for a non-profit to conduct its counseling and referral services to help individuals find homes. *See* 455 U.S. at 378-379. The latter are pre-litigation expenses that are not an Article III injury, otherwise any organization could manufacture standing on that basis. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010).

Nor did these actions "'perceptibly impair[]'" the organizations' "pro-life mission." Response Br. 35 (quoting *Havens*, 455 U.S. at 379). The two voting-

rights cases Plaintiffs cite (at 36) prove as much.  *OCA-Greater Houston* found a voting-rights organization had standing to challenge a law that required changing the way the organization conducted voter outreach.  867 F.3d at 610-612.  *Texas State LULAC v. Elfant* found *no* organizational standing because the organizations' "vague assertions that they diverted resources" were insufficient to "show[] they curtailed specific projects in order to counteract" the challenged actions.  52 F.4th 248, 255 (5th Cir. 2022) (quotation marks omitted).  Like in *LULAC*, Plaintiffs assert that they diverted money to pre-litigation expenses and unspecified "educational" activities that sit at the heart of their mission to restrict abortion access.  Response Br. 34.  And no Plaintiff-organization identified a specific project it curtailed or costly ways it had to change its daily interactions with members, like in *OCA*.

### B.    Plaintiffs' Challenge To The 2000 NDA Is Time-Barred.

The panel stayed the District Court's mandatory injunction of the 2000 approval, finding reopener and equitable tolling likely inapplicable.    Both conclusions were correct.

*No reopener.*  Nothing shows that FDA actually or constructively reopened its 2000 approval of mifepristone when it expanded the approved uses and removed certain use restrictions in 2016, or when it denied Plaintiffs' citizen petition in 2021.

Start with 2016.  FDA reviewed and approved Danco's Supplemental New Drug Application (sNDA), which "propose[d] to provide for use through 70 days

gestation, revise the labeled dose and dosing regimen and modify the REMS." ROA.689. As the stay panel found, nothing in FDA's approval suggests FDA also reconsidered whether it should have approved mifepristone in the first place. ROA.4402-4403. Plaintiffs do not argue otherwise. Instead, Plaintiffs premise their reopener argument on FDA's separate, contemporaneous denial of their citizen petition, relying on *Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021). Response Br. 38-39.

But *Growth Energy* found reopener inapplicable. It explains that actual reopening requires evidence that the "agency actually reconsidered the rule." 5 F.4th at 21 (quotation omitted); *accord Sendra Corp. v. Magaw*, 111 F.3d 162, 167 (D.C. Cir. 1997) (no reopening when later decision "did not expressly say that it had reopened the matter"). Nothing in the 2016 approval indicates that FDA's review of the sNDA actually considered whether to withdraw the 2000 approval; the petition denial's timing alone is not a valid basis to infer otherwise, especially on a limited record. *See Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 142 (D.C. Cir. 1998) ("anything less than a direct relationship between the two rules would be too lax a standard" for triggering reopener).

The 2021 petition denial did not actually reopen the 2000 approval, either. Plaintiffs latch onto FDA's reference that it undertook "a full review of the Mifepristone REMS Program in 2021." Response Br. 40 (quotation marks omitted).

That argument ignores a dispositive fact: The REMS and the original 2000 approval are not the same. The next sentence of the 2021 petition response makes this clear: Based on the "full review," FDA "determined that certain elements of the Mifepristone REMS Program remain necessary to assure the safe use of mifepristone for medical termination of intrauterine pregnancy through 70 days gestation; and therefore, the Mifepristone REMS Program continues to be necessary to ensure the benefits outweigh the risk." ROA.808. There is no evidence that the "full review" of the then-operative REMS restrictions included considering whether mifepristone was too unsafe to be approved at all.

Plaintiffs' constructive reopening argument fundamentally misunderstands the concept. Despite invoking *Sierra Club* (at 40), Plaintiffs do not attempt to rebut the stay panel's conclusion that this case requires an alteration "to such a degree that the prior rule is only now 'worth challenging' when it otherwise might 'not have been.'" ROA.4407 (quoting *Sierra Club v. EPA*, 551 F.3d 1019, 1025-26 (D.C. Cir. 2008)). The stay panel rightly found such evidence lacking here because Plaintiffs could have reasonably anticipated changes like FDA's 2016 and 2021 actions and "it's somewhat of a strain" to say those actions alone made the 2000 approval worth challenging, since "plaintiffs *did* challenge the 2000 Approval well before" those changes. ROA.4407 (emphasis in original). Plaintiffs do not dispute any of this.

*No equitable tolling.* Despite acknowledging their need to prove both diligent pursuit and extraordinary circumstances, Response Br. 41, Plaintiffs offer nothing on either requirement. They do not disagree with the stay panel's conclusion that "no 'extraordinary circumstance' prevented plaintiffs from filing within six years of FDA's 2016 Petition Denial." ROA.4407. They point instead to how long it took FDA to rule on their 2002 petition. Response Br. 41. As the stay panel noted, "that delay had no impact on the length of the statute-of-limitations period or plaintiffs' capacity to challenge the 2016 Petition Denial." ROA.4407.

### C.    Plaintiffs' Failure To Exhaust Is Inexcusable.

Plaintiffs did not challenge the 2000 approval in their 2019 petition and never presented to FDA many of the articles forming the basis of their preliminary-injunction request. That failure is inexcusable.

Plaintiffs' brief asserts for the first time that they *did* exhaust a challenge to the 2000 approval in the 2019 petition by mentioning ultrasounds (once in passing) and requesting a return to heightened, mandatory adverse event reporting (rather than withdrawing the 2000 approval). Response Br. 43 (citing ROA.745, 75[2]). This smacks of desperation. The single-sentence reference to ultrasounds is under a heading asking FDA to "restore" and "strengthen" the requirements "approved in 2000," ROA.743 (capitalization altered), in a paragraph describing the Provider Agreement, ROA.745. And the request to *reinstate* an aspect of the 2000 approval

in no way exhausted their challenge to that approval. ROA.752-753. The exhaustion requirement exists precisely to prevent such "'sandbag[ging]' … by withholding legal arguments for tactical reasons until [plaintiffs] reach the court of appeals." *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) (quotations omitted).

Plaintiffs call it "preposterous" that FDA might have taken a different position to a renewed challenge to the 2000 approval in the 2019 petition or in response to the new studies they put before the District Court. Response Br. 43. But the purpose of exhaustion is to give FDA "a fair and full opportunity to adjudicate [Plaintiffs'] claims," *Woodford v. Ngo*, 548 U.S. 81, 90 (2006), which is lacking if Plaintiffs can upend agency action based on materials they *never presented to FDA*. If those new studies deserved weight in evaluating the 2000 approval—as Plaintiffs claim—it would not have been futile to present them to FDA.

Plaintiffs' abuse-of-process exception is meritless too. Response Br. 43. No court has ever excused exhaustion because an agency previously took too long to answer a citizen petition. This Court should not be the first. Plaintiffs' cited cases mandated exhaustion, *Woodford*, 548 U.S. at 89, or excused exhaustion based on an intervening Supreme Court decision dictating the resolution, *Hormel v. Helvering*, 312 U.S. 552 (1941).

**D.      Plaintiffs' Claims Fail On The Merits.**

      *1.      FDA's actions were explained and supported by substantial evidence.*

Plaintiffs misrepresent the limited record and contrive a non-statutory standard for drug approvals and REMS modifications. Such judicially invented drug approval standards would open all approvals to meritless legal challenges and destabilize the industry.

The District Court admitted "second-guess[ing]" FDA, ROA.4363, without reviewing the administrative record, which FDA estimated could span hundreds of thousands of pages, ROA.3807-3808. This is not how the "narrow and highly deferential" APA standard works. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (quotation omitted); *accord, e.g.*, *Dep't of Com.*, 139 S. Ct. at 2573 ("meaningful judicial review" is based on "agency's contemporaneous explanation in light of the existing administrative record").

But even the preliminary-injunction record showed FDA's actions were "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1155 (2021). For each action, FDA exhaustively reviewed data and carefully explained how it supported FDA's decision. This more than clears FDA's obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 51 F.4th

616, 629 (5th Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

*The 2000 approval.*  Plaintiffs say FDA should have required an ultrasound and could not approve the drug after posing questions about Mifeprex's safety and efficacy during the 54-month review.  FDA's decisions on both were reasonable.

FDA understood the importance of gestational age and reasonably explained why it was granting doctors discretion about how to assess it.  ROA.595 ("The role of ultrasound was carefully considered."); *id.* (pregnancy dating is often done through non-ultrasound clinical methods; how to do so is within the "medical judgment of the physician").  FDA specifically required Mifeprex prescribers to certify that they could "assess the duration of pregnancy accurately" and "diagnose ectopic pregnancies."  ROA.596.  FDA left it to providers' discretion to determine the most appropriate way to screen patient eligibility for Mifeprex.  FDA affirmed this decision when denying the 2002 petition, recognizing it would be "inappropriate for us to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy."  ROA.652.  That satisfies *State Farm*'s requirement that an agency "articulate a satisfactory explanation for its action," 463 U.S. at 30; Plaintiffs cannot prevail simply by declaring the explanation unsatisfactory *to them*.

Plaintiffs misconstrue the (limited) record.  They claim FDA did away with the ultrasound requirement "[w]ithout any evidence, testing, or information."

23

Response Br. 48.  But as the District Court recognized, two of the three clinical trials FDA considered left it "to the investigator's discretion" whether to require an ultrasound.  ROA.4355 n.47; *see* ROA.652.

Plaintiffs argue that FDA was required to demand clinical trials with the precise proposed conditions of use.  Response Br. 49.  FDA explicitly rejected this "incorrect" argument in the 2016 petition denial.  ROA.662.  The FDCA purposefully provides flexible standards that allow FDA and its teams of experts to exercise their expert judgment and determine whether a drug is safe and effective under the proposed conditions of use.  21 U.S.C. §§ 355(d)-(e); Former FDA Officials Br. 14-20, ECF No. 307; Pharmaceutical Companies Br. 19-20, ECF No. 309; Danco Br. 40-42.  There is *no* requirement for a clinical trial exactly matching the approved conditions of use.  *See, e.g.*, Former FDA Commissioners Br. 6-7, ECF No. 311; FDA Scholars Br. 9-10, 12-13, ECF No. 308; PhRMA Br. 14-15, 17-19, ECF No. 312.  Were that the test, it is possible that no drug on the market could pass.  *See* Pharmaceutical Companies Br. 31, ECF No. 309.

Plaintiffs next say that even if "preliminary studies" can contain different requirements, "studies FDA uses to approve a new drug" must match the way it "would be administered when marketed."  Response Br. 49 (quotation marks omitted).  Nothing in the FDCA supports that view, either.  *E.g.*, Pharmaceutical Companies Br. 19-20, ECF No. 309.

Plaintiffs' fallback is that even if a precise study-match is not required, FDA still needed to rely on "substantial evidence, sufficient information, and adequate tests supporting … safety and effectiveness." Response Br. 49. FDA did. It "assess[ed] … the procedures employed during the clinical trials and the conditions under which the drug was studied," ROA.662, and reasonably concluded that Mifeprex would be safe and effective if gestational-dating procedures were "left to the professional judgment of each provider," ROA.652. That FDA did not impose the *most* prophylactic conditions does not somehow render its logical, reasonably explained choice unreasonable. *See State Farm*, 463 U.S. at 43; *Cmty. Fin. Servs. Ass'n of Am.*, 51 F.4th at 629.[5]

Nor can Plaintiffs genuinely suggest the 2000 approval was arbitrary and capricious because FDA reviewers raised questions and sought additional information during the review process. Response Br. 51. Rigorous inquiry is a *strength* of FDA's process, not a deficiency. As seven former FDA commissioners explained, it "is often the case" that FDA does not immediately approve the

---

[5] Plaintiffs suggest (at 51) that FDA got the benefit-risk assessment wrong, but the limited record confirms FDA appropriately asked whether the benefits of the drug outweigh the risks under the proposed conditions of use and concluded that standard was met. *See* FDA, *Benefit-Risk Assessment for New Drug and Biological Products, Guidance for Industry, Draft Guidance*, 3-4 (Sept. 2021), https://www.fda.gov/media/152544/download; Former FDA Commissioners Br. 5-6, ECF No. 311.

application for new pharmaceutical products. Former FDA Commissioners Br. 12, ECF No. 311; *see also* ROA.651. FDA instead engaged in a thoughtful, thorough review, sought additional data, and implemented distribution requirements before concluding Mifeprex was approvable. It cannot be arbitrary and capricious for FDA to raise concerns during an approval process when FDA ultimately concludes that those concerns were adequately resolved.

*The 2016 changes.* Faced with abundant evidence of FDA's painstaking review in support of the 2016 changes, Danco Br. 6-11, 45-47, Plaintiffs abandon any challenge to the individual changes. They instead take their study-match requirement one step further, arguing FDA could not make these changes without a single omnibus study evaluating the changes as a whole. Response Br. 52. Again, this requirement does not exist in law, and imposing it would be error.

As explained, neither the FDCA nor the APA requires FDA to have a single study evaluating a drug under the precise conditions of approval or for REMS modifications. *Amici* across the board confirm as much. *See, e.g.*, Former FDA Officials Br. 16-19, ECF No. 307; PhRMA Br. 14-15, 17-19, ECF No. 312. And again, were this "study match" standard imposed, few drugs (if any) on the market today would pass that test. In fact, *no* clinical trial data are required for REMS modifications. *See* FDA Scholars Br. 13, ECF No. 308; *compare* 21 U.S.C. § 355-1 *with* 21 U.S.C. § 355(d). Congress directed only that FDA find "an adequate

26

rationale." 21 U.S.C. § 355-1(g)(4)(A). FDA can modify a REMS based on its view that modification is appropriate given the benefit-risk balancing for the drug, to minimize the healthcare delivery system's compliance burden, or to accommodate a generic applicant. 21 U.S.C. §§ 355-1(g)(4)(A), (B).

Under the appropriate standard, the 2016 changes were proper. Plaintiffs question none of the 2016 data. They do not (because they cannot) point to any deficiency in the hundreds of pages in the preliminary-injunction record showing FDA carefully evaluated dozens of studies covering tens of thousands of women. ROA.689-725, 2142-2337; *see also* ROA.803-842. Many of those studies evaluated multiple changes ultimately made in the 2016 changes. ROA.703. One peer-reviewed study (Sanhueza Smith) evaluated the relevant dosing regimen through 70 days gestation with an in-person follow-up seven days later. ROA.2179, 2182, 2210. The only distinction is that the 2016 changes offer prescribers flexibility on how to conduct follow-up. ROA.2208-2209. Another peer-reviewed study (Winikoff 2012) evaluated the proposed dosing regimen through 70 days gestation, with an ultrasound to confirm gestational age and an in-person follow-up 7-14 days later. ROA.728, 2171, 2179, 2182.

Plaintiffs claim the 2016 changes are akin to an agency removing multiple auto safety features in response to a study evaluating one. No; if anything, the 2016 changes are akin to changing from requiring a four-point harness, helmet, head

27

restraint, and seatbelt to requiring only a seatbelt based on studies showing no difference in outcomes as between variations of those safety features. Agencies need not have "perfect empirical or statistical data" covering every possible combination and permutation of facts and circumstances; they can form a "reasonable predictive judgment" based on the evidence before them. *Prometheus*, 141 S. Ct. at 1160. FDA did so here.

Nor was it arbitrary and capricious for FDA to relax some mandatory adverse event reporting. Until 2016, mifepristone prescribers faced a mandatory reporting burden that *no currently effective REMS* requires. FDA Scholars Br. 19, ECF No. 308. FDA required prescribers to agree in writing to comply with that reporting requirement to be certified to prescribe mifepristone. ROA.660. Sixteen years of mandatory reporting showed, consistent with numerous clinical trials and decades of European post-marketing data, that mifepristone was well-established as a safe drug, with adverse events happening in less than one-tenth of one percent of patients, and *serious* adverse events happening in far fewer cases. Danco Br. 9-10. FDA reasonably relied on this when reevaluating the REMS and concluded mandatory reporting of *all* serious adverse events was no longer necessary. ROA.2150. Instead, mifepristone became subject to the same reporting mechanisms as other drugs, with heightened mandatory provider reporting for fatalities.

*FDA's 2021 non-enforcement decision.* This too was supported by substantial evidence. Plaintiffs' argument to the contrary ignores the reporting system that remained in place after 2016 and the evidence FDA relied on in 2021.

Plaintiffs say FDA could not rely on FAERS data to modify the REMS because FDA stopped requiring mandatory reporting in 2016. Response Br. 56. If mandatory reporting data were required to modify a REMS, such modifications would rarely, if ever, occur. Like every other drug on the market, providers and patients are encouraged to report adverse events directly to the manufacturer, which is bound by 21 C.F.R. § 314.80 and § 314.81 to report adverse events to FDA. Plaintiffs suggest (at 55) this settled system is somehow inadequate because Danco is "[n]owhere near America's emergency rooms." That is true for every drug manufacturer. Accepting Plaintiffs' argument would inhibit FDA's ability to look to adverse event reporting data for every drug. In addition, mifepristone is one of only five REMS (out of 63) that require prescribers to report deaths. *See* FDA, *Approved Risk Evaluation and Mitigation Strategies (REMS)*, https://www.access data.fda.gov/scripts/cder/rems/index.cfm (last visited May 12, 2023).

Rather than substantively responding to these points, Plaintiffs seize on a stray statement in an FDA Q&A acknowledging that FAERS can be both over- and under-inclusive, and from that suggest FDA cannot rely on FAERS data to adjust a REMS. Response Br. 56 (quoting ROA.845). But FDA *must* approve REMS modifications

29

that eliminate (or relax) certain elements to assure safe use when the restrictions are no longer necessary under a benefit-risk analysis or unduly burden patient access or the health care system.  21 U.S.C. § 355-1(f)(2); § 355-1(g)(4)(A); FDA Scholars Br. 11-13, ECF No. 308.  FDA often relies on FAERS data to loosen and release REMS as prescribers become more familiar with a drug's safety profile.  *See* GAO, GAO-18-292, *FDA: Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts* 10-11 (Mar. 2018), https://www.gao.gov/assets/gao-18-292.pdf; FDA Scholars Br. 15-16, ECF No. 308.

The 16 years of mandatory reporting showed that serious adverse events happen in less than one percent of cases.  Danco Br. 9-10.  The absence of adverse reports following the 2016 changes is consistent with this trend.  Plaintiffs strain to come up with alternate explanations for this relative dearth of data, speciously suggesting Danco underreports adverse events to FDA, Response Br. 29, or that the *lack* of reporting proves the need for more stringent requirements, *id.* at 56-57.  But Occam's Razor holds true:  The most likely explanation for the lack of adverse event reporting is that, consistent with decades of data, adverse events are simply not occurring at the rate Plaintiffs claim.

FDA's 2021 changes also relied on post-marketing safety data and studies addressing pharmacy dispensing or clinic dispensing by mail.  Danco Br. 47-48.  FDA reasonably concluded this combined evidence supported a conclusion that

mifepristone would remain safe and effective, and that "[r]emoving the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients," ROA.837.

\* \* \*

Congress entrusted FDA—not the courts—with the power and responsibility to make the consequential decision to approve drugs. In 2000, 2016, and 2021, FDA exercised that authority and made reasonable, reasonably explained, judgments based on abundant peer-reviewed data assessed by a wide range of scientific experts. That Plaintiffs (and the District Court) disagree with FDA's judgment does not make it unreasonable. Were that enough, chaos would ensue across the pharmaceutical industry.

### 2. *FDA's reliance on Subpart H is irrelevant today and was correct in 2000.*

Subpart H plays no role today in the use restrictions applicable to mifepristone. Danco Br. 49-50. Like the District Court, Plaintiffs ignore Congress's decision to supersede FDA's *regulatory* authority to impose use restrictions under Subpart H with the *statutory* REMS process. 253 Members of Congress Br. 11-12, ECF No. 351; Former FDA Officials Br. 13, ECF No. 307; Former FDA Commissioners Br. 8-9, ECF No. 311. And they ignore that FDA's 2011 approval of Danco's REMS application confirms that FDA would approve Mifeprex as safe and effective with a REMS, rendering Subpart H irrelevant.

31

In any case, FDA properly invoked Subpart H back in 2000. Plaintiffs downplay that FDA treated the terms "illness," "disease," and "condition" synonymously in promulgating Subpart H, New Drug, Antibiotic, and Biological Drug Product Regulations, 57 Fed. Reg. 58,942, 58,945 (Dec. 11, 1992), because that language appears in the Federal Register but not the codified rule, Response Br. 45. But "[i]f a prologue is indeed an appropriate guide to meaning"—and there is no reason to doubt that here—"it ought to be considered along with all other factors in determining *whether* the instrument is clear." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 218 (2012). FDA has consistently used illness, disease, and condition interchangeably. *See* FDA, *Guidance for Industry, Expedited Programs for Serious Conditions—Drugs and Biologics* 3 (May 2014), https://www.fda.gov/media/86377/download. Against this backdrop, FDA appropriately exercised its discretion to impose use restrictions through Subpart H in approving Mifeprex. 57 Fed. Reg. at 58,946; *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-18 (2019).

Nor was it arbitrary and capricious to find Mifeprex conferred a "meaningful therapeutic benefit … over existing treatments." 21 C.F.R. § 314.500. Plaintiffs fault FDA for not commissioning a study comparing medication abortion and surgical abortion head-to-head, but no such requirement exists. Even so, FDA *did* consider data from multiple clinical trials comparing the two and reasonably

32

concluded that medication abortion can have various benefits over surgical abortion, and that "it is up to the patient and her provider to decide whether a medical or surgical abortion is preferable and safer in her particular situation." ROA.639. That leaves Plaintiffs' baseless claim that "the avoidance of the existing treatment cannot itself be the benefit." Response Br. 46. Of course it can: That is the whole point of having multiple treatment options. *See* 57 Fed. Reg. at 58,947.

To the extent this Court disagrees, however, the proper merits remedy would be remand without vacatur. FDA's REMS authority allows it to impose elements "necessary to assure safe use" for any drug, regardless of whether it is used to treat an illness (or disease or condition) or whether it has a meaningful therapeutic benefit over existing treatment. *See* 21 U.S.C. § 355-1(f)(1). If the Court believes FDA's 2000 approval failed to meet the conditions of Subpart H in place at the time, it should allow FDA to explain whether, if given the chance today, it would instead approve Mifeprex with a REMS (as indeed it already has). *See, e.g.*, *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (remanding without vacatur to determine whether FDA approval was justifiable because vacatur would "prove disruptive" to sponsor, "which ha[d] relied on" drug approval "in good faith for over thirteen years").

33

    3.    *Plaintiffs' Comstock argument is unreviewable and wrong.*

Plaintiffs don't dispute that FDA's 2021 non-enforcement statement is moot twice over:  In early 2023, FDA permanently removed the in-person dispensing requirement (an action Plaintiffs never challenged), Danco Br. 54, and on May 11, 2023, the 2021 decision expired when the COVID-19 public health emergency ended, CDC, *End of the Federal COVID-19 Public Health Emergency (PHE) Declaration* (May 5, 2023), https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html; *see also* ROA.787-788.  Plaintiffs also forfeited any argument as to their failure to exhaust this claim before FDA by addressing it in only a single sentence (at 44).  *United States v. Green*, 508 F.3d 195, 203 (5th Cir. 2007).

Regardless, their challenge to the 2021 non-enforcement decision fails on the merits.  Plaintiffs say (at 58-60) that the Comstock Act forbade FDA from deciding in 2021 that mifepristone would remain safe and effective without an in-person dispensing requirement.  But FDA's actions speak only to what Congress authorizes FDA to do: assess whether mifepristone is safe and effective under specified conditions.  21 U.S.C. §§ 355(b)(1)(A)(i), (d); 355-1(c), (e)-(f).  The FDCA gives FDA no authority to deny a drug application or REMS modification based on Comstock or any other statute outside FDA's purview.

Plaintiffs' invocation of *FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293 (2003), proves their folly.  Response Br. 62-63.  The statute there

applied to actions *any* "governmental unit" took. A party asked the FCC (a "governmental unit") to comply with the statute, and the Court agreed the FCC was obliged to do so. *NextWave*, 537 U.S. at 300-301. Comstock is not directed at FDA, which regularly approves drugs subject to the concurrent jurisdiction of statutes and regulations administered by other agencies.

In any event, Plaintiffs misinterpret the Comstock Act's text. Read together, as they must be, *see* H.R. Rep. No. 71-7, at 160 (1929); *United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123, 130 n.7 (1973), the Comstock Act's separately codified provisions demonstrate that "abortion" means "unlawful abortion." Many parts of the law's original text and 1875 amendments applied only to "unlawful abortion." Act of Mar. 3, 1873, ch. 258, § 1, 17 Stat. 598, 598-599; Rev. Stat. § 2491 (1st ed. 1875), 18 Stat. pt. 1, at 460. One provision still employs the "unlawful" qualifier. 19 U.S.C. § 1305(a). Every court decision from the past century-plus (save the District Court) is in accord. *See* 18 U.S.C. § 1461 at Historical Notes (collecting cases); *GenBioPro, Inc. v. Sorsaia*, No. CV 3:23-0058, 2023 WL 3211847, at *7 (S.D.W. Va. May 2, 2023).

Courts have also consistently rebuffed private plaintiffs' attempts to invoke this law. *See, e.g.*, *Consumers Union of U.S. v. Walker*, 145 F.2d 33 (D.C. Cir. 1944); *Manual Enters., Inc. v. Day*, 370 U.S. 478, 509, 519 (1962) (Brennan, J., concurring). And even if the Comstock Act may be enforced by some private

plaintiff, the District Court defied decades of administrative law when it repurposed that statute to invalidate agency action where (1) Plaintiffs never asked FDA to consider the law, (2) that agency is not *allowed* to orient its decisionmaking around the law, (3) constitutional concerns precluded enforcing Plaintiff's version of the statute in 2021, and (4) the consensus judicial position is against Plaintiffs.  Danco Br. 54-56.

## II.    THE EQUITIES OVERWHELMINGLY FAVOR DEFENDANTS.

For 23 years, the status quo has been that mifepristone is approved as safe and effective for early pregnancy termination.  Plaintiffs acknowledged as much below, requesting a "mandatory injunction" because they said the "*existing status quo*" was irreparably injuring them.   ROA.1062 (emphasis added and quotation marks omitted).  The equities overwhelmingly favored denying that mandatory injunctive relief.

### A.    Danco Faces Certain, Significant Harm.

The District Court refused to acknowledge the serious, certain, unrecoverable harm Danco faces as a result of the preliminary injunction.  Danco Br. 56-57. Plaintiffs urge this Court to dismiss those harms out-of-hand because they say FDA's actions were unlawful.  Response Br. 64.  That argument "is entirely derivative of the merits"—the same error Plaintiffs accuse FDA of making.  *Id.*  It is also wrong on the law.  "The purpose of a preliminary injunction is to prevent irreparable injury

so as to preserve the court's ability to render a meaningful decision on the merits." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985). That is why "potential economic loss" that "threaten[s]" a party's very "existence" weighs against a preliminary injunction. *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989).

Plaintiffs assume Danco would not be harmed by enjoining only the 2016 and 2021 actions because it could simply revert to a years old label and outdated REMS with the stroke of a pen. Not so; for all the reasons set out in the declarations submitted by FDA and Danco on this very point following the stay panel's decision. *See* Danco Br. 57. Reverting to the 2011 REMS and labeling would require a new sNDA justifying reverting to the outdated dosing regimen—including on aspects of the 2016 changes that Plaintiffs never challenged, *see* FDA Br. 50-51; reducing the gestational limit to 49 days; and reinstating in-person dispensing and follow-ups, certified physicians dispensing, and additional mandatory reporting. And, based on the District Court's reasoning, FDA would be unable to approve these changes until Danco submits a single study of their combined effect. In the meantime, Danco would be unable to lawfully distribute its sole product.

### B. The Public Interest Weighs Against An Injunction.

The preliminary injunction will significantly harm women, the pharmaceutical industry, states and localities, and the healthcare system writ large.

Plaintiffs, like the District Court, "balance" the equities by leaving out the interests of the overwhelming majority of women for whom mifepristone is completely safe (over 99.9%) and effective (over 96%). Response Br. 66-67. Without lawful mifepristone, women will be forced to turn to less reliable forms of medication abortion; seek out time-consuming, costly, and more invasive surgical abortions; or carry unwanted and potentially dangerous pregnancies to term.

Plaintiffs' speculation (at 67) about "psychological pain" may project their own views, but it is a false narrative as to the public interest. *Contra, e.g.*, Reproductive Orgs. Br. 13, ECF No. 348 (American Psychological Association "has emphatically rejected the notion that [elective] abortion is associated with increased psychological problems"). There are real risks that an injunction would force on women who affirmatively want abortion care and will no longer be able to access mifepristone—including documented psychological risks that result from *denying* patients abortions. ACOG Br. 15-16, ECF No. 354; *see Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (cited at Response Br. 67) (*preventing* abortion clinic from opening would irreparably injure pregnant women seeking abortion care). The injunction will also significantly harm women who rely on mifepristone for miscarriage management, to reduce bleeding following certain pregnancy complications, and for maternal health purposes. *See, e.g.*, Reproductive

Orgs. Br. 23-24, ECF No. 348; ACOG Br. 25-26, ECF No. 354; Local Governments Br. 24-25, ECF No. 313.  As members of the public, these women matter too.

As numerous leading industry organizations and hundreds of companies and executives have made clear, the District Court's first-of-its-kind order will disrupt the pharmaceutical industry writ large.  Drug development is costly and time-consuming, averaging $2.6 billion per drug.  PhRMA Br. 23, ECF No. 312.  The ability to rely on FDA's "scientifically based and predictable regulatory process" to review and approve drugs according to its scientific judgment and the stability in drug approvals that comes from Congress's carefully calibrated scheme has allowed this industry to thrive.  *See id.* at 25-26.  Chaos will result "[i]f every FDA drug approval decision is subject to an appreciable risk of being upended by a court based on flawed assessments of studies, reliance on anecdotes, and judicially added requirements."  *Id.* at 26; *see* Pharmaceutical Companies Br. 3-4, 11-14, 31-33, ECF No. 309.  Plaintiffs cannot point to a single case doing anything like this; none exists.

Plaintiffs' federalism argument is misplaced.  This case is about FDA's safety and efficacy determination, full stop; FDA has not "imposed a mail-order elective-abortion policy on the country."  Response Br. 69.  The state-law landscape on this issue is also varied, as is to be expected after *Dobbs*.  Many states have imposed additional restrictions above-and-beyond what FDA requires in the REMS, mandating in-person examinations and ultrasounds, or allowing only physicians to

prescribe medication abortion—including Texas, Indiana, Tennessee, and Georgia, where the majority of declarants practice. Response Br. 69-70. Reversing the injunction here will not invalidate any of those states' laws. But it will protect many other states and localities that have made a different choice, instead legislating to prioritize telehealth and protect prescriber flexibility and medication abortion access. *See* State of New York et al. Br. 15-21, ECF No. 356; City of New York et al. Br. 26-27, ECF No. 349; Local Governments Br. 24-28, ECF No. 313. Their laws equally deserve the structural guarantees secured by "principles of federalism," which "counsel against awarding affirmative injunctive and declaratory relief that would require state officials to repeal an existing law and enact a new law proposed by plaintiffs." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 470 (5th Cir. 2020) (quotation marks and alteration omitted).

The order below will also harm the medical industry, including doctors, advanced practice clinicians, students, residents, and healthcare systems. In addition to preventing providers from exercising their medical judgment to offer a safe, effective standard of care to their patients, eliminating or restricting medication abortion access will exacerbate the already significant strains on healthcare professionals and systems nationwide, and particularly those in rural and underserved communities. *See* Local Governments Br. 24-26, ECF No. 313; City of New York et al. Br. 22, 26-27, 28-31, ECF No. 349; State of New York et al. Br.

40

26-27, ECF No. 356; Medical Students for Choice Br. 7-18, ECF No. 353.  Because many of these providers and systems also serve other patients, increasing wait times and reducing provider availability will make it more difficult for other patients to access many other critical services, like cancer screenings.  State of New York et al. Br. 30-31, ECF No. 356.  Pushing more patients to surgical abortions will also burden already tight budgets; one amicus estimates surgical abortions cost public health systems more than five times as much as medication abortions.  City of New York et al. Br. 22, ECF No. 349.  Plaintiffs say nothing about any of this.

Finally, the appropriate remedy here would be remand without vacatur.  As Plaintiffs' citation explains, a court retains "discretion" to order remand without vacatur depending "on the seriousness of the order's deficiency ... and the disruptive consequences of an interim change that may itself be changed." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (omission in original) (quotation omitted).[6]  Both factors point toward remand without vacatur here.  Never before has a judicial officer set aside an FDA drug approval after second-guessing the agency's safety determination.  And

---

[6] Plaintiffs truncate the full quote from the Government's filing in *Washington v. FDA*, which explained that "when a party prevails on its APA challenge, the proper remedy—even in the context of a preliminary injunction—is limited only to vacating the unlawful action, *not precluding future agency decisionmaking*."  Defs.' Resp. in Opp'n to Mot. for Prelim. Inj. at 32, *Washington v. FDA*, No. 1:23-cv-03026-TOR (E.D. Wash. Mar. 17, 2023), ECF No. 51 (emphasis added and quotation marks omitted).

because the agency can further explain its medical and scientific judgment, it can cure any such errors on remand. *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009). The significant harm and disruption that will result from the preliminary injunction makes judicial modesty all the more appropriate.

## C.     Plaintiffs Face No Irreparable Harm Absent An Injunction.

Plaintiff doctors do not prescribe mifepristone. They do not provide abortions. No specific doctor faces irreparable harm, because all Plaintiffs' claims of harm rest on cascading chains of speculation about potential future events.

Plaintiffs also significantly delayed bringing suit before seeking "emergency" relief. Because a preliminary injunction is designed to prevent *imminent* harm, *e.g.*, *Google, Inc. v. Hood, III*, 822 F.3d 212, 228 (5th Cir. 2016), even a few months' delay in seeking relief "militates against a finding of irreparable harm," *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). And although Plaintiffs say they needed time to "expeditiously gather evidence before filing suit," Response Br. 66, they do not identify one scrap of evidence that they needed *eleven months* from the second petition denial to gather. Indeed, it seems the real reason for their delay was that Plaintiffs needed time to incorporate the Alliance for Hippocratic Medicine in Amarillo, Texas.[7]

---

[7] *See Alliance for Hippocratic Medicine – Franchise Tax Details*, Tex. Comptroller (registration effective August 2022), *available at* https://mycpa.cpa.state.tx.us/coa/search.do (last visited May 12, 2023).

## CONCLUSION

For the foregoing reasons, and those in the opening brief, the Court should vacate the District Court's decision.

Respectfully submitted,

/s/ Jessica L. Ellsworth
JESSICA L. ELLSWORTH
CATHERINE E. STETSON
KAITLYN A. GOLDEN
DANIELLE DESAULNIERS STEMPEL
MARLAN GOLDEN
DELIA SCOVILLE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

PHILIP KATZ
LYNN W. MEHLER
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

EVA M. SCHIFINI
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067

*Counsel for Intervenor-Appellant*

43

## CERTIFICATE OF SERVICE

I hereby certify that, on May 12, 2023, I electronically filed the foregoing with the Clerk of Court by using the appellate CM/ECF system.  I further certify that the participants in the case are CM/ECF users and that service will be accomplished by using the appellate CM/ECF system.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

*Counsel for Intervenor-Appellant*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's Order of May 2, 2023, because it contains 9,461 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

*Counsel for Intervenor-Appellant*