No. 23-10362

---

In the

# United States Court of Appeals for the Fifth Circuit

_____

ALLIANCE FOR HIPPOCRATIC MEDICINE, et al.,
*Plaintiffs – Appellees*,

v.

FOOD & DRUG ADMINISTRATION et al.,
*Defendants – Appellants*,

v.

DANCO LABORATORIES, L.L.C,
*Intervenor – Appellant.*

_____

**Appeal from the United States District Court for the Northern District of
Texas, Amarillo Division, Case No. 2:22-CV-223-Z
The Honorable Matthew J. Kaczmaryk, Judge Presiding**

_____

**AMICUS CURIAE BRIEF OF STUDENTS FOR LIFE OF AMERICA IN
SUPPORT OF PLAINTIFFS-APPELLEES AND FOR AFFIRMANCE**

Submitted May 12, 2023

WARREN NORRED
*Local Counsel and Counsel of Record*
NORRED LAW, PLLC
515 East Border Street
Arlington, Texas 76010
(817) 704-3984
wnorred@norredlaw.com

ZACHARY KESTER
*General Counsel*
STUDENTS FOR LIFE OF AMERICA
1000 Winchester Street, Suite 301
Fredericksburg, VA  22401
(463) 229-0240
zkester@studentsforlife.org
*Counsel for Amicus Curiae
Not active Fifth Circuit Bar Member*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The case number here is No. 23-10362, *Alliance for Hippocratic Medicine, et al. v. U.S. Food and Drug Administration, et al*.

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the Certificate of Interested Persons filed by appellants, appellees, and the other amici–the following listed persons and entities as described in the fourth sentence of Rule 28.2. I have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

> Students for Life of America
>
> Warren V. Norred
>
> Zachary Kester

Students for Life is a 501(c)(3) charity which does not issue stock, has no parent corporation, in which no person or entity has an ownership interest of 10%.

Dated May 12, 2023

/s/Warren V. Norred
WARREN NORRED
*Local Counsel and Counsel of Record*
NORRED LAW, PLLC; 515 East Border Street
Arlington, Texas 76010
(817) 704-3984
wnorred@norredlaw.com

i

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .......................................... ii

TABLE OF AUTHORITIES ............................................................... iii

SUMMARY OF ARGUMENT .............................................................3

ARGUMENT ...................................................................................4

I.    THE FDA'S APPROVAL OF MIFEPRISTONE FAILED TO COMPLY
WITH THE ESA. ...............................................................................6

    *A.    The 2000 Approval of Mifepristone.* ......................................6
    *B.    The 2016, 2019, 2021, and 2023 Changes to the Mifepristone
Regimen and REMS were not in accordance with the ESA.* ........................7

II.    THE LEGALLY NECESSARY CONSULTATION WITH THE
SERVICES REGARDING THE IMPACT OF MIFEPRISTONE ON LISTED
ENDANGERED OR THREATENED SPECIES OR DESIGNATED CRITICAL
HABITATS. ......................................................................................7

III.    SECTION 7 REGULATIONS AND FURTHER CASE LAW ON ESA
CONSULTATIONS...........................................................................10

IV.    EXAMPLES OF ENDANGERED SPECIES POTENTIALLY AFFECTED
BY THE FDA'S IMPROPER APPROVAL OF MIFEPRISTONE. ......................16

CONCLUSION ...............................................................................21

CERTIFICATE OF COMPLIANCE ....................................................22

CERTIFICATE OF SERVICE ............................................................22

# TABLE OF AUTHORITIES

## CASES:

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
515 U.S. 687 (1995)……………...……………..……………………... 12

*Bennett v. Spear*,
520 U.S. 154 (1997)……………………...…………………………….…14

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009)………………………………………11, 14

*Ecological Rts. Found. v. Fed. Emergency Mgmt. Agency*,
384 F. Supp. 3d 1111 (N.D. Cal. 2019)………………………………...14

*Growth Energy v. Env't Prot. Agency*,
5 F.4th 1 (D.C. Cir. 2021) …………………………….…...................11

*Inst. for Fisheries Res. v. United States Food & Drug Admin.*,
499 F. Supp. 3d 657 (N.D. Cal. 2020)………………………….…...11

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012)………..…………………...........11, 12, 14

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007)…. ………………………………..……………..…..12

*Nat'l Wildlife Fed'n v. Coleman*,
529 F.2d 359 (5th Cir. 1976). …. ……..……………...……………..….. 8

*Pac. Rivers Council v. Thomas,*
30 F.3d 1050 (9th Cir.1994)……………………….…………….…13

*Sierra Club v. Glickman*,
2156 F. 3d 606 (5th Cir. 1998)……..……....…………………….…15

*Sierra Club v. US Fish and Wildlife Service*,
245 F. 3d 434 (5th Cir. 2001). …………..……………………..…14

*Sierra Club v. Yeutter*,
 926 F. 2d 429 (5th Cir. 1991). …………………………..……………….……5

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
 992 F.3d 1071 (D.C. Cir. 2021)…................................................................15

*Tenn. Valley Auth. v. Hill*,
 437 U.S. 173 (1978)………………………….…………..…..................5, 12

## STATUTES AND REGULATIONS:

16 U.S.C.
 § 1531 *et seq.*  .........................................................................................4
 § 1532(19)..................................................................................................11
 § 1536.........................................................................................................7
 § 1536(a)(2)...............................................................................................11
 § 1536(c)....................................................................................................15
50 C.F.R.
 § 402.02....................................................................................................10
 § 402.03....................................................................................................12
 § 402.10....................................................................................................15
 § 402.11....................................................................................................15
 § 402.12....................................................................................................15
 § 402.13....................................................................................................15
 § 402.14(a) ........................................................................................ 11, 15
 § 402.14(b)(1) ...........................................................................................15

## OTHER AUTHORITIES:

*Interagency Cooperation—Endangered Species of 1973, as Amended*, 51 Fed. Reg.
 19,926 (June 3, 1986)……………………………………………………..11

Joel Millman*,* "Fish Boom Makes Splash in Oregon: Population Surge Comes
 Despite Forecasts of Decline; Salmon at the Food Bank," *Wall Street
 Journal,* (January 21, 2010), available at https://www.wsj.com/articles/
 SB10001424052748703657604575005562712284770…………………. 20

U.S. Fish & Wildlife Service, *California Condor Recovery Program*
 https://www.fws.gov/program/california-condor-recovery...……………..19

U.S. Fish & Wildlife Service, Environmental Conservation Online System
(ECOS): *Conserving the Nature of America*, Listed Animals 1493 Records
  https://ecos.fws.gov/ecp0/reports/ad-hoc-speciesreport?
  kingdom=V&kingdom=I&status=E&status=T&status=EmE&status=EmT&
  status=EXPE&status=EXPN&status=SAE&status=SAT&mapstatus=3&fcri
  thab=on&fstatus=on&fspecrule=on&finvpop=on&fgroup=on&header=Liste
  d+Animals.....………………………………………………….………16

*1996 Environmental Assessment and/or FONSI*,
  Application Number 20-687 page 1 of Cover Letter……………………….6

## STATEMENT OF INTEREST

*Amicus curiae* Students for Life of America ("SFLA") is the nation's largest pro-life youth organization that uniquely represents the generation most targeted for abortion. SFLA, a 501(c)(3) charity, exists to recruit, train, and mobilize the Pro-Life Generation to abolish abortion and provide policy, legal, and community support for women and their children, born and preborn. Founded in 1977 as a student-run organization and headquartered in Fredericksburg, VA, SFLA has more than 1,400 student groups with thousands of members on middle school, high school, college, university, and law school campuses in all 50 states, with nearly 100 groups in Texas alone. Today, SFLA is a full-time operation with a nation-wide network of staff, volunteers, and more than 150,000 pro-life SFLA-trained advocates.

SFLA and its members are uniquely harmed as the generation most targeted for abortion. A legal prejudice in favor of abortion prevents women from having access to all the information about how abortion harms women and preborn children and what services and support can be made available to them. SFLA thus works to overcome the bias in favor of abortion in critical social institutions, including the courts. As an organization made up primarily of women, many who are working mothers, the mission to build up each generation of women to succeed at home and at work is undermined by misogynist presuppositions—including statements in court findings—that abortion contributes to women's prosperity.

1

SFLA and its members desire to protect the environment from Mifepristone and its active metabolites, and its members nationwide have a vested interest in protecting the environment from pollution, protecting endangered species and habitats from destruction, and preserving these species and habitats for future generations to see and experience. SFLA seeks to prevent the dumping of Mifepristone into the waterways of the United States and the inevitable harm that has and will continue to result to endangered species. The approval of Mifepristone in 2000 and the alteration of the Risk Evaluation and Mitigation Strategies in 2016, 2019, 2021, and 2023 were all done inappropriately and in contravention of the Endangered Species Act's mandate under §7 that all action agencies must first consult with the United States Fish and Wildlife Service and National Marine Fisheries Service to determine the effects that the usage of this drug has had on listed endangered or threatened species or designated critical habitats.

## SUMMARY OF ARGUMENT

The Food and Drug Administration failed to consider the impact Mifepristone could have on the environment, specifically on endangered species or listed habitats, when approving Mifepristone in 2000, its generic form in 2019, and when making the changes to the Mifepristone Risk Evaluation and Mitigation Strategy ("REMS") in 2016, 2021, and 2023.

The Endangered Species Act requires federal agencies to follow certain restrictions when undertaking "actions" that may harm listed species or habitats. This process has been thoroughly litigated and set out since 1973 and no federal agency is exempt from its provisions. Despite this, the Food and Drug Administration did not conduct the proper statutorily required consultation with the United States Fish and Wildlife Service and National Marine Fisheries Service as it relates to Mifepristone on at least five occasions.

Amicus offer information to assist this Court in fully reckoning with the legal and public policy implications of its decision and the district court's ruling below. For all these reasons, this Court should uphold the district court's order staying the FDA's unlawful approval of Mifepristone regimen as an abortifacient in both its name-brand and generic form and to grant all of the Plaintiff-Appellees' other prayers for relief.

**ARGUMENT**

Under Section 7 of the Endangered Species Act of 1973 (16 U.S.C. § 1531 *et seq.*) (hereinafter, "ESA") the Commissioner of the Food and Drug Administration ("FDA") must revoke (1) the 2000 approval of the Population Council's new drug application for Mifepristone (Mifeprex® or RU-486); (2) the 2019 approval of GenBioPro, Inc.'s generic 200mg Mifepristone tablet (collectively, "Mifepristone"); (3) the 2016 changes to the Mifepristone regimen and associated REMS; (4) the 2021 changes to the Mifepristone REMS; and (5) the 2023 changes to the Mifepristone REMS in light of the FDA's failure to comply with the requirements of the ESA when taking these actions.

The FDA must be barred from approving Mifepristone or modifying the associated regimen (including the REMS) until after conducting the required consultation with the United States Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (collectively, "Services") as required by the ESA. Before allowing Mifepristone for human consumption, use outside of a medical setting, and disposal into the environment, the FDA must first consult with the Services to determine the extent and effects that such actions may have on listed endangered or threatened species or designated critical habitats in the FDA's action area (i.e., the United States and its territories). Without the required consultation, the FDA should not take action such as approval of a drug or updates to a drug's REMS.

The FDA has a legal obligation to comply with the ESA. The consultation requirement reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). The FDA's actions on Mifepristone have failed to meet the requirements of the ESA and, therefore, must be revoked until the agency can implement measures to ensure that its actions do not adversely affect listed endangered or threatened species or designated critical habitats. Failure to do so could lead to the extinction of these species. The district court, and now the Fifth Circuit, has the authority to order a federal agency to comply with the ESA.

> Clearly, the district court has the authority to enjoin an agency from violating section 7 of the ESA. 16 U.S.C. § 1540(g)(1)(A). As part of that authority, the court may enjoin the agency from continuing activity that has resulted in past violations and, to the extent necessary, may dictate temporarily the actions the agency must take with regard to that activity until the party has submitted to the court an acceptable plan of its own. *See, e.g., Coleman,* 529 F.2d at 375. Once an agency submits a plan that has been agreed to through the section 7 consultation process, the court then, applying the arbitrary and capricious standard of review, must approve or disapprove it. If the latter, the court should send the consulting parties back to the drawing board to compose a plan that, when given the benefit of the arbitrary and capricious standard of review, provides reasonable assurance against continuation of the section 7 violations.

*Sierra Club v. Yeutter*, 926 F. 2d 429, 439-440 (5th Cir. 1991). Thus, the Fifth Circuit should uphold the district court's order staying the FDA's unlawful approval of Mifepristone regimen as an abortifacient in both its name-brand and generic form until the FDA conducts the proper consultation with the Services.

5

I.    **The FDA's Approval of Mifepristone Failed to Comply with the ESA.**

      **A. The 2000 Approval of Mifepristone.**

When the FDA approved Mifepristone in 2000 for chemical abortions, the FDA did not consult the Services to determine the effects of Mifepristone on listed endangered or threatened species. The FDA merely relied on a conclusory environmental assessment inadequately performed by the Population Council.

In a document entitled, "ENVIRONMENTAL ASSESSMENT AND FINDING OF NOT SIGNIFICANT IMPACT FOR NDA 20-687 MIFEPRISTONE TABLETS," the FDA stated without support that "[a]dverse effects are not anticipated upon endangered or threatened species." This conclusion runs afoul of the requirements of the ESA and adopted numerous incorrect assumptions about how Mifepristone could enter the environment. Indeed, the FDA did not conduct an environmental study regarding the potential impact Mifepristone could have on the nation's wastewater. The FDA reviewed only the impact that packaging, production waste, and pharmaceutical waste would have on the environment, failing to examine the impact the excretion of Mifepristone itself would have on the environment.[1] Further, the assessment underestimated the number of chemical abortions due to Mifepristone, which are today the most popular form of abortion.

---

[1] 1996 Environmental Assessment and/or FONSI App. Number 20-687 page 1 of Cover Letter. This assessment is available online (accessed May 12, 2023) at: https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_EA.pdf.

**B. The 2016, 2019, 2021, and 2023 Changes to the Mifepristone Regimen and REMS were not in accordance with the ESA.**

When the FDA made significant changes to the Mifepristone regimen and REMS in 2016, 2019, 2021, and 2023, the agency simply failed to conduct any ESA consultation or environmental assessment. This failure clearly violated the ESA and must be corrected immediately—especially in light of the FDA's removal of the in-person dispensing requirement, which opened the floodgates to do-it-yourself home abortions, followed by disposal of Mifepristone into our nation's water supply.

**II.  The Legally Necessary Consultation with the Services Regarding the Impact of Mifepristone on Listed Endangered or Threatened Species or Designated Critical Habitats.**

The purpose of the ESA is to provide a means to conserve the ecosystems upon which endangered and threatened species depend and provide a program for the conservation of such species. Section 7 of the ESA, codified at 16 U.S.C. § 1536 ("Section 7"), directs all federal agencies to participate in conserving these species. Specifically, Section 7(a)(1) of the ESA charges federal agencies to aid in the conservation of listed species, and Section 7(a)(2) requires all federal agencies to cooperate and consult with the Services to aid in the conservation of listed species and ensure that their activities are not likely to jeopardize the continued existence of federally listed species or destroy or adversely modify designed critical habitats. The Fifth Circuit, in an early case handling Section 7 of the ESA, explained:

Section 7 of the Endangered Species Act of 1973 imposes on Federal agencies the duty to 'insure that actions authorized, funded, or carried out' by them do not jeopardize the continued existence of any endangered species or result in the destruction or modification of habitat of such species which the Secretary of Interior determines to be critical. Hence, s[ection] 7 imposes on federal agencies the mandatory duty to insure that their actions will not either (i) jeopardize the existence of an endangered species, or (ii) destroy or modify critical habitat of an endangered species.

*Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 371 (5th Cir. 1976). Thus, the Fifth Circuit has affirmed the obligation of federal agencies under Section 7 of the ESA.

First, in order to ensure compliance with the ESA, before taking action such as approving a drug or medication, a federal agency such as the FDA must first define the action area and submit a proposed list of impacted species or request from the Services a list of impacted species. The purpose is to encompass all listed species that may be impacted by the proposed agency action. The species list must include all listed and proposed species and designated critical habitats that may be present in the action area. The action area must not neglect indirect effects, such as stormwater run-off, or the effect felt in wastewater or wastewater effluent and the route it takes to public waterways. Since there are no geographical limitations to the FDA's approval of Mifepristone, the relevant action area is the entire United States and its territories.

Second, the FDA must determine whether the proposed action *may affect* a Section 7 resource, or a species on the aforementioned list. This is done through

assessments of the direct or indirect effects mentioned previously.[2] Every listed species or habitat must be analyzed through this lens. As discussed below, the "may affect" designation is a low bar. The "no effect" determination applies only in very limited circumstances, such as when the species ranges and critical habitat do not overlap with the action area. Given the nationwide action area and known potential effects of Mifepristone, a "no effect" determination cannot apply to the FDA's actions on Mifepristone.

Third, if the proposed action *may affect* a Section 7 resource, the FDA must enter "information consultation" with the Services to analyze the aforementioned potential direct and indirect, adverse, and beneficial effects of the action on the Section 7 resources that may be affected. The ESA requires clear documentation (i.e., a Biological Assessment or Biological Evaluation) that there is a determination being made, regardless of the effect itself. For any determination that the action is not likely to adversely affect any Section 7 resources, the agency must obtain from the Services an express concurrence in writing.

Finally, in instances where an adverse effect is *likely*, the ESA requires a "formal consultation" between the FDA and the Services wherein the FDA would submit further documentation to the Services and provide a full Biological Opinion

---

[2] Direct effects are those that are caused by the action, while indirect effects are those that are caused by the action and are later in time, but still are reasonably certain to occur.

on the impact, in this case of Mifepristone, would have on any listed species or habitats. Beyond this, the FDA would be required to show Mifepristone would not jeopardize, destroy, or adversely affect listed species or habitats, and if it does, then either seek an exemption or provide for reasonable and prudent alternatives.

## III.    Section 7 Regulations and Further Case Law on ESA Consultations.

Section 7 consultation requirements apply to federal agency actions, including actions on federal land and actions on private land with a federal nexus. The Services' joint regulations[3] on Section 7 consultations define an agency action as all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

(a) actions intended to conserve listed species or their habitat;
(b) **the promulgation of regulations**;
(c) **the granting of licenses**, contracts, leases, easements, rights-of-way, **permits**, or grants-in-aid; or
(d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02. This regulation defines an "action" as anything that "includes any activity authorized, funded, or carried out by a federal agency, including permits and licenses." Federal courts in other Circuits have interpreted an agency action requiring consultation in the context of the ESA to be a low threshold, lower than that of other Federal environmental protection statutes, including the National

---

[3] 50 C.F.R. § 402 *et seq.*

Environmental Policy Act (NEPA):

> It is instructive to compare the requirements under the ESA to those under NEPA. Whereas NEPA asks the agency to identify and prepare an environmental impact report for "significant" impacts on any aspect of the environment, the ESA requirements are triggered by a lower threshold, but for a narrower set of impacts. The agency must identify *any* potential effect, however small, on listed species and consult with the relevant agencies about the proposed action. *See Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1027 (9th Cir. 2012).

*Inst. for Fisheries Res. v. United States Food & Drug Admin.*, 499 F. Supp. 3d 657, 668 (N.D. Cal. 2020). Similarly, the D.C. Circuit found in 2021 that:

> Implementing regulations promulgated pursuant to the Endangered Species Act require an agency to "determine whether any action **may affect** listed species or critical habitat," and, if so, to **consult with the Services**. 50 C.F.R. § 402.14(a); *see* 16 U.S.C. § 1536(a)(2). Only if an agency determines that its action will have no effect on listed species or critical habitat can it dispense with consultation. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009). "May affect" purposefully sets a low bar: **"Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement."** *Interagency Cooperation— Endangered Species of 1973, as Amended*, 51 Fed. Reg. 19,926, 19,949 (June 3, 1986). "Thus, actions that have any chance of affecting listed species or critical habitat — even if it is later determined that the actions are 'not likely' to do so — require at least some consultation under the ESA." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012).

*Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 30 (D.C. Cir. 2021) (emphasis added). The ESA defines "take" to include a wide range of actions, such as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect an endangered wildlife species, or any attempt to engage in such conduct. 16 U.S.C. § 1532(19).

Likewise, the United States Supreme Court has stated that "take" must be interpreted in the broadest possible way, as "Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 (1995).

Thus, every conceivable way that an agency may harm a listed species can constitute a take for the purposes of the Act. Thus, an agency's action proceeding without guidance from the Services puts that agency at great risk for the substantial civil or criminal liabilities enumerated in the Act in the event the agency action harms an endangered species or listed habitat. *See Babbitt* at 697 n.9. In the above referenced *Karuk* case, the Ninth Circuit in explaining that the definition of agency "action" can cover a variety of activities found that:

> [t]here is "little doubt" that Congress intended agency action to have a broad definition in the ESA, and we have followed the Supreme Court's lead by interpreting its plain meaning "in conformance with Congress's clear intent." *Pac. Rivers Council v. Thomas,* 30 F.3d 1050, 1054–55 (9th Cir.1994) (citing *Tenn. Valley Auth.,* 437 U.S. at 173, 98 S.Ct. 2279).

> The ESA implementing regulations limit Section 7's application to "'actions in which there is discretionary Federal involvement or control.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 666, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (quoting 50 C.F.R. § 402.03). The Supreme Court explained that this limitation harmonizes the ESA consultation requirement with other statutory mandates that leave an agency no discretion to consider the protection of listed species. *Home Builders,* 551 U.S. at 665–66, 127 S.Ct. 2518.

*Karuk* at 1020–21 (9th Cir. 2012). It is clear that many courts have established that under the ESA, "agency action" is both a low bar that an agency will very likely

cross but also a broad one that encompasses many activities. "Any possible effect" triggers the FDA's duty to consult with the Services; and there is no doubt that Mifepristone has "any possible effect" on an endangered species.

Federal courts define the requirements of Section 7 as a two-fold burden. The first is a procedural burden: the agency seeking to take an action, known hereinafter as "Action Agency," is to engage in consultation with the Services as the experts in the field, and the second is a more substantive requirement: to ensure that the proposed action will not jeopardize a listed species or its critical habitat.

At the onset, the Action Agency and Services engage in "informal consultation." Informal consultation is a wide-ranging term, and generally covers the conversations, correspondence, and discussions between the Services and Action Agency at the early stages to see whether or not the next step is necessary – formal consultation, as oftentimes the two parties can determine then and there that there will be no impact on a listed species or habitat.

In the event the proposed action requires "formal" consultation, the first step in this process is to form a "biological assessment" followed by a biological opinion from the Services. This opinion summarizes the information needed to show the potential impact the agency action might have. Only at this point, if the action will not jeopardize an endangered species or habitat, may the Action Agency proceed. If there is a chance of endangerment, the Services will provide "reasonable and

prudent" alternatives, and the Action Agency is encouraged to adopt those alternatives, or risk civil and criminal penalties for failing to comply with the ESA. *See Bennett v. Spear*, 520 U.S. 154, 170 (1997).

The purpose of Section 7's consultation provision is to determine if any agency may adversely affect an endangered species or habitat. By failing to conduct even an informal consultation, the FDA did not ensure that the approval of Mifepristone would not harm potential listed species.

> The purpose of the consultations is to "draw on the expertise of 'wildlife agencies to determine whether [an] action is likely to jeopardize a listed species' or its habitat, and 'to identify reasonable and prudent alternatives' to avoid those harmful impacts." *Ctr. for Biological Diversity*, 847 F.3d at 1075 (quoting *Karuk Tribe*, 681 F.3d at 1020). NMFS provides consultation on actions involving marine and anadromous species and habitats, and FWS for all other species and habitats.

*Ecological Rts. Found. v. Fed. Emergency Mgmt. Agency*, 384 F. Supp. 3d 1111, 1115 (N.D. Cal. 2019). Similarly, this Court has found previously that

> regardless of whether critical habitat is designated, an agency must consult with the Secretary where an action will 'jeopardize the continued existence' of a species. If critical habitat has been designated, the statute imposes an additional consultation requirement where an action will result in the 'destruction or adverse modification' of critical habitat.

*Sierra Club v. US Fish and Wildlife Service*, 245 F. 3d 434, 439 (5th Cir. 2001). The ESA thus requires federal agencies to "draw on the expertise" of the Services when a proposed action may harm an endangered species, doubly so when it may also harm a critical habitat. This did not occur in the FDA's handling of Mifepristone.

The ESA is clear that some amount of consultation is required. This Court previously found in *Glickman* that

> § 7(a)(1) contains a clear statutory directive (it uses the word "shall") requiring the federal agencies to consult and develop programs for the conservation of each of the endangered and threatened species listed pursuant to the statute. That Congress has passed a statute that is exceptionally broad in its effect, in the sense that it imposes a tremendous burden on the federal agencies to comply with its mandate, however, does not mean that it is written in such broad terms that in a given case there is no law to apply. On the contrary, given the specific requirements of § 7(a)(1), in any given case there is more than enough law against which a court can measure agency compliance.

*Sierra Club v. Glickman*, 156 F. 3d 606, 618 (5th Cir. 1998). Certainly, in not every case will formal consultation be required, but to not even perform informal consultation is a clear violation of the ESA. When the consultation process does not proceed to the formal stage, if as in the case of *Shafer*, is only when the Action Agency and the wildlife agency agree it is not necessary:

> While the consultation process can take a variety of forms, the Action Agency often performs a preliminary review to determine whether the proposed action could affect any listed species. *See* 50 C.F.R. § 402.14(a); *see also* 16 U.S.C. § 1536(c); 50 C.F.R. §§ 402.10–402.13. If the Action Agency determines—and the wildlife agency concurs—that no listed species or critical habitats are likely to be adversely affected, then no formal consultation is required. 50 C.F.R. § 402.14(b)(1). But if either the Action Agency or the wildlife agency concludes that the proposed action "may affect" a listed species or its critical habitat, then a formal consultation begins. *Id.* § 402.14(a).

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1079 (D.C. Cir. 2021). The case law is clear that not every time there is an agency action

will there be even a formal consultation, but in failing to even begin the *informal* process, the FDA failed to comply with a Congressional mandate placed upon all federal agencies and expanded on by federal courts.

Federal courts have interpreted the triggering of ESA's Section 7 protections to be a low bar, lower than similar federal statutory constructs, but the Act's mandate to protect endangered species and threatened habitats does require action agencies that propose new actions to consult with the relevant Service. In approving Mifepristone, the FDA bypassed this requirement on at least five occasions. Amicus requests that the FDA comply with the ESA and conduct the appropriate consultation with the Services.

## IV.    Examples of Endangered Species Potentially Affected by the FDA's Improper Approval of Mifepristone.

The current list of endangered species recognized by the Services contains nearly 1,500 different species and can be found on the Fish and Wildlife Service's website.[4] Multiple endangered species may be affected by the approval of Mifepristone, but the extent is unknown due to the FDA's failure to consult as

---

[4] U.S. Fish & Wildlife Service Environmental Conservation Online System (ECOS) *Conserving the Nature of America* Listed Animals 1493 Records, available at https://ecos.fws.gov/ecp0/reports/ad-hoc-species-report?kingdom=V&kingdom=I&status=E&status=T&status=EmE&status=EmT&status=EXPE&status=EXPN&status=SAE&status=SAT&mapstatus=3&fcrithab=on&fstatus=on&fspecrule=on&finvpop=on&fgroup=on&header=Listed+Animals.

required by Section 7 of the ESA. By way of some specific examples, *Canis rufus*[5] (more commonly known as the red wolf) is a canine native to the Southeastern United States, intermediate in size between the grey wolf and coyote. Originally listed in 1967 under the Endangered Species Preservation Act of 1966 (the predecessor act to the ESA) the red wolf is critically endangered with fewer than 50 currently in the wild, and around 200 in captivity. The red wolf is gradually being reintroduced into the Southeastern United States, and often inhabits wetlands, forest, and some agricultural lands. The red wolf is at one of the more sensitive stages of reintroduction into these ecosystems.

Similarly, *Lepidochelys kempii*[6], or Kemp's ridley sea turtle, listed since 1970, is the world's rarest and most endangered species of sea turtle, finds its range along

---

[5] *Canis rufus*



[6] *Lepidochelys kempii*



the Gulf Coast region of the Southeastern United States, and often employs the coasts of Texas as a primary nesting range. The Kemp's ridley sea turtle numbers fewer than 10,000 and faces critical habitat loss from human impact on the Gulf of Mexico. *Percina pantherine*[7], or leopard darter, is a freshwater fish originally found throughout Oklahoma and Arkansas, and listed as an endangered species since 1978. The leopard darter's habitat throughout these states is often connected to outflows from sewage processing plants and other human elements that can cause disruption.

*Gymnogyps californianus*[8], the California condor, is another listed species within the United States that has a long history of conservation having being listed

---

[7] *Percina pantherine*



[8] *Gymnogyps californianus*



since 1967 (similar to the red wolf above). According to the Fish and Wildlife Service, over $35 million has been spent on California condor conversation efforts, making it one of the most expensive conservation projects in American history.[9] With fewer than 600 living in captivity and the wild, the condor remains one of the world's rarest bird species. Originally inhabiting locations across North America, including Texas, they can only be found in small portions of Southern California. California condor feed off of a variety of carrion across their habitat in Southern California, and will consume nearly any non-bird carcass they come across, including aquatic creatures.

*Grus americana*[10], the Whooping crane, inhabits portions of Texas and Louisiana as well as other parts of the central United States while on migration. Its status as a member of the endangered species list is owed to 20th Century over-hunting and destruction of their habitats by human actions. There are fewer than

---

[9] U.S. Fish & Wildlife Service *California Condor Recovery Program*, available at https://www.fws.gov/program/california-condor-recovery.

[10] *Grus americana*



1,000 members living both in the wild and captivity; they forage in shallow waters and fields and generally inhabit marshes throughout the Gulf Coast region of Texas. Finally, *Oncorhynchus nerka*[11], the sockeye salmon, is one of the most popular salmon used for food, and is a listed species in locations within the United States. Compared to soho salmon, steelhead trout, and Chinook salmon, populations of sockeye in the Pacific Northwest are not experiencing a resurgence in population.[12] In fact, populations in Idaho and Oregon have become completely extinct. In recent years populations across North America have come under their spawning estimates and are at 50-year lows in some places. Sockeye inhabit many fresh and saltwater locations across the Pacific Northwest and Alaska and are heavily impacted by human activity in those waters.

All of these listed species depend on a variety of ecosystems within the United States that are often impacted by human activity. Amicus SFLA and its members are concerned that the failure of the FDA to conduct consultation with the Services has

---

[11] *Oncorhynchus nerka*



[12] *Joel Millman*, "Fish Boom Makes Splash in Oregon: Population Surge Comes Despite Forecasts of Decline; Salmon at the Food Bank," *Wall Street Journal*, (January 21, 2010), available at https://www.wsj.com/articles/SB10001424052748703657604575005562712284770.

led to irreparable harm to many listed species and habitats and will likely lead to the destruction of some of these species. When federal agencies propose actions that could impact these ecosystems, they are required to consult with the Services to determine if these actions will harm these three species, among the list of nearly 1,500 individual species. FDA did not do this when approving Mifepristone in 2000, nor when loosening the regimen in 2016, 2019, 2021, and 2023.

## CONCLUSION

For the foregoing reasons, we urge the Court to uphold the district court's order staying the FDA's unlawful approval of the Mifepristone/misoprostol regimen as an abortifacient in both its name-brand and generic forms and to grant all of the Plaintiff – Appellees' other prayers for relief.

Respectfully submitted,

/s/Warren V. Norred
WARREN NORRED
*Local Counsel and Counsel of Record*
NORRED LAW, PLLC
515 East Border Street
Arlington, Texas 76010
(817) 704-3984
wnorred@norredlaw.com

/s/ *Zachary Kester*
ZACHARY KESTER
*General Counsel*
STUDENTS FOR LIFE OF AMERICA
1000 Winchester Street, Suite 301
Fredericksburg, VA 22401
(463) 229-0240
zkester@studentsforlife.org
*Counsel for Amicus Curaie*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fifth Circuit R. 32 because this brief contains 4,918 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes produced by Microsoft Word software.

*/s/ Warren Norred*
WARREN NORRED

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, an electronic copy of the foregoing brief was filed with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record.

*/s/ Warren Norred*
WARREN NORRED